# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-10617 (KJC) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Pending) |
|  | ) |  |

## DECLARATION OF WILLIAM G. HARVEY
## IN SUPPORT OF CHAPTER 11 PETITIONS AND
## VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

**WILLIAM G. HARVEY**, being duly sworn, deposes and states:

1.      I am the Senior Vice-President and Chief Financial Officer of

AbitibiBowater Inc. ("AbitibiBowater" and with its subsidiaries and affiliates, the "Company").

I have served in that capacity since November 2007.  I have served in various executive

capacities for Bowater Inc. for over ten years, including most recently as Executive Vice-

President and Chief Financial Officer (from 2006 to 2007); previously, as Senior Vice-President,

Chief Financial Officer and Treasurer (from 2005 to 2006); and prior to that as Vice-President

and Treasurer (1998 to 2005).

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal or Canadian tax
identification number, are:  AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (6050),
AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (3225), Abitibi-Consolidated Alabama
Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi
Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC
(0999), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation
(8810), Bowater Canadian Forest Products Inc. (2010), Bowater Canadian Holdings Incorporated (6828),
Bowater Canadian Limited (7373), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886),
Bowater Incorporated (1803), Bowater LaHave Corporation (5722), Bowater Maritimes Inc. (5684), Bowater
Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0186), Bowater Nuway Inc. (8073),
Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater
Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702),
Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913).  The Debtors'
corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street,
Suite 800, Montreal, Quebec H3B 5H2, Canada.

2.     On April 16, 2009 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

Certain of the Debtors (the "Canadian Debtors")[2] and non-debtor subsidiaries of AbitibiBowater

(the "CCAA Debtors")[3] are currently under court protection in Canada and will make further

application for protection from their creditors under Canada's *Companies' Creditors*

*Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court,

Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court" and

the filing, the "Canadian Proceeding").  Two of the CCAA Debtors -- Abitibi-Consolidated Inc.

("ACI") and Abitibi-Consolidated Company of Canada ("ACCC") (together, the "Chapter 15

Debtors") -- will also file petitions for recognition under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Cases") in this Court seeking emergency provisional relief in support of the

Canadian Proceeding.  In addition, AbitibiBowater will file for ancillary relief in Canada seeking

provisional relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of

chapter 15, section 18.6 of the CCAA.

3.     The Company's ability to reorganize depends on the comprehensive

reorganization of its businesses in Canada and the United States.  The Debtors and the CCAA

---

[2]   The Canadian Debtors are:  Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[3]   The CCAA Debtors are:  Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231378 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

Debtors' interests are united in their integrated, co-dependent business relationship. The Debtors and the CCAA Debtors (including the Chapter 15 Debtors) have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

4.   Exhibit A attached hereto identifies those Debtors which are United States companies and who have not filed for CCAA relief (the "U.S. Debtors"), the Canadian Debtors, the CCAA Debtors and the Chapter 15 Debtors.

5.   I am advised by counsel that the initial order the Debtors will try to obtain in the Canadian Proceeding will, among other things: (a) impose an initial stay of all proceedings against the Canadian Debtors and their property in Canada; (b) appoint Ernst & Young Inc. as Monitor (the "Monitor") in the Canadian Proceeding; (c) authorize the Canadian Debtors and the CCAA Debtors to remain in possession and control of their assets, business and operations; (d) authorize the Canadian Debtors and the CCAA Debtors to continue utilizing their existing bank accounts and cash management system; (e) authorize the Canadian Debtors to incur postpetition indebtedness in an amount up to $600 million on terms described in part VIII of this affidavit; and (f) authorize and direct the coordination of the Canadian Proceeding with the Chapter 11 Cases and the Chapter 15 Cases to the greatest extent possible.

6.   The Debtors intend to operate their business and to manage their properties as debtors-in-possession under section 1107(a) and 1108 of the Bankruptcy Code. In that regard, the Debtors anticipate that numerous notices, applications, motions and other filings in these Chapter 11 Cases will affect more than one of the Debtors. Moreover, as described more fully below, the Debtors' financial affairs and operations are highly integrated. Accordingly, joint administration of these cases for procedural purposes will reduce fees and

costs, avoid needless duplicative filings, and will enable a more efficient and economical administration of the Chapter 11 Cases.

7.      I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      To minimize any adverse effects that filing for bankruptcy protection may have on their business, the Debtors have requested various types of "first day" relief (collectively, the "First Day Motions"). A list of First Day Motions is attached as Exhibit B. The First Day Motions seek to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtors' operations and balance sheet; (c) best serves the Debtors' estates and creditors' interests; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

9.      I submit this declaration ("Declaration") in support of the First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Company's management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

## I.  Overview

10.  AbitibiBowater is incorporated in Delaware and headquartered in Montreal, Quebec.  The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers in the world.  It produces an extensive range of commercial printing papers, market pulp, and wood products, serving customers in over 90 countries.  The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party certified 100% of its managed woodlands to sustainable forest management standards.  As of December 31, 2008, it owned or operated 24 pulp and paper facilities and 30 wood products facilities located in the United States, Canada, the United Kingdom and South Korea, as well as recycling and power generation facilities.  Employing around 15,900 people, the Company realized sales of approximately $6.8 billion[4] in 2008.  Its total assets were $8.1 billion as of December 31, 2008.

11.  The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold.  These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels.  Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories, and fluctuations in currency exchange rates.  The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product.  In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage, and continued expansion of the Internet, have exacerbated downward pressure on revenue.  At the same time, the global

---

[4]  All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels, a restriction of available credit under the Debtors' prepetition secured bank facility caused by recent adverse covenant amendments (described further in section VI below) and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated CCAA filings.

## II.    Corporate Structure

### A.    History

12.    AbitibiBowater was created by the merger of two North American leaders in the forest and wood products industry, Bowater Inc. ("Bowater") and Abitibi-Consolidated Inc. ("ACI"). Specifically, on October 29, 2007, pursuant to that certain Combination Agreement and Plan of Merger dated as of January 29, 2007, Abitibi and Bowater combined (the "Merger") in an all-stock merger of equals to create AbitibiBowater Inc. The Merger was effected under Delaware law and plan of arrangement pursuant to section 192 of the *Canada Business Corporations Act*.

13.    Since the combination, ACI and its direct and indirect subsidiaries, together with its former subsidiary, Donohue Corp. and its subsidiaries (the "Abitibi Group"), and Bowater and their direct and indirect subsidiaries (the "Bowater Group") have retained distinct identities within the corporate enterprise for cash flow and finance purposes. Both groups maintain separate accounting systems capable of tracking cash flows within the Abitibi Group and Bowater Group respectively. Similarly, no cross-defaults or cross-acceleration provisions exist under the Bowater Group's funded debt obligations in the event of default or

acceleration under the Abitibi Group's funded debt obligations, or, except as noted below with regards to the securitization facility at Donohue Corporation, under the Abitibi Group's funded debt obligations in the event of default or acceleration under the Bowater Group's funded debt obligations. As a result of AbitibiBowater's guarantee of Bowater's U.S. bank credit facility (described in further detail in section VI below), however, any default or acceleration with respect to that bank credit facility will result in an event of termination under the Donohue Group securitization facility which supports the Abitibi Group's cash flow.[5]

14.     Operationally, however, the Abitibi and Bowater Groups' interests are united in an integrated and co-dependent business relationship. The Company has realized meaningful efficiencies from the Merger and continues to rationalize its operations. Thus, for example, a centralized sales team sells product manufactured at any of the Company's North American facilities on behalf of the entire Company. Similarly, a centralized procurement and logistics team supports the Company's manufacturing and shipping and warehousing needs.

15.     AbitibiBowater itself functions as a holding company with no independent operations. It principally conducts its business through four direct subsidiaries: Bowater Incorporated, Bowater Newsprint South LLC, Abitibi-Consolidated Inc., and AbitibiBowater U.S. Holding LLC ("ABUSH"). Bowater and its former subsidiary, Bowater Newsprint South LLC ("Newsprint South"), and their direct and indirect subsidiaries comprise the Bowater Group, the historic Bowater operations. ABUSH and ACI function as the holding companies for the Donohue Group and Abitibi Group, respectively.

---

[5]     As described further in Section VI below, the Debtors will seek this Court's authority to enter into an amendment with the other parties to the securitization program pursuant to which the parties agree that the filing of the Chapter 11 Cases and the Canadian Proceeding will not trigger a termination event under the securitization program.

*(i)   Abitibi*

16.     Prior to the Merger, Abitibi was the 8th largest publicly traded pulp and paper manufacturers in the world with roots tracing back to 1914. It resulted from the 1997 amalgamation of Abitibi-Price Inc. (incorporated in 1914) and Stone-Consolidated Corporation (itself the result of a merger with Rainy River Forest Products Inc., incorporated in 1941) under the *Canada Business Corporations Act*. Abitibi principally produced and marketed newsprint and commercial printing papers. It also manufactured and marketed wood products and in 2007, prior to the Merger, had ownership interests in 20 sawmills, four remanufacturing facilities, and two engineering wood facilities in Canada having a total annual production capacity of over 2.1 billion board feet.

17.     In 2000, Abitibi acquired all the shares of Donohue Corp. ("Donohue"), a major Canadian integrated forest products company engaged in forest management and in the manufacturing and sale of newsprint, specialty papers, market pulp and wood products with mills located in Quebec, Ontario, British Columbia and Texas. Donohue became a direct subsidiary of AbitibiBowater U.S. Holding LLC (itself a direct subsidiary of AbitibiBowater) in 2008 as part of the Company's restructuring efforts. Donohue and its direct and indirect subsidiaries, and parent holding company (collectively, the "Donohue Group") own paper production and manufacturing facilities in the United States, operate the Company's recycling operations, and are involved with the Company's securitization facility. The Donohue Group principally operates in the U.S. and does not have any Canadian subsidiaries or significant Canadian assets. It owns Abitibi-Consolidated Corporation through which the Company conducts its North American recycling operations, described in greater detail below.

*(ii) Bowater*

18. Prior to the Merger, Bowater was one of the largest publicly traded pulp and paper manufacturers in the world. Incorporated in Delaware in 1964 and in operation since 1938, Bowater was a leading producer of newsprint and coated mechanical papers as well as uncoated mechanical papers, bleached kraft pulp, and lumber products. In 1998, Bowater acquired Avenor Inc., an important Canadian integrated forest products company headquartered in Montreal, Quebec. The acquisition added the Dalhousie, New Brunswick; Gatineau, Quebec; Maniwaki, Quebec; Thunder Bay, Ontario; and Usk, Washington mills to Bowater's operations. In 2001, Bowater acquired Alliance Forest Products Inc., also headquartered in Montreal, Quebec, adding 10 Canadian sawmills, the Coosa Pines, Alabama, and the Donnacona and Dolbeau, Quebec paper mills to Bowater's operations.

B.   Joint Ventures

19. Several of the Company's subsidiaries, including some of the Debtors, operate production facilities that are jointly owned with third parties (the "Joint Ventures"). The U.S. Debtors participate in the following Joint Ventures in the United States (the "U.S. Joint Ventures"): (a) Augusta Newsprint Company; (b) Calhoun Newsprint Company; and (c) Ponderay Newsprint Company. None of the U.S. Joint Ventures has filed for chapter 11 relief or relief under the CCAA.

*(i) Augusta Newsprint Company*

20. Augusta Newsprint Company ("Augusta Newsprint") operates a newsprint mill in Augusta, Georgia. AbitibiBowater's indirect subsidiary, Abitibi Consolidated Sales Corporation ("ACSC"), and an unrelated third party, The Woodbridge Company, own 52.5% and 47.5% of its equity interests respectively. ACSC manages the facility. Pursuant to the governing

partnership agreement, Augusta Newsprint sells 100% of its product to ACSC at arm's length market-determined rates, but otherwise operates as an independent company with its own employees and accounting systems.

*(ii)    Calhoun Newsprint Company*

21.    Calhoun Newsprint Company ("Calhoun Newsprint") functions as an ownership vehicle for The Herald Company's 49% interest in certain assets located at the Company's Calhoun, Tennessee operations. Bowater, through its direct subsidiary Bowater Nuway Inc., owns Calhoun Newsprint's remaining equity. Bowater manages the facility and owns all of the other assets at the Calhoun site, including the remaining portion of the TMP mill, a kraft pulp mill, a market pulp dryer, four other paper machines and other support equipment. Pulp, other raw materials, labor and other manufacturing services are transferred between AbitibiBowater and Calhoun Newsprint pursuant to agreed-upon pricing arrangements.

*(iii)    Ponderay Newsprint Company*

22.    Ponderay Newsprint Company ("Ponderay") owns and operates a paper mill in Usk, Washington. An unconsolidated partnership, Bowater's indirect subsidiary, Lake Superior Forest Products Inc., holds a 40% partnership interest in Ponderay and also acts as its managing partner. Several unaffiliated third parties, Copley Northwest Inc., Indiana Newspaper Inc., Newsprint Ventures Inc., Wingate Paper Company, Tribune Newsprint Company and Nimitz Paper Company, own Ponderay's remaining 60% partnership interest (collectively, the "Non-Bowater Partners"). Pursuant to a management agreement between Bowater and Ponderay, Bowater manages the day-to-day operations of the Ponderay Mill, and uses its sales force to sell the mill's product that is not otherwise committed under existing operating

agreements. Ponderay otherwise operates as an independent self-sufficient venture and sells the majority of its product to the Non-Bowater Partners under various operating agreements.

C. Foreign Operations

23. The Company has operations in the United States, Canada, Europe and Asia. It conducts its European business through Bridgewater Paper Company Limited (UK) ("Bridgewater"), a company constituted under the laws of England and Wales. Bridgewater owns and operates a newsprint mill located in Bridgewater, United Kingdom and through its wholly-owned subsidiary, Cheshire Recycling Ltd., conducts recycling operations. In addition to its European operations, the Company also owns and operates, through its indirect subsidiary Bowater-Korea Ltd., a newsprint mill in Yongam-gun, Korea. The Company's Korean mill sells product primarily to customers in Asia.

