# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ABITIBIBOWATER INC., et al.,[1] | ) ) ) | Case No. 09-11296 (KJC) |
|  | ) ) | Jointly Administered |
| Debtors. | ) ) | **Objection Deadline: May 8, 2009 at 4:00 p.m. (ET)[2]** **Hearing Date: June 4, 2009 at 10:00 a.m. (ET)** |

## LIMITED OBJECTION OF WILMINGTON TRUST COMPANY, SOLELY AS INDENTURE TRUSTEE FOR THE 7.95% NOTES ISSUED BY BOWATER CANADA FINANCE CORPORATION, TO DEBTORS' MOTION FOR, INTER ALIA, AN ORDER: (1) APPROVING POSTPETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY EXPENSE STATUS; AND (4) GRANTING ADEQUATE PROTECTION [DOCKET NO. 18]

Wilmington Trust Company ("Wilmington Trust"), solely as indenture trustee for the 7.95% Notes due 2011 (collectively, the "2011 Notes") issued by Bowater Canada Finance Corporation ("Bowater Canada Finance") pursuant to that certain indenture agreement, dated as of October 31, 2001 (the "Indenture"), by and through its undersigned co-attorneys, hereby submits this limited objection to the motion of AbitibiBowater Inc. ("AbitibiBowater") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal or Canadian tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp (6050), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (3225), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (0999), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (8810), Bowater Canadian Forest Products Inc. (2010), Bowater Canadian Holdings Incorporated (6828), Bowater Canadian Limited (7373), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (5722), Bowater Maritimes Inc. (5684), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0186), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913).

[2] The Debtors agreed to extend the objection deadline for Wilmington Trust to May 28, 2009.

"Debtors") for entry of a final order, pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure and Rules 2002-1, 4001-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, authorizing, among other things, the Debtors to obtain postpetition financing [Docket No. 18] (the "Motion").[3] In support of this limited objection, Wilmington Trust respectfully represents as follows:

## THE 2011 NOTES

1. The aggregate principal amount owed under the 2011 Notes is $600 million, exclusive of accrued interest, fees, expenses and all other charges. The 2011 Notes were issued by Bowater Canada Finance and guaranteed by Bowater Incorporated ("Bowater"), each of which is a Debtor.

2. Pursuant to that certain Agreement of Resignation, Appointment and Acceptance, dated as of April 28, 2009, The Bank of New York Mellon resigned as indenture trustee under the Indenture and Wilmington Trust accepted the appointment to serve as the successor indenture trustee.

## THE MOTION

3. By their Motion, the Debtors seek, inter alia, entry of a final order (the "Final DIP Order"): (a) authorizing certain Debtors to enter into the DIP Facility; (b) authorizing the Debtors to use cash collateral; (c) granting liens to collateralize and superpriority administrative expense status to further ensure payment of claims arising in connection with the DIP Facility; and (d) granting adequate protection to the Prepetition Lienholders.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

4. On April 17, 2009, this Court entered an order [Docket No. 64] (the "<u>Interim DIP Financing Order</u>") granting certain interim relief sought in the Motion.

5. Pursuant to the DIP Facility, AbitibiBowater, Bowater and Bowater Canada (collectively, the "<u>Borrowers</u>") would be able to borrow up to $600 million in the aggregate. Additionally, pursuant to the DIP Facility: (a) the US Debtors, including Bowater, would be obligated for or guarantee <u>on a joint and several basis</u> all of the obligations of AbitibiBowater and Bowater under the DIP Facility; (b) the Canadian Debtors, including Bowater Canada Finance, would be obligated for or guarantee <u>on a joint and several basis</u> all of Bowater Canada's obligations under the DIP Facility; (c) the US Debtors, including Bowater, would -- <u>on a joint and several basis</u> -- provide adequate protection to the Prepetition Lienholders; and (d) the Canadian Debtors, including Bowater Canada Finance, would -- <u>on a joint and several basis</u> -- provide adequate protection to the Canadian Lienholders, even though Bowater Canada Finance has no liability for such lenders' prepetition loans. Further, the Canadian Lienholders would obtain junior liens on the assets of the US Debtors even though the US Debtors, including Bowater, have no liability on such lenders' prepetition loans. <u>See</u> Interim DIP Financing Order ¶ 10(a). Moreover, the Canadian Debtors would provide the US Debtors with junior liens to secure intercompany claims. <u>See</u> Interim DIP Financing Order ¶ 4(c).

