# **EXHIBIT 2**

SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
CREDIT AGREEMENT

dated as of April 21, 2009

by and among
**ABITIBIBOWATER INC., BOWATER INCORPORATED and BOWATER CANADIAN FOREST PRODUCTS INC.,**

as Debtors and Debtors in Possession,
as Borrowers,

the Lenders from time to time party hereto,

and

**FAIRFAX FINANCIAL HOLDINGS LTD.**

as Initial Lender, Initial Administrative Agent and Initial Collateral Agent

WHEREAS, each of the Guarantors has agreed, to the extent set forth in Article VI hereof, to guaranty the obligations of the Borrowers hereunder and each Borrower and each Guarantor has agreed to secure its obligations to the Lenders hereunder with, *inter alia*, security interests in, and liens on, all of its property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein, in the DIP Financing Orders and in the Collateral Documents;

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein and such other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

SECTION 1.01. <u>Certain Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such terms to be equally applicable to both the singular and plural forms of the terms defined):

"*Abitibi Entities*" means, collectively, (a) Abitibi-Consolidated Inc. and its Subsidiaries and (b) AbitibiBowater US Holding LLC and its Subsidiaries.

"*ABL Facility*" means a debtor in possession asset-backed revolving credit facility in an amount not to exceed $600,000,000 minus the outstanding principal amount of the DIP Facility at any time, which may be entered into after the Final Order has been entered, on terms reasonably acceptable to the Required Lenders, and subject to intercreditor arrangements on terms acceptable to each of the Initial Lenders, the proceeds of which are to be used, first, to refinance the Existing Facilities and, after the Existing Facilities have been repaid in full, for working capital and general corporate purposes.

"*Accounts*" has the meaning set forth in the UCC and, in the case of the Canadian Guarantors, in the PPSA.

"*Account Collateral*" has the meaning specified in Section 9.01(f).

"*Advance*" means a Term Advance or an advance under the Incremental Facility.

"*Affiliate*" means:

(a) as to any Agent or Lender, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person; and

(b) as to any Person other than an Agent or Lender, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this clause (b), the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 10% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" means, collectively, the Administrative Agent and the Collateral Agent.

"*Agreement Value*" means, for each Hedge Agreement, on any date of determination, an amount equal to: (a) in the case of a Hedge Agreement documented pursuant to the Master Agreement (Multicurrency-Cross Border) published by the International Swap and Derivatives Association, Inc. (the "*Master Agreement*"), the amount, if any, that would be payable by any Credit Party or any of its Subsidiaries to its counterparty to such Hedge Agreement, as if (a) in the case of a Hedge Agreement traded on an exchange, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss or gain on such Hedge Agreement to the Credit Party or Subsidiary of a Credit Party to such Hedge Agreement based on the settlement price of such Hedge Agreement on such date of determination; or (b) in all other cases, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss or gain on such Hedge Agreement to the Credit Party or Subsidiary of a Credit Party to such Hedge Agreement determined as the amount, if any, by which (i) the present value of the future cash flows to be paid by such Credit Party or Subsidiary exceeds (ii) the present value of the future cash flows to be received by such Credit Party or Subsidiary pursuant to such Hedge Agreement; capitalized terms used and not otherwise defined in this definition shall have the respective meanings set forth in the above described Master Agreement.

"*Applicable Margin*" means, in the case of a Base Rate Advance, 6.50% and in the case of a LIBOR Advance, 7.50%; provided that if all obligations hereunder shall not have been repaid in full within 12 months following the Closing Date, "Applicable Margin" shall mean, in the case of a Base Rate Advance, 7.0% and in the case of a LIBOR Advance, 8.0%.

"*Applicable Law*" means all applicable statutes, laws, ordinances, regulations, orders, writs, injunctions or decrees of the United States, any state, Canada, any provinces, any foreign country or any other Governmental Authority.

"*Approved Fund*" means any fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Asset Disposition*" means the disposition of any or all of the assets (including, without limitation, any Equity Interest owned thereby) of Parent or any of its Subsidiaries, in one transaction or a series of transactions, whether by sale, lease, transfer or otherwise. The term "Asset Disposition" shall not include any Insurance and Condemnation Event.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, and, if required, the Borrowers, in accordance with Section 10.07 and in substantially the form of Exhibit A hereto.

"*Assuming Lender*" has the meaning specified in Section 2.10(d).

"*Avoidance Actions*" shall mean avoidance actions of the Borrowers under Chapter 5 or Section 724(a) of the Bankruptcy Code (and proceeds thereof ~~other than proceeds of avoidance actions under Section 547 of the Bankruptcy Code~~). The term does not include an action to avoid a transfer under Section 549 of the Bankruptcy Code.

