# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Hearing Date: October 28, 2009 at 10:00 a.m. (ET)** |
| | ) | **Objection Deadline: October 21, 2009 at 4:00 p.m.** |
| | ) | **(ET)** |
| | ) | |

## DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(A), 363(B) AND 365 OF THE BANKRUPTCY CODE (A) AUTHORIZING ABITIBI-CONSOLIDATED CORPORATION TO: (I) ENTER INTO AND PERFORM ALL OF ITS OBLIGATIONS UNDER A PURCHASE AND SALE AGREEMENT FOR THE SALE OF CERTAIN ASSETS IN LUFKIN, TEXAS; (II) ENTER INTO THE PAPER MACHINE NO. 8 LEASE; (III) ASSUME, ASSIGN AND TRANSFER ITS INTERESTS IN CERTAIN EXECUTORY CONTRACTS; AND (B) GRANTING RELATED RELIEF

AbitibiBowater Inc. ("AbitibiBowater") and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") pursuant to sections 105(a), 363(b) and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal or Canadian tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (6050), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (3225), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (0999), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (8810), Bowater Canadian Forest Products Inc. (2010), Bowater Canadian Holdings Incorporated (6828), Bowater Canadian Limited (7373), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (5722), Bowater Maritimes Inc. (5684), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0186), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

Abitibi-Consolidated Corporation ("ACC" or the "Seller"), a Debtor in these Chapter 11 Cases, to: (i) enter into the purchase and sale agreement substantially in the form attached hereto as Exhibit A to the Order (the "Purchase and Sale Agreement" or "PSA")[2] between ACC and CIT Partners, LLC, as purchaser ("CIT" or the "Purchaser"); (ii) sell the Property (as defined in the Purchase and Sale Agreement) free and clear of all liens, claims and interests (the "Sale"); (iii) assume, assign and/or transfer certain executory contracts in connection therewith; and (iv) take such other actions as are necessary to consummate the Sale. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

3.      AbitibiBowater (together with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Québec. The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide. It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries. The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase and Sale Agreement.

certified 100% of its managed woodlands to sustainable forest management standards. As of December 31, 2008, it owned or operated 24 pulp and paper facilities and 30 wood products facilities located in the United States, Canada, the United Kingdom and South Korea, as well as recycling and power generation facilities. Employing around 15,900 people, the Company realized sales of approximately $6.8 billion[3] in 2008. Its total assets were $8.1 billion as of December 31, 2008.

4.     The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold. These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels. Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product. In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

---

[3]    All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

DB02:8763018.2 068104.1001

5. Specifically, on April 16, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). On April 17, 2009, certain of the Debtors (the "Canadian Debtors")[4] and non-debtor subsidiaries of AbitibiBowater (the "CCAA Debtors")[5] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court" and the filing, the "Canadian Proceeding"). Two of the CCAA Debtors – ACI and Abitibi-Consolidated Company of Canada ("ACCC") (together, the "Chapter 15 Debtors") – thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases"). AbitibiBowater and certain of the Debtors also filed for ancillary relief in Canada seeking provisional relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[6]

---

[4] The Canadian Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[5] The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

[6] The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

6. On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

7. The Company's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors' interests are united in their integrated, co-dependent business relationship. The Debtors and the CCAA Debtors have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

## RELIEF REQUESTED

8. By this Motion, the Debtors request the entry of an order authorizing the Debtors to enter into and perform their obligations under the Purchase and Sale Agreement, which provides for the sale of ACC's permanently idled mill site located in Lufkin, Texas. Specifically, the Debtors request authorization to: (a) implement the Sale contemplated in the Purchase and Sale Agreement; (b) enter into the Paper Machine No. 8 Lease contemplated therein, whereby ACC will be entitled to store certain Excluded Assets on the Property; and (c) assume and assign certain executory contracts to the Purchaser in connection with the Sale.

9. Sound business reasons exist for entering into the Purchase and Sale Agreement. The Debtors will realize approximately $20.5 million from the sale of real property, buildings and related assets located at the site of a paper mill that has been permanently idled by the Debtors. In addition, as further set forth herein, the Sale will save ACC approximately $250,000 in monthly operating expenses and will relieve ACC from any potential environmental liability that may arise with respect to the Property.

