# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | :     CHAPTER 11 |
| | :     (Jointly Administered) |
| **ABITIBIBOWATER INC.,** *et. al*[1] | : |
| | :     Case No.09-11296(KJC) |
| Debtors | : |

## MEMORANDUM[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

AbitibiBowater Inc. and its affiliated debtors (the "Debtors") filed a Motion for an Order

Pursuant to Section 365 of the Bankruptcy Code Authorizing the Rejection of a Certain Call

Agreement (D.I. 497) (the "Rejection Motion"). The Woodbridge Company Limited

("Woodbridge Company"), Woodbridge International Holdings Limited ("WIHL"),and

Woodbridge International Holdings SA ("WIHSA")[3] filed an Objection to the Rejection Motion

(D.I. 628), and the Debtors filed a Reply thereto (docket no.839). The Official Committee of

---

[1]The following chapter 11 debtors are being jointly administered in this case: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp, AbitibiBowaer US Holding LLC (N/A), AbitibiBowater Canada Inc., AbitibiConsolidated Alabama Corporation, Abitibi-Consolidated Corporation, Abitibi-Consolidated Finance LP, Abitibi Consolidated Sales Corporation, Alabama River Newsprint Company, Augusta Woodlands, LLC, Bowater Alabama LLC, Bowater America Inc., Bowater Canada Finance Corporation, Bowater Canadian Forest Products Inc., Bowater Canadian Holdings Incorporated, Bowater Canadian Limited, Bowater Finance Company Inc., Bowater Finance II LLC, Bowater Incorporated, Bowater LaHave Corporation, Bowater Maritimes Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Nuway Inc. Bowater Nuway Mid-States Inc., Bowater South American Holdings Incorporated, Bowater Ventures Inc., Catawba Property Holdings, LLC (N/A), Coosa Pines Gold Club Holdings LLC, Donohue Corp., Lake Superior Forest Products Inc., and Tenex Data Inc. *See* Order dated April 17, 2009 (docket no. 61).

[2]This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). Venue is proper pursuant to 28 U.S.C. §1409. This adversary proceeding involves a core matter pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A) and (O).

[3]Woodbridge Company, WIHL, and WIHSA shall be referred to collectively herein as "Woodbridge."

Unsecured Creditors filed a joinder to the Rejection Motion (D.I. 944)(the "Joinder").

On September 8, 2009, the Debtors and Woodbridge filed a Joint Pretrial Statement for the Rejection Motion (D.I. 955), and on September 11, 2009, this Court held a hearing to consider the Rejection Motion. The Debtors seek authority under Bankruptcy Code §365 to reject the Amended and Restated Call Agreement made as of July 1, 2004 (as amended as of May 27, 2005 and February 23, 2007) between Woodbridge and debtors Abitibi Consolidated Sales Corporation ("ACSC") and Abitibi-Consolidated Inc. ("ACI")(the "Call Agreement"). If not rejected, the Debtors have only what is now a limited time to decide whether to exercise a certain option under the Call Agreement, failing which exercise the Debtors will lose this option right, and the consequent process which ensues could result in the Debtors' loss of the value of the partnership interest.

Woodbridge, the counter party, objects to rejection of the Call Agreement and advances two arguments in support of its Objection. First, Woodbridge argues that the Call Agreement alone cannot be rejected because it is an integral part of a bargain that included an amendment to a partnership agreement and, therefore, both the Call Agreement and the partnership agreement are a single, integrated agreement and would have to be rejected (or assumed) together under Bankruptcy Code §365. Second, Woodbridge argues that the Call Agreement is not executory because neither ACSC nor Woodbridge have exercised their options and, therefore, neither party had any material obligations as of the date of the bankruptcy filing.

For the reasons set forth below, the Rejection Motion will be granted.

2

STATEMENT OF UNCONTESTED FACTS

In the Joint Pretrial Statement, the parties stipulated that the following facts are true and correct, for the purpose of this proceeding only:[4]

1.      On August 17, 1981, Abitibi-Price Corporation (now, ACSC), Abitibi-Price Inc. (now, ACI, and together with ACSC, "Abitibi"), Thomson Newsprint Inc. ("TNI"), and Thomson Newspapers Limited ("Thomson") entered into a partnership agreement (the "Partnership Agreement") to create Augusta Newsprint Company (the "Partnership") and to: (1) acquire an existing newsprint manufacturing facility and related property; (2) finance and complete an expansion of that facility; (3) "carry on the business of newsprint production and ownership and management of forest resources with these assets"; and (4) "carry on all related activities reasonably necessary or desirable in connection therewith, including all matters contemplated by this agreement." A true copy of the Partnership Agreement [was admitted] as Trial Exhibit 1.

2.      Section 9.8 of the Partnership Agreement provides that "this Agreement shall be governed by Georgia law."

3.      The Partnership Agreement contains no dispute resolution provisions.

4.      The Partnership Agreement was amended six times between 1981 and 2001. Other than the amendment in 2001, none of these amendments involved a change in the partners. True copies of these amendments [were admitted] as Trial Exhibits 2 through 7.

5.      During 2000 and 2001, Thomson disposed of all of its newspaper operations in Canada

---

[4]At the hearing on September 11, 2009, the parties submitted Joint Trial Exhibits, Declarations and Deposition Excerpts, all of which were admitted into evidence.

and the United States and, as a result, ceased to have a need for its interest in the Partnership with ACSC. Thomson offered to sell TNI's 50% interest in the Partnership to ACSC. Beginning in January 2001, the parties had extensive discussions regarding transactions that would facilitate the sale of TNI's 50% interest to ACSC. Though interested in acquiring TNI's 50% interest, Abitibi did not have the financial resources to complete the transaction at that time.

