IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| ABITIBIBOWATER INC., et al.,[1] | ) Case No. 09-11296 (KJC) |
| Debtors. | ) Jointly Administered |

## DECLARATION OF GORDON COLE IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AUTHORIZING ALABAMA RIVER NEWSPRINT COMPANY AND ABITIBI-CONSOLIDATED ALABAMA CORPORATION: (A) TO SELL CERTAIN ASSETS LOCATED IN CLAIBORNE, ALABAMA; (B) TO ENTER INTO AND PERFORM ALL OF THEIR OBLIGATIONS UNDER A CERTAIN AGREEMENT FOR CONVEYANCE OF PROPERTY AND EQUIPMENT; (C) TO ASSUME A CERTAIN AMENDED SERVICES AGREEMENT; AND (D) GRANTING RELATED RELIEF

GORDON COLE, pursuant to 28 U.S.C. § 1746, declares:

1. I am the Vice President of Energy, Strategy, Hyrdro and Asset Management of AbitibiBowater, Inc. ("AbitibiBowater"), a position which I have held

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada. On February 18, 2010, the Court entered an order dismissing the case of ABH LLC 2.

for the past six months. I was first employed, as a project engineer, by Abitibi-Price Inc., in 1985. I have a Bachelor of Engineering from Memorial University of Newfoundland.

2. I submit this declaration in support of the Motion (the "Motion")[2] of AbitibiBowater and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors") for an Order authorizing Alabama River Newsprint Company ("ARN") and Abitibi-Consolidated Alabama Corporation ("ACAC"): (A) to sell certain assets located in Claiborne, Alabama; (B) to enter into and perform all of their obligations under a certain agreement for conveyance of property and equipment; (C) to assume a certain amended services agreement; and (D) granting related relief.

3. Except as otherwise noted, I have personal knowledge as to all of the information set forth below.

4. In 1988, Parsons & Whittemore Alabama Newsprint Corp. ("PWANC"), Parsons & Whittemore, Incorporated ("PWI" and together with PWANC, the "PW Partners"), Abitibi-Price Alabama Corporation, and Abitibi-Price Inc. (Abitibi-Price Alabama Corporation and Abitibi-Price Inc. together, the "Abitibi Partners" and the PW Partners and the Abitibi Partners together, the "Partners") created ARN for the purposes of constructing and operating a 220,000 tonne per year newsprint mill (the "Mill") at a site adjoining the Alabama River, and the pulp mill owned by Alabama River Pulp Company, Inc. ("ARP") and Alabama Pine Pulp Company ("APP"). The PW Partners own ARP and APP. ARN built the Mill pursuant to a funding and construction

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

agreement with The Industrial Development Board of Monroe County, Alabama (the "Board").

5. In connection with building the Mill, ARN entered into that certain Lease Agreement dated as of October 1, 1988 and recorded at deed book 354 page 495 in the records of the Judge of Probate of Monroe County, Alabama (as heretofore amended, the "Lease Agreement") with the Board, in connection with the issuance by the Board of its bonds (which bonds are no longer outstanding) to finance industrial facilities for the benefit of ARN. The Board has record title to the real property described in the Lease Agreement (the "Leased Property"). By order dated October 28, 2009 [Docket No. 1208], ARN assumed the Lease Agreement.

6. In 2004, a disagreement arose between the Partners which gave rise to a lawsuit filed by the PW Partners against the Abitibi Partners. The lawsuit led to the dissolution of the original partnership and separation of ARN and ARP's ownership. As a result, ACAC, a wholly-owned subsidiary of Abitibi-Consolidated Sales Corporation ("ACSC"), and ACSC, are now ARN's general and limited partners respectively. ACAC and ACSC are both Debtors in these Chapter 11 Cases.[3] The PW Partners remain the partners and owners of ARP and APP.

7. When the Partners created ARN and built the Mill, they intended ARP's pulp mill to provide raw materials and other services to the Mill once it became operational. Accordingly, the parties entered into a services agreement (the "Services Agreement") pursuant to which, among other things, ARP: (a) provides steam to the Mill; (b) provides boiler feedwater to the Mill; (c) provides pulp to the Mill; (d) provides

---

[3] ACSC and ACAC are successors in interest to the Abitibi Partners.

3

water to the Mill; (e) treats effluent discharged by the Mill; (f) uses its machine shop to perform normal maintenance and repair work on the Mill's machinery and equipment; (g) performs all scaling and receiving services for pulpwood supplied to the Mill; and (h) provides additional services for the Mill, including personnel services, accounting, payroll, purchasing, data processing, general stores, traffic (including railroad) and yard services (including disposal of non-hazardous operational refuse). By its terms, the Services Agreement terminates in 2018.

8. The parties have operated both mills pursuant to the relationship created by the Services Agreement. In recent years, however, as the demand for newsprint has decreased, the Services Agreement no longer reflects the Mill's actual need for pulp and other services. In fact, the Mill is currently idle. Its operations are limited to operating its wood yard and selling wood chips to ARP. Pursuant to this month by month chipping agreement with ARP, ARN achieves near cost neutrality while in its idle stage.

9. In connection with the Chapter 11 Cases, the Debtors and ARP have agreed to restructure their relationship and align it more closely with the Mill's actual needs and the two mills' operating realities. Specifically, the parties have agreed to: (a) amend the Services Agreement by entering into Amendment No. 3 in a form substantially as the one attached to the Motion as <u>Exhibit B</u> (the Services Agreement, as amended by Amendment No. 3, the "<u>Amended Services Agreement</u>") (i) to reduce those payments due to ARP from ARN to no more than $5,000 per month for so long as ARN has suspended paper-making operations at the Mill; (ii) to allow ARN to cancel the Amended Services Agreement upon sixty (60) days' written notice to ARP in certain

4

circumstances; and (iii) to allow the parties to assign the Services Agreement to a third party; and (b) sell certain of ARN's equipment and real property interests to ARP.

