IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | Jointly Administered |
| Debtors. | ) | **Hearing Date: May 26, 2010 at 2:00 p.m. (ET)** |
| | ) | **Objection Deadline: May 19, 2010 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING BOWATER INCORPORATED TO: (A) ENTER INTO AND PERFORM ALL OF ITS OBLIGATIONS UNDER AN ASSET SALE CONTRACT FOR THE SALE OF CERTAIN ASSETS LOCATED IN MARSHALL COUNTY, ALABAMA; AND (B) GRANTING RELATED RELIEF**

AbitibiBowater Inc. ("AbitibiBowater") and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing Bowater

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

Incorporated (the "Seller"), a Debtor in these Chapter 11 Cases, to: (A) enter into the asset sale contract substantially in the form attached hereto as Exhibit B (the "Sale Contract")[2] between Progress Rail Services Corporation (the "Purchaser") and the Seller, for the sale of approximately 107.5 acres[3] of industrial property, including buildings, infrastructure, sawmill equipment, spare parts and mobile equipment (the "Assets"), free and clear of all liens, claims and interests (the "Sale"); and (B) take such other actions as are necessary to consummate the Sale. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 9014.

## BACKGROUND

3. AbitibiBowater (together with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Québec. The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide. It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries. The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Contract.

[3] The Assets include 32.5 acres of fee simple land, plus 75 acres of land and a sawmill operation.

certified 100% of its managed woodlands to sustainable forest management standards. As of December 31, 2008, it owned or operated 24 pulp and paper facilities and 30 wood products facilities located in the United States, Canada, the United Kingdom and South Korea, as well as recycling and power generation facilities. Employing around 15,900 people, the Company realized sales of approximately $6.8 billion[4] in 2008. Its total assets were $8.1 billion as of December 31, 2008.

4. The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold. These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels. Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product.
In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

---

[4] All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

5. Specifically, on April 16, 2009 (the "Petition Date"), each of the Debtors—with the exception of the SPV Debtors—filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[5] On April 17, 2009, certain of the Debtors (the "Canadian Debtors")[6] and non-debtor subsidiaries of AbitibiBowater (the "CCAA Debtors")[7] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court" and the filing, the "Canadian Proceeding"). Two of the CCAA Debtors – ACI and Abitibi-Consolidated Company of Canada ("ACCC") (together, the "Chapter 15 Debtors") – thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases"). AbitibiBowater and certain of the Debtors also filed for ancillary relief in Canada seeking provisional relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[8]

---

5 The SPV Debtors commenced their chapter 11 cases on December 21, 2009.

6 The Canadian Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

7 The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

8 The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint

6. On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

7. The Company's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors' interests are united in their integrated, co-dependent business relationship. The Debtors and the CCAA Debtors have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

## RELIEF REQUESTED

8. By this Motion, the Debtors request the entry of an order authorizing the approximately $4,100,000 sale of the Seller's currently dormant sawmill operation in Marshall County, Alabama, pursuant to the Sale Contract. The Sale constitutes another step in the Debtors' continuing efforts to dispose of certain non-profitable and burdensome assets for which they have no use. Having now found a buyer for the Assets at a price the Debtors believe is fair and commensurate with the current market for assets of this nature, the Debtors request authority to sell the Assets as set forth herein, and to consummate the Sale Contract.

### A. The Assets

9. The Assets consist of 107.5 acres of industrial property, including buildings, infrastructure, sawmill equipment, spare parts and mobile equipment. This includes approximately 32.5 acres of land held in fee simple, plus 75 acres of land and a sawmill

---

South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

operation (the "Sawmill") held under two industrial development board leases (the "Leased Property"). The Sawmill was originally built in 1976, underwent major upgrades in 1981, 1989 1996, and 2001, and has rail siding for lumber shipment. The proposed Sale is part of an ongoing effort to monetize the Company's non-performing, non-strategic assets.

10. The value of the Assets has been negatively impacted by the decline in the housing and lumber markets over the past five years. Indeed, the Sawmill has not produced revenue since 2005, and from January 2006 to December 2009, the Sawmill lost approximately $12 million in EBITDA. As set forth more fully below, the Debtors believe that the prospects for any improvement in the housing and lumber markets in the near term are dim, per published forecasting agency reports. Moreover, the Debtors estimate that to improve cost position in the industry, the Sawmill would require upwards of $5 million of capital improvement.

