# Exhibit A

## Debtors' Reply

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | )  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*, | ) | Case No. 09-11296 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date with respect to Bid Procedures Order:** |
| | ) | **June 11, 2010 at 11:00 a.m. (ET)** |

### DEBTORS' REPLY TO OBJECTIONS AND JOINDER TO OBJECTIONS REGARDING DEBTORS' MOTION FOR ENTRY OF ORDERS: (I) (A) APPROVING BID PROCEDURES AND BID PROTECTIONS WITH RESPECT TO AN AUCTION IN CONNECTION WITH THE DEBTORS' RIGHTS OFFERING, (B) SCHEDULING AN AUCTION AND HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (D) APPROVING THE RELEASE OF CERTAIN CLAIMS; AND (II) AUTHORIZING THE DEBTORS TO (A) ENTER INTO A BACKSTOP COMMITMENT AGREEMENT AND (B) MAKE CERTAIN PAYMENTS THEREUNDER

AbitibiBowater Inc. and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), by and through their undersigned counsel, hereby submit this reply (the "Reply") in support of the *Debtors' Motion for Entry of Orders: (I)(A) Approving Bid Procedures and Bid Protections with Respect to an Auction in Connection with the Debtors' Rights Offering, (B) Scheduling an Auction and Hearing, (C) Approving the Form and Manner of Notice Thereof and (D) Approving the Release of Certain Claims; and (II) Authorizing the Debtors to (A) Enter into a Backstop Commitment Agreement and (B) Make Certain Payments Thereunder* [Dkt. No. 2201] (the "Motion") and in response to (i) the objection filed by Aurelius Capital Management, LP and Contrarian Capital Management, LLC (collectively, the "Noteholders") [Dkt. No. 2297], (ii) the objection filed by Wilmington Trust Company, as successor indenture trustee for the 7.95% Notes issued by Bowater Canada Finance Corporation ("Wilmington Trust") [Dkt. No. 2298], and (iii) the

Doc#: US1:6445640v6

joinder to such objections filed by certain equity shareholders (the "Equity Holders" and, together with the Noteholders and Wilmington Trust, the "Objectors") [Dkt. No. 2313] with respect to the relief requested in the Motion.[1]

**Preliminary Statement**

1. In the simplest terms, the Objectors have missed the point, failing to recognize the critical role that obtaining the backstopped Rights Offering has played in garnering the key constituent support which will allow the Company to emerge expeditious from bankruptcy. The substantial capital made available pursuant to the committed Rights Offering constitutes a critical element of the plans of reorganization that the Company recently filed in its Chapter 11 Cases and in its CCAA Proceedings (collectively, the "Plans") and is an essential building block upon which the Company's emergence strategy is based and value to unsecured creditors preserved. Regardless of whether that capital is utilized by the Company, the Backstop Investors' firm commitment of substantial new capital has significantly diminished uncertainty regarding the Company's exit financing needs, providing the Company with insurance against both volatility in the financing markets and the possibility that other sources of capital being pursued by the Company may not materialize in sufficient time for emergence.

2. The Company has spent months negotiating with its key constituents regarding the terms and related economics of a restructuring. One of the main elements of this negotiation focused on availability of sufficient new capital necessary to repay all of the Company's secured obligations and fund its emergence, thus preserving the entirety of the equity value for unsecured creditors. The Commitment Agreement addressed this issue and set the stage for the parties to agree on the economic terms of the Plans. Fairfax played an instrumental role in these

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motion.

negotiations, helping the key constituents achieve consensus. Today, the Company's Plans enjoy the support of the Official Committee of Unsecured Creditors (the "<u>Creditors Committee</u>"), the ad hoc committee of bondholders appearing in the CCAA Cases and holders of approximately 50% of the Company's unsecured bonds. Notably, the Release is supported by holders of approximately 45% of the unsecured bonds issued by Bowater Incorporated ("<u>Bowater</u>"). The Commitment Agreement also provides confidence to the Company's general unsecured creditors – soon to be the Company's equity owners – as well as its business partners, that the Company's reorganization efforts will be successful and emergence can be achieved quickly. Barely a year after commencing these complex, cross-border cases, the Company has taken a momentous step towards concluding its bankruptcy cases.

