# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Objection Deadline for Bid Procedures: June 30, 2010 at 4:00 p.m. (ET)** |
| | ) | **Bid Procedures Hearing Date: July 7, 2010 at 10:00 a.m. (ET)** |
| | ) | **Sale Objection Deadline: July 28, 2010 at 4:00p.m. (ET)** |
| | ) | **Sale Hearing: August 4, 2010 at 1:00 p.m. (ET)** |

**MOTION OF THE DEBTORS FOR ORDERS: (A)(I) APPROVING BIDDING AND AUCTION PROCEDURES FOR THE SALE OF A CLOSED MILL SITE IN LUFKIN, TEXAS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE OF SUCH ASSET; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF THE CLOSED MILL SITE IN LUFKIN, TEXAS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS RELATED THERETO; (II) AUTHORIZING AND APPROVING A PURCHASE SALE AGREEMENT; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; (IV) PAYING SELLER'S BROKER'S COMMISSION; AND (V) GRANTING RELATED RELIEF**

AbitibiBowater Inc. ("AbitibiBowater") and its affiliated debtors and debtors-in-

possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), by and

---

[1] The debtors-in-possession in these cases, along with the last four digits of each Debtor's federal or Canadian tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (6050), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (3225), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (0999), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (8810), Bowater Canadian Forest Products Inc. (2010), Bowater Canadian Holdings Incorporated (6828), Bowater Canadian Limited (7373), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (5722), Bowater Maritimes Inc. (5684), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0186), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (together, the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The corporate headquarters of the debtors-in-possession is located at, and the mailing address for each debtor-in-possession is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

through their undersigned counsel, hereby move (the "Motion") this Court for (A) entry of an order substantially in the form attached hereto as Exhibit A (the "Bid Procedures Order") pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving auction and bid procedures (the "Bid Procedures"), substantially in the form annexed as Exhibit 1 to the Bid Procedures Order, with respect to the sale (the "Sale") of certain assets in Lufkin, Angelina County, Texas (the "Lufkin Property") owned by Abitibi-Consolidated Corporation ("ACC" or the "Seller"); (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection deadlines with respect to the Sale; (iii) directing that notice of the Bid Procedures and the Sale be given, substantially in the form annexed as Exhibit 3 to the Bid Procedures Order (the "Auction and Sale Notice"); and (iv) granting related relief; and (B) entry of order, substantially in the form annexed hereto as Exhibit B (the "Sale Order"),[2] (i) authorizing the Sale of the Lufkin Property free and clear of liens, claims encumbrances, and other interests pursuant to the terms of the purchase and sale agreement, substantially in the form annexed to the Bid Procedures Order as Exhibit 2, or in such other form as the Debtors find acceptable in their business judgment (the "Purchase Sale Agreement"); (ii) authorizing and approving the Purchase Sale Agreement; (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale; (iv) authorizing the payment of the Seller's broker commission the ("Broker Commission"); and (v) granting related relief. In support of this Motion, the Debtors respectfully represent:

---

[2] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

2

## JURISDICTION

1.     This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## GENERAL BACKGROUND

3.     AbitibiBowater (together with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Québec.  The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide.  It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries.  The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party certified 100% of its managed woodlands to sustainable forest management standards.  As of December 31, 2008, it owned or operated 24 pulp and paper facilities and 30 wood products facilities located in the United States, Canada, the United Kingdom and South Korea, as well as recycling and power generation facilities.  Employing around 15,900 people, the Company realized sales of approximately $6.8 billion[3] in 2008.  Its total assets were $8.1 billion as of December 31, 2008.

4.     The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold.  These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels.  Supply and demand, in turn, are affected by global economic conditions, changes

---

[3]      All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

3

in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product. In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

5.       Specifically, on April 16, 2009 (the "Petition Date"), each of the Debtors— with the exception of the SPV Debtors—filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). On April 17, 2009, certain of the Debtors (the "Canadian Debtors")[4] and non-debtor subsidiaries of AbitibiBowater (the "CCAA Debtors")[5] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court, Commercial Division, for

---

[4]      The Canadian Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[5]      The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

4

the Judicial District of Montreal, Canada (the "Canadian Court" and the filing, the "Canadian Proceeding"). Two of the CCAA Debtors – ACI and ACCC (together, the "Chapter 15 Debtors") – thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases"). AbitibiBowater and certain of the Debtors also filed for ancillary relief in Canada seeking provisional relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[6]

