# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
|  | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Hearing Date: July 7, 2010 at 1:30 p.m. (ET)** |
|  | ) | **Objection Deadline: June 29, 2010 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) APPROVING THE FORM AND CONTENTS OF THE SOLICITATION PACKAGE AND BALLOTS; (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE CONFIRMATION HEARING; (IV) APPROVING PROCEDURES FOR DISTRIBUTION OF SOLICITATION PACKAGES; (V) APPROVING PROCEDURES FOR PARTICIPATING IN A RIGHTS OFFERING; (VI) APPROVING PROCEDURES FOR VOTE TABULATIONS; (VII) APPROVING THE FORM AND CONTENTS OF SUBSCRIPTION PACKAGES FOR THE RIGHTS OFFERING; (VIII) APPROVING THE CROSS-BORDER VOTING PROTOCOL; (IX) ESTABLISHING A RECORD DATE, A VOTING DEADLINE FOR RECEIPT OF BALLOTS AND EXPIRATION DATES FOR THE RIGHTS OFFERING; (X) ESTABLISHING THE DEADLINE AND PROCEDURES FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN AND ASSERTED CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AS PART OF THE PLAN; AND (XI) GRANTING RELATED RELIEF

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

AbitibiBowater Inc. and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion"), pursuant to sections 1125 and 1126 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 3016, 3017 and 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 3017-1(a) and 3017-1(b) of the Local Rules of Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for the entry of an order (the "Order") (i) approving the *Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code,* dated May 24, 2010 (including all exhibits thereto and as amended, modified or supplemented from time to time, the "Disclosure Statement") [Docket No. 2200]; (ii) approving the form and contents of the Debtors' proposed solicitation package relating to the *Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code*, dated May 24, 2010 (including all exhibits thereto and as amended, modified or supplemented from time to time, the "Plan")[2] [Docket No. 2199]; (iii) approving the form and manner of the notice of the Confirmation Hearing; (iv) approving procedures for distribution of Solicitation Packages; (v) approving procedures for vote tabulations; (vi) approving the Cross-Border Voting Protocol; (vii) approving the form and contents of the subscription packages for the Rights Offering; (viii) approving procedures for participating in the Rights Offering; (ix) establishing a Record Date, a Voting Deadline for receipt of ballots and Expiration Dates for the Rights Offering; (x) establishing the deadline and procedures for filing objections to confirmation of the Plan and to the Debtors' asserted cure amounts for executory contracts and unexpired leases that may be assumed by the

---

[2] Unless otherwise defined in this Motion, all capitalized terms used herein shall have the meanings ascribed to them in the Plan.

Debtors as part of the Plan; and (xi) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## BACKGROUND

1.      AbitibiBowater Inc. ("AbitibiBowater" and with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Quebec.  The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide.  It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries.  The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party certified 100% of its managed woodlands to sustainable forest management standards.  As of March 31, 2010, the Company owned or operated 23 pulp and paper facilities and 30 wood products facilities located in the United States, Canada and South Korea, and 26 wood products facilities in Canada.  Employing around 11,900 people, the Company realized sales of approximately $4.4 billion[3] in 2009.  Its total assets were $7.0 billion as of March 31, 2010.

2.      The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold.  These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels.  Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates.  The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product.  In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends

---

[3]      All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

3. Specifically, on April 16, 2009 (the "<u>Petition Date</u>"), certain of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>").[4] On April 17, 2009, certain of the Debtors (the "<u>Cross-Border Debtors</u>")[5] and non-debtor subsidiaries of AbitibiBowater (the "<u>CCAA Debtors</u>" and together with the Cross-Border Debtors, the "<u>Canadian Debtors</u>")[6] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "<u>CCAA</u>"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "<u>Canadian Court</u>" and the filing, the "<u>Canadian Proceedings</u>"). Two of the CCAA Debtors -- Abitibi-Consolidated Inc. ("<u>ACI</u>") and Abitibi-Consolidated Company of Canada ("<u>ACCC</u>" and together with ACI, the

---

[4]     The SPV Debtors commenced their Chapter 11 Cases on December 22, 2009.

[5]     The Cross-Border Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[6]     The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

"Chapter 15 Debtors") -- thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") in this Court seeking relief in support of the Canadian Proceedings. AbitibiBowater and certain of the Debtors also filed for ancillary relief in Canada seeking relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[7]

4.     On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory Creditors Committee of unsecured creditors (the "Creditors Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

### JURISDICTION

5.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The relief requested herein is predicated on Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 2002, 3016, 3017 and 3020 and Local Rules 3017-1(a) and 3017-1(b).

### OVERVIEW

7.     The Company has achieved a significant milestone on its path towards emergence: on May 24, 2010, it filed amended plans of reorganization and related disclosure materials in both its U.S. and Canadian restructuring proceedings. The Company's principal stakeholders, including the Creditors Committee, secured lenders, and ad hoc bondholders committee, support both plans. The restructuring will effectively convert the Company's prepetition

---

[7]     The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

unsecured debt into equity of the reorganized Company, and will provide certain eligible holders of unsecured claims the ability to participate in a rights offering of up to $500 million of convertible unsecured notes (as defined in the Plan and used herein, the "Rights Offering Notes"). A commitment from certain substantial holders of unsecured notes issued by the Company backstops the rights offering.

8.      The Plan represents tremendous progress in the Company's restructuring efforts and results from collaborative efforts by the Company and its principal stakeholders. By this Motion, the Debtors seek this Court's (a) approval of the Disclosure Statement, (b) approval of the solicitation and voting procedures for the Plan, including a protocol for voting claims against the Cross-Border Debtors, (c) approval of the rights offering procedures, and (d) approval of a Plan confirmation hearing date and related objection deadlines. The Canadian Debtors are seeking parallel relief in the Canadian Proceedings with respect to the CCAA plan (the "CCAA Plan").

9.      The Plan does not provide for substantive consolidation of any of the Debtors' estates and constitutes a separate plan of reorganization for each Debtor, including the Cross-Border Debtors. As detailed in the Disclosure Statement, the Plan classifies Claims against, and Interests in, each Debtor based on a shared numbering scheme. Thus, for example, Class 1A (Priority Non-Tax Claims against AbitibiBowater Inc.) through Class 1HH (Priority Non-Tax Claims against ABH Holding Company LLC) comprise all priority non-tax Claims against the separate Debtors, Classes 6A (Unsecured Claims against AbitibiBowater Inc.) through Class 6HH (Unsecured Claims against ABH Holding Company LLC) comprise all Unsecured Claims against the separate Debtors, and so on.

10. More specifically, in accordance with section 1122 of the Bankruptcy Code, the Plan classifies Claims against, and Interests in, the Debtors into the following Classes for all purposes, including voting:[8]

| CLASS(ES) | DESCRIPTION | TREATMENT | ENTITLED TO VOTE |
|---|---|---|---|
| 1A through 1HH | Priority Non-Tax Claims | Unimpaired | No – Deemed to Accept |
| 2A through 2G | Bowater Secured Bank Claims | Unimpaired | No – Deemed to Accept |
| 3A through 3G | BCFPI Secured Bank Claims | Unimpaired | No – Deemed to Accept |
| 4A through 4G | ACCC Term Loan Secured Guaranty Claims | Unimpaired | No – Deemed to Accept |
| 5A through 5HH | Other Secured Claims | Unimpaired | No – Deemed to Accept |
| 6A through 6HH | Unsecured Claims | Impaired | Yes |
| 7A through 7HH | Convenience Claims | Impaired | Yes |
| 8A through 8HH | Intercompany Claims and Intercompany Interests | Impaired | No –Deemed to Accept |
| 9A through 9HH | Common Stock Claims and Interests | Impaired | No – Deemed to Reject |

11. The Debtors are only soliciting votes from holders of Claims in Class 6 (Unsecured Claims) and Class 7 (Convenience Claims). Holders of Claims in Classes 6 and 7 (together, the "Voting Classes") are impaired and therefore entitled to vote to accept or reject the Plan.

12. The Debtors are not soliciting votes from holders of Claims in Classes 1 through 5, 8 and 9 (the "Non-Voting Classes" and the holders therein, the "Non-Voting Parties"). Holders of Claims in Classes 1 through 5 are unimpaired and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of claims in these Classes are not entitled to vote to accept or reject the Plan. Holders of Intercompany Claims in Class 8 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

---

[8] Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify priority Claims, including: Administrative Claims, Priority Tax Claims, DIP Facility Claims, Securitization Claims, and Adequate Protection Claims.

Holders of Claims and Interests in Class 9 will not receive nor retain any property under the Plan on account of their Claims and Interests, and thus are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Claims and Interests in Class 9 are accordingly not entitled to vote to accept or reject the Plan.

## **RELIEF REQUESTED**

### A. **Approval of the Disclosure Statement**

#### *(i)     Adequacy*

13.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide holders of impaired claims and interests entitled to vote to accept or reject the Plan "adequate information" regarding that plan. Section 1125(a)(1) of the Bankruptcy Code states, in relevant part:

> '[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . ..

11 U.S.C. § 1125(a)(1).

14.     A disclosure statement should provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision on whether to vote to accept or reject a plan. *See, e.g.*, *Century Glove, Inc.* v. *First Am. Bank of New York,* 860 F.2d 94, 100 (3d Cir. 1988) ("[S]ection 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985); *In re Phoenix Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001); *In re Unichem Corp.*, 72 B.R.

95, 97 (Bankr. N.D. Ill. 1987). Congress intended that such informed judgments would be needed to both negotiate the terms of, and vote on, a plan of reorganization. *Century Glove*, 860 F.2d at 100.

15. This Court has broad discretion to determine what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code. *See, e.g.*, *Tex. Extrusion Corp.* v. *Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court"); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate disclosure' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court."); *Oneida Motor Freight, Inc.* v. *United Jersey Bank,* 848 F.3d 414, 417 (3d Cir. 1988) ("From the legislative history of section 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of New York* v. *Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); *see also* S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case").

