| | |
|---|---|
| In re:            ) | Chapter 11 |
| ) | Case No. 09-11296 (KJC) |
| ABITBIBOWATER INC.,   ) | |
| ) | Jointly Administered |
| Debtors.      ) | |
| ) | **Hearing Date: August 4, 2010 at 1:00 p.m. EST** |
| ) | **Objection Deadline: July 28, 2010 by 4:00 p.m. EST** |

**MOTION OF CERTAIN EQUITY SECURITY HOLDERS**
**FOR THE APPOINTMENT OF**
**AN EQUITY SECURITY HOLDERS COMMITTEE**

Certain equity shareholders (the "Shareholders[1]") of the above-captioned debtors (the "Debtors"), by and through their undersigned counsel, respectfully submit this Motion, pursuant to Section 1102(a)(2) of Title 11 of the United States Code (the "Bankruptcy Code"), requesting an Order appointing an Official Committee of Equity Security Holders in the Debtors' Chapter 11 cases (an "Official Equity Committee"). In support of this Motion, the Shareholders state as follows:

**PRELIMINARY STATEMENT**

1. When the Debtors first filed for bankruptcy protection in early Spring of 2009, the company was struggling with one of the worst recessions in U.S. history. Like hundreds of other chapter 11 debtors that come before this Court, the downturn in the global economy that began in 2008 significantly depressed demand and consequently pricing for the Debtors' primary products.

2. However, much has changed since the commencement of these bankruptcy proceedings. These proceedings have afforded Debtors the opportunity to reduce substantial

---

[1] A list of the Shareholders, along with the amount of shares held, is attached hereto as Exhibit "A".

claim exposure, eliminate unprofitable contracts and renegotiate a more favorable debt structure. In addition, in more recent filings with this Court, the Debtors reported that under Chapter 11 bankruptcy protection they have "made significant progress stabilizing their operations," "reduced operating costs by idling or closing certain unprofitable operations" and "made substantial progress in formulating and negotiating viable plans of reorganization." See Debtors' Third Motion Extending Exclusivity [D.I. , pp. 7-8].

3.      In addition, the economics of the Debtors' businesses have substantially improved. In particular, global demand and pricing for the Debtors' products have recovered markedly. The price of lumber on April 16, 2009, was $180 USD per 1,000 board feet and traded at $209 per 1,000 board feet on July 15, 2010, up 13.8%. The price of pulp in the US was $577 per metric ton in mid 2009 and was sold at $1,020 per metric ton on July 13, 2010, up 43.4%. Newsprint sold at $445.89 on September 1, 2009, and at $593.06 on July 13, 2010, up 24.8%.[2]

4.      These improvements are beginning to be reflected in the Debtors' financial results. For example, according to Debtors' Monthly Operating Report, Form No. MOR-7, for month ending April 30, 2010 [D.I. No. 2267], Debtors list net income of $449,563 USD, operating income of $4,934,460 USD and gross profit of $7,265,374 USD. Note that these results were achieved despite the Debtors incurring restructuring costs amounting to $21,792,806 for the period January 1, 2010, to May 31, 2010[3].

5.      An initial valuation of the Debtors' businesses prepared by professional advisors consulted by the Shareholders show a Fair Market Value of $4.3 billion and a liquidation value of $9.9 billion.

---

[2] Sources: FOEX Indexes Limited at www.PaperAge.com/foex/pulp, www.PaperAge.com/foex/newsprint, and www.PaperAge.com/foex/paper.
[3] See Debtors' Monthly Operating Report, Form MOR-4, [D.I. 2538], filed with the Court on June 30, 2010.

WM1A 955355v3 07/16/10

6. Pursuant to the Debtors' proposed plan of reorganization, equity will be wiped out, considered impaired, and prevented from voting on plan confirmation. According to the Debtors' valuations, equity holders are "out of the money" and therefore not viable stakeholders in these proceedings. However, the Debtors' proposed plan does not reflect the current and future economic realities surrounding this company. As indicated above, there is compelling evidence, including the Debtors own financial forecasts, to suggest that the Debtors are not "hopelessly insolvent". In fact, the improvements in the Debtors' financial position and future prospects provide opportunities for equity holders to realize significant value in these cases.

7. Despite the improving economics, the equity holders are not meaningfully represented in this bankruptcy process. The Debtors' directors certainly do not provide such representation. During bankruptcy proceedings such as these, the predominant fiduciary duty of the directors is to the creditors rather than to the equity holders.

8. The directors are not financially motivated to represent the shareholders because they will see significant reward for the confirmation of the plan of reorganization regardless of the outcome for current equity holders. Under the Debtors' proposed plan of reorganization, on a fully diluted basis the directors would own 8.5% of the replacement shares, which in turn will almost certainly enjoy a materially higher price shortly after plan confirmation than the current share price. The directors and named executive officers as a group (18 persons) cumulatively own just 2.1% percent of the existing shares, with a current market value of $104,550[4] Currently, several of the Shareholders bringing this motion individually own more shares than this entire group.

