# Exhibit I

# Purchase and Sale Agreement

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this **"Agreement"**) is executed as of the 3rd day of August, 2010 (the **"Execution Date"**) by and between **Abitibi-Consolidated Corp.**, a Delaware corporation (**"Seller"**), and **Verdant Industries, LLC** (**"Purchaser"**) (Seller and Purchaser are sometimes hereinafter collectively referred to as the **"Parties"** and individually as a **"Party"**).

WHEREAS, Seller is the owner of the Property (as defined in **Section 1** below); and

WHEREAS, on April 16, 2009, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (**"Bankruptcy Court"**); and

WHEREAS, Seller has sought to sell and otherwise divest itself of this Property and in doing so has marketed the Property diligently, in good faith, and in a commercially reasonable manner; and

WHEREAS, Seller desires to sell and convey the Property to Purchaser and Purchaser desires to purchase the Property, all subject to the review and approval of the Bankruptcy Court (as set forth in **Section 20** below) and in accordance with the terms and provisions hereof; and

WHEREAS, Purchaser has agreed to assume, and Seller wishes to transfer and assign to Purchaser any and all obligations, liability and responsibility that Seller may have under any and all applicable Environmental Laws or otherwise for the Remediation of any and all Pollution Conditions at or from the Property, including all Pollution Conditions (as defined below); and

WHEREAS, in connection with Purchaser's assumption of all obligations, liability and responsibility for the Remediation of the Pollution Conditions at the Property, Purchaser has agreed to obtain and maintain the Insurance Policy (as defined below) providing insurance coverage in accordance with **Exhibit B** hereto.

In consideration of the mutual covenants set forth herein, the Independent Consideration, the Earnest Money (as defined in **Section 2(a)** below) deposited in connection with this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller, the parties agree as follows:

**DEFINITIONS.** In addition to the capitalized terms defined above, the following capitalized terms shall have the following meanings for purposes of this Agreement:

**"AbitibiBowater"** means AbitibiBowater, Inc., its subsidiaries, and each of their corporate successors and assigns.

**"APAR"** means the Affected Property Assessment Report prepared for and filed with the TCEQ with respect to the Property.

**"Appurtenances"** has the meaning given in **Section 1(a)**.

YCST01:9812989.1                                                                    068104.1001

**"Assignment of Transferred Contracts, Permits and Licenses"** has the meaning given in **Section 11(d)(iii)**.

**"Assumed Obligations"** has the meaning given in **Section 9(a)**.

**"Bankruptcy Court"** has the meaning given in the recitals above.

**"Bodily Injury"** means physical injury, sickness, disease or emotional distress sustained by any person, including death resulting therefrom.

**"Broker"** has the meaning given in **Section 14(a)**.

**"CERCLA"** means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601 et seq.) and any analogous state laws, as amended from time to time.

**"Clean-Up"** means the investigation, study, remediation, removal, transportation, disposal, treatment (including in-situ treatment), management, stabilization, containment or neutralization of Pollutants, including, but not limited to, any monitoring, closure, maintenance, repair, replacement and reporting activities that may be required after the completion of such investigation, study, remediation, removal, transportation, disposal, treatment, management, stabilization, containment or neutralization.

**"Closing"** and **"Closing Date"** have the meanings given in **Section 11(b)**.

**"Commitment"** has the meaning given in **Section 6**.

**"Contracts"** has the meaning given in **Section 11(d)(iii)**.

**"Costs"** has the meaning given in **Section 10(a)**.

**"Deed"** has the meaning given in **Section 11(d)(i)**.

**"Earnest Money"** has the meaning given in **Section 2(a)(i)**.

**"Effective Date"** has the meaning given in **Section 20**.

**"Environmental Laws"** means any federal, state or local laws (including, but not limited to, statutes, rules, regulations, ordinances, guidance documents and governmental, judicial or administrative orders or judgments, decrees, directives, permits, licenses or approvals, and all common law) that are applicable to Pollution Conditions, the protection or regulation of human health, natural resources or the environment, or the emission, discharge, disposal, release or threatened release, or presence of Pollutants into indoor air, buildings or structures or the environment (including ambient air, surface water, ground water, land or soil).

**"Environmental Liability"** means any legal requirement under Environmental Law relating to or arising out of ownership or operation of the Property, including any obligation to perform, or any liability (whether based on negligence, strict liability, statutory obligation or

other theory of liability) relating to Pollution Conditions (including any Clean-Up and associated costs and expenses) at, under or migrating from the Property, including any liability for natural resource damages and any liability for off-site disposal of Pollutants that are removed and disposed of by or at the direction of Purchaser, its successors and assigns or their respective agents or consultants, as part of any Clean-Up of Pollution Conditions.

"**EPA**" means the United States Environmental Protection Agency.

"**Escrow Account**" has the meaning given in **Section 2(a)(ii)**.

"**Escrow Agent**" has the meaning given in **Section 2(a)(i)**.

"**Excluded Matters**" has the meaning given in **Section 9(c)**.

"**Excluded Property**" means the Kurth Lake Reservoir Property, water wells located on the Property and associated appurtenances and permits, and other property described or referred to in **Section 12** of this Agreement.

"**Execution Date**" has the meaning given in the preamble above.

"**Governmental Authority**" means any federal, state or local governmental regulatory or administrative agency, commission, department, board or other governmental subdivision, court, tribunal, arbitral body or other governmental authority or other subdivision, department or branch of any of the foregoing.

"**Identified Mortgages**" has the meaning given in **Section 6**.

"**Improvements**" has the meaning given in **Section 1(a)**.

"**Indemnified Party**" has the meaning given in **Section 10(c)(i)**.

"**Indemnifying Party**" has the meaning given in **Section 10(c)(i)**.

"**Independent Consideration**" means an amount equal to One Hundred and No/100 Dollars ($100.00) that shall be deducted from the Earnest Money and delivered to Seller as independent consideration, which independent consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable under any circumstances and shall be retained by Seller notwithstanding any other provisions of this Agreement.

"**Insurance Policy**" means a Pollution Legal Liability insurance policy provided by Purchaser, at its sole cost and expense, issued by an insurance company reasonably acceptable to Seller and Purchaser, naming Seller and AbitibiBowater as additional insureds, providing Ten Million Dollars (U.S.) ($10,000,000.00) of insurance protection, having a ten (10) year term for which the premium is fully paid at Closing, having the coverage described in **Exhibit B** hereto and otherwise being in form, scope and coverage satisfactory to Seller.

"**Knowledge Date**" has the meaning given in **Section 16**.

"**Known to Seller**" or "**to the Knowledge of Seller**" (or any similar expression) means within the actual knowledge, without special or independent investigation, of Chad Nerren, Delton Smith and/or Nicole Roy.

"**Kurth Lake Reservoir Property**" means the Kurth Lake reservoir and associated land more particularly described in **Exhibit C** hereto, and permits and the pipeline and right-of-way connecting the Kurth Lake reservoir to the Property but excludes the Kurth Lake Water Rights Reservation.

"**Kurth Lake Water Rights Reservation**" means the rights reserved by Seller under and in accordance with the terms of that certain Purchase and Sale Contract (Water Purchase) by and between Seller and the City of Lufkin, Texas pursuant to which the City of Lufkin agrees to provide up to five million (5,000,000) gallons per day of water from Kurth Lake for a period of twenty (20) years, with two (2) ten-year renewal options.

"**Land**" has the meaning given in **Section 1(a)**.

"**Licenses and Permits**" means any and all licenses, permits, authorizations, approvals, decrees and orders relating to the ownership, use, operation and/or maintenance of the Property.

"**Operating Contracts**" has the meaning given in **Section 1(b)**.

"**Outstanding Legal Diligence**" has the meaning given in **Section 5(b)**.

"**Paper Machines**" has the meaning given in **Section 18(a)**.

"**Past Unpaid Costs**" has the meaning given in **Section 9(c)(ii)**.

"**Permits and Licenses**" has the meaning given in **Section 1(c)**.

"**Permitted Title Exceptions**" has the meaning given in **Section 6**.

"**Personal Property**" means the personal property located in, on or about the Land and Improvements other than any of the Excluded Property, including but not limited to: machinery, equipment, tanks, rail equipment, power station equipment, water treatment equipment, salvage items, scrap, ferrous metals, non-ferrous metals, material handling equipment, cranes, pumps, compressors, components (including items considered scrap), removable fixtures, janitorial and maintenance supplies, office equipment and furniture, and other tangible personal property located in, on or about the Land or Improvements on the Execution Date.

