# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
|  | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Hearing Date: August 25, 2010 at 1:00 p.m. (ET)** |
|  | ) | **(requested)** |
|  | ) | **Objection Deadline: August 18, 2010 at 4:00 p.m. (ET)** |
|  | ) | **(requested)** |
|  | ) |  |

## MOTION PURSUANT TO SECTIONS 363(b) AND 503(b)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER AUTHORIZING THE DEBTORS TO (I) ENTER INTO CERTAIN AGREEMENTS IN CONNECTION WITH ANTICIPATED EXIT FINANCING, (II) INCUR AND PAY RELATED FEES AND (III) FORM A SPECIAL PURPOSE ISSUER

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order, pursuant to sections 363(b)(2) and 503(b)(1) of title 11 of the United Stated Code (the "Bankruptcy Code"), and Rules 2002(a)(2) and (c), and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtors to (i) enter

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

into certain agreements (including amendments to existing agreements) in connection with their anticipated exit financing, (ii) incur and pay related fees and expenses as administrative expenses, and (iii) form a special purpose issuer in connection therewith. In support of this Motion, the Debtors respectfully state as follows:

## **BACKGROUND**

1.     AbitibiBowater Inc. ("AbitibiBowater" and with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Quebec. The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide. It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries. The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party certified 100% of its managed woodlands to sustainable forest management standards. As of March 31, 2010, the Company owned or operated 23 pulp and paper facilities and 30 wood products facilities located in the United States, Canada and South Korea, and 26 wood products facilities in Canada. Employing around 11,900 people, the Company realized sales of approximately $4.4 billion[2] in 2009. Its total assets were $7.0 billion as of March 31, 2010.

2.     The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold. These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels. Supply and demand, in turn, are affected by

---

[2]     All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product. In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

     3.     Specifically, on April 16, 2009 (the "Petition Date"), certain of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[3] On April 17, 2009, certain of the Debtors (the "Cross-Border Debtors")[4] and non-debtor subsidiaries of AbitibiBowater (the "CCAA Debtors" and together with the Cross-Border Debtors, the "Canadian Debtors")[5] applied for protection

---

[3]    The SPV Debtors commenced their Chapter 11 Cases on December 22, 2009.

[4]    The Cross-Border Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[5]    The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova

from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court" and the filing, the "Canadian Proceedings"). Two of the CCAA Debtors -- Abitibi-Consolidated Inc. ("ACI") and Abitibi-Consolidated Company of Canada ("ACCC" and together with ACI, the "Chapter 15 Debtors") -- thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") in this Court seeking relief in support of the Canadian Proceedings. AbitibiBowater and certain of the Debtors also filed for ancillary relief in Canada seeking relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[6]

4.       On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory Creditors Committee of unsecured creditors (the "Creditors Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code

5.       The Company's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors have therefore committed to engage in a joint and

---

Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

[6]     The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

6.    The Company has made significant progress towards confirmation and consummation of viable plans in the Chapter 11 Cases and Canadian Proceedings that will enable the Company to emerge from bankruptcy as a successful going concern. On August 2, 2010, the Debtors filed their *Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as amended, supplemented or otherwise modified, the "Plan") [Docket No. 2796] and their Disclosure Statement (the "Disclosure Statement") for the Second Amended Plan [Docket No. 2797] in the Bankruptcy Court. The monitor in the CCAA Proceedings (the "Monitor") also filed, on behalf of the CCAA Debtors, the *Plan of Reorganization and Compromise under the CCAA* (as amended, supplemented or otherwise modified from time to time, the "CCAA Plan" and, together with the Plan, the "Plans").

7.    In addition, on August 3, 2010, the Bankruptcy Court entered the *Corrected Order (I) Approving the Disclosure Statement; (II) Approving the Form and Contents of the Solicitation Package; (III) Approving the Form and Manner of the Notice of the Confirmation Hearing; (IV) Approving Procedures for Distribution of Solicitation Packages; (V) Approving Procedures for Vote Tabulations; (VI) Approving the Cross-Border Voting Protocol; (VII) Approving the Form and Contents of the Subscription Packages for a Rights Offering; (VIII) Approving Procedures for Participating in Rights Offering; (IX) Establishing a Record Date, a Voting Deadline for Receipt of Ballots and Expiration Dates for the Rights Offering; (X) Establishing the Deadline and Procedures for Filing Objections to Confirmation of the Plan and Asserted Cure Amounts for*

*Executory Contracts and Unexpired Leases that may be Assumed as Part of the Plan; and (XI) Granting Related Relief.* [Docket No. 2824].