D. QSPEs

24. In connection with certain timberland sales transactions in 2002 and prior years, Bowater received a portion of the sale proceeds in notes receivable from institutional investors. To increase their liquidity, Bowater monetized those notes receivable using qualified special-purpose entities ("QSPEs"). The QSPE's are not consolidated in the Company's financial statements and their business purpose relates strictly to the monetization of the timberland notes.[6] None of the QSPE's has filed for bankruptcy protection in the United States or Canada, and indeed, are restricted by their formation documents from doing so.

---

[6] The monetization documents require Bowater to make capital contributions to the QSPEs from time to time in sufficient amounts so that the QSPEs can comply with their covenants regarding the payment of taxes, maintenance as entities in good standing, transaction fees, and similar payments. Notwithstanding these covenants, because of the expected net available cash flow to the QSPEs (interest and principal on notes receivable backed by letter of credit will be in excess of interest and principal on debt securities), Bowater does not expect to be required to make additional capital contributions, nor have any additional capital contributions been required to date.

## III. Operations

### A.    Facilities and Products

25.    Pulp and paper technology utilizes a number of integrated manufacturing and production processes. In its day-to-day operations, the Company manages a variety of facilities, including: paper and pulp mills, saw mills, hydroelectric and cogeneration plants, and recycling facilities. Specifically, as of December 31, 2008, the Company owned 24 pulp and paper facilities, 30 wood products facilities, seven cogeneration operations, and 16 hydroelectric facilities. In addition, the Company owns timberlands as part of its forest resources management practices. The Company manages its business along product lines. Its reportable segments comprise newsprint, commercial printing papers (*i.e.*, coated and specialty papers), market pulp, and wood products.

#### (i)    Pulp and Paper Mills

26.    The Company produces newsprint at 17 facilities in North America, South Korea and the United Kingdom. The largest producer of newsprint in the world by capacity, with annual capacity estimated at 5.0 million metric tons (or approximately 13% of worldwide capacity), the Company's North American production capacity of approximately 4.5 million metric tons represents about 43% of North American capacity. It produces newsprint for leading papers, including The New York Times, The Washington Post, The Daily Telegraph and The Globe and Mail. The Company supplies leading publishers in more than 90 countries.

27.    One of the larger producers of coated mechanical paper in North America, with capacity of approximately 736,000 short tons in 2008, the Company produces coated mechanical paper at one facility in North America. It also manufactures specialty papers at 11 facilities in North America and operates as one of the largest specialty paper operations in North

American with capacity of approximately 2.3 million short tons in 2008, representing about 36% of North American total capacity.

28.    Wood pulp is the most common material used to make paper.  Pulp shipped and sold as pulp -- as opposed to being processed into paper in the same facility -- is commonly referred to as market pulp.  Mechanical, chemical, and thermomechanical pulping are the three primary pulping processes for virgin fiber (*i.e.*, wood chips or sawdust).  The Company produces approximately 1.0 million metric tons of market pulp at five facilities in North America, which represents about 6% of North American capacity.

### (ii)    Sawmills

29.    The Company operates sawmills in Canada and the United States that produce construction-grade lumber sold in North America.  The Company's sawmills have an annual capacity of close to 3 billion board feet of lumber.  In addition, the sawmills are a major source of wood chips for the Company's pulp and paper mills.  The Company also operates facilities that remanufacture and engineer wood for specialized use in applications such as bedding components, roofing and flooring material.

### (iii)    Woodlands

30.    The Company's sources of wood include property it owns or leases, property on which it possesses cutting rights, and purchases from local producers, including sawmills that supply residual wood chips.  As of December 31, 2008, the Company owned or leased approximately 0.1 million acres of timberlands in the southeastern United States and approximately 1.2 million acres in Canada.  The Company also has contractual cutting rights on approximately 46.8 million acres of government owned land in Canada.  The contractual cutting rights contracts are approximately 20 to 25 years in length and automatically renew every

five years, contingent upon the Company's continued compliance with environmental performance and reforestation requirements.

### (iv) Recycling

31.     Among one of the largest global recyclers of newspapers and magazines, the Company has a number of recycling plants that utilize advanced mechanical and chemical processes to manufacture high quality pulp from a mixture of old newspapers and magazines ("Recovered Paper"). Recycling constitutes an integral part of the Company's business strategy and its success has been achieved through a combination of community drop-off programs, municipal partnerships and other recycling initiatives. The Company's Paper Retriever® and Paper Bank® programs promote recycling by supplying and servicing recycling containers to community-based partners, such as schools and churches, and serve numerous metropolitan areas in North America. The Company also provides curbside collection of recyclables, including to more than 1.7 million homes in the United Kingdom.

32.     Using Recovered Paper, the Company produces, among other things, recycled fiber newsprint and uncoated specialty paper comparable in quality to paper produced with 100% virgin fiber pulp. In 2008, the Company used 2.4 million metric tons of recovered paper worldwide, and the recycled fiber content in its newsprint averaged 38%. The Company conducts its North American recycling operations primarily through ACC. ACC maintains its principal recycling facility in Texas, and also has various offices and operations through the United States and Canada.

### (v) Energy Assets

33.     Steam and electrical power constitute the primary forms of energy used in pulp and paper production. The Company operates seven cogeneration power plants in North

America. It also owns or participates as a joint venture partner in 16 hydroelectric facilities. Most of the Company's mills generate some of their own power (in some cases, up to 41% of their own energy needs). The Company purchases the balance of its energy needs from third parties. In some instances, it also sells power to the grid for end use by third party customers.

B.    Sales and Distribution

34.    The global delivery of the Company's products depends on a synchronized sales and distribution chain.

(i)    Sales

35.    Since the Merger, the Company has centralized most of its sales and customer service team (the "Centralized Sales Team") under Bowater America Inc. ("BAI"). The Centralized Sales Team originates sales of the Company's products to customers in North America and around the world.[7] Once originated, the Centralized Sales Team purchases (via intercompany allocations) the necessary product from the most rational producing entity within the Company which, once identified, ships the product directly to the customer or in some cases, to BAI, which then ships the product to the customer.[8] Thus, for example, ACSC is the selling entity for paper sales in the United States from any of ACSC's mills, even though the Centralized Sales Team generates the sale at BAI on ACSC's behalf. Intercompany allocations account for the transactions between the various AbitibiBowater companies. As discussed in more detail below, the Company also utilizes third party brokers and agents to sell product.

---

[7]    ACI originates limited international sales and some sales to Canadian customers. ACSC historically employed the Abitibi Group's sales people for sales of Abitibi products to United States customers. Following the Merger, ACSC's sales team was transferred to BAI as part of the centralization process.

[8]    Third party warehouses are commonly used to store goods in transit.

*(ii)*     *Brokers*

36.     As mentioned, the Debtors utilize brokers and agents (together, "Brokers")[9] to obtain new customers and to maintain long-term customer relationships for certain products.  In general, the Brokers are responsible for the promotion, sale, solicitation and confirmation of orders from customers for the Debtors' products.  In addition, the Brokers are generally responsible for communicating with the Customers regarding the sales and marketing of the Debtors' products.  Among other things, the Brokers inform the Debtors about changes in the requirements, nature, quality or quantity of products, any complaints or other problems with the products, delivery or other matters, creditworthiness of the customers, and changes in the market, including matters that relate to the Debtors' competition.

37.     The Debtors do not employ the Brokers directly.  Rather, they enter into contracts with the Brokers, who typically accrue commissions under the contracts based on the amount of the Debtors' products sold to customers located in certain regions of the United States, Canada and internationally (the "Broker Customers").  The Debtors usually pay the commissions at the time the price of any products sold by the Brokers becomes part of the Debtors' net revenues, or upon actual receipt by the Debtors of payments from Broker Customers.

38.     For many of the Brokers, commissions constitute the sole source of revenue for any given sale.  Thus, the majority of Brokers do not receive a profit margin on any of the products that they sell.  In addition, in  many instances, no specific performance goals or quotas exist obligating the Debtors to sell a pre-defined amount of product or to aggressively

---

[9]     A broker acts as a distributor, holding inventory and taking legal title and customer credit risk.  A broker receives a discount or commission off of the Company's list price and resells at an additional markup and trade for its account.  An independent agent, by contrast, does not take title or credit risk and essentially earns a commission as a finders' fee.

solicit new Broker Customers. In other words, the Brokers' incentive to expend effort to sell the Debtors' products (as opposed to someone else's product) directly links to the Brokers' commission package. Accordingly, if the Brokers are not paid their commissions, the Brokers may and can substantially reduce their sales efforts on behalf of the Debtors because the ongoing payment of commissions constitutes their only incentive to sell the Debtors' products.

39. In addition, with respect to certain Brokers, the contracts limit the Debtors' ability to sell directly to Broker Customers. Other Broker contracts contain exclusivity provisions, which prohibit the Debtors from hiring new brokers or directly marketing their items to certain Broker Customers. Accordingly, any substandard performance by these Brokers would, in essence, substantially limit the Debtors' ability to sell their products to such Broker Customers. Additionally, other Broker contracts may permit the Broker to sell a competitors' non-competing products to the Broker Customers. As a result, absent payment of commissions, the sale and promotion of the Debtors' products might decrease as compared to the sale and promotion of other companies' products.

*(iii)    Customer Programs*

40. The Company engages in a number of practices to develop and sustain a positive reputation with its customers and in the marketplace generally (collectively, the "Customer Programs"). The Customer Programs are customary in the paper and forest products industry, and include, among others, rebates, adjustments, and performance and volume discounts. The Customer Programs respond to competitive pressures, ensure customer satisfaction and loyalty, and generate goodwill for the Debtors. This enables the Debtors to retain existing customers, attract new ones, and ultimately, to enhance their revenue and profitability.

(a)    Customer Rebates and Allowances

41.    The Debtors offer rebates and allowances to certain customers to incentivize them to buy the Company's products.  The Debtors may calculate a customer's rebate or allowance based upon various factors related to the sale of product to the customer.  The Debtors tailor each rebate or allowance to the unique needs of each customer to meet that customer's specific needs and demands.  Under each customer rebate or allowance program, customers accrue rebates or allowances either monthly, quarterly or annually.  The Debtors pay the accrued rebates or allowances either by applying certain credits to that customer's account or by making periodic cash payments to the customer.

(b)    Customer Adjustments

42.    From time to time, given the size of the Company's operations, certain products the Debtors supply do not conform to their customers' specifications (the "Nonconforming Goods").  In some instances, the Debtors have warranted that their products, upon delivery, will meet certain customer specifications.  Similarly, despite the Debtors' efforts to manage their supply chain, certain products will occasionally be misdelivered, delivered in an inaccurate quantity, or damaged in transit (the "Misdelivered Goods" and together with the Nonconforming Goods, the "Adjusted Goods").

43.    The Debtors also audit and correct billing errors after sending invoices to customers.  Such errors may include duplicative invoicing (when two invoices are created for the same shipment), improper invoicing (when the invoice created does not properly reflect the goods shipped or is otherwise incorrect), duplicative payment (when a customer makes two payments on account of the same shipment), mispricing (when a customer is charged or pays an incorrect price for the Debtors' products), and various other billing and payment errors

(collectively, the "Invoicing Errors").  To correct Invoicing Errors, the Debtors routinely issue credits or refunds to their customers.

44.     In the event of delivery of Adjusted Goods or an Invoicing Error the Debtors will usually agree with the affected customer to adjust the amount owed by the customer in connection with the affected shipment (the "Invoice Adjustments") or will agree to correct the products previously shipped.  The correct goods or adjustment will be in such quantity or amount as is allocable to the Adjusted Goods or sufficient to correct the Invoicing Error, as appropriate.

45.     The Debtors may also incur, directly or indirectly, additional shipping charges in connection with expediting delivery to ensure the timely delivery of corrected goods.  Alternatively, the Debtors may directly or indirectly incur charges in connection with the sorting or repair of the Adjusted Goods if such activities are feasible.

C.     Shipping and Distribution

46.     The Company's operations necessarily depend on an extensive shipping, warehousing and distribution network as it moves raw materials to and from its global manufacturing centers and finished product to end-users worldwide.  As with its sales and procurement functions, the Company increasingly centralizes its freight and shipping logistics.[10]

47.     The Company's supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carriers, less-than-truckload carriers, freight-forwarders, ocean and lake carriers, parcel carriers, brokers and agents (collectively, the "Shippers").  The Company also utilizes a network of third-party warehousemen who store goods in transit on behalf of the Company (the "Warehousemen").  In addition, the Company

---

[10]   The Company does not retain a third party logistics provider.  Rather, a core team manages shipping logistics for most of the AbitibiBowater companies.  The costs of the logistics team are allocated within the Company to the appropriate legal entity via intercompany transfer pricing arrangements.

utilizes the services of customs agents to facilitate the shipment of goods across, into, and out of the United States, Canada, Europe, and Asia.

48. The Debtors engage approximately 1,200 third-party Shippers and Warehousemen to ensure a smoothly functioning delivery network. As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of the Debtors' raw materials and supplies, as well as their finished goods.

49. The Debtors hire Shippers to transport, store and deliver raw materials, goods and components to the Debtors, as well as finished product to the Debtors' customers. The Debtors contract with Warehousemen to store raw materials and finished goods which are inventory. They often receive daily shipments of raw materials and supplies necessary for operation. The Debtors also rely on Shippers for the transport of raw materials from their own mills to their manufacturing facilities, as well as finished goods from one AbitibiBowater company to another prior to shipping the goods to their customers. Finally, the Debtors also ship finished goods to customers directly from their mills.