6. At one level, the Motion emphasizes the distinctions among the Debtors and between the Debtors and their affiliates. For example, the Debtors state that "from a cash management and corporate finance point of view, the Bowater Debtors and the Abitibi Group remains [sic] essentially distinct." Motion ¶ 12. Further, the Debtors state that "[e]ach of the Abitibi Group, Bowater Debtors and Donahue Debtors maintain separate accounting systems capable of tracking cash flows within their respective groups." <u>Id.</u>

7. Yet, at another level, the Motion incorporates a one for all, all for one approach that blurs the distinctions among the Debtors and their affiliates:

> A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the collateral. The Bowater Debtors require access to ongoing working capital which is critical to the Debtors' entire business. Absent access to the DIP Facility and the use by the Bowater Debtors of the cash collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facility and continued use of cash collateral will ensure that the "going concern" value of their assets is preserved, a value substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

Motion ¶ 61.

8. While the blurring of corporate distinctions regarding proposed DIP financing might be understandable when: (a) substantive consolidation of the Debtors appears to be inevitable; or (b) prepetition, the Debtors all were jointly and severally liable under a single financing arrangement and already had pledged substantially all of their assets to secure that facility; here, <u>neither</u> is the case. As noted above, the Debtors have made representations inconsistent with substantive consolidation. Meanwhile, prepetition, only $1 billion of the Company's $6.7 billion of debt was secured. <u>See</u> Motion ¶ 32. Further, prepetition, the Company had multiple secured and unsecured debt facilities on which different Debtors and/or their affiliates were liable. <u>See</u> Motion ¶¶ 14 - 31. Moreover, it appears that significant portions of that prepetition debt may have been incurred or collateralized shortly before the Debtors' chapter 11 filings and, therefore, certain of the Debtors' prepetition obligations might be subject to challenge.

9.     Accordingly, by blurring corporate distinction among the Debtors, the Motion fails to provide information critical to evaluating the proposed DIP financing from the perspective of individual Debtors or their respective creditors. Just by way of example, the Motion fails to disclose: (a) the debt structure of each Debtor or even the prepetition obligations of each Debtor for borrowed money, whether as obligor or guarantor; (b) which Debtor had unencumbered assets or assets with values in excess of secured debt as of the Petition Date; (c) which Debtors are anticipated to be net borrowers under the proposed DIP financing; (d) whether such net borrowing Debtors, as opposed to the Debtors as a whole, would have the ability to repay the DIP financing utilized by such net borrowing Debtors; (e) how much of the DIP financing would be applied to satisfy debt of the Prepetition Lienholders, and which Debtors were obligated on the prepetition debt to be repaid; or (f) how the full $600 million DIP loan would be allocated between the U.S. and Canadian portions.

10.    Equally problematic is the Motion's failure to mention the parallel DIP financing that has been or might be approved in the Canadian Proceedings of certain of the Debtors and their Canadian affiliates, let alone explain how the Canadian DIP financing interfaces with the DIP financing requested in this Court or impacts the relevant Debtors. For example, concurrently with filing the Motion, certain of the Debtors and their affiliates filed a Motion for Approval of a DIP Financing in Respect of the Abitibi Petitioners, dated April 27, 2009 (the "Canadian DIP Motion"), in the Superior Court for the Province of Quebec, District of Montreal, Canada (the "Canadian Court"). On May 6, 2009, the Canadian Court entered a Second Amended Initial Order (the "Canadian DIP Order") authorizing: (a) AbitibiBowater, Abitibi-Consolidated Inc. and those entities listed on Schedule A to the Canadian DIP Motion to borrow under a $100 million credit facility (the "Canadian DIP Facility"); and (b) Bowater

Canadian Holdings Inc. and those entities listed on Schedule B to the Canadian DIP Motion to enter into the DIP Facility.