"*Bankruptcy Code*" shall mean the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"*Bankruptcy Courts*" means, collectively, the U.S. Bankruptcy Court and the Canadian Bankruptcy Court, or any other court having jurisdiction over the Cases from time to time.

"*Bankruptcy Petition Date*" has the meaning specified in Preliminary Statement.

"*Base Rate*" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of (a) ½ of 1% per annum above the Federal Funds Rate and (b) ~~2.50~~4.50%.

"*Base Rate Advance*" means an Advance bearing interest at the Base Rate.

"*BIA*" means the Bankruptcy and Insolvency Act (Canada) or any successor statute, as amended.

"*Borrowers*" shall have the meaning set out in the preamble.

"*Borrowing*" means a Term Borrowing or a borrowing under an Incremental Facility.

"*Borrowing Date*" means the date on which the Term Advance is made.

"*Bowater D&O Charge*" means the Canadian court-ordered charge for directors and officers in an aggregate amount not to exceed $25,000,000 Canadian Dollars securing the Canadian Credit Parties' obligation to indemnify the directors and officers of the Canadian Credit Parties for certain liabilities arising after entry of the Initial CCAA Order or in connection with the Canadian Credit Parties' failure to make payments in respect of employee obligations (as set forth more fully in paragraphs 51 and 53 of the Initial CCAA Order).

"*Bowater Entities*" means Bowater, Newsprint South and each of their respective Subsidiaries. For the avoidance of doubt, "Bowater Entities" shall not include the Abitibi Entities.

"*Budget Variance Report*" means a report, in each case certified by a Responsible Officer of the Parent, in form reasonably satisfactory to the Required Lenders, delivered in accordance with Section 5.03(g), showing actual cash flows and the aggregate maximum amount of utilization of the Advances for each such week as of the end of the week immediately preceding the week during which such Budget Variance Report is delivered and the variance (as a percentage) of such amounts from the corresponding anticipated amounts therefor set forth in the DIP Budget.

"*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York, New York.

"*Canadian Bankruptcy Court*" has the meaning specified in the Preliminary Statements.

"*Canadian Credit Parties*" means Bowater Canada and the Canadian Guarantors.

"*Canadian DIP Recognition Order*" means a recognition order made by the Canadian Bankruptcy Court pursuant to section 18.6 of the CCAA, in form and substance acceptable to the Required Lenders in their sole discretion, recognizing and giving full force and effect to the Interim Order.

"*Canadian Dollars*" means lawful money of Canada.

"*Collateral Documents*" means, collectively, the DIP Financing Orders and any other security agreement, pledge agreement, mortgage or other documents delivered pursuant to Section 5.01(l) or otherwise that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Commitment*" means, with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Commitment" or, if such Lender has entered into an Assignment and Acceptance, the amount set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 10.07 as such Lender's "Commitment."

"*Commitment Assumption Agreement*" has the meaning specified in Section 2.10(d)(B).

"*Commitment Letter*" means the commitment letter, dated as of April 11, 2009, between the Parent, Bowater, Newsprint South and FFH.

"*Computer Software*" has the meaning specified in Section 9.01(g)(iv).

"*Confidential Information*" means any and all material non-public information delivered or made available by any Credit Party or any Subsidiary relating to any Credit Party or any Subsidiary or their respective businesses, other than any such information that is or has been made available publicly by a Credit Party or any Subsidiary.

"*Confirmation Order*" means collectively, an order of the U.S. Bankruptcy Court confirming a Reorganization Plan in the Chapter 11 Cases and an order of the Canadian Bankruptcy Court confirming a Reorganization Plan in the CCAA Case, which orders shall be in form and substance reasonably satisfactory to the Required Lenders.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Consolidated EBITDA*" means, for any period, the sum for the Bowater Entities (determined on a combined basis, without duplication, in accordance with GAAP) of the following:

(a) Consolidated Net Income for such period,

plus

(b) the sum of the following to the extent deducted in determining Consolidated Net Income for such period:

(i) income taxes for such period (or minus, to the extent added in determining Consolidated Net Income for such period, income tax benefit for such period);

(ii) amortization, depreciation, and depletion expense for such period;

(iii) other non-cash charges for such period, including, but not limited to, non-cash pension expense, non-cash incentive compensation expense and equity-based compensation expense;

(iv) minority interest expense for such period;

(v) Consolidated Interest Expense for such period;

(ivi) any extraordinary charges for such period;

(vii) any unusual or non-recurring charges for such period including, but not limited to (a) Chapter 11 and CCAA expenses (or administrative costs reflecting Chapter 11 and CCAA expenses, including, but not limited to, professional fees) and (b) severance expense and closure costs up to an amount not to exceed five percent (5%) of the Consolidated EBITDA of the Parent and its Subsidiaries (as calculated without giving effect to this clause (vii) or clause (viii) below); and