5

## A. **The Lufkin Property.**

10.     The Property is located in Lufkin, Angelina County, Texas.  ACC acquired the Property in April 2000 as part of its acquisition of Donohue Corporation.  The Property consists of land that is primarily occupied by a paper mill (the "Lukfin Mill") and related infrastructure, including several support buildings, ponds, roads, tanks, and a lined sub-grade aqueduct.  In December 2003, mill operations were suspended, and the mill was permanently closed in December 2007.  The remaining portion of the Property consists primarily of forested area and cleared land with overgrown vegetation.  As further described below, the Property is subject to potential environmental liabilities.  In addition, maintenance of the Property, including utilities, taxes, insurance and security, costs ACC approximately $3 million annually, averaging approximately $250,000 per month.

11.     In January 2007, ACC hired Grubb & Ellis ("G&E") as its broker for the disposition of the Lufkin Mill and surrounding real property.  G&E worked with ACC representatives for several months on identifying property segments to be included with the disposition of the Lufkin Mill.  Utility capacities and industrial infrastructures, such as access to roads and highways, railroad lines and pipelines were also researched and considered in the evaluation process.

12.     In June 2007, G&E recommended that ACC divide the Lufkin property into three segments to be sold as separate tracts:

>    (a)     The Property (to be sold pursuant to the Purchase and Sale Agreement):  This is an 895.5 acre tract including the buildings and improvements associated with the Lufkin Mill.  This tract also includes 150 acres of landfill and 100 acres of ponds and marsh that serve as the storm water impoundment area.  It is G&E's opinion that this site is only suitable for industrial redevelopment.

>    (b)     Buffer Zone Property.  This property is approximately 152 acres of undeveloped land situated along the western border of the plant property.  This

6

property is contiguous to property owned by the City of Lufkin and zoned for commercial industrial park development. One party has indicated significant interest in purchasing this property.

(c)     <u>Kurth Lake Property</u>. This property includes approximately 1,600 acres of timber land that is located 9 miles north of the Lufkin Mill site. The property includes 13 water wells, an 800 acre lake and a conveyance system which had the capacity to provide eighteen million gallons of industrial grade water per day. The City of Lufkin purchased this property from ACC for fifteen million ($15,000,000.00) dollars on March 13, 2009.

## B.     Potential Environmental Risk.

13.     The Lufkin Mill operations incorporated on-site wastewater management ponds and on-site landfills. These ponds and landfills pose potential environmental regulatory risk for ACC and for prospective purchasers. In connection with the anticipated sale of the Lufkin properties, beginning in April 2008, Camp, Dresser and McKee Inc. ("Camp Dresser"), at ACC's request, conducted an environmental site assessment. ACC hoped that it would be able to use information obtained through Camp Dresser's assessment to obtain a no further action letter (a "NFA Letter") from Texas' environmental agency, the Texas Commission on Environmental Quality (the "TCEQ"). A NFA Letter issued from the TCEQ would have assured any prospective purchaser that no regulatory action would be taken by the TCEQ with respect to existing conditions beyond the eventual closure of the landfills when they are no longer used for waste management purposes. As discussed below, a NFA Letter was sought in the fall of 2008. In February 2009, the TCEQ refused to issue a NFA Letter for want of additional sampling. The purchase price for the Sale reflects the TCEQ's position on a NFA letter.

## C.     The Sale Process.

14.     In the summer of 2007, ACC and G&E, together with assistance from the City of Lufkin and the Lufkin Angelina County Economic Development Partnership, began to actively market the Property to potential purchasers. During this period, ACC devoted

7

significant time and resources to the marketing effort by participating in meetings, plant tours and negotiations with prospective purchasers and by responding to due diligence requests. A total of nine qualified prospects indicated interest in acquiring the Property. Of the qualified prospects, four submitted offers to purchase the Property.

### (i) *First Offeror*

15.     ACC hosted a meeting for the first offeror (the "First Offeror") and Lufkin city officials at the plant in June 2007, at which ACC provided an overview of the plant history and improvements/infrastructure along with a plant tour. ACC provided numerous transmittals of information to the First Offeror. In connection therewith, the parties executed a confidentiality agreement in August 2007. ACC hosted another large meeting for the First Offeror, City of Lufkin and economic development officials in September 2007. However, the First Offeror ultimately terminated discussions with ACC in May 2008. The First Offeror was only prepared to purchase approximately 100 acres of land, along with the utility infrastructure available at the Lufkin Mill site. In addition, the First Offeror was adverse to accepting any environmental risk and insisted on indemnification for all environmental risk.