6.    On September 6, 2001, TNI sold for payment of approximately $190 million in cash TNI's partnership interest to Augusta Newsprint Inc. ("ANI"), a newly formed special-purpose holding company wholly owned by WIHL and WIHSA, which are wholly owned by Woodbridge Company, a private company and the largest shareholder of TNI's parent, The Thomson Corporation.

7.    Also on September 6, 2001, ACSC, ACI, TNI, ANI and Woodbridge Company executed a "Consent" to the sale of TNI's 50% partnership interest to ANI. A true copy of the Consent [was admitted] as Trial Exhibit 8.

8.    AbitibiBowater's Form 10-K filed on April 30, 2009 for the year ended December 31, 2008 states that "Augusta Newsprint Company, which operates [AbitibiBowater's] newsprint mill in Augusta, Georgia, is owned 52.5% by [AbitibiBowater] and 47.5% by The Woodbridge Company," and also lists "The Woodbridge Company" as its partner in the Partnership. (pp. 9, 75.) The Declaration of William G. Harvey In Support of Chapter 11 Petitions and Various First Day Applications and Motions [Docket No. 20] (the "Harvey Declaration") states that "[ACSC], and an unrelated third party, The Woodbridge Company, own 52.5% and 47.5% of its equity interests respectively." True

4

copies of the Harvey Declaration and the Debtors' Form 10-K for the year ended
December 31, 2008 [were admitted] as Trial Exhibits 19 and 20.

9.    AbitibiBowater's Form 10-Q filed on August 11, 2009 for the period ended June 30, 2009
      states that "Abitibi Consolidated Sales Corporation ("ACSC"), an indirect, wholly-owned
      subsidiary of AbitibiBowater, Abitibi and Woodbridge International Holdings Limited,
      Woodbridge International Holdings SA and the Woodbridge Company Limited
      (collectively, "Woodbridge"), are party to an amended and restated call agreement. The
      call agreement grants ACSC the right to purchase Augusta Newsprint Inc., ACSC's
      47.5% partner in Augusta Newsprint Company and a subsidiary of Woodbridge, on or
      before December 31, 2009, at a pre-established price." (p. 60.) A true copy of
      AbitibiBowater's Form 10-Q for the period ended June 30, 2009 [was admitted] as Trial
      Exhibit 21.

10.   Also on September 6, 2001, because ACSC was interested in eventually acquiring the
      partnership interest held by ANI and owning the entire Partnership, and Woodbridge
      Company, an investment company that was not in the newsprint or newspaper business,
      had no strategic reason for owning an interest in the Partnership in the long term, ACSC,
      ACI and Woodbridge entered into the call agreement (the "Call Agreement"), the purpose
      of which was (a) to give ACSC an option to purchase ANI from WIHL and WIHSA by a
      date and at price certain and, in the event ACSC does not exercise its option, (b) to
      provide for a sale of the entire Partnership, thus giving Woodbridge a means to exit its
      investment and compel termination of the Partnership. A true copy of the Call
      Agreement [was admitted] as Trial Exhibit 9.

11.    Woodbridge would not have allowed any affiliated entity to become a partner in the
Partnership without the Call Agreement being in place.

12.    Pursuant to Section 2.1 of the Call Agreement, ACSC was granted the option (the "Call
Option") to purchase all of the shares of ANI at a specified price (the "Option Price")
with stated adjustments.  If ACSC does not exercise the Call Option by a set date, the
Call Agreement provides procedures for an alternative partnership transaction (the
"Alternative Partnership Transaction").  The Alternative Partnership Transaction
procedures give ACSC and then WIHL and WIHSA the right to solicit and complete (i)
the sale of the Partnership as a going concern, (ii) the sale of all or substantially all of the
consolidated assets of the Partnership, or (iii) a merger or other business combination
involving the Partnership.  In the event of an Alternative Partnership Transaction, WIHL
and WIHSA would be entitled to receive "first out" proceeds in an amount in excess of
the Option Price (the "Alternative Transaction Amount").  ACSC would be entitled to the
balance of the proceeds, if any.  If ACSC does not exercise the Call Option, and if an
Alternative Partnership Transaction is not completed within the time periods stated in the
Call Agreement, the § 4.1 rights expire.

13.    The Call Agreement requires Woodbridge, among its other obligations under the Call
Agreement, to (a) cause ANI's representatives on the Partnership's management
committee to support capital expenditures on an average annual basis of up to six million
dollars, and (b) indemnify ACSC, ACI, the Partnership and ANI, among others, for a
share of the costs associated with environmental damage caused by the operation of the
Augusta mill. *See* Trial Exhibit 9 §§ 5.3, 9.4.

6

14.    The Credit and Guaranty Agreement, dated April 1, 2008, by and among Abitibi-
       Consolidated Company of Canada, ACI, certain subsidiaries and affiliates of ACI,
       Goldman Sachs Credit Partners L.P., Wachovia Capital Markets, LLC and the various
       lenders named therein, defines "Organizational Documents" to mean, *inter alia*, "with
       respect to [the Partnership], the call agreement entered into among its partners and their
       affiliates". This Credit and Guaranty Agreement is incorporated by reference into the
       Debtors' Form 10-K for the year ended December 31, 2008, which [was admitted] as
       Trial Exhibit 20.

15.    ANI is not a party to the Call Agreement. WIHL and WIHSA, the owners of ANI, are
       parties to the Call Agreement.

16.    The Call Agreement is governed by the laws of the State of New York.

17.    Certain disputes under the Call Agreement are subject to arbitration before the American
       Arbitration Association in New York.