10. Pursuant to the Amended Services Agreement, ARP will continue to provide a variety of services to the Mill, including accounting, yard services, scale house services, steam, water, and effluent treatment. However, ARN's monthly fees payable to ARP will be reduced from $20,000 to $5,000 for so long as ARN has suspended paper-making operations at the Mill. In addition, ARN can terminate the Amended Services Agreement in certain circumstances on sixty days notice. Finally, ARP currently uses ARN's waste conveyor, water pumps and effluent equipment, most of which are located on ARP's land, to fulfill its obligations to ARN under the Services Agreement. Accordingly, to enable ARP to continue servicing the Mill, and in light of the customized nature of the equipment and its unique value to ARP as the principal operator of the equipment and ARN's continued need for certain services, albeit on a more limited basis, ARN has determined to sell the equipment to ARP in connection with the amendment of the Services Agreement.

11. The Sale Agreement also contemplates the conveyance to ARP of the Land and release of the Easements. Specifically, since 1995, ARP has been operating a wood yard that occupies about twelve acres of the Leased Property. The amount of land ARP uses has no material impact on ARN's business, nor does ARN use the land for its own Mill operations. In fact, in connection with ensuring the security of its Mill when ARN idled it, ARN allowed ARP to build a fence around the Land in a manner that enabled ARP's continued operation of its wood yard. As part of the restructuring of the parties' relationship under the Services Agreement, ARN has agreed to convey the Land

to ARP. It intends to do so through an assignment of the Land and concurrent entry into the Lease Amendment.

12. I believe that sound business reasons justify the Transactions. Pursuant to the Services Agreement, the Debtors pay $20,000 per month for services including effluent treatment services at the Mill. By assuming the Amended Services Agreement, the Debtors will reduce the cost of maintaining the Mill by seventy-five percent, to $5,000 per month for so long as ARN has suspended paper making operations at its Mill. Because ARN has not permanently closed or decommissioned the Mill, ARN continues to incur operating costs associated with the Mill.

13. Notably, even though ARN no longer needs the same volume of services contemplated in the Services Agreement, ARP does provide services critical to ARN's continued operations. These include obtaining fire water (in the absence of which, all flammables would have to be removed), effluent treatment, accounting services necessary to operate the wood yard for chipping, and security. Accordingly, if ARN were to simply reject the Services Agreement, ARN would have to either immediately shut down all its remaining operations at the Mill, or enter into a new agreement with ARP for those essential services. In contrast, assumption of the Amended Services Agreement reduces ARN's costs for paying for the critical services it needs to keep the Mill operating, provides those costs at seventy-five percent less than what ARN currently pays under the Services Agreement, and allows ARN to terminate the agreement on sixty days notice in certain circumstances.

14. Likewise, a sound business purpose justifies the sale of the Equipment to ARP. Most of the Equipment is located on ARP's property, and ARP

continues to operate its pulp mill. Moreover, the Amended Services Agreement obligates ARP to continue treating ARN's effluent using the Equipment. In addition, ARN's reduced operations have significantly reduced ARN's need for the Equipment for its own operations. The Equipment itself is heavily-used industrial machinery specifically built for the ARN and ARP mills. Notably, ARP, not ARN, has the state permits required to operate the Equipment. I do not believe that ARN can sell the Equipment for anything more than scrap metal value without the associated state permits, nor is it possible for ARN to operate the Equipment without the state permits, and hence, ARP's involvement. As a result, I believe that selling the Equipment to ARP as part of the $1.25 million Purchase Price, in connection with restructuring the Services Agreement to reduce the Debtors' monthly costs by seventy-five percent, is well justified under the circumstances.

15. Finally, the Land is not material to ARN's operations. Transferring the Land does not materially impact the marketability or saleability of the Mill. The acreage is not material to ARN's operations, is located at the lower end of the Leased Property, and is not currently used by ARN. Moreover, selling the Land to ARP in connection with the Transactions aligns with the parties' existing operations and understanding, as ARP has been operating its wood yard on the Land for almost fifteen years.

16. In sum, the Transactions effect a beneficial and reasonable restructuring of the parties' relationship and I believe maximizes value for the Debtors' estates. We have considered alternatives to the proposed Sale, including a rejection of the Services Agreement and a sale of the Equipment to another party. Rejecting the Services Agreement, however, leaves ARN without necessary services for its Mill.

Moreover, I do not believe any other party would be interested in acquiring the Equipment (and indeed, am aware of none), which I believe ARP is buying for more than scrap metal value. The Transactions provide ARN with continued services for the Mill at a significant savings over the terms of the existing contract, are more aligned with ARN's actual production, avoid potentially significant rejection damages, and realize meaningful value for the Equipment.

17. I believe that the Buyer is the only sensible purchaser and is, to my knowledge, the only party interested in acquiring the Property. I further believe that the Transactions will provide fair and reasonable value for the Property and $1.25 million constitutes the best offer. In connection with filing the Motion, we provided the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC, with the names and addresses of all known parties who we believed may have an interest in the Property, including the Term Loan Lenders (as defined in the Order). I understand that the claims agent served copies of the Motion, including the exhibits, on such parties.

18. I believe that the Sale is the product of good faith, arm's length negotiations between ARN, on the one hand, and ARP and APP on the other. Neither the PW Partners nor the Buyer currently share common ownership with any of the Debtors, and are not otherwise affiliated with the Debtors or their officers and directors. The parties were represented by independent counsel throughout the negotiations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March /6, 2010

_____
GORDON COLE