11. The Sawmill once served the purpose of high-grading company owned timber production for use as sawtimber versus pulpwood. However, since the Company began to divest itself of all timberlands prior to the commencement of these Chapter 11 Cases—a process that continues in bankruptcy—the purpose of the Sawmill is no longer served. Accordingly, the Sawmill was indefinitely idled in November 2008, and was permanently closed on November 15, 2009. The Debtors estimate that the Company will save approximately $40,000 to $50,000 per month in carrying costs for security, electricity and maintenance if the proposed relief is granted.

**B. The Marketing and Sale Process**

12. The Assets have been marketed to approximately 25-30 parties over the past eighteen months, most of whom are other sawmill operators, but other parties of potential interest, including various real estate agents, were also contacted. Numerous visits and tours

were conducted and due diligence information was provided to potential purchasers upon the execution of a confidentiality agreement. In January 2009, bid packages detailing the Assets were sent to eight (8) parties who had indicated a sustained and viable interest in purchasing the Assets. Those same parties will also receive notice of this Motion to ensure that they either no longer have a legitimate interest in the Property or will not be coming forward with a better offer than that memorialized in the Sale Contract described below.

13. The Leased Property is currently held under two industrial development board leases (the "AIDB Leases") with the Industrial Development Board of the City of Albertville, Alabama (the "AIDB"). In an effort to optimize value for the Assets through a comprehensive marketing process, the Debtors presented two options to potential purchasers with respect to the treatment of the Assets as they relate to the interest in the Leased Property. Specifically, the Seller offered to either exercise its rights under the AIDB Leases to purchase AIDB's interest in the Leased Property for the nominal amount of $20.00 and transfer all of the Assets on a fee simple basis, or in the alternative, to assign the AIDB Leases to a potential purchaser who would, in turn, step into the Seller's shoes as a nominal lessee of the Leased Property. The Seller fully satisfied its basic rent obligations under the AIDB Leases in the early 1990s, and only maintained its status as a lessee for purposes of preserving certain tax benefits generated by the initial agreement with the AIDB. The Purchaser elected to have the Seller first acquire the AIDB's leasehold interest in the Leased Property as a pre-condition to closing, and in conjunction therewith, to subsequently purchase all of the Assets on a fee simple basis, as outlined below.

## C. The Sale Contract

14. The key terms of the Sale Contract include:[9]

(a) The Owner: Bowater Incorporated

(b) The Purchaser: Progress Rail Services Corporation

(c) The Assets: Approximately 107.5 acres of real property situated in Marshall County, Alabama (the "Land"), which comprises 32.5 acres of fee simple land and an additional 75 acres of land and a sawmill operation.

(d) Purchase Price: The Purchaser will pay $4,100,000 consisting of (a) an earnest money deposit in the amount of $205,000.00 and (b) the balance of $3,895,000 payable in cash at Closing, subject to certain prorations and adjustments more fully set forth in the Sale Contract. Sale Contract § 1.

(e) Closing Conditions: The Owner is the fee simple owner of certain of the real property being sold and the Industrial Development Board of the City of Albertville, Alabama (the "AIDB") is the fee simple owner of the remainder of the real property subject to the leasehold estate in favor of the Owner. As to the personal property being conveyed to the Purchaser (equipment on the Land), the AIDB is the owner thereof, subject, however, to the acquisition rights of the Owner. Prior to closing, and as a pre-condition to closing, Owner agrees to secure conveyance from the AIDB of the fee-simple interest in the real property of the AIDB and to fully and finally terminate the leasehold estate between the Owner and the AIDB, and further, to secure a bill of sale from the AIDB transferring and assigning the personal property to the Owner. Thus, at closing (described below), the Owner agrees to convey all real and personal property free and clear of all claims of the AIDB, and free and clear of all mortgage interest and security interest arising out of the AIDB revenue bond issues. Purchaser must also seek an environmental assessment of the Property at its own expense, the results of which the Purchaser must accept as a condition to closing. Sale Contract §§ 5, 16.