3. To obtain this exceptional level of constituent support for the Plans, and in light of the substantial benefits that the Commitment Agreement provides to the Company, the Company agreed to provide the Termination Payment, the Transaction Expenses and the Release in accordance with the terms of the Commitment Agreement. These terms are more than appropriate and reasonable, and the Company agreed to these terms following extensive consultation with the Creditors Committee and the agreement of the non-Fairfax Backstop Parties to support the Release. In particular, the non-Fairfax Backstop Parties negotiated specifically for individual termination rights under the Commitment Agreement in the event the Release is not approved, underscoring their collective support for the Release and acknowledgement of Fairfax's critical role in coalescing constituent support for the Commitment Agreement and the Plans. Accordingly, for the reasons set forth herein, the Company respectfully requests that this Court overrule the Objections.

# Reply

## A. Pursuit of the Rights Offering and Entry into the Commitment Agreement Is Reasonable and Appropriate.

4. The Company anticipates that its total new capital needs to fund its emergence will exceed $1.5 billion. Given the magnitude of this need and the inherent uncertainty of the financing markets, the Company determined, in the exercise of its sound business judgment and as a fiduciary for the estates, to lock in a substantial amount of new capital through a backstopped Rights Offering. As such, the Rights Offering is an integral component of the Company's exit financing requirements. By locking up $500 million of the Company's requirements, the Commitment Agreement eliminates uncertainty regarding the Company's ability to raise the remainder of its exit financing needs from other sources thus allowing it to emerge from bankruptcy expeditiously. As a result, the Company is not forced to rely on alternative sources of capital often utilized debtors -- significant asset sales or roll-over of secured creditors – which would increase complexity of confirmation and result in substantial dilution of value available for distribution to unsecured creditors. By avoiding unnecessary complexities and risk to unsecured creditor recoveries, the committed Rights Offering provides the Company certainty and leverage to negotiate the best possible terms for the balance of its exit financing requirements. Indeed, the Backstop Investors' willingness to provide capital to the reorganized Company on an unsecured basis is a strong signal by sophisticated financial players regarding their confidence in the reorganized Company, which the Company also believes will be helpful to its exit financing process.[2]

---

[2] The Motion contains a statement on page 11 in the table describing the Backstop Commitment that each Backstop Investor is jointly, but not severally, liable for the percentage commitment set forth in the Commitment Agreement. This statement needs to be clarified as the Commitment Agreement provides that "each Investor agrees, severally and not jointly, to subscribe for and purchase...the principal amount of Unsubscribed Notes..." on the terms set forth in the Commitment Agreement. See Commitment Agreement Section 2(a).

5. The Objectors question the Company's need for, and the benefits provided by, the Rights Offering. However, there is no basis on which to challenge this reasonable and prudent decision by the Company. A committed Rights Offering provides certainty and security in the face of volatile and uncertain capital markets. Obtaining a backstopped Rights Offering already has yielded considerable value to the estates: the Backstop Investors' commitment to invest new capital in the reorganized Company crystallized key creditors' perspectives regarding the value of the reorganized Company, and enabled the parties to reach agreement regarding the fundamental economic terms of the Plans, including the allocation of equity in the reorganized Company to disparate creditor groups. In this way, the Commitment Agreement has served as a catalyst for consensus among key constituents – a substantial benefit in any complex chapter 11 case that cannot be quantified.

B. **The Terms of the Commitment Agreement Are Fair, Reasonable and Appropriate Under the Circumstances.**

6. The Company engaged in extensive arms'-length negotiations with the Backstop Investors regarding the terms of their financing commitment. The resulting terms of the Commitment Agreement are fair, reasonable and appropriate under the circumstances. The Objectors have misconstrued certain aspects of this agreement:

7. *First*, the Objectors argue that the conditionality of the Commitment Agreement makes its value illusory. See Wilmington Trust Obj. at 2-3. It is true that the Company has the ability to reduce or, if appropriate, eliminate the Rights Offering. However, this flexibility does not undercut the substantial benefit provided by the Rights Offering. To the contrary, this flexibility is something for which the Company specifically negotiated: the Company's ability to downsize or eliminate the Rights Offering without undue penalty if more favorable alternatives

materialize ensures that the Company can pursue the best available financing for the benefit of the estates and creditors.