6.    On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

7.    The Company's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors' interests are united in their integrated, co-dependent business relationship. The Debtors and the CCAA Debtors have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

## RELIEF REQUESTED

8.    By this Motion, the Debtors seek *first*, entry of the Bid Procedures Order: (a) approving the Bid Procedures; (b) approving and establishing procedures for the assumption and assignment of various exectuory contracts and unexpired leases relating to the Lufkin Property; (c) approving the form and manner of notice of the Bid Procedures, the auction of the

---

[6]    The Debtors who obtained section 18.6 relief are:  AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

Lufkin Property (the "Auction") and the Sale Hearing; (d) scheduling the Sale Hearing and

establishing related deadlines; and (e) granting such other and further relief as is just and proper;

and *second*, the entry of a Sale Order (a) authorizing the sale of the Lufkin Property free and clear

of any liens, claims, encumbrances, and interests pursuant to the Purchase Sale Agreement;

(b) authorizing the Purchase Sale Agreement; (c) approving the assumption and assignment of

various contracts and leases related thereto; (d) authorizing payment of the Broker Commission;

and (e) granting related relief.

      9.     The Debtors have previously marketed the Lufkin Property and obtained this

Court's approval to sell the assets to CIT Partners, LLC ("CIT").[7] The sale to CIT was scheduled

to close on October 30, 2009, but at CIT's request, the Debtors extended the closing date multiple

times. Unfortunately, CIT was unable to consummate the sale and the transaction failed to close

by the expiration of the last closing extension deadline of June 4, 2010. ACC accordingly now

seeks to sell the Lufkin Property through an open auction process in an effort to obtain the highest

and best offer for some or all of the assets.

**A.    The Lufkin Property**

      10.    The Lufkin Property is located in Lufkin, Angelina County, Texas. ACC

acquired the Lufkin Property in April 2000 as part of its acquisition of Donohue Corporation. The

Lufkin Property consists of land primarily occupied by a paper mill (the "Lufkin Mill") and related

---

[7]     Specifically, on September 23, 2009, the Debtors filed the *Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code (A) Authorizing Abitibi-Consolidated Corporation to: (i) Enter Into and Perform All of its Obligations Under a Purchase and Sale Agreement for the Sale of Certain Assets in Lufkin, Texas; (ii) Enter into the Paper Machine No. 8 Lease; (iii) Assume, Assign and Transfer its Interests in Certain Executory Contracts; and (B) Granting Related Relief* (the "Original Sale Motion") [Docket No. 1023]. On October 28, 2009, this Court entered the *Order (A) Authorizing Abitibi-Consolidated Corporation to: (i) Enter Into and Perform All of its Obligations Under a Purchase and Sale Agreement for the Sale of Certain Assets in Lufkin, Texas; (ii) Enter into the Paper Machine No. 8 Lease; (iii) Assume, Assign and Transfer its Interests in Certain Executory Contracts; and (B) Granting Related Relief* (the "Initial Sale Order") [Docket No. 1207].

infrastructure, including several support buildings, ponds, roads, tanks, and a lined sub-grade aqueduct. In December 2003, mill operations were suspended, and the mill was permanently closed in December 2007. The remaining portion of the Lufkin Property consists primarily of forested area and cleared land with overgrown vegetation.

      11.    In January 2007, ACC hired Grubb & Ellis ("G&E") as its broker for the disposition of the Lufkin Mill and surrounding real property. G&E worked with ACC representatives for several months to identify property segments to include with any disposition of the Lufkin Mill. Utility capacities and industrial infrastructures, such as access to roads and highways, railroad lines and pipelines were also researched and considered in the evaluation process. As a result of this process, in June 2007, G&E recommended a partition of the Lufkin Mill site into three parcels, including the Lufkin Property. The Lufkin Property itself comprises an 895.5 acre tract including the buildings and improvements associated with the Lufkin Mill. This tract also includes 150 acres of landfill and 100 acres of ponds and marsh that serve as the storm water impoundment area. The site is suitable for industrial redevelopment.

      12.    The Lufkin Mill operations incorporated on-site wastewater management ponds and landfills, both of which remain in operation. At ACC's request, beginning in April 2008, Camp, Dresser and McKee Inc. ("Camp Dresser"), conducted a Phase I and Phase II environmental site assessment. These site assessments resulted in a no further action recommendation and ACC submitted a request for no further action letter (a "NFA Letter") to the Texas Commission on Environmental Quality (the "TCEQ"). As of the filing of this Motion, the TCEQ has not yet issued an NFA Letter.