16. A court will consider a number of topics when evaluating the adequacy of a disclosure statement. These include the following types of pertinent information that stakeholders consider when making informed decisions about whether to vote to accept or reject the Plan:

    a.    <u>Executive Summary</u>: statement of the Debtors in support of the Plan, purpose and effect of the Plan, overview of the Classes of Claims and Interests and their respective treatment under the Plan, overview of the solicitation and voting procedures and confirmation and consummation, including important dates with respect to voting on the Plan and objecting

to the confirmation, and a summary and explanation of the settlement, release, injunction, and exculpation provisions of the Plan;

b. <u>Background to These Chapter 11 Cases</u>:  the Debtors' corporate history and capital structure, an overview of their business operations, the Debtors' prepetition indebtedness, and certain events leading to the commencement of these chapter 11 cases;

c. <u>Summary of the Plan</u>:  Section VI of the Disclosure Statements contains a detailed summary of the Plan;

d. <u>Confirmation and Consummation Procedures</u>:  procedures for soliciting votes to accept or reject the Plan, confirmation procedures, and statutory requirements for confirmation and consummation;

e. <u>Risk Factors</u>:  certain risk factors that may affect the Plan, the value of any securities to be issued under the Plan (including the New ABH Common Stock and the Rights Offering Notes to be issued thereunder) and the Debtors' businesses as well as certain risks associated with forward-looking statements and overall disclaimer as to the information provided by and set forth in the Disclosure Statement;

f. <u>Alternatives to Confirmation and Consummation</u>:  liquidation under chapter 7 of the Bankruptcy Code, including the liquidation analysis or the filing of alternative plans of reorganization;

g. <u>Exemptions From Securities Act Registration</u>:  section 1145 of the Bankruptcy Code, the Rights Offering and the issuance of New ABH Common Stock and Rights Offering Notes under the Plan;

h. <u>Tax Consequences of the Plan</u>:  certain U.S. federal income tax law consequences of the Plan;

i. <u>Financial Information</u>:  the Reorganized Debtors' projections and valuation; and

j. <u>Recommendation</u>:  the Debtors' recommendation that holders of Claims and Interests vote to accept the Plan.

17.     The Disclosure Statement contains the information set forth above in a manner that provides holders of Claims and Interests entitled to vote to accept or reject the Plan, and participate in the Rights Offering, with adequate information within the meaning of section 1125 of the Bankruptcy Code, and otherwise complies with section 1125 of the Bankruptcy Code.

*(ii)    Notice*

18.    Bankruptcy Rule 3017(a) requires that creditors and other parties in interest receive notice of the hearing to consider a proposed disclosure statement.  *See* Fed. R. Bankr. P. 3017(a) (providing that after a disclosure statement is filed it must be mailed with the notice of the hearing to consider the disclosure statement and any objections or modifications thereto on no less than 28 days' notice thereof); *see also* Fed. R. Bankr. P. 2002(b).

19.    On June 1, 2010, the Debtors (through their Claims and Noticing Agent) served over 94,000 entities with a copy of a notice identifying:  (a) the date, time, and place of the Disclosure Statement hearing; (b) the manner in which a copy of the Disclosure Statement (and exhibits thereto, including the Plan) can be obtained; and (c) the deadline and procedures for filing objections to the approval of the Disclosure Statement.

20.    Accordingly, parties in interest have had no fewer than 28 days' notice of the deadline to object to the approval of the Disclosure Statement and 28 days' notice of the Disclosure Statement hearing in compliance with Bankruptcy Rule 3017(a).  The Debtors submit that they provided adequate notice of the Disclosure Statement hearing and, therefore, request that the Court approve such notice as appropriate and in compliance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

**(B)    Solicitation of the Plan**

*(i)    Approval of Form and Content of Solicitation Package*

21.    Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of Claims and Interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan.  It provides:

> Upon approval of a disclosure statement -- except to the extent that
> the court orders otherwise with respect to one or more unimpaired

classes of creditors -- the debtor in possession, trustee, proponent
of the plan, or clerk as the court orders shall mail to all creditors,
and in a chapter 11 reorganization case shall transmit to the United
States trustee:

> (1)     the plan or a court-approved summary of the plan;

> (2)     the disclosure statement approved by the court;

> (3)     notice of the time within which acceptances and rejections of the plan may
> be filed; and

> (4)     any other information as the court may direct, including any court opinion
> approving the disclosure statement or a court-approved summary of the
> opinion.

In addition, notice of the time fixed for filing objections and the
hearing on confirmation shall be mailed to all creditors in
accordance with Rule 2002(b), and a form of ballot conforming to
the appropriate Official Form shall be mailed to creditors entitled
to vote on the plan.

Fed. R. Bankr. P. 3017(d).

22.     In accordance with Bankruptcy Rules 2002 and 3017(d), the Debtors propose,

by first class mail, to transmit or to cause to be transmitted to creditors entitled to vote on the Plan, a

solicitation package (the "Solicitation Package") containing copies of the following documents:[9]

> (a)     written notice (the "Solicitation Package Notice"), substantially in the
> form annexed hereto as Exhibit B, of (i) the Court's approval of the
> Disclosure Statement, (ii) the deadline for voting on the Plan, (iii) the date
> of the Confirmation Hearing, and (iv) the deadline and procedures for
> filing objections to confirmation of the Plan;

> (b)     the Plan;

> (c)     the Disclosure Statement;

---

[9]     To reduce mailing and production costs, the Debtors reserve the right to transmit some of these materials in a
CD-ROM format, including the Plan, the Disclosure Statement and proposed Order.  Parties may request hard-
copies of these documents by contacting Epiq at 1-888-266-9280 (for U.S. / Canada calls) OR (503) 597-7694
(for non-U.S. / Canada calls).  Delaware courts have approved the use of CD-ROMs in other cases.  *See, e.g.*, *In
re Merisant Worldwide, Inc.*, Case No. 09-10059 (Bankr. D. Del.); *In re Buffets Holdings, Inc.*, Case No. 08-
10141 (Bankr. D. Del.); *In re The Bombay Co., Inc.*, Case No. 07-44084 (Bankr. N.D. Tex.); *In re Levitt and
Sons, LLC*, Case No. 07-19845 (Bankr. S.D. Fla.); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y.).

(d)     a ballot (proposed forms of which are annexed hereto as Exhibits <u>F-1</u> through <u>F-4</u>) (each a "<u>Ballot</u>," and collectively, the "<u>Ballots</u>") and a pre-addressed, postage paid, return envelope to be used to return a completed Ballot;

(e)     the Court's order approving, <u>inter alia</u>, the Disclosure Statement and this Motion (the "<u>Disclosure Statement and Solicitation Procedures Approval Order</u>") (excluding any exhibits thereto);

(f)     with regard to holders of Claims in Classes 6A through 6HH entitled to participate in the Rights Offering, Subscription Forms (as defined below); and

(g)     such other information as the Court may direct or approve.[10]

23.     The Debtors propose that the Solicitation Package be mailed on July 15, 2010, or as soon thereafter as reasonably practicable (the "<u>Solicitation Date</u>"). As discussed below, pursuant to the Cross-Border Voting Protocol, the Monitor will transmit solicitation materials to holders of claims against the Cross-Border Debtors. The Solicitation Materials will contain French translations of the Solicitation Package Notice and certain other materials (excluding the Plan and Disclosure Statement) where appropriate.

24.     The Debtors further propose that, prior to transmitting the Solicitation Packages, the Debtors may fill in any missing dates and other information, correct any typographical errors, reformat and make such other non-material, non-substantive changes to the Disclosure Statement, the Plan and any other materials in the Solicitation Package as they deem appropriate.

25.     *Multiple Claims or Interests.* To avoid duplication and to reduce expenses, the Debtors propose that creditors that have filed multiple Claims in any given Class should receive only one (1) Solicitation Package and one (1) Ballot for voting their Claims with respect to that Class. In the case of debt securities, each Beneficial Holder must execute a separate Beneficial

---

[10]     The Debtors anticipate that, on or before the hearing on this Motion, the Creditors Committee will submit to the Court a letter in support of the Plan to be included with the Solicitation Package.

Ballot for each block of debt securities that it holds through any Voting Nominee (as defined below) and must return each such Beneficial Ballot to the appropriate Voting Nominee.

26. *Non-Voting Parties.* Bankruptcy Rule 3017(d) permits the Court to limit the contents of the solicitation materials to be distributed to "one or more unimpaired classes of creditors." Fed. R. Bankr. P. 3017(d). Pursuant to section 1126(f) of the Bankruptcy Code, such unimpaired creditors are "conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class … is not required." 11 U.S.C. § 1126(f). Similarly, the holders of Claims in Class 9 are not entitled to receive any distribution under the Plan and, thus, pursuant to section 1126(g) of the Bankruptcy Code, are presumed to have rejected the Plan.

27. Accordingly, the Debtors propose that they not transmit a Solicitation Package to the Non-Voting Parties. Rather, the Debtors will mail or to cause to be mailed to each Non-Voting Party at its address to which notices are required to be sent, pursuant to Bankruptcy Rule 2002(g), a notice, substantially in the forms of the notice attached hereto as Exhibits <u>C</u> and <u>D</u> (the "<u>Unimpaired Party Notice</u>" and the "<u>Impaired Non-Voting Notice</u>," respectively), which contains a brief summary of the Plan and sets forth:

    (a)    the Court's approval of the Disclosure Statement;

    (b)    the date of the Confirmation Hearing; and

    (c)    the deadline and procedures for filing objections to confirmation of the Plan.

The Unimpaired Party Notice and the Impaired Non-Voting Notice will further provide that Non-Voting Parties are entitled to receive a copy of the Plan and Disclosure Statement at the Debtors' expense upon written request to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, New York 10017, <u>Attention</u>: AbitibiBowater Ballot Processing Center, or may obtain a copy from Epiq's (as defined below) website at http://dm.epiq11.com/abitibibowater.

> (ii) *Establishment of Record Date, Appointment of Claims and Noticing Agent and Approval of Procedures for Distribution of Solicitation Packages*

28.     Bankruptcy Rule 3017(d) provides that, for the purposes of soliciting votes to approve a plan of reorganization, "creditors and equity security holders shall include holders of stocks, bonds, debentures, notes, and other securities of record on the date the order approving the disclosure statement is entered or another date fixed by the court, for cause, after notice and a hearing." Fed. R. Bankr. P. 3017(d).