---

[4] Source: Debtors' Form 10-K10 for year ending December 31, 2009 and issued April 30, 2010, at p. 52, Item 12.

WM1A 955355v3 07/16/10

9.     The creditors, inclusive of Fairfax (which currently owns no shares), are not motivated to represent the shareholders either. Far from it; as in most bankruptcy proceedings, the creditors are motivated to dilute equity as much as possible.

10.     The Debtors concede that these cases present an extraordinarily complex bankruptcy proceeding. This complexity is due in part to Debtors' size, cross-border insolvency proceedings, numerous business lines, and finally several national and international subsidiaries. The complexity and breadth of these proceedings further support the appointment of an Official Equity Committee.

11.     The Debtors' shares are widely held and, until the Debtors announced their intention to wipe out the existing shares, there was substantial trading volume.

12.     Principles of fundamental fairness dictate that equity holders be afforded adequate representation to protect and advance their interests at this critical stage of the Chapter 11 process. In particular, the equity holders should have the opportunity to meaningfully participate in developing a comprehensive strategic plan, financial forecast and business plan. The Debtors' recent filings confirm that these planning processes are underway, yet they are being undertaken without any representation of the Shareholders submitting this Motion, who own approximately 27% of the Debtors' stock.

13.     The Debtors' proposal of wiping out all equity shares would be unjust and contrary to the equitable jurisdiction of this Court. This consideration more than justifies the incremental costs associated with the appointment of an Official Equity Committee. In any event such incremental costs are likely to be *de minimis* relative to the overall restructuring costs already incurred. Further, such incremental costs may represent a small price to pay for preempting potential litigation by unrepresented shareholders..

4

14.     Without an Official Equity Committee, the Shareholders will go unrepresented and lack a voice during these critical negotiations. The Creditors' Committee, the Debtors and the lenders all have a prevailing interest in confirming a plan of reorganization, even if doing so is at the expense of equity holders. As discussed in greater detail below, the facts underlying this case strongly support the formation of an Official Equity Committee so that all stakeholders may participate fully and fairly in these proceedings.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter constitutes a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND

### I.     Case Background

16.     On April 16, 2009 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Debtors operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Pursuant to Debtors' voluntary petitions filed with this Court, the company lists assets valued at $9.94 billion against liabilities of $8.78 billion.

17.     On April 17, 2009, certain of the Debtors (the "Canadian Debtors"), along with non-debtor subsidiaries, sought protection from creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Proceeding" and the "Canadian Court," respectively).

18.     On April 28, 2009, the United States Trustee for the District of Delaware (the

"U.S. Trustee") appointed a statutory committee of unsecured creditors (the "Committee"), pursuant to 11 U.S.C. sec. 1102 of the Bankruptcy Code.

19.     By letter dated March 11, 2010, a true and correct copy of which is attached hereto as Exhibit "B," a representative of the Shareholders made a request of the U.S. Trustee to appoint an Official Equity Committee. By letter dated April 26, 2010, a true and correct copy of which is attached hereto as Exhibit "C," the U.S. Trustee declined the Shareholders' request. On April 27, 2010, this Court conducted a status conference on the Shareholders' request for the formation of an Official Equity Committee. Since the April 27th hearing, the Shareholders have retained Fox Rothschild LLP as legal counsel, and NHB Advisors as financial advisor to assist in the preparation of this Motion.

20.     On April 14, 2010, Debtors filed their Third Motion for Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances (the "Third Exclusivity Motion"). Pursuant to this Court's order dated May 12, 2010 granting the Third Exclusivity Motion (the "Order"), Debtors' exclusivity for filing a plan of reorganization was extended through and including July 21, 2010. Further, the Order extended exclusivity for solicitation of acceptance of a plan through and including September 9, 2010.

21.     On May 24, 2010, Debtors filed their First Amended Joint Plan of Reorganization (the "Plan") and Disclosure Statement for First Amended Plan (the "Disclosure Statement") [D.I. 2199 and 2200]. A hearing to consider the Disclosure Statement is scheduled to go forward on July 30, 2010. On June 29, 2010, Aurelius Capital Management, LP ("Aurelius") filed an Objection to Disclosure Statement (the "Aurelius Objection") [D.I. 2526].

22.     The Shareholders filed a Joinder (the "Joinder") [D.I. 2558] to the Aurelius Objection as the Shareholders share many of the concerns raised by Aurelius. For example,

6

Aurelius objects to the Debtors' Disclosure Statement as it lacks a liquidation analysis for each

Debtor, nor does it include a valuation of the reorganized Debtors. See Objection, at *3.

Aurelius also objects to the Disclosure Statement's lack of explanation of how certain

intercompany claims are being treated under Debtors' proposed Plan. Id.

## II.    Debtors' Solvency

23.    According to Debtors' Declaration in Support of Chapter 11 Petitions and Various

First Day Applications and Motions (the "Declaration") [D.I. 20], Debtors are the "world's

largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper

manufacturers in the world." See Declaration, at *5. The company is also one of the world's

largest recyclers of newspapers and magazines. Id. Further, 100% of the Debtors' woodlands

are third-party certified to "sustainable forest management standards." Id.