"**Pollutants**" means any solid, liquid, gaseous or thermal irritant, waste or contaminant, or hazardous, toxic or radioactive substance, material or waste, including soot, acids, alkalis or toxic chemicals, solid waste, medical waste and waste material, and/or by-products or progeny thereof. Pollutants include, but are not limited to, all of the following: hazardous wastes or constituents (as defined in RCRA); hazardous substances (as defined in CERCLA); substances, materials and wastes that are now or become listed in the United States Department of Transportation Hazardous Materials Table (49 CFR Section 172.101) or by EPA (40 CFR Part 302), and amendments thereto, as hazardous substances; substances, materials and wastes

designated as "hazardous substances" pursuant to Section 311 of the Clean Water Act, or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); oil or petroleum products; chemical liquids or solid, liquid or gaseous products; polychlorinated biphenyls ("PCBs"); asbestos or asbestos-containing material; mold; any substances, materials and wastes that are or become defined as a solid waste or hazardous, toxic or radioactive substance, material, pollutant or contaminant under any existing or future reported decision of a federal, state or local court of the state in which the Land is located, ordinances or regulations, or under any existing or future reported decision of a federal, state or local court of the state in which the Land is located; and any substances, materials and wastes, the presence of which requires or may require investigation, removal, abatement or remediation under any existing or future Environmental Law.

"**Pollution Conditions**" means the presence, disposal, discharge, dispersal, release, emission, escape or migration of any Pollutants at, on, above, under, within or migrating from the Land or any portion thereof, including into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided that such conditions are not naturally present in the local environment in the amounts or concentrations discovered.

"**Property**" has the meaning given in **Section 1**.

"**Property Damage**" means (i) physical injury to (including contamination of) or destruction of real or personal property, including any resulting loss of use or diminution in value; (ii) loss of use of real or personal property that has not been physically injured or destroyed; or (iii) natural resource damages.

"**Purchase Price**" has the meaning given in **Section 2**.

"**Purchaser's Covenants, Representations and Warranties**" has the meaning given in **Section 17**.

"**RAP**" means the remedial action plan for the Property approved by the TCEQ.

"**RCRA**" means the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.) and any analogous state laws, all as amended from time to time.

"**Recovery Action**" has the meaning given in **Section 16**.

"**Sale Order**" has the meaning given in **Section 20**.

"**Seller Encumbrances**" has the meaning given in **Section 3(b)**.

"**Seller Parties**" has the meaning given in **Section 10(a)**.

"**Seller's Covenants, Representations and Warranties**" has the meaning given in **Section 16**.

"**Survey Certificate**" has the meaning given in **Section 6**.

"**Surveys**" has the meaning given in **Section 6** and as identified in **Exhibit D**.

"**Survival Period**" has the meaning given in **Section 16**.

"**Taxes**" has the meaning given in **Section 3(a)**.

"**TCEQ**" means the Texas Commission of Environmental Quality.

"**Title Company**" has the meaning given in **Section 2(a)(i)**.

"**Title Policy**" has the meaning given in **Section 3(c)(x)**.

"**Transferred Contracts**" has the meaning given in **Section 1(b)**

1.     <u>Sale of Property</u>. Seller agrees to sell, transfer and convey to Purchaser and Purchaser agrees to purchase from Seller, in accordance with the terms of this Agreement, all of Seller's right, title, estate and interest in and to:

    (a)     the approximately 895.542 acres of land in Angelina County, Texas more particularly described or identified on **Exhibit A** to this Agreement (the "**Land**"), and generally known as the "Abitibi Lufkin Paper Mill Site" at Highway 103 East, Lufkin, Texas, and the fixtures, buildings, structures and improvements located thereon (collectively, the "**Improvements**"), together with all rights, privileges and interests appertaining to such Land which constitute real property interests that run with the Land, including easements, oil and gas, oil and/or gas drilling rights, oil and/or gas exploration rights, mineral and mining rights, development rights and riparian rights, including the Kurth Lake Water Rights Reservation (collectively, the "**Appurtenances**");

    (b)     (i) those contracts, leases or agreements related to the Land and/or the Improvements listed on **Exhibit E** (the "**Operating Contracts**") entered into by Seller prior to its bankruptcy filing, that Purchaser has elected to accept assignment of and assume as of the Closing Date (the "**Transferred Contracts**," as identified in **Exhibit E**), it being understood that Purchaser is rejecting those Operating Contracts identified as "**Rejected Contracts**" in **Exhibit E**, (ii) Seller's obligations under the Transferred Contracts, including the obligation to cure all Transferred Contracts within the meaning of Bankruptcy Code section 365, at the amounts set forth on **Exhibit E** or as otherwise ordered by the Bankruptcy Court, which cure costs shall be borne solely by Purchaser; and (iii) the Assumed Obligations set forth in Section 9 (together with the liabilities under the Transferred Contracts, the "**Transferred Contracts and Liabilities**");

    (c)     any entitlements, permits and licenses (to the extent transferable) including emission and City of Lufkin potable water usage permits, as applicable, and other governmental permits owned by Seller and used in or related to Seller's operation of the Land and Improvements, including existing warranties, licenses, permits, registrations, and the related documents, plans, drawings, specifications, engineering reports and other technical descriptions, but excluding any permits or licenses related to or used, required, or necessary for the business of Seller or its affiliates or subsidiaries; in each case to the extent assignable without consent or

only assignable with consent of a third party and such consent has been obtained in writing (collectively, the **"Permits and Licenses"**); and

(d) the Personal Property.

SAVE AND EXCEPT from the Land, Improvements, Personal Property, and Transferred Contracts and Liabilities to be conveyed, the Excluded Property. The Land, Appurtenances, Improvements, Permits and Licenses, Personal Property and Transferred Contracts and Liabilities are herein referred to collectively as the **"Property."** All of the Property shall be conveyed, assigned, and transferred to Purchaser at the Closing (as defined in **Section 11(b)**. below) free and clear of all liens, claims, easements, and encumbrances whatsoever, by, through or under Seller, except for the Excluded Property (as defined in **Section 12** and/or **Exhibit C** below) and except for those Permits and Licenses (as defined in **Section 11(e)** below) that are not transferable at Closing.

Notwithstanding any other provision herein to the contrary, the sale provided for herein excludes all books, records and internal memoranda that are proprietary to Seller.

2. <u>Purchase Price and Payment</u>. The purchase price (**"Purchase Price"**) for the Property is Eleven Million Dollars (U.S.) ($11,000,000.00), which shall be paid as provided in (a) and (b):

(a) <u>Earnest Money</u>.

(i) Prior to the Execution Date, Purchaser will have deposited into escrow with Chicago Title Insurance Company (**"Escrow Agent"**), 712 Main Street, Suite 2000E, Houston, TX 77002 (Attention: Reno Hartfiel) (the **"Title Company"**), a sum equal to Dollars (U.S.) Nine Hundred Thousand ($ 900,000.00) (the **"Earnest Money"**).

(ii) Upon any termination of this Agreement, the Earnest Money shall be paid over and irrevocably released to Seller, except that under certain limited circumstances expressly provided in **Section 11(a)** and **Section 15(b)**, the Earnest Money may be refundable to Purchaser in accordance with this Agreement. The Earnest Money deposit shall be invested by the Title Company in an interest bearing account (the **"Escrow Account"**). Any interest earned on the Earnest Money shall become part of the Earnest Money.

(b) <u>Payment at Closing</u>. At Closing, Purchaser shall pay the balance of the Purchase Price, subject to prorations and adjustments hereinafter described, by federal wire transfer of immediately available funds to the Title Company for disbursement to Seller (along with the Earnest Money).

(c) Seller and Purchaser have agreed upon the following preliminary allocation of the Purchase Price:

Land                          $ _____

Improvements                  $ _____

Equipment and Personal Property    $_____

The foregoing allocation can be adjusted by the mutual written agreement of Seller and Purchaser within thirty (30) following the Closing Date.

  3.   <u>Prorations and Adjustments</u>. The following prorations and adjustments shall be made to the Purchase Price at Closing:

   (a)   <u>Taxes</u>. All ad valorem real estate taxes with respect to the Land, Improvements and Personal Property (the **"Taxes"**) for the calendar years prior to and including 2009 have been or will be paid at Closing by Seller. At Closing, Taxes for 2010 shall be prorated. Purchaser will receive a debit for Taxes for the number of days during 2010 prior to the Closing Date, and Purchaser will assume responsibility for payment of 2010 taxes when due. If Taxes for 2010 are not known at Closing, then the proration shall be based on the assumption that 2010 Taxes will be the same as 2009. The proration shall be a final proration.

   (b)   <u>Release of Encumbrances</u>. Concurrently with or before Closing, Seller shall cause, at Seller's cost, any and all judgment liens, mechanics liens, security interests, mortgages, deeds of trust and other encumbrances securing indebtedness affecting the Property (**"Seller Encumbrances"**) to be satisfied and released. The proceeds due at Closing may be applied by Seller to satisfy or pay any such Seller Encumbrance.

   (c)   <u>Expenses</u>.