       8.     Together, the Plans contemplate a repayment in cash in full of all secured debt, and recoveries for unsecured creditors in the form of equity in the reorganized Company ("New ABH Stock"). The Company intends to fund distributions under the Plans and the operation of the business after emergence from bankruptcy through a combination of cash on hand and proceeds from (i) a rights offering to general unsecured creditors of $500 million (which amount may be decreased or increased under certain conditions) (the "Rights Offering") and (ii) exit financing in the form of an asset-based facility and a notes offering (the "Notes Offering") or a new credit facility.

## JURISDICTION

       9.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

       10.    The relief requested herein is predicated on Bankruptcy Code sections 105(a), 363(b) and 364(b).

## RELIEF REQUESTED

       11.    At this time, the Debtors have made significant progress towards confirmation of a consensual plan of reorganization. As part of their exit from chapter 11, the Debtors have a firm commitment to backstop the $500 million Rights Offering (which amount may be decreased or increased under certain conditions) from certain of the Company's existing bondholders (the "Backstop Parties"). The Debtors have also received this Court's approval of the Disclosure Statement and will begin soliciting votes in connection with

the Plan. The confirmation hearing is currently scheduled for September 24, 2010 and the Debtors believe that they are now on a path to emerge from chapter 11 by mid-October 2010.

12. Over the past several months, the Debtors and their advisors have spent a significant amount of time focusing on the appropriate debt financing to fund the Plan. The Debtors have determined that given the favorable market conditions that currently exist in the high yield debt markets, the Debtors will seek to raise up to approximately $750 million of exit financing in the capital markets through a notes offering (the "New Notes"). Based on the Debtors' discussions with numerous financial institutions, including potential arrangers and underwriters, the Debtors currently believe that the Notes Offering will provide the reorganized Debtors with the best financing terms and greatest operational flexibility upon their emergence from chapter 11. Given the uncertainties in the market, however, to the extent the Debtors determine that a notes offering is not available on satisfactory terms, the Debtors intend to raise the exit financing in the form of a secured term loan credit facility.

13. With respect to the Notes Offering, the Debtors have determined that in order to take maximum advantage of current favorable market conditions, it is in the best interests of their estates to commence the Notes Offering immediately and to market and have the note issuance funded as soon as possible and prior to Plan confirmation.[7] The Debtors believe that even a short delay in this process could result in increased borrowing costs and may result in the Debtors losing the option to raise a substantial portion of the exit financing in the form of New Notes rather than a more costly term credit facility.

---

[7] The Notes Proceeds (as defined below) would be funded into escrow prior to Plan confirmation as described below.

14.     In order to facilitate the funding of the New Notes prior to confirmation - which is the only way to guarantee that the funds will be available to the reorganized Debtors on the effective date of the Plan (the "Effective Date") on current market terms (as discussed in detail below) - the Debtors will form a new non-debtor Delaware company (the "Delaware LLC") that will, in turn, form ABI Escrow Corporation, a new non-debtor Delaware company (the "Escrow Issuer"), which will enter into the initial agreements relating to the New Notes. The Escrow Issuer will also (i) enter into related escrow agreements, pursuant to which the proceeds of the New Notes and other amounts relating to the payment of interim interest and other payment obligations in respect of the New Notes will be held pending consummation of the Plan, and (ii) grant a lien on the proceeds from the New Notes and all other assets it holds (if any). Upon the Effective Date, the Escrow Issuer will merge into one of the reorganized Debtors, which will assume the on-going liability for the New Notes, and the proceeds of the Notes Offering (and other amounts held in escrow) will be released from escrow.

15.     Neither the Delaware LLC nor the Escrow Issuer shall be subject to liens or claims arising under the *Final DIP Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection and (5) Modifying the Automatic Stay* [Docket No. 503] (the "Bowater DIP Order"), the DIP Facility (as defined in the Bowater DIP Order), the *Final Order Supplementing Amended and Restated Guaranteed Receivables Purchase Facility Order and Authorizing Debtors to (I) Extend Maturity Date of Amended and Restated Guaranteed Receivables Purchase Facility, (II) Enter Into*

*Related Documents, and (III) Cause the Payment of Fees in Connection Therewith*
[Docket No. 2322] (the "Securitization Order") and the Existing Securitization Facility
(as defined in the Securitization Order).

    16.    Accordingly, by this Motion, the Debtors seek entry of an order
pursuant to sections 363(b)(1) and 503(b)(1) of the Bankruptcy Code and Bankruptcy
Rules 2002 and 6004 authorizing the Debtors to (i) enter into certain agreements (including
amendments to existing agreements) in connection with their anticipated exit financing,
(ii) incur and pay related fees and expenses as administrative expenses, and (iii) form a special
purpose issuer in connection therewith.