50. The Company has carefully cultivated a reputation for reliability and dependability among its customers. Many of the Company's pricing policies and marketing strategies revolve around its ability to meet individual customer needs on a timely, dependable and often custom-tailored basis. This reputation, in turn, depends on the ability to timely deliver the Company's product to its customers, as well as the timely delivery of raw materials and supplies needed for production. The Debtors accordingly must maintain a reliable and efficient supply and distribution network during these Chapter 11 Cases. If the Debtors' paper and pulp mills, sawmills, and recycling facilities do not receive delivery of raw materials when scheduled, and the Debtors' customers are unable to receive delivery of goods, the Debtors' manufacturing

operations will be severely and adversely affected, and production may even be stopped. As a result, the Debtors may suffer, at a minimum, a significant loss of credibility and customer goodwill as well as revenue, thereby causing substantial and potentially irreparable harm to their businesses and reorganization efforts.

D.    Raw Materials and Vendors

51.    The Company's operations use primarily wood fiber, energy, chemicals, and mill supplies as raw materials. The Company employs an increasingly centralized procurement team that operates in a manner similar to the Centralized Sales Team. The centralized procurement team purchases supplies from vendors (the "Vendors") on behalf of the entire corporate group and allocates materials to the appropriate corporate entity within the Company on an "as needed" basis. The Company allocates centrally invoiced purchases to the respective corporate entity that requires the raw goods, and uses intercompany credits and debits to account for the transaction. Centralized procurement allows the Company to benefit from volume discounts and otherwise facilitates the rationalization of the supply chain within the corporate group.

*(i)    Wood and Reclaimed Fiber*

52.    As noted above, wood fiber (virgin or recycled) constitutes the primary ingredient in the paper manufacturing process. The Debtors obtain fiber from wood (or wood chips and saw dust) from their own timberland operations and saw mills, or as needed, from third party wood or recycled fiber providers.

53.    Third party wood suppliers typically harvest wood from their forests on a weekly basis to meet the Debtors' wood fiber requirements for that week. As a result, the wood suppliers usually do not carry excess capacity or inventory that they otherwise sell to other

customers. As such, the Debtors' third party wood suppliers are uniquely dependent on receiving payment from the Debtors for their product.

54. As one of the world's largest recyclers, the Debtors have a number of contractual and commercial relationships with third parties supporting their recycling operations. The Debtors collect recyclable materials through a number of community-based programs. They also purchase recyclable materials from third party suppliers. Maintaining these arrangements is crucial to the Debtors' recycling business because they provide the Debtors with reclaimed fibers for their manufacturing process, and also provide the Debtors with an additional source of revenue by permitting sales of certain materials to outside customers at a profit. The recycling materials market is highly competitive and an inability to pay amounts due under the Debtors' various agreements may impair the Debtors' ability to purchase recyclable materials directly from recyclable generators.

*(ii)    Chemicals*

55. The paper making process uses a number of different chemicals at various stages. The chemical pulping process, for example, requires caustic chemicals to remove lignin from wood to render it soluble, so that it may be washed from the cellulose fibers ultimately used to make paper. Pulp may also be bleached, or mixed with other chemicals, to produce different types and grades of paper. The Company also uses processed chemicals at various stages of manufacturing to impute characteristics to any given type of paper and to improve the efficiency of the paper making process.

56. In many cases, the Debtors use chemicals that they can purchase only from a limited number of suppliers. Moreover, the Debtors' existing manufacturing processes depend on a predictable and consistent supply of quality chemicals that, while the Debtors may

be able to find them in generic form from another supplier, are best purchased from existing suppliers to maintain the quality and integrity of the Debtors' manufacturing process. The Debtors have also in many cases negotiated favorable pricing terms with their key chemical suppliers as compared to the open market prices otherwise available.

*(ii)    Operating Supplies*

57.    The Debtors rely on a number of suppliers to provide specialized materials to support the Debtors' operations (the "Operations Suppliers"). These products are customized for the Debtors' use and are tailored to complement the Debtors' products and customer requirements. For example, the Debtors use specialized packaging to ship paper. The packaging material is necessary and required to ship the Debtors' product, and is custom designed for each roll of paper produced at the Debtors' various paper machines. Due to the customized nature of the packaging material, the Debtors cannot easily or quickly replace a packaging supplier should such a supplier stop providing product to the Debtors. If the Debtors are unable to ship their goods, or otherwise have to suspend manufacturing because they cannot find a replacement Operations Supplier, the Debtors would be unable to service their customers in a timely manner and, depending on the product at issue, may also experience mill downtime. Such a result would severely and irreparably harm the Debtors' business and ability to generate revenue.

*(iii)    Plant Maintenance and Repair*

58.    The Company owns and operates a number of complex manufacturing equipment, including pulp and paper mills, saw mills, and cogeneration and hydroelectric facilities. In many instances, the Company relies on its own qualified technicians to service its machines and equipment. In some instances, however, the Debtors engage outside maintenance and repair service providers (collectively, the "Maintenance Technicians") to fix or maintain

their machinery. Due to the specialized and often hazardous nature of some of the services involved, the Debtors can only obtain certain of the services from specially licensed and permitted Maintenance Technicians.

59. The Debtors' machinery and equipment also require specialized and often custom-made parts to maintain and repair. Due to the frequency with which the Debtors require spare parts and the specialized nature of their equipment, the Debtors typically have few options as to the choice of spare parts vendor. Additionally, many of the Debtors' spare parts vendors carry the appropriate number of spare parts in their inventories so that they can support and service the Debtors' machinery and equipment upon short notice in the event of a part failure. In fact, the Debtors have arrangements with certain of their spare parts vendors pursuant to which the vendor permits the Debtors to store spare parts at the Debtors' facilities. This enables the Debtors to service their own machines on an "as needed" and emergency basis in the event a machine breaks down.

60. Equipment downtime could immediately and severely disrupt the Debtors' operations and render the Debtors unable to service their customers, causing significant harm to their revenue and cash flow.

*(iv)    Committed Project Vendors*

61. At any given time, and from time to time, the Debtors participate in construction projects, joint venture pursuits and other capital maintenance endeavors (the "Active Projects"). Completion of Active Projects depends on meeting predetermined deadlines. The Debtors' inability to complete committed projects or finish work on existing capital improvements may impair the integrity of the Debtors' mills and facilities, including the machinery necessary for their continued operations.

62.     For example, the Debtors are working on the Murdoch-Wilson Hydroelectric project. This project entails repair and replacement of a pipe, many kilometers in length, that conveys water from a dam to the associated hydro-generating facility owned by one of the Debtors' subsidiaries. The pipe must be completed in full before it can transport water to the generator and as a result, before the generator can resume operating. Cost-effective completion of the project therefore depends critically on the ability to meet construction deadlines within a committed timeframe.

63.     The Debtors depend on suppliers and vendors engaged in connection with Active Projects (the "Committed Project Vendors") to complete their work within these predetermined timeframes so that the Debtors can meet their own deadlines. An inability or unwillingness of the Committed Project Vendors to continue providing supplies critical to the completion of Active Projects could seriously undermine the Debtors' ability to complete the Active Projects in a timely manner, if at all.

    (iv)    *Dependent Vendors*

64.     Finally, a small number of vendors are so dependent on the Debtors for business that failure to pay their prepetition claims creates the substantial risk that these vendors will be forced to suspend or cease business entirely (the "Dependent Vendors"). Allowing payment of these critical Dependent Vendors minimizes the "domino effect" of the Debtors' bankruptcy up and down the supply chain. Given the nature of its industry, the failure of a Dependant Vendor to continue producing products or supplies to the Debtors could seriously and irreparably harm the Debtors' business and ability to satisfy its obligations to -- and impair the Debtors' relationships with -- key customers. In addition, if the Debtors have to replace Dependent Vendors, the Debtors would have to search for substitute suppliers for certain

product, which may be subject to an extensive quality control process before it can be approved for sale by the Debtors.

### (v)    Energy and Utilities

65.    Many of the Company's mills produce some of their own energy through on-site or locally owned and operated cogeneration or hydroelectric facilities. The Company purchases the balance of its energy needs from third parties, as well as coal and other fuels to run the cogeneration plants.

66.    The Debtors' operations necessarily depend on a number of different kinds of utilities, including, among others, electricity, water, sewer service, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services. On average, the Debtors spend approximately $970 million per year for various utility services, of which approximately $365 million is attributable to the U.S. Debtors (the "Utility Services"). These Utility Services are provided by numerous utility providers in the United States (the "Utilities"), with which the Debtors may have multiple accounts.[11]

67.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts. A disruption of the Utility Services at any of the Debtors' facilities would result in a costly disruption of the Debtors' operations, and force the Debtors to focus from the outset of the cases on finding replacement providers and services, rather than on the operation and restructuring of their businesses.

---

[11]    A non-exhaustive list of Utility Providers is attached as an exhibit to the *Debtors' Motion for an Order: (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to the Debtors; (B) Deeming Utility Providers Adequately Assured of Future Performance; (C) Establishing Procedures to Determine Requests for Adequate Assurance of Payment; and (D) Setting a Final Hearing Related Thereto* filed substantially contemporaneously herewith.

Moreover, the disruption to the Debtors' business would inevitably damage customer relationships, revenues, and profits and would seriously undermine the Debtors' reorganization efforts to the detriment of their estates, creditors, and employees.

## IV.    Employees and Insurance

A.    <u>Employees</u>

68.    The Company employs approximately 15,809 active employees, of which 11,268 work in Canada and 3,922 work in the United States.  The Company also has 619 employees in Europe and South Korea.  Of these totals, the Debtors employ approximately 6,000 employees (each an "<u>Employee</u>" and collectively, the "<u>Employees</u>") in the United States and Canada, as described further below.  The Employees' skills, knowledge and understanding of the Company's business are among its most valuable assets and are critical for a successful reorganization.

69.    The U.S. Debtors collectively employ approximately 3,390 Employees at facilities located in Alabama, Michigan, Minnesota, Mississippi, South Carolina, Texas and Tennessee (the "<u>U.S. Employees</u>"), of whom approximately 2,369 are hourly (the "<u>U.S. Hourly Employees</u>") and 1,021 are salaried (the "<u>U.S. Salaried Employees</u>").

70.    The Canadian Debtors collectively employ approximately 2,610 Employees at facilities located in New Brunswick, Quebec, Ontario and Nova Scotia (the "<u>Canadian Employees</u>"), of whom approximately 2,180 are hourly  employees (the "<u>Canadian Hourly Employees</u>") and 430 are salaried employees (the "<u>Canadian Salaried Employees</u>").

71.     Approximately 73% or roughly 11,600 of the Company's employees are represented by bargaining units.[12] The Company's unionized employees are represented predominantly by the Communications, Energy and Paperworkers Union in Canada and predominantly by the United Steelworkers Union in the United States.

72.     The Debtors also employ independent contractors (the "Independent Contractors"), sometimes through third-party staffing agencies, for, among other things, seasonal employment in their wood products operations, as international sales agents (primarily in Europe, South America and Asia), and to perform certain general corporate functions (*e.g.,* legal, accounting etc.).

(i)      *Wages, Salaries and Other Compensation*

73.     The Employees perform a broad spectrum of services, including manufacturing functions, recycling pick-up and bundling services, sales, and logging. The Debtors' average gross monthly compensation for Employees, including wages, salaries, and other compensation totals approximately $34.9 million ("Wages"), consisting of $24.3 million for U.S. Employees and $10.6 million for Canadian Employees. The Debtors pay most of their salaried employees via direct deposit or ACH transfers, while a majority of their hourly workers are paid by check.

74.     The Debtors pay Hourly Employees on Fridays, on a bi-weekly schedule five (5) days in arrears. The last hourly pay period concluded on April 3, 2009 and the next

---

[12]     Specifically, all of the U.S. Hourly Employees at the Catawba, Calhoun, Goodwater, Coosa Pines, Albertville and Westover facilities, and a small portion of the U.S. Hourly Employees at the Houston recycling facility, are governed by collective bargaining agreements (the "CBAs"). The remaining U.S. Employees are not unionized. Similarly, 1,941 of the Canadian Hourly Employees at the Dolbeau, Donnacona, Gatineau, Maniwaki Sawmill, Mistassani Sawmill, Mistassani Woodlands, St-Felicien Sawmill, St-Felicien Woodlands, Thunder Bay, Thunder Bay Woodlands, Dalhousie and Mersey facilities are governed by CBAs and 32 of the Canadian Salaried Employees at the Dolbeau and Mersey facilities are governed by CBAs. The remaining Canadian Employees are not unionized.

hourly pay period concludes April 17, 2009. The Debtors pay salaried Employees once per month in the United States, twice per month in Canada, with direct deposits made, or checks issued, on the day before or on pay periods ending on the last day of each month in the United States and on the 15th and 30th of each month in Canada. The Debtors manage their payroll mostly on a centralized basis (from Greenville, South Carolina for U.S. Employees and from Montreal, Canada for Canadian Salaried Employees).[13] They do not employ a third party payroll processor.

75. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Employee Wages (excluding Payroll Taxes and Deductions, defined below) earned prior to the Petition Date that remain unpaid totals approximately $11.75 million, consisting of approximately $4.3 million for U.S. Salaried Employees and $4.95 million for U.S. Hourly Employees and $2.5 million for Canadian Employees (collectively, the "Unpaid Wages"). Based upon the Debtors' review of their books and records, they do not owe any individual Employee more than $10,950 for Unpaid Wages as of the Petition Date.

76. The Debtors engage, on average, approximately 75 to 80 Independent Contractors in Montreal for general corporate functions (e.g., legal, accounting). They also engage, from time to time, and at any given time, hundreds of Independent Contractors for a variety of operational functions through their companies, including for seasonal forest management operations, international sales, and general corporate functions (e.g., legal, accounting). The number of Independent Contractors actually employed may vary at any given moment. Depending on the type of services rendered, the Debtors pay Independent Contractors on a weekly, monthly or per assignment basis. As of the Petition Date, the Debtors estimate that

---

[13] Payroll for the Canadian Debtors' mills in Canada is decentralized and processed at the mill level.

they owe approximately $1 million for unpaid and accrued services provided by Independent Contractors. No Independent Contractor has outstanding invoices in excess of $10,950 as of the Petition Date.