11. Consequently, even assuming a reader of the Motion could figure out which Debtors would be liable for each portion ("U.S." and "Canadian") of the DIP Facility, which in and of itself is essentially impossible, there is no way to evaluate whether as to any individual Debtor: (a) the proposed DIP Facility would be beneficial because that Debtor would be a net borrower; or (b) harmful because that Debtor would be obligated to repay DIP financing without necessarily having effective reimbursement rights against the net borrowing Debtors.

12. In addition, by the Motion, the Debtors seek a "Carve-Out" for, inter alia, the following: (a) with respect to the US Debtors and their respective cases, after the occurrence and during the continuation of an Event of Default, an amount not to exceed $7.5 million plus all accrued and unpaid professional fees and disbursements incurred prior to the occurrence of the Event of Default, which amount may be used to pay any fees and expenses incurred by the professionals retained by the Bowater Debtors and any statutory committee appointed in these cases (the "US Professional Fees"); and (b) with respect to the Canadian Debtors and their respective cases: (i) an administration charge in an amount not to exceed CAD 2 million for the payment of allowed and unpaid professional fees and disbursements incurred by the Canadian Debtors' advisers and the monitor in the Canadian Proceedings (the "Administration Charge" and, together with the US Professional Fees, the "Professional Fees"); and (y) a charge for directors in an aggregate amount not to exceed CAD 7.5 million to secure the Canadian Debtors' obligation to indemnify the directors of the Canadian Debtors for liability arising after the entry of the CCAA Order or in connection with the Canadian Debtors' failure to make payments respecting employee obligations (the "Directors' Indemnification Charge"). See Motion ¶ 16.

The Motion does not describe how or whether the Professional Fees or the Directors' Indemnification Charge would be allocated on a Debtor-by-Debtor basis.

13. On the Petition Date, the Debtors also filed a motion seeking, inter alia, entry of an order: (a) authorizing the continued use of the existing consolidated cash management system, bank accounts and business forms; (b) authorizing the continuation of certain Intercompany Transactions (as defined in the Cash Management Motion); and (c) granting administrative priority status to postpetition intercompany claims [Docket No. 13] (the "Cash Management Motion"). Pursuant to the Cash Management Motion, the Debtors would be permitted to pay intercompany obligations, extend intercompany credit and continue all other Intercompany Transactions among the Debtors and non-Debtor affiliates in a manner consistent with prepetition practices, including netting and setting off obligations arising from Intercompany Transactions. On April 17, 2009, the Court entered an interim order [Docket No. 62] (the "Cash Management Order") approving the Cash Management Motion.

## THE LIMITED OBJECTION

14. The Debtors cannot satisfy their burden of proof here simply by asserting the proposed DIP Facility benefits the Debtors as a whole; rather, the Debtors must demonstrate how each Debtor's liability under the DIP Facility would correspond to such Debtor's benefit (i.e., actual net borrowings under the DIP Facility or other cognizable and quantifiable benefit). The Debtors' Motion fails to meet this burden of proof. The absence of critical information (some of which may not exist) regarding the proposed DIP Facility and its consequences as to individual Debtors despite the enormous economic consequences to individual Debtors, mandates conditioning any such DIP financing on certain protective measures. As detailed below, the key to all such measures is that no individual Debtor should be exposed to liability

under the DIP Facility beyond the net benefit of the DIP Facility to the individual Debtor. For example, Bowater Canada Finance, which is not an operating entity with ongoing material cash needs or operating losses to fund, and is without obligations under any secured prepetition debt facility, should not be potentially liable for the full amount of the requested DIP financing for Bowater Canada or for any amount concerning adequate protection of the Prepetition Lienholders.

A.  Bowater's And Bowater Canada Finance's Respective
    Liability Under The DIP Facility Should Be Limited In Scope

15. Statements of the Debtors that the proposed DIP Facility is vital to all the Debtors are misleading. In effect, even assuming any DIP loan whatsoever is necessary here -- which has not been demonstrated -- the need would exist only for certain Debtors.