(viii)     any net loss on any Asset Disposition during such period,

less

(c)   the sum of the following to the extent included in determining Consolidated Net Income for such period:

(i)   the aggregate amount of interest income for such period;

(ii)  any extraordinary gains during such period;

(iii) any unusual or non-recurring gains during such period, which shall exclude any income associated with fuel tax credits arising under IRC Section 6426(e); and

(iv)  any net gain on any Asset Disposition during such period;

provided that, for purposes of this Agreement, Consolidated EBITDA shall be adjusted on a pro forma basis, in a manner consistent with Regulation S-X of the SEC or otherwise reasonably acceptable to the Required Lenders, to include or exclude, as applicable, as of the first day of any applicable period, any permitted Asset Disposition closed during such period.

"*Consolidated Fixed Charge Coverage Ratio*" means, as of the last day of any Fiscal Quarter, with respect to the Bowater Entities for the period of four consecutive Fiscal Quarters most recently ended on or prior to such date, taken as one accounting period, the ratio of (a) Consolidated EBITDA as of such last day of such Fiscal Quarter to (b) the sum of (i) interest payable on, and amortization of debt discount in respect of, all Debt for borrowed money, plus (ii) rentals payable under leases of real or personal, or mixed, property, plus (iii) principal amounts of all Debt for borrowed money payable, in each case, of or by the Bowater Entities for or during such period.

"*Consolidated Interest Expense*" means, with respect to the Bowater Entities, for any period, the gross interest expense determined for such period on a combined basis without duplication, in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to the Bowater Entities, for any period, the net income (or loss) of the Bowater Entities for such period, determined on a combined basis and otherwise determined in accordance with GAAP.

"*Consolidated Subsidiary*" means, for any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of such Person in accordance with GAAP, excluding, in the case of the Parent, the Abitibi Entities.

(vi) any rights under any lease, contract or agreement to the extent that the granting of a security interest therein is specifically prohibited in writing by, or would constitute an event of default under or would grant a party a termination right under any agreement governing such right unless such prohibition is not enforceable or is otherwise ineffective under Applicable Law; provided, however, that this clause (vi) shall not affect, limit, restrict or impair the grant by any Credit Party of a security interest in any Account, money or other amounts due and payable to any Credit Party or to become due and payable to any Credit Party under such lease, contract or agreement unless such Security Interest in such Account, money or other amount due and payable is also specifically prohibited by the terms of such lease, contract or agreement or such security interest in such Account, money or other amount due and payable or would expressly constitute an event of default under or would expressly grant a party a termination right under any such lease contract or agreement, in each case unless such prohibition is not enforceable or is otherwise ineffective under Applicable Law; provided, further, that notwithstanding anything to the contrary contained in the foregoing proviso, the security interests granted herein shall immediately attach to and the term "Collateral" shall immediately include the rights under any such lease, contract, or agreement and in such Account, money, or other amounts due and payable to any Credit Party at such time as such prohibition, event of default or termination right shall terminate or shall be waived;

(vii) any Excluded Deposit Accounts and Excluded Investment Property; and

(viii) any Avoidance Actions.

"*Excluded Taxes*" means (a) Income Taxes imposed directly on an Indemnified Party (or its members or shareholders) in respect of payments hereunder or under any other Loan Documents, and (b) any withholding or other taxes imposed or otherwise due in respect of such payments because the Indemnified Party fails to satisfy the requirements of Section 2.14(e).

"*Existing Facilities*" has the meaning specified in Section 4.01(m).

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Fee Letter*" means the fee letter, dated as of April 11, 2009, between the Parent and FFH.

SECTION 2.03. <u>Voluntary Prepayment of the Advances</u>. The Borrowers may, upon at least five Business Days' notice (or such shorter notice period agreed by the Lenders) to the Administrative Agent, stating the proposed date and the aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Advances in whole or in part, together with all interest and other amounts required to be paid pursuant to Sections 2.08(c) and 2.12 in connection with such prepayment.