### (ii) *Second Offeror*

16.     Communications with a second offeror (the "Second Offeror") began in March 2008 and a confidentiality agreement was executed in May 2008. The Second Offeror planned to purchase the Lufkin Mill and demolish most of the buildings and to salvage the equipment, metals, and building materials. G&E transmitted several packages of information pertaining to the Lufkin Mill to the Second Offeror in April 2008. Meetings and tours of the Lufkin Mill were conducted in April and May of 2008.

17.     The Second Offeror offered to purchase the Property in August 2008. A counter offer was not provided to the Second Offeror due to ACC's belief that higher and better offers were available, and the Second Offeror did not continue to participate in the sale process.

### (iii) *The Third Offeror*

18.     Initial contact and execution of a confidentiality agreement with a third offeror (the "Third Offeror") occurred in April 2008. Three packages of information pertaining to the Property were sent to the Third Offeror in May 2008. ACC provided the Third Offeror with an initial site tour in May 2008.

19.     In June 2008, the Third Offeror's executives and engineers met with Company representatives at the Lufkin Mill. They were provided a detailed overview of the improvements and environmental matters along with a tour of the Property. City and economic development officials from Lufkin also attended this meeting. The Third Offeror announced that they were considering the Property and another competitive site for the construction of a plant unrelated to paper production.

20.     The Third Offeror submitted an offer to purchase the Property in June 2008, and in September 2008 ACC provided the Third Offeror with a counteroffer.

21.     In October 2008 the Third Offeror advised ACC that it would not purchase the Property unless ACC closed certain landfills consistent with requirements imposed by the TCEQ and/or excluded the landfills from the proposed sale. ACC, the Third Offeror, and the City of Lufkin explored multiple options of ownership and closure of the landfills in order to facilitate the Third Offeror's acquisition of the Property.

22.     In November 2008, the Third Offeror terminated discussions with ACC and the City of Lufkin in order to pursue development on another site.

**(iv) _CIT_**

23.     In July 2008, ACC made initial contact with a representative of a group of entities and individuals that were interested in acquiring the Property for redevelopment, including CIT (collectively, "CIT"). The parties executed confidentiality agreements in July 2008. Numerous packages of information with respect to the real estate, improvements, infrastructure and remaining equipment were sent to CIT beginning in August 2008.

24.     The first Property tour by CIT was in August 2008. The tour began with a general overview of the Property followed by a tour of all major facilities, improvements and the landfills. CIT's focus through September 2008 was primarily on requests for information on the landfills, environmental data and remaining equipment, as well as inventories.

25.     CIT submitted its first offer to purchase the Property in August 2008. In September 2008, CIT spent three days at the Lufkin plant to evaluate the environmental issues, building square footage and equipment. ACC responded with a counter-offer in October 2008.

26.     The parties met in Montreal in October 2008 and discussed CIT's redevelopment plans, CIT's financial ability to complete the purchase of the Property, scope of the sale, an update on environmental investigation, matters regarding the landfills, transaction price and terms, and a transaction timeline.

27.     CIT made its second offer to purchase the Property in November 2008. The offer was subject to certain conditions, including ACC acquiring a NFA Letter (as described in paragraph 13, above).

28.     ACC and CIT reached an agreement in principle with respect to a purchase and sale of the Property in a letter of intent dated November 13, 2008. Shortly thereafter, CIT escrowed a deposit of $500,000 as earnest money.

10

29.     A large meeting of representatives from ACC, CIT, City of Lufkin and Angelina County met at the Lufkin plant in December 2008.  CIT presented their partners' backgrounds and expertise as well as their plans for redevelopment of the Property.  An open discussion with city, county and economic development officials occurred after the CIT presentation where officials provided feedback to CIT.

30.     On February 16, 2009, the TCEQ issued its findings, which included its refusal to provide the NFA Letter.

31.     Final surveys and legal descriptions of the Property were completed in March 2009.

32.     In May 2009, CIT submitted a revised proposal to purchase the Property, with a reduced price reflecting the TCEQ's refusal to provide the NFA Letter.