18.    The Call Agreement contains an integration clause, providing that it "constitutes the
       entire agreement between the parties pertaining to the subject matter [t]hereof."

19.    Also on September 6, 2001, the same day that the Consent and the Call Agreement were
       executed, ACSC, ACI, ANI, Woodbridge Company, TNI and The Thomson Corporation
       entered into an "Amendment to Partnership Agreement" (the "2001 Amendment"). A
       true copy of the 2001 Amendment [was admitted] as Trial Exhibit 10.

20.    The 2001 Amendment recited that "(a) [TNI] is transferring its 50% interest in the
       Partnership to [ANI], and (b) all of the stockholders of [ANI] . . . is [sic] entering into a
       Call Agreement with [ACSC]," and that recital was expressly incorporated into the 2001

7

Amendment. It added a new section 8.6 to the Partnership Agreement by which the

parties approved, notwithstanding Section 8 of the Partnership Agreement, any

transaction "pursuant to that certain Call Agreement . . . dated as of September 6, 2001."

The 2001 Amendment also adjusted various terms (definitions, etc.) in the Partnership

Agreement accordingly. The 2001 Amendment expressly provides that: "[e]xcept as set

forth in this Amendment, the Partnership Agreement shall remain unchanged. . ." and

states that "[t]he Partners and the Parents, and the Withdrawing Partner and the

Withdrawing Parent, desire to . . . (b) admit the New Partner [ANI] as a general partner of

the Partnership. . . ."

21.    Paragraph 10 of the 2001 Amendment also incorporates by reference Section 9.8 of the

Partnership Agreement, which provides that "this Agreement shall be governed by

Georgia law."

22.    The Partnership Agreement contains no liquidity and exit provisions for the parties

outside of the context of a Third Party Offer, as that term is defined therein.

23.    On July 1, 2004, ACSC purchased five percent of the partnership interest owned by ANI,

resulting in ACSC holding 52.5% of the Partnership and ANI holding 47.5%. ACSC,

ACI, ANI and Woodbridge Company amended the Partnership Agreement (the "2004

Amendment") to reflect this change in ownership and to provide for changes in

governance provisions and the composition of the Partners Committee. A true copy of

the 2004 Amendment to the Partnership Agreement [was admitted] as Trial Exhibit 11.

24.    The 2004 Amendment incorporates by reference Section 9.8 of the Partnership

Agreement, which provides that "this Agreement shall be governed by Georgia law."

8

25.     Also on July 1, 2004, ACSC, ACI and Woodbridge executed the Amended and Restated
        Call Agreement. A true copy of the Amended and Restated Call Agreement [was
        admitted] as Trial Exhibit 12.

26.     The Amended and Restated Call Agreement amended the Option Price to add a premium
        for the "early exercise" of ACSC's call right. A new formula, the "Return Cap," was
        added to the price calculation, the effect of which was to reduce the Option Price paid to
        WIHL and WIHSA by any return ANI received on its distributions under the Partnership
        Agreement in excess of 10% per annum.

27.     The Amended and Restated Call Agreement was amended on May 27, 2005 for the
        purpose of extending the period of time in which the Call Option could be exercised and
        adjusting the purchase price accordingly. A true copy of this amendment [was admitted]
        as Trial Exhibit 13.

28.     No change was made to the Partnership Agreement at that time.

29.     On February 23, 2007, ACSC and ANI entered into a Stock Purchase Agreement with
        Abitibi-Consolidated Corporation ("ACC"), a subsidiary of ACI, for the sale to ACC by
        the Partnership of the Partnership's subsidiary, Augusta Woodlands Corporation, for a
        purchase price of $40 million payable to the Partnership and evidenced by a promissory
        note. At the same time, the Amended and Restated Call Agreement was amended, but no
        change was made to the Partnership Agreement. A true copy of this amendment [was
        admitted] as Trial Exhibit 14.

30.     ANI is not a party to the Amended and Restated Call Agreement. WIHL and WIHSA, the
        owners of ANI, are parties to the Amended and Restated Call Agreement.

31.    The Amended and Restated Call Agreement is governed by the laws of the State of New
York.

32.    Certain disputes under the Amended and Restated Call Agreement are subject to dispute
resolution before the American Arbitration Association in New York.

33.    The Amended and Restated Call Agreement contains an integration clause which
provides that "[t]his Agreement constitutes the entire agreement between the parties
pertaining to the subject matter hereof and supersedes all prior agreements, negotiations,
discussions, and understandings, written or oral, between the parties."

34.    The Option Price that ACSC would have to pay if it exercises the Call Option is higher
than the current value of ANI. The Alternative Transaction Amount that ANI would be
entitled to receive under the Call Agreement in the event of a sale would be greater than
the total amount for which Augusta Newsprint could be sold in the current market; and,
therefore, ACSC would be likely to receive no proceeds in the event of an Alternative
Partnership Transaction.

## DISCUSSION

1.    The Call Agreement stands apart as a separate agreement.

In *Exide Technologies*, I recognized that:

An executory contract must be assumed or rejected *in toto*. *See Sharon Steel
Corp. v. Nat'l Fuel Gas Distribution Corp.,* 872 F.2d 36, 41 (3d Cir. 1989); *In re
Teligent, Inc.*, 268 B.R. 723, 728 (Bankr.S.D.N.Y. 2001). A contract will not be
bifurcated into parts that will be rejected and those that will not. *See In re Metro
Transp. Co.,* 87 B.R. 723, 728 (Bankr.E.D.Pa. 1988). Correspondingly, all of the
contracts that comprise an integrated agreement must either be assumed or
rejected, since they all make up one contract. *See Philip Servs. Corp. v. Luntz (In
re Philip Servs., Inc.)*, 284 B.R. 541, 547-48 (Bankr.D.Del. 2002), *aff'd* 303 B.R.
574 (D.Del. 2003); *In re Karfakis*, 162 B.R. 719, 725 (Bankr.E.D.Pa. 1993).