(f) Closing: The sale shall be closed within forty-five (45) days after approval of the United States Bankruptcy Court for the District of

[9] The summary of key terms of the Sale Contract herein is for descriptive purposes only. In the event of any discrepancy between the Sale Contract and this Motion, the terms of the Sale Contract shall govern.

Delaware of the Sale Contract, at a time and place in the County where the land lies.

(g) Subject to Certain Easements: The Assets will be conveyed and transferred to the Purchaser subject to all existing easements and rights of way for public roads and highways, public utilities, railroads, pipelines and riparian rights, if any, extending into, through, over or across the Property. Assets are also sold subject to any reservations of oil, gas, stone, minerals or mining rights reserved in prior deeds, as well as any covenants, restrictions or zoning, which may be applicable to the property. Sale Contract § 11.

(h) Sale "As Is": The Assets will be conveyed and transferred to the Purchaser in its present condition and state of repair, "As Is" and "Where Is," without any covenants or warranties as to the quantity of acreage or the condition or suitability of the Land. Sale Contract § 15.

**BASIS FOR RELIEF**

15. By this Motion, the Debtors request the entry of an order under sections 105(a) and 363 of the Bankruptcy Code authorizing the Debtors to enter into and perform their obligations under the Sale Contract. Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(l) states, in pertinent part, that:

> the notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(l).

16. To approve the use, sale, or lease of property outside the ordinary course of business, this Court must find "some articulated business justification" for the proposed action. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (adopting good faith test and implicitly adopting the "articulated business justification" test of *Committee of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*).

17. Courts generally apply the following four factors when deciding whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See In re Exaeris, Inc.,* 380 B.R. 741, 744 (Bankr. D. Del. 2008) (requiring that a sale of assets outside the ordinary course of business be supported by a sound business purpose, a fair sale price, adequate and reasonable notice and good faith); *Titusville Country Club* v. *PennBank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (same); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (same). *See also Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *Abbotts Dairies*, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.*, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided

the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

18. This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g.*, *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). "The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds*, 165 B.R. 1 (D.P.R. 1992); *accord In re Canyon P'ship*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). *See also In re AFY Holding Co.*, No. 08-12175 (PJW) (Bankr. D. Del. July 15, 2009) [Docket No. 482] (authorizing private sale of real property); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) [Docket No. 265] (authorizing private sales of furniture, fixtures and equipment).

19. Here, the Sale meets these requirements and should be approved as a private transaction.

### A. <u>A Sound Business Reason Exists for the Proposed Sale</u>

20. Sound business reasons justify the Sale. The Debtors will realize approximately $4.1 million for assets that no longer provide any commercial value to the Debtors' operations. Since the Debtors have determined that they no longer have a need for the Property and the Sale will generate a fair monetary return for the Assets, they submit that the proposed Sale is in the best interests of their estates and creditors. Moreover, the Company will save approximately $40,000 to $50,000 per month in carrying costs for security, electricity and maintenance, and the proposed Sale is consistent with the Debtors' continuing effort—one that

commenced pre-petition—to shed burdensome assets of this sort. Indeed, the Property has been idle for nearly 18 months, and permanently closed for the last seven. Significantly, the Purchaser will acquire the Assets "as is," therefore including all of the obsolete Sawmill equipment that the Debtors otherwise would have had to remove at their own expense. In light of the financial drain the Assets represent to the Debtors, the Debtors submit that the Sale is the most prudent course of action at this time.

21. In order to attract the most possible interest in the Assets from potential acquirers, the Debtors provided all potential purchasers with the option to acquire the Assets either through an assignment of the Seller's rights under the AIDB Lease or through an outright purchase of the Assets in fee simple, after the Seller exercised its option to purchase the Leased Property from the AIDB. In light of the Purchaser's preference to acquire all the Assets on a fee simple basis, the Debtors submit that exercising the Seller's rights under the AIDB Lease to acquire the Leased Property in fee simple from the AIDB is in the best interests of the Debtors' estates and creditors insofar as that transaction allows the Debtors to expeditiously dispose of these burdensome Assets, and to do so in a manner that will result in the greatest available consideration for the Assets.