8. *Second*, the Termination Payment is carefully structured to protect the Company's ability to choose the financing option that is in the best interests of the estates while appropriately compensating the Backstop Investors for their commitment. Specifically, if the Backstop Investors do not win at the auction, the Termination Payment is capped at 3% of their commitment (i.e., the *lesser* of $15 million and 5% of the capital raised in any transaction, but in any event no less than $7.5 million). Cf. Wilmington Trust Obj. at 9. By complaining about the short duration of this commitment period, Wilmington Trust disregards the value of the proposed auction process. The backstopped Rights Offering enables the Company to market test the Commitment Agreement while appropriately compensating the Backstop Investors for their commitment of substantial capital, and is well within the market standard for such fees. In exchange for fees that are reasonable and appropriate, the Company is permitted to seek out a Rights Offering and backstop terms that are more advantageous and, if the auction is successful, the benefit to the Company from incurring such fees will be even more tangible.

9. *Third*, the Objectors suggest that the backstop may not be necessary, based on their prediction that the Rights Offering will be fully subscribed for by unsecured creditors. However, this possibility is not a reason to discount the value of the commitment made by the Backstop Investors or argue that they are being overcompensated. The uncertainty of participation is inherent in all rights offerings, and is precisely why companies routinely secure

backstop commitments.[3] Absent the Commitment Agreement, there would be no assurance that the Rights Offering would yield the funds that the Company will require to emerge.

### C.    The Company's Decision to Grant the Release Is Appropriate.

10.    The decision to grant the Release to Fairfax constitutes a sound exercise of the Company's business judgment and is an appropriate settlement of a potential avoidance action against Fairfax as the single holder of the Convertible Notes issued by the Company and guaranteed by Bowater. While the Objectors likely recognize that Fairfax is a key creditor in these Cases; they do not realize that Fairfax played a leading role in initiating and negotiating the terms of the Commitment Agreement and in garnering key creditor support for the Plans. Fairfax's size, sophistication and reputation in the marketplace, along with its ongoing support of the Company's reorganization (beginning with providing DIP financing to the Company at a time when the credit markets were effectively frozen), is clearly evidence that Fairfax is a crucial player among the Company's constituents. Fairfax motivated the Backstop Investors to provide a meaningful commitment to the Company and took a leadership role in forging consensus among the parties regarding the terms of the Commitment Agreement and the Plans. It is the Company's view that, without Fairfax's participation in the Commitment Agreement, some or all of the other Backstop Investors would not have entered into the Commitment Agreement or have agreed to support the Plans. Indeed, underscoring the importance of Fairfax to the process and the appropriateness of the settlement of the potential avoidance action, the non-Fairfax Backstop Investors bargained for individual termination rights under the Commitment Agreement in the

---

[3]    The Company also notes that the compensation typically paid to backstop investors in the context of rights offerings invariably is measured by the investors' total commitment, despite that fact that they ultimately may be required to fund a lesser amount.

event the Release is not approved by the Bankruptcy Court. See Commitment Agreement, Section 12(a)(ii); Motion at 14.

11.  The Objectors incorrectly argue that the Release should be considered under the standards applicable to a break-up fee, rather than as under the standards applicable to a settlement of a claim under Bankruptcy Rule 9019. The Objectors are wrong. While the Termination Fee and the Transaction Expenses are designed to compensate the Backstop Investors in the event that they are outbid at the auction, the Release constitutes a settlement of an avoidance claim that induced Fairfax to be an active participant in negotiating and supporting the Plans, and bringing together key constituents to negotiate and agree to the terms of the Commitment Agreement.

12.  For all these reasons and having considered the merits of the avoidance action claim as discussed below, and in light of the significant benefits to the estates of having the Commitment Agreement, the Company believes that, in the exercise of its business judgment, it is reasonable and appropriate under the circumstances to grant Fairfax the Release as part of the consideration given to Fairfax in exchange for its capital commitment and support for the Company's reorganization process.

13.  The terms of the Release are tailored to ensure that the estates obtain commensurate benefit from Fairfax in exchange for granting the Release. Specifically, the Release is not effective until *both* of the following events occur:

>   (i)   final orders are entered by the Bankruptcy Court approving a backstop commitment agreement for the Rights Offering and the Rights Offering process; and
>
>   (ii)  the earliest to occur of (x) the Commitment Agreement and Fairfax's obligations thereunder are consummated, (y) the Bankruptcy Court approves the Company's entry into a higher, better or alternative backstop agreement with a third party, or

> (z) Fairfax terminates or does not perform under the Commitment Agreement for a reason other than the existence of a Material Adverse Effect or unintentional breach by the Company of any of the representations or warranties in the Commitment Agreement.