7

13.     As mentioned, the Lufkin Property includes operating landfills.[8]  The landfills have significant additional capacity and are situated adjacent to other industrial property. The Debtors believe that the landfills have value as operating sites and seek to sell the assets in that condition, along with the appropriate permitting.

14.     The Lufkin Property includes the Lufkin Mill and paper machines.  The Debtors believe that the equipment on the mill site, as well as the paper machines, have significant value.  The Debtors intend to render the paper machines inoperable prior to the proposed sale. Their principle value accordingly is in their steel/scrap metal value.

**B.      Proposed Auction and Bid Procedures**

15.     The Debtors want to sell the Lufkin Property (including the Lufkin Mill, paper machines in a nonfunctioning state, and operating landfills) for the highest and best offer on substantially the same terms as were originally approved by this Court in the terminated sale to CIT.[9]  These include: (a) sale of the underlying real property; (b) sale of the fixtures, buildings, structures and improvements located on the real property; (c) assumption of environmental liabilities related to the site or provision of an appropriate insurance policy addressing such potential liabilities; and (d) transfer of any executory contract related to the Lufkin Property desired by a potential purchaser.  The sale will be "as is where is."  The Debtors will consider any offer for all or some, or a combination of, the assets comprising the Lufkin Property, and will consider a joint sale of the Lufkin Property to one or more parties.  The Debtors, however, reserve the right to withdraw some or all of the Lufkin Property assets from the auction at any time, and may cancel the auction in their discretion.

---

[8]     The TCEQ has asserted that ACC has abandoned the landfills.  The Debtors dispute this allegation.

[9]     The original sale to CIT did not include a sale of Paper Machine No. 8.

8

16.     The Debtors propose the following Bid Procedures:[10]

(a)     <u>Assets for Sale</u>:  Approximately an 895.5 acre tract of real property including the buildings and improvements associated with the Lufkin Mill, and, subject to appropriate use restrictions, the disabled paper machines on the site.  This tract also includes 150 acres of landfill and 100 acres of ponds and marsh that serve as the storm water impoundment area.

(b)     <u>Qualified Bidders</u>:  Only Qualified Bidders may participate in the Auction.  To qualify as a "<u>Qualified Bidder</u>" a bidder must:

> (i)  Execute an appropriate confidentiality agreement acceptable to the Debtors; and
>
> (ii)  Submit a "<u>Qualified Bid</u>" by the Bid Deadline (defined in the proposed Bid Procedures).

(c)     <u>Qualified Bids</u>.  To constitute a "<u>Qualified Bid</u>", a bid must:

> (i)  Be in writing;
>
> (ii)  Set forth the purchase price and the assets or combination of assets the bidder intends to buy;[11]
>
> (iii)  Contain a mark-up of the form of Purchase Sale Agreement attached as <u>Exhibit A</u> to the Bid Procedures that reflects the bidder's proposed changes thereto including, at a minimum: (1) listing the assets proposed to be purchased, to the extent that they do not comprise the Lufkin Property in its entirety; (2) listing of the Debtors' executory contracts and unexpired leases related to the Lufkin Property with respect to which the bidder seeks assignment from the Debtors; and (3) proposing a closing date for the Sale on or before August 31, 2010, unless otherwise agreed to by the Debtors.
>
> (iv)  Identify the potential bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;
>
> (v)  Provide evidence satisfactory to the Debtors, in their reasonable discretion, of the bidder's financial wherewithal and operational ability to consummate the proposed transactions, including such

---

[10]     The following description of the Bid Procedures is a summary of the terms set forth in the Bid Procedures annexed as <u>Exhibit 1</u> to the Bid Procedures Order.  Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in such Exhibit.  To the extent that this summary differs in any way from the terms set forth in such Exhibit, the terms of such Exhibit shall control.