29.     The Debtors propose that the Court establish the date that is four (4) business days prior to the first day of the hearing to consider approval of the Disclosure Statement (*i.e*., June 30, 2010) as the record date (the "Record Date") for purposes of determining which creditors are entitled to receive a Solicitation Package and to vote on the Plan, and for purposes of determining which creditors are entitled to receive the Unimpaired Party Notice and the Impaired Non-Voting Notice.

30.     With respect to any transferred Claim, the Debtors propose that the transferee will be entitled to receive a Solicitation Package and to vote to accept or reject the Plan on account of the transferred Claim only if: (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Record Date, or (b) the transferee files, no later than the Record Date, (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the transferor has completed a Ballot, the transferee of such Claim shall also be bound by any vote (and the consequences thereof) made on the Ballot by the holder as of the Record Date of such transferred Claim.

31.     Pursuant to an order dated April 17, 2009 [Docket No. 71], this Court authorized the retention and employment of Epiq Bankruptcy Solutions, LLC ("Epiq" or the "Claims

and Noticing Agent") as the Debtors' notice, claims, solicitation and balloting agent in these cases. In such capacities, Epiq shall inspect, monitor and supervise the solicitation process, serve as the tabulator of the Ballots and certify to the Court the results of the balloting. Epiq will also act as the solicitation and subscription agent for the Rights Offering discussed below.

32. The Debtors propose that the Debtors shall, except as otherwise provided herein, mail by first class mail a Solicitation Package to each entity that (i) is entitled to vote and (ii) is listed on the Debtors' schedules of assets and liabilities, as amended, as of the Record Date, or that has filed a Proof of Claim as of the Record Date.

33. On June 1, 2010, the Debtors mailed notices of the Disclosure Statement hearing to all creditors and parties-in-interest. The Debtors expect that a number of such notices will be returned by the United States Postal Service as undeliverable. The Debtors believe that it would be costly and wasteful to mail Solicitation Packages, Unimpaired Party Notices or Impaired Non-Voting Notices to the same addresses from which notices of the Disclosure Statement hearing are returned as undeliverable. Therefore, the Debtors seek the Court's approval to dispense with the mailing of Solicitation Packages, Unimpaired Party Notices or Impaired Non-Voting Notices to the entities listed at such addresses unless the Debtors are provided with an accurate address prior to the Disclosure Statement hearing. The Debtors further propose that they may, but shall not be required to, attempt to locate the correct address, and prior to the Voting Deadline (as defined below) resend the Solicitation Packages that are returned as undeliverable; provided, however, that in no event, unless expressly agreed to in writing by the Debtors, will such parties be afforded any additional time to vote.

*(iii)    Ballots and Master Ballots and the Distribution Thereof*

34.    With respect to the Solicitation Packages that will be sent to certain holders of debt securities entitled to vote on the Plan, the Debtors propose to deliver Solicitation Packages to the record holders of such Claims, including, without limitation, representatives such as brokers, banks, commercial banks, transfer agents, trust companies, dealers, other agents or nominees, or their mailing agents (collectively, the "<u>Voting Nominees</u>").[11]  Each Voting Nominee will receive reasonably sufficient numbers of Solicitation Packages, including sufficient beneficial Ballots (the "<u>Beneficial Ballots</u>"), to distribute to the beneficial holders of the Claims for whom such Voting Nominee acts (collectively, the "<u>Beneficial Holders</u>").  In addition, upon written request on or prior to the bar date for certain Administrative Claims as set forth in Section 4.1 of the Plan, with supporting back-up documentation, the Debtors shall reimburse each Voting Nominee's reasonable, actual, and necessary out-of-pocket expenses associated with the distribution of the Solicitation Packages to the Beneficial Holders of such Claims, the tabulation of the Ballots, and the completion of Master Ballots (as defined below).

35.    The Debtors propose that each Voting Nominee be required to (i) forward a Solicitation Package to the Beneficial Holders of the securities entitled to vote on the Plan (the "<u>Voting Securities</u>") for whom such Voting Nominee acts, and (ii) include a return envelope provided by and addressed to the Voting Nominee so that the Beneficial Holders may return the

---

[11]    Unless pre-validated, Beneficial Holders (as defined below) should return their executed Beneficial Ballots (as defined below) to the Voting Nominee in either the pre-addressed envelope provided by the Voting Nominee and/or by any other means proscribed by the Voting Nominee and <u>should</u> <u>not</u> mail their Beneficial Ballots to the Debtors, the Claims and Noticing Agent, or the indenture trustee for their series of notes.  Any Beneficial Ballot not timely received by the Voting Nominee shall not be counted for voting purposes.

To pre-validate a Ballot, the Voting Nominee shall complete Item 1, execute Item 5 of the Beneficial Ballot and indicate on the Beneficial Ballot:  (i) the name of the Voting Nominee, (ii) the amount of securites held by the Voting Nominee for the Beneficial Holder, and (iii) the account number(s) in which such securities are held.  The Beneficial Holder shall then complete Items 2, 3, and 4 of the Beneficial Ballot and return the pre-validated Ballot to the Claims and Noticing Agent by the Voting Deadline.

completed Beneficial Ballots to the Voting Nominee so that they are received in sufficient time to allow the Voting Nominee to receive the Beneficial Ballots and summarize the results on a Master Ballot by such deadline as may be established by the Voting Nominee. The Voting Nominee will then summarize the individual votes of its respective Beneficial Holders from their Beneficial Ballots on the appropriate master ballot (the "Master Ballot"),[12] in substantially the form of the Master Ballot (and instructions attached thereto) annexed hereto as Exhibit E, and will then return the Master Ballot to the Claims and Noticing Agent so that it is actually received prior to the Voting Deadline (as defined below). The Debtors propose that the Voting Nominees be required to retain the Beneficial Ballots for inspection for a period at least one (1) year following the Voting Deadline.

36.     To aid this process, the Debtors propose that the indenture trustees for certain revenue bonds with the Industrial Development Board be required to request on behalf of the Debtors the security position listing for such bonds as of the Record Date from The Depository Trust Company ("DTC".)[13]  After the Record Date, the Debtors shall provide a draft letter, and the indenture trustees for such bonds shall furnish the completed letter to DTC within two (2) business days of receipt of such request, with a copy to the Debtors, as directed in the request. The Debtors shall retain responsibility for making any payments to DTC that may be required in connection with the request.

37.     Bankruptcy Rule 3017(e) specifically contemplates procedures for transmitting the disclosure statement and other solicitation materials to beneficial holders of stocks, bonds, debentures, notes and other securities. The Debtors believe that the process described above recognizes and harmonizes the complexity of the securities industry, the need for administrative

---

[12]     In accordance with customary procedures, Master Ballots will be distributed to the appropriate Voting Nominees after the initial distribution of the Solicitation Packages.

[13]     The Depository Trust Company is the central depository for the vast majority of securities held in "street name" in the United States.

economy, and the rights of Beneficial Holders to have a fair and reasonable opportunity to vote to accept or reject the Plan. Accordingly, the Debtors request that the Court find such procedures adequate and enter an order approving the procedures.

38. The Debtors submit that they have shown good cause for implementing the proposed notice and service procedures described herein.

### C. Approval of Form of Ballots and Establishing Procedures for Voting on the Plan[14]

*(i)   Approval of Form of Ballots*

39. Bankruptcy Rule 3017(d) requires the Debtors to mail a form of ballot to "creditors and equity security holders entitled to vote on the plan." Fed. R. Bankr. P. 3017(d). The Debtors propose to distribute to holders of Claims in the Voting Classes, as described below, one or more Ballots (and instructions attached thereto) in substantially the form annexed hereto as Exhibits F-1 through F-4. The Ballots are based on Official Form No. 14, but have been modified to address the particular aspects of these Chapter 11 Cases and to include certain additional information that the Debtors believe is relevant and appropriate for each Class of Claims entitled to vote to accept or reject the Plan. The appropriate Ballots, along with return envelopes, will be distributed to holders of Claims in the Voting Classes as part of the Solicitation Packages.

*(ii)   Establishing Voting Deadline for Receipt of Ballots*

40. Bankruptcy Rule 3017(c) provides that, on or before approval of a disclosure statement, the Court may fix a time within which the holders of Claims or Interests may accept or reject a plan. The Debtors propose to commence the solicitation period on July 15, 2010, or as soon thereafter as reasonably practicable. Based on the proposed confirmation schedule, the Debtors

---

[14]  With respect to creditors of the Cross-Border Debtors, the procedures described in this Section C are in each case subject to the Cross-Border Voting Protocol as described in Section D below.

request that, to be counted as votes to accept or reject the Plan, all Ballots, including Master Ballots, must be properly executed, completed and delivered to Epiq (a) by first-class mail, in the return envelope provided with each Ballot, (b) by overnight courier or (c) by personal delivery, so that they are <u>actually</u> <u>received</u> by Epiq no later than **4:00 p.m. prevailing Eastern Time on August 23, 2010** (the "<u>Voting Deadline</u>"), which is more than twenty-eight (28) days after the proposed commencement of the solicitation period. The Master Ballots must be properly executed, completed and delivered to Epiq so that they are actually received no later than the Voting Deadline. This solicitation period should be a sufficient period within which creditors can make an informed decision to accept or reject the Plan.

### (iii)  Voting  and Estimation of Claims

41.  Unless otherwise specified in this Motion, the Debtors propose that each holder of a Claim within a Voting Class may vote the face amount (the "<u>Face Amount</u>") of such Claim as of the Record Date.[15] The Face Amount of a Claim means with respect to such Claim:  (a) the amount fixed or estimated in an order of the Bankruptcy Court; (b) for filed claims, the liquidated amount set forth on the Debtors' claims register maintained by Epiq; or (c) for scheduled claims, the amount of the Claim listed in the Schedules as liquidated, undisputed and not contingent. Where possible, the Ballots mailed to holders of Claims within a Voting Class will include the Face Amount of such Claim based on Epiq's claims register of scheduled and filed Claims in these Chapter 11 Cases.