24.    Prior to the Petition Date, Debtors owned or operated 24 pulp and paper facilities

and 30 wood products facilities throughout the United States, Canada, the United Kingdom and

South Korea. As of the Petition Date, the company employed approximately 15,900 people.

Debtors achieved $6.8 billion in sales in 2008.

25.    Going in to bankruptcy, David J. Paterson, Debtors' President and CEO, issued a

press release stating that the company has an "enviable roster of customers ... and valuable

assets that are generating positive operating cash flow, so our long-term prospects are good."

Indeed, the Debtors' prospects are good. On March 24, 2010, the Pulp and Paper Products

Council (the "PPPC") reported that total North American newsprint demand increased year-over-

year by 1.5% to 447,000 tonnes. The PPPC further reported a 5.5% year-over-year increase in

newsprint in February 2010. Similar media reports indicate Canadian and U.S. newsprint

shipments increased year-over-year by 4.4% and 7.2%, respectively.

7

26.     There is no disputing that the paper industry has declined over the years. The same reports that show an increase in newsprint shipments also show substantial decline in U.S. consumption in daily newspapers, a major customer base of the Debtors. However, there is also no disputing that Debtors' position has improved tremendously within the last year.

27.     Debtors' filed bankruptcy, in part, to consolidate debt and achieve a balance sheet restructuring. In a report filed with Reuters on May 25, 2010, Debtors' CEO stated that when the Debtors merged "the Canadian and U.S. companies, we were never able to consolidate the debt structure at parent level." By filing for bankruptcy, the Debtor hopes to "have only one debt-issuing entity [and] ... be able to move cash around the system as needed." Similar reports suggest that Debtors expect a loss for 2010, followed by a net profit of $273 million in 2011. Through a reduction in interest payments and increased demand, Debtors project net profits to rise to $423 million by 2014.

### A.     Expert Report of NHB Advisors

28.     In light of Debtors' projections to earn considerable profits beginning in 2011, as well as the many questions stemming from Debtors' various financial reports, in May the Shareholders retained NHB Advisors to render an expert opinion regarding the fair market value of Debtors' assets (the "NHB Report", a copy of which is attached hereto as Exhibit "D"). As discussed in greater detail below, NHB concludes that Debtors have a fair market value of $4.9 billion and a liquidation value of $9.9 billion. This clearly indicates value for the current shareholders. Equally important, NHB raises a common concern in these bankruptcy proceedings, namely that it is impossible to determine the amount of claims and value that should be attributed to each individual Debtor. Even so, NHB concludes that there may be some recovery to Debtors' shareholders. See NHB Report at pp. 35-36. This lack of transparency

8

means there could be even greater recovery for the shareholders than represented by NHB's current estimate of the Fair Market Value.

## **LEGAL ARGUMENT**

29.     Section 1102(a)(2) of the Bankruptcy Code authorizes this Court to appoint a committee to these bankruptcy proceedings.  This section of the Bankruptcy Code provides:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure <u>adequate representation</u> of creditors or of equity security holders.  The United States Trustee shall appoint any such committee.  (Emphasis added).

30.     What constitutes "adequate representation" is determined on a case-by-case basis. <u>In re Enron Corp.</u>, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).  Courts consider a variety of factors, including:

   (i)      whether the interests of shareholders are otherwise already adequately represented;

   (ii)     whether the debtor appears to be hopelessly insolvent;

   (iii)    the complexity of the case;

   (iv)    whether the stock is widely held and actively traded;

   (v)     the timing of the request; and

   (vi)    whether the cost of the additional committee significantly outweighs the concerns for adequate representation.

<u>See, e.g.</u>, <u>In re Kalvar Microfilm</u>, 195 B.R. 599, 600 (Bankr. D. Del. 1996); <u>In re Williams Commc'ns Group, Inc.</u>, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); <u>Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 68 B.R. 155, 159-60 (S.D.N.Y. 1986), <u>appeal dismissed</u> 824 F.2d 176 (2d Cir. 1987); <u>In re Exide Techs.</u>, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of debtor and official committee of unsecured

creditors); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing equity committee over objections of United States Trustee and official committee of unsecured creditors even while debtor had negative book equity of several hundred million dollars); In re Beker Indus. Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity committee appointed). Each of these factors favors the establishment of an Official Equity Committee in these cases.

31.     Other courts deciding whether to appoint an equity committee have considered (i) whether there is a substantial likelihood that shareholders will receive a meaningful distribution under the absolute priority rule; and (ii) whether shareholders are unable to represent their interests without an official committee. In re Spansion, 421 B.R. at 156 citing Exide Tech. v. State of Wisconsin Inv. Bd., 2002 WL 32332000, *1 (D. Del. Dec. 23, 2002). Appointment of an additional committee is considered "extraordinary relief" and its use is the exception, not the rule. Spansion, 421 B.R. at 156, citing Dana Corp., 344 B.R. at 38.