    (x)   Seller shall be responsible to pay for (i) all expenses in connection with the removal of any Seller Encumbrances and recording costs to release of record or otherwise cause to be removed as exceptions to the Title Policy any Seller Encumbrances, ~~and~~ (ii) Seller's attorneys' fees, *(iii) the cost of the Title Policy up to Fifty Thousands Dollars*.

    (y)   Purchaser shall pay for (i) any title insurance for the benefit of any lender financing any portion of the Purchase Price (including endorsements to the Lender's title policy), (ii) the cost of Purchaser's title policy and the base premium (including costs of any endorsements it elects) for a current Texas Standard Form Owner's Policy of Title Insurance for Purchaser (**"Title Policy"**)*(* *Seller will be liable in excess of Fifty Thousand Dollars* (iii) recording fees, (iv) Purchaser's attorney's fees, (v) Purchaser's expenses for tests and inspections, (vi) expenses of any consultants retained by Purchaser, (vii) such other expenses provided herein to be paid by Purchaser, (viii) the cost of the Surveys (herein defined), and (ix) the escrow fee charged by the Escrow Agent for closing this transaction.

    (z)   <u>Sales Tax</u>. The parties anticipate that the transfer of personal property provided herein will be exempt from Texas state sales tax. If, however, any sales tax is due on the sale, Purchaser shall pay such tax and shall indemnify Seller from all costs, expenses and penalties related to such sales tax.

   (d)   <u>Miscellaneous</u>. Any other items of proration not enumerated in (a), (b) and (c) above, shall be allocated between Seller and Purchaser consistent with local custom for where such Property is located for consummating a sale transaction as provided herein.

- 8 -

4. Diligence Items.

(a) Diligence Materials. Seller has heretofore made available to Purchaser at Seller's offices in the Improvements, in an electronic database, or by delivery to Purchaser, all of the following in Seller's possession and control and which relate to the Property and the interests of Seller in the Property:

(i) City, county, municipal, state and/or federal permits and licenses;

(ii) existing service contracts, supply contracts, maintenance contracts, leases, transportation contracts and agreements (including but not limited to railroad service licenses, contracts and agreements) which will be in effect as of the Closing Date and will continue after the Closing;

(iii) inspection or engineering reports; environmental studies; maintenance logs and records; written notices from governmental authorities within the three years prior to the Effective Date as to violations of any zoning, building or fire codes or environmental laws; and

(iv) material reports, data and other documents concerning any Pollution Conditions known to Seller.

Any of the foregoing materials made available at the Property may be copied by Purchaser at the Property, but Purchaser shall reimburse Seller for the cost of all copying.

In the event that Purchaser does not acquire the Property pursuant hereto, then Purchaser shall return all such items, including copies thereof, in the possession of Purchaser, its agents or representatives (as opposed to items viewed or examined at Seller's offices) to Seller within five (5) business days after termination of this Agreement. All such information as is provided by Seller to Purchaser shall be held in confidence by Purchaser and its agents and representatives, shall not be utilized for any purpose and shall be returned to Seller in the event that Purchaser does not proceed with the purchase.

(b) No Representation Regarding Materials. The Purchaser acknowledges and agrees that all reports, documents and other information provided or made available to it by the Seller in respect of environmental conditions and the Property have been provided for informational purposes only, and nothing in the reports, documents, information or attachments is warranted as true. Furthermore, Purchaser acknowledges and agrees that the environmental reports, documents or information provided by Seller are not intended to serve as "due diligence" for Purchaser or any third party to establish an "innocent purchaser" or other "landowner" defense under CERCLA, or any applicable state laws, and neither Purchaser nor any third party may rely on the information in such reports, documents or information. The information in the reports and documents is not intended as a baseline of environmental conditions as part of any property transfer, and no party shall hold Seller or its consultant(s) or any of their respective affiliates liable for negligence, misrepresentation or breach of contract regarding information in the reports or documents. Neither Seller nor its consultant(s) renders any opinion regarding the suitability of the Property for occupancy, use or future development. Neither Seller nor the

author of any such reports or documents represents or warrants the completeness or accuracy of such reports, documents or information, including regarding the current conditions of the Property, and no such representation or warranty may be implied. Purchaser shall rely solely on its own environmental assessment to determine the nature and extent of environmental conditions on the Property.

5. Investigation of the Property.

(a) Property Investigation and Inspection. Purchaser acknowledges that Purchaser and its representatives have been given the right and full opportunity, at Purchaser's own risk, cost and expense, to enter the Land and Improvements for the purpose of making inspections of the Property, including surveys (or updates to existing surveys), environmental inspections, other investigations and analysis of the Property. Between the Execution Date and Closing, subject to the provisions of this **Section 5**, Purchaser and any lender financing a portion of the Purchase Price shall continue to have the right to conduct inspections and non-invasive studies of the Property as they may reasonably require. Purchaser must obtain express written consent from Seller prior to conducting any invasive environmental testing. Solely for such purposes, Seller grants Purchaser and its agents and representatives reasonable access to the Property between the Execution Date and the earlier of the Closing Date or the date this Agreement terminates and Purchaser shall give Seller reasonable advance notice, including the schedule and scope, of such proposed activities, and Seller shall have the right to have a representative present for all such activities. Purchaser agrees that all information provided to it by Seller pertaining to the environmental status of the Property shall be held in confidence by Purchaser as confidential, proprietary information of Seller. Purchaser shall advise its counsel, environmental engineers and other representatives that such information is to be held in confidence and kept confidential. Prior to entering the Land, Purchaser shall provide Seller with proof of having a commercial general liability insurance policy for at least One Million Dollars (U.S.) ($1,000,000.00) naming Seller as additional insured. Purchaser shall conduct all of its tests and inspections of the Property permitted under this Agreement in a manner that is not disruptive to the operation of the Property at Purchaser's own risk and expense. Notwithstanding **Sections 9** and **10** or any limitation herein, Purchaser will indemnify, defend and hold harmless Seller from and against any and all third party liabilities, claims and causes of action (including, without limitation, all judgments, settlement amounts, reasonable attorneys' fees and costs) caused by the entry onto the Property by Purchaser or its contractors or representatives or performance of any tests, inspections and other activities on the Property by Purchaser or any of its contractors or representatives. Purchaser will use its best efforts to repair all damages caused by any entry, test or inspection and restore the Property to the condition it was in prior to such entry, test or inspection. Purchaser shall be responsible for proper management and disposal of any samples or any drill cuttings or soil borings and for proper plugging or capping of any wells resulting from its entry, testing or inspection on the Property. Purchaser's obligations pursuant to this **Section 5** will survive the expiration of this Agreement. Based on its inspection and investigation of the Property as of the Execution Date, Purchaser is prepared to accept the Property in its "AS IS" condition.

(b) Legal Diligence. Purchaser acknowledges that Purchaser and its representatives have been given the right and full opportunity, at Purchaser's cost and expense, to complete its review of the documentation concerning the Property including title documents,

surveys, Operating Contracts, Permits and Licenses, leases, other legal documents, Seller's corporate authority documentation, and proposed forms of closing documents (the "**Outstanding Legal Diligence**"). Purchaser has agreed to accept the condition of the Property "AS IS" and elected to proceed with the acquisition of the Property in accordance with the terms of this Agreement.

(c)     Forms of Insurance Policy. Within five (5) days following the Execution Date, Purchaser shall deliver to Seller a pro forma of the actual form of Insurance Policy Purchaser proposes to provide together with reasonably satisfactory evidence that Purchaser will have such Insurance Policy in effect at Closing. Seller shall provide to Purchaser any comments or required changes for the Insurance Policy to be satisfactory, and Purchaser shall use commercially reasonable efforts to cause such changes to be incorporated into the final form of the Insurance Policy.

6.     Title and Survey. Purchaser has received a copy of the Commitment for a Texas Owner's Policy of Title Insurance GF No. 3711001665 dated effective June 4, 2010 and issued June 17, 2010 (the "**Commitment**") and all recorded exception documents listed therein from the Title Company. Seller has furnished to Purchaser copies of the existing surveys and updates thereto identified in **Exhibit D** hereto (the "**Surveys**"). Within ten (10) days after the Effective Date, Seller shall cause the updates of the Surveys to be amended to include a certificate addressed to Seller, Purchaser, the Title Company, and Purchaser's lender indicating that such updated Surveys are Category 1A, Condition II surveys (the "**Survey Certificate**").

Any title encumbrances or exceptions which are set forth in the Title Commitment or the Surveys shall be deemed to be permitted exceptions (the "Permitted Title Exceptions") to the status of Seller's title to the Property. Notwithstanding anything in this Agreement to the contrary, in no event shall monetary liens or mortgages identified in the Title Commitment or that are placed after the date of the Title Commitment but before the Closing Date (the "**Identified Mortgages**") be permitted Title Exceptions.