## I.    The New Notes

    17.    Prior to confirmation of the Debtors' Plan, the Escrow Issuer will
issue the New Notes in an amount up to approximately $750 million. The Escrow Issuer
will be created solely to issue the New Notes and grant a lien on the proceeds of the New
Notes. The proceeds of the New Notes (the "Notes Proceeds") will be held in escrow until
certain conditions - including consummation of the Plan - are satisfied (the "Release
Conditions"). If the Release Conditions are satisfied, the Escrow Issuer shall merge into
reorganized AbitibiBowater Inc. ("Reorganized AbitibiBowater"), with Reorganized
AbitibiBowater as the surviving entity, and the Note Proceeds will be released to (and other
escrowed amounts refunded to) Reorganized AbitibiBowater. In such case, the New
Notes will be assumed by, and thus will become, senior obligations of Reorganized
AbitibiBowater.[8]

---

[8]    The New Notes will be senior obligations of (i) initially, the Escrow Issuer and (ii) upon effectiveness
of the Plan, Reorganized AbitibiBowater and the guarantors thereunder.

18.     During the escrow period, the New Notes will be secured by a pledge by the Escrow Issuer of the Note Proceeds and other escrowed amounts, none of which, whether or not in escrow, will constitute property of the Debtors' estates. The Debtors, conversely, will have no obligations under the New Notes (other than the fee, expense reimbursement, interest and indemnity obligations as specified below).

19.     In connection with the private offering of the New Notes, the Debtors have reached an agreement in principle, on an uncommitted basis, with certain financial institutions to be joint bookrunners, joint lead underwriters, joint lead initial purchasers and/or joint lead placement agents (in such capacities, the "Lead Managers").[9]

20.     The terms of the agreement with the Lead Managers are contained in a Securities Engagement Letter (the "Engagement Letter" and, together with Confidential Schedule A referred to below and related documents, the "Exit Financing Agreements"), a copy of which is attached hereto as Exhibit A.[10] The Engagement Letter provides that, among other things, each of the Lead Managers will act as joint bookrunner, joint lead underwriter, joint lead initial purchaser and/or joint lead placement agent for the Escrow Issuer in connection with the Notes Offering (in each case upon the terms and subject to the conditions set forth or referred to in the Engagement Letter). Entry into the Engagement Letter does not constitute a commitment by, or obligation of, any Lead Manager to act as an underwriter, initial purchaser and/or placement agent in connection with the Notes Offering (as such commitment or obligation would exist only upon execution of an underwriting, purchase or placement agreement, and then only in accordance with the terms specified therein).

---

[9]     The Lead Managers are J.P. Morgan Securities Inc. ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), and Citigroup Global Markets, Inc. ("Citigroup").

[10]    Confidential Schedule A (as defined below), is not attached hereto. The Debtors are requesting authorization from the Bankruptcy Court to file Confidential Schedule A under seal.

## II.  Term Loan Facility

21.  In the event the Debtors determine that they cannot pursue a notes offering on satisfactory terms to the Debtors and the Backstop Parties, the Debtors will enter into a term loan facility (the "Term Loan Facility" and, together with the New Notes, the "Exit Financing") up to an aggregate principal amount of up to approximately $750 million.  The proceeds of the Term Loan Facility will be funded to Reorganized AbitibiBowater on the Effective Date.

22.  In connection with the Term Loan Facility, the Debtors have reached agreement in principle, on an uncommitted basis, with certain financial institutions to be lead arrangers and bookrunners (in such capacities, the "Lead Arrangers").[11]

23.  The Exit Financing Agreements provide that, among other things, (i) each of the Lead Arrangers will use their best efforts to, arrange and syndicate the Term Loan Facility and to assist Reorganized AbitibiBowater in obtaining commitments from prospective lenders in respect of such facility, and (ii) the Lead Arrangers will act as joint lead arrangers and joint bookrunners and one of the Lead Arrangers will act as administrative agent for, in each case, the Term Loan Facility.  The obligations under the Engagement Letter do not constitute a commitment by the Lead Arrangers to provide, arrange or syndicate the Senior Term Loan Facility, other than an obligation to use their best efforts to provide such services.

## III.  Fees and Reasonable Expenses To Be Incurred Prior to Confirmation

### A.  *Fees and Expenses Related to the New Notes*

24.  As is reasonable and customary for transactions in the nature of the New Notes, the Debtors will be required to incur obligations to pay certain fees and expenses

---

[11]  The Lead Arrangers are J.P. Morgan, Barclays and Citigroup.

(collectively, the "Notes Obligations") prior to confirmation. The Notes Obligations will be paid as consideration under the Engagement Letter. The terms of the Notes Obligations are set forth in the Engagement Letter, including the confidential fee schedule attached thereto ("Confidential Schedule A").