### (ii)    *Employee Business Expenses*

77.    The Debtors' Employees often travel to customer locations to assist customers with technical issues relating to the customers' production processes that use the Debtors' products. In addition, given the size and geographical reach of the Debtors' operations, Employees often travel from site to site. As a result, in the ordinary course of their businesses, the Debtors reimburse Employees for certain expenses the Employees incur on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses typically include expenses for air travel, lodging, ground transportation, meals and other similar charges.

78.    Employees incur the Reimbursable Expenses on behalf of the Debtors through the use of a corporate credit card account with American Express, or their personal funds or credit cards. American Express bills employees directly for charges incurred on the corporate cards. The Debtors reimburse these Employees through the regular payroll process after the Employees submit and obtain approval of their expenses. Based on expenses incurred in 2008, the Debtors spend on average approximately $1 million per month on Reimbursable Expenses.

79.    Because Employees do not always submit expense reports on a regular basis, the Debtors are unable to determine precisely the aggregate amount of outstanding Reimbursable Expenses at any given time. Based on historical payments, the Debtors estimate that, as of the Petition Date, no more than $1 million in Reimbursable Expenses has been incurred and remain unpaid.

80.    The taxes on the Debtors' payroll (the "Payroll Taxes"), including both the employee and employer portion, for 2008 totaled about $12 million. The Debtors generally process and forward Payroll Taxes to the appropriate federal, state or local taxing authorities at the same time that they administer the Employee payroll checks and direct deposits. As of the Petition Date, approximately $4 million in accrued and outstanding prepetition obligations with respect to Payroll Taxes were outstanding.

81.    During each applicable pay period, the Debtors also routinely deduct other amounts from certain of their Employees' paychecks, including without limitation: (a) union dues and union fund contributions; (b) credit union payments; (c) garnishments, child support, and similar deductions; and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below (*e.g.*, an Employee's share of pension payments, health care benefits, insurance premiums, 401(k) contributions, etc.) (collectively, the "Deductions") and forward those amounts to various third party recipients. Based on historical payments, the Debtors on average deduct approximately $5.5 million in Deductions from the Employees' paychecks per month. As of the Petition Date, approximately $2.3 million and $1.5 million was previously deducted from Salaried and Hourly Employee earnings, respectively, which has not yet been processed and forwarded to the appropriate third party recipient.

*(iv)*    *Prepetition Employee Benefits*

82.    In the ordinary course of business, the Company provides its employees, directly or indirectly, with a number of employee benefits, including but not limited to: (a) a range of medical, dental, disability and life insurance coverage, prescription medication

programs and flexible spending accounts; (b) vacation, holiday and leave benefits; (c) savings and certain pension plans; and (d) certain other specific employee benefits such as tuition, adoption and health club reimbursements (collectively, the "Employee Benefits"). As of the Petition Date, the Debtors estimate that the total amount owed or accrued prepetition for the Employee Benefits totals approximately $3.2 million, excluding pension plan and OPEB obligations.

(a)    <u>Health Care Programs</u>

83.    The Debtors offer several benefit programs to full-time Employees for medical, dental, disability and life insurance coverage, including prescription medication and flexible spending accounts (the "Health Care Programs"). The Debtors provide the Health Care Programs for their Salaried Employees through a benefit plan provided by AbitibiBowater (the "Benefit Plan") and for their Hourly Employees through benefit programs managed by Bowater and ACI. The Benefit Plan is funded through contributions by both the Debtors and the Employees.

84.    On average, the Debtors pay approximately $2.3 million per month for the Health Care Programs. In addition, the Debtors' average monthly administrative fees paid in connection with the Health Care Programs total approximately $100,000. As of the Petition Date, approximately $1.5 million of accrued and outstanding prepetition obligations with respect to the Health Care Programs was outstanding.

(b)    <u>Vacation, Sick, Holiday and Leave Benefits</u>

85.    The Debtors provide their Employees with paid vacation time (the "Vacation Time"). The amount of Vacation Time varies based on the Employee's years of service with the Debtors. Employees are generally not entitled to cash payment for accrued

Vacation Time. In the ordinary course of business, the Debtors also provide sick leave ("Sick Leave") to certain of their Employees. The Debtors also provide their eligible Employees with paid holiday time in an approximate amount of 10 days per year (the "Holiday Pay"). The collective bargaining agreements govern certain of the unionized Employees' entitlement to benefits, and accordingly, the number of paid holidays and provisions relating to Holiday Pay and Sick Leave will vary based on, among other things, the length of the Employee's service (seniority) and pay rate.

86.     In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain of their Employees (the "Additional Leave Policies" and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay"). The details of the Additional Leave Policies depend on whether the Employees are unionized or not, hourly or salaried, and additional facts that vary from site to site and Employee to Employee. The Debtors ordinarily honor the costs of Leave Pay through the payroll process.

(c)     Defined Contribution and Defined Benefit Plans

87.     The Company maintains a number of defined contribution plans for the benefit of its North American Employees (the "Employee Savings Plans"). These generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. In the U.S., for the most part, the Company makes matching contributions varying from 40% to 50% on the first 6% of a union hourly employee's contribution, and beginning in 2007, a matching contribution of 100% on the first 3% and 50% on the next 2% of a salaried or non-union employee's contribution. Effective April 1, 2009, the Company has decided to suspend the match on employee contributions for Salaried and non-union Hourly employees.

88.     In addition, the Company is making an automatic contribution, regardless of the employee's contribution, of 2.5% to 6.5% of a salaried or non-union employee's annual compensation, depending on the employee's age plus years of service on the previous December 31.  These contributions are available only to employees that are not eligible to participate in a defined benefit plan and are made to Canadian and U.S. salaried and non-union hourly employees.  The Company's expense for the defined contribution plans totaled $11 million in 2008, $11 million in 2007 and $7 million in 2006.  Certain of these plans are covered by collective bargaining agreements.

89.     The Company maintains several contributory and noncontributory defined benefit plans covering some of its Employees (the "Pension Plans").  It also sponsors a number of other postretirement benefit plans (*e.g.*, defined benefit health care and life insurance plans) for retirees ("OPEB Plans") at certain mill locations (often subject to CBAs).  Benefits are typically based on years of service and, depending on the plan, average compensation earned by employees either during their last years of employment or over their careers.  In 2008, the Company paid $313 million and $33 million for the Pension Plans and OPEB Plans respectively.

(d)     Specified Employee Benefits

90.     In addition to the employee benefit plans described above, the Debtors are currently aware of and may discover other *de minimis* prepetition obligations owed with respect to their Employees (the "Miscellaneous Benefit Programs").  For example, the Debtors sponsor an educational assistance program (the "Educational Assistance Program") for certain Employees.  Under the Educational Assistance Program, the Debtors reimburse eligible Employees for the cost of tuition upon certain requirements being met.  The Debtors also offer Employees reimbursement of up to $200 of each Employee's annual membership cost in a health

club.  Miscellaneous *de minimis* benefits also exist under certain CBAs, such as, for example,

tool and clothing allowances.  Other programs involving *de minimis* costs of similar magnitude

may exist.  Some of the Employees may have incurred expenses in connection with the

Miscellaneous Benefit Programs prior to the Petition Date but have not yet sought

reimbursement therefor.  In most, if not all, such instances, the Employees incurred such

expenses based on the Debtors' policy and on their eligibility to participate in the Miscellaneous

Benefit Programs.

       B.     <u>Insurance</u>

       91.     During the ordinary course of their operations, the Debtors maintain or are

beneficiaries of a number of insurance policies, some of which are centralized (each an

"<u>Insurance Policy</u>" and collectively, the "<u>Insurance Policies</u>").  The Company maintains the

Insurance Policies in amounts and types of coverage in compliance with state and local laws

governing the multiple jurisdictions in which they operate.  The Insurance Policies provide

coverage for, among other things, workers compensation, real property, directors and officers,

general liability, automobile liability, crime insurance, fiduciary liability, flood insurance, vessel

pollution, commercial relations, umbrella excess liability, and employment practices liability.[14]

       92.     The Debtors are required by law to maintain workers' compensation

coverage for claims arising from or related to workers' employment with the Debtors (the

"<u>Workers' Compensation Insurance</u>").[15]  The Debtors maintain separate Workers'

---

[14]   A list of the Debtors' insurance policies is attached as an exhibit to the *Debtors' Motion for an Order Authorizing: (A) the Continuation of the Debtors' Workers' Compensation Insurance and Other Insurance Policies; and (B) the Payment of Certain Obligations Related Thereto* filed substantially contemporaneously herewith.

[15]   None of the Debtors are self-insured or participate in self-insured workers' compensation arrangements.

Compensation Insurance for their U.S. and Canadian employees. Specifically, for their U.S. employees, the Debtors maintain Workers' Compensation Insurance with The Phoenix Insurance Company ("Phoenix"). The policy renews on July 1st of each year and covers claims asserted by the Debtors' U.S. employees.

93.     Workers' Compensation Insurance in Canada is maintained by the government. Companies pay annual premiums to the government, which then insures the employees.

94.     The premiums under both the U.S. and Canadian Workers' Compensation Insurance are calculated in a substantially similar manner. The Debtors pay an annual premium for the Workers' Compensation Insurance based upon a combination of the Debtors' projected payroll, the classification of the Debtors' employees (*e.g.*, office worker, plant employee, etc.) and historic loss rates (the "Workers' Compensation Premium"). For the period July 1, 2008 through July 1, 2009, the Workers' Compensation Premium totaled approximately $601,441 for the Debtors' U.S. employees and $1,879,957 for the Debtors' Canadian employees. At the conclusion of each policy year, the Debtors' insurance providers conduct an audit of the Debtors' payroll records and issue a premium adjustment based upon the difference between the Debtors' projected and actual payroll for the previous year.

95.     The Debtors pay their Insurance Policy premiums based upon a fixed rate established and billed by each Insurance Carrier. The Debtors pay their annual insurance premiums (the "Insurance Premiums") in lump sum payments. The Insurance Premiums totaled approximately $21.1 million[16] in 2008, and are adjusted annually at the beginning of each

---

[16]   Premiums paid in non-USA currency have been converted to U.S. dollars herein based on the currency exchange rate published in the Wall Street Journal on March 31, 2009.

policy's term. The Debtors believe that they are current on their prepetition premium payments with respect to the Insurance Policies.

96.     Pursuant to the Insurance Policies, the Debtors must pay various deductibles (the "Insurance Deductibles"). In general, the insurance carrier pays claims directly to the claimant and then seeks reimbursement from the Debtors for the Insurance Deductible. As of the Petition Date, pending claims against the Debtors may exist.

97.     If the Debtors do not continue to perform their obligations under the Insurance Policies, their coverage under the Insurance Policies could be voided. Disruption of the Debtors' insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies; (c) the possible loss of good standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.[17]

## V.     Cash Management and Cost Allocation

98.     In furtherance of the Company's integrated global business operations, and in the ordinary course of its business, the Company employs a cash management system (the "Cash Management System") to: (a) transfer funds between and among the Debtors, the

---

[17]     Nothing contained herein is intended or should be construed as either: (a) an admission by the Debtors as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) a request to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

Canadian Debtors, and (mostly European) non-debtor affiliates; (b) properly allocate costs and revenues among the Company's various legal entities (the "AbitibiBowater Companies"), as part of an arm's length transfer pricing policy to comply with tax laws; and (c) to generally manage the Company's operations, cash flow, and cash needs. The Company's treasury department ("Treasury"), situated in Canada, exercises primary oversight of the Cash Management System. Treasury has integrated the Cash Management System with the Company's sales, purchasing, supply and distribution networks, thereby facilitating the Company's cash forecasting and reporting needs, enabling the monitoring, collection and disbursement of funds, and facilitating the administration of the various bank accounts required to collect, disburse and effect the movement of cash throughout the system.

99.     The Company administers its Cash Management System along historic Bowater and Abitibi Group lines. As a result, two essentially separate but centrally controlled systems funnel revenue from the respective Bowater or Abitibi Groups into separate concentration accounts, from which disbursements are made to cover each Group's separately incurred costs. Transfer pricing mechanisms and intercompany agreements exist to allocate the costs within each Group and across both Groups, including for AbitibiBowater, the ultimate parent. In addition, both the Bowater and Abitibi Groups utilize a number of United States and Canadian bank accounts to facilitate the transfer and exchange of revenue from and between their respective United States and Canadian operations.

100.     The Cash Management System has been continuously utilized by the Company (and as separate systems, by Abitibi and Bowater before the Merger) and constitutes a customary and essential business practice. Intercompany notes and agreements govern the

significant intercompany relationships, and the Company engaged outside third-party accountants to develop its transfer pricing mechanisms.

101. The Cash Management System compares to those commonly employed by multinational corporate enterprises of comparable size and complexity as the Debtors. The interrelationships between the Debtors' operations and those of their affiliates, and the scope and breadth of their operations, mandates the use of the Cash Management System for a successful reorganization of the Company's business, as well as the preservation and enhancement of its going concern value.

102. In addition, the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, makes it difficult if not impossible, and in any event, unduly burdensome, for the Debtors to establish an entirely new system of accounts and a new cash management system for each AbitibiBowater Company. Thus, under the circumstances, maintenance of the Cash Management System is not only essential, but also in the best interests of the Debtors' respective estates and creditors. Furthermore, preserving "business as usual" conditions and avoiding the enormous difficulties inevitably triggered by any substantial disruption of the Cash Management System will facilitate the Debtors' stabilization of their postpetition business operations and assist the Debtors in their reorganization efforts. The Company will continue to maintain accurate and current records with respect to all transactions, whether transfers of cash, setoffs or otherwise, so that all transactions can be readily ascertained, traced and properly recorded on applicable intercompany accounts.