16. Hence, the DIP Facility should not be approved unless the liability of each of Bowater and Bowater Canada Finance thereunder is strictly limited to the net borrowing benefit each such entity would receive under the DIP Facility. As drafted, however, the DIP Facility effectively treats many of the Debtors as if they have been substantively consolidated and imposes joint and several liability for many obligations. Worse, because the Debtors appear to have complete freedom to advance funds among each other under their cash management system, even placing limitations on the liability of individual Debtors under the DIP Facility might prove ineffective. Hence, this objection also should be deemed to be a limited objection to the Cash Management Motion to the extent it would permit the movement of cash so as to subvert any protections provided by limiting an individual Debtor's exposure under the proposed DIP Facility.

17. Under the DIP Facility, each of the US Debtors (including Bowater) and each of the Canadian Debtors (including Bowater Canada Finance) would be liable "jointly and

severally" under a portion of the DIP financing agreements and would grant: (a) the DIP Lenders a valid and enforceable first or second priority security interest; and (b) the Prepetition Lienholders adequate protection liens in all of such Debtors' assets without demonstrating how or whether each such Debtor would benefit individually from the applicable borrowings under the DIP Facility. As a result, a Debtor, such as Bowater or Bowater Canada Finance, potentially could be liable for all applicable obligations under the DIP Facility (including paydowns of other Debtors' prepetition debt) irrespective of the actual benefit it might derive.[4]

18. In effect, if a Debtor that on its Petition Date had no secured debt or had asset values in excess of its secured liabilities, now has guaranty obligations under the DIP Facility and such Debtor's liability on such guaranty exceeds the net benefit of that Debtor's (the "Subsidizing Debtor") borrowings under the DIP Facility, then the value that would have been available to unsecured creditors of the Subsidizing Debtor would be reduced or eliminated. The fact the Subsidizing Debtor may have an administrative claim against a Borrower or the other DIP Facility guarantors for reimbursement only would benefit the Subsidizing Debtor if the Debtors that are net borrowers under the DIP Facility have sufficient assets beyond their secured debt (including their new liabilities under the DIP Facility)[5] to reimburse the Subsidizing Debtor. Even if the Subsidizing Debtor is entitled to be subrogated to the DIP Lenders' claims once they have been paid in full (and it does not appear that would be the case here), that only would provide meaningful protection if the Debtors obtaining the benefit of the DIP Facility still would

---

[4] The US Debtors would guaranty all DIP obligations of, among others, AbitibiBowater and Bowater. The Canadian Debtors, including Bowater Canada Finance, would guaranty all DIP obligations of Bowater Canada.

[5] Those new liabilities include senior secured obligations for the DIP loan, adequate protection claims for the Prepetition Lienholders, the Carve-Out for the Professional Fees, and the Directors' Indemnification Charge.

have asset values available after repayment of the DIP loans (which would be questionable, as a Debtor operating at a loss and needing to utilize the DIP Facility is less likely to have much, if any, value to spare).

19. The solution to the foregoing concerns is to limit the scope of each Debtor's liability under the DIP Facility (both as to the DIP loans and for adequate protection) to the amount of its net borrowings under the DIP Facility (or having each applicable Debtor be a direct borrower under the DIP Facility with all guaranties eliminated). Additionally, the intercompany reimbursement claims among the Debtors should be secured by liens and be granted superpriority claims that have priority over all liens and claims of the DIP Lenders and the adequate protection claims of the Prepetition Lienholders.[6] Finally, advances among the Debtors should be prohibited except to the extent directly flowing from the DIP Facility; otherwise, at the outset of these cases, there would appear to be a de facto substantive consolidation of many of the Debtors to the detriment of their unsecured creditors.

20. Still another allocation problem unaddressed by the Motion concerns the Carve-Out. In effect, the DIP Facility effectively incorporates a Carve-Out of at least $7.5 million for professionals (exclusive of analogous carve outs and the Directors' Indemnification Charge approved by the Canadian Court), but does not require professionals to allocate their fees by Debtor or otherwise provide for fee allocation. Thus, just as an individual Debtor could be liable for a disproportionate amount of the DIP financing, an individual Debtor also could be liable for a disproportionate share of the Carve-Out.