SECTION 2.04. <u>Mandatory Prepayment of the Advances</u>. Each Borrower shall, within three Business Days of receipt by the Parent or any Bowater Entity of Net Cash Proceeds arising from (i) any Asset Disposition in respect of a sale or other disposition of any property or assets of the Parent or any Bowater Entity (including any sale of any Equity Interests in the Abitibi Entities) but excluding any Asset Disposition permitted by clauses (i), (iii) – (v) or (vii) of Section 5.02(h), (ii) any Insurance and Condemnation Event with respect to any property of the Parent or any Bowater Entity to the extent resulting in the receipt of Net Cash Proceeds in excess of $5,000,000, or (iii) proceeds from the incurrence of Debt for borrowed money by the Parent or any Bowater Entity in excess of $5,000,000 (other than Debt permitted by Section 5.02(b)), immediately pay or cause to be paid to the Administrative Agent for the account of the Lenders an amount equal to 100% of such Net Cash Proceeds; <u>provided, however</u>, that, so long as no Event of Default shall be continuing, any Credit Party may (A) with respect to any Net Cash Proceeds received in connection with the sale of any equipment in the ordinary course of business, upon any such receipt, reinvest such Net Cash Proceeds to acquire replacement equipment and (B) with respect to any Net Cash Proceeds received in connection with any Insurance and Condemnation Event, upon any such receipt, reinvest such Net Cash Proceeds to replace or repair the property or assets lost or damaged, in each case, within the earlier of (i) the Maturity Date and (ii) 90 days following the date of receipt of such Net Cash Proceeds; <u>provided, further</u>, that no repayment shall be required hereunder as a result of any Net Cash Proceeds received by a Subsidiary that is not wholly-owned except to the extent such Net Cash Proceeds are distributed to a Borrower or a wholly-owned Subsidiary of a Borrower.

SECTION 2.05. <u>Scheduled Interest</u>. The Borrowers shall pay interest on the unpaid principal amount of the Advances from the Borrowing Date until such principal amount shall be paid in full, in arrears ~~monthly~~<u>on the 21st day of each calendar month (or if such day is not a Business Day, the immediately preceding Business Day)</u>, and (with respect to LIBOR Advances) at the end of each Interest Period, and on the date that such Advances are Converted or repaid in full, at the following rates per annum:

(a) <u>Base Rate Advances</u>. During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the sum of (i) the Base Rate in effect from time to time plus (ii) the Applicable Margin in effect from time to time.

(b) <u>LIBOR Advances</u>. During such periods as such Advance is a LIBOR Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of (A) LIBOR for such Interest Period for such Advance plus (B) the Applicable Margin in effect on the first day of such Interest Period.

(e) On the applicable Increase Date, each Eligible Assignee that accepts an offer to participate in a requested Incremental Commitment in accordance with Section 2.10(c) (each such Eligible Assignee, an "*Assuming Lender*") shall become a Lender to this Agreement as of the applicable Increase Date and the Commitment of each Increasing Lender for such Incremental Commitment shall be so increased by such amount (or by the amount allocated to such Lender pursuant to the last sentence of Section 2.10(b)) as of such Increase Date; provided, however, that the Administrative Agent shall have received on or before the Increase Date the following, each dated such date:

(i) certified copies of resolutions of the board of directors of the Credit Parties approving the applicable Incremental Commitment and the corresponding modifications to this Agreement;

(ii) an assumption agreement from each Assuming Lender, if any, in form and substance satisfactory to the Borrowers and the Administrative Agent (each a "*Commitment Assumption Agreement*"), duly executed by such Eligible Assignee, the Administrative Agent and each Borrower;

(iii) confirmation from each Increasing Lender of the increase in the amount of its Commitment in a writing satisfactory to the Borrower and the Administrative Agent; and

(iv) orders of the Bankruptcy Courts approving such Incremental Facility in form and substance acceptable to the Required Lenders in their sole discretion.

On the applicable Increase Date, upon fulfillment of the conditions set forth in the immediately preceding sentence of this Section 2.10(d), the Administrative Agent shall notify the Lenders (including, without limitation, each Assuming Lender) and the Borrowers, on or before 1:00 p.m. (New York City time), by telecopier or telex, of the occurrence of the applicable Incremental Commitment to be effected on the related Increase Date and shall record in the Register the relevant information with respect to each Increasing Lender and each Assuming Lender on such date.

(f) The Borrowers may, at any time and from time to time after the Closing Date and prior to the Maturity Date, by notice to the Administrative Agent, request that an ABL Facility be incorporated into the DIP Facility. The approval of the addition of an ABL Facility to the DIP Facility shall be at the discretion of each of the Initial Lenders and, if so approved, shall be reflected in amendments to the Loan Documents adopted in accordance with Section 10.01.

SECTION 2.11. Use of Proceeds. The proceeds of the Advances shall be available (and each Borrower agrees that it shall use such proceeds) solely (i) to pay transaction costs, fees and expenses, which are incurred in connection with this Agreement, (ii) for working capital purposes, (iii) to pay adequate protection to holders of Debt under the Existing Facilities, as set forth in the DIP Financing Orders, and (iv) for other general corporate purposes of the Borrowers and their Subsidiaries, provided, however, that the proceeds of the Advances shall not be used to repay Prepetition Debt.