33.     G&E has recommended that ACC promptly proceed with the proposed sale of the Property to CIT.  This recommendation is based on current market conditions as well as CIT's ability to redevelop industrial sites that require remediation of environmental issues, while working alongside local city and economic development officials.

34.     Upon information and belief, and based upon the thorough, two year marketing process and one year of substantial negotiations with CIT, CIT is the only party prepared to proceed with the purchase of the Property on terms acceptable to ACC and Lufkin officials.

**D.     Paper Machine No. 8.**

35.     The Property contains a paper machine ("Paper Machine No. 8"), which is still capable of production.  However, transporting Paper Machine No. 8 from the Property to another site would be very costly.  The parties have agreed to defer resolution of the ultimate

disposition of Paper Machine No. 8 by providing that it is an Excluded Asset under the PSA and by further providing that the Purchaser will lease the space occupied by Paper Machine No. 8 to the Seller for an initial term of one year, rent-free, subject to a one year renewal at a rental rate of $20,000 per month (the "Paper Machine No. 8 Lease").

### E.     The Purchase and Sale Agreement.

36.     The key terms of the Purchase and Sale Agreement include:[7]

(a)     The Purchaser: CIT Partners, LLC, a Delaware limited liability company.

(b)     The Property: Approximately 895.5 acres of real property located in Angelina County, Texas, which is generally known as the "Abitibi Lufkin Paper Mill Site" at highway 103 East, Lufkin, Texas (the "Land"), and the fixtures, buildings, structures and improvements located thereon (collectively, the "Improvements"), together with all rights, privileges and interests appertaining to such Land and Improvements (collectively, the "Appurtenances"). PSA § 1(a).

(c)     Paper Machine No. 8 Lease: Paper Machine No. 8 and the equipment, parts and components located within its footprint are Excluded Assets under the PSA. At Closing, the Parties will enter into a commercial lease agreement for the land and building that houses the Paper Machine No. 8 Assets. The Paper Machine No. 8 Lease will have an initial term of one (1) year, and provide for a one (1) year renewal, with the Seller's right to terminate the lease on thirty (30) days' prior written notice. The Paper Machine No. 8 Lease will include one (1) year of free rent and a rental rate of twenty thousand dollars ($20,000) per month for the renewal period. PSA § 12(f).

(d)     Assumed Obligations: The Purchaser will assume and agree to be responsible for any and all risks, liabilities, obligations, responsibilities, costs and expenses of any nature whatsoever which now exist or may arise, except for certain Excluded Matters as defined in the PSA, directly or indirectly related to the physical

---

[7]     The summary of key terms of the Purchase and Sale Agreement contained herein is for descriptive purposes only. In the event of any discrepancy between the Purchase and Sale Agreement and this Motion, the terms of the Purchase and Sale Agreement shall govern.

DB02:8763018.2                                                          068104.1001

and environmental conditions of or related to the Property, including, but not limited to, risks, liabilities, obligations, responsibilities, costs and expenses arising from, related to or associated with compliance with Environmental Laws or the presence or suspected presence of any Pollutants on the Property, including any Environmental Liability (collectively, the "Assumed Obligations"). PSA § 9(a).

(e)   Purchase Price:  The Purchaser will pay $20,500,000, consisting of (a) an Earnest Money Deposit in the amount of $500,000 and (b) the balance payable in cash at Closing, subject to certain prorations and adjustments more fully set forth in the PSA. PSA § 2.

(f)   Closing:  The Closing of the purchase and sale of the Property will take place on October 31, 2009; provided that if the Effective Date (the date of entry of an order approving the PSA) has not occurred prior to such date, the Closing Date will occur on the first business day after the passage of twenty-five calendar days after the Effective Date, or such other date as the parties may mutually agree upon in writing. PSA § 11(b).

(g)   Legal Diligence Inspection Period:  During the period from the Execution Date (the date the PSA is fully executed) until the date that is ten (10) days after the Effective Date (the "Inspection Period"), the Purchaser and its representatives have and will be given the right and full opportunity, at Purchaser's cost and expense, to complete its review of the documentation concerning the Property including title documents, surveys, Operating Contracts, Permits and proposed forms of closing documents (the "Outstanding Legal Diligence").  If the Purchaser, in its sole discretion, determines that the Outstanding Legal Diligence reveals a matter relating to the Property that is new and was not reasonably contemplated that alters in a meaningful way the Purchaser's view of the value of the Property as of the Execution Date, such that the Purchaser would not have proceeded with the transaction at the Purchase Price had it discovered such information prior to execution of the PSA, then the Purchaser may terminate the PSA by notifying the Seller in writing of such termination and specifying the reason therefore within five (5) days following the expiration of the Inspection Period. PSA § 5(b).