*In re Exide Tech.,* 340 B.R. 222, 228 (Bankr.D.Del. 2006) *aff'd* 2008 WL 522516 (D.Del. Feb.

27, 2008). *See also In re Buffets Holdings, Inc.,* 387 B.R. 115, 119 (Bankr.D.Del. 2008)("If the

debtor decides to assume a lease, however, it must generally assume all the terms of the lease and

may not pick and choose only favorable terms to be assumed.").

　　　　Woodbridge asserts that the parties intended that the Call Agreement, the Partnership

Agreement, and the Consent Agreement would be one integrated agreement.[5]  The Partnership

Agreement was amended in 2001 to replace one partner (TNI) with a new partner (ANI), and

Woodbridge contends that, as part of that deal, the parties entered into the Call Agreement to

establish a buy-out and exit mechanism for the new partner. Woodbridge relies on deposition

testimony of the CEO of one of the Debtors (ACI) who stated: "[T]he deal was that Thomson

would transfer to Woodbridge and we [Abitibi] would get an exit agreement . . . It was all one

deal." (*See* Weaver Dep., Ex. 23, at 11:23 - 12:4).  Woodbridge asserts that it would not have

allowed any affiliated entity to become a partner in the Partnership without the Call Agreement

being in place. (Stipulated Fact, ¶11). Because the Call Agreement includes "fundamental terms

critical to Abitibi's and Woodbridge's partnership bargain," Woodbridge argues that the

agreements cannot be rejected in a piecemeal fashion. (*See* Woodbridge Trial Brief, D.I. 959 at

3).

　　　　The Debtors assert, in response, that the history and plain language of the Partnership

---

[5]The Consent also was entered into on September 6, 2001 between ACSC, ACI, Thomson, ANI and Woodbridge Company (Ex. 8). In the Consent, ACSC and ACI, among other things, consent to ANI's purchase of 50% partnership interest held by TNI, and agree that ANI is entitled to all of the rights and benefits held by TNI under the Partnership Agreement. The Consent does not contain any reference to the Call Agreement and does not affect my decision.

Agreement and Call Agreement demonstrate that the agreements are completely separate. The

Partnership Agreement was entered into in 1981 by two partners, and governs, among other

things, the relationship of the partners and the management and operation of a newsprint mill in

Augusta, Georgia. The Debtors assert that the Call Agreement, in contrast, was entered into in

2001 and is not an agreement among the partners; instead, it is a separate agreement that allows

one partner (ACSC) to purchase the shares of the company that owns the other partnership

interest (ANI) from WIHSA and WIHL.

     The parties agree that the Call Agreement is to be interpreted under New York law. To

determine whether multiple agreements should be read as one contract under New York law, the

court looks to the parties' intention, which is determined by the circumstances surrounding the

transaction. *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006). The parties

agree that the Partnership Agreement is to be interpreted under Georgia law, which also provides

that "[t]he intent of the parties governs as the cardinal rule of construction" and that the court

should "consider the background of the contract and the circumstances under which it was

entered into, particularly the purpose for the particular language to be construed." *Brogdon v.

Pro Futures Bridge Capital Fund, L.P.*, 260 Ga.App. 521, 580 S.E.2d 303, 306 (2003). I agree

with the Debtors that the two agreements, while related, were intended to be separate agreements.

I rely on the following aspects of the transaction, raised and argued by both the Debtors and

Woodbridge:

     (a)    <u>The Agreements were executed at different times</u>:  Although Woodbridge argues

               that it is "incomprehensible" to assert that a Partnership began in 1981 when one

               of the 50-50 partners did not join until 20 years later, the original Partnership

12

Agreement was indeed executed in 1981. The Partnership Agreement was

amended in 2001 - - at the same time the Call Agreement was signed - - to

substitute one partner for another. The 2001 amendment to the Partnership

Agreement included reference to the Call Agreement to note a change to the

original agreement's provision on restrictions on transfer.[6] However, the parties

did not execute a new partnership agreement, but chose instead to remain within

the framework of the original Partnership Agreement, which had a number of

amendments to various provisions over the years, many unrelated to the 2001

Partnership Agreement Amendment or the Call Agreement. (*See* LeClair Decl.,

Ex. 16, ¶8).

(b)    The Agreements relate to different subject matters. Although both agreements

are related to the Partnership, the agreements address different subject matters.

Each agreement includes a provision that sets forth its separate purpose. When

---

[6]The Partnership Agreement provided for a right of first refusal if either partner found a buyer for its interest. Partnership Agr., Ex. 1, §§ 8.2- 8.3. In contrast, the Call Agreement separately provides (i) ACSC with the option to buy ANI and, if not exercised, (ii) ACSC, and then Woodbridge, with the option to force a sale of the entire Partnership. As stated in the LeClair Declaration:

> Although the 2001 Amendment to the Partnership Agreement and the Call Agreement were executed at the same time, neither agreement incorporates the other agreement by reference. Rather, section 3(f) of the 2001 Amendment merely amends the Partnership Agreement to allow the transactions contemplated by the Call Agreement:
>
> > The parties hereto approve any purchase, sale, transfer, conveyance and/or assignment of the issued and outstanding share capital of the Woodbridge Partner pursuant to that certain Call Agreement . . . dated as of September 6, 2001. The restrictions on transfer contained in this Agreement, including under Section 8.2 through 8.5 hereof, shall not apply to any such transaction in accordance with the terms and conditions of the Call Agreement.
>
> This Amendment to the Partnership Agreement to permit the transfers contemplated by the Call Agreement was necessary because ANI was not a party to the Call Agreement.