**B. <u>The Purchase Price is Fair and Reasonable</u>**

22. The Debtors retained MS Appraisal Services, LLC to determine the fair market value of the Sawmill, and Tillman, Allen, and Sizemore, LLC to assess the other real estate that comprises the Assets. In May 2009, MS Appraisal Services concluded that the Sawmill would be difficult to sell, and arrived at a final reconciliation value of $4,382,000 for the Assets. The Seller had received a prior firm bid for the land tract of $2.5 million, and as a result, the Seller determined not to consider bids to purchase the Assets for less than $2.5 million.

23. With those threshold numbers in place, the Seller commenced a comprehensive marketing and bid process to secure the highest and best available offer. The Seller contacted 25-30 parties over the course of eighteen months to gauge interest in the Property. In January 2009, bid packages were sent to eight parties that had indicated a sustained interest in purchasing the Assets.

24. The bid process was completed in early March 2010. An initial bid was placed in the amount of $2,010,000, and ultimately, five parties submitted bids. During each stage, all parties were given the opportunity to counterbid. The final bid, submitted by the Purchaser, was made in the amount of $4,100,000. No parties wished to counter the Purchaser's bid.

25. The proposed purchase price approaches the designated value the Seller's appraiser generated in May 2009. Considering that the Sawmill was permanently closed in November 2009, and the continued decline in the lumber market, the Debtors believe that the $4,100,000 offer is a fair, reasonable, and indeed, favorable purchase price for the Assets.

### C. <u>Adequate and Reasonable Notice of the Sale Will Be Given</u>

26. The Debtors will provide adequate notice of the Motion to all parties-in-interest, as required by the applicable procedural rules. *See* Fed. R. Bankr. P. 2002(c)(l) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections"); *see also Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement). In addition, the Debtors will provide notice of the proposed Sale to all parties who at one time or another expressed a viable and legitimate interest in purchasing the Assets.

**D. The Sale is Proposed in Good Faith Within the Meaning of <u>11 U.S.C. § 363(m)</u>**

27. The proposed Sale is the product of good faith, arms' length negotiations between the Seller, on the one hand, and the individual purchaser, Progress Rail Services Corporation, on the other. The Purchaser does not share common ownership with any of the Debtors, and is not otherwise affiliated with the Debtors or their officers and directors. No evidence of collusion or bad faith exists in connection with the proposed Sale.

28. Under the circumstances, the Purchaser should be afforded the protections of section 363(m) of the Bankruptcy Code. *See generally Marin* v. *Coated Sales, Inc. (In re Coated Sales, Inc.)*, 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

**E. <u>The Sale Should be Free and Clear of Liens, Claims, and Interests</u>**

29. Section 363(f) of the Bankruptcy Code allows a debtor in possession to sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable

proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *see In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

30. Considering that any objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the second and fifth subsections of section 363(f) of the Bankruptcy Code. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g, In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp.* v. *Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). Accordingly, the Debtors request that the Sale be approved "free and clear," with any liens, claims, encumbrances, and interests to attach to the proceeds of the Sale.

31. As outlined above, sound business reasons exist for authorizing the relief requested herein. The Debtors no longer have a need for the Assets, and will realize over $4 million from the Sale.

32. For these reasons, the Debtors respectfully submit that this Court should authorize the relief requested herein, and grant any related relief this Court deems just and proper.

**NOTICE**

33. Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the agents for the Debtors' prepetition secured bank facilities; (iv) counsel to the agent for the Debtors' postpetition lenders; (v) counsel to the agent for the

Debtors' securitization facility; (vi) the Monitor appointed in the Canadian Proceeding; (vii) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b); (viii) all taxing authorities and other governmental agencies having jurisdiction over any of the Property, including the Internal Revenue Service; (ix) the Attorney General in the state where the Property is located; (x) the United States Environmental Protection Agency; (xi) all parties that received bid packages during the marketing process; and (xii) any applicable state environmental agency. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

34. No previous motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached as Exhibit A, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
May 5, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Kelley A. Cornish
Claudia R. Tobler
Jonathan T. Koevary
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors-in-Possession*