Accordingly, while the Company seeks approval of the Release at this time, by its own terms, the Release is conditioned upon subsequent events which ensure that the Company continues to enjoy the benefits of the Commitment Agreement for so long as they are required.

14. Prior to making a decision to grant the Release, the Company conducted extensive analysis with respect to the enforceability of the Guaranty. Based on that analysis, the Company believes that, if litigated, the Guaranty likely would be upheld and, therefore, that a potential avoidance action regarding the Guaranty is unlikely to benefit the Bowater creditors. At a minimum, this issue is fact-intensive and complex, and would result in expensive and protracted litigation that may derail the Company's emergence from bankruptcy. Wilmington Trust's assertion that this claim is worth $200 million to the Bowater gives "full value" to the potential claim, simply by multiplying the principal amount of the debt guaranteed by Bowater by expected recoveries to Bowater unsecured creditors. Wilmington Trust Obj. at 17-19. This rough calculation ignores completely the substantial risks inherent in the litigation, along with costs, delay and disruption factors.

15. However, even assuming for the sake of argument that the Objectors are correct in their estimated valuation of this claim, the Company submits that the Release is still appropriate when the benefits to the estates of the Commitment Agreement and the parties' support for the Plans are considered. The Commitment Agreement and, in connection therewith, the Release, facilitated the parties' reaching consensus regarding the Plans. Specifically, by resolving a key open issue that could impact creditor recoveries, the Release reduced uncertainty concerning those recoveries under the Plans. Armed with that clarity and with a common understanding

regarding the key economic points of the Plans, the Creditors Committee, Fairfax, Avenue and the other Backstop Investors all have agreed to support the Plans. Notably, the Plans set forth anticipated creditor recoveries that presume the Guaranty is fully enforceable.

16.  In the Company's judgment, an expeditious and consensual emergence from bankruptcy is in the best interests of all creditors. Because Fairfax has been instrumental in positioning the Company to achieve that goal, and because the Release was essential to securing the backstopped Rights Offering and creditor support for the Plans, the Company submits that the Release is appropriate under the circumstances.

**D.  The Creditors Committee and the Other Backstop Investors Support the Release.**

17.  The Objectors complain that the economic effect of the Release inappropriately burdens only Bowater creditors. As a threshold matter, the Company notes that the Backstop Investors (excluding Fairfax) hold, in the aggregate, approximately 45% percent of all outstanding Bowater bonds. As sophisticated creditors of Bowater that are active in these cases, the Backstop Investors are fully capable of analyzing the impact the Release will have on their recoveries against Bowater. Nevertheless, they have agreed to support the Plans and estimated creditor recoveries that presume the Guaranty is valid. Contrary to the Objectors' assertions, the fact that the other Backstop Investors do not require additional compensation comparable to the Release does not prove that the Release is inappropriate; rather, it is an indication by significant Bowater creditors that litigation regarding the validity of the Guaranty would yield questionable, if any, value for them compared to the benefits that the Rights Offering and consensual Plans provide to the Bowater estate.

18.  Indeed, the Objectors' argument with respect to the impact of the Release on the Bowater estate ignores the fact that the Release is necessary to secure the key constituents'

agreement regarding the Plans, which provide for the payment in full of secured creditors and distributions of equity in the reorganized Company to unsecured creditors – including Bowater creditors. Such a reorganization undoubtedly provides value for Bowater creditors far in excess of the speculative value of the avoidance action claim. In other words, the impact on Bowater creditors if the Company is unable to obtain exit financing sufficient to repay secured creditors in full surely exceeds the hypothetical value of the avoidance action claim.

## Conclusion

19. The backstopped Rights Offering is critical to the success of the Company's Plans. Not only does it provide the Company with assurance regarding its ability to finance its emergence from bankruptcy in the face of volatile capital markets, but it also acts as the foundation on which the Company's key constituents have agreed to support the Plans. To lose either the benefits of the Rights Offering or the support of the key constituents for the Plans would derail the Company from its path towards emergence – to the detriment of all parties in interest. For these reasons, and for the reasons set forth herein and in the Motion, the Company respectfully requests that this Court overrule the Objections and enter the Bid Procedures Order.

Dated: June 9, 2010  YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

/s/ Sean T. Greecher
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Kelley A. Cornish
Alice Belisle Eaton
Lauren Shumejda
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors-in-Possession*