[11]     In their discretion, the Debtors may request bidders to allocate the purchase price to specific assets included in any proposed Qualified Bid.

bidder's ability to provide appropriate indemnities or insurance for potential environmental liabilities at the site;

(vi)  Provide that the bid is not conditioned on the outcome of unperformed due diligence by the bidder, board approval, or any financing contingency;

(vii)  Include the Good Faith Deposit (described below);

(viii)  Provide that the bidder's offer is irrevocable until consummation of a transaction involving any other bidder for the Lufkin Property;

(ix)  Contain a mark-up of the Sale Order that reflects the bidder's proposed changes thereto;

(x)  Include evidence of the bidder's ability to provide adequate assurance of future performance under any assigned contracts; and

(xi)  May not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.[12]

(d)  <u>Good Faith Deposits</u>:  Bidders will be required to submit good faith deposits (the "<u>Good Faith Deposits</u>") with the Debtors on or before the Bid Deadline (as described below) in an amount equal to 10% of the cash purchase price.  Good Faith Deposits must be in form of a certified or bank check or wire transfer, and will be held in a separate interest-bearing account for the Debtors' benefit until consummation of a transaction involving any other bidder for the Lufkin Property.  If a Successful Purchaser (as defined in the Bid Procedures) fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Purchaser (as defined in the Bid Procedures), the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Purchaser, and such Good Faith Deposit shall irrevocably become property of the Debtors.  All other deposits will be returned to the respective Qualified Bidders within ten (10) days following entry of the Sale Order.

(e)  <u>The Bidding Process</u>.  The Debtors, in consultation with the Committee, shall (i) determine whether any bid is a Qualified Bid and whether any person is a Qualified Bidder; (ii) provide reasonable assistance to Qualified Bidders in conducting their due diligence investigations; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Lufkin Property.  Any person who wishes to participate in the Auction must be a Qualified Bidder.  Neither the Debtors nor their representatives shall be obligated to furnish any information of

---

[12]  The Debtors reserve the right, in their discretion, to select a stalking horse bidder and seek court approval of exepense reimbursements and/or break-up fees related thereto if the Debtors determine that a stalking horse bidder will maximize the value for the Lufkin Property.

any kind to any person who is not determined to be a Qualified Bidder. To facilitate the Auction, and to assist the Debtors and other interested parties in assessing the terms of each bid, prospective bidders must utilize the Purchase Sale Agreement to prepare their bids and mark all proposed changes to such agreement as part of their bid.

(f)     Access to Due Diligence Materials. The Debtors may afford any potential bidder the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their reasonable discretion. The Debtors either have provided or will provide to all parties that have either expressed an interest in purchasing the Lufkin Property or who the Debtors believe may have an interest in purchasing the Lufkin Property (each, an "Interested Party" and collectively, the "Interested Parties"), certain non-confidential information in connection with the proposed Sale including, among other things, the proposed Bid Procedures and Purchase Sale Agreement. Should any Interest Party desire additional or further information, such Interested Party will be required to enter into a confidentiality agreement satisfactory to the Debtors in their business judgment, upon the execution of which such Interested Party will be given access to relevant and confidential information, subject to the Debtors' right to exclude such access for competitive concerns.

Each bidder shall be deemed to acknowledge and represent that: (i) it has had an opportunity to conduct any and all due diligence regarding the Lufkin Property prior to making any bid; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and (iii) that it did not rely upon any written or oral statements, representations, promises, warranties or guarantees whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Lufkin Property, or the completeness of any information provided in connection therewith, except as expressly stated in these Bid Procedures or, as to the Successful Purchaser (as defined below), in the Purchase Sale Agreement.

(g)     Due Diligence From Bidders. Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Qualified Bidder and its contemplated transaction. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

(h)     Bid Deadline. The proposed deadline for submitting bids by a Qualified Bidder is July 28, 2010 at 12:00 pm (ET) (the "Bid Deadline"). Any person or entity wishing to participate in the Auction must submit a Qualified Bid so that it is received on or before the Bid Deadline. The Qualified Bid must be submitted to the Debtors, counsel to the Debtors, and counsel for the Committee. A bid received after the Bid Deadline will not constitute a Qualified Bid unless otherwise agreed to by the Debtors.

11

(i)     Auction.  If a Qualified Bid is timely received, the Auction will be conducted at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19899, on August 2, 2010, or such later time and place as the Debtors may provide so long as such change is communicated reasonably in advance by the Debtors to all Qualified Bidders.  Any bidder submitting a Qualified Bid may appear and submit its highest or best bid at the Auction.  The Debtors may adjourn or cancel the Auction without further notice by announcement at the Auction.  If no Qualified Bid is timely received, the Debtors will not conduct an Auction.