---

[15]  Allowance of Claims as provided herein is for voting purposes only, and does not constitute a determination of the validity of the Claim, or allowance for any other purpose, and the Debtors reserve all of their rights related thereto.

42.     In addition, the Debtors propose that, absent a further order from this Court with respect to any specific Claim, each Claim within the Class of Claims entitled to vote to accept or reject the Plan will be temporarily allowed for voting purposes as follows:

a.     Claims scheduled as contingent, unliquidated, disputed, undetermined in amount, or in a $0.00 amount, for which no Proof of Claim has been filed, are disallowed for voting;

b.     Proofs of Claim filed for $0.00 are disallowed for voting;

c.     If a claim is partially liquidated and partially unliquidated, such claim shall be allowed for voting purposes only in the liquidated amount;

d.     If the Debtors have requested that a Claim be reclassified and/or allowed in a fixed, reduced amount pursuant to an objection to such Claim, by motion or objection prior to August 9, 2010, such holder's Claim shall be counted in the reduced amount requested by the Debtors and/or in the requested category, unless otherwise estimated or allowed by the Court;

e.     If a creditor has requested that a Claim be reclassified and/or allowed in an estimated amount pursuant to a Rule 3018 Motion (as defined below), then in the amount estimated or allowed by the Court or in such other amount in which the Debtors and such creditor mutually agree;

f.     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court;

g.     Timely filed Proofs of Claims that are filed in their entirety as contingent, unliquidated and/or disputed, or are filed for unknown or undetermined amounts, shall vote in the amount of $1.00;

h.     If a Claim is deemed allowed in accordance with the Plan, such Claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth in the Plan.  For the avoidance of doubt, subject to the provisions contained herein for Voting Securities and Master Ballots, holders of Allowed Unsecured Note Claims (including any claims arising from related guarantees) may vote in the Allowed amounts, and in each of the Classes, set forth on Exhibit B6 of the Plan;

i.     Any creditor who has filed or purchased duplicative Claims within the same Voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicative Claims; and

j.     For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, and the Convenience Claim Election, separate Claims held by a single creditor in a particular Class will be aggregated as if such creditor held one Claim against the Debtors in such Class, and the votes related to such Claims will be treated as a single vote to accept or reject the Plan; and

k.     Votes against the Cross-Border Debtors shall be temporarily allowed for voting purposes as provided in the Cross-Border Voting Protocol.

43.     The Debtors further request that creditors with multiple Claims within a particular Class must vote all such Claims in any such Class to either accept or reject the Plan and may not split their vote(s).  Accordingly, an individual Ballot (as opposed to a Master Ballot) that partially rejects and partially accepts the Plan on account of multiple Claims within the same Class will not be counted.

44.     Notwithstanding the foregoing, a holder of Claims in more than one Class under the Plan must execute and submit a separate Ballot for each Class of Claims in which the claimant holds a Claim, including in the case of debt securities, each Beneficial Holder must execute a separate Beneficial Ballot for each block of debt securities that it holds through any Voting Nominee and must return each such Beneficial Ballot to the appropriate Voting Nominee.

45.     The Debtors propose that the following  Ballots will not be counted in determining whether the Plan has been accepted or rejected:

a.     Any Ballot or Master Ballot received after the Voting Deadline except if otherwise determined in the Debtors' sole discretion but after consultation with the Creditors Committee;

b.     Any Ballot or Master Ballot containing a vote that this Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

c.     Any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

d.     Any Ballot that partially accepts and partially rejects the Plan;

e. Any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

f. Any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed or in an amount equal to zero dollars for which no Proof of Claim was timely filed and is not otherwise subject to a motion filed pursuant to Bankruptcy Rule 3018;

g. Any unsigned Ballot or a Ballot without an original signature, except in the Debtors' sole discretion; and

h. Any Ballot transmitted to the Claims and Noticing Agent by facsimile or other electronic means, except in the Debtors' sole discretion.

46. If any creditor wishes to have its Claim allowed for purposes of voting on the Plan in a manner that is inconsistent with the Ballot it receives, or if any party that did not receive a Ballot wishes to have its Claim temporarily allowed for voting purposes only, the Debtors propose that such party must file with the Court, and serve on the Debtors, on or before **August 16, 2010 at 4:00 p.m. prevailing Eastern Time**, a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for purposes of voting on the Plan (a "Rule 3018 Motion").  Any such Rule 3018 Motion must set forth with particularity the amount and classification in which such party seeks to temporarily allow its Claim for voting purposes, along with appropriate evidentiary support therefore.[16]

47. If any Rule 3018 Motion is timely filed, the Ballot in question shall be counted for voting purposes (a) in the amount established in an order entered by the Bankruptcy Court, (b) in the amount agreed to by the Debtors and the moving party, (c) in the absence of a court order or consensual agreement, in the amount equal to the preprinted amount on the Ballot, or if the moving party did not receive a Ballot, in a $0.00 amount.

---

[16] The Debtors reserve the right to file a motion for an order pursuant to Bankruptcy Rule 3018 temporarily allowing any Claim for purposes of voting on the Plan, provided, however, that the Debtors will file such motion on or before August 9, 2010 unless otherwise provided by Court order or agreed to by the Debtors and affected creditor(s).

48.     The Debtors respectfully request that this Court consider all Rule 3018 Motions and any motion by the Debtors under Bankruptcy Rule 3018 regarding the allowed amount of a Claim for voting purposes at the Confirmation Hearing.

*(iv)     Ballot Tabulation Generally*

49.     The Debtors propose that the following voting procedures and standard assumptions be used in tabulating the Ballots:

a.      Any executed Ballot that does not indicate either an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall not be counted.

b.      The method of delivery of Ballots to the Claims and Noticing Agent is at the election and risk of each voting holder, but such delivery will be deemed made only when the original, executed Ballot is actually received by the Claims and Noticing Agent.

c.      If multiple Ballots are received from an individual holder with respect to the same Claim prior to the Voting Deadline, the last dated valid Ballot timely received will be deemed to reflect such holder's intent and shall supersede and revoke any prior dated Ballot with respect to such Claim.

d.      If a holder of Claim(s) casts multiple Ballots on account of the same Claim or Class of Claims, which are dated on the same day, but which are voted inconsistently, such Ballots shall not be counted (except in the case of a supplemental Master Ballot).

e.      The Debtors, in their sole discretion but after consultation with the Creditors Committee, subject to contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, including failure to timely file such Ballot, either before or after the close of voting, and without notice.

f.      After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors.

g.      Subject to any contrary order of the Court, the Debtors reserve the right to reject any and all Ballots or Master Ballots not proper in form;

h.      Subject to any contrary order of the Court, the Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.

i.  Unless otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots or Master Ballots must be cured within such time as the Debtors (or the Court) determine, and delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

j.  Neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots or Master Ballots, nor will any such party incur any liability for failure to provide such notification. Ballots or Master Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will not be counted.

k.  Any holder of a Claim that opts for the Convenience Claim Election on account of such Claim shall make such election on its Ballot. If such a holder fails to make such an election on its Ballot or otherwise does not comply with the applicable instructions on the Ballot with respect to such election, and the Claim is ultimately Allowed, the holder's Allowed Claim will be treated as a Class 6 Claim and receive a Pro Rata Share of New ABH Common Stock and of the Rights in accordance with Section 2.13 of the Plan.

50.     The Debtors further request that the date that is three (3) business days prior to the Confirmation Hearing (expected to be September 14, 2010) be set as the deadline for the Claims and Noticing Agent to file its voting tabulations reflecting the votes cast to accept or reject the Plan. The tabulation report will also detail any defective, irregular or otherwise invalid Ballots that were waived by the Debtors or were not waived and therefore not counted by the Debtors. The tabulation report may also include references to pending Rule 3018 Motions, if appropriate.

*(v)    Tabulation of Master Ballots and Beneficial Ballots*

51.     With respect to the tabulation of Master Ballots and Beneficial Ballots cast by Voting Nominees and Beneficial Holders, the Debtors propose that the amount that will be used to tabulate acceptance or rejection of the Plan will be the principal amount held by such Voting Nominees and Beneficial Holders as of the Record Date (the "Record Amount"); provided, however, that any principal amounts may be adjusted by the Claims and Noticing Agent to reflect the amount

of the Claim actually voted, including any prepetition interest.  The Debtors propose that the following additional rules apply to the tabulation of Master Ballots and Beneficial Ballots cast by Voting Nominees and Beneficial Holders:

a.  Votes cast by Beneficial Holders through a Voting Nominee will be applied against the positions held by such entities in the applicable debt security of the Debtors as of the Record Date, as evidenced by the record and depository listings.  Votes submitted by a Voting Nominee pursuant to a Master Ballot will not be counted in excess of the Record Amount of the applicable securities held by such Voting Nominee on the Record Date.

b.  To the extent that conflicting votes or "overvotes" are submitted by a Voting Nominee, the Claims and Noticing Agent, in good faith, will attempt to reconcile discrepancies with the applicable Voting Nominees.

c.  To the extent that overvotes on a Master Ballot are not reconcilable prior to the preparation of the vote certification, the Claims and Noticing Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot that contained the overvote, but only to the extent of the Voting Nominee's position in the applicable security.

d.  Where a Beneficial Holder holds securities through more than one Voting Nominee, it must execute a separate Ballot for each block of debt securities it owns.  However, such holder must vote all of its Claims in each Class in the same manner, to either accept or reject the Plan. Accordingly, if such holder returns more than one Ballot to more than one Voting Nominee voting different Claims within each Class under the Plan and the Ballots are not voted in the same manner, as reflected on such separate Master Ballots, such votes will not be counted.