32.     The shareholders, as the moving party, carry the burden of proving that an additional committee is needed in order to receive adequate representation. In re Spansion, 421 B.R. 151, 156 (Bankr. D.Del. 2009), citing Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.), 1996 WL 534853, *4 (D.Del. Sept. 17, 1996). Whether to appoint an equity committee under § 1102 falls within the discretion of the court, based upon the facts of the case. In re Spansion, 421 at 156, citing In re Dana Corp., 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006).

33.     The Court's determination of the need for an additional committee is unfettered and de novo, without regard to any prior determination of the U.S. Trustee. In re Enron Corp., 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) (court reviewed U.S. Trustee appointment decisions de novo), aff'd, 2003 U.S. Dist. LEXIS 18149 (S.D.N.Y. Oct. 9, 2003); In re Texaco, Inc., 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987) (noting that whether or not request for additional

10

committee is made to the U.S. Trustee, the court must exercise its own judgment); In re McLean Indus., 70 B.R. 852, 856-57 (Bankr. S.D.N.Y. 1987) (an abuse of discretion standard does not apply with respect to U.S. Trustee's initial exercise of discretion); see also In re Value Merchants, 202 B.R. 280, 284 (E.D. Wis. 1996) (reviewing U.S. Trustee decision *de novo*); In re Dow Corning Corp., 194 B.R. 121, 130-31 (Bankr. E.D. Mich. 1996) (court has *de novo* authority to alter an existing committee), rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997); In re First RepublicBank Corp., 95 B.R. 58, 59 (Bankr. N.D. Tex. 1998) (applying *de novo* standard of review to determine adequacy of representation).

34.     Congress recognized the vulnerability of public investors in Chapter 11 cases when it provided for the ability to seek appointment of additional committees of shareholders in Bankruptcy Code Section 1102(a)(2).[5]  11 U.S.C. § 1102(a)(2).  The legislative history of Section 1102 indicates that Congress understood the important purpose an equity committee could serve "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors."  S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5796.

35.     As a result, official committees of equity security holders have been appointed in many recent large and complex Chapter 11 cases, including many in this District and the Southern District of New York. See, e.g., In re Cone Mills Corp., Case No. 03-12944 (Bankr. D. Del.); In re Seitel, Inc., Case No. 03-12227 (Bankr. D. Del.); In re Peregrine Sys., Inc., 02-12740 (Bankr. D. Del.); In re Exide Techs., Case No. 02-11125 (Bankr. D. Del.); *In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del.); In re Oneida Ltd., Case No. 06-10489 (Bankr. S.D.N.Y.); In

---

[5] In enacting the Bankruptcy Code of 1978, Congress viewed reorganization proceedings as "literally the last clear chance toconserve for [shareholders] values that corporate financial stress or insolvency have placed in jeopardy."  S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5796.

re Calpine Corporation, Inc., Case No. 05-60200 (Bankr. S.D.N.Y.); In re Delphi Corporation, Case No. 05-44481 (Bankr. S.D.N.Y.); In re Loral Space & Commc'ns Ltd., Case No. 03-41710 (Bankr. S.D.N.Y.); In re Solutia Inc., Case No. 03-17949 (Bankr. S.D.N.Y.); In re Impath Inc., Case No. 03-16113 (Bankr. S.D.N.Y.); see also In re Interstate Bakeries Corp., Case No. 04-45814 (Bankr. W.D. Mo.); In re Gadzooks, Inc., 04-31486 (Bankr. N.D. Tex.); and In re Mirant Corp., 03-46590 (Bankr. N.D. Tex.).

### III.    The Motion Should Be Granted Because The Debtors Are Not "Hopelessly Insolvent"

36.    The applicable legal standard on a motion requesting appointment of an official committee of equity holders is not whether the Debtors are insolvent, but rather whether the Debtors "appear to be hopelessly insolvent." Williams Commc'ns, 281 B.R. at 220; In re Emons Indus., Inc., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985); see also In re Exide Techs., 2002 U.S. Dist. LEXIS 27210, at *4 (D. Del. 2002) (if a debtor does not appear to be hopelessly insolvent, court should then consider other relevant factors to determine whether shareholders are adequately represented). Thus, an official equity committee is appropriate even if the Debtors are slightly insolvent. See Wang Labs., 149 B.R. at 3 (court appointed official equity committee, even though the company was operating "at a loss," because the debtor was "not *hopelessly* insolvent" (emphasis in original)).

37.    "[T]here is no clear litmus test" for determining whether a debtor is insolvent. Williams Commc'ns, 281 B.R. at 220. Instead, the determination is a "practical conclusion, based on a confluence of factors." Id. at 221.

38.    This Court should have little trouble reaching the conclusion that the Debtors do not "appear to be hopelessly insolvent." Although the Shareholders cannot afford to finance a comprehensive valuation of the Debtors' businesses, the Shareholders do believe they have

12

provided the Court with sufficient evidence to show that Debtors are anything but "hopelessly insolvent."