7.     Casualty and Eminent Domain.

(a)     Casualty. Risk of loss of the Property shall be borne by Seller until Closing. If the Property is damaged, altered or destroyed by earthquake, flood, stormwater or other disaster or casualty, after the Execution Date and prior to the Closing, Seller shall immediately notify Purchaser in writing of the damage or destruction, and the amount and terms of any insurance proceeds available, if any. If the cost of repairs for building damage are reasonably estimated to exceed Five Million and No/100 Dollars (U.S.) ($5,000,000.00), Purchaser may either: (i) proceed with the Closing with no reduction in the Purchase Price and be entitled to all insurance proceeds, if any, payable to Seller under all policies insuring the Property, together with a credit against the Purchase Price for any deductible amount applicable thereto (net of amounts expended by Seller to make repairs to the Property and costs incurred by Seller in making proof of loss or settling claims with insurers); or (ii) terminate this Agreement, in which event the Earnest Money shall be refunded to Purchaser and neither party shall have any further right or obligation hereunder other than the rights or obligations hereunder which by their terms expressly survive the termination of this Agreement. Purchaser shall give written

notice of its election to Seller within ten (10) business days after Purchaser received Seller's notice of such damage or destruction and the amount of insurance proceeds available, and Closing will be extended accordingly, if required to permit such notices to be given. Failure by Purchaser to so notify Seller in writing shall constitute an election to terminate this Agreement. A termination hereunder does not constitute a default by Seller or Purchaser.

(b) <u>Eminent Domain</u>. In the event prior to Closing, any portion of the Property is taken by eminent domain, or becomes the subject of eminent domain proceedings threatened or commenced, Seller shall immediately notify Purchaser in writing thereof, and provide Purchaser with copies of any written communication from any condemning authority. If the portion of the Property taken by eminent domain or subject to eminent domain proceedings would have a material adverse effect on the ability of Purchaser to use and operate the Property, Purchaser may either (x) terminate this Agreement by written notice to Seller within ten (10) business days after Purchaser has received Seller's written notice, in which event the Earnest Money shall be refunded to Purchaser and neither party shall have any further right or obligation hereunder other than the rights or obligations hereunder which by their terms expressly survive the termination of this Agreement or (y) proceed with the Closing. If Purchaser elects to close, then: (i) if the transfer to the condemning authority takes place prior to Closing hereunder, the remainder of the Property shall be conveyed to Purchaser at Closing hereunder; (ii) if the transfer to the condemning authority has not taken place prior to Closing, the entire Property shall be conveyed to Purchaser at Closing hereunder; (iii) if Seller has received payment for such condemnation or taking prior to Closing hereunder, the amount of such payment shall be a credit against the Purchase Price payable by Purchaser hereunder; (iv) if Seller has not received such payment at the time of Closing, Seller shall assign to Purchaser all claims and rights to or arising out of such taking, including the right to conduct any litigation in respect of such condemnation and Purchaser shall be entitled to receive and retain all awards for the Property in connection with such proceeding.

8. <u>Sale "As Is"</u>.

(a) <u>AS IS</u>. THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT HAS BEEN NEGOTIATED BETWEEN SELLER AND PURCHASER, AND THIS AGREEMENT REFLECTS THE MUTUAL AGREEMENT OF SELLER AND PURCHASER. PURCHASER HAS CONDUCTED (OR WILL CONDUCT PRIOR TO THE CLOSING) ITS OWN INDEPENDENT EXAMINATION OF THE PROPERTY AND ALL DOCUMENTS. OTHER THAN THE SPECIFIC MATTERS REPRESENTED IN **SECTION 16** HEREOF (AS LIMITED BY **SECTION 15(c)** OF THIS AGREEMENT), WHICH EXCEPTIONS SHALL APPLY TO ALL OF THE FOLLOWING PROVISIONS OF THIS **SECTION 8**, PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION, WARRANTY OR STATEMENT OF SELLER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, AND PURCHASER HEREBY ACKNOWLEDGES THAT NO SUCH REPRESENTATIONS, WARRANTIES OR STATEMENTS HAVE BEEN MADE. NEITHER SELLER NOR ANY AFFILIATES OF SELLER NOR ANY OTHER PERSON IS MAKING, ANY REPRESENTATION, WARRANTY, STATEMENTS OR ASSURANCE WHATSOEVER TO PURCHASER; AND NO WARRANTIES, REPRESENTATIONS, STATEMENTS OR ASSURANCES OF ANY KIND OR CHARACTER, EITHER EXPRESS OR IMPLIED, ARE

MADE BY SELLER OR RELIED UPON BY PURCHASER WITH RESPECT TO THE STATUS OF TITLE TO, THE MAINTENANCE, REPAIR, CONDITION, DESIGN OR MARKETABILITY OF, OR THE SUFFICIENCY OF THE TRANSFERRED CONTRACTS OR THE PERMITS AND LICENSES FOR THE PROPERTY, OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO (A) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (B) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (C) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (D) ANY RIGHTS OF PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, (E) ANY CLAIM BY PURCHASER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN, OR LATENT, WITH RESPECT TO THE PROPERTY, (F) THE FINANCIAL CONDITION OR PROSPECTS OF THE PROPERTY OR (G) THE COMPLIANCE OR LACK THEREOF OF THE PROPERTY WITH GOVERNMENTAL REGULATIONS, IT BEING THE EXPRESS INTENTION OF SELLER AND PURCHASER THAT THE PROPERTY WILL BE CONVEYED AND TRANSFERRED TO PURCHASER IN ITS PRESENT CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS," WITH ALL FAULTS. PURCHASER SHALL BE SOLELY RESPONSIBLE FOR ENSURING THAT ANY AND ALL NECESSARY PERMITS AND OTHER AUTHORIZATIONS NEEDED TO MAINTAIN AND OPERATE THE PROPERTY AFTER CLOSING ARE OBTAINED IN ITS NAME AND/OR FOR ITS BENEFIT.

Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and the other types of interests contemplated to be sold hereunder, and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property. Prior to the Closing, Purchaser shall have conducted such inspections, investigations and other independent examinations of the Property and related matters as Purchaser deems necessary, including but not limited to the physical and environmental conditions thereof, and will rely upon same and, except for those express representations of Seller set forth in Section 16 below, not upon any statements of Seller or any of its affiliates, or any of their respective partners, members, owners, officers, directors, employees, agents, representatives or attorneys. Purchaser acknowledges that all information obtained by Purchaser was obtained from a variety of sources, and no person will be deemed to have represented or warranted the completeness, truth or accuracy of any of the documents or other such information heretofore or hereafter furnished to Purchaser. Upon Closing, Purchaser will assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Purchaser's inspections and investigations. Purchaser acknowledges and agrees that upon Closing, Purchaser will accept the Property "AS IS, WHERE IS," with all faults. Purchaser further acknowledges and agrees that there are no oral agreements, warranties or representations, collateral to or affecting the Property, by Seller, any affiliate of Seller or any third party. Seller is not liable or bound in any manner by any oral or written statements or information pertaining to the Property furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth or referred to in this Agreement. Purchaser acknowledges that the Purchase Price reflects the "AS IS, WHERE IS" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property. Purchaser, with Purchaser's counsel, has fully reviewed the disclaimers and waivers set forth in this Agreement, and understands the significance and effect thereof. **Purchaser acknowledges and agrees that the disclaimers and other agreements set forth herein are an integral part**

of this Agreement, and that Seller would not have agreed to sell the Property to Purchaser for the Purchase Price without the disclaimers and other agreements set forth in this Agreement.

(b)     Purchaser's Waiver of Objections.  Purchaser acknowledges that it has (or shall have prior to the Closing) inspected the Property, observed the physical characteristics and existing conditions and had the opportunity to conduct such investigations and studies on and of said Property and adjacent areas as it deems or deemed necessary.  Subject only to Seller's obligations for Excluded Matters under **Section 9** of this Agreement, Purchaser, on behalf of itself and its affiliates, and their respective partners, members, owners, officers, directors, agents, representatives and controlling persons, hereby waives, to the maximum extent possible as limited by the express terms of this Agreement and/or conditions imposed by the Bankruptcy Court, any and all objections to or complaints (including but not limited to actions based on federal, state or common law and any private right of action under CERCLA, RCRA, Texas environmental laws or any other state and federal law to which the Property is or may be subject) against any of the Seller Parties regarding physical characteristics and existing conditions, including, without limitation, structural and geologic conditions, subsurface soil and water conditions and Pollutants (if any) on, under, adjacent to or otherwise affecting the Property or related to prior uses of the Property, subject to Seller's obligations for Excluded Matters under **Section 9** of this Agreement.

(c)     Changed Conditions.  Purchaser further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental, safety or health conditions on, or resulting from the ownership or operation of, the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Pollutants, may not be revealed by its investigations.