25. Pursuant to the terms of the Engagement Letter, the Debtors have agreed to the following expense reimbursement and indemnification provisions in connection with the Notes Offering:[12]

- Fees and Expenses: The Company agrees to pay total underwriting or placement fees, discounts or commissions in connection with each Offering equal to a certain percentage of the aggregate principal amount of Securities sold in such Offering (the "Arrangement Fee"), with J.P. Morgan, Barclays and Citigroup being entitled to an aggregate of not less than a certain percentage of such compensation which portion of the Arrangement Fee shall be allocated among J.P. Morgan, Barclays and Citigroup in equal amounts. The Engagement Parties acknowledge and agree that the Work Fee (as defined in the Work Fee Letter) earned by each Engagement Party shall be credited against the Arrangement Fee payable to such Engagement Party.

  The entire amount of the Arrangement Fee for each Offering of Securities shall be earned by the Engagement Parties upon the closing of such Offering, regardless of whether such Offering closes into escrow (an "Escrow Offering"). If any Offering of Securities is not an Escrow Offering, the entire amount of the Arrangement Fee shall be payable upon the closing of such Offering. If an Offering of Securities is an Escrow Offering, the Arrangement Fee with respect to such Offering shall be due and payable to the Engagement Parties as follows: (i) one-half on the date of the closing of such Escrow Offering into escrow and (ii) one-half (the "Delayed Fee Portion") on the date of the release of the proceeds from such Escrow Offering from escrow (regardless of whether such proceeds are used by the Company to fund its emergence from bankruptcy or whether such proceeds are returned to investors (an "Escrow Redemption")); provided that in the event that an Escrow Redemption occurs and the Company subsequently

---

[12] The description of the terms and provisions of the Engagement Letter contained herein are summary in nature, and are qualified in their entirety by the Engagement Letter. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Engagement Letter.

consummates a subsequent Offering of Securities for purposes of consummating the Plans (a "<u>Subsequent Offering</u>") the Company shall be entitled to a credit for a portion of the fees for a limited period following the Subsequent Offering.

In addition, the Company agrees to reimburse the Engagement Parties promptly upon request for all reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable fees, disbursements and other charges of New York legal counsel and one firm of Delaware legal counsel and one firm of Canadian legal counsel (which, in the case of such Delaware counsel and Canadian counsel, shall be the same counsel as are employed by the arrangers for the Company's proposed asset-backed lending facilities unless, in the reasonable opinion of any Engagement Party, representation of all Engagement Parties (and, where applicable, the arrangers for the Company's proposed asset-backed lending facilities) by one such Delaware or Canadian counsel would be inappropriate due to the existence of an actual or potential conflict of interest)) incurred in connection with this letter agreement or any of the transactions contemplated hereby, whether or not any Securities are issued, offered or sold, provided that, except as provided by the following sentence, no such reimbursement of costs and expenses shall be required in connection with any Offering in the event that all the Securities with respect to such Offering are sold in a public or Rule 144A offering and the Engagement Parties are paid the compensation set forth in Confidential Schedule A with respect to such Offering. Notwithstanding the foregoing, if all the Securities are sold in a public or Rule 144A offering and the Engagement Parties are paid the compensation contemplated, by Confidential Schedule A, (i) each of (x) the Company and (y) the underwriters, placement agents or initial purchasers (including the Engagement Parties) for such Offering shall be responsible for one-half of the cost of chartered aircraft for any "roadshow" relating to, such Offering (to the extent the Engagement Parties and the Company have consented to the use of any such aircraft) and (ii) if the Securities issued are secured by collateral, the Company shall reimburse the Engagement Parties for reasonable out of pocket costs and expenses (including, without limitation, reasonable fees, disbursements and other charges of legal incurred in connection with the creation, documentation and perfection of the security interests in the collateral. The parties agree that the provisions of Section 4 of the Engagement Letter do not alter the terms of the Work Fee Letter, dated as of June 23, 2010, between the Engagement Parties and the Company (the "<u>Work Fee Letter</u>"), which Work Fee Letter governs the reimbursement of the Engagement Parties' out-of-pocket costs and expenses (including

fees, disbursements and other charges of legal counsel and other experts) relating to the Plans, motions or submissions to the Courts and other matters related to Company's emergence from bankruptcy.