The Debtors' inability to continue using the Cash Management System would severely, and perhaps irreparably, disrupt the Company's operations.[18]

A.  Bowater Group Cash Management System

103.  The Bowater Group manages its cash primarily through two concentration accounts:  (a) one with Wachovia Bank, National Association ("Wachovia") for United States operations; and (b) one with Bank of Montreal ("BMO") for Canadian operations.[19]  As described in more detail below, the Bowater Group's United States receivables are collected through a network of lockboxes, in BAI's name, that are aligned with its various product lines (pulp, paper and wood).  Cash is swept daily from these lockboxes and centralized in the Wachovia concentration account (the "Wachovia Concentration Account").[20]  Disbursements, in turn, are made from the concentration accounts or through separate checking accounts maintained at other institutions.  The Bowater Group uses the Wachovia Concentration Account (along with a separate bank account at Wells Fargo Bank, N.A. used for check writing purposes) for the majority of its significant disbursements in the United States.[21]  Similarly, the Bowater

---

[18]  A list of the Company's bank accounts involved in the Cash Management System is attached as an exhibit to the *Debtors' Motion for an Order: (A) Authorizing the Continued Use of Existing Consolidated Cash Management System, Bank Accounts and Business Forms; (B) Authorizing the Continuation of Certain Intercompany Transactions; (C) Granting Administrative Priority Status to Postpetition Intercompany Claims; and (D) Granting a Limited and Interim Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code* filed substantially contemporaneously herewith.

[19]  Two separate accounts -- one each denominated in U.S. and Canadian dollars respectively -- comprise the BMO concentration accounts.

[20]  The Wachovia Concentration Account also receives some direct payments by ECF or wire transfer, but most electronic payments from customers are funneled through BAI's account with J.P. MorganChase Bank, N.A. described below.

[21]  As described previously, the Company has a centralized shipping and distribution team in Montreal that manages shipping logistics for the entire Company.  Accordingly, freight payables attributable to Bowater are processed in Montreal and funded by checks disbursed from an ACI bank account.  Funds to cover the amounts

Group's Canadian receivables, including transfers from Bowater to its Canadian subsidiary, Bowater Canadian Forest Products Inc. ("BCFPI"), to fund Canadian operations, are centralized in the BMO account (the "BMO Concentration Account"), from which the Bowater Group makes disbursements to fund Canadian operations.

(i)    *Bowater Group U.S. Cash Management System*

104.    Receivables. BAI employs the Company's centralized sales force, and has historically employed the Bowater Group's United States sales force. BAI accordingly issues customer invoices -- and receives corresponding customer payments -- in its own name.[22] BAI collects payments made by check from its United States pulp and paper customers in four lockboxes (collectively, the "Pulp and Paper Lockboxes") held at Bank of American, National Association ("Bank of America"). BAI collects payments made by check from United States customers purchasing lumber from the Bowater Group's Canadian operations[23] in two lockboxes held at Bank of America (together, the "Wood Products Lockboxes" and together with the Pulp and Paper Lockboxes, the "U.S. Customer Lockboxes"). The majority of the Bowater Group's customer payments are deposited into the U.S. Customer Lockboxes. Deposits from the U.S. Customer Lockboxes are transferred daily into the Wachovia Concentration Account.

---

attributable to Bowater freight payables are then transferred from the Wachovia Concentration Account to the ACI account.

[22]    From time to time, accounts receivable may be combined from customers. As a result, some customer payments attributable to the Bowater Group may be collected by lockboxes maintained by ACI, and visa-versa.

[23]    In the ordinary course of business, BAI employees sell wood products from the Bowater Group's Canadian lumber operations to United States customers. Upon completion of the sale, BAI acquires the inventory from the Bowater Group's Canadian operations (principally, from BCFPI through Bowater). Intercompany agreements govern the pricing and cost allocations of these transactions.

105.     BAI also has a bank account with J.P. Morgan Chase Bank, N.A. (the "JPM Account") for purposes of receiving its customer payments from anywhere in the world made in electronic form (either wire or automatic clearing house ("ACH") transactions).[24]  Once the JPM Account receives the money, the funds are transferred to the Wachovia Concentration Account.

106.     BAI also has four bank accounts with Wachovia (London Branch) for its international sales (the "Wachovia London Accounts").  European customers pay in their local currency.  Bowater America accordingly maintains the Wachovia London Accounts to accept customer payments (in check and electronic form) made in Euros and British pounds.[25]  It maintains a U.S. dollar account with Wachovia (London Branch) for currency conversion functions.  Deposits into the Wachovia London Accounts are swept monthly into the Wachovia Concentration Account.

107.     Several of the Debtors' mills maintain petty cash accounts at local banks (collectively, the "Mill Petty Cash Accounts").  These include, specifically:  (a) two BB&T accounts to service the Southern/Calhoun mills; (b) an AmSouth bank account to service the Calhoun, Tennessee mill operations; (c) a Union Planters bank account to service the Grenada mill operations; (d) a Coosa Pines Credit Union account to service the Grenada mill operations; and (e) a Bowater Credit Union account to service the Catawba mill operations.  Excess deposits,

---

[24]   From time to time, accounts receivable may be combined from customers.  As a result, some customer payments made in electronic form attributable to the Bowater Group may be deposited into an ACI account, and vice versa.

[25]   Bowater also makes miscellaneous non-material payments and disbursements (*e.g.*, bank fees) in local currency from the Wachovia London Accounts.

if any, from the Mill Petty Cash Accounts are transferred to the Wachovia Concentration Account.

108. Finally, the Wachovia Concentration Account also receives: (a) transfers from the Bowater Group's Canadian operations from the BMO Concentration Account;[26] and (b) the monthly management fee paid by the Ponderay Newsprint Company to Lake Superior Forest Products Inc.[27]

109. <u>Payables</u>. The Wachovia Concentration Account serves as the primary funding account for significant United States payments (*e.g.*, interest on funded debt, dividends, and tax liabilities) attributable to the Bowater Group and miscellaneous wire transfers and bank drafts. It also funds the Bowater Group's Canadian operations (other than its Mersey mill operations[28]) directly from the Wachovia Concentration Account by way of transfers to the BMO Concentration Account. The Bowater Group maintains separate bank accounts for its United States accounts payable paid by check (the Wells Fargo Check Account as defined below), wire or ACH transfers (the Wachovia ACH Payroll and AP Account, as defined below), and certain employee benefits. It funds these bank accounts from the Wachovia Concentration Account.

110. The Bowater Group makes all check payments for its U.S. dollar denominated accounts payable (whether arising from United States or Canadian operations) from a Wells Fargo Bank, National Association ("<u>Wells Fargo</u>") account (the "<u>Wells Fargo Check</u>

---

[26] The amounts transferred from the BMO Concentration Account are not substantial. Most transactions between the United States and Canada are transfers from the United States to fund the Canadian operations.

[27] The Ponderay Newsprint Company Joint Venture is described in more detail in section II(B).

[28] Bowater Mersey Paper Company Limited ("<u>Bowater Mersey</u>") operates one paper mill, one sawmill and has woodlands operations. Bowater Mersey maintains its own bank accounts (in U.S. and Canadian dollars) at Toronto Dominion Bank ("<u>Toronto Dominion</u>"). Bowater funds Bowater Mersey's U.S. dollar account directly from the Wachovia Concentration Account on an "as needed" basis.

Account"). The Wells Fargo Check Account is also used to make payroll and related payments by check.[29] The Bowater Group funds the Wells Fargo Check Account (from the Wachovia Concentration Account) on a daily basis after Wells Fargo identifies which checks have cleared within the immediately preceding 24 hour period. The Bowater Group maintains a separate bank account with Wachovia which it uses for wire and ACH transfers to pay certain additional payroll and accounts payable obligations (the "Wachovia ACH Payroll and AP Account"). In addition, the Bowater Group has two accounts for U.S. employee flex spending benefits which it keeps at Sun Trust Bank and Bank of New York respectively.

     111. <u>Investments</u>. The Wachovia Concentration Account constitutes the Bowater Group's primary United States operating account, and at the end of any given day, may contain significant cash balances. The Bowater Group invests these excess balances on an overnight and short-term basis in highly rated securities and money market accounts. Specifically, the Bowater Group maintains a money market investment account with Carolina First Bank for overnight sweeps of excess cash where the cash amount is relatively small, typically from $1 to $2 million. The Bowater Group also maintains an investment account with Bank of New York for short term investment (two to four days on average) of larger excess cash balances. These amounts may range from $25 to $30 million depending on the Bowater Group's cash flow, and are invested in institutional funds (*e.g.*, high grade corporate securities). The cash balances and proceeds from investment are transferred back into the Wachovia Concentration Account on an "as needed" basis from the Carolina First Bank money market account, and within two to four days (on average) from the Bank of New York institutional investment fund accounts.

---

[29]   Three separate sub-accounts exist at Wells Fargo for purposes of tracking and accounting outstanding checks.

(ii)     *Bowater Group's Canadian Cash Management System*

112.   Receivables.  The Bowater Group uses the BMO Concentration Account as its primary operating account for its Canadian operations.  Deposits into the BMO Concentration Account come from the following principal sources:  (a) Canadian customer receipts in electronic form (wire and ACH transfers); (b) Canadian customer receipts in check form, collected by way of two lockboxes maintained at Toronto Dominion; (c) miscellaneous receipts from the Canadian lumber operations;[30] (d) excess cash deposits from the Canadian mill operations' separate accounts (described in more detail below); and (e) intercompany transfers from the Wachovia Concentration Account.

113.   Payables.  Payables from the BMO Concentration Account include primarily:  (a) interest on Canadian issued debt[31]; (b) transfers to an account at Toronto Dominion used for making check payments for payroll and accounts payable; (c) transfers to separate accounts held by Bowater's Maniwaki and Mersey mills for mill expenses, including payroll; and (d) miscellaneous wire transfers and fuel payments arising from general operations.

114.   The Bowater Group maintains several bank accounts with Toronto Dominion from which it makes check payments for trade and other accounts payable arising from its various Canadian mill and lumber operations, including Dolbeau, Mistassini, Price-Mitis, Thunder Bay and Ontario (the "TD Mill Accounts").  The Bowater Group also has five

---

[30]   BAI's centralized sales team in the United States originates and invoices lumber sales of Canadian wood products.  Accordingly, the majority of wood products customers pay in United States dollars to the Wood Products Lockboxes.  Some customers, however, may pay in Canadian dollars, and other Canadian deposits might arise from the Canadian wood products operations.

[31]   The Bowater Group's Canadian companies have five outstanding debt issues (one public and four private) which incur interest and debt service charges.  The BMO Concentration Account includes separate U.S. and Canadian dollar accounts.  The Bowater Group makes United States dollar and Canadian dollar debt service payments from the respective U.S. or Canadian dollar accounts.

separate regional accounts with Toronto Dominion for making payroll payments by direct deposit for its Canadian mill and lumber employees (the "TD Payroll Accounts"). It also pays certain employees by ACH or direct deposit directly from the BMO Concentration Account.

115.    Two of Bowater's Canadian mills -- Maniwaki and Mersey -- maintain their own bank accounts. Specifically, BCFPI's Maniwaki mill has a separate bank account at Bank of Nova Scotia for its operations from which it pays its expenses, including payroll. Inflows into Maniwaki's account include various mill receivables and funding from the BMO Concentration Account on an "as needed' basis. Bowater Mersey Paper Company Limited also maintains its own bank account with Toronto Dominion for the Mersey operations from which it pays some expenses.[32]

116.    Finally, BCFPI has an account at National Bank of Canada ("National Bank") used for petty cash purposes. The account is limited to receiving petty cash deposits from the Canadian sawmills and makes no disbursements, other than transfers of funds to the BMO Concentration Account when the deposits have cleared National Bank's system and are available for transfer.

A.    Abitibi Group Cash Management System

117.    The Abitibi Group conducts its principal treasury functions in Montreal, Canada on a group-wide basis. It manages cash flow through a number of different accounts that align with its manufacturing, sales and European divisions.[33]

---

[32]    The BMO Concentration Account also receives excess cash from the Canadian Mill Accounts when excess deposits exist. BFCPI currently funds Mersey's payroll from the BMO Concentration Account.

[33]    The Abitibi Group may also have additional bank accounts that are no longer active or that contain immaterial amounts which are not described in this narrative.

118.    Bridgewater, incorporated in England and Wales, and a wholly-owned subsidiary of ACCC, owns and operates a paper mill in Bridgewater, England.[34]  Its sales team (the "European Sales Team") sells products from the Bridgewater mill, and other Abitibi Group mills in North America, to European customers.

119.    Bridgewater maintains its own bank accounts with NatWest from which it makes mill-related disbursements, including for payroll and operating expenses.  In addition, Treasury uses accounts at Citibank (London Branch) (collectively, the "Citibank London Accounts") in Bridgewater's name to manage the Abitibi Group's international cash flows.  As described in more detail below, the vast majority of European customer receipts[35] -- whether for sales from the Bridgewater or North American mills -- are collected in the Citibank London Accounts.  Treasury then makes transfers from the Citibank London Accounts:  (a) to Bridgewater's NatWest accounts for those customer receivables attributable to sales from the Bridgewater mill, and any additional funds necessary to fund the Bridgewater mill operations; and (b) to its North American accounts.[36]

---

[34]  As previously mentioned, AbitibiBowater, through ACCC, also holds equity interests in other European companies operating, among other things, recycling facilities in the United Kingdom.

[35]  Bridgewater has one customer that makes payments directly into Bridgewater's operating account at NatWest.