---

[6] Granting the intercompany reimbursement claims among the Debtors superpriority status would mitigate any adverse effect from the Debtors extending intercompany credit to one another under the Cash Management Order, which otherwise could circumvent protections advocated herein.

21.     Accordingly, Wilmington Trust objects to the Motion insofar as it fails to limit the scope of each Debtor's potential liability under the DIP Facility to the net benefit such Debtor would receive. Such limitation could be provided with language substantially as follows:

> Notwithstanding anything in this Order to the contrary, no individual Debtor shall have any liability hereunder or under the Interim DIP Financing Order in excess of the aggregate amount of such Debtor's: (a) net borrowings under the DIP Facility, plus any allocable interest, fees and other charges; (b) net use of cash collateral; (c) allocable share of the Professional Fees covered by the Carve-Out; and (d) allocable share, if any, of the Directors' Indemnification Charge.

B.      Obligating Every Debtor For The Full Amounts Potentially
        Due Under The DIP Facility Is Inappropriate and Premature

22.     At most, any current need of the Debtors for DIP financing only could be for the initial $206 million already advanced. In effect, any additional amounts -- whether to increase the DIP loan to $360 million to fund operations or a further increase up to $600 million to refinance prepetition debt -- already would require the Debtors to return to Court. Thus, unless each Debtor's liability is strictly limited to its net benefit from the DIP Facility, no DIP financing in excess of the $206 million already advanced should be approved.

23.     Correspondingly, regarding adequate protection, the Prepetition Lienholders are not entitled to any adequate protection absent a showing they lack a sufficient equity cushion if their collateral declines in value during these cases. Even assuming the Prepetition Lienholders are entitled to some adequate protection, however, the providers of such adequate protection should be limited to the individual Debtors that are obligors on the Prepetition Lienholders' debt <u>and</u> then only to the extent such obligors benefit from the DIP Facility.

C.  The Final Cash Management Order Should Not Enable The
    Debtors To Subvert The Allocation Protections Requested Herein

24. As described above, the Cash Management Order permits the Debtors to pay intercompany obligations, extend intercompany credit, and continue all other Intercompany Transactions among the Debtors and non-Debtor affiliates in a manner consistent with prepetition practices. Such practices might result in significant value transfers from individual, solvent estates to other, potentially less solvent, Debtors and non-Debtor affiliates regardless of whether the protections advocated herein are implemented. Accordingly, to protect against such transfers of value, the final Cash Management Order should provide explicitly that intercompany reimbursement claims should be secured by liens and be granted superpriority claims that have priority over all liens and claims of the DIP Lenders and the adequate protection claims of the Prepetition Lienholders.

D.  The Final DIP Order Has Not Been Circulated

25. The form of the proposed Final DIP Order has not been filed with the Court. The Debtors should provide Wilmington Trust with a copy of the proposed Final DIP Order, blacklined to reflect changes from the Interim DIP Order, at least three business days in advance of the final hearing on the Motion in order to provide Wilmington Trust with a meaningful opportunity to review such Final DIP Order and, if necessary, object thereto. Wilmington Trust reserves all rights to object to the proposed Final DIP Order or to otherwise amend, modify or supplement this limited objection.

E.  Joinder In The Committee's Objection

26. Wilmington Trust anticipates supporting each objection to the DIP Facility filed by the Official Committee of Unsecured Creditors, and hereby incorporates them by reference, except to the extent Wilmington Trust may so advise the Court.

## CONCLUSION

WHEREFORE, Wilmington Trust respectfully requests that the Court enter an order: (a) denying the Motion or granting the Motion only on terms consistent with the objections set forth above; and (b) granting Wilmington Trust such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware
May 28, 2009

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: _____
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

Alan J. Lipkin, Esquire
Steven Z. Szanzer, Esquire
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

Co-Attorneys for Wilmington Trust Company, solely as indenture trustee for the 7.95% Notes due 2011 issued by Bowater Canada Finance Corporation pursuant to an indenture agreement, dated as of October 31, 2001

2917796.1