SECTION 2.12. Fees.

(b)     Closing Fees.  The Borrowers shall pay fees (the "*Closing Fees*") to each Lender, as fee compensation for the funding of such Lender's Term Advances, in an amount equal to 2.0% of the stated principal amount of such Lender's Term Advances, earned when funded and payable to such Lender out of the proceeds of its Term Advances; provided that (i) 50% of such Closing Fees shall be payable to such Lender upon entry of the Interim Order and (ii) 50% of such Closing Fees shall be deposited into an escrow account (on terms acceptable to each of the Initial Lenders) and funded to such Lender upon the earlier of (x) the Maturity Date and (y) the U.S. Bankruptcy Court entering the Final Order; provided however, that in the case of any Incremental Facility, 100% of the closing fees agreed in connection therewith shall be earned and payable upon the funding of such Incremental Facility. The Closing Fees, once paid, shall be non-refundable in all circumstances.

(c)     Upfront Fee.  The Borrowers shall pay an upfront fee to the Administrative Agent for the account of the Lenders, on the Closing Date, in an amount equal to 3.0% of the stated principal amount of the Term Advance. Such upfront fee, once paid, shall be non-refundable in all circumstances.

(d)     Extension Fees.  The Borrowers shall pay the following extension fees to the Administrative Agent for the account of the Lenders:

(i)     if the Maturity Date is extended past twelve months pursuant to the definition thereof, the Borrowers shall pay an extension fee equal to 0.5% of the aggregate amount of Advances made by each Lender hereunder payable on the date that is twelve months following the Closing Date; and

(ii)    in addition, if the Maturity Date is extended past fifteen months pursuant to the definition thereof, the Borrowers shall pay an extension fee equal to 0.5% of the aggregate amount of Advances made by each Lender hereunder payable on the date that is fifteen months following the Closing Date.

Each such extension fee, once paid, shall be non-refundable in all circumstances.

(e)     Exit Fees.  The Borrowers shall pay fees (the "*Exit Fees*") to each Lender in an amount equal to 2.0% of the aggregate amount of Advances made by such Lender hereunder upon the earlier of (i) the Maturity Date and (ii) repayment in full of all Obligations hereunder. The Exit Fees, once paid, shall be non-refundable in all circumstances.

(d) Within 30 days after the date of any payment of Taxes, the appropriate Credit Party shall furnish to the Administrative Agent, at its address referred to in Section 10.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to each of the Initial Lenders. In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Credit Party through an account or branch outside the United States or by or on behalf of a Credit Party by a payor that is not a United States person, if such Credit Party determines that no Taxes are payable in respect thereof, such Credit Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this Section 2.14, the term "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e) Each Lender organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of the Initial Lenders and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), provide the Administrative Agent, the Initial Lenders and the Borrowers with two original properly completed Internal Revenue Service Forms W-8BEN, W-8IMY or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or the other Loan Documents or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that such Lender is a foreign corporation, partnership, estate or trust. Each Lender claiming exemption from withholding tax pursuant to the portfolio interest exception set forth in sections 871(h) and 881(c) of the Code shall provide the Administrative Agent, the Initial Lender and the Borrowers such forms, certificates or documents required by the Internal Revenue Service to establish entitlement to such exemption. If the forms provided by a Lender at the time such Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; provided, however, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) of this Section 2.14 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8IMY, W-8ECI or any successor, or the related certificate described above, that the applicable Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(ii)　The Borrowers shall be in compliance with the DIP Financing Orders and the Recognition Orders and each of the DIP Financing Orders and the Recognition Orders shall not have been reversed, modified, amended, stayed or vacated, in the case of any amendment or modification, without the prior written consent of the Required Lenders; provided, however, that any such modification or amendment that is adverse to an Initial Lender shall be subject to the consent of such Initial Lender.

(iii)　Within 45 days following the Closing Date (or such later date as the Required Lenders may approve), the Credit Parties shall have executed and delivered any security agreements, pledge agreements and any other documents and agreements relating thereto reasonably requested by FFH, in each case, in form and substance reasonably acceptable to FFH.

(iv)　Within 10 days following the Closing Date (or such later date as the Required Lenders may approve), the Collateral Agent shall have received a certificate from the Borrowers' insurance broker or other evidence satisfactory to it that all insurance required to be maintained by the Credit Parties hereunder is in full force and effect, together with endorsements naming the Collateral Agent as additional insured and loss payee thereunder.

(v)　~~Within 45 days following the Closing Date~~<u>As soon as reasonably practicable but no later than June 20, 2009</u> (or such later date as the Required Lenders may approve), the Borrowers shall have appointed a Chief Restructuring Officer reasonably acceptable to the Required Lenders.