(h)   Title Review:  The Purchaser will have a period of time (the "Title Review") commencing on the Execution Date and ending on the last day of the Inspection Period in which to notify Seller of any and all objections ("Objections") the Purchaser has to any matters shown on the Title Commitment or Surveys.  The Seller will use reasonable good faith efforts to remedy and remove all Objections

13

during the period of time ending on the fourth day after the Seller's receipt of the notice of Objections (the "Cure Period"). If the Seller is unable, despite using reasonable good faith efforts, to remedy or cause removal of any Objection relating to a matter that is new and was not reasonably contemplated that the Purchaser in good faith determines alters in a meaningful way the Purchaser's view of the value of the Property as of the Execution Date, such that the Purchaser would not have proceeded with the transaction at the Purchase Price had it discovered such matter prior to execution of the PSA, then Purchaser may terminate the PSA by written notice on or before the third business day following the Cure Period or is otherwise deemed to waive any Objections. Any title encumbrances or exceptions which are set forth in the Title Commitment or the Surveys and to which the Purchaser does not object to on or prior to the last day of the Inspection Period (or which are thereafter waived or deemed to be waived by Purchaser) will be deemed to be permitted exceptions to the status of Seller's title to the Property. PSA § 6.

(i) Sale "As Is": The Property will be conveyed and transferred to the Purchaser in its present condition and state of repair, "As Is" and "Where Is," with all faults. PSA § 8.

(j) Seller's Indemnification and Releases: The Seller will indemnify the Purchaser Parties from and against any claims or liabilities that arise directly from, out of, or in connection with (i) Excluded Matters; (ii) any taxes relating to the ownership and operation of the Property which are attributable to the period prior to the Closing Date; and (iii) any performance or failure to perform the Seller's obligations under the PSA or any breach of an express representation or warranty of the Seller set forth in Section 16 of the PSA that is timely asserted by the Purchaser in accordance with the PSA. The Seller will release the Purchaser Parties from any and all past, current, future and contingent Seller Costs of any and every kind and nature, whether currently known or unknown. PSA PSA §§ 10(c);10(d).

(k) Transferred Contracts: Transferred Contracts set forth on Exhibit E-1 to the PSA will be assumed and assigned to the Purchaser and identified, along with applicable proposed cure amounts, prior to filing of the Motion (the "Transferred Contract List")[8] provided,

---

[8]   The parties are still in the process of identifying contracts for assumption and assignment. Therefore Exhibit E-1 will not be filed concurrently with the Motion. The Debtors intend to file Exhibit E-1 in advance of the notice period for assumption and assignment provided for by the applicable Bankruptcy Rules. Pursuant to the PSA, the Debtors reserve their right to supplement Exhibit E-1 and seek approval for assumption and assignment of additional executory contracts at a subsequent hearing.

DB02:8763018.2                                                                  068104.1001

however, that such Transferred Contract List may be supplemented by the Parties with additional contracts ("Additional Contracts"), or otherwise modified, within 10 days after the Closing Date, provided, further, however, that, on or prior to 25 days after the Closing Date, Seller will seek Bankruptcy Court approval for assumption and assignment of any Additional Contracts. The Purchaser shall pay all respective cure costs at the amounts set forth on Exhibit E-1 or as otherwise ordered by the Bankruptcy Court. PSA § 1(b).

(l)    Effective Date Must Occur on or Prior to December 31, 2009: The Seller has the right to terminate its obligations under the PSA if the Effective Date has not occurred on or prior to December 31, 2009. PSA § 11(a)(viii).

## BASIS FOR RELIEF

**A. The Sale of the Lufkin Property Should Proceed by Private Sale and be Approved.**

37.    By this Motion, the Debtors request the entry of an order under sections 105(a), 363 and 365 of the Bankruptcy Code authorizing the Debtors to enter into and perform their obligations under the Purchase and Sale Agreement, including entry into the Paper Machine No. 8 Lease. Finally, the Debtors hereby seek authority to assume and assign Transferred Contracts to the Purchaser pursuant to the PSA.