LeClair Decl., Ex. 16, ¶17.

considering whether separate documents should be read as one agreement, a court

may analyze the parties' intent by reviewing the purpose of each agreement.

*Broadhollow Funding, LLC v. Bank of America, N.A. (In re American Home*

*Mortgage Holdings, Inc.)*, 390 B.R. 120, 137 (Bankr.D.Del. 2008) citing *W. Alton*

*Jones Foundation v. Chevron U.S.A. Inc. (In re Gulf Oil/Cities Serv. Tender Offer*

*Lit.)*, 725 F.Supp. 712, (S.D.N.Y. 1989).

        The Partnership Agreement states that the purpose of the partnership is to:

(i) acquire an existing newsprint manufacturing facility and related property, (ii)

finance and complete and expansion of that facility, and (iii) "carry on the

business of newsprint production and ownership and management of forest

resources with these assets." (Partnership Agreement, Ex. 1, §2.1; *See* LeClair

Decl., Ex. 16, ¶5.) "The Partnership Agreement provides for the formation,

management and governance of the Partnership, the expansion of the facility, the

minimum production (operating rate) of the mill, and the financial relations of the

partners, among other things." (LeClair Decl., Ex. 16, ¶5.)

        In 2001, when Thomson was exiting the newspaper business and no longer

wanted to own an interest in the Augusta mill, Thomson requested that ACSC

consent to the transfer of TNI's interest in the Partnership to ANI. (*Id.* at ¶9.)

ANI was a newly-formed subsidiary of Woodbridge Company, and Woodbridge

Company was the largest shareholder of Thomson. (*Id.*). Although ACSC was

interested in owning TNI's interest in the Partnership, it was not the right time for

ACSC and, as an accommodation to Thomson, ACSC and ACI consented to the

14

transfer of TNI's interest to ANI. (*Id.* at ¶¶ 9,10.) Thus, the Call Agreement was entered into - - not between the partners - - but between Woodbridge and ACSC and ACI to accommodate their respective interests. (*Id.* at ¶¶ 9, 11.) The Call Agreement's recitals state that its purpose is to provide "for certain call rights respecting the Purchase Shares and certain other rights respecting the disposition, merger or other business combination of the Partnership . . . ." (Call Agreement, Ex. 9, p. 1.) The separateness of the agreements is reflected in the different purposes underlying the agreements.

Gregory J. Dart's Declaration in support of the Woodbridge Objection (Ex. 18) stated that three practical considerations led to documenting separately the Call Agreement, rather than entering into one agreement for the entire 2001 transaction: (1) the Call Agreement had complicated and detailed terms best suited to a separate agreement; (2) the Partnership Agreement did not exist in electronic form and could be more easily amended by the 2001 Partnership Amendment rather than a full amendment and restatement; and (3) the parties to the 2001 Partnership Agreement and Call Agreement are headquartered in Canada, Luxembourg and New York, and felt more comfortable designating New York as the governing law for the new terms. (Dart Decl., Ex. 18, ¶20). He also stated that the 2001 Partnership Amendment and the Call Agreement included references to each other, including incorporation of definitions for common terms, which indicates an intention that the agreements be read together. (*Id.* at ¶19).

However, neither the "practical considerations" nor the few references

15

between the agreements demonstrate convincingly an intent that the separate documents embodied only one agreement.  Even assuming that the parties decided to separate the complicated details of the Call Agreement for ease only, the parties could have included merger or cross-default provisions in either (or both) the Partnership Amendment and/or the Call Agreement, rather than an integration clause appearing only in the Call Agreement. *See Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 233 (2d Cir. 1991)(holding that contemporaneously executed promissory notes and a distributorship agreement should be treated as a single contract when "[t]he promissory notes were executed for the *sole purpose* of making payments under the distributorship agreement and the notice and cure provisions of the agreement deal specifically with the consequences of [the obligor's] failure to make timely payments.")(emphasis added).   Further, when amending the Partnership Agreement, the parties also could have amended its governing law provision to make it consistent with the Call Agreement. Finally, I give no weight to the "practical consideration" of using separate documents because the original partnership agreement was not in an electronic format, given the business sophistication of the parties and the magnitude of the economics of the transaction.

(c)    <u>The Agreements are not between the same parties.</u>  The Partnership Agreement is between ACSC, ACI, ANI and Woodbridge Company, while the Call Agreement is between ACSC, ACI, and Woodbridge.  Although the parties are related, they are separate entities, and this weighs in favor of finding separate agreements. *See*

16

*Arciniaga*, 460 F.3d at 237 (deciding that parties to two agreement were different when one contract was executed by A, B, and C, and the other was executed by A and B), *Brogdon*, 580 S.E.2d at 306 (deciding that contracts were separate when, among other things, one was signed by party in his individual capacity and the other was signed by the same party on behalf of the company).

(d)     The Call Agreement contains an integration clause.     The Call Agreement includes an integration clause which expressly provides that:

> This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the parties.