(j)     Bidding Increments and Auction Procedures.  At the start of the Auction, the Debtors will advise all Qualified Bidders of what they believe, in consultation with the Committee, to be the highest or otherwise best Qualified Bid with respect to the Lufkin Property (the "Highest Qualified Bid").  Only Qualified Bidders are eligible to participate in the Auction.  The Committee and its counsel and advisors shall be permitted to attend the Auction.  Bidding at the Auction shall begin with an initial minimum overbid of the Highest Qualified Bid for a consideration of at least $250,000 and shall subsequently continue in $250,000 increments or such other minimum increments as the Debtors determine (each such amount, an "Overbid Amount").  The Debtors, in consultation with the Committee,  will determine whether any overbid contains consideration in an Overbid Amount by evaluating the cash and non-cash consideration provided in any such overbid, and may request that any Qualified Bidder allocate the total consideration contained in any Qualified Bid to specific assets identified in such bid, and reserve the right to make such allocation themselves.

During the Auction, Qualified Bidders will have the opportunity to revise their marked-up Purchase Sale Agreement and each Qualified Bidder will be informed of the terms of the previous bids.  Bidding at the Auction will continue until the Debtors, in consultation with the Committee, determine that they have received the highest or otherwise best bid for the Lufkin Property (the "Successful Bid").  The bidder that submits the Successful Bid will be the "Successful Purchaser".  The Debtors, in consultation with the Committee, in their discretion may elect one or more Qualified Bids together, with the consent of the Qualified Bidders, as the Successful Bid and such Qualified Bidders, as the Successful Purchaser.  After the Debtors determine the Successful Purchaser, they will announce which bid was the Successful Bid and will close the Auction.  The Debtors, in consultation with the Committee, will then determine and announce which bid constituted the second highest or otherwise best bid (the "Backup Bid").  Within two (2) business days after concluding the Auction, the Successful Purchaser must complete and execute all agreements, contracts, instruments or other documents setting forth the terms and conditions upon which the Successful Bid was made.

In determining which bids comprise the Successful Bid and the Backup Bid, among other things, the Debtors will use their business judgment and may consider any one or more of the following factors:  (i) the speed and certainty of closing a Qualified Bid; and (ii) the net economic return to the estates at closing of the competing bids,

including, but not limited to, consideration of remuneration, form of remuneration, assumption of liabilities (including environmental liabilities), ability to operate the landfills and assume the relevant permitting, and elimination of claims (the "Determining Factors").

(k)     Reservation of Rights. The Debtors reserve the right to: (i) determine in their reasonable discretion which bid is the highest or best bid; (ii) reject at any time prior to entry of a Court order approving an offer, without liability, any offer that the Debtors in their reasonable discretion deem to be: (1) inadequate or insufficient; (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or in the Bid Procedures; or (3) contrary to the best interests of the Debtors and their estates. The selection of a Successful Purchaser shall be within the reasonable business judgment of the Debtors and subject to the approval of the Bankruptcy Court. The presentation of a particular bid to the Bankruptcy Court for approval will not constitute the Debtors' acceptance of the bid, and the Debtors will be deemed to have accepted the bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. At or before the Sale Hearing the Debtors, in consultation with the Committee, may impose, in a manner consistent with the Bid Procedures and the Determining Factors described above, such other terms and conditions on the Qualified Bidders as the Debtors may determine to be in the best interests of the Debtors, their estates and their creditors.

(l)     Modification of Bid Procedures. The Debtors reserve the right to: (i) extend the deadlines set forth in the Bid Procedures and/or adjourn the Auction and/or the Sale Hearing in open court without further notice; (ii) withdraw their offer to sell the Lufkin Property at any time subsequent to the Auction; or (iii) reject any or all bids if, in the Debtors' reasonable business judgment, such other bids are not for fair and adequate consideration.

(m)    Closing with Alternative Backup Bidders. If for any reason the entity that submits the highest or otherwise best bid fails to consummate the purchase of the Lufkin Property, the offeror of the Backup Bid (the "Backup Bidder") will automatically be deemed to have submitted the highest or best bid and to the extent such Backup Bidder and the Debtors consent, the Debtors and such Backup Bidder are authorized to effect the sale of the Lufkin Property to such Backup Bidder as soon as is commercially reasonable. Following the Sale Hearing: (i) if such failure to consummate the purchase is the result of a breach by the Successful Purchaser, the Debtors are entitled to seek all available damages from the defaulting Successful Purchaser; and (ii) if such failure to consummate the purchase is the result of a breach by the Debtors, the Successful Purchaser shall have no recourse against the Debtors other than for recovery of its Good Faith Deposit.