\*        \*        \*

52.  Similar voting and tabulation procedures have been approved in other chapter 11 cases in this District.  *See*, *e.g.*, *In re Smurfit-Stone Container* Corporation, Case No. 09-10235 (BLS) (Jan. 29, 2010); *In re Merisant Worldwide, Inc.*, Case No. 09-10059 (PJW) (Oct. 23, 2009); *In re Pliant Corporation*, Case No. 09-10443 (MFW) (Aug. 17, 2009); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Jan. 26, 2009); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Dec. 16, 2008); *In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Dec. 1, 2008); *In re*

*Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Aug. 25, 2008); *In re Inland Fiber Group, LLC*, Case No. 06-10884 (KJC) (Sept. 29, 2006); *In re QUTI Corp., f/k/a Questron Tech., Inc.*, Case No. 02-10319 (PJW) (Aug. 26, 2005); *In re Cone Mills Corp.*, Case No. 03-12944 (MFW) (Aug. 20, 2004); *In re BRAC Group, Inc. (f/k/a Budget Group, Inc.)*, Case No. 02-12152 (CGC) (Feb. 4, 2004). The Debtors submit that such procedures provide for a fair and equitable voting process.

### D. Cross-Border Voting Protocol[17]

53. The Debtors, together with the Canadian Debtors and the Monitor, have negotiated a cross-border voting protocol (the "<u>Cross-Border Voting Protocol</u>"),[18] attached hereto as Exhibit <u>J</u>, establishing efficient and consistent procedures for creditors of the Cross-Border Debtors that are entitled to vote on both the Plan and the CCAA Plan (such creditors, the "<u>Cross-Border Voting Creditors</u>").[19]

54. The Cross-Border Voting Protocol seeks to ensure compliance with the confirmation procedures under these Chapter 11 Cases and the Canadian Proceedings and to minimize the potential for any confusion of creditors of the Cross-Border Debtors in connection with the solicitation process. It provides, in essence, that a Cross-Border Voting Creditors' vote to accept or reject the Plan shall be deemed a vote to accept or reject the CCAA Plan, and conversely, that a vote to accept or reject the CCAA Plan shall be deemed a vote to accept or reject the Plan. In addition, the Monitor will review and temporarily allow Claims of Cross-Border Voting Creditors for voting purposes only (as necessary) pursuant to the CCAA

---

[17] For purposes of this Section D, capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Cross-Border Voting Protocol.

[18] The Debtors reserve the right to modify and amend the Cross-Border Voting Protocol prior to or at the hearing on this Motion, and as necessary to comply with orders of this Court and the Canadian Court.

estimation procedures, provided however, that a Cross-Border Voting Creditor has recourse to either a Canadian Court appointed claims officer under the CCAA procedures or this Court if it disagrees with the Monitor's determination. Finally, the Cross-Border Voting Protocol applies to the voting of all Claims against the Cross-Border Debtors notwithstanding any contrary provisions contained in this Motion and proposed Order. This Court has approved similar cross-border procedures in these cases, including the cross-border claims protocol in the *Order Approving a Cross-Border Claims Reconciliation Protocol*. [Docket No. 1581].

55. The Cross-Border Voting Protocol also clarifies convenience claim treatment and election for Cross-Border Voting Creditors. Specifically, the convenience claim threshold under the CCAA Plan (CDN$6,073) and the U.S. Plan (US$5,000) will account for differences caused by the foreign exchange rate between the U.S. and Canadian dollars as of the petition date assuming a Petition Date conversion rate of CDN$1.00:US$0.892 as provided in the U.S. and Canadian orders establishing bar dates for filing proofs of claim (as more specifically defined in the Cross-Border Voting Protocol, the "Claims Orders"). Under the Cross-Border Voting Protocol, for sake of administrative convenience, for purposes of determining whether a Claim is a Convenience Claim as defined in the U.S. Plan or a Cross-Border Convenience Claim as defined in the CCAA Plan, (a) all eligible Claims will be valued in Canadian dollars using the Petition Date conversion rate set forth in the Claims Orders; (b) will be determined in reference to the dollar thresholds established for such treatment under the CCAA Plan (CDN$6,073); and (c) cash distributions on account of such Claims, once Allowed, will be made in Canadian dollars. A classification or valid election to participate as a Convenience Claim as defined in the

---

19   Holders of claims against the Cross-Border Debtors who are not entitled to vote on the CCAA Plan but who are entitled to vote on the Plan, if any, will receive the Solicitation Package.

U.S. Plan or a Cross-Border Convenience Claim as defined in the CCAA Plan will be binding for purposes of voting and distributions under both Plans.[20]

56.     Under the Cross-Border Voting Protocol, Cross-Border Voting Creditors will receive a single form of combined ballot and proxy (the "Proxy/Ballot") that will satisfy the voting and solicitation procedures of the Canadian Proceedings as well as the Chapter 11 Cases. A vote to accept the Plan by a Cross-Border Voting Creditor shall be deemed to be a vote to accept the CCAA Plan with respect to such Cross-Border Debtor in the CCAA Proceedings, and vice versa. A vote to reject the Plan by a Cross-Border Voting Creditor shall be deemed to be a vote to reject the CCAA Plan with respect to such Cross-Border Debtor in the CCAA Proceedings, and vice versa. A Cross-Border Voting Creditor that submits a Proxy/Ballot for voting at the CCAA creditors' meetings (the "CCAA Creditors' Meetings") will be deemed to submit such Proxy/Ballot as a vote to accept or reject both the Plan and the CCAA Plan and shall be bound by the results of such Proxy/Ballot for purposes of both plans. A form of Proxy/Ballot in substantially final form will be attached as Exhibit 1 to the Cross-Border Voting Protocol.

57.     If the amount of a Cross-Border Voting Creditor's Claim has not been resolved and remains disputed ("Disputed Claims"), it shall be temporarily allowed solely for the purposes of voting in accordance with the following:

a.      If the Disputed Claim has been valued in the notice of disallowance sent by the Monitor at $0, then the Disputed Claim shall be allowed to vote to accept or reject the CCAA Plan or the U.S. Plan in the amount of $1.00.

b.      If the Disputed Claim has been valued in the notice of disallowance sent by the Monitor in any amount other than $0 (the "Valued Amount"), then the Disputed Claim shall be allowed to vote to accept or reject the CCAA Plan or the U.S. Plan in the Valued Amount.

---

[20]   To the extent necessary, the Debtors will amend the Plan prior to or at the Disclosure Statement Hearing to reflect the proposed distribution mechanics and conversion factors contemplated herein.

c.  The holder of a Disputed Claim may either (a) request that the Monitor refer, on an expedited basis, the Disputed Claim to a claims officer appointed under the Canadian Claims Orders to fix the amount of the Disputed Claim for voting purposes only, or (b) file a motion in the U.S. court under Rule 3018 of the U.S. Federal Rules of Bankruptcy Procedure seeking an estimation of the amount of the Disputed Claim for voting purposes only so as to be heard prior to the CCAA Creditors Meetings.  Any determination made by the Canadian claims officer or the U.S. Court pursuant to this paragraph shall be binding in both the CCAA Proceedings and the Chapter 11 Cases and shall be binding for voting purposes only.

58.     Subject to the Monitor's review, Claims scheduled by the Cross-Border Debtors in a liquidated or partially liquidated amount, or Claims filed by Cross-Border Voting Creditors in a liquidated or partially liquidated amount, in both cases only if such claims are not Disputed Claims, shall be entitled to vote in such liquidated or partially liquidated amount (such Claims, collectively, "Partially Liquidated Claims").

59.     For the avoidance of doubt, any timely filed proof of claim against a Cross-Border Debtor or any claim scheduled by a Cross-Border Debtor to which the Canadian Petitioners or the Monitor have not objected or filed a notice of disallowance, and which are not unliquidated and contingent by their nature, shall be allowed to vote in the liquidated face amount of such claim.

60.     Subject to the Monitor's review, any Claims against the Cross-Border Debtors that are filed as contingent, unliquidated, or undetermined on the face of the Claim, or that by their nature are unliquidated or contingent claims, shall vote in the amount of $1.00 (such claims, "Unliquidated Claims") unless the Monitor and Debtors determine, after reasonable review, that such Unliquidated Claim should be allowed for voting purposes in a different amount, in which case the Monitor shall notify the holder of such Unliquidated Claim as to such different amount.  The holder of an Unliquidated Claim may either (a) request that the Monitor refer, on an expedited basis, the Unliquidated Claim to a claims officer appointed under the

Canadian Claims Orders to fix the amount of the Unliquidated Claim for voting purposes only, or (b) file a motion in the U.S. court under Rule 3018 of the U.S. Federal Rules of Bankruptcy Procedure seeking an estimation of the amount of the Unliquidated Claim for voting purposes only so as to be heard prior to the CCAA Creditors Meetings. Any determination made by the Canadian claims officer or the U.S. Court pursuant to this paragraph shall be binding in both the CCAA Proceedings and the Chapter 11 Cases and shall be binding for voting purposes only.

61.     With respect to proceedings for the determination of the value of Disputed Claims and/or Unliquidated Claims for voting purposes, the Monitor has standing to participate in any U.S. proceeding and the Creditors Committee has standing to participate in any CCAA proceeding.

62.     If a Cross-Border Voting Creditor submits a Proxy/Ballot to the Monitor in the CCAA Proceedings and to Epiq in the Chapter 11 Cases, the last timely filed vote will govern. Epiq shall provide to the Monitor a copy of each Proxy/Ballot that it receives in respect of a Cross-Border Debtors at or prior to the commencement of the CCAA Creditors Meetings.

63.     In the event that a Proxy/Ballots is incomplete, such Proxy/Ballot shall be excluded from the vote. The results of the vote conducted at the Creditors' Meeting shall be binding on all Cross-Border Voting Creditors whether or not any particular Cross-Border Voting Creditor is present in person or by proxy while voting at the Creditors' Meeting. Following the vote, the Monitor shall tally the votes and determine whether the CCAA Plan has been accepted by the requisite majority of each Class of Affected Creditors (as defined in the CCAA Plan).

64.     On or before August 26, 2010 or as such later date as may be determined by the Debtors and the Monitor, the Monitor shall provide a certified report to Epiq with respect to the results of the vote with respect to the Cross-Border Debtor, including whether the CCAA Plan has

been accepted by the requisite majorities in respect of claims against the Cross-Border Debtors. Such tabulation report will also detail any defective, irregular or otherwise invalid Ballots that were counted or not counted by the Monitor.