### A.    Debtors' Companies Have Considerable Value

39.     According to the NHB Report, Debtors have a fair market value of $4.3 billion and a liquidation value of $9.9 billion. See NHB Report at pp. 35-36. When other sources of value are considered, NHB places Debtors' fair market value at $4.9 billion. Id, at 35. These additional sources of value arise in part from (i) Debtors' $500 million litigation against various Canadian government entities; (ii) discrepancies in the value of Debtors' inventory; and, (iii) union wage concessions. Id. at 31.

40.     Pursuant to § 2.2 of the Plan, "[t]he Plan does not provide for substantive consolidation of the Estates." Debtors therefore have elected not to combine assets and liabilities in to a single pool to pay creditors. On page 22 of the Disclosure Statement (attached hereto as Exhibit "E"), Debtors list claims on a debtor-by-debtor basis that total in the aggregate $7.4 billion.[6] However, a comparison of the claim value attributed to individual debtors in the Disclosure Statement is inconsistent with the Debtors' financial information provided in the Debtors' Monthly Operating Reports (the "MORs").

41.     For example, on page 22 of the Disclosure Statement, Debtors list the total amount of unsecured claims against Debtor AbitibiBowater, Inc. at $466.22 million. Yet pursuant to the Monthly Operating Report-6 ("MOR-6") for month ending April 30, 2010, Debtors list AbitibiBowater, Inc. as having "total assets" of $3.545 billion, of which $3.155 arises from "Investment in Subsidiaries." A copy of MOR-6 is attached hereto as Exhibit "F".

42.     Per MOR-6, Debtors recognize $3.155 billion in value for AbitibiBowater, Inc., through investments in subsidiaries, yet this amount does not appear reconciled against the $466

13

million in claims against this same Debtor per the Disclosure Statement. According to page 36 of the NHB Report, NHB was "unable ... to determine how claims related to each individual Debtor and how the value will be applied to each Debtor to determine recovery of each claim class." NHB further concluded that although it was unable to quantify Equity Value for the Debtors, NHB found that "there could be some recovery to Class of Common Stock Interests for certain individual Debtors." Id. at p. 36.

43. Again, going back to MOR-6, if AbitibiBowater, Inc. values "Investments in Subsidiaries" at $3.155 billion, and the same non-consolidated Debtor calculates total claims at $466 million (per the Disclosure Statement), the resulting value in AbitibiBowater, Inc. totals approximately $2,689 billion. More important, on the last page of MOR-6, Debtors list the total amount of "Investment in Subsidiaries" as $14.891 billion, which is a considerable sum given that claims against the Debtors total $7.4 billion. See MOR-6 attached hereto as Exhibit "F".

44. Equally compelling is what the NHB Report does not tell the Court, or more importantly, cannot tell the Court, due to the lack of transparency by the Debtors. In reviewing Debtors' books and records, NHB was <u>unable to allocate value to each individual Debtor</u> in order to assess the Plan of Reorganization's proposed recovery to creditors. Id. at p. 33. The Aurelius noteholders raise similar objections to the lack of transparency in their Objection to the Disclosure Statement. See Objection at p. 25 (Disclosure Statement inadequate, in part, because it is "impossible for a creditor to even understand what it is the Debtors intend to do with the Intercompany Claims, never mind assess the impact of treatment of such Intercompany Claims on their recovery.")

---

[6] See also NHB Report at p. 38 listing a "Total Asserted Value" of Debtors' claims at 7.389 billion.

WM1A 955355v3 07/16/10

45.     Debtors' failure to assess value and claims on a individualized basis is problematic for several reasons[7]. First, Debtors's use of a "blanket allocation of claims" risks the elimination of value for a particular Debtor which may provide recovery to equity holders. See NHB Report at p. 34. Second, according to Debtors' April 30, 2010 Monthly Operating Report (the "April MOR"), Debtors value investments in subsidiaries at $14.8 billion, yet such value is not provided for in Debtors' Plan. Id. at p. 34. Finally, from the information made available so far, even Debtors appear not to know the amount of claims that should be allocated against each individual Debtor. Id. at p. 35.

## IV.     There Exists Serious Reason to Doubt That The Shareholders Are Adequately Represented

46.     Although Debtors' directors and management have a fiduciary responsibility to look after Shareholders' interests, the commencement of a bankruptcy case saddles the debtor with additional fiduciary duties to its creditors. In re Trans World Airlines, Inc., 261 B.R. 103, 114 (Bankr. D. Del. 2001). Thus, while unsecured creditors have a statutory fiduciary – the Creditors' Committee – to advocate exclusively for their interests, public shareholders currently do not have such a representative.