(d)     Survival.  All provisions of this **Section 8** shall survive, without limitation, either (i) the Closing and shall not be deemed merged into the provisions of any Closing documents or (ii) any termination of this Agreement.

9.    Assumption of Liabilities; Excluded Matters.

(a)     Assumption of Liabilities.  On the Closing Date, except for the Excluded Matters, Purchaser, on behalf of itself and its successors and assigns, shall assume and agree to be responsible for any and all risks, liabilities, obligations, responsibilities, costs and expenses of any nature whatsoever which may now exist or hereafter arise directly or indirectly related to the physical or environmental conditions of or related to the Property, including, but not limited to, risks, liabilities, obligations, responsibilities, costs and expenses arising from, related to or associated with compliance with Environmental Laws or the presence or suspected presence of any Pollutants on the Property, including any Environmental Liability (collectively, the **"Assumed Obligations"**).

(b)     No Further Action Letter; On-Site Landfills.  Seller and Purchaser acknowledge that Seller initiated but has not completed an effort to obtain a No Further Action (**"NFA"**) letter from TCEQ regarding any Pollution Conditions pre-existing at the Property, except those Pollution Conditions that are related to the on-site landfills that are currently used

and will continue to be used for solid waste disposal at the Property. Seller and Purchaser also acknowledge that during the course of communications with TCEQ relating to the requested NFA, TCEQ has suggested that Seller has abandoned the on-site landfills and Seller disagrees with such position. Among other communications, Seller and TCEQ exchanged the letters attached as Schedule 9(b) to this Agreement relating to this issue. Seller does not warrant that the requested NFA will be obtained or issued prior to Closing, nor do the Parties condition Closing upon the issuance of such NFA letter or resolution of the issue raised by TCEQ concerning the status of the landfills. The Closing is not conditioned upon issuance of the NFA or resolution of the status of the landfills. In the event the NFA letter is not issued prior to Closing, Purchaser may pursue securing an NFA and Seller shall allow Purchaser to use the existing documentation prepared by Seller or its consultant to obtain an NFA. Promptly following Closing, Seller shall provide Purchaser with copies of final reports and work product prepared by Seller's consultant, Camp Dresser McKee, in connection with Seller's efforts to obtain the NFA, with the understanding that Seller makes no representation or warranty concerning such reports or work product. In any event, it is the intention of the Parties that Seller and Purchaser both shall be entitled to the benefits of any NFA that may be issued.

Notwithstanding anything which may be construed to the contrary in this **Section 9(a) and 9(b)**, the Assumed Obligations shall not include, and the foregoing transfer and assumption of liabilities shall not apply to, any Excluded Matters.

(c)     Excluded Matters.   The following matters to the extent existing as of Closing or asserted after Closing but related to a period of time prior to the Closing are excluded matters ("**Excluded Matters**") hereunder, liability for which is not assumed by Purchaser:

(i)     worker health claims (including but not limited to claims or damages for workers' compensation, personal injury, disease or death) by current or former employees of Seller and/or current or former employees of any predecessors-in-interest or predecessors-in-title to Seller arising or resulting from pre-Closing injury or exposure and any claims of Seller's current or former employees, including any wrongful death and wrongful termination claims, which are pending or accrued prior to Closing; and

(ii)     any past unpaid costs and/or expenses incurred by Seller or any predecessors-in-interest or predecessors-in-title to Seller, including but not limited to any oversight costs or expenses incurred by or owed to any Governmental Authority prior to the Execution Date (the "**Past Unpaid Costs**").

(d)     Certain Post-Closing Environmental Matters.   After Closing, any RAP environmental work required by the TCEQ or other work required under Environmental Laws with respect to the Property shall be carried out by Purchaser or its contractor(s) at Purchaser's cost, expense, risk and liability. Purchaser will indemnify, defend and hold harmless the Seller Parties from all claims, liabilities, costs, judgments and attorney's fees that may arise or be in any way connected with all environmental and remedial actions taken after the Closing associated with the Property and/or in any way connected to any remediation work performed with respect to the Property.

(e)     Survival.  The terms of this **Section 9** shall survive the Closing and shall not be merged into the deeds or any document given at Closing.  Purchaser shall execute such documents as Seller requests to confirm the foregoing.

10.     Indemnification and Release by Purchaser.

(a)     Indemnification.  Purchaser (or any assignee of this Agreement prior to Closing) shall be responsible for, and shall indemnify, protect, defend and hold harmless Seller and Seller's affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, representatives, attorneys, and contractors and their respective successors and assigns (collectively with Seller, the **"Seller Parties"**) from and against any and all claims (including, without limitation, claims by (1) adjacent or non-adjacent property owners or any other third party for contribution, Bodily Injury or Property Damage or (2) any Governmental Authority, including, but not limited to, the State of Texas or the EPA, and any successor agencies), demands, actions, administrative proceedings (whether formal or informal proceedings, including, without limitation, any citation, directive, order or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties (including, without limitation, the cost of any environmental investigation or remediation required under any federal, Texas state or local laws, ordinances or regulations, or under any existing or future reported decision of a Texas state, federal or local court), liabilities (including, without limitation, sums paid in settlements of claims), compensation, debts, costs and expenses (including, without limitation, attorneys' fees and expenses, consultants fees, and expert fees), to the extent that they arise directly or indirectly from, out of, or in connection with (i) any actual, alleged or suspected Pollution Conditions now or hereafter existing, (ii) any activities, acts or omissions, including, without limitation, performance or failure to perform the Assumed Obligations, breach of this Agreement or non-compliance with laws, of or by Purchaser, or Purchaser's employees, officers, consultants, contractors or other agents or representatives, including, without limitation, Bodily Injury or Property Damage, and (iii) the Assumed Obligations (collectively, **"Costs"**).

(b)     Release by Purchaser Parties.  Purchaser, for itself and its affiliates, members, directors, officers, shareholders, managers, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and all successors and assigns of the foregoing, does hereby completely and irrevocably release and forever discharge the Seller Parties from any and all past, current, future and contingent Costs of any and every kind and nature, whether currently known or unknown, including, without limitation, any Costs arising under CERCLA, RCRA or any other Environmental Law (including, without limitation, any claims sounding in tort, negligence, contract, environmental, statutory or equitable liability or otherwise) relating to the Property, including, without limitation, actual, alleged or suspected Pollution Conditions and Costs resulting from or by reason of any conduct, cause or course of action whatsoever which has been done or omitted by Seller; provided, however this release does not extend to Excluded Matters.  The foregoing release and discharge includes all known, unknown, unforeseen, unanticipated and unexpected Costs associated with the released matters and the consequences thereof.

(c)     Indemnification Procedures.

- 16 -

(i) <u>Notice</u>. Any person seeking indemnification under **Section 10(a)** (the **"Indemnified Party"**) agrees to give prompt written notice to the party against whom indemnity is sought (the **"Indemnifying Party"**) of the assertion of any claim, which notice shall describe in reasonable detail the nature of the claim, an estimate of the amount of damages attributable to such claim to the extent feasible, and the basis of the Indemnified Party's request for indemnification under this Agreement. The failure by any Indemnified Party to timely notify the Indemnifying Party shall not relieve the Indemnifying Party of any of its obligations under this **Section 10** except to the extent that such failure prejudices or impairs, in any material respect, any of the rights or obligations of the Indemnifying Party.

(ii) <u>Defense</u>. In connection with any third party claim giving rise to indemnity hereunder, the Indemnifying Party at its sole cost and expense may, upon written notice to the Indemnified Party, elect to assume the defense of any such claim or legal proceeding with counsel of its choosing, provided such counsel is reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in (but not control) the defense of any such action, with its counsel and at its own expense. The Indemnified Party shall not settle or compromise any indemnified liability without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld. In the event that the Indemnifying Party assumes such defense, it shall not compromise or settle any such claim, action, or suit unless (1) the Indemnified Party gives its prior written consent, which shall not be unreasonably withheld, or (2) the terms of the compromise or settlement of such claim, action, or suit provide that the Indemnified Party shall have no responsibility for the discharge of any settlement amount and impose no other obligations or duties on the Indemnified Party, and the compromise or settlement discharges all rights against the Indemnified Party with respect to such claim, action, or suit. If a firm offer is made to settle a pending or threatened claim, action or proceeding for which the Indemnified Party may be entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, Indemnifying Party will give written notice to the Indemnified Party to that effect. If the Indemnified Party fails to consent to such firm offer within ten calendar days after its receipt of such notice, the Indemnifying Party may continue to contest or defend such claim and, in such event, the maximum liability of the Indemnifying Party as to such claim will not exceed the amount of such settlement offer. The Indemnified Party will cooperate with the defense of any such claim, action, or suit and will provide such technical support and access to employees and information as may be reasonably requested by the Indemnifying Party in connection with such defense.