- Indemnification and Contribution: The Company has agreed to indemnify and hold harmless the Engagement Parties, their respective affiliates and their respective officers, directors, employees, agents and controlling persons (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with the transactions contemplated by the Engagement Letter, or any claim, litigation, investigation or proceedings relating to the foregoing ("Proceedings") regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse such Indemnified Persons for any reasonable and documented legal or other expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Person. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company for or in connection with the Agreement, any transactions contemplated thereby or the Engagement Parties' roles or services in connection therewith, except to the extent that any liability for losses, claims, demands, damages, liabilities or expenses incurred by the Company are finally judicially determined to have resulted from the gross negligence or willful misconduct of such Indemnified Person. In the event any losses, claims, damages, liabilities or expenses are finally judicially determined to have resulted from the gross negligence or willful misconduct of an Indemnified Person, such Indemnified Person shall promptly repay to the Company without interest any amounts advanced to such Indemnified Person by the Company pursuant to this paragraph in respect of such losses, claims, damages, liabilities or expenses that are so determined to have resulted from such Indemnified Person's gross negligence or willful misconduct.

If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only

the relative benefits received by the Company on the one hand and such Indemnified Person on the other hand but also the relative fault of the Company and such Indemnified Person, as well as any relevant equitable considerations. It is agreed that the relative benefits to the Company on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total proceeds received or proposed to be received by the Company pursuant to any sale of the Securities (whether or not consummated) bears to (ii) the fee paid or proposed to be paid to the Engagement Parties in connection with such sale. The indemnity, reimbursement and contribution obligations of the Company shall be in addition to any liability which the Company may otherwise have to an Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any Indemnified Person.

Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings, such Indemnified Person will, if a claim is to be made thereunder against the Company in respect thereof, notify the Company in writing of the commencement thereof; provided that the omission so to notify the Company will not relieve it from any liability which it may have hereunder except to the extent it has been materially prejudiced by such failure. In case any such Proceedings are brought against any Indemnified Person and it notifies the Company of the commencement thereof, the Company will be entitled to participate therein and, to the extent that it may elect by written notice delivered to the Indemnified Person, to assume the defense thereof with counsel reasonably satisfactory to such Indemnified Person; provided that if the defendants in any such Proceedings include both the Indemnified Person and the Company and the Indemnified Person shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Company, the Indemnified Person shall have the right to select separate counsel reasonably satisfactory to the Company to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Company to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by the Indemnified Person of counsel, the Company will not be liable to such Indemnified Person for expenses incurred by the Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence

(it being understood, however, that the Company shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel), approved by J.P. Morgan, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Company shall not have employed counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Company has authorized in writing the employment of counsel for the Indemnified Person.

The Company shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such Proceedings, the Company agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the provisions of Annex A to the Engagement Letter. The Company shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (x) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on claims that are the subject matter of such Proceedings and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

B.   *Fees and Expenses Related to the Term Loan Facility*

26.   Pursuant to the Term Loan Engagement Letter (the "Term Loan Engagement Letter"), attached hereto as Exhibit B,[13] if the Debtors decide to pursue raising a portion of their exit financing through the Term Loan Facility in lieu of the Notes Offering, the Debtors will become obligated to pay or incur fees and expenses (the "Term Loan Facility Obligations," and together with the New Note obligations, the "Exit Financing Obligations") in connection with the Term Loan Facility. The terms of the Term Loan Facility

---

[13]   The Term Loan Fee Schedule (as defined below) is not attached hereto. The Debtors are requesting authorization from the Bankruptcy Court to file the Term Loan Fee Schedule under seal.

Obligations are set forth in the Term Loan Engagement Letter and the related fee schedule attached thereto (the "Term Loan Fee Schedule").

27.    Under the Term Loan Engagement Letter, the Debtors have agreed to the following expense reimbursement and indemnification provisions:[14]

- Fees: As consideration for the agreements of Engagement Parties, the Company agrees to pay the Lead Arrangers, an arrangement fee equal to a certain percentage of the aggregate principal amount of loans made under the Term Loan Facility (such fee, the "Arrangement Fee"), with J.P. Morgan, Barclays and Citigroup being entitled to an aggregate of not less than a certain percentage of such compensation which portion of the Arrangement Fee shall be allocated among J.P. Morgan, Barclays and Citigroup in equal amounts. The Engagement Parties acknowledge and agree that the Work Fee (as defined in the Work Fee Letter) earned by each Engagement Party shall be credited against the Arrangement Fee payable to such Engagement Party. Such compensation shall be in addition to any fees paid to the administrative agent and collateral agent for serving in its capacity as such and any fees paid to Lenders.