[36]  To illustrate, assume that the Citibank London Accounts collect $10 million at the end of any given period and that sales from the Bridgewater mill and the Abitibi Group's North American mills account for $7 million and $3 million of this amount respectively.  Assume further that the Bridgewater mill's operating expenses for that period total $8 million.  Under such facts, Treasury would distribute the $10 million from the Citibank London Accounts as follows:  (a) $7 million to Bridgewater's NatWest accounts credited to the Bridgewater mill sales; (b) $1 million to Bridgewater's NatWest account to fund Bridgewater's operations; and (c) $2 million to the Abitibi Group's treasury account with CIBC in Montreal.  Treasury would record and allocate all the transactions via intercompany credits and debits.

(a)     Bridgewater NatWest Accounts

120.    As mentioned, Bridgewater maintains bank accounts with NatWest (the "NatWest Account") for its day-to-day operations. Transfers from the Citibank London Accounts and one European customer constitute the principal deposits into the NatWest account. Bridgewater uses the NatWest Account for funding its payroll and accounts payable.

(b)     Citibank London Accounts

121.    The Abitibi Group maintains the Citibank London Accounts (which are held in Bridgewater's name but controlled by Treasury) to manage its international cash flows. The Citibank London Accounts constitute: (a) about a dozen local country accounts (the "Local Country Accounts") used for the receipt of customer receivables in various European countries; and (b) four concentration accounts (the "London Concentration Accounts") denominated in British pounds, Euros, U.S. dollars and Norwegian krones respectively.

122.    The Local Accounts. Since European customers pay in the country in which they reside, Treasury maintains separate bank accounts in various countries for receiving European customer payments.[37] Receivables from European customers, whether for product from the Bridgewater mill or mills in the United States and Canada, constitute the primary deposits into the Local Country Accounts. The customer receivables, which are made in Euros, are swept into the Euro-denominated London Concentration Account on a daily basis.

123.    The London Concentration Accounts – Inflows. The London Concentration Accounts receive transfers from the Local Country Accounts and serve as the main concentration accounts for European receivables. European customer receivables paid in

---

[37]   Specifically, the Local Country Accounts include accounts in Brussels, Madrid, Paris, Frankfurt, Lisbon, Italy, Ireland and Amsterdam.

British pounds sterling are made directly into the British pound-denominated London Concentration Account.

124. The London Concentration Accounts – Outflows. Treasury makes the following three principle transfers from the London Concentration Accounts: (a) payments to Bridgewater on account of Bridgewater sales, and any additional amounts needed to fund Bridgewater's operations; (b) transfers to two bank accounts in London used to fund miscellaneous payables incurred from the sale of North American product in Europe; [38] and (c) transfers to the United States and Canada.

125. Excess cash in the London Concentration Accounts is, principally, transferred to ACCC's Canadian dollar treasury account with the Canadian Imperial Bank of Commerce ("CIBC").[39]

(ii) *Abitibi Group North American Cash Management System*

126. The Abitibi Group's North American Cash Management System functions through a series of lockboxes and concentration accounts designed to centralize and regulate the flow of cash among the various corporate entities. The Abitibi Group has monetized substantially all of its accounts receivable and accordingly, most of its principle lockboxes for collecting customer payments are subject to controlled account agreements with Citibank, N.A. ("Citibank").

---

[38] Such amounts include, for example, shipping, freight or customs charges denominated in Euros or British pounds arising from the sale of United States or Canadian mill products that are not attributable to Bridgewater's operations.

[39] Depending on whether the Abitibi Group's North American cash needs call for U.S. or Canadian dollars, at any given time, Treasury may also transfer excess cash from the London Concentration Accounts to the ACI U.S. dollar-denominated concentration account held with Bank of America, described further below. Treasury has increasingly relied on its U.S. and Canadian dollar denominated ACCC treasury accounts with CIBC in Canada, however, for currency conversion purposes, and most excess cash transfers from Europe now go directly into one or both of these accounts.

127.    Specifically, ACI and ACSC are parties to a two-level receivables securitization program (the "Securitization Program").  Under the Securitization Program, ACI and ACSC obtain advance payments on their accounts receivable by selling them, at a discount, to a special purpose entity ultimately funded by Citibank.

(a)    The Securitization Accounts

128.    Under the Securitization Program, accounts receivable are collected through six separate lockboxes.  Funds from the lockboxes are transferred daily into two accounts controlled by Citibank that serve to concentrate receivables in U.S. and Canadian dollar accounts.  To obtain advances under the Securitization Program, the Company provides Citibank with a daily report identifying the amount of eligible receivables available and the performance of the existing receivables portfolio (the "Daily A/R Report").  The parties calculate the amount available (or owed) under the program.  From this total, Citibank then releases funds up to the amount of the Abitibi Group's projected cash needs for that day (the "Cash Flow Forecast").  The proceeds from the Securitization Program are transferred into the Abitibi Group's operating accounts and disbursed through its cash management system.

129.    Canadian Dollar Lockboxes and Securitization Account.  Payments from ACI's Canadian customers in Canadian dollars are collected through two separate lockboxes -- one for newsprint and commercial paper sales and the other for wood products sales -- maintained with RBC (the "ACI Cdn$ Lockboxes").  Every morning, RBC transfers deposits in the lockboxes from the prior day into a joint account ACI holds with Citibank's Toronto branch (the "Citi Toronto Securitization Account").  The ACI Cdn$ Lockboxes and Citi Toronto Securitization Account are all within Citibank's dominion and control as provided by the Securitization Program.  Based upon its analysis of the Daily A/R Report and Cash Flow

Forecast, Citibank releases funds to the Company, which are transferred directly into ACCC's

Canadian dollar treasury account at RBC (the "ACCC C$ Treasury Account").

130. <u>U.S. Dollar Lockboxes and Controlled Account</u>. Four lockboxes exist for

the collection of U.S. dollar accounts receivable. Two are owned by the Securitization Program

SPV, Abitibi-Consolidated U.S. Funding Corp., and collect customer payments in U.S. dollars

on ACSC's accounts receivable ACSC sold to the SPV. Both these accounts -- one for

newsprint and commercial paper sales and the other for wood products sales -- are with Bank of

America (the "SPE U.S. Lockboxes"). ACI also maintains a lockbox with RBC in Montreal for

payments by ACI's Canadian customers in U.S. dollars (The "ACI U.S. $ Lockbox" and together

with the SPE U.S. Lockboxes, the "U.S. Lockboxes"). Finally, ACI maintains a lockbox with

Citibank's New York branch for collection of customer receivables from international sales

(excluding the U.K. and Europe). This account (the "Citi U.S. Securitization Account" and

together with the Citi Toronto Securitization Account, the "Securitization Accounts")) also

serves as the U.S. equivalent of the Citi Toronto Securitization Account, and collects accounts

receivable payments in U.S. dollars subject to the Securitization Program. Every morning, Bank

of America transfers U.S. Lockbox deposits from the prior day into the Citi U.S. Securitization

Account. As with the Canadian accounts supporting the Securitization Program, the SPE U.S.

Lockboxes, ACI U.S. $ Lockbox, and Citi U.S. Securitization Account are all within Citibank's

dominion and control as provided by the Securitization Program. Based upon its analysis of the

Daily A/R Report and Cash Flow Forecast, Citibank releases funds to the Company from the Citi

U.S. Securitization Account, which are transferred directly into ACI's U.S. dollar concentration

account at Bank of America (the "ACI US$ Concentration Account").

131.    The Abitibi Group uses a number of accounts in the United States and Canada to manage cash flow among its various entities, including funds advanced from the Securitization Program.  These include three principle U.S. concentration accounts in U.S. dollars in ACI, ACSC and ACC's names, as well as a treasury account in Canadian dollars in ACCC's name.  The Company makes disbursements from these concentration accounts to a number of accounts payable and funding accounts along operating divisions.  The Abitibi Group also maintains a U.S. and Canadian dollar currency account with CIBC to service foreign currency exchange needs.

(i)    *U.S. Operating Accounts*

(a)    ACC

132.    The Company conducts its recycling operations through ACC.  ACC maintains a concentration account (the "ACC Concentration Account") with Bank of America.

133.    Inflows.  Deposits into the ACC Concentration Account come from (a) recycling customer receivables collected through a lockbox held with Bank of America in Chicago; and (b) intercompany funding transfers from the ACSC Concentration Account (defined below).

134.    Outflows.  ACC uses the ACC Concentration Account for funding accounts payables arising from its recycling operations.  It makes such payments through the use of two accounts in its name -- treasury and A/P -- also held at Bank of America, for wire and check payments respectively made on account of recycling payables.  Excess funds from these two accounts arising from miscellaneous deposits or cancelled payments (and similar sources) are transferred back to the ACC Concentration Account.  Excess cash in the ACC Concentration account is transferred to the ACSC Concentration Account described below.

(b)    <u>ACSC</u>

135.    ACSC maintains a concentration account with Bank of America (the "ACSC Concentration Account").

136.    <u>Inflows</u>.  Deposits into the ACSC Concentration Account include primarily transfers from the ACC Concentration Account, but also include miscellaneous deposits from the Augusta mill joint venture and intercompany transfers from the ACI US$ Concentration Account on an "as needed" basis.

137.    <u>Outflows</u>.  Transfers from the ACSC Concentration Account include: (a) payments on account of certain mill and wood products operations (including for purchases from the Augusta mill joint venture); and (b) transfers to the ACC and ACI Concentration Accounts.  ACSC also pays its U.S. dollar expenses from two accounts -- treasury and A/P -- held in its own name at Bank of America.  ACSC makes EFT transfers on account of commissions, customer rebates, and similar expenses arising from its operations from the treasury account.  It issues checks for other accounts payable, including some arising from the Augusta joint venture, from its A/P account.  Excess amounts in the ACSC Concentration Account are transferred to the ACI US$ Concentration Account on a daily basis.

(c)    <u>ACI</u>

138.    ACI maintains the ACI US$ Concentration Account for purposes of managing cash flow within the United States and ultimately, to Canada.

139.    <u>Inflows</u>.  Deposits into the ACI US$ Concentration Account are principally from the Citi U.S. Securitization Account, and also include intercompany transfers from the ACSC Concentration Account.

140.    <u>Outflows</u>.  Transfers from the ACI Concentration Account include: (a) daily sweeps of excess cash into an overnight investment account with Bank of America; and

(b) transfers of cash to a U.S. treasury account at Bank of America held by ACCC (the "ACCC U.S. Treasury Account"). ACI also pays certain U.S. dollar expenses from two accounts -- treasury and A/P -- held in its own name at Bank of America.

### (d) ACCC

141. ACCC maintains s U.S. dollar A/P account and a U.S. dollar treasury account with Bank of America. ACCC makes EFT transfers and miscellaneous payments in U.S. dollars, mostly on account of its Fort Frances operations, from the treasury account. It makes all U.S. dollar check payments for the Abitibi Group's Canadian legal entities from the A/P account. Inflows into the ACCC U.S. Treasury Account include transfers from the ACI US$ Concentration Account. ACCC makes all U.S. dollar electronic fund transfers for its Canadian legal entities from the ACCC U.S. Treasury Account. ACCC also flows intercompany transfers from the ACI US$ Concentration Account to its Canadian treasury account through the ACCC U.S. Treasury Account on an "as needed" basis.

### (ii) *Canadian Operating Accounts*

142. As with its United States cash management system, in Canada, funds released from the Citi Toronto Securitization Account flow into a principle operating account, ACCC's Canadian dollar treasury account with RBC (the "ACCC Cdn$ Treasury Account").

### (a) ACCC Cdn$ Treasury Account

143. Inflows. Transfers from the Securitization Program coming from the Citi Toronto Securitization Account constitute the principal deposits into the ACCC Cdn$ Treasury Account. Deposits also include transfers from: (a) the ACCC U.S. Treasury Account; and (b) the CIBC accounts upon conversion of U.S. dollar or other non-Canadian currency transfers into Canadian dollars. Transfers into the CIBC foreign currency exchange accounts include transfers

from the ACCC U.S. Treasury Account and the Company's European operations (typically from the London Concentration Accounts discussed previously).[40]

144. <u>Outflows</u>. The ACCC Cdn$ Treasury Account is the Abitibi Group's principal operating account and is used for most payables arising from its Canadian operations, including payroll. Transfers are made from the ACCC Cdn$ Treasury Account to a variety of additional accounts with RBC (the "<u>RBC Funding Accounts</u>") that serve accounts payable or payroll functions. These include: (a) the ACCC Payroll Prefunding Account for Canadian payroll; (b) the ACCC ACH Prefunding Account for EFT payroll, trade payables and miscellaneous expenses; (c) the ACCC A/P account for all accounts payable paid by check; and (d) the Abitibi Group's division accounts, which comprise approximately 70 individual accounts maintained at the Company's various mill sites throughout Canada used to pay miscellaneous mill-related expenses arising at the mill level. The Company transfers money into the RBC Funding Accounts on an "as needed" and generally daily basis. Excess amounts in the RBC Funding Accounts are transferred back into the ACCC Cdn$ Treasury Account.

(b) <u>Miscellaneous Accounts</u>

145. ACCC also maintains a U.S. dollar account in Canada with RBC (the "<u>ACCC US$ RBC Account</u>"). Historically a concentration account for collecting U.S. dollar receivables, the ACCC US$ RBC Account now serves a much more limited function. Inflows include principally intercompany transfers from the United States (specifically, from the ACCC U.S. Treasury Account) that are cycled through ACCC's two accounts with CIBC in connection

---

[40] In addition, ACH Limited Partnership, which owns various energy assets in Northeastern Canada and in which ACCC has a substantial ownership stake, maintains a bank account with CIBC. For the sake of the partnership's convenience, the Abitibi Group accepts deposits from the partnership into its CIBC U.S. or Canadian dollar accounts. Such amounts are then transferred into the ACCC treasury accounts, and disbursements to the partnership are made from ACCC Cdn$ Treasury Account.

with foreign currency conversion functions. Outflows include transfers to ACI's U.S. dollar treasury account in Canada with RBC. Also historically a concentration account for collection of U.S. dollar receivables, ACI's U.S. dollar RBC account now serves as a back-up account for U.S. dollar wires in Canada, and otherwise has very limited activity.