(vi)　The Credit Parties shall provide written notice to the Administrative Agent and FFH in reasonable detail within two Business Days of (A) any purchase offer that any Credit Party or a Subsidiary may receive with respect to any material asset (including with respect to the Abitibi Entities), (B) any plan or proposal to sell or otherwise dispose of any material asset of the Credit Parties or their Material Subsidiaries (including with respect to the Abitibi Entities), and (C) any plan or proposal for the issuance of Debt or Equity Interests by any Credit Party or any Subsidiary thereof (excluding the Abitibi Entities), and, in each case, at the request of FFH, additional details with respect to any such offer, plan or proposal, to the extent not prohibited by confidentiality requirements.

(vii)　~~Within 45 days following the Closing Date,~~<u>As soon as reasonably practicable but no later than June 30, 2009, the Borrowers shall</u> obtain private debt ratings on the Obligations under the DIP Facility from Moody's and Standard & Poor's.

(viii)　Within 10 days following the Closing Date, the Administrative Agent shall have received from each Secondary Guarantor duly executed counterparts of the closing documents described in Sections 3.01(a)(iii), (iv), (v) and (vi).

(ix) Within 10 Business Days following the Closing Date, the Administrative Agent shall have received a complete and accurate list of (A) all Material Real Property owned by any Credit Party or any of its Subsidiaries, showing as of the date hereof the street address (if available), county or other relevant jurisdiction, state, record owner and book value thereof, (B) all leases of Material Real Property under which any Credit Party or any of its Subsidiaries is the lessee, showing as of the date hereof the street address, (if available) county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof and (C) all leases of Material Real Property under which any Credit Party is the lessor, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.

(x) ~~Within 45 days following the Closing Date,~~As soon as reasonably practicable but no later than June 30, 2009, as such time period may be extended by the Administrative Agent and FFH in their sole discretion (provided, that if substantially all of the items described in this Section 5.01(I) are not delivered by the date that is 90 days after the Closing Date, any additional extensions shall be subject to the approval of the Required Lenders), the Borrower shall deliver deeds of trust, trust deeds, mortgages, leasehold mortgages and leasehold deeds of trust in form and substance reasonably satisfactory to the Administrative Agent and FFH (the "*Mortgages*") with respect to the properties requested by FFH after the date hereof, duly executed by the appropriate Credit Party, together with:

(A) evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered on or before the date that is 45 days after the Closing Date (or such later date as approved by the Administrative Agent and FFH in their sole discretion) and are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem necessary or desirable in order to create a valid and subsisting Lien on the property described therein in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid;

(B) fully paid American Land Title Association Lender's Extended Coverage (or, with respect to properties located in Canada, a Canadian equivalent thereof reasonably acceptable to the Administrative Agent and FFH) title insurance policies (the "*Mortgage Policies*") in form and substance, with endorsements and in amount reasonably acceptable to the Administrative Agent and FFH, issued by Chicago Title or one or more other title insurers reasonably acceptable to the Administrative Agent and FFH, insuring the Mortgages to be valid and subsisting Liens on the real property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Liens, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents and for mechanics' and materialmen's Liens) as the Administrative Agent may reasonably deem necessary or desirable, and a zoning report from Planning and Zoning Resources Corporation (or, with respect to properties located in Canada, a Canadian equivalent thereof reasonably acceptable to the Administrative Agent and FFH) satisfactory to Administrative Agent and FFH;

(o) <u>Abitibi Entities</u>. Promptly notify FFH with respect to any purchase offer or any proposal received by the Parent or any Abitibi Entity to sell, transfer or otherwise dispose of all, substantially all or any significant portion of the assets of the Abitibi Entities (including, without limitation, any Equity Interests therein), and consult with FFH in good faith prior to entering into any agreement with respect thereto.

SECTION 5.02. <u>Negative Covenants</u>. So long as any Advance shall remain unpaid or any Lender shall have any Commitment hereunder, no Credit Party will, at any time:

(a) <u>Liens</u>. Incur, create, assume or suffer to exist any Lien on any asset of the Borrowers or any of their respective Subsidiaries now owned or hereafter acquired by any of the Borrowers or the Guarantors, other than:

(i) Liens in favor of the Collateral Agent and the Secured Parties;

(ii) Liens in connection with Debt permitted to be incurred pursuant to Section 5.02(b)(vii) so long as such Liens extend solely to the property (and improvements and proceeds of such property) acquired with the proceeds of such Debt or subject to the applicable Capitalized Lease;

(iii) Liens securing Debt in respect of any ABL Facility; <u>provided</u> that Liens against Lender Priority Collateral securing any ABL Facility shall be subordinated to the Lien in favor of the Collateral Agent hereunder pursuant to intercreditor arrangements on terms reasonably acceptable to each of the Initial Lenders;