38.    The Debtors believe that sound business reasons justify entry into and performance under the PSA. For over two years, ACC has engaged in an exhaustive sale process with respect to the Property, leading to interest from nine prospective candidates. ACC engaged in serious negotiations with four prospective purchasers. After extensive negotiations, including interaction with Lufkin city officials and state environmental authorities, CIT is the only remaining party interested in purchasing the Property on terms acceptable to ACC, including, significantly, CIT's assumption of potential environmental liabilities. Following a final inspection period, CIT is prepared to purchase the Property on an "AS-IS" basis. The Sale will

also save ACC approximately $250,000 per month of expenses with respect to the permanently idled Lufkin mill.

39.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l).  Section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).  With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(l) states, in pertinent part, that:

> the notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(l).

40.     To approve the use, sale, or lease of property outside the ordinary course of business, this Court must find "some articulated business justification" for the proposed action. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (adopting good faith test and implicitly adopting the "articulated business justification" test of *Committee of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*).

41.     Courts generally apply the following four factors when deciding whether a sale of a debtor's assets should be approved:  (a) whether a sound business reason exists for the

16

proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See In re Exaeris, Inc.,* 380 B.R. 741, 744 (Bankr. D. Del. 2008) (requiring that a sale of assets outside the ordinary course of business be supported by a sound business purpose, a fair sale price, adequate and reasonable notice and good faith); *Titusville Country Club v. PennBank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (same); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.,* 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (same). *See also Lionel,* 722 F.2d at 1071 (setting forth the "sound business purpose" test); *Abbotts Dairies,* 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.,* 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

      42.    This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g., In re Ancor Exploration Co.,* 30 B.R. 802, 808 (N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). "The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.,* 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds,* 165 B.R. 1 (D.P.R. 1992); *accord In re Canyon P'ship,* 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). *See also In re AFY Holding Co.,* No. 08-12175 (PJW) (Bankr. D. Del. July 15, 2009) [Dkt. No. 482] (authorizing private sale of real property); *In re KB Toys, Inc.,*

No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) [Dkt. No. 265] (authorizing private sales of furniture, fixtures and equipment). Here, the Sale meets these requirements and should be approved.

### (I) Proceeding by Private Sale Reflects an Exercise of the Debtors' Sound Business Judgment

43.     There is ample business justification to sell the Property to CIT in a private sale rather than conducting a public auction. As outlined above, ACC began actively marketing the Property with the assistance of an experienced broker, G&E, in July 2007. Since that time, ACC entered into significant negotiations with four parties. ACC's marketing efforts included entering into confidentiality agreements, arranging factory tours and actively working with the City of Lufkin and the Lufkin Angelina County Economic Development Partnership in search of an appropriate buyer. At this time, the Debtors believe that there is no other serious interest in the Property, and that a public auction would cause undue delay and expense (approximately $250,000 per month), and would present the risk of losing CIT as purchaser. Accordingly, G&E has recommended that the Debtors proceed promptly to consummate a private sale of the Property to CIT.

44.     Therefore, the Debtors submit that an order granting the relief requested herein is a matter within the discretion of the Court and is in the best interests of the Debtors' estates and their creditors.

### (II) The Purchase Price is Fair and Reasonable

45.     As set forth above, ACC has fully and exhaustively marketed the Property over a two year period, culminating with CIT's offer. In light of the foregoing, and in particular, CIT's assumption of any potential environmental liabilities at the Property, the Debtors believe that the Sale will provide fair and reasonable value for the Property.

18

### (III)  The Sale of the Lufkin Property is Proposed in Good Faith

46.     The proposed Sale is the product of good faith, arms' length negotiations between ACC, on the one hand, and CIT, on the other.  CIT does not share common ownership with any of the Debtors, is independently controlled and operated, and is not otherwise affiliated with the Debtors or their officers and directors.  There is no evidence of collusion or bad faith in connection with the proposed Sale.

### (IV)  Adequate and Reasonable Notice of the Sale Will Be Provided

47.     The Debtors will provide adequate notice of the Motion to all parties-in-interest, as required by the applicable procedural rules.  *See* Fed. R. Bankr. P. 2002(c)(l) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections"); *see also Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

48.     In particular, the Debtors will serve the Motion on all parties that have expressed interest in the Property (including the three parties which previously submitted offers for the Property, but did not continue in the sale process), as well as any other parties which the Debtors believe may have interest in the Property.