(Call Agreement, Ex. 9, ¶10.5.)  Under both New York and Georgia law, the presence of an integration clause undermines the argument that two separate agreements are one. *DDCLAB Ltd. v. E.I. DuPont NeMours and Co.,*, No. 03 CV 3654GBD, 2005 WL 425495, *4 (S.D.N.Y. Feb. 18, 2005)("Since the [i]nvestment [a]greement contains an integration clause providing that the entire agreement and understanding between the parties are set forth in the agreement, and that the agreement supersedes all prior agreements and understandings, plaintiff is precluded from claiming a separate enforceable contract which induced it to execute the written agreement."), *American Home Mortgage*, 390 B.R. at 136-37 (holding that under New York law even if only one of three allegedly integrated contracts has an integration clause, it is strong evidence that they are all separate agreements), *Brogdon*, 580 S.E.2d at 306 ("that the Subscription

17

[Agreement] contains an integration clause subverts Brogdon's argument that it should be read as part and parcel of the Put Agreement."). Here, the integration clause weighs in support of concluding that the agreements were intended to be separate.

(e)    <u>The Partnership Agreement continues even if the Call Agreement is terminated.</u>
In the Objection, Woodbridge concedes that the Partnership Agreement expires by its own terms if the call option is not exercised and a forced sale is not consummated. (Objection, D.I. 628, ¶12). Thus, the Partnership Agreement will continue even if the Call Agreement expires. *See Arciniaga*, 460 F.3d at 237 (one factor considered by the Court in deciding that two agreements were separate was that the contracts were not mutually dependent, because one agreement would not end if the other agreement "fails").

(f)    <u>The Agreements were not consideration for one another.</u> The Debtors argue persuasively that the terms of the Call Agreement contain full consideration for each party: ACSC received an option to purchase the other partner; and Woodbridge received assurance that the entire partnership could be sold if ACSC does not exercise its option. (LeClair Decl., Ex. 16, ¶19.)

(g)    <u>The Agreements have different choice of law and dispute resolution provisions.</u>
As mentioned above, the Partnership Agreement is governed by Georgia law and the Call Agreement is governed by New York law. (Partnership Agreement, Ex. 1, §9.8, Call Agreement, Ex.9, §10.3.) The Call Agreement provides that certain disputes are subject to arbitration before the American Arbitration Association in

18

New York. (*Id.*)  The Partnership Agreement has no dispute resolution provision.

The difference in these contract provisions further underscores that the

agreements were separate and intended to be so.

(h)  Subsequent Amendments to the Partnership Agreement and the Call Agreement
were designed to keep the economics of the two agreements separate.

The parties entered into an Amended and Restated Call Agreement dated July 1,

2004 (Ex. 13).  According to the Declaration of Pierre Rougeau, Executive Vice

President of Operations and Sales of AbitibiBowater, Inc., the Debtors structured

the new provisions of the Amended and Restated Call Agreement to keep the

economics of the two agreements completely separate:

> At the time, we [understood] that Woodbridge wanted ACSC to delay
> exercising the option because (i) the partnership was profitable, and (ii)
> Woodbridge required more time to fully realize the benefit of certain tax attributes
> resulting from its ownership of ANI.  ACSC, on the other hand, wanted to
> increase its percentage ownership of the Partnership. Accordingly, ACSC agreed
> with ANI to purchase 2.5% of its interest in the Partnership for 5% of the amount
> that would have been the purchase price under the Call Agreement had the
> Closing Date been June 30, 2004.  ACSC also agreed to enter into the Amended
> and Restated Call Agreement which (i) postponed the Closing Date and (ii)
> [added terms, the specifics of which are under seal].

(Rougeau Decl., Ex. 17, ¶9.)  Rougeau also stated that the "purpose for this

amendment [to the Call Agreement] was to adjust the Option Price for the benefit

of ACSC if it exercised the option, without affecting the Partnership Agreement."

(*Id.* at ¶10.  *See also id.*, at ¶11.)  Thus, subsequent agreements also reflect the

parties' intent to keep the Call Agreement and the Partnership Agreement

separate.

Finally, in support of its argument that there is only one agreement here, Woodbridge also

19

asserts that certain provisions of the Call Agreement are of the kind that normally would be found in a partnership agreement.[7]  Even if true, the Debtors have established a record sufficient to demonstrate the separate purpose of each agreement.  Many transactions involve the simultaneous negotiation and execution of multiple agreements embodied in multiple documents, which are *almost always related*, but relatedness alone does not warrant the undoing of a structure purposefully chosen by the parties.

While no single item here may be determinative of the issue, the above considerations, taken together, lead me to conclude that the parties intended to, and did, make separate agreements.  Therefore, the Debtors are free to move for the rejection of the Call Agreement.

2.     The Call Agreement is executory.

Section 365(a) of the Bankruptcy Code authorizes a trustee or a debtor-in-possession to "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). The Bankruptcy Code does not define the term "executory contract."  However, the Third Circuit Court of Appeals has adopted the following definition for purposes of §365:

> [An executory contract] is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

*Enterprise Energy Corp. v. United States (In re Columbia Gas System, Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995) quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d

---

[7]*See, e.g.*, the discussion in part 2, *infra.*, addressing the parties' respective obligations under the Call Agreement.

Cir. 1989).[8]  *See also Glosser v. Maysville Regional Water District (In re Midwest Portland*

*Cement Co.)*, 174 Fed. Appx. 34, 36, 2006 WL 565683 (3d Cir. 2006) (adopting same

definition). This definition recognizes that,

> [I]n the context of a bankruptcy, an executory contract should be thought of "as a
> combination of assets and liabilities to the bankruptcy estate; the performance the
> nonbankrupt owes the debtor constitutes an asset, and the performance the debtor
> owes the nonbankrupt is a liability." Economically the debtor should assume an
> executory contract when the assets are greater than the liabilities; conversely, the
> debtor should reject an executory contract when the assets are less than the
> liabilities. If one party has fully performed its obligations, the contract should not
> be thought of as executory: if the nonbankrupt party has fully performed, it simply
> holds a claim against the debtor's estate; if the bankrupt party has fully performed,
> the performance owed it by the nonbankrupt party is an asset of the estate.