(n)     Sale Hearing. The Debtors are requesting that the Sale Hearing be held on **August 4, 2010 at 1:00 p.m. (ET).** The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by

announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

## C.      Form of Purchase Sale Agreement

17.    To facilitate the Auction and maximize efficiency, the Debtors will rely on a form of Purchase Sale Agreement containing substantially the same terms and conditions as were approved by this Court in the Initial Sale Order.  The Original Sale Motion highlights the key terms of the Purchase Sale Agreement in the form that this Court approved under the sale to CIT.  The Debtors submit that relying on this well publicized form of agreement will expedite negotiations over the key terms of any agreement that the Debtors enter into with a Qualified Bidder.  Upon the closing of the Auction and prior to the Sale Hearing, assuming that the Debtors select a Successful Purchaser, the Debtors will file with the Court a notice of final Purchase Sale Agreement that will highlight the key terms of the selected Purchase Sale Agreement in accordance with Local Rule 6004-1.

## D.      Notice of Auction and Sale Hearing

18.    Subject to the Court's availability, the Debtors seek to schedule the Sale Hearing on August 4, 2010 at 1:00 pm (ET), with an objection deadline seven (7) days prior to the Sale Hearing.  Additional objections related solely to the identity of a Successful Bidder will be permitted following identification of such party.

19.    On or before three (3) business days after the entry of the Bid Procedures Order, the Debtors will serve copies of the Auction and Sale Notice, the Purchase Sale Agreement, and the Bid Procedures Order by mail, postage prepaid to:  (i) the Office of the United States Trustee; (iii) counsel for the Committee; (iv) all entities known to have expressed a bona fide interest, within the last three (3) years, in acquiring the Lufkin Property; (v) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other interest in

14

or upon the Lufkin Property; (vi) federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the Sale of the Lufkin Property, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Lufkin Property or have any reasonably known interest in the relief requested by the Motion; (vii) all parties, if any, who are known to claim interests in any Transferred Contracts (defined below); (viii) the United States Attorney's office; (ix) the Internal Revenue Service; (x) the TCEQ; (xi) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of the entry of the Bid Procedures Order.

20.    In addition, not later than five (5) business days after entry of the Bid Procedures Order, the Debtors will cause the Auction and Sale Notice, in a form substantially similar to the form attached to the Bid Procedures Order as Exhibit 3, to be published in the Texas Real Estate Business journal pursuant to Bankruptcy Rule 2002(l). The Debtors submit that such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

## BASIS FOR RELIEF

**A.    The Proposed Bid Procedures are Appropriate**

21.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The reasons underlying the Debtors' business judgment for selling the Lufkin Property have not changed since the Court initially approved this Sale. If anything, the justification for divesting the property has become more urgent as the Debtors near emergence. Specifically, the Lufkin Property does not comprise part of the Debtors' going-forward business platform. The Debtors incur approximately $3 million annually, averaging approximately $250,000 per month, in maintenance costs associated with the Lufkin Property, including for

utilities, taxes, insurance and security. Finally, environmental liabilities may exist at the site. The Debtors believe that at this time, auctioning the Lufkin Property through a structured well-publicized Auction will generate the maximum possible return on account of these assets for the Debtors' estates.

22.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

23.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co.* v. *Allen*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this motion if the Debtors demonstrate a sound business justification therefore. *See Schipper*, 933 F.2d at 515; *In re Lionel Com.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

24.     The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates, and their stakeholders. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Debtors' business judgment. The Bid Procedures set minimal participation requirements, and encourage a broad range of offers. The incremental Overbid Amounts are set at appropriate thresholds to encourage a lively Auction, while at the same time infusing a degree of efficiency into the process. Courts in

16

this District have approved similar procedures in other cases. *See e.g., In re National Dry Cleaners Inc.*, No. 08-11382 (CSS) (Bankr. D. Del. July 24, 2008) [Dkt. No. 91 (approving bid procedures without a stalking horse); *In re Premium Papers Holdco, LLC*, No. 06-10269 (CSS) (Bankr. D. Del. Sept. 28 2006) [Dkt. No. 746] (same).

**B.      The Sale is Within the Sound Business Judgment of the Debtors
        and Should be Approved**

25.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

26.      The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club* v. *Pennbank (In re Titusville Country Club)*, 128 B.R. 396,

399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

27.     A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

28.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect

068104.1001

whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

29.     Here, the Sale of the Lufkin Property is based upon the Debtors' sound business judgment and should be approved. In fact, the reasons for selling the Lufkin Property now are no different – if not even more compelling – than was the case when this Court considered the Original Sale Motion. Under a proposed sale, the purchaser will assume potential environmental liabilities associated with the Lufkin Property, and in conjunction with a Sale, ACC will save approximately $250,000 per month in incurred expenses associated with the permanently idled Lufkin Mill.