65.    The Cross-Border Voting Protocol does not supersede, amend or modify the Court Cooperation Protocol or the Claims Reconciliation Protocol, both of which remain in place in full and all parties' rights thereunder remain unaffected by this Claims Voting Protocol.

### E.    Rights Offering Participation Procedures and Subscription Forms

66.    The Plan and the CCAA Plan (collectively, the "Plans") provide holders of Claims in Class 6A through 6HH (Unsecured Claims against the Debtors) in the Plan and holders of Affected Unsecured Claims in the CCAA Plan (other than those holders who have, or elect, a Convenience Class Claim (as that term is defined in the Plans)) as of the Record Date (collectively, the "Eligible Holders") with the right to subscribe (the "Subscription Right") for up to US$500 million in the aggregate of convertible unsecured subordinated notes through a rights offering under the Plans pursuant to section 1145 of the Bankruptcy Code (the "Rights Offering").

67.    The procedures set forth below are consistent with, and in furtherance of, the Backstop Commitment Agreement among AbitibiBowater and those certain investors identified therein (collectively, the "Backstop Investors"), filed with the Court on May 24, 2010 [Docket No. 2201], or any higher, better or alternative backstop commitment agreement as may be approved by the Court (the "Backstop Commitment Agreement").  As such, in the event of an alternative transaction, the amount of Convertible Unsecured Subordinated Notes and the terms thereof may be modified, or an alternate security may be issued by the Debtors on the Effective Date.  The Debtors reserve the right to supplement, revise or otherwise modify these procedures prior to the hearing hereon as necessary to reflect any such revised terms of the Backstop Commitment Agreement.

68.     Subscription Rights will be allocated to Eligible Holders as of the Record Date based on an Eligible Holder's proportionate share of Reorganized ABH common stock available to be distributed under the Plans on account of such Eligible Holder's Claim. This allocation will be determined as follows: the Debtors will determine the Reorganized ABH common stock allocable to each Debtor and also will determine the expected proportionate share of such Reorganized ABH common stock expected to be distributed under the Plans to each Eligible Holder on account of its Claim against each Debtor as of the Record Date. The amount of an Eligible Holder's Claim for purposes of distributing Subscription Rights shall be the amount of such Claim that is allowed for voting purposes as set forth in paragraphs 41 and 42 hereof and, with respect to Claims against a Cross-Border Voting Debtor, as set forth in paragraphs 56-59 hereof. The amount of Subscription Rights offered to Eligible Holders per US$1.00 of such Claims is referred to as the "Rights Ratio."

69.     The Debtors seek to conduct the Rights Offering subscription process contemporaneously with the voting solicitation process to allow Eligible Holders sufficient information, in the form of the Solicitation Package (including the Disclosure Statement, the Backstop Commitment Agreement as an exhibit to the Disclosure Statement or, in the case of Cross-Border Debtors and CCAA Debtors, analogous voting materials with respect to the CCAA Plan) and the Subscription Forms to make an informed decision about whether to participate in the Rights Offering and sufficient opportunity to do so, and to ensure that the new capital will be available to the Debtors on the Effective Date.

70.     Epiq will act as the subscription agent for the Rights Offering. However, for simplicity's sake and subject to approval by the Canadian Court, the Subscription Forms and related notices will be distributed to Eligible Holders by Epiq with respect to the Debtors, and the Monitor

with respect to the Cross-Border Debtors and the CCAA Debtors. The Subscription Form and the associated instructions will be translated into French for the benefit of Eligible Holders who may require them or who generally deal with the Debtors in French, and will be distributed as necessary by the Monitor to Eligible Holders with Claims against Cross-Border Debtors and CCAA Debtors.

71.     With respect to Eligible Holders with Claims against the Debtors, the Debtors propose that, when Epiq distributes solicitation materials to holders of Class 6A through Class 6HH Claims, Epiq also will distribute to holders of Class 6A through Class 6HH Claims who are Eligible Holders the applicable forms on which to exercise the Subscription Rights (collectively, the "Subscription Forms").[21]  The Subscription Forms will (i) identify the total number of Subscription Rights that an Eligible Holder is eligible to exercise based on applying the Rights Ratio to the amount of such Eligible Holder's Claims that are allowed for voting and subscription purposes and (ii) include a certification to be completed by each Eligible Holder, that such Eligible Holder (a) understands that the Subscription Rights are not transferable separately from such Eligible Holder's prepetition Claim with respect to which Subscription Rights have been granted and (b) has not entered into and agrees that, prior to the Effective Date, it shall not enter into, any transaction involving a direct or indirect transfer of Subscription Rights in which any other person receives a Subscription Right, except as contemplated by clause (a) above. The Subscription Forms, along with the instructions for completing and mailing the Subscription Form and instructions for paying the applicable purchase price for that portion of the Subscription Rights that an Eligible Holder may acquire (as described immediately below), will be substantially in the form annexed hereto as Exhibits H-1 and H-2.

---

[21]     Exhibit H-1 to this Motion is the Subscription Form that will be sent to Eligible Holders who do not hold notes issued by a Debtor through DTC or CDS.  Exhibit H-2 to this Motion is the Subscription Form that will be sent to Voting Nominees on behalf of Eligible Holders who do hold notes issued by a Debtor through DTC or CDS.

72.     Epiq also will distribute to holders of Class 6A through Class 6HH Claims who are Eligible Holders a notice of the commencement of the Rights Offering, which will, among other things, list key dates for the Plan process and the Rights Offering, and summarize the terms of the proposed Convertible Unsecured Subordinated Notes to be issued under the Plan pursuant to the Rights Offering (the "Notice of Rights Offering" substantially in the form attached hereto as Exhibit G).  The Debtors submit that, along with the Solicitation Package, the form of the Subscription Form, the Notice of Rights Offering and the related instructions are fair and reasonable, and fairly designed to enable an Eligible Holder to determine whether or not to exercise its Subscription Rights to participate in the Rights Offering, and should therefore be approved.

*(i)     Procedures for Distribution of Subscription Forms for Beneficial Holders*

73.     With respect to Eligible Holders who are the beneficial holders of Claims related to securities held through the DTC by a bank or brokerage firm on behalf of Beneficial Holders, or through the Clearing and Depository Services Inc. ("CDS"), the Debtors, through Epiq and the Monitor, will distribute the Subscription Form annexed hereto as Exhibit H-2 in respect of such Claims, in accordance with the customary procedures.  With respect to securities held through DTC, the Subscription Form will be distributed to the bank or brokerage firm holding such securities, which bank or brokerage firm will be required to forward information with respect to the Rights Offering to Beneficial Holders of those securities and to effect any exercise of Subscription Rights on their behalf through the DTC's Automated Subscription Offer Program ("ASOP").  Such firms may use the Subscription Forms provided or such other form as they may customarily use for the purpose of obtaining instructions with respect to a subscription on account of the Beneficial Holder's claim.

74.     With respect to securities held exclusively through CDS, the Debtors propose to distribute Subscription Forms and to effect any exercise of Subscription Rights in accordance with the customary procedures of CDS, and their respective participants.  If Subscription Rights are exercised other than pursuant to the Subscription Form, the Beneficial Holders will be deemed to have made the certification regarding the transferability of Subscription Rights as described in paragraph 72 hereof.

*(ii)     Procedures for the Exercise of Subscription Rights*

75.     To exercise the Subscription Rights each Eligible Holder, other than an Eligible Holder that exercises its Subscription Rights through the DTC or CDS, must: (i) return a duly completed Subscription Form to Epiq and (ii) pay or arrange for payment to an escrow agent engaged by the Debtors for such purpose (the "Escrow Agent"), of such holder's purchase price (the "Subscription Purchase Price") by wire transfer so that the completed Subscription Form and the Subscription Purchase Price are actually received on or before **4:00 p.m. prevailing Eastern Time on August 27, 2010** (the "Rights Offering Expiration Date").  Payment of the Subscription Purchase Price can be made only through wire transfer of U.S. dollars.  Instructions for such transfer will be included with the Subscription Form.

76.     Eligible Holders who are exercising their Subscription Rights through DTC or CDS must (i) send their completed Subscription Form to the relevant bank or brokerage firm (or otherwise follow such firm's directions with respect to exercising their Subscription Rights or instructions to the firm) with enough time for the bank or brokerage firm to effect the subscription through DTC or CDS on or before the Rights Offering Expiration Date and (ii) direct or arrange for payment of the Subscription Purchase Price to be made to the Escrow Agent through DTC's ASOP

system, analogous CDS system, or wire transfer so that such payment is actually received by the Escrow Agent on or before the Rights Offering Expiration Date.

77.     The Debtors have designed the subscription procedures to maximize participation in the Rights Offering.  As described herein, the Subscription Rights allocable to an Eligible Holder are based on (i) the such Eligible Holder's Claim amount, as allowed for voting and subscription purposes, and (ii) the amount of common stock of Reorganized ABH that is available to be distributed to the Debtor against whom the Eligible Holder's Claim is asserted.  In the event that such Claim amount increases or decreases by order of the Court or the Canadian Court, or is modified by the Monitor or a claims officer appointed by the Canadian Court, on or before August 18, 2010 (or such later date as determined by the Debtors in consultation with the Creditors Committee and the Monitor) as a result of either a successful 3018 Motion by such Eligible Holder, the claims reconciliation process, which will continue after the Record Date, or otherwise, then the Subscription Rights allocable to such Eligible Holder may increase or decrease.  Any increase of an Eligible Holder's Subscription Rights will be calculated by applying the Rights Ratio to the incremental amount of the Claim, as allowed for voting and subscription purposes described above, over the amount previously allocated to the Eligible Holder.  Any decrease in the amount of Subscription Rights ultimately available for exercise by any such Eligible Holder will be determined as described below.

78.     Subject to the Debtors' reservations set forth in paragraph 81, in the event of an increase in the number of an Eligible Holder's Subscription Rights, Epiq will deliver such Eligible Holder a supplemental Subscription Form permitting such Eligible Holder to exercise additional incremental Subscription Rights with regard to such increased amount.  The Eligible Holder must exercise its incremental Subscription Rights by completing and delivering the

Supplemental Subscription Form to Epiq and paying the additional Subscription Purchase Price to the Escrow Agent (which may be through DTC or CDS) by September 2, 2010 (the "Subsequent Rights Offering Expiration Date"). The Supplemental Subscription Form will be in form and substance substantially similar to the Subscription Form to be distributed in the initial distribution.