47.     In addition, conflicting concerns often arise which make it difficult for a debtor's directors and management to follow the best course for non-insider public shareholders. Among other things, as noted in commentary:

> Another conflict can arise from the desire of directors and management to retain their jobs and maximize their compensation. If a proposed plan contemplates the distribution of the majority of the equity in the debtor to creditors, the debtor's directors and management will realize that, upon implementation of the plan, their employment will be controlled by these creditors (who, by virtue of the newly obtained equity majority, will control the election of directors and, in turn, the hiring of management by such directors). This realization may lead to favoritism

---

[7] Aside from the reasons above, section 2.2 of the Plan states that Debtors are not substantively consolidated. This fact, by itself, shows the flaws in Debtors' valuation methodology.

to creditors in the plan formulation process, in an effort to stay in the creditors' good graces.

See, Thomas H. Coleman & David E. Woodruff, Looking Out for Shareholders: the Role of the Equity Committee in Chapter 11 Reorganization Cases of Large, Publicly Held Companies, 68 Am. Bankr. L.J. 295, 301 (Summer 1994).

48.     Pursuant to § 6.8 of the Plan, "Reorganized Debtors shall reserve 8.5% on a fully diluted basis of the New ABH Common Stock for issuance pursuant to such management and director compensation and incentive programs." Pursuant to the Plan, Debtors' management stand to make considerable gains from the issuance of new stock, while remaining shareholders will be wiped out. The language of the Plan shows how shareholders' and management's interests are not aligned, leaving shareholders with inadequate representation in these proceedings.

49.     Debtors' management also lacks the incentive to represent the interest of the Shareholders. The recent decision in Pilgrim's Pride illustrates this point. In Pilgrim's Pride, an ad hoc committee of equity holders moved for an order directing the U.S. Trustee to appoint an official committee to represent shareholders. In considering the shareholders' motion, the court looked at whether equity was adequately represented without a formal committee. The debtor's lenders and creditors committee argued that shareholders were adequately represented by Pilgrim's management. In re Pilgrim's Pride Corp., 407 B.R. 211, 219 (Bankr. N.D. Tex. 2009)

50.     In granting the motion for the appointment of an equity committee, the Pilgrim's Pride court recognized as "unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors." Pilgrim's Pride at 218. However, the court noted that the reorganization process does not insure that shareholders are adequately represented by management who own shares in the bankrupt company. To the contrary, the "principal concern of Debtors and their managers ... must be preservation of

16

Debtors' going concern value and their successful emergence from chapter 11. That will occur through confirmation of a plan of reorganization." Id. Further, confirmation of a plan, the court found, is heavily dependent on reaching an agreement with the debtor's lenders and unsecured creditors' committee. Id.

51.     Even this Court has recognized different parties' "incentive to ... overvalue or undervalue" a debtor. See In re Coram Healthcare Corp., 315 B.R. 321, 339 (Bankr. D.Del. 2004); see also In re Exide Techs., 303 B.R. 48, 61 (Bankr. D.Del. 2003). Debtors have every incentive to get a plan of reorganization confirmed based on the lowest valuation possible, even if doing so is at the cost of Debtors' equity holders.

A.     **Fairfax Does Not Represent Shareholder Interests**

52.     On April 27, 2010, this Court held a status conference on the Shareholders' request for the formation of an Official Equity Committee. During the hearing, counsel for the Official Committee of Unsecured Creditors shared with the Court some of the reasons the Committee was opposed to the formation of an Official Equity Committee. One of the points made by counsel was that the Shareholders' interest were adequately represented by Fairfax Financial Holdings ("Fairfax"):

> We think it's also relevant ... that Fairfax Financial Holdings is a large stakeholder. Fairfax on an as converted basis would be the largest single shareholder, and it's very active in these cases. It is the DIP lender. It holds substantial positions in various parts of the capital structure. And, in addition, a number of the current directors collectively hold several percentage points of equity in the company. So we think that equity is already adequately represented by Fairfax, by the Directors that are on the Board of Directors.

Transcript at p.16, ln. 16 – p. 17, ln. 1.

53.     Contrary to the Committee's contention, the Shareholders' interests are neither aligned with, nor adequately represented by, Fairfax (which owns zero shares). As stated in the

17

Declaration of Steven Zelin in Support of Debtors' Motion for Postpetition Financing (the "Zelin Declaration") [D.I. 27], Fairfax purchased $350 million of Debtor AbitibiBowater, Inc.'s convertible notes in February 2009, provided $10 million to Bowater Canada Forest Products and seated two Fairfax representatives on Debtors' Board of Directors. See Zelin Declaration, at p. 6.

54.     In the days prior to the Petition Date, Debtors' financial advisor, Blackstone Advisory Services L.P. ("Blackstone"), contacted Fairfax to see if the company would be willing to provide postpetition financing to the Debtors. According to the Zelin Declaration, "[w]ithin 24 hours [of Debtors' request for financing], Fairfax indicated that it would provide a fully-committed $175 million DIP term loan to the Company." Id.

55.     Pursuant to the Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Loan"), Fairfax agreed to lend Debtors $206 million in exchange for liens and security interests in all prepetition and postpetition property of the Debtors' estates, including all proceeds therefrom. See Motion to Approve Debtors' Postpetition Financing (the "DIP Motion") [D.I. 18], at p. 19.