(iii) <u>Disputes</u>. Notwithstanding the other provisions of this **Section 10(c)**, if the Indemnifying Party disputes its potential liability to the Indemnified Party under this **Section 10** and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party shall not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this **Section 10** or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party shall reimburse the Indemnifying Party in full for all costs and expenses of the litigation concerning such dispute. If a dispute over potential liability is resolved in favor of the Indemnified Party, the Indemnifying Party shall reimburse the Indemnified Party in full for all costs of the litigation concerning such dispute.

(iv) <u>Subrogation</u>. In the event of any payment by an Indemnifying Party to an Indemnified Party in connection with any liability, the Indemnifying Party shall be subrogated to and shall stand in the place of the Indemnified Party as to any events or circumstances for which the Indemnified Party may have any right or claim against any third party relating to such event or indemnification. The Indemnified Party shall cooperate with the Indemnifying Party in any reasonable manner in prosecuting any subrogated claim.

(v) <u>Scope</u>. WITHOUT LIMITING OR ENLARGING THE SCOPE OF THE INDEMNIFICATION OBLIGATIONS SET FORTH HEREIN, TO THE FULLEST EXTENT PERMITTED BY LAW, AN INDEMNIFIED PARTY SHALL BE ENTITLED TO INDEMNIFICATION HEREUNDER IN ACCORDANCE WITH THE TERMS HEREOF, REGARDLESS OF WHETHER THE INDEMNIFIABLE LOSS GIVING RISE TO ANY SUCH INDEMNIFICATION OBLIGATION IS THE RESULT OF THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL FAULT OR INADVERTENT VIOLATION OF ANY LAW OF OR BY ANY SUCH INDEMNIFIED PARTY. THE PARTIES AGREE THAT THIS STATEMENT CONSTITUTES A CONSPICUOUS LEGEND.

(vi) <u>Mitigation</u>. Each of the Indemnified Parties shall mitigate, and shall cause each of its affiliates to mitigate, any liability that such party may suffer as a consequence of any matter giving rise to a right to indemnification under **Section 10** by taking all actions which a reasonable and prudent person would undertake to minimize or alleviate the amount of such liability and the consequences thereof, as if such person would be required to suffer the entire amount of such liability and the consequences thereof by itself, without recourse to any remedy against another person.

(d) <u>Survival</u>. The terms of this **Section 10** shall survive the Closing.

11. <u>Closing</u>.

(a) The Earnest Money shall be refundable only as set forth in **Section 7** or **15(b)** of this Agreement or under the circumstances expressly provided below. The obligation of Purchaser to close the purchase of the Property is contingent upon the following, and if any of such events occurs or exists at the time set for the Closing, Purchaser shall have the right to terminate this Agreement and obtain a refund of the Earnest Money:

(i) The filing of any litigation in which a claim is made by a third party claiming superior title to any material portion of the Property;

(ii) The failure of Seller to discharge any Identified Mortgages against the Property on or before the Closing Date;

(iii) Any representation of Seller in **Section 16** hereof is untrue in any material adverse respect;

(iv) A material breach exists by Seller in performing its obligations under this Agreement;

(v)     Any condemnation or eminent domain proceeding exists with respect to the Property entitling Purchaser to terminate this Agreement as provided in **Section 7**; or

(vi)     Any casualty of the Property has occurred entitling Purchaser to terminate this Agreement pursuant to **Section 7**.

(b)     Place and Closing Date.  The closing ("**Closing**") of the purchase and sale of the Property shall take place in the offices of the Escrow Agent at 10:00 a.m. (Houston, Texas time) on August 31, 2010 (the "**Closing Date**"), or such other place or other date as the parties may mutually agree upon in writing signed by each.

(c)     Possession.  At Closing, Seller shall deliver possession of the Property to Purchaser free and clear of all leases and Contracts (as defined below), other than those Contracts Purchaser has expressly agreed to assume and Contracts which are terminable upon not more than thirty (30) days notice and as to which Seller gives notice of termination on the Closing Date.

(d)     Seller's Obligations at Closing.  The obligation of Seller to close any transaction contemplated herein is subject to the occurrence of the Effective Date as defined in **Section 20** hereto.  Seller shall have no obligation to close any transaction contemplated herein absent the occurrence of the Effective Date.  At Closing, Seller shall deliver or cause to be delivered to Purchaser, the following items, all of which shall be duly executed and acknowledged in recordable form, where appropriate:

(i)     Deed.  Deed Without Warranty (the "**Deed**") from Seller to Purchaser conveying the Land, Improvements, and Appurtenances, including the Kurth Lake Water Rights Reservation, subject to the Permitted Title Exceptions and including the reservation provided in **Section 12 (g)** hereof substantially in the form attached hereto as **Exhibit I**.

(ii)     Bill of Sale.  A Bill of Sale to Purchaser transferring the Personal Property subject to the Permitted Title Exceptions and without warranty of any kind or nature substantially in the form attached hereto as **Exhibit J**.

(iii)     General Assignment.  Two (2) executed originals of an Assignment of Seller's interest in the Transferred Contracts and the Permits and Licenses, if any, in form and substance reasonably satisfactory to Seller and Purchaser, assigning to Purchaser the Transferred Contracts and the Permits and Licenses (the "**Assignment of Transferred Contracts, Permits and Licenses**.") substantially in the form attached hereto as **Exhibit K**.

(iv)     Permits and Licenses.  Originals, or photocopies if originals are not available, of all licenses, permits, authorizations and approvals actually in Seller's possession and issued by all governmental authorities having jurisdiction over the Property and which are assignable by Seller without consent of a third party or for which third party consent has been obtained, which are listed on **Exhibit H**.

(v)     Seller's Affidavit.  A Seller's Affidavit, in form approved by Seller, in order for the Title Company to issue the Title Policy.

(vi)     Non-Foreign Person Affidavit.  An affidavit of Seller in form and substance reasonably satisfactory to Purchaser setting forth Seller's United States taxpayer identification number and certifying that Seller is not a foreign person as that term is used and defined in Section 1445 of the United States Internal Revenue Code; and

(vii)     Title Insurance.  The Title Company's irrevocable commitment to issue the Title Policy.

(e)     Miscellaneous.  Any other documents reasonably required by this Agreement or the Title Company to be delivered by Seller or necessary to implement and effectuate the Closing hereunder.

(f)     Purchaser's Obligations at Closing.  At Closing, Purchaser shall, in addition to any other obligations of Purchaser as set forth in this Agreement:

(i)     Purchase Price.  Deliver the balance of the Purchase Price to Seller (or the Escrow Agent for disbursement to Seller) by federal wire transfer of funds (subject to adjustment and proration as hereinbefore provided).

(ii)     Assignment of Contracts.  Two (2) executed originals of the Assignment of Transferred Contracts, Permits and Licenses.

(iii)     Insurance Policy.  Deliver an original copy of the Insurance Policy to Seller together with evidence that the premium for such Insurance Policy has been fully paid.

(iv)     Transfer of Permits and Licenses.  Purchaser shall take all measures required to transfer the Permits and Licenses to its name effective as of the Closing Date, or not transferable, to cause such permit or license to be reissued in Purchaser's name. The Parties acknowledge that certain Permits and Licenses listed on **Exhibit H** hereto may require amendment as a result of a change of use in the Property by Purchaser and that Purchaser shall be responsible for procuring any such amendments. Prior to Closing, Seller shall reasonably cooperate with Purchaser with respect any required transfers, reissuances or amendments of Permits and Licenses, except Seller will not be responsible for any expenditures related to these efforts.

(v)     Miscellaneous.  Deliver any other documents reasonably required by this Agreement or the Title Company to be delivered by Purchaser or necessary to implement and effectuate the Closing hereunder, including, without limitation, a closing statement and documents, consents and approvals from Purchaser and evidence of Purchaser's authority to consummate the purchase of the Property reasonably satisfactory to Seller.

12.    Excluded Property.  The property described or referred to in this **Section 12** constitutes the **"Excluded Property."**

(a)    Kurth Lake Reservoir.  The Kurth Lake Reservoir Property and associated piping within the boundaries of the Property.

(b)    Water Wells.  All water wells located on the Property and associated permits.

(c)    Process Water Storage Facilities.  All process water storage facilities, not including the wastewater treatment and the fire protection system which are part of the Property, wherever situated.

(d)    Emission Credits.  All VOC, NOX and other emissions-related credits associated with the historical operation of the Property prior to the Closing Date by Seller or its predecessors.

(e)    Turbine.  The 50 MW turbine stored on the Property.