  If the Term Loan Facility does not close into escrow, the entire amount of the Term Loan Arrangement Fee shall be payable upon the closing of the Term Loan Facility. If the Term Loan Facility closes into escrow (an "Escrow Closing"), the Arrangement Fee shall be due and payable to the Engagement Parties as follows: (i) one-half on the date of the closing of the Term Loan Facility into escrow and (ii) one-half (the "Delayed Fee Portion") on the date of the release of the escrowed Term Loan Facility (regardless of whether such proceeds are used by the Company to fund its emergence from bankruptcy or whether such proceeds are returned to lenders) (an "Escrow Redemption")); provided that in the event that an Escrow Redemption occurs and the Company subsequently consummates a Term Loan Facility for purposes of consummating the Plans (a "Subsequent Facility" ) the Company shall be entitled to a credit for a portion of the fees for a limited period following the Subsequent Facility.

---

[14]   The description of the terms and provisions of the Term Loan Engagement Letter contained herein are summary in nature, and are qualified in their entirety by the Term Loan Engagement Letter. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Term Loan Engagement Letter.

- <u>Indemnification</u>: The Debtors have agreed (a) to indemnify and hold harmless the Engagement Parties, their affiliates and their respective directors, officers, employees, advisors, and agents (each, an "<u>indemnified person</u>") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with the Term Loan Engagement Letter, the Term Loan Facility, the use of the proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any reasonable and documented legal or other expenses incurred in connection with investigating or defending any of the foregoing, <u>provided</u> that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the willful misconduct or gross negligence of such indemnified person, and (b) to reimburse the Engagement Parties and their affiliates on demand for all reasonable and documented out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses, and reasonable fees, charges and disbursements of New York legal counsel and one firm of Delaware legal counsel and one firm of Canadian legal counsel (which, in the case of such Delaware counsel and Canadian counsel, shall be the same counsel as are employed by the arrangers for the Company's proposed asset-backed lending facilities unless, in the reasonable opinion of any Engagement Party, representation of all Engagement Parties (and, where applicable, the arrangers for the Company's proposed asset-backed lending facilities) by one such Delaware or Canadian counsel would be inappropriate due to the existence of an actual or potential conflict of interest)) incurred in connection with the Term Loan Facility and any related documentation (including the Term Loan Engagement Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. The Debtors have acknowledged that information and documents relating to the Term Loan Facility may be transmitted through Intralinks or another similar secured electronic platform, and notwithstanding anything herein to the contrary, no indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems except to the extent any such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the gross negligence or willful

misconduct of such indemnified person or such indemnified person's affiliates, directors, employees, advisors or agents. In addition, no party hereto shall be liable to any other party hereto for any special, indirect, consequential or punitive damages in connection with the Senior Facilities and any related documentation (including the Term Loan Engagement Letter and the definitive financing documentation), even if advised of the possibility thereof.

## IV.    Agreements to Be Signed by the Debtors

28.    While no Debtor will be undertaking any repayment obligations for the funded New Notes prior to the Effective Date, in order to facilitate the pre-funding of their exit financing in the case of the New Notes, or the funding upon emergence in the case of the Term Loan Facility (if applicable, in lieu of the New Notes), the Debtors seek authority to form the Delaware LLC and the Escrow Issuer and execute all documents and take all other actions necessary or appropriate to consummate the Exit Financing, including the following documents:

29.    In connection with the New Notes:

- The Engagement Letter (and any amendment or replacement thereof), providing for, among other things, expenses, indemnification and releases.

- Confidential Schedule A, providing for the payment of an arrangement fee in connection with the Notes Offering.

- A purchase agreement, underwriting agreement and/or placement agreement and any related agreements.

- An amendment, waiver or supplement to the Debtors' debtor in possession financing credit agreement, and any documents related thereto, as needed to allow for the Notes Offering (the "Amendments").

- Formation documents for the Delaware LLC and the Escrow Issuer and agreements in connection with the funding of, and payment of fee obligations of, the Escrow Issuer.

30.    In connection with the Term Loan Facility, if applicable:

- The Term Loan Engagement Letter (and any amendment or replacement thereof).

- The Term Loan Fee Schedule, providing for an arrangement fee.

- A term loan agreement, promissory notes, guarantee agreement, collateral security agreement, intercreditor agreement, and other documents and instruments as needed in connection with the Term Loan Facility.

31.     The Escrow Issuer will be the issuer prior to emergence in the case of the New Notes, with Reorganized AbitibiBowater assuming obligations and granting security interests, if any, and the domestic subsidiaries of AbitibiBowater being guarantors of the New Notes, following a merger on the Effective Date. As set forth above, the Debtors will be responsible for representations and warranties, fees, expenses and indemnification and all other costs of funding the Escrow Issuer in the manner described herein.

32.     In all, the Debtors believe that approval of the Exit Financing Obligations and Exit Financing Agreements are critical and necessary in order for the Debtors to confirm the Plan and emerge from chapter 11 in the near term. The Debtors believe that the Exit Financing Obligations and Exit Financing Agreements are customary in connection with obtaining exit financing and that incurring such obligations and entering into such agreements is appropriate in light of the value anticipated to be received by the Debtors in obtaining the exit financing contemplated by this Motion.