146. ACI also maintains a Canadian dollar treasury account with RBC. Deposits into this account include all Canadian non-accounts receivable payments (in Canadian dollars) arising from ACI's operations. Such deposits may comprise, for example, government rebates, miscellaneous proceeds from non-material asset sales in Canadian dollars, and similar transactions. Outflows from the ACI Canadian dollar treasury account are principally into the ACCC Cdn$ Treasury Account.

B.     Intercompany Transactions

147. In the normal course of business, the Debtors, the Canadian Debtors, and certain of their non-debtor affiliates engage in various intercompany transactions. As a result, at any given time, numerous intercompany transactions exist (the "Intercompany Claims") that reflect intercompany payments and receivables made in the ordinary course between and among the Debtors, between and among the Debtors and the Canadian Debtors, and among the Debtors, the Canadian Debtors, and certain non-debtor affiliates (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to:

> (i)     Accounts Receivable, Accounts Payable, and Payroll. In their day-to-day operations, the Debtors contribute cash and process disbursements through the Cash Management System described above. The system is generally integrated along Bowater and Abitibi Group lines. Where receipts are swept into and disbursements are paid from the concentration accounts maintained by Bowater, ACC, ACI and ACCC, corresponding Intercompany Claims arise between Bowater, ACC, ACI, ACCC and the applicable Bowater or Abitibi corporate entity. Also in the ordinary course of business, Bowater, ACC, ACI and ACCC

collect cash and disburse funds on behalf of other entities within the corporate group. The Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Debtor.

(ii) <u>Centrally Billed Expenses.</u> In the ordinary course of business, the Debtors, the Canadian Debtors, and AbitibiBowater incur centrally billed expenses. These include, for example, centralized invoicing for raw materials (*e.g.,* wood chips bought from third parties, chemicals, etc.) and freight and distribution costs, as well as certain employee medical costs, insurance premiums, accounts payable processing, certain taxes (including real estate, franchise, sales taxes, etc.) and leased equipment. To illustrate, AbitibiBowater has centralized many of its shipping and warehousing expenses. These charges are allocated among the Debtors and the Canadian Debtors and are reflected in the intercompany accounts.

(iii) <u>Corporate Expense Allocation.</u> Charges for corporate expenses provided by AbitibiBowater to the Debtors and the Canadian Debtors are allocated among the Debtors, the Canadian Debtors and AbitibiBowater based upon the cost of service provided, directly identifiable costs, and other allocation methods.

(iv) <u>Intercompany Purchases and Centralized Sales.</u> AbitibiBowater has centralized its sales force primarily in the United States. The Company's sales and customer service representatives accordingly operate predominantly in the United States and are employed by BAI. The Centralized Sales Team sells product on behalf of the entire corporate group. As a result, in the ordinary course of business, certain Debtors purchase and sell products to or on behalf of other Debtors, Canadian Debtors and non-debtor entities. For example, BAI sells wood products manufactured by BCFPI to BAI's United States customers. Once sold and invoiced to a United States customer in its own name, BAI purchases the lumber products from BCFPI via Bowater. The prices for such purchases are typically determined by Bowater and BCFPI based on the prices applicable to third parties that purchase similar products from BCFPI on an arm's length basis.

148. The Debtors maintain records of Intercompany Transactions and can ascertain, trace and account for Intercompany Transactions between and among the Debtors, between and among the Debtors and the Canadian Debtors, and among the Debtors, the

Canadian Debtors and their non-debtor affiliates. The significant intercompany relationships are generally documented by intercompany agreements and notes.

149. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors will seek Court approval to accord administrative expense status to all Intercompany Claims against a Debtor by another Debtor, a Canadian Debtor or a non-debtor affiliate arising after the Petition Date as a result of an Intercompany Transaction. If all Intercompany Claims are accorded administrative expense priority status, each entity will continue to bear ultimate repayment responsibility for these ordinary course transactions.

## VI.    Capital Structure

150. AbitibiBowater employed a number of prepetition financing programs to fund its operations. As of the Petition Date, its overall principal debt obligations, including secured bank debt, secured and unsecured notes (public issues and private placements), industrial revenue bonds and a securitization program (but excluding other off-balance sheet monetizations and capital lease obligations) totaled approximately $6.7 billion. Of this amount, the Debtors were liable as borrowers or issuers for approximately $3.1 billion.[41] The following table lists the approximate aggregate outstanding debt issued or borrowed by AbitibiBowater, the Bowater Group, the Abitibi Group and the Donohue Group:

|  | Total Secured Debt | Total Unsecured Debt | Total Debt |
|---|---|---|---|
| **AbitibiBowater** | $ 0 | $ 369,000,000 | $ 369,000,000 |
| **Abitibi Group** | $ 760,000,000 | $ 2,950,000,000 | $ 3,710,000,000 |
| **Bowater Group** | $ 267,000,000 | $ 2,178,000,000 | $ 2,445,000,000 |
| **Donohue Group** | $ 171,694,000 | $ 0 | $ 171,694,000 |

---

[41]  As discussed in further detail, some of the Debtors are guarantors of, and/or have pledged assets in favor of, debt incurred by the Canadian Debtors.

(1)     AbitibiBowater Indebtedness

151.    AbitibiBowater issued $350 million of 8% senior unsecured convertible notes due April 15, 2013 (the "Fairfax Notes"), which are guaranteed by Bowater and of which approximately $368.9 million is outstanding as of March 31, 2009.

(2)     Bowater Group Indebtedness

(a)     *Secured Bank Facilities*

152.    Bowater U.S. Credit Agreement.  Bowater is party to a credit agreement dated as of May 31, 2006 among Bowater, Newsprint South, Bowater Alabama LLC, and Bowater Newsprint South Operations LLC, as borrowers (collectively, the "U.S. Borrowers"), the lenders from time to time party thereto, and Wachovia Bank, National Association, as administrative agent ("Wachovia") (as amended, the "Bowater U.S. Credit Agreement"; Wachovia and the lenders thereunder, the "Bowater U.S. Secured Parties").  It is guaranteed by AbitibiBowater and certain wholly-owned U.S. subsidiaries of Bowater.  The Bowater U.S. Credit Agreement provides for a $370.4 million[42] revolving credit facility (the "Existing U.S. Credit Facility") with a scheduled maturity date of May 25, 2011.  As of March 31, 2009, the outstanding principal amount under the Bowater U.S. Credit Agreement was approximately $203.8 million.

153.    Collateral securing the Bowater U.S. Credit Agreement includes, but is not limited to:  (a)  the inventory, accounts receivable, deposit accounts, and certain other current assets of the U.S. Borrowers and the subsidiaries of Bowater that are guarantors, (b) 65% of the stock of certain of Bowater's foreign subsidiaries, (c) the stock of Bowater's U.S. subsidiaries that do not own mills or converting facilities, (d) the equity interests in Newsprint South's

---

[42]    On March 31, 2009, the commitment was reduced from $396.4 million to $370.4 million.

subsidiaries, and (d) the real property, fixtures and equipment relating to the Coosa Pines, Alabama and Grenada, Mississippi mills.

154. _Bowater Canadian Credit Agreement_. Bowater Canada is party to a credit agreement dated May 31, 2006 among Bowater Canada, as borrower, the U.S. Borrowers and certain subsidiaries of Bowater Canada, as guarantors, the lenders from time to time party thereto, and The Bank of Nova Scotia, as administrative agent ("BNS") (as amended from time to time, the "Bowater Canadian Credit Agreement," and together with the Bowater U.S. Credit Agreement, the "Bowater Prepetition Credit Agreements"; BNS and the lenders thereunder, the "Canadian Secured Parties," and together with the U.S. Secured Parties, the "Prepetition Bowater Secured Parties"). The Bowater Canadian Credit Agreement provides for a $165 million revolving credit facility (the "Existing Canadian Credit Facility") with a maturity date of June 5, 2009. As of March 31, 2009, the approximate outstanding principal amount under the Bowater Canadian Credit Agreement was $63.5 million.

155. Collateral securing the Bowater Canadian Credit Agreement includes, but is not limited to: (a) the inventory, accounts receivable, deposit accounts, and certain other current assets of Bowater Canada and its subsidiaries that are guarantors, (b) the real property, equipment and fixtures relating to the Coosa Pines, Alabama and Grenada, Mississippi paper mills, (c) the real property, equipment and fixtures of Bowater Canada located in Gatineau, Quebec, Dolbeau, Quebec and Thunder Bay, Ontario, and (d) the equity interest of Bowater's South Korean subsidiary (which owns Bowater's Mokpo mill). The Existing U.S. Credit Facility and the Existing Canadian Credit Facility shall be jointly referred to as the "Existing Secured Facilities".

*(b)      Bowater Group Unsecured Debt*

156.    Bowater is obligated under five separate series of unsecured notes with an aggregate principal amount outstanding as of March 31, 2009 of approximately $1.2 billion.[43] Furthermore, Bowater is an obligor on certain tax exempt industrial revenue bonds and similar bonds issued by local government entities totaling approximately $168.9 million in aggregate outstanding principal amount as March 31, 2009.

157.    In addition, Newsprint South is a borrower under a certain unsecured credit agreement with the City of Grenada, Mississippi, in an original principal amount of $8.5 million, of which approximately $4.6 million was outstanding as of December 30, 2008.

158.    Bowater Canada and Bowater Finance are each obligated under certain of six separate series of unsecured notes with an aggregate principal amount outstanding as of March 31, 2009 of approximately $802 million.[44]

---

[43]    The Bowater note issuances include: (i) 9.0% Notes due 2009 in the aggregate principal amount of $300 million (approximately $248 million outstanding as of March 31, 2009); (ii) Floating Rate Notes due 2010 (as amended) in the aggregate principal amount of $250 million (approximately $234 million outstanding as of March 31, 2009); (iii) 9.50% Notes due 2012 in the aggregate principal amount of $125 million; (iv) 6.5% Notes due 2013 in the aggregate principal amount of $400 million; and (v) 9.375% Notes due 2021 in the aggregate principal amount of $200 million.

[44]    Specifically, Bowater Canada Finance issued 7.95% notes due 2011 in the aggregate principal amount of $600 million. Bowater Canada is the issuer of the following unsecured notes: (i) 10.63% senior notes (Series A) due 2010 in the aggregate principal amount of $98 million (approximately $2.8 million outstanding as of March 31, 2009); (ii) 10.50% senior notes (Series B) due 2010 in the aggregate principal amount of $102 million (approximately $20.4 million outstanding as of March 31, 2009); (iii) 10.60% senior notes (Series C) due 2011 in the aggregate principal amount of $70 million; (iv) 10.26% senior notes (Series D) due 2011 in the aggregate principal amount of $22 million (approximately $6.6 million outstanding as of March 31, 2009); and (v) 10.85% debentures due 2014 in the aggregate principal amount of $125 million (approximately $125 million outstanding as of March 31, 2009).

(3)     Abitibi Group Indebtedness

159.    Certain companies within the Abitibi Group are borrowers or issuers of secured and unsecured debt totaling approximately $3.7 billion.  The majority of the Abitibi Group's debt is issued by Canadian entities.  As described in more detail below, certain of the Debtors within the Donohue Group are guarantors of debt or participate in a securitization facility with certain companies within the Abitibi Group.

(a)     *Canadian Secured Credit Facilities*

160.    ACCC is a borrower under a Credit Agreement (the "ACCC Credit Agreement") dated April 1, 2008 among ACCC, as borrower, ACI and certain members of the Abitibi Group and Donohue Group, as guarantors, the lenders from time to time party thereto and Goldman Sachs Credit Partners L.P., as administrative agent.  The ACCC Credit Agreement provides for a $400 million 364 day senior secured term loan (the "ACCC Term Loan") at LIBOR + 800 basis points.  The outstanding balance of the ACCC Term Loan is $347 million.

161.    Collateral securing the ACCC Term Loan includes, among other things: (a) certain inventory, accounts, and other current assets of ACCC, ACI and the other guarantors; (b) substantially all of the personal property of Donohue and certain other Donohue Group subsidiaries; (c) the pledge of stock or other equity interests of certain other Donohue subsidiaries; and (d) real estate and fixtures relating to the Alabama River, Alabama newsprint mill.

162.    Certain subsidiaries of ACCC have guaranteed the ACCC Term Loan.[45]
The following Donohue Group entities have also guaranteed the ACCC Term Loan: Donohue,
ACSC, Augusta Woodlands, Abitibi-Consolidated Alabama Corporation and Alabama River
Newsprint Company (the "Donohue Group ACCC Guarantors" and, together with the non-U.S.
ACCC Guarantors, the "ACCC Guarantors").

*(b)    Canadian Secured and Unsecured Notes*

163.    ACCC issued $413 million of 13.75% senior secured notes (the "ACCC
Senior Secured Notes") due April 1, 2011 pursuant to an indenture dated as of April 1, 2008 and
guaranteed by the ACCC Guarantors.[46] The Abitibi Group had unsecured notes outstanding
totaling approximately $2.95 billion as of March 31, 2009.[47]

---

[45]    Specifically, Canadian guarantors include: ACI, Abitibi-Consolidated Canadian Office Products Holdings Inc;
1508756 Ontario Inc., Donohue Recycling Inc., Marketing Donohue Inc; 6169678 Canada Incorporated,
3834328 Canada Inc., Abitibi-Consolidated Nova Scotia Incorporated, Terra-Nova Explorations Ltd.; The
Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Ltd;
3224112 Nova Scotia Limited and Saguenay Forest Products Inc., Bridgewater and Cheshire Recycling Ltd
(U.K.) (collectively, the "Non-U.S. Guarantors").