(iv) Liens securing the Carve-Out and other Liens contemplated under the DIP Financing Orders (including Liens securing the Existing Facilities);

(v) (A) purchase money Liens (including precautionary Lien filings made under the Code of any jurisdiction) on equipment acquired or held by any Credit Party or any of its Subsidiaries in the ordinary course of its business to secure the purchase price of such equipment or Debt incurred solely for the purpose of financing the acquisition of such equipment or (B) Liens existing on such equipment at the time of its acquisition; <u>provided, however,</u> that in the case of each of clauses (A) and (B), (x) no such Lien shall extend to or cover any other property of any Credit Party or any of its Subsidiaries, and (y) the aggregate principal amount of Debt secured by any or all such Liens shall not exceed at any one time outstanding $10,000,000;

(vi) Liens arising from judgments, orders, or other awards not constituting an Event of Default;

(vii) Liens in existence on the Closing Date with respect to each Credit Party or any Subsidiary of a Credit Party, in each case described on Schedule 5.02(a)(vii); <u>provided</u> that the scope of any such Lien shall not be increased, or otherwise expanded, to cover any additional property or type of asset, as applicable, beyond that in existence on the Closing Date;

(ix) Debt incurred in connection with a Hedge Agreement (A) which is entered into for interest rate, foreign currency or other business purposes and not for speculative purposes and (B) with a counterparty reasonably satisfactory to the Administrative Agent; provided that any counterparty that is a Lender or any Affiliate thereof shall be deemed satisfactory to the Administrative Agent;

(x) Debt in respect of non-Credit Parties in existence on the Closing Date and set forth on Schedule 5.02(b);

(xi) Debt arising from judgments, orders or other awards to the extent not constituting an Event of Default;

(xii) other unsecured Debt in an aggregate principal amount outstanding not at any time exceeding $5,000,000;

(xiii) Debt owed by any Credit Party to any other Credit Party (provided that, if requested by the Administrative Agent, such Debt shall be subordinated to the Obligations on terms and conditions reasonably satisfactory to the Administrative Agent);

(xiv) Debt owed by any Subsidiary which is not a Credit Party to any other Subsidiary which is not a Credit Party;

(xv) Debt owed by any Subsidiary which is not a Credit Party to a Credit Party (provided that such Debt shall be payable by such Subsidiary on demand by the Credit Party to the extent required pursuant to the Intercompany Subordination Agreement); provided that the aggregate amount of such Debt, together with any ~~equity or capital investments~~Investments permitted pursuant to Section ~~5.01(h~~5.02(g)(~~vii~~viii) (without duplication), shall not exceed $25,000,000 outstanding on any date of determination (which amount shall be calculated as the net balance of such loans, advances and investments as reduced by any repayments or distributions made with respect thereto);

(xvi) Debt in respect of insurance premium financing arrangements incurred in the ordinary course of business and provided that such Debt does not exceed the unpaid amount of such premiums;

(xvii) Debt of non-U.S. Subsidiaries in an aggregate amount not to exceed at any time $15,000,000; ~~and~~

(xviii) Debt of the Parent or any of its Subsidiaries (but excluding, for the avoidance of doubt, the Abitibi Entities) as an account party in respect of trade letters of credit entered into in the ordinary course of business; provided that no such trade letter of credit shall be secured by any assets of the Parent or any of its Subsidiaries other than the assets being acquired or shipped pursuant to such letter of credit; and

(xix) Debt owed by Calhoun Newsprint Company to one or more Bowater Entities (provided that such Debt shall be payable by such entity on demand by the Credit Party to the extent required pursuant to the Intercompany Subordination Agreement); provided that the aggregate amount of such Debt, together with any Investments in Calhoun Newsprint Company permitted pursuant to Section 5.02(g)(viii) (without duplication), shall not exceed $10,000,000 outstanding on any date of determination (which amount shall be calculated as the net balance of such loans, advances and investments as reduced by any repayments or distributions made with respect thereto).

(c) Chapter 11 Claims. Subject to the DIP Financing Orders, incur, create, assume, suffer to exist or permit any claim that is pari passu with or senior to the claims of the Secured Parties against the Borrowers and the Guarantors, other than in accordance with the applicable DIP Financing Orders.