## B.  The Sale Should Be Approved Under 11 U.S.C. §§ 363(m) and 363(f).

### (I) The Sale is Proposed in Good Faith Within the Meaning of 11 U.S.C. § 363(m)

49.     Here, the Sale of the Property is being proposed by the Debtors in good faith.  There is no evidence of fraud or collusion.  To the contrary, as discussed herein, the PSA is the culmination of a lengthy solicitation and negotiation process.  All negotiations have been

19

conducted on an arms' length, good faith basis. Under the circumstances, the Purchaser should be afforded the protections of section 363(m) of the Bankruptcy Code. *See generally Marin* v. *Coated Sales, Inc. (In re Coated Sales, Inc.)*, 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671,673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

**(II) The Sale Should be Free and Clear of Liens, Claims, and Interests**

50.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *see In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

51.     Considering that any objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the second and fifth subsections of section 363(f) of the Bankruptcy Code. Furthermore, courts have

held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g, In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp.* v. *Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). Accordingly, the Debtors request that the Sale be approved "free and clear," with any liens, claims, encumbrances, and interests to attach to the proceeds of the Sale.

C.     **The Bankruptcy Court Should Approve the Assumption and Assignment of the Transferred Contracts.**

        52.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(a) of the Bankruptcy Code is intended to allow a debtor to assume those contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *In re Fleming Companies, Inc.*, 499 F.3d 300, 304 (3d Cir. 2007) (section 365 of the Bankruptcy Code enables "the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not"); *L.R.S.C. Co.* v. *Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000) (same).

        53.    The Debtors' decision to assume or reject executory contracts or unexpired leases is a matter within their "business judgment." *Sharon Steel Corp.* v. *Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (acknowledging business judgment as the standard for determining whether rejection of a contract is proper); *Nickels Midway Pier, LLC* v. *Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 493 (D.N.J. 2006) ("[a]lthough the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject a contract, the Third Circuit has

adopted the business judgment standard"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("[a] debtor's decision to reject an executory contract under section 365 is governed by the business judgment standard"); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001) (same). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject "was the product of bad faith, whim or caprice." *In re HQ Global Holdings*, 290 B.R. at 511; *In re Trans World Airlines*, 261 B.R. at 121.

54.     The Transferred Contracts run attendant to the Property and serve no purpose other than to support ownership and upkeep of the Property. Counterparties' interests in the Transferred Contracts will be protected, as CIT will pay all amounts necessary to cure any defaults under the Transferred Contracts in accordance with section 365 of the Bankruptcy Code and will assume all of the Debtors' obligations under the Transferred Contracts. The Debtors will be relieved from continued performance under the Transferred Contracts and will not be subject to rejection damages. Therefore, the Debtors submit it is well within their business judgment to assume, assign and/or transfer the Transferred Contracts to CIT at the cure amounts set forth on Exhibit E-1 to the Purchase and Sale Agreement.

## NOTICE

55.     Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel:  (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the agents for the Debtors' prepetition secured bank facilities; (iv) counsel to the agent for the Debtors' postpetition lenders; (v) counsel to the agent for the Debtors' securitization facility; (vi) the Monitor appointed in the Canadian Proceeding; (vii) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b); (viii) all taxing authorities and other governmental agencies having jurisdiction over any of the Property, including the Internal Revenue Service; (ix) all Persons known or reasonably believed to have asserted an interest on any of the Property; (x) the Attorney General in the state where the Property is located; (xi) the United States Environmental Protection Agency; and (xii) any applicable state environmental agency.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

56.     No previous motion for the relief requested herein has been made to this or any other court.

DB02:8763018.2                                                                              068104.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached as Exhibit A, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware  
      September 23, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Pauline K. Morgan*

Pauline K. Morgan (No. 3650)  
Sean T. Greecher (No. 4484)  
The Brandywine Building  
1000 West Street, 17th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON &  
GARRISON LLP  
Kelley A. Cornish  
Jeffrey D. Saferstein  
Claudia R. Tobler  
Jonathan T. Koevary  
1285 Avenue of the Americas  
New York, New York 10019-6064  
Telephone: (212) 373-3000  
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors-in-Possession*