*In re Safety-Kleen Corp.* 410 B.R. 164, 167 (Bankr.D.Del. 2009) quoting *Columbia Gas*, 50 F.3d

at 238. "The time for testing whether there are material unperformed obligations on both sides is

when the bankruptcy petition is filed." *Columbia Gas*, 50 F.3d at 240.

Woodbridge argues that the Call Agreement is not executory because, as of the petition

date, there was only one non-material obligation due on its side related to supporting the

Partnership's capital expenditures and none remaining on the Debtors' side.[9]  Otherwise,

Woodbridge claims, there is no obligatory language in the Call Agreement. Section 4.1 of the

Call Agreement provides that ACSC is *entitled* to call the shares of the Woodbridge Partner. If

ACSC does not exercise that right prior to its expiration, either party (first ACSC, then WIHL

---

[8]This is also known as the "Countryman definition," since it is taken from the article by
Professor Countryman: Vern Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn.L.Rev.
439, 460 (1973). Many courts have adopted this definition. *In re Riodizio, Inc.*, 204 B.R. 417, 421
(Bankr.S.D.N.Y. 1997)(collecting cases).

[9]More specifically, Section 5.3 of the Call Agreement provides that WIHL and WIHSA "shall
cause [the Woodbridge Partner's] representatives on the Partnership's management committee to support
capital expenditures on an average annual basis of up to six million dollars ($6,000,000) unless such
expenditures would cause a violation of or default under the [credit facility]."

and WIHSA) has the right - - but not the obligation - - to consummate an Alternative Partnership

Transaction and each is entitled to the benefit of the bargain negotiated between the parties. (*See*

Woodbridge Objection, at 16-17).

The Debtors dispute Woodbridge's characterization of the Call Agreement. The Debtors

assert that the Call Agreement not only provides ACSC with an option to purchase shares at a

specific price, but also grants each party an option to force a sale of the entire Partnership if

ACSC does not exercise the option, and it sets forth the method by which the parties are required

to allocate the proceeds of any such sale. (*See* Debtors' Reply Brief, at 22). Moreover, the

Debtors cite to a number of cases holding that option agreements are executory contracts,[10] and

argue that the contrary case relied on by Woodbridge (*Unsecured Creditors Comm. v. Southmark*

*Corp. (In re Robert L. Helms Constr. And Dev. Co., Inc.)*, 139 F.3d 702 (9th Cir. 1998))

represents a minority view. 3-365 Collier on Bankruptcy ¶365.02[1] n. 12 (2009). Finally, the

Debtors also argue that other obligations in the Call Agreement (such as indemnification

obligations, capital contribution obligations, and tax obligations) are sufficient to render the Call

---

[10]The Debtors assert that a majority of courts have decided that option contracts are executory, citing *In re Kellstrom Indus., Inc.* 286 B.R. 833, 834-35 (Bankr.D.Del. 2002) ("we conclude, like the majority of courts before us, that the right of first refusal . . .is an executory contract which may be rejected by the Debtor under section 365"); *In re Elkowni*, 318 B.R. 605, 608 (Bankr.M.D. Fla. 2004) (holding that option contract is executory under Countryman standard); *In re Simon Transp. Servs., Inc.*, 292 B.R. 207, 220 (Bankr.D.Utah 2003) (option contract at issue is executory); *In re Riodizio, Inc.*, 204 B.R. 417, 423 (Bankr.S.D.N.Y. 1997) (noting that "[m]ost courts . . . consider an option contract to be executory" and concluding that a warrant is an executory contract); *In re Fund Raiser Prods. Co., Inc.*, No. Civ. A. 95-1353, 1996 WL 515504, *1 (E.D.Pa. 1996) (holding that matching right is executory under Countryman standard); *In re Hardie*, 100 B.R. 284, 286-87 (Bankr.E.D.N.C. 1989) (stating that "option contracts are generally executory contracts until the option is exercised" and holding that option contract at issue is executory); *In re A.J. Lane & Co., Inc.*, 107 B.R. 435, 437 (Bankr.D.Mass 1989) (holding that option contract is executory under Countryman standard); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes)*, 103 B.R. 524, 535 (Bankr.D.N.J. 1988) (holding that option contract at issue is executory).

Agreement executory.

When considering whether the failure to perform a remaining obligation constitutes a material breach, a bankruptcy court should look to contract principles under relevant nonbankruptcy law, i.e., the law applicable to the contract. *Columbia Gas*, 50 F.3d at 240 n.10. The parties agree that New York law is applicable to the Call Agreement.

> Under New York law, an obligation is material if a breach of the same "would justify the other party to suspend his own performance, or . . . defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976); *accord [Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)]*, 2001 WL 1112308, at *7, 2001 U.S. Dist. LEXIS 14755, at *25 (S.D.N.Y. Sept. 20, 2001). That is, an obligation is material if it relates to the root or essence of the contract. *See Medical Malpractice Inc. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997); *see also Philip Services*, 284 B.R. 541, 547 (Bankr.D.Del. 2002).

*Exide,* 340 B.R. at 229-30. The purpose of the Call Agreement is "to provide for certain call rights respecting the Purchase Shares and certain other rights respecting the disposition, merger or other business combination of the Partnership." (*See* Call Agreement, Ex. 9, at 1.) If ACSC exercises its right to purchase all of the shares of ANI, then Woodbridge is required to sell and ACSC is required to buy the shares at a set price, and within the specific time and manner set forth in the Call Agreement. (*See id.,* at Articles 2 and 3). If ACSC does not exercise its right to purchase the shares, each party in turn (first ACSC, then WIHL and WIHSA) has the right to market and sell the Partnership as a going concern. (*See id.*, at Article 4). These unperformed obligations are clearly material, as they relate to the root or essence of the contract.