30.     The Debtors also believe that the Bid Procedures and the Auction will generate interest and bidding, and that the bidding process will yield the highest and best bids for the Lufkin Property. As such, the Motion seeks reasonable and necessary relief that the Debtors believe will maximize the value of these assets for their estates. The notice described herein and the Bid Procedures are designed to provide adequate notice to all potentially interested parties, including those offerors who previously expressed an interest in purchasing the Lufkin Property prior to the execution of the CIT Agreement. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

31.     Moreover, the Bid Procedures are designed to maximize the value received for the Lufkin Property. The process proposed by the Debtors allows for a timely auction process, given the circumstances currently facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid. Indeed, the Debtors anticipate that many of the potential bidders for the Lufkin Property are already familiar with the assets, and the Debtors will be readily able to update those parties—and all others—regarding the state of the Lufkin Property.

19

The proposed Sale will subject the assets to the market by soliciting competing bids in a court-supervised Auction. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Lufkin Property will be fair and reasonable, and the third prong of the *Abbotts Dairies* standard is satisfied.

**C.    The Sale is Proposed in "Good Faith"
Under Section 363(m) of the Bankruptcy Code**

32.    The Debtors request that the Court find that the Successful Bidder (or Backup Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

33.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

34.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Lufkin Property. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. *Krebs Chrysler-Plymouth, Inc.* v. *Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3d. Cir. 1998). In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit

20

reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Transferred Contracts (as defined below) are executory contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder (or Backup Bidder) with respect to the Transferred Contracts (as defined and described more fully below) designated for assumption and assignment in the Purchase Sale Agreement.

35. As required by section 363(m) of the Bankruptcy Code, the Bid Procedures have been proposed in good faith and provide for both ACC and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the designated Transferred Contracts (as defined below). Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*,

66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

36.     Here, the sale of the Lufkin Property and the assignment of the Transferred Contracts (as defined below) which are designated by the ultimate purchaser are in good faith.  No evidence of fraud or collusion exists in the terms of the Sale and the assignment of the Transferred Contracts.  To the contrary, as will be further demonstrated at the Sale Hearing, the Purchase Sale Agreement will be the culmination of an open solicitation and negotiation process and the Debtors anticipate that most parties will be represented by counsel.  All negotiations have been and will continue to be conducted on an arms length, good faith basis.  With respect to the potential bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process.  Under the circumstances, the Successful Bidder (or Backup Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Bid Procedures are designed to prevent ACC or the Successful Bidder (or the Backup Bidder) from engaging in any conduct that would cause or permit the Purchase Sale Agreement, or the Sale of the Lufkin Property to the Successful Bidder (or the Backup Bidder), to be avoided under section 363(n) of the Bankruptcy Code.

37.     All counterparties to the Transferred Contracts will be provided notice of the potential assumption and assignment of their agreements and an opportunity to be heard, just as they were when the Original Sale Motion was filed.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**D.     The Sale Satisfies the Requirements
        of Section 363(f) of the Bankruptcy Code**

        38.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc.* v. *Elliot (In re Elliot)*, 94 B.R.

343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met).  Because the Debtors expect that they will satisfy the second and fifth of these

requirements, if not others as well, approving the sale of the Lufkin Property free and clear of all

adverse interests is warranted.  Furthermore, courts have held that they have the equitable power to

authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See,*

*e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001);

*Volvo White Truck Corp.* v. *Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75

B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**E.     Assumption and Assignment
        of Transferred Contracts Should be Approved**

        39.     To facilitate and effectuate the sale of the Lufkin Property, the Debtors seek

authority to assume and assign various executory contracts and unexpired leases related to the

Lufkin Property (as may be identified by separate notice prior to the Sale Hearing, the "Transferred

Contracts") to the Successful Bidder (or the Backup Bidder) to the extent required by such

Successful Bidder (or the Backup Bidder). Section 365 of the Bankruptcy Code authorizes a

debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval

of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and

adequate assurance of future performance is provided. A debtor's decision to assume or reject an

executory contract or unexpired lease must only satisfy the "business judgment rule" and will not

be subject to review unless such decision is clearly an unreasonable exercise of such judgment.

*Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523

(1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code section

365) (rejecting the test of whether the executory contract was burdensome in favor of whether

rejection is within the debtor's business judgment); *Lubrizol Enter., Inc.* v. *Richmond Metal*

*Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

      40.    The meaning of "adequate assurance of future performance" depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction." *See*

*Carlisle Homes. Inc.* v. *Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989). Among other things, adequate assurance may be given by demonstrating the assignee's

financial health and experience in managing the type of enterprise or property assigned. *In re*

*Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future

performance present when the prospective assignee of a lease from the debtors has the financial

resources and has expressed a willingness to devote sufficient funding to the business in order to

give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future

performance is whether rent will be paid").

      41.    The Successful Bidder (or the Backup Bidder) may desire to take

assignment of certain executory contracts and unexpired leases related to the Lufkin Property. To

the extent Transferred Contracts are identified for assumption and assignment by the Successful

Bidder (or the Backup Bidder), the Debtors believe that they can and will demonstrate that all

requirements for assumption and/or assignment of the such Transferred Contracts will be satisfied

at the Sale Hearing. The Debtors, as required by the Bid Procedures, will evaluate the financial

wherewithal of all potential bidders before qualifying such bidders to bid for the Lufkin Property.

Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound

business judgment, believe that selling the Lufkin Property and assuming and assigning to the

Successful Bidder (or the Backup Bidder) the selected Transferred Contracts would be in the best

interests of their estates. Moreover, the Debtors will provide all parties to the Transferred

Contracts an opportunity to be heard. Specifically, all parties to the Transferred Contracts will

have the opportunity to object to such assumption and assignment solely on the issue of whether

such Successful Bidder can provide adequate assurance of future performance as required by

section 365 of the Bankruptcy Code.

42.     Thus, the Debtors request that assumption and assignment of the Transferred

Contracts should be approved.

**F.     Payment of the Commission Owed to the Seller's Broker from the Proceeds of the Sales Is Appropriate**

43.     The Debtors also seek authorization to pay the Broker's Commission of 5%

of the first $20 million in sale consideration; 4% on the subsequent tranche from $20 to $30

million and 3% on the portion of sale consideration in excess of $30 million. The Broker's

Commission falls within the range customarily found in similar real estate transactions. The

Broker's Commission is particularly warranted in this case, given G&E's involvement in the

marketing of the Assets since 2007. G&E's listing of the Assets, as well as its continued efforts to

find and obtain a buyer for what constitutes a unique site, have been instrumental in ensuring an

25

open and objective marketing process. Thus, payment of the Broker's Commission from the proceeds of the Sale is appropriate under the circumstances.

44.     Upon information and belief, the Seller's Broker is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code. The Debtors will endeavor to file with the Court an affidavit of disinterestedness completed by the Seller's Broker (the "Broker's Affidavit") prior to the hearing on this Motion. To the extent not filed prior to the hearing, the Debtors will file and serve such affidavit on the United States Trustee, counsel to the Committee, counsel to agent for the Debtors' postpetition lenders and all parties having requests for notice in these cases, following approval of this Motion. To the extent no objection to the Broker Affidavit is filed within 10 days thereof, the Debtors request authorization, without further order of the Court, to pay the Broker's Commission.

**F.     Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

46.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order

YCST01:9812649.1                                                                                    068104.1001

otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

47.     In light of the failed consummation of the CIT Sale and the Debtors' need to sell the Lufkin Property in an expeditious manner, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

48.     Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the agents for the Debtors' prepetition secured bank facilities; (iv) counsel to the agent for the Debtors' postpetition lenders; (v) counsel to the agent for the Debtors' securitization facility; (vi) the Monitor appointed in the Canadian Proceeding; (vii) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b); (viii) all taxing authorities and other governmental agencies having jurisdiction over any of the Lufkin Property, including the Internal Revenue Service; (ix) all Persons known or reasonably believed to have asserted an interest on any of the Lufkin Property; (x) the Attorney General in the state where the Property is located; (xi) the United States Environmental Protection Agency; (xii) the TCEQ; and (xiii) any other applicable state environmental agency. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

# CONCLUSION

WHEREFORE, the Debtors respectfully request (i) entry of the Bid Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) entry of Sale Order substantially in the form attached hereto as <u>Exhibit B</u>, and (iii) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
June 17, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Kelley A. Cornish
Claudia R. Tobler
Jonathan T. Koevary
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors-in-Possession*

YCST01:9812649.1 068104.1001