79. Conversely, if an Eligible Holder's Claim amount, as allowed for voting and subscription purposes, decreases by order of the Court or the Canadian Court, or by the Monitor or a claims officer appointed by the Canadian Court, on or before August 18, 2010 (or such later date as determined by the Debtors in consultation with the Creditors Committee and the Monitor), then Epiq will provide a letter notice to the Eligible Holder concerning the revised number of Subscription Rights allocable to such Eligible Holder and, as soon as reasonably practicable following the Subsequent Rights Offering Expiration Date, return to the Eligible Holder any funds received as part of the Subscription Purchase Price that represents withdrawn Subscription Rights.

80. In the event of either an increase or decrease in an Eligible Holder's Subscription Rights, as described above, the Debtors reserve the right to limit incremental Subscription Rights, or refunds, in the event that such an increase or decrease represents a five (5) percent or lesser change in such Eligible Holder's Claim or such change represents an immaterial dollar amount (as determined by the Debtors in their sole discretion).

81. Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Right(s) on or prior to the applicable Rights Offering Expiration Date. If for any reason (i) Epiq does not receive from an Eligible Holder or DTC or CDS a duly completed Subscription Form or equivalent instructions from DTC or CDS and (ii) the Escrow Agent does not receive from the Eligible Holder or DTC or CDS immediately available funds in an amount equal to such holder's Subscription Purchase Price, in each case on or prior to

the Rights Offering Expiration Date (or, if applicable, the Subsequent Rights Offering Expiration Date), such Eligible Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

82. Pending consummation of the Plan and the Rights Offering, the Debtors propose that the Subscription Purchase Price funds be held in a non-interest bearing account to be established by the Debtors at a financial institution engaged by the Debtors as an Escrow Agent solely for this purpose. Accordingly, by this Motion, the Debtors seek authority to engage an Escrow Agent to establish and maintain such an account and perform all necessary actions in connection therewith.

*(iii)      Modifying the Number or Allocation of Subscription Rights*

83. Under certain circumstances, the number of Subscription Rights allocable to an Eligible Holder may be subject to modification or adjustment. As described above, Subscription Rights can be adjusted to reflect adjustments to the Eligible Holder's Claims. Adjustments to Subscription Rights also are contemplated in the Backstop Commitment Agreement: under the Backstop Commitment Agreement, the Debtors may reduce the total amount of Convertible Unsecured Subordinated Notes available for purchase on the Effective Date, or cancel the Rights Offering entirely, if the Debtors determine that such funds from such sale are not necessary to their emergence from bankruptcy. Upon such an event, the Debtors will file a notice with the Court, and deliver a notice to the Monitor and the parties backstopping the Rights Offering, detailing the amount of, and basis for, such reduction. As set forth in the Backstop Commitment Agreement, the size of the Rights Offering may be reduced as a result of, among other things, assets sales conducted by the Debtors that generate significant proceeds such that the full amount of the Rights Offering is not necessary to fund the Debtors' emergence.

84.     The Backstop Commitment Agreement[22] also provides that the number of Convertible Unsecured Subordinated Notes for which an Eligible Holder may subscribe may be decreased by the Debtors to the extent required to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code (the "<u>BCA Cutback</u>").  Any decisions to reduce the Subscription Rights of any or all Eligible Holders pursuant to the BCA Cutback will be made by the Debtors in consultation with the Creditors Committee and the Monitor.  The Debtors, with the assistance of Epiq, will determine whether any such reduction is necessary as soon as practicable following the Subsequent Rights Offering Expiration Date.  Any Convertible Unsecured Subordinated Notes excluded from the Rights Offering on account of a reduction related to the BCA Cutback will be purchased by the Backstop Investors.

85.     Following that analysis, as promptly as practicable following the Subsequent Rights Offering Expiration Date, the Debtors will deliver to each Eligible Holder that has sought to exercise Subscription Rights (or to DTC or CDS with respect to any subscription effected through their respective systems) a written statement specifying the portion of the Subscription Rights that was validly and effectively exercised by such holder.  This written statement will reflect such Eligible Holder's Subscription Rights after taking into account any reduction required.

86.     To the extent of any reduction of an Eligible Holder's Subscription Rights, as soon as reasonably practicable following the Subsequent Rights Offering Expiration Date, the Debtors will direct the Escrow Agent to return to the Eligible Holder the part of the Subscription Purchase Price amount that equals the difference between the price of the Subscription Rights to

---

[22]     Specifically, section 1(l) provides: "The number of Notes for which any Eligible Holder may subscribe in the Rights Offering may be decreased by the Company to the extent required, after consultation with counsel or as required by the U.S. Bankruptcy Court, to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code (the "1145 Cutback").  Any Notes excluded from the Rights Offering due to a Section 1145 Cutback will instead be offered to the Investors for purchase on or before the Effective Date as Unsubscribed Notes."

which the Eligible Holder is entitled and the Subscription Purchase Price previously received by the

Escrow Agent from such Eligible Holder, unless otherwise agreed by the Debtors and such Eligible

Holder.  No interest will be paid on returned amounts.

87.     The Debtors also request the authority to implement procedures for distribution of the Rights Offering Notes as necessary to effectuate the Rights Offering.

88.     The Debtors propose that the Subscription Rights will not be validly exercised if the relevant Subscription Form is:

a.     received after the Rights Offering Expiration Date or, if applicable, the Subsequent Rights Offering Expiration Date, except if otherwise determined in the Debtors' sole discretion but after consultation with the Creditors Committee;

b.     illegible or contains insufficient information to permit the identification of the claimant;

c.     submitted by a person or entity that does not hold a Claim in Class 6 of the Plan or an Affected Unsecured Claim in the CCAA Plan;

d.     unsigned without an original signature, except in the Debtors' sole discretion; or

e.     transmitted to the Claims and Noticing Agent by facsimile or other electronic means, except in the Debtors' sole discretion.

89.     The Debtors also propose that the following procedures and standard assumptions be used in tabulating the Subscription Forms:

a.     The method of delivery of Subscription Forms to the Claims and Noticing Agent is at the election and risk of each voting holder, but such delivery will be deemed made only when the original, executed Subscription Forms is actually received by the Claims and Noticing Agent.

b.     If multiple Subscription Forms are received from an individual holder with respect to the same Claim prior to the applicable Rights Offering Expiration Date, the last dated valid Subscription Form timely received will be deemed to reflect such holder's intent and shall supersede and revoke any prior dated Subscription Form.

c.    The Debtors, in their sole discretion but after consultation with the Creditors Committee, subject to contrary order of the Court, may waive any defect in any Subscription Form at any time, either before or after the close of subscription, and without notice.

d.    After the Rights Offering Expiration Date and, if applicable, the Subsequent Rights Offering Expiration Date, no Subscription Form may be withdrawn without the prior consent of the Debtors.

e.    Subject to any contrary order of the Court, the Debtors reserve the right to reject any and all Subscription Forms not proper in form;

f.    Subject to any contrary order of the Court, the Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Subscription Form.

g.    Neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Subscription Forms, nor will any such party incur any liability for failure to provide such notification.

h.    The Debtors must be able to match each Eligible Holder's completed Subscription Forms with the corresponding Subscription Purchase Price paid by such Eligible Holder.  As such, the Debtors reserve the right to cancel the Subscription Rights of an Eligible Holder if such holder, among other things, submits Subscription Purchase Price funds without reference to the coded Claim provided in the Subscription Form such that the Debtors are unable to reasonably reconcile the Subscription Form with the Subscription Purchase Price or reasonably determine that reconciling such discrepancy or omission would result in an undue administrative burden.

i.    Any funds held by the Debtors on account of Subscription Rights that were not validly and effectively exercised, or that were subject to the BCA Cutback or other reduction, will be returned to the Eligible Holder as promptly as possible following written notice as set forth above, unless otherwise agreed among the Company and such Eligible Holder.

90.    The foregoing procedures will enable the Debtors to efficiently transmit to Eligible Holders the materials necessary to participate in the Rights Offering and afford such parties a fair and reasonable opportunity to participate therein.  The Debtors also request that this Court authorize the Debtors, in consultation with the Creditors Committee and the Monitor, to adopt, as necessary, additional procedures consistent with the provisions of the Rights Offering and to execute

and enter into agreement and take further action as may be necessary or appropriate to effectuate and implement the Rights Offering without further order of this Court.

91.     Courts in this district and others have approved similar procedures pursuant to which a debtor is authorized to conduct a rights offering. *See, e.g., In re Lyondell Chemical Company*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 11, 2010); *In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (PJW) (Bankr. D. Del. Mar. 26, 2010); *In re Merisant Worldwide, Inc.*, Case No. 09-10059 (PJW) (Bankr. D. Del. Oct. 23, 2009); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 20, 2007); *In re Northwest Airlines Corp.*, Case No. 05-17930 (Bankr. S.D.N.Y. Mar. 30, 2007); *In re Owens-Corning*, Case No. 00-3837 (JFK) (Bankr. D. Del. July 10, 2006).

## F.     Confirmation of the Plan

### (i)     *Establishing Notice and Objection Procedures for Confirmation of the Plan*

#### (a)     Confirmation Hearing

92.     In accordance with Bankruptcy Rule 3017(c) and in view of the Debtors' proposed solicitation schedule detailed above, the Debtors request that the Confirmation Hearing be scheduled for **10:00 a.m. prevailing Eastern Time on September 14, 2010,** which is more than 60 days after the anticipated date for the entry of an order approving the Disclosure Statement. The Confirmation Hearing may be continued from time to time by the Court without further notice except for adjournments announced in open court.

93.     Bankruptcy Rule 3017(c) provides:

> On or before approval of the disclosure statement, the court shall fix a time within which the holders of claims and interests may accept or reject the plan and may fix a date for the hearing on confirmation.