56.     Fairfax and the Committee both share an interest in undervaluing the Debtors. Both will benefit from a plan of reorganization based on conservative projections that will insure approval by unsecured creditors, and ultimately the Court.  Fairfax, as Debtors' DIP Lender, is motivated to secure creditor approval of a plan of reorganization that will re-pay Debtors' postpetition Debt in full. Were Fairfax to agree to a more optimistic valuation, the Debtors may be overvalued to the detriment of creditors. See In re Miriant Corp, 334 B.R. 800, 814-15 (Bankr.N.D.Tex. 2005)(finding that if the debtor were to "be overvalued, harm to the creditors represented by the Corp. Committee would result."); see also, In re Pilgrim's Pride Corp., 407

18

B.R. 211, 219 (Bankr. N.D. Tex. 2009)(recognizing that the "dynamics of chapter 11 are such that Debtors and their management are likely to be constrained to accept and advocate to the court a conservative value of their business in order to obtain creditor assent to a reorganization plan."). Further, to the extent any current shareholders recover on their equity, such recovery will likely dilute the value of the shares proposed under the Plan.

57.     The Shareholders therefore request the Court appoint an Official Equity Committee that may represent their interests. The Shareholders are not adequately represented in these bankruptcy proceedings and would continue to lack adequate representation unless the Court appoints an Official Equity Committee.[8]

## V.     The Cases Are Large And Complex

58.     There is no real dispute that these cases are large and complex. Debtors concede this point in their Third Exclusivity Motion:

> While the Debtors have made significant progress to date, given the size and complexity of these Chapter 11 Cases and the demands of conducting parallel restructuring proceedings in the U.S. and Canada, the Debtors need additional time to complete the formulation and negotiation of a plan of reorganization that is supported by key creditor constituents. Although the Debtors are working towards filing a plan of reorganization within the next few weeks, they believe that extending each of their Exclusive Periods by an additional 97 days is prudent under the circumstances.

Third Exclusivity Motion, at pp. 2-3.

59.     In order for equity holders to properly protect and advance their interests and evaluate any new plan of reorganization in such a large and complex restructuring, they need a representative with access to information which the creditor constituencies have been privy to for

---

[8] The Shareholders in support of this Motion raised funds to pay for the NHB Report as well as the legal costs associated with this Motion. Yet despite the advancement of these funds, the Shareholders do not believe they have access to information necessary to assess the proper value of the Debtors. Given the size of the Debtors, a proper and independent valuation will need to be financed through a formal committee.

some time.[9] Only an Official Equity Committee (comprised of members whose trading activities will be restricted) can realistically obtain this information.

60.     In Pilgrim's Pride, the court recognized that it was doubtful that an informal group of shareholders would underwrite the valuation of the debtor. In re Pilgrim's Pride Corp., 407 at 219. Given the scope and complexity of these bankruptcy proceedings, the Shareholders should not be expected to cover the costs to investigate the existence of additional value within Debtors' estates. During the April 27th hearing, Committee counsel argued that if the Shareholders, without an Official Equity Committee, generate substantial value, "they can file a claim for a substantial contribution and get that paid." Transcript, at p. 17, ln. 6. However, as pointed out by the Pilgrim's Pride court, while some of the costs of an informal committee might be compensable under Code § 503(b)(3)(D) and (4), "the cost of a financial advisor, whose role in the valuation process is indispensable, would not be payable under those provisions. In re Pilgrim's Pride, 407 B.R. at 219, see also, In re Mirant Corp, 354 B.R. 113, 138-39 (Bankr. N.D.Tex. 2006).

## VI.     Debtors' Stock Is Widely Held and Actively Traded

61.     There are approximately 54.7 million outstanding shares of Debtors' common stock. Almost all of the outstanding shares are owned by the public at large, who are generally not represented in these cases. The single largest shareholder owns 6,445,000 shares, or just 11.8% of the issued shares. Debtors' shares, therefore, are widely held by the general public.

62.     Debtors' shares continue to be actively traded, but were far more actively traded until the Debtors announced their Plan, which proposed to cancel the existing shares. Prior to the

---

[9] The complexity of these cases carries over to the Debtors' efforts to confirm a plan of reorganization. According to the Debtors, the "size and scope of the Company's cross-border operations, along with its intricate corporate structure, add significant complexity to the plan formulation process." See Third Exclusivity Motion, at *9. (Emphasis added).

WM1A 955355v3 07/16/10

proposed Plan, millions of shares "exchanged hands" in a given day. Not surprisingly, the announcement of the proposed Plan caused Debtors' share price to fall from a recent high of 59 cents to 9 cents. Similarly, trading volume also slumped. There is little doubt that should a revised plan of reorganization be proposed which retains value for existing shareholders, trading activity would increase dramatically.