13.    Notices.  Any notice, request, approval, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be conclusively deemed to be delivered when personally delivered or when (a) transmitted by fax to the applicable fax number indicated below followed with mailing by overnight delivery with an overnight courier such as Federal Express, Airborne, United Postal Service or other national overnight courier service; or (b) one (1) business day following being deposited for prepaid overnight delivery with an overnight courier such as Federal Express, Airborne, United Postal Service or other national overnight courier service, and such notices are addressed to the following addresses:

If to Seller:

Abitibi-Consolidated Corp.
c/o Abitibi-Consolidated Inc.
1155 Metcalfe
Montreal, Quebec
Canada  H3B 5H2
Attn:   Alice Minville
            Advocate/Legal Counsel
514-394-2147 (Phone) / 514-394-3644 (Fax)

With a copy to:

Baker Botts L.L.P.
1500 San Jacinto Center
98 San Jacinto Boulevard
Austin, Texas  78701
Attn:   Aileen Hooks

512-322-2616 (Phone) / 512-322-8314 (Fax)

If to Purchaser:

> Verdant Industries, LLC
> 6004 South Highway 59
> Lufkin, Texas 75901

with a copy to:

> Josh H. Lowe, Esq.
> Zeleskey Law Firm, PLLC
> 1616 South Chestnut
> Lufkin, Texas 75902-1728
> 936-633-4289 (Phone) / 936-632-6545 (Fax)

The parties may change their respective addresses and/or fax numbers for the receipt of notice hereunder by giving notice thereof to the other party in accordance herewith.

14. Brokers' Commissions.

(a) The Parties hereby represent and warrant to each other that, in connection with this transaction, no third party broker or finder has been engaged or consulted by such Party or through such Party's actions (or claiming through such Party) or is entitled to compensation as a consequence of this transaction except with Grubb & Ellis Company ("**Broker**") pursuant to separate written agreement between Seller and Broker.

(b) At Closing, Seller shall pay Broker the commission due pursuant to the separate written agreement entered into by Seller with Broker.

(c) No commission or other payment shall be due to Broker with respect to the transaction provided for herein if the transaction does not close for any reason whatsoever, including default by a Party.

(d) Each Party hereby indemnifies, defends and holds the other Party harmless against any and all claims of all other brokers, finders or the like, and against the claims of all third parties claiming any right to commission, finder's fee or other compensation by or through acts of such Party or such Party's partners, agents or affiliates in connection with this Agreement.

(f) Pursuant to the requirements of the Texas Real Estate License Act, notice is hereby given to Purchaser that Purchaser should either have an attorney examine an abstract of title to the Land and Improvements or obtain a title insurance policy.

15. Defaults and Remedies.

(a) Default of Purchaser. If the sale and purchase of the Property contemplated by this Agreement is not consummated on account of Purchaser's breach or default hereunder, Seller shall be entitled to either (i) terminate this Agreement by giving Purchaser

written notice hereof and to recover the Earnest Money as an option contract payment and/or liquidated damages and not as a penalty, in full satisfaction of all claims against Purchaser hereunder, except Seller's indemnity obligation for inspections and entry onto the Property, or (ii) sue Purchaser for specific performance to enforce Purchaser's obligation to acquire the Property on the terms set forth in this Agreement. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine and that the Earnest Money is a fair estimate of such damages that has been agreed to by Seller and Purchaser in an effort to cause the amount of said damages to be certain.

(b) <u>Default of Seller</u>. If the sale and purchase of the Property contemplated by this Agreement is not consummated on account of Seller's breach or default hereunder, Purchaser may, as its sole exclusive remedy, either (i) terminate this Agreement and receive the Earnest Money or (ii) sue Seller for specific performance to enforce Seller's obligation to convey the Property pursuant to this Agreement. Notwithstanding any provision in this Agreement to the contrary, it is specifically agreed and understood that Purchaser will not have the right to enforce specific performance of Seller's obligations under this Agreement or to place a lis pendens on the Property or otherwise encumber the Property in any way until and unless: (1) Purchaser timely tenders full performance under this Agreement by delivering to the Title Company, on or before the Closing Date, fully executed originals of all documents required to be executed by Purchaser under the terms and provisions of this Agreement, together with cash or other readily available funds in an amount sufficient to pay the Purchase Price and all expenses which are required to be paid by Purchaser under the terms and provisions of this Agreement; (2) despite such tender of full performance by Purchaser at the Closing, Seller fails or refuses to close the transaction evidenced by this Agreement; (3) Purchaser institutes, within ten (10) business days after the scheduled date for Closing, an action in the Bankruptcy Court seeking to enforce specific performance of Seller's obligations under this Agreement; and (4) Purchaser delivers evidence of access to funds to be borrowed by Purchaser from a qualified lender to finance a portion of the Purchase Price.

(c) <u>Maximum Liability</u>. Notwithstanding anything to the contrary contained in this Agreement or any of the Closing documents, in no event shall Seller's liability for all inaccuracies and/or breaches under **Section 16** (including, Seller's liability for attorneys' fees and costs) and liability to Purchaser for any of the Closing surviving obligations exceed, in the aggregate, two percent (2%) of the Purchase Price.

(d) <u>Independent Knowledge</u>. Notwithstanding anything to the contrary contained in this Agreement, Seller shall have no liability with respect to any Seller's representation, warranty or covenant herein if, prior to the Closing, Purchaser has actual knowledge of the full extent of any breach of such representation, warranty or covenant of Seller, or Purchaser obtains actual knowledge (from any source, including, as a result of Purchaser's due diligence tests, investigations and inspections of the Property or the documents; or as a result of written disclosure by Seller or any of Seller's agents, representatives or employees) that entirely contradicts such Seller's representation, warranty or covenant (and such representation and warranty of Seller shall be deemed modified thereby to be accurate), and Purchaser nevertheless consummates the transaction contemplated by this Agreement (in which event any such breach or contradiction shall be deemed waived by Purchaser).

16.   <u>Seller's Covenants, Representations, and Warranties</u>.  Seller covenants, represents and warrants to Purchaser as follows ("**Seller's Covenants, Representations and Warranties**"), which covenants, representations and warranties shall be considered made as of the Execution Date and which representations and warranties shall be deemed made again as of Closing, except to the extent that Seller obtains knowledge or notice after the Execution Date of any fact or facts which would make any representation or warranty untrue or misleading in any material respect and discloses such fact or facts to Purchaser in writing prior to Closing, in which case Purchaser shall not be obligated to close hereunder and the representations and warranties herein shall be deemed modified by such disclosed information:

(a)     From the Execution Date until Closing, Seller shall not execute any leases or Contracts, or amendments or modifications to any existing such leases or Contracts, affecting the Property which shall be binding on the Property or Purchaser after Closing without the prior written consent of Purchaser.

(b)     From the Execution Date until Closing, Seller shall maintain the Property in substantially the same condition existing as of the date of this Agreement, and wear and tear and casualty and removal of Excluded Assets excepted.

(c)     Seller has the authority and capacity to execute this Agreement, however its authority and capacity to close or perform the transactions contemplated hereunder is subject to and contingent solely upon entry of the Sale Order.

(d)     To Seller's knowledge, there is no pending or threatened condemnation of any portion of the Property and no pending enforcement action brought by any governmental agency or official for violation of any laws, rules, regulations or ordinances to which the Property is subject, nor is there any pending public improvements in, about or outside the Property which will in any manner affect access to the Property or result in additional assessments against the Property.

(e)     There are no tenant leases or occupancy agreements with third parties other than the rights of the City of Lufkin pursuant to the terms of that certain Purchase and Sale Contract (Water Purchase) by and between Seller and the City of Lufkin, Texas.

(f)     As of Closing, there shall be no service, supply, maintenance or management, contracts or agreements affecting the Property which will be binding on the Property or Purchaser after Closing, except for the Transferred Contracts or which are part of the Permitted Title Exceptions or for which termination notices are to be given at Closing.

(g)     There are, and as of Closing there shall be, no recorded or unrecorded contracts and/or options to which Seller is a party granting an option to purchase or lease the Property, or any part thereof.

(h)     Except as set forth in the environmental studies, reports and assessments provided or made available for inspection by Seller or to be provided or made available for inspection to Purchaser under **Section 4** of this Agreement, and except as otherwise disclosed in writing by Seller to Purchaser, to the Knowledge of Seller and without any independent inquiry or investigation, Seller is not aware of and has not received written notice of any pending or

threatened litigation, suit, proceeding, action or notice from any governmental agency of violation of the Property of any Environmental Law related to or any release of (a) any "hazardous substance" as defined in CERCLA, or any regulations promulgated under or pursuant to CERCLA or any applicable state counterpart; (b) any "hazardous waste" as defined in RCRA or regulations promulgated under or pursuant to RCRA or any applicable state counterpart; (c) gasoline, diesel fuel, or other petroleum hydrocarbons; (d) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (e) polychlorinated biphenyls; (f) radon gas; and (g) any other hazardous materials or substances which are now classified or considered to be hazardous or toxic under Environmental Laws.

(i)    There are no actions, proceedings, investigations or arbitrations now pending or to the Knowledge of Seller threatened against Seller which would adversely affect Purchaser as owner of any of the Property.