33.     In connection with both the New Notes and the Term Loan Facility, the Debtors will also enter into one or more agreements for the purpose of ratings evaluation (the "Ratings Evaluation Agreements"), pursuant to which the Debtors will incur certain reasonable and customary fees.

## BASIS FOR RELIEF REQUESTED

34.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell or lease, other than in the

ordinary course of business, property of the estate." 11 US C. § 363(b)(1). Although

section 363(b) does not provide a standard for determining whether a debtor may sell, use or

lease estate property not in the ordinary course of business, courts generally authorize such

transactions if (i) the debtor has an articulated sound business justification, (ii) the debtor

provides adequate notice to all creditors, and (iii) a hearing is held. *See, e.g., In re Martin*,

91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *In*

*re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *In re Montgomery*

*Ward Holding Corp.*, 242 BR. 147,153 (D. Del. 1999); *see also In re Delaware & Hudson*

*Rv. Co.*, 124 B.R. 169,176 (D. Del. 1991) (explaining that the Third Circuit has adopted

the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)

of the Bankruptcy Code).

      35.    A debtor exercises sound business judgment where it determines,

in good faith, that the proposed action is in the best interests of the estate. *See, e.g., In re*

*Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith* v. *Van*

*Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (declaring that a debtor satisfies the business

judgment rule where "the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company"). When a

valid business justification exists for the use of estate property, a debtor's decision to use such

property out of the ordinary course of business enjoys a strong presumption of validity and

shields a debtor's management from judicial second-guessing. *Integrated Res.*, 147 B.R. at

656. Accordingly, upon finding that a debtor's action satisfies the business judgment rule, such

action should be approved under section 363(b)(1) of the Bankruptcy Code.

36.     Bankruptcy courts have approved a debtor's entry into commitment letters or incurring obligations in connection with exit financing on the basis of a debtor's reasonable business judgment. *See e.g., In re Mirant Corp.*, Case No. 03-46590 (DML) (Bankr. N.D. Tex. May 13, 2005) [Docket No. 9764] ("entry into the Commitment Letter is in the best interest of the Debtors' estates and creditors and represents a sound exercise of the Debtors' business judgment"); *In re Integrated Health Services, Inc.*, Case No. 00-00389 (Bankr. D. Del. Feb. 14, 2002) [Docket No. 6662] (authorizing debtors to execute a senior secured credit facilities commitment letter, pay fees in connection therewith and pay initial purchasers of senior subordinated notes a 2.75% purchase discount); *see also In re Smurfit-Stone Container Corp., et al.*, Case No. 09-10235 (BLS) (Bankr. D. Del. Feb. 16, 2010) (approving and authorizing motion for term loan facility).

37.     Courts also have approved the payment of fees and expenses and the provision of indemnification as a sound exercise of business judgment when the transactions enable a debtor to secure financing at a price that the debtor believes is fair. *See, e.g., In re Mirant Corp.,* Case No. 03-46590 (DML) (Bankr. N.D. Tex. May 13, 2005) [Docket No. 9764]; *In re Integrated Health Servs., Inc.*, Case No. 00-00389 (Bankr. D. Del. Feb. 14, 2002); *In re NRG Energy, Inc.*, Case No. 03-13024 (PCB) (Bankr. S.D.N.Y. July 1, 2003). For example, in *In re Mirant Corp.*, the Court permitted the debtor pay an underwriting fee equal to 1.50% of the aggregate commitments related to a revolving credit facility in connection with the acquisition of up to $2.35 billion of exit financing. *See In re Mirant Corp.*, Case No. 03-46590 (DML) (Bankr. N.D. Tex. May 13, 2005). Similarly, courts have approved debtors' requests to form new entities and enter into escrow agreements on the basis of the debtor's reasonable business judgment. *See In re Lyondell Chemical Co.*, Case No. 09-10023

(REG) (Bankr. S.D.N.Y. Mar. 24, 2010) [Docket No. 4051] (authorizing debtors to pre-fund into escrow $2.25 billion of proceeds from exit financing note offering, authorizing escrow agent to execute agreements and grant liens in connection therewith and authorizing the debtor to form a non-debtor entity to receive proceeds of the notes offering); *In re The Reader's Digest Assoc. Inc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Feb. 1, 2010) [Docket No. 617] (authorizing debtors to execute, deliver and perform under and implement escrow and security agreement).