[46]    The collateral securing the ACCC Senior Secured Notes includes, but is not limited to: (a) real property and
fixtures associated with eleven pulp and paper mills located in Canada and the United Kingdom (including the
Grand Falls, Newfoundland mill, which has been expropriated by the government of Newfoundland and
Labrador); (b) ACCC's 60% equity interest in Manicouagan Power Company, which owns and operates a
hydroelectric plant on the Manicouagan river; (c) ACCC's 75% equity interests in each of ACH Limited
Partnership and its general partner, Abitibi-Consolidated Hydro Inc.; and (d) equipment and intellectual
property of ACCC and the Non-U.S. Guarantors.

[47]    The ACCC unsecured note issuances include: (i) 15.5% exchange notes due July 15, 2010 in the aggregate
principal amount of $293 million (approximately $293 million outstanding as of March 31, 2009); (ii) 7.75%
notes due June 15, 2011 in the aggregate principal amount of $200; (iii) Floating Rate Notes due June 15, 2011
in the aggregate principal amount of $200 million; (iv) 0% debentures due through June 2012 in the aggregate
principal amount of CDN$14 million (approximately $11 million outstanding as of March 31, 2009); (v) 6.00%
notes due June 20, 2013 in the aggregate principal amount of $350 million; (vi) 8.375% notes due April 1, 2015
in the aggregate principal amount of $450 million; (vii) 8.55% notes due August 1, 2010 in the aggregate
principal amount of $500 million (approximately $395 million outstanding as of March 31, 2009); (viii) 7.40%
debentures due April 1, 2018 in the aggregate principal amount of $100 million; (ix) 7.50% debentures due

*(c)*     *U.S. Unsecured Notes*

164.     In 1999, Abitibi-Consolidated Finance LP issued unsecured notes due in 2009 in connection with a financing. Approximately $8 million of the aggregate principal amount of such notes remain outstanding. The notes are guaranteed by ACI.

A.     Donohue Group Indebtedness

165.     *Securitization.* The Company has historically monetized substantially all of its accounts receivable generated by the Abitibi Group pursuant to a securitization program (the "Securitization Program") arranged by Citibank, N.A. ("Citibank"). The Securitization Program enables the Debtors to immediately convert the receivables generated by ACI and its United States affiliate, Abitibi Consolidated Sales Corporation ("ACSC"), to cash. Doing so provides up-front liquidity to the Company and funds the Abitibi Group's day-to-day operations.

166.     The Securitization Program operates as follows. ACI and ACSC originate accounts receivable. As "originators," ACI and ACSC sell and/or contribute those receivables to a special purpose vehicle, a non-debtor, Abitibi-Consolidated U.S. Funding Corp. ("ACI Funding") at a discount based upon the outstanding balance on the accounts receivable. ACI Funding pays ACI and ACSC for the receivables using money from (a) collections on the accounts receivable it already owns, and (b) pooling acquired receivables and selling an undivided percentage ownership interest in the pool to Citibank.[48] Under the Securitization

---

April 1, 2028 in the aggregate principal amount of $250 million; (x) 8.50% debentures dues August 1, 2029 in the aggregate principal amount of $250 million; and (xi) 8.85% debentures due April 1, 2030 in the aggregate principal amount of $450 million.

[48]     The purchase price is payable in cash and in the case of a purchase from ACSC, may also be paid by way of a contribution by ACSC to ACI Funding's capital or an increase in the Deferred Purchase Price (as defined in the PCA). The Deferred Purchase Price is set at a maximum of $35 million and is evidenced by a subordinated promissory note by ACI Funding to ACSC.

Program, Citibank has committed to purchase receivables from ACI Funding in an aggregate principal amount of up to $210 million. Financing available under the Securitization Program at any time is limited by the outstanding balance of the eligible receivables, the size of the total reserves under the programs (effectively, an "equity cushion" based on the present value of the future income stream from the receivables), and other factors.

167. In practice, accounts receivable are collected through various separate lockboxes. Funds from the lockboxes are transferred daily into two accounts now controlled by Citibank that serve to concentrate customer payments on receivables in U.S. and Canadian dollars. To obtain advances under the Securitization Program, the Company provides Citibank with a daily report identifying the amount of eligible receivables available for sale under the Securitization Program and the performance of the existing receivables portfolio. The parties then calculate the amount available (or owed) under the program. From this total, Citibank releases funds up to the amount of the Abitibi Group's projected cash needs for that day (the "Cash Flow Forecast"). The proceeds from the Securitization Program are transferred into the Abitibi Group's operating accounts and disbursed through its cash management system.

168. Various documents implement this structure. Specifically, ACI and ACSC (together, the "Originators") are parties to (a) that certain Amended and Restated Receivables Purchase Agreement, dated as of January 31, 2008 (as heretofore amended, including, without limitation, by Omnibus Amendment No. 5 to Amended and Restated Receivables Purchase Agreement and Amendment No. 3 to Amended and Restated Purchase and Contribution Agreement and Waiver Agreement dated as of April 16, 2009, the "RPA") among ACI Funding, Eureka Securitisation, plc ("Eureka"), Citibank, N.A. ("Citibank"), Citibank, N.A., London Branch (the "Agent"), ACI, in its capacity as Subservicer and an

Originator, and ACSC, in its capacity as Servicer and an Originator and (b) that certain Amended and Restated Purchase and Contribution Agreement, dated as of January 31, 2008 (as heretofore amended, including, without limitation, by Omnibus Amendment No. 5 to Amended and Restated Receivables Purchase Agreement and Amendment No. 3 to Amended and Restated Purchase and Contribution Agreement and Waiver Agreement dated as of April 16, 2009, the "PCA", the RPA and PCA are collectively hereinafter referred to as the "Receivables Agreements") among ACI and ACSC as Sellers and ACI Funding as Purchaser.

169.    Pursuant to the RPA, ACI Funding granted Citibank a security interest for its benefit and for the ratable benefit of the investor and the banks participating in the Securitization Program[49] in all of ACI Funding's right, title and interest (collectively, the "Collateral") in and to, among other things:  (a) the PCA, including (i) all rights of ACI Funding to receive monies due or to become due under the PCA, (ii) all security interests and property subject thereto from time to time purporting to secure payment of monies due or to become due under the PCA, (iii) all rights of ACI Funding  to receive proceeds of insurance (including the right to receive proceeds under the Accounts Receivable Policy (Shipments) General Terms and Conditions issued by Export Development Canada and Compagnie Française d'Assurance pour le Commerce Extérieur – Canada Branch (the "Insurance Proceeds")), indemnity, warranty or guaranty with respect to the PCA, (iv) claims of ACI Funding for damages arising out of or for breach of or default under the PCA, and (v) the right of ACI Funding to compel performance and otherwise exercise all remedies thereunder; (b) all Receivables, the Related Security with respect thereto and the Collections (each such term as defined in the RPA); (c) the lockboxes and deposit

---

[49]    Although the RPA contemplates the purchase of receivables by multiple investors and banks, the only purchaser currently under the RPA is Citibank.

accounts to which collections of the Receivables are remitted and any funds on deposit in the foregoing; and (d) proceeds of any and all of the foregoing.

170.    On April 1, 2009, ACI, ACSC, ACI Funding, Eureka, and Citibank entered into Waiver and Amendment No. 4 to the RPA (the "Fourth Amendment"). As a result, Eureka, Citibank and Agent waived certain events of termination under the RPA, extended the Securitization Program to September 1, 2009, and added certain covenants and an event of termination.

171.    In anticipation of the Insolvency Proceedings, the parties entered into the Fifth Amendment, specifically, the *Omnibus Amendment No. 5 to Amended and Restated Receivables Purchase Agreement and Amendment No. 3 to Amended and Restated Purchase and Contribution Agreement and Waiver Agreement*. The Fifth Amendment provides that the Insolvency Proceedings will not constitute an Event of Termination or trigger a Facility Termination Date (both as defined in the Receivables Agreements) and accordingly, permits the continuance of the Securitization Program in place post-filing. Absent modification, the Fifth Amendment provides that an Event of Termination under the Securitization Program will occur forty-five (45) days after the Petition Date. The Debtors expect to obtain alternate financing to replace the liquidity currently provided by the Securitization Facility prior to such time.

172.    In the meanwhile, however, the Fifth Amendment will permit ACI and ACSC to continue selling their receivables to ACI Funding, thereby allowing them to continue their prepetition practice of converting Receivables to cash as soon as possible to provide cash flow necessary for various business purposes. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, to purchase

and supply new inventory and otherwise finance their operations, is essential to the Debtors' continued viability.

173. In addition, the Debtors' need for financing is immediate. In the absence of the proposed continued financing through the Securitization Program, serious and irreparable harm to the Debtors and their estates could occur, which may include third parties declining to conduct business dealings with the Debtors. The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

174. The Fifth Amendment effectively maintains the Securitization Program's prepetition economics in place. ACI and ACSC will continue to sell their receivables to ACI Funding and Citibank will remain obligated, subject to the terms of the RPA, to purchase (directly or indirectly) receivables interests in an aggregate principal amount up to $210 million, subject to advance rates established under the program. Other than benefiting from the Debtors' continued access to postfiling liquidity, the Debtors' other creditors and stakeholders will not be adversely impacted by the Fifth Amendment or its terms. Notably, the Fifth Amendment does not change Citibank's priority vis-à-vis the Debtors and their, or ACI's and ACCC's, existing secured lenders.

175. *Other Obligations*. In addition to ACSC's obligations under the Securitization Program, as noted previously, certain of the Donohue Group entities have guaranteed various Abitibi Group obligations, including: (a) the ACCC Term Loan; (b) the ACCC Senior Secured Notes; and (c) the 15.5% exchange notes due July 15, 2010.

## VII.  Events Leading to Chapter 11 Filing

176.    The Company has a significant amount of indebtedness.  As of December 31, 2008, the Company had, on a consolidated basis, outstanding total debt of approximately $6.0 billion, of which approximately $1.1 billion was secured.  Notably, the November 2008 amendments to Bowater's secured bank facilities restricted its liquidity by significantly reducing availability under the facilities.  Coupled with the current recession and the lack of liquidity in the markets generally, the Company's indebtedness rendered it vulnerable to adverse economic and industry conditions, impaired its ability to obtain additional financing, required it to dedicate a substantial portion of cash flow from operations to service debt, and has otherwise limited its flexibility in planning and responding to business drivers.

177.    As a result of the above factors, by the beginning of this year, the Debtors' liquidity positions were severely constrained.  To address the Debtors' tightening liquidity pressures, on February 9, 2009, the Company announced the commencement of private offers to exchange certain outstanding series of unsecured notes issued by Bowater and one of its wholly-owned subsidiaries for new secured notes to be issued by an indirect subsidiary of AbitibiBowater, as well as a concurrent notes offering.  Shortly thereafter, on March 13, 2009, the Company commenced a debt recapitalization plan for the Abitibi Group's Canadian companies pursuant to the Canada Business Corporations Act.  At the same time, the Company announced that ACCC and an unaffiliated third party signed a letter of intent in connection with the sale of ACCC's 60% interest in Manicouagan Power Company ("MPCo") for gross proceeds of $615 million.

178.    Unfortunately, the Company was unable to successfully complete the Bowater exchange offer.  As a result, the Abitibi Group's recapitalization, which was contingent

on a successful Bowater exchange, could not be consummated, and the Company had no other option but to seek protection under the Bankruptcy Code and the CCAA.

## VIII.  Debtor-in-Possession Financing

179.   Recognizing the pressing risks and uncertainties surrounding its restructuring efforts given existing market conditions, on February 23, 2009, the Company retained Blackstone Advisory Services L.P. ("Blackstone") to assist it with contingency planning and to solicit interest from lenders to provide debtor-in-possession ("DIP") financing.  As set forth more fully in *Declaration of Steven Zelin in Support of the DIP Motion*, the Company and Blackstone engaged in a thorough, competitive and arms' length process to obtain postpetition financing on the best possible terms.

180.   The Company and Blackstone reviewed and evaluated financing proposals from various traditional postpetition lenders, namely, financial institutions, private equity firms and hedge funds, and determined that the postpetition facility (the "DIP Facility") proposed by Fairfax Financial Holdings Ltd. ("Fairfax") offered the Company significant benefits - including the best available terms - and therefore, the Company selected the DIP Facility to support its business during these Chapter 11 Cases.

181.   As set forth more fully in the DIP credit agreement,[50] the DIP Facility provides for a fully-committed $206 million term loan (the "Initial Funding") upon entry of the Interim Order to be provided by Fairfax, the proceeds of which would be available to provide sorely needed working capital to the Debtors.  In addition, the DIP Facility can be upsized to

---

[50]   The motion seeking authority to enter into the DIP Facility sets forth in more detail the terms and conditions of the DIP Facility.

$600 million (an incremental term loan and an asset backed revolving credit facility) following entry of a final order approving the DIP Facility.

182. The Debtors intend to draw the full amount of the Initial Funding upon entry of the Interim Order. The Debtors are operating with constrained liquidity and drawing of the full amount of the Initial Funding is appropriate for a manufacturing company of the size and scope of the Debtors. The Debtors must obtain immediate liquidity to fund their businesses and maintain operations in the ordinary course and permitting the Debtors to access the Initial Funding as soon as possible will enable the Debtors to demonstrate to its vendors, customers, employees and other stakeholders that the Debtors have sufficient resources to meet their obligations as they come due. Strengthened by this liquidity infusion, the Debtors will take their first important steps toward stabilizing their businesses and bolstering important relationships that have been strained due to prepetition liquidity constraints.

## IX. Conclusion

183. For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date:  April 16, 2009

Name:  William G. Harvey

Title:  Senior Vice-President and Chief Financial Officer of AbitibiBowater Inc.