(d) Dividends; Capital Stock. Declare or pay, directly or indirectly, any dividends or make any other distribution, or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of capital stock (or any options, warrants, rights or other equity securities or agreements relating to any capital stock) of the Borrowers, or set apart any sum for the aforesaid purposes; provided that:

(i) the Borrowers or any of their Subsidiaries may make cash distributions or equity repurchases pursuant to employee benefit plans or incentive compensation plans, in each case to the extent such distributions constitute compensation to executives or employees of such Borrower or of the applicable Subsidiary and in each case as approved by the applicable Bankruptcy Court (whether or not such repurchase constitutes compensation);

(ii) any Subsidiary of the Parent may make distributions or pay dividends to the Parent or any other Subsidiary of the Parent that owns any Equity Interests in such Subsidiary and, in the case of a distribution or dividend by a Subsidiary that is not a wholly-owned Subsidiary, to each other owner of Equity Interests in such Subsidiary based on their relative ownership interests; and

(iii) AbitibiBowater Canada Inc. may repurchase all or any portion of the Exchangeable Shares solely with either shares of common stock of the Parent, consideration received from the Abitibi Entities (including, but not limited to, any consideration received for the repurchase of the shares of Abitibi held by AbitibiBowater Canada Inc.) or any combination thereof, in each case as approved in the CCAA Case for the Abitibi Entities.

(iv) Investments (A) received in satisfaction or partial satisfaction thereof from financially troubled account debtors or in connection with the settlement of delinquent accounts and disputes with customers and suppliers, or (B) received in settlement of debts created in the ordinary course of business and owing to the Borrower or any Subsidiary or in satisfaction of judgments;

(v) Investments (A) in the form of deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with current market practices, (B) in the form of extensions of trade credit in the ordinary course of business, (C) in the form of prepaid expenses and deposits to other Persons in the ordinary course of business and (D) Investments constituting Hedge Agreements entered into for non-speculative purposes and permitted pursuant to Section 5.02(b);

(vi) Investments made after the Closing Date in any Subsidiary formed after the Closing Date so long as (A) such Subsidiary is a Guarantor hereunder and (B) the Borrowers and their respective Subsidiaries comply with the applicable provisions of 5.02(i);

(vii) Investments in the form of loans and advances to employees in the ordinary course of business, which, in the aggregate, do not exceed at any time $5,000,000;

(viii) Investments in the form of intercompany Debt to the extent permitted by Section 5.02(b)(xv) or (xix);

(ix) Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(x) Investments in the form of payment of expenses to the extent permitted under Section 5.02(f)(vi); and

(xi) other Investments in an aggregate amount not to exceed $500,000.

(h) <u>Fundamental Changes; Acquisitions; Asset Dispositions</u>. Take any of the following actions, or permit any of its Subsidiaries to do any of the foregoing: (x) wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, (y) purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof), or (z) make any Asset Disposition; other than, with respect to this sub-clause (z):

(i) the sale of inventory in the ordinary course of business;

(ii) the sale of obsolete, worn-out or surplus assets in the ordinary course of business that are no longer used or usable in the business of the Parent or any of its Subsidiaries;

(i) any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby; or

(j) any ERISA Event shall have occurred with respect to an ERISA Plan if such ERISA Event, along with any other ERISA Event that has occurred and then exists, is reasonably likely to result in any additional liability of a Credit Party or an ERISA Affiliate with respect to an ERISA Plan that exceeds $10,000,000; or

(k) any Credit Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Credit Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds $10,000,000 or requires payments exceeding $1,000,000 per annum; or

(l) any Credit Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Credit Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $10,000,000; or

(m) a contribution or premium required, other than the Special Amortization Payments, to be paid to or in respect of any Canadian Pension Plan is not paid in a timely fashion in accordance with the terms thereof and all applicable law, or material taxes, penalties or fees are owing or exigible under any Canadian Pension Plan beyond the date permitted for payment of same; a proceeding, action, suit or claim (other than routine claims for benefits) is commenced or instituted involving any Canadian Pension Plan or its assets; an event with respect to any Canadian Pension Plan (other than the failure to pay the Special Amortization Payments) which would entitle any Person (without the consent of the applicable Credit Party) to wind-up or terminate any Canadian Pension Plan, in whole or in part, or which could reasonably be expected to adversely affect the tax status thereof, shall occur; a going concern unfunded actuarial liability, past service unfunded liability or solvency deficiency shall exist with respect to any single Canadian Pension Plan which exceeds $200,000,000; or an improper withdrawal or transfer of assets from any Canadian Pension Plan shall occur; or

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**ABITIBIBOWATER INC.**

By: _____
    Title:
    Name:

**BOWATER INCORPORATED**

By: _____
    Title:
    Name:

**BOWATER CANADIAN FOREST PRODUCTS INC.**

By: _____
    Title:
    Name:

**AVENUE INVESTMENTS, L.P.**

By Avenue Partners, LLC, its General Partner

By: _____
    Title:
    Name:

**FAIRFAX FINANCIAL HOLDINGS LTD.**

By: _____
    Title:
    Name:

**[GUARANTORS]**