The Debtors argue that the fact that certain obligations may be contingent does not

prevent the Call Agreement from being executory.[11] *Safety-Kleen*, 410 B.R. at 168 (determining

that contingent environmental indemnification obligations that were material to both parties were

sufficient to render a contract executory). Numerous other courts have determined that

contingent option agreements are executory when material obligations will arise on each side if

the option is exercised. *E.g., Kellstrom*, 286 B.R. at 835 (an option contract is executory when

the debtor is obligated to give notice of an offer to purchase and to sell property to a counter-

party if the counter-party matches the offer; and the counter-party is obligated to exercise or

waive its right of first refusal within 30 days of notice); *Riodizio*, 204 B.R. at 424(a warrant is

executory when the debtor must keep an offer open and sell shares, and the counter-party must

exercise the option in the warrant to purchase the shares), *Carlisle Homes*, 103 B.R. at 535 (the

debtor's unexercised option to purchase real property was an executory contract), *In re G-N*

*Partners*, 48 B.R. 462, 465 (Bankr.D.Minn. 1985) (same).

---

[11]A contingent obligation is distinguished from a condition that remains unperformed but will not render an agreement executory. The *Columbia Gas* Court described the basic contract principles of conditions and obligations as follows:

> There is a distinction in the law between failure of a condition and a breach of a duty: "non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Restatement (Second) of Contracts §225(3) (1981). This distinction between a condition and a duty (or promise) is important here. The Restatement makes clear that while "a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages." . . . In this case, if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of §365 because no material breach could occur.
> . . . .
> The determination whether a contract term is a promise or condition is a problem of interpretation, so that "each case turns on its own facts. . . ."

*Columbia Gas*, 50 F.3d at 241 (citations omitted). *See also Kent's Run P'ship, Ltd. v. Glosser*, 323 B.R. 408, (W.D.Pa. 2005) *aff'd In re Midwest Portland Cement Co.*,174 Fed. Appx. 34, 37, 2006 WL 565683, *3 (3d Cir. 2006) (unperformed obligations related to easements were merely conditions and did not render the agreement of sale executory).

The Call Agreement contains layers of material obligations by both ACSC and Woodbridge that change depending on the particular contingency that occurs.

Further, the indemnification, tax, and capital contribution obligations in the Call Agreement also support the conclusion that it is an executory contract. Section 5.3 of the Call Agreement requires Woodbridge to cause its ANI's representatives on the Partnership's management committee to support capital expenditures on an average basis of up to $6 million dollars. Article 7 of the Call Agreement sets forth the parties' agreements regarding tax obligations, e.g., which party is responsible for preparation of tax returns, agreements to cooperate in any audit or litigation arising from the filing of tax returns, allocation of tax refunds and carry-back losses, and agreements to indemnify for tax obligations. Article 9 sets forth the parties' agreements to indemnify each other for, among other things, a share of the costs associated with environmental damage caused by the operation of the Augusta mill. These obligations are continuing for both Woodbridge and ACSC, and may provide significant benefits and burdens to the estate. Other courts have determined that such obligations are material. *Safety-Kleen*, 410 B.R. at 168 (on-going, contingent environmental obligations render a contract executory), *Philip Services Corp. v. Luntz (In re Philip Services (Delaware), Inc.*, 284 B.R. 541, 549-50 (Bankr.D.Del. 2002)(same). *See also Broadstripe, LLC v. Nat'l Cable Television Cooperative, Inc. (In re Broadstripe, LLC)*, 402 B.R. 646, 655 (Bankr.D.Del. 2000)(membership agreement was executory when one party had ongoing confidentiality and indemnification obligations, and the other party had ongoing obligations to advise members and "use its best efforts" to negotiate agreements on behalf of members).

For the foregoing reasons, I conclude that the Call Agreement is an executory contract.

25

3.      The Debtor has properly exercised its business judgment to reject the Call Agreement.

A debtor's decision to assume or reject an executory contract is a matter within the

"business judgment" of the debtor. *Sharon Steel*, 872 F.2d at 40.  A court is required to examine

whether a reasonable business person would make a similar decision under similar

circumstances. *Exide*, 340 B.R. at 239 citing *In re Vencor, Inc.*, 2003 WL 21026737, *3

(Bankr.D.Del. April 30, 2003).  This is not a difficult standard to satisfy and requires only a

showing that rejection will benefit the estate. *Id.*  The parties have stipulated that:

> The Option Price that ACSC would have to pay if it exercises the Call Option is
> higher than the current value of ANI.  The Alternative Transaction Amount that
> ANI would be entitled to receive under the Call Agreement in the event of a sale
> would be greater than the total amount for which Augusta Newsprint could be
> sold in the current market; and, therefore, ACSC would be likely to receive no
> proceeds in the event of an Alternative Partnership Transaction.

Stipulated Facts, ¶34.  *See also* Rougeau Decl., Ex. 17, ¶¶ 4-7.  In accordance with the underlying

purpose of  §365, the Debtors properly weighed the parties' respective duties under the Call

Agreement and determined that the Call Agreement is disadvantageous to the Debtors and

should be rejected.

<u>CONCLUSION</u>

For the reasons stated above, I conclude that the Call Agreement is a separate agreement from the Partnership Agreement.  I also conclude that the Call Agreement is an executory contract, which the Debtors may reject under Bankruptcy Code §365.  Finally, based upon the undisputed facts regarding the value of the Partnership, I conclude that the Debtors properly exercised their business judgment in rejecting the Call Agreement.  An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:   October 27, 2009

27