Fed. R. Bankr. P. 3017(c).

94. The proposed schedule complies with the Bankruptcy Rules and enables the Debtors to pursue confirmation of the Plan in accordance with the requisite statutory timeframes.

(b) <u>Establishing Procedures for Notice of the Confirmation Hearing</u>

95. Bankruptcy Rules 2002(b) and 2002(d) require notice to all creditors of the time set for filing objections to confirmation of a chapter 11 plan and the hearing to consider confirmation of a chapter 11 plan. In accordance with Bankruptcy Rules 2002 and 3017(d), and as set forth in greater detail above, the Debtors propose to provide to all creditors, simultaneously with the distribution of the Solicitation Packages, a copy of either the (i) Solicitation Package Notice, (ii) Unimpaired Party Notice or (iii) Impaired Non-Voting Notice, as applicable. As indicated above, each of these Notices will set forth: (i) the Court's approval of the Disclosure Statement; (ii) the date of the Confirmation Hearing; and (iii) the deadline and procedures for filing objections to confirmation of the Plan.

(c) <u>Publication Notice</u>

96. Bankruptcy Rule 2002(l) permits the Court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement notice." Fed. R. Bankr. P. 2002(l). As indicated above, upon approval of the Disclosure Statement, the Debtors will serve on the appropriate parties a Solicitation Package Notice, an Unimpaired Party Notice or an Impaired Non-Voting Notice. The Debtors additionally propose to publish a notice (the "<u>Publication Notice</u>"), substantially in the form of Exhibit <u>E</u> annexed hereto, of the time set for filing objections to confirmation of the Plan and the Confirmation Hearing in the national edition of the Wall Street Journal, the New York Times or USA Today not less than twenty-eight (28) calendar days before the Confirmation Hearing. The Debtors will also publish a French translation of the Publication Notice in an appropriate national edition of a French-language publication.

97.     The Debtors believe that the Publication Notice will provide sufficient notice of the Confirmation Hearing to persons who do not otherwise receive notice by mail, and submit that the foregoing procedures will provide adequate notice of the Confirmation Hearing.

(d)     <u>Establishing Procedures for Objecting to the Plan</u>

98.     Bankruptcy Rule 3020(b) provides that objections to confirmation of a proposed plan of reorganization must be filed with the bankruptcy court and be served on the debtor, the trustee, any Creditors Committee appointed under the Bankruptcy Code and on any other entity designated by the bankruptcy court, within a time specified by the Bankruptcy Court. Fed. R. Bankr. P. 3020(b). To comply with the 28-day notice requirement of Bankruptcy Rule 2002(b) and 2002(d) and the solicitation schedule described above, and to permit the Debtors adequate time to respond to objections prior to the Confirmation Hearing, the Debtors propose that August 27, 2010 be fixed by the Court as the last date for filing and serving written objections to confirmation of the Plan. The Debtors further propose that the Court only consider timely filed written objections and that all objections not timely filed and served in accordance with the provisions of the order approving this Motion be deemed waived. Objections to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Interest(s) held by the objector. Any such objection must be filed with the Court and served so that it is actually received by the Court, the following parties (the "<u>Notice Parties</u>") and the other parties requesting notice in these cases on or before August 27, 2010 at 4:00 p.m.:

AbitibiBowater, Inc.
1155 Metcalfe Street, Suite 800
Montreal, Quebec H3B 5H2
Canada
<u>Attention</u>:  Vice President of Legal Affairs

Paul, Weiss, Rifkind, Wharton &
Garrison  LLP
Co-Counsel to the Debtors and Debtors
in   Possession
1285 Avenue of the Americas
New York, New York  10019-6064
<u>Attention</u>:  Kelley A. Cornish, Esq.
            Alice Belisle Eaton, Esq.

Young Conaway Stargatt & Taylor, LLP
Co-Counsel to the Debtors and Debtors in
Possession
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19801
<u>Attention</u>:  Pauline K. Morgan, Esq.
            Sean T. Greecher, Esq.

Paul, Hastings, Janofsky & Walker LLP
Co-Counsel to the Official Creditors'
Committee
75 East 55th Street
New York, New York  10022
<u>Attention</u>:  Luc Despins, Esq.
            Robert E. Winter, Esq.

Bayard, P.A.
Co-Counsel to the Official Creditors
Committee
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19899
<u>Attention</u>:  Neil B. Glassman, Esq.
            Jamie L. Edmonson, Esq.

Office of the United States Trustee
    for the District of Delaware
J. Caleb Boggs Federal Building
844 King Street, Lockbox 35
Wilmington, DE 19801
<u>Attention</u>:  David M. Klauder, Esq.

Allen & Overy LLP
Counsel to the Monitor
1221 Avenue of the Americas
New York, New York 10020
<u>Attention</u>:  Rowena White, Esq.

99.     The Debtors further propose that they, or any other party supporting the Plan, be afforded an opportunity to file a reply to any objection to confirmation of the Plan no later than three (3) business days prior to the Confirmation Hearing (including any adjournments thereof).

(ii)     *Fixing of Cure Amounts and Deadline to Object Thereto*

100.     Pursuant to the Plan, certain executory contracts and unexpired leases will be assumed as of, and subject to, the Effective Date of the Plan.  The Plan and section 365(b) of the Bankruptcy Code require the Debtors to cure or provide adequate assurance that the Debtors will promptly cure existing defaults under such executory contracts and unexpired leases.

101.     Establishing the amounts to be paid in satisfaction of all such cure obligations is an important element of Plan confirmation and feasibility.  To aid in the implementation of the Plan, the Debtors seek to establish a procedure for determining cure amounts ("<u>Cure Amounts</u>") and a

deadline for objections relating to contracts and leases that may be assumed pursuant to the Plan. To facilitate a prompt resolution of cure disputes and objections relating to the assumption of these agreements, the Debtors propose the following deadlines and procedures:[23]

a. The Debtors will cause the *Notice of (I) Possible Assumption of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto* (the "Cure Notice"), in a form substantially similar to the form attached hereto as Exhibit K, to be served on the non-debtor parties to all executory contracts and unexpired leases to be assumed as part of the Plan (the "Subject Contracts") no less than ten (10) days prior to the Voting Deadline. Among other things, the Cure Notice shall set forth the amount which the Debtors believe must be paid in order to cure all monetary defaults under each of the Subject Contracts;

b. The non-debtor parties to the Subject Contracts shall have eighteen (18) calendar days after service of the Cure Notice (the "Cure Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object (a "Cure Objection") to the (a) Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (b) proposed assumption of the Subject Contracts under the Plan; provided, however, that if the Debtors amend the Cure Notice or any related pleading that lists the Subject Contracts to add a contract or lease or to reduce the cure amount thereof, except where such reduction was based upon the mutual agreement of the parties, the non-debtor party thereto shall have an additional ten (10) calendar days after service of such amendment to object thereto or to propose an alternative cure amount(s);

c. Any party objecting to the Cure Amount(s), whether or not such party previously has filed a Proof of Claim with respect to amounts due under the applicable Subject Contract(s), or objecting to the potential assumption of such Subject Contract(s), shall be required to file and serve a Cure Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Subject Contract(s) and/or any and all objections to the potential assumption of such Subject Contract(s), together with all documentation supporting such cure obligation or objection, upon each of the Notice Parties so that the Cure Objection is actually received by them no later than 4:00 p.m. on the Cure Objection Deadline. If a Cure Objection is timely filed and the parties are unable to settle such Cure Objection, the Bankruptcy Court shall determine the amount of any disputed Cure Amount(s) or objection to assumption at the Confirmation Hearing. The Debtors may, in their sole discretion, extend the

---

[23] Receipt of a Cure Notice (as defined below) does not constitute a determination by the Debtors to assume any executory contract or unexpired lease; the Debtors may still decide not to assume any executory contract or unexpired lease through the Plan or otherwise.

Cure Objection Deadline without further notice, but are not obligated to do so; and

d. In the event that no Cure Objection is timely filed with respect to a Subject Contract, the counterparty to such Subject Contract shall be deemed to have consented to the assumption of the Subject Contract and the Cure Amount proposed by the Debtors and shall be forever enjoined and barred from seeking any additional amount(s) on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates or the Reorganized Debtors. In addition, if no timely Cure Objection is filed with respect to a Subject Contract, upon the Effective Date of the Plan, the Reorganized Debtors and the counterparty to such Subject Contract shall enjoy all of the rights and benefits under the Subject Contract without the necessity of obtaining any party's written consent to the Debtors' assumption of the Subject Contract, and such counterparty shall be deemed to have waived any right to object, consent, condition or otherwise restrict the Debtors' assumption of the Subject Contract.

102. The inclusion of a Subject Contract in the Cure Notice is without prejudice to the Debtors' right to modify their election to assume or to reject such Subject Contract prior to the entry of a final, non-appealable order (which order may be the order confirming the Plan) deeming any such Subject Contract assumed or rejected, and inclusion in the Cure Notice is not a final determination that any Subject Contract will, in fact, be assumed.

103. The Debtors submit that the foregoing procedures will help facilitate the resolution of any issues concerning Cure Amounts and/or objections regarding whether a Subject Contract satisfies the requirements for assumption, while adequately protecting the rights of the counterparties to the Subject Contracts, and therefore request approval of such procedures.

## **NO PRIOR REQUEST**

104.     No previous motion for the relief requested herein has been made to this or any other court.

## **NOTICE**

105.     Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel:  (i) the Office of the United States Trustee; (ii) counsel to the Creditors Committee; (iii) counsel to the agents for the Debtors' prepetition secured bank facilities; (iv) counsel to the agent for the Debtors' postpetition lenders; (v) counsel to the agent for the Debtors' securitization facility; (vi) counsel to the parties to the Backstop Agreement; (vii) the Monitor appointed in the Canadian Proceedings; and (viii) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Reminder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form annexed hereto, (i) granting the relief requested in this Motion, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: June 22, 2010          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware


_____*/s/ Sean T. Greecher*_____

Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Kelley A. Cornish
Alice Belisle Eaton
Claudia Tobler
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Counsel for the Debtors and Debtors in Possession