## VII. The Motion Should Be Granted Because The Critical Need For an Official Equity Committee Outweighs the Administrative Costs

63.     The Shareholders are mindful of concerns regarding the additional expense associated with the formation of an official equity committee. Nevertheless, "[c]ost alone cannot, and should not, deprive … security holders of representation." McLean Indus., 70 B.R. at 860; see also, Enron Corp., 279 B.R. at 694 ("[a]dded cost alone does not justify the denial of appointment of an additional committee where it is warranted.") The additional costs of an equity committee must be weighed against the need for adequate representation of public shareholders. See Wang Labs., 149 B.R. at 3-4; Beker Indus., 55 B.R. at 949-51. "Essentially the courts employ a balancing test to weigh the cost of an equity committee versus the 'concern for adequate representation.'" Williams Commc'ns, 281 B.R. at 220.

64.     Once the need for adequate representation is established, "the burden shifts to the opponent of the motion [to appoint an official equity committee] to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways." Beker Indus., 55 B.R. at 949; 4 Norton Bankr. L. & Prac. 2d § 78:5 (2d ed. 2005) ("Should the moving party be successful in showing that an additional committee is required, the burden then shifts to the opponent to demonstrate that the cost of such an additional committee notably outweighs the interest in adequate representation.")

21

65.     The comparatively small additional costs of an Official Equity Committee at this critical juncture in these cases do not outweigh the need for adequate representation of the Debtors' shareholders. In addition, an Official Equity Committee would have a significant interest in minimizing not only its own administrative expenses, but all administrative expenses, which if left unchecked would only reduce its constituents' ultimate recovery. Moreover, all fees and expenses of an Official Equity Committee's professionals would be subject to this Court's review and approval. Simply stated, there are sufficient checks and balances to override any concerns regarding costs.

## VIII.   The Motion Should Be Granted Because The Request Was Made On A Timely Basis

66.     The Shareholders have acted with deliberate speed. During the April 27, 2010 hearing before this Court, it was suggested to the Shareholders that if they wish to proceed with a motion to appoint an equity committee, they should retain counsel. Immediately thereafter, the Shareholders began investigating alternatives and retained Fox Rothschild LLP.

67.     The Shareholders made their request to the U.S. Trustee on March 15, 2010, 55 calendar days before Debtors filed a proposed plan of reorganization. The appointment of an Official Equity Committee is warranted now, while the Debtors are engaged in the process of negotiating a plan of reorganization.

68.     If an Official Equity Committee is to have a meaningful role in these cases, the Shareholders request that such Committee be appointed promptly. With the absence of an Official Equity Committee, there is currently no shareholder representative that can obtain, review and analyze critical information (likely designated as confidential by the Debtors) that has been and will continue to be disseminated to the Creditors' Committee and other creditor

22

constituencies (and their respective professionals) in connection with the on-going plan negotiations.

69.     The Shareholders face a fundamental problem in that the Debtors and their creditors are collaborating in the negotiation of a plan of reorganization, to the detriment of the Shareholders. By that, under the currently proposed Plan, there is no recovery for equity despite the continual improvement of Debtors' businesses.

70.     One of the primary purposes of an official committee is to serve a negotiating role in the crafting of a plan. See H.R. Rep. No. 95-595 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6357 (Congress noting that official committees "will be the primary negotiating bodies for the formulation of the plan of reorganization"). If the Debtors seek approval of a plan of reorganization without the input from an Official Equity Committee, the only remaining avenue for the Shareholders is to contest their treatment through litigation that could prove to be protracted and expensive.

71.     Litigation over plan confirmation can be avoided if an Official Equity Committee is given the opportunity to engage the Debtors in a more collegial setting while the plan of reorganization is being negotiated. Thus, if an Official Equity Committee is to have a productive and meaningful role in plan negotiations, and be on equal footing with the other constituencies in this case, it must be appointed promptly. See Johns-Manville Corp., 68 B.r. at 161 (noting that an official equity committee "will most effectively exercise its responsibilities at the beginning of a reorganization, prior to the formulation of a plan"); In re Edison Bros. Stores., Inc., 1996 WL 363806, at *12 (D.Del. June 27, 1996)("[A]t some point in the proceedings, the opportunity to effectively participate in the reorganization will be lost, thereby mooting the question of official committee status.").

23

72.     If for no other reason than ensuring the integrity of the Chapter 11 process, the relief requested in this Motion should be granted. See In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966)(Friendly, C.J.)("The conduct of bankruptcy proceedings not only should be right but must seem right").

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Shareholders of the above-captioned Debtors request that the Court: (i) enter an Order compelling the U.S. Trustee to immediately appoint an Official Equity Committee in the Debtors' Chapter 11 cases; and (ii) grant it such other and further relief as is just and proper.

Date: July 16, 2010

**FOX ROTHSCHILD LLP**

/s/ L. JASON CORNELL, ESQUIRE
L. JASON CORNELL, ESQUIRE (No. 3821)
DANIELLE S. BLOUNT, ESQUIRE (No. 5135)
Citizens Bank Center
919 N. Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
(302) 654-7444
jcornell@foxrothschild.com
dblount@foxrothschild.com

Attorneys for the Movant

24