(j)    Seller has not intentionally withheld copies of any Operating Contracts, Permits, Licenses and other agreements to which Seller is a party affecting or pertaining to the Property which are in Seller's possession and are Known to Seller.

Notwithstanding anything in this Agreement to the contrary, any right of Purchaser to bring any action, claim, suit or proceeding against, or to otherwise recover from, Seller for the breach of a representation or warranty contained in this Agreement, shall be expressly limited by and subject to the following conditions: (i) Purchaser may bring any such action, claim, suit or proceeding or seek such recovery, for any such breach (each, a "**Recovery Action**") only if Purchaser (x) first learns of the breach (the date on which Purchaser learns of the breach is referred to as the "**Knowledge Date**"), and provides Seller with written notice of such breach, after the Closing Date and before the expiration of the Survival Period (as defined below) and (y) files such Recovery Action not later than two (2) years and one (1) day after the Knowledge Date, (ii) Purchaser will not have any right to bring a Recovery Action, or any other cause of action related to this transaction, unless the damage to Purchaser on account of such breach (individually or when combined with damages from other breaches of Seller's representations and warranties hereunder) equals or exceeds $ 250,000.00, and (iii) Purchaser agrees to first seek recovery under any insurance policies prior to seeking recovery from Seller, and Seller shall not be liable to Purchaser for such untruths, inaccuracies and/or breaches if Purchaser's claim is satisfied from such insurance policies. Upon the expiration of the Survival Period, all representations and warranties contained in this Agreement shall be deemed to have merged into the Deed and other instruments of Closing and shall be of no further force or effect. As used herein, the term "**Survival Period**" shall mean a period of eighteen (18) months after the Closing Date. The provisions of this Section shall survive the Closing and the delivery of the Deed and other instruments of Closing.

17.     Purchaser's Representations, and Warranties.  Purchaser represents and warrants to Seller as follows ("**Purchaser's Covenants, Representations and Warranties**"), which representations and warranties shall be considered made as of the Execution Date and again as of Closing, except to the extent that Purchaser obtains knowledge or notice after the Execution Date of any fact or facts which would make any representation or warranty untrue or misleading in any material respect and discloses such fact or facts to Seller in writing prior to Closing, in which case Seller shall not be obligated to close hereunder:

(a)     Except as specifically set forth in Seller's Covenants, Representations and Warranties, Purchaser is relying entirely on its own investigation and inspection of the Property, any other reports, inspections or studies obtained by Purchaser and Purchaser will take title to the Property in its AS IS, WHERE IS condition based solely on such investigation and inspection.

(b)     Purchaser has the authority and capacity to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Purchaser has been authorized to do so.

(c)     Purchaser shall not encumber or cause any liens to be created against the Property in any way, nor record this Agreement or a memorandum hereof, prior to Closing.

Purchaser's Representations and Warranties and Purchaser's liability for breach thereof shall survive Closing and shall not be merged into any deed or other document given at Closing.

18.     Agreements Concerning Paper Machines 1-4 and Paper Machine 8.

(a)     Pre-Closing.  Prior to the Closing Date, Seller may, in its sole discretion disable the existing headbox, forming section, press section, dryers, calander stacks and spare parts and other key parts of paper machines number 1, 2, 3, 4, and 8 (collectively, the "**Paper Machines**") included in the Property by dismantling, removing or destroying these items of key equipment.

(b)     Disabling Paper Machines.  In the event that Seller does not dismantle, remove, or destroy all of the key equipment included in any of the Paper Machines prior to the Closing Date, Seller shall have a period of up to thirty (30) days following the Closing Date to identify in writing to Purchaser any such key equipment included in the Personal Property or the Improvements transferred at Closing that it requests that Purchaser dismantle or destroy.  In the event of such request by Seller, Seller and Purchaser shall act in good faith to reach agreement upon the terms of an agreement governing the dismantling or destruction of such equipment.  Regardless whether Seller exercises its rights pursuant to **Section 18(a)** above or this **Section 18(b)**, Purchaser agrees that it will not sell, trade, exchange or swap any of the Paper Machines or any part thereof to or with any person or entity which was, is or could be producing products that would compete with AbitibiBowater's current range of products, as set forth in **Exhibit F.** Comparable language will be included in any bill of sale or transfer document executed by Purchaser to a transferee.  Upon request by Seller, Purchaser shall provide a list of names of parties that purchase useable parts and the parts sold to such parties.

(c)    Non-Compete.  Purchaser hereby covenants and agrees that none of the Paper Machines or any part thereof shall ever be used by Purchaser or any related person or entity to produce newsprint or commercial printing paper products.

(d)    Consideration.  Purchaser acknowledges that the Purchase Price reflects the scrap-value of the paper machines and paper machine equipment/parts, and that Seller would not have agreed to include those items in the Purchase Price if they were intended for use in producing newsprint or commercial printing paper products or to be re-sold for such use.

(f)    Survival.  All provisions of this **Section 18** shall survive the Closing and shall not merge into any deeds, assignments or documents delivered at the Closing.

19.    Assignment.  Purchaser shall have the right to assign its rights under this Agreement to an affiliated entity of Purchaser or Purchaser's members with Seller's consent. Seller shall have the right to approve that the creditworthiness of the assignee is satisfactory, provided that such assignment shall not release Purchaser from obligations for the indemnity agreements provided for herein and provided such assignment is made and Seller receives written notice of such assignment at least five (5) business days prior to the scheduled Closing Date.  Upon Purchaser's assignment of this Agreement, such assignee shall be deemed a successor to the named Purchaser, and such assignee shall be deemed to have assumed Purchaser's obligations and Purchaser shall be released of any obligations hereunder except for obligations for the indemnity agreements provided for herein.

20.    Bankruptcy Court Approval.  This Agreement shall not become binding on the Seller unless and until the Bankruptcy Court enters an order (the "Sale Order") approving the Agreement and Seller's entry hereto.  The Sale Order shall be substantially in the form of **Exhibit G** hereto and the date the Bankruptcy Court enters the approved Sale Order on its docket shall be the "Effective Date."  Purchaser acknowledges that, prior to entry of the Sale Order, this Agreement is subject to higher and better offers, that Seller may have a fiduciary obligation to entertain any such offers, and that exercise of Seller's fiduciary duties to entertain higher and better offers prior to entry of the Sale Order is not a breach of this Agreement.

21.    Miscellaneous.

(a)    Binding Effect.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective heirs, legal representatives, executors, administrators, successors and permitted assigns.

(b)    Person Defined.  The word "person" as used herein shall include all individuals, partnerships, corporations or any other entities whatsoever.

(c)    Exhibits/Time Periods.  Any reference herein to any exhibits, addenda or attachments refers to the applicable exhibit, addendum or attachment that is attached to this Agreement, and all such exhibits, addenda or attachments shall constitute a part of this Agreement and are expressly made a part hereof.  If any date, time period or deadline hereunder falls on a weekend, a state or federal holiday, or any other day on which the governmental office

for the recordation of the deed is not open for business, then such date shall be extended to the next occurring business day.

(d) Agreement Separable. If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

(e) Counterparts. This Agreement may be executed in any number of counterparts, each of which will, for all purposes, be deemed to be an original, and all of which are identical. Facsimile signatures shall have the same force and effect as executed originals.

(f) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to its conflicts of laws rules or principles.

(g) Entire Agreement. This Agreement and any Confidentiality Agreement executed by Purchaser related to the Property constitute the entire agreement between Seller and Purchaser, and there are no other covenants, agreements, promises, terms and provisions, conditions, undertakings or understandings either oral or written, between them concerning the Property other than those herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Purchaser unless in writing and signed by both Seller and Purchaser.

(h) BANKRUPTCY COURT JURISDICTION. PURCHASER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (a) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENTS EXECUTED PURSUANT HERETO, (b) THE PROPERTY, AND/OR (c) ANY OF THE SELLER'S OBLIGATIONS THAT MAY SURVIVE CLOSING, AND PURCHASER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

(i) Certain Rules of Construction. Whenever the context may require, the singular form of nouns, pronouns and verbs shall include the plural and vice versa. In addition, as used in this Agreement, unless otherwise provided to the contrary, any reference to a "Section" or "Exhibit" shall be deemed to refer to a section of this Agreement or an exhibit attached to this Agreement. The words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation." All references to dollar amounts are to the lawful currency of the United States of America.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the Execution Date.

**SELLER**:

ABITIBI-CONSOLIDATED CORP.,
a Delaware corporation

By: _____
Name:  Luc Lachapelle
Title:  Vice-President of Business Support

*for Pierre Rougeau*

**PURCHASER**:

VERDANT INDUSTRIES, LLC,
a Texas limited liability company

By: _____
Name:  Harold Estees
Title:  ~~President~~ Manager