38.     The Debtors have exercised their business judgment in seeking to form the Delaware LLC and the Escrow Issuer, execute the Exit Financing Agreements and pay the Exit Financing Obligations in connection with the pre-funding of the New Notes and the Term Loan Facility (if applicable). In these Chapter 11 Cases, obtaining and pre-funding the New Notes and taking other related actions are necessary for the Debtors to both confirm and fund the Plan and emerge from chapter 11 with sufficient liquidity to continue their business operations in a timely manner. Without this financing, the Debtors will remain in chapter 11 with no clear path toward emergence, which could damage the Debtors' relationships with their customers, harm their business operations, and otherwise result in undue costs and delays in connection with the continuing administration of these Chapter 11 Cases.

39.     In addition, the terms of the Exit Financing are the product of extended, good faith, arm's length negotiations between the Debtors and their counterparties, and are reasonable given the type of transactions contemplated by the Exit Financing Agreements, the size of the proposed financing, and the magnitude of these Chapter 11 Cases. The payment of certain fees and expenses at this time or upon a redemption of the New Notes, and the agreement to provide indemnities, are integral terms of the proposed Exit

Financing and are necessary for the Debtors and their counterparties to move forward with the financing process. Moreover, given the favorable environment that exists today for borrowers in the high-yield debt markets, the Debtors believe that they are in a position to conduct a notes offering on beneficial terms that will maximize the value of the Debtors' estates. If the Debtors were to delay the pricing and pre-funding of the New Notes or, if applicable, the Term Loan Facility, such delay could result in the Debtors, and ultimately the Reorganized Debtors, incurring additional costs related to their financing and a prolonged, indefinite stay in chapter 11. Accordingly, the Exit Financing will yield the best result for the Debtors' estates and is in the best interests of the Debtors, their estates and their creditors.

## THE EXIT FINANCING OBLIGATIONS ARE ADMINISTRATIVE EXPENSES

40. Section 503(b)( 1 )(A) of the Bankruptcy Code provides that upon notice and a hearing, the actual necessary costs and expenses of preserving the estate constitute administrative expenses. 11 U.S.C. § 503(b)(1)(A). Specifically, section 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including [ ] the actual necessary costs and expenses of preserving the estate ..." *Id.* The Exit Financing Obligations clearly constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Without the payment of the relevant fees and escrow expenses, agreement to enter into the indemnification obligations or the obligation to redeem the New Notes in the event the Release Conditions are not satisfied, the Debtors would be unable to secure exit financing. As noted above, the lack of exit financing would jeopardize the Debtors' ability to confirm their Plan and to preserve the value of their businesses for the benefit of creditors. The Exit Financing Obligations, therefore, should be awarded administrative expense status under section 503(b)(1) of the Bankruptcy Code. The Debtors propose that any administrative

expense shall be junior to (a) all superpriority and administrative claims arising under the Final Order (1) Approving Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Expense Status; (4) Granting Adequate Protection; and (5) Modifying the Automatic Stay (dated June 4, 2009 and conformed on June 16, 2009) and the Carve Out as defined therein and (b) all superpriority and administrative liens and claims arising under the Final Order (1) Authorizing Entry into an Amended and Restated Guaranteed Receivables Purchase Facility, (2) Authorizing the Sale of Receivables and Related Rights Pursuant to an Amended and Restated Securitization Program, (3) Authorizing ACSC to Cause Payment of Certain Fees Pursuant to the Engagement Letters, (4) Modifying the Automatic Stay, (5) Authorizing the Use of Cash Collateral, (6) Granting Superpriority Administrative Expense Claims, (7) Granting Adequate Protection, (8) Scheduling A Hearing and (9) Granting other Related Relief [Docket No. 595] and the Carve Out (as defined therein).

## WAIVER OF BANKRUPTCY RULE 6004(h)

41.    The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise."  As set forth in the Motion, the relief proposed herein is essential and necessary for the Debtors to fund the Plan and emerge from chapter 11 successfully.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

42.    Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the Creditors Committee; (vi) counsel to the agents for the Debtors' prepetition loan facilities; (vii) counsel to the agents for the Debtors' post-petition lenders; (viii) the indenture trustees for each series of the Debtors' pre-petition notes; and (ix) counsel to the Lead Managers and Lead Arrangers; and (x) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b). In light of the nature of the relief requested in this Motion, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

43.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

# CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the Proposed Order, in substantially the form attached hereto as <u>Exhibit C</u>, authorizing the Debtors to (i) enter into the Exit Financing Agreements (including the indemnification provided therein), (ii) pay the Exit Financing Obligations and other related fees and expenses as administrative expenses, and (iii) form ABI Escrow Corporation to receive the pre-funded proceeds of the Exit Financing prior to confirmation.

Dated: Wilmington, Delaware
August 6, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Kelley A. Cornish
Jeffrey D. Saferstein
Alice Belisle Eaton
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors in Possession*