# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Hearing Date: August 25, 2010 at 1:00 p.m. (ET) (requested)** |
| | ) | **Objection Deadline: August 18, 2010 at 4:00 p.m. (ET) (requested)** |

**MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 364(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORITY TO (A) ENTER INTO AN ASSET-BASED FACILITY COMMITMENT LETTER AND RELATED FEE LETTERS, (B) PAY ASSOCIATED FEES AND EXPENSES, AND (C) FURNISH RELATED INDEMNITIES**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order, pursuant to sections 105(a), 363(b) and 364(b) of title 11 of the United Stated Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authority to (a) enter into (i) a $600 million Senior Secured Asset-Based

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

Credit Facility Commitment Letter (the "Commitment Letter") by and among AbitibiBowater, Citigroup Global Markets Inc. ("CGMI"), Barclays Capital, the investment banking division of Barclays Bank PLC ("Barclays Capital"), and J.P. Morgan Securities Inc. ("JPMSI"), (together, the "Joint Lead Arrangers"), and certain other financial institutions (together with CGMI, the "Agents"); (ii) the Joint Lead Arranger Fee Letter (the "Arranger Fee Letter," and together with the Agent Fee Letter, defined below, the "Fee Letters") by and among AbitibiBowater, and each of the Joint Lead Arrangers and JPMorgan Chase Bank, N.A. ("JPMCB"), and (iii) the Administrative Agency Fee Letter by and among AbitibiBowater and Citibank N.A. (the "Agent Fee Letter" and together with the Commitment Letter and Arranger Fee Letter, the "ABL Facility Commitment Documents"), (b) pay those fees and expenses expressly set forth in, and pursuant to the terms and conditions of, the ABL Facility Commitment Documents, and (c) furnish those indemnities expressly set forth in, and pursuant to the terms and conditions of, the ABL Facility Commitment Documents. In support of this Motion, the Debtors respectfully state as follows:

## BACKGROUND

1.     AbitibiBowater Inc. ("AbitibiBowater" and with its subsidiaries and affiliates, the "Company") is incorporated in Delaware and headquartered in Montreal, Quebec. The Company is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide. It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries. The Company is also among the world's largest recyclers of newspapers and magazines, and has third-party certified

100% of its managed woodlands to sustainable forest management standards. As of March 31, 2010, the Company owned or operated 23 pulp and paper facilities and 30 wood products facilities located in the United States, Canada and South Korea, and 26 wood products facilities in Canada. Employing around 11,900 people, the Company realized sales of approximately $4.4 billion[2] in 2009. Its total assets were $7.0 billion as of March 31, 2010.

     2.     The Company's financial performance depends primarily on the market demand for its products and the prices at which they can be sold. These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels. Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, the Company's primary product. In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as the Company's high debt levels and the overall weakness in consumer demand, have adversely impacted the

---

[2]    All monetary figures are presented in U.S. dollars unless specifically noted otherwise.

Company's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

3.     Specifically, on April 16, 2009 (the "Petition Date"), certain of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[3] On April 17, 2009, certain of the Debtors (the "Cross-Border Debtors")[4] and non-debtor subsidiaries of AbitibiBowater (the "CCAA Debtors" and together with the Cross-Border Debtors, the "Canadian Debtors")[5] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court" and the filing, the "Canadian Proceedings"). Two of the CCAA Debtors -- Abitibi-Consolidated Inc. ("ACI") and Abitibi-Consolidated Company of Canada ("ACCC" and together with ACI, the "Chapter 15 Debtors") -- thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") in this Court seeking relief in support of the Canadian Proceedings. AbitibiBowater and certain of the Debtors also filed for

---

[3]    The SPV Debtors commenced their Chapter 11 Cases on December 22, 2009.

[4]    The Cross-Border Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[5]    The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

ancillary relief in Canada seeking relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[6]

4.    On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory Creditors Committee of unsecured creditors (the "Creditors Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

5.    The Company's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

## JURISDICTION

6.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The relief requested herein is predicated on Bankruptcy Code sections 105(a), 363(b) and 364(b).

## THE ABL FACILITY COMMITMENT DOCUMENTS

8.    On August 2, 2010, the Debtors filed their *Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as amended,

---

[6]    The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc., Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

supplemented or otherwise modified, the "Plan") [Docket No. 2796] and their Disclosure

Statement (the "Disclosure Statement") for the Second Amended Plan [Docket No. 2797].

The Court approved the Disclosure Statement on August 3, 2010, and set a hearing

regarding confirmation of the Plan for September 24, 2010.

   9. A key element of the restructuring contemplated by the Plan is the

availability of exit financing that provides sufficient funding for the Debtors to meet their

cash obligations under the Plan and for the reorganized Debtors to have sufficient

working capital for their business operations and general corporate purposes. In that

regard, the Debtors currently contemplate entering into engagement letters with respect to

the issuance of securities and a separate revolving credit facility (which is the subject of

this Motion) in connection with their emergence from chapter 11. Section 6.11 of the

Plan specifically provides that certain of the Debtors shall enter into definitive

documentation for their exit financing on or prior to the effective date of the Plan. Entry

into the ABL Facility Commitment Documents constitutes the first step in arranging the

Debtors' contemplated US $600,000,000.00 exit revolving loan facility (the "ABL

Facility").

   10. The Debtors have long known that exit financing would be

required to implement a Plan of reorganization. Accordingly, the Debtors maintained

ongoing relationships with numerous financial institutions and completed numerous

analyses as to the likely amount and structure for its exit financing. After examining their

options, and in consultation with their financial advisors, The Blackstone Group, the

Debtors selected the Joint Lead Arrangers to arrange the financing under the ABL

Facility. The Debtors and the Joint Lead Arrangers negotiated each of the ABL Facility

Commitment Documents extensively, at arm's-length, and in good faith, with the advice of their respective counsel and financial advisors, culminating in the ABL Facility Commitment Documents described in this Motion.

11.    The Commitment Letter provides that, upon execution thereof by the parties thereto and the effectiveness thereof, CGMI, Barclays Bank PLC ("Barclays") and JPMSI, will each commit to provide $100,000,000 of financing pursuant to the ABL Facility upon the terms of and subject to the conditions set forth or referred to in the Commitment Letter and in the Summary of Principal Terms and Conditions (the "Term Sheet") attached to the Commitment Letter as Exhibit A.[7] The Joint Lead Arrangers have the right to arrange a syndicate of lenders to provide the ABL Facility. Pursuant to the Commitment Letter, (a) CGMI, Barclays Capital and JPMSI will act as joint lead arrangers and joint bookrunners, (b) Barclays Capital will act as syndication agent for the ABL Facility, (c) JPMSI will act as documentation agent for the ABL Facility, and (d) Citibank N.A. will act as sole administrative agent and collateral agent for the ABL Facility. The Commitment Letter also provides that AbitibiBowater will provide indemnities to each Lender (as defined below), the Joint Lead Arrangers and each other designated agent or co-agent, if any (together with the Joint Lead Arrangers, the "Agents") pursuant to the terms of the Commitment Letter and will reimburse the Joint Lead Arrangers for reasonable out-of-pocket expenses.

12.    In return for the Agents' undertakings set forth in the Commitment Letter, AbitibiBowater has agreed, among other things, to enter into (i) the Arranger Fee

---

[7]    The draft Commitment Letter attached hereto as Exhibit A does not constitute a financing commitment; however, upon completion and execution of the Commitment Letter and the effectiveness thereof, the commitments described in the Commitment Letter will constitute valid commitments to provide financing in accordance with the terms and conditions of the Commitment Letter.

Letter, pursuant to which AbitibiBowater agrees to pay an arrangement fee to each of the Joint Lead Arrangers, participation fees to Citibank N.A. (for the accounts of itself and certain other Agents) and fronting fees to Citibank N.A. (as defined in the Commitment Letter), Barclays, or JPMCB each as set forth in the Arranger Fee Letter, and (ii) the Agent Fee Letter, pursuant to which AbitibiBowater agrees to pay certain additional fees to Citibank N.A., as set forth in the Agent Fee Letter. The Fee Letters were negotiated at arms-length and in good faith and the fees provided therein are market rates for the type of financing being provided.[8]

13.    The Debtors further anticipate that they will separately seek authority from the Court to enter into definitive documentation in respect of the ABL Facility at the appropriate time.

## SUMMARY OF THE TERMS AND CONDITIONS OF THE ABL FACILITY COMMITMENT DOCUMENTS[9]

14.    The Commitment Letter, which is attached as Exhibit A to this Motion, contains various provisions related to the indemnification, fees and expenses, and termination of AbitibiBowater's engagement of the Joint Lead Arrangers, which are outlined below:

- Commitments: Subject to the satisfaction of conditions precedent, upon completion and execution of the Commitment Letter, Citibank N.A., Barclays, and JPMCB will have each committed to providing funds under the ABL Facility in the respective amounts set forth in the Commitment Letter, subject to the terms and

---

[8]    Concurrently with the filing of this Motion the Debtors are filing a motion for entry of an order authorizing the Debtors to file the Fee Letters under seal.

[9]    The description of the terms and provisions of the ABL Facility and the ABL Facility Commitment Documents contained herein are summary in nature, and are qualified in their entirety by the Term Sheet, the Commitment Letter, the Arranger Fee Letter, and the Agent Fee Letter. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Term Sheet and ABL Facility Commitment Documents.

conditions of the Commitment Letter, including receipt by the Debtors of commitments from other Lenders (defined below) in an aggregate amount not less than $300,000,000.00.

- Syndication: The Joint Lead Arrangers and Joint Bookrunners intend to syndicate all or a portion of the Asset-Based Facility, including all or a portion of the Exit Commitments, to one or more other financial institutions that will become parties to the Credit Documents, pursuant to a syndication to be managed by the Joint Lead Arrangers (the financial institutions becoming parties to the Credit Documents, together with the Joint Lead Arrangers and the Joint Bookrunners, being collectively referred to herein as the "Lenders"). The Joint Lead Arrangers will commence syndication efforts promptly upon the execution of the Commitment Letter. Citibank will manage all aspects of the syndication in consultation with the Barclays, JPMSI, and the Company, including the timing of all offers to potential Lenders, the determination of the amounts offered to potential Lenders, the acceptance of commitments of the Lenders, the assignment of any titles and the compensation to be provided to the Lenders.

- Termination: The Exit Commitments and the other agreements under the Commitment Letter, except as expressly provided therein, shall automatically terminate on the earliest of (a) the Effective Date, (b) the completion of the Reorganization without the closing of the Asset-Based Facility, (c) the dismissal or conversion to proceedings under Chapter 7 of the Bankruptcy Code of any of the U.S. Bankruptcy Cases with respect to any Material Debtor, or the appointment in any of the U.S. Bankruptcy Cases with respect to any Material Debtor of a trustee or examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) (d) the dismissal or conversion of the Canadian Cases to proceedings under the Bankruptcy and Insolvency Act (Canada) with respect to any Material Debtor or the appointment in any of the Canadian Cases with respect to any Material Debtor of a trustee in bankruptcy, receiver, interim receiver or similar official (e) a material breach by you, or a failure of a condition, under any of the Commitment Documents, (f) 11:59 p.m. New York City time on August 31, 2010 if the Commitment Letter Approval Date (as defined below) has not occurred on or prior to such date, (g) the date on which the Commitment Letter Approval Order (as defined below) shall have been reversed, vacated, or amended, supplemented or otherwise modified without consent of the Joint Lead Arrangers and the Joint Bookrunners and (h) 11:59 p.m. New York City time on December 31, 2010 if the Effective Date has not occurred on or prior to such date. The "Commitment Letter

Approval Date" shall mean the date on which the US Bankruptcy Court shall have entered an order (the "Commitment Letter Approval Order"), in form and substance satisfactory to the Joint Lead Arrangers and Joint Bookrunners, approving the entry by the US Debtors into the Commitment Documents and the payment of all fees and expenses when due thereunder (with any unpaid fees and expenses being entitled to priority as administrative expenses claims under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code whether or not the Asset-Based Facility is entered into or funded junior to (a) all superpriority and administrative claims arising under the Final Order (1) Approving Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Expense Status; (4) Granting Adequate Protection; and (5) Modifying the Automatic Stay (dated June 4, 2009 and conformed on June 16, 2009) and the Carve Out as defined therein and (b) all superpriority and administrative liens and claims arising under the Final Order (1) Authorizing Entry into an Amended and Restated Guaranteed Receivables Purchase Facility, (2) Authorizing the Sale of Receivables and Related Rights Pursuant to an Amended and Restated Securitization Program, (3) Authorizing ACSC to Cause Payment of Certain Fees Pursuant to the Engagement Letters, (4) Modifying the Automatic Stay, (5) Authorizing the Use of Cash Collateral, (6) Granting Superpriority Administrative Expense Claims, (7) Granting Adequate Protection, (8) Scheduling A Hearing and (9) Granting other Related Relief [Docket No. 595] and the Carve Out (as defined therein)). "Material Debtor" means (i) the Company and (ii) any US Debtor or Canadian Debtor that (x) owns assets of a type that would be eligible for inclusion in the Borrowing Base or (y) together with all other subsidiaries that are subject to such dismissal or conversion, owns assets having a fair market or book value greater than 2% of the fair market or book value of the property, plant and equipment, inventory and receivables of the Company and its subsidiaries, on a consolidated basis.

- Indemnification: AbitibiBowater and certain of its subsidiaries will jointly and severally, indemnify and hold harmless each Joint Lead Arranger, each Joint Bookrunner, each Agent and each other agent or co-agent (if any) designated by the Joint Lead Arrangers with respect to the Asset-Based Facility, and each Lender (including in any event each of Citigroup, Barclays and JPMCB) and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without

limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case, arising out of or in connection with or by reason of the Commitment Letter or the Asset-Based Facility or the transactions contemplated hereby or thereby or any actual or proposed use of the proceeds of the Asset-Based Facility, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity will be effective whether or not such investigation, litigation or proceeding is brought by the Debtors or any of the Debtors' respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Party will have any liability (whether in contract, tort or otherwise) to the Debtors or any of their affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct. In no event, however, will any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including without limitation, any loss of profits, business or anticipated savings).

The Debtors acknowledge that information and other materials relative to the Asset-Based Facility and the transactions contemplated in the Commitment Letter may be transmitted through the Platform. No Indemnified Person will be liable to the Debtors or any of their affiliates or any of their respective security holders or creditors for any damages arising from the use by unauthorized persons of information or other materials sent through the Platform that are intercepted by such persons.

- <u>Cost and Expenses</u>: AbitibiBowater will pay, or reimburse each Joint Lead Arranger on the earlier of (i) five business days of invoicing or (ii) the Effective Date, for all reasonable and documented out- of-pocket costs and expenses incurred by it (whether incurred before or after the date hereof) in connection with the Asset-Based Facility and the preparation, negotiation, execution and delivery of the Commitment Letter, including without limitation, the reasonable fees and expenses of one U.S. counsel, one Delaware

counsel, one Canadian and, if necessary, of one local counsel in any relevant jurisdiction for all Joint Lead Arrangers and arrangers of the Senior Secured Notes (unless, in the reasonable opinion of any Joint Lead Arranger, representation of all Joint Lead Arrangers (and, where applicable, the underwriters for the Senior Secured Notes) by one such U.S., Delaware or Canadian counsel would be inappropriate due to the existence of an actual or potential conflict of interest) regardless of whether any of the transactions contemplated hereby are consummated. AbitibiBowater will also pay all costs and expenses of each Joint Lead Arranger (including without limitation, the reasonable fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights and remedies under this Commitment Letter.

- Confidentiality: AbitibiBowater agrees that the Commitment Letter is for their confidential use only and that neither its existence nor its terms will be disclosed to any person other than their affiliates and their respective officers, directors, employees, advisors, agents and representatives (the "Representatives"), and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby; *provided, however,* that AbitibiBowater may make such public disclosure of the terms and conditions hereof as is required to obtain the Commitment Letter Approval Order (including filing of the Commitment Letter with the Bankruptcy Court and the disclosure of the Commitment Letter to the Office of the United States Trustee and any official committee of creditors appointed in the Bankruptcy Case) or is required by law, in the opinion of their counsel, to make; *provided further,* that the confidentiality of each of the Fee Letters (and the fees provided for therein) shall be governed by the confidentiality provisions of the respective Fee Letters. It is understood and agreed that the foregoing restrictions (other than restrictions relating to the Fee Letters) shall cease to apply after the Commitment Letter has been accepted by AbitibiBowater and had become publicly available as a result of its disclosure in accordance with the terms of this paragraph. Notwithstanding any other provision in the Commitment Letter, AbitibiBowater and their Representatives will not be limited from disclosing the U.S. tax treatment or U.S. tax structure of the Asset-Based Facility.

15. The Commitment Letter references the Term Sheet, which is

attached thereto, which sets forth the material terms and conditions for the ABL Facility.

The final terms and conditions of the ABL Facility will be included in a comprehensive

new credit agreement that is expected to be agreed upon between the Debtors and the Agents.

16.    Various key terms and provisions of the ABL Facility as set forth in the Term Sheet are summarized below:

- Borrower: The U.S. Borrowers and the Canadian Borrowers are collectively referred to as the "Borrowers". The "U.S. Borrowers" are AbitibiBowater Inc. (the "Company") and each of the Company's wholly owned U.S. Subsidiaries that is a material subsidiary. The U.S. Borrowers are jointly and severally liable for all of the obligations of the U.S. Borrowers under the Asset-Based Facility. The "Canadian Borrowers" are each of the Company's wholly owned Canadian subsidiaries that is a material subsidiary. Each of the Canadian Borrowers shall be designated as a borrower for the Canadian Sub-Facility (as defined in the Term Sheet). The Canadian Borrowers are jointly and severally liable for all of the obligations of the Canadian Borrowers under the Canadian Sub-Facility. .

- Guarantees: All obligations of the Borrowers under the Asset-Based Facility including, if applicable, obligations of the Borrowers arising under the Secured Hedging Agreements (as defined in the Term Sheet) and the Secured Cash Management Agreements (as defined in the Term Sheet), will be unconditionally guaranteed, jointly and severally on a senior secured basis (the "U.S. Guarantees") by the U.S. Borrowers (the "U.S. Guarantors," and, together with the U.S. Borrowers, the "U.S. Credit Parties"). All obligations of the Canadian Borrowers under the Asset-Based Facility including, if applicable, obligations of the Canadian Borrowers arising under the Secured Hedging Agreements and the Secured Cash Management Agreements, will be unconditionally guaranteed, jointly and severally on a senior secured basis (the "Canadian Guarantees" and, together with the U.S. Guarantees, the "Guarantees") by the Canadian Borrowers (the "Canadian Guarantors" and, together with the Canadian Borrowers, the "Canadian Credit Parties"). The U.S. Credit Parties and the Canadian Credit Parties are collectively referred to herein as the "Credit Parties". Each such entity providing a guarantee is referred to herein as a "Guarantor".

- Administrative Agent: Citibank, N.A. or an affiliate thereof will act as sole and exclusive administrative agent (in such capacity, the "Administrative Agent") for the Lenders.

- Collateral Agent:  Citibank, N.A., will act as collateral agent (the "Collateral Agent") for the Lenders.

- Joint Lead Arrangers:  Citigroup, Barclays Capital, the investment banking division of Barclays Bank PLC ("Barclays Capital"), and JPMSI will act as exclusive joint lead arrangers (collectively, together with their affiliates, the "Joint Lead Arrangers").

- Joint Bookrunners:  Citigroup, Barclays Capital, and JPMSI will act as joint bookrunners (collectively, together with their affiliates, the "Joint Bookrunners").

- Syndication Agent:  Barclays Capital will act as syndication agent (the "Syndication Agent") for the Asset-Based Facility.

- Documentation Agent:  JPMSI will act as documentation agent (the "Documentation Agent") for the Asset-Based Facility.

- Asset-Based Facility:  A non-amortizing revolving credit facility, subject to Maximum Facility Availability (as defined in the Term Sheet) will be made available to the Borrowers in a principal amount of up to $600,000,000 (the "Asset-Based Facility") during the period from (and including) the Effective Date (as defined in the Term Sheet) to (but excluding) the Termination Date (as defined in the Term Sheet).  Subject to the Maximum U.S. Borrower Availability (as defined in the Term Sheet), the Asset-Based Facility will be available to the U.S. Borrowers (denominated in U.S. dollars); *provided that* subject to Maximum Canadian Borrower Availability (as defined in the Term Sheet), up to $400,000,000 of the Asset-Based Facility, will be available to the Canadian Borrowers (denominated in U.S. dollars or Canadian dollars) (the "Canadian Sub-Facility").  All loans outstanding under the Asset-Based Facility (the "Loans") shall become due and payable on the Termination Date.

  Letters of Credit: Up to $150,000,000 of the Asset-Based Facility, subject to Maximum Facility Availability, will be available for the issuance of letters of credit by the Fronting Banks for the account of the Borrowers (the "Letters of Credit").  No Letter of Credit will be issued or shall expire after the 30th day preceding the Termination Date and none shall have a term of more than one year; *provided that* any Letter of Credit may provide for renewal thereof for additional periods of up to twelve months.

  Swingline Loans: Up to $20,000,000 of the Asset-Based Facility, subject to Maximum Facility Availability, will be

available at the discretion of Citibank, N.A. (or an affiliate thereof) as swingline lender (the "Swingline Lender") to the Borrowers for swingline loans from the Swingline Lender.

Increase Option: The Asset-Based Facility may from time to time, at the option of the Borrowers, be increased through the addition of new Lenders or increases in the commitments of existing Lenders, subject to the satisfaction of customary conditions; *provided* that no existing Lender will be obligated to provide any such increase. The aggregate amount of all increases in the Asset-Based Facility may not exceed $100,000,000 and each individual increase(s) shall be in an amount greater than or equal to $25,000,000.

- Use of Proceeds: The proceeds of the Asset-Based Facility will be used by the Borrowers for funding amounts payable under the Plan and the CCAA Plan and for working capital and general corporate purposes.

- Termination Date: The fourth anniversary of the Effective Date (the "Termination Date").

- Maximum Facility Availability: Availability under that portion of the Facility that may be made available to U.S. borrowers (the "Maximum U.S. Borrower Availability") will be at any date an amount equal to the lesser of (a) the then effective commitments under the Asset-Based Facility on such date and (b) the aggregate amount of the Borrowing Base (as defined in the Term Sheet) attributable to the U.S. Credit Parties on such date. Availability under the Canadian Sub-Facility (the "Maximum Canadian Borrower Availability") will be at any date an amount equal to the lesser of (a) $400,000,000 and (b) the aggregate amount of the Borrowing Base attributable to the U.S. Credit Parties on such date. Notwithstanding the foregoing, aggregate availability under the Asset-Based Facility (the "Maximum Facility Availability") will be, at any date, an amount equal to the lesser of (i) the then effective commitments under the Asset-Based Facility on such date and (ii) the aggregate amount of the Borrowing Base (as defined in the Term Sheet) on such date.

- Borrowing Base: At any time, an amount equal to the sum of (i) 85% of the eligible accounts receivable *plus* (ii) the lesser of (x) 65% of eligible inventory and (y) 85% of the net orderly liquidation value of such eligible inventory, *minus* (iii) the sum of (x) aggregate net exposure under Secured Hedging Agreements (as defined in the Term Sheet) which are pari passu in the right of

payment with the Asset-Based Facility, (y) aggregate net exposure under Secured Cash Management Agreements (as defined in the Term Sheet) which are pari passu in the right of payment with the Asset-Based Facility and (z) reserves established by the Administrative Agent in its reasonable credit judgment; *provided* that the methodology for deriving Borrowing Base will not be materially different than that reflected in the spreadsheet furnished by the Administrative Agent to the Company on August 3, 2010 (the "Spreadsheet").

*"Secured Hedging Agreements"* means certain interest rate, foreign currency and commodity hedging agreements entered into by the Credit Parties with the Lenders (as defined in the Term Sheet) or their affiliates designated as such by the Company.

*"Secured Cash Management Agreements"* means certain cash management agreements entered into by the Credit Parties with the Lenders or their affiliates and designated as such by the Company.

- Interest Rates:  Loans will bear interest, at the option of the Borrowers, at one of the following rates: (i) the Applicable Margin (as defined in the Term Sheet) *plus* the Alternate Base Rate (as defined in the Term Sheet), calculated on a 365/366-day basis and payable monthly in arrears; or (ii) the Applicable Margin *plus* the current LIBO rate as quoted by Reuters LIBOR01 page, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions for interest periods of one month (the "LIBO Rate"), calculated on a 360-day basis and payable at the end of the relevant interest period.

- Security:  All amounts owing by the U.S. Credit Parties under the Asset-Based Facility will be secured by (i) a first priority perfected lien on all now owned or hereafter acquired inventory, accounts receivable, cash and other related rights to payment, deposit and securities accounts, books and records, intangibles to the extent necessary to sell the U.S. ABL Collateral (as defined in the Term Sheet), and contracts and assets of the U.S. Credit Parties, evidencing or relating to the inventory or accounts receivable, together with proceeds of the foregoing (collectively, the "U.S. ABL Collateral") and (ii) a second priority perfected lien on all other now owned or hereafter acquired assets of the U.S. Credit Parties pledged to secure the Senior Secured Notes (as defined in the Term Sheet) (other than the U.S. ABL Collateral) (collectively, the "Other U.S. Collateral" and together with the U.S. ABL Collateral, the "U.S. Tranche Collateral").  All amounts owing by the Canadian Credit Parties under the Asset-Based Facility will be secured by (i) a first priority perfected lien on all now owned or

hereafter acquired inventory, accounts receivable, cash and other related rights to payment, deposit and securities accounts, books and records, intangibles to the extent necessary to sell the Canadian ABL Collateral (as defined in the Term Sheet) and contracts and assets of the Canadian Credit Parties evidencing or relating to the inventory or accounts receivable, together with proceeds of the foregoing (collectively, the "Canadian ABL Collateral") and (ii) a second priority perfected lien on all other now owned or hereafter acquired assets of the Canadian Credit Parties pledged to secure the Senior Secured Notes (other than the Canadian ABL Collateral) (collectively, the "Other Canadian Collateral" and together with the Canadian ABL Collateral, the "Canadian Tranche Collateral"). The Canadian ABL Collateral and the U.S. ABL Collateral are collectively referred to herein as the "ABL Collateral".

"Senior Secured Notes" means the senior first lien notes to be issued by the Company in connection with its exit from Chapter 11 or any term loan financing entered into by the Company in lieu of all or any portion thereof.

- Conditions Precedent: The conditions precedent to the Effective Date shall be those customarily found in the Administrative Agent's agreements for similar financings and other conditions deemed by the Administrative Agent to be appropriate to the specific transaction and as set forth in the attached Term Sheet.

- Events of Default: The Credit Documents will contain events of default customarily found in the Administrative Agent's loan agreements for similar asset-based financings and other events of default reasonably deemed by the Joint Lead Arrangers appropriate to the specific transaction.

## RELIEF REQUESTED

17.     By this Motion, the Debtors seek authority pursuant to sections 105(a), 363(b) and 364(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h) to (i) enter into, execute, deliver and perform under the Commitment Letter, Arranger Fee Letter and Agent Fee Letter, (ii) pay the fees and expenses and any other amounts related thereto, and (iii) furnish the indemnities associated therewith. The Debtors have negotiated the terms of the Commitment Letter, Arranger Fee Letter and Agent Fee Letter

in good faith and at arm's-length with the Agents after considering several potential options for exit financing. As a result, the Debtors believe that the terms of the ABL Facility Commitment Documents represent fair market rates and standard terms for the ABL Facility and that the accompanying terms and conditions, fees, expense reimbursement provisions and indemnities are reasonable.

### BASIS FOR RELIEF REQUESTED

18.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts in this circuit interpreting section 363(b) of the Bankruptcy Code have generally approved the use, sale, or lease of estate property out of the ordinary course of business where there exists a sound business justification for the proposed transaction. *See, e.g., Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 142, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); *In re Delaware and Hudson Rv. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business judgment" test for the use of property under section 363). Additionally, section 364(b) of the Bankruptcy Code states that a court may authorize a debtor to obtain unsecured credit or incur unsecured debt outside the ordinary course of business, and may allow such obligations as administrative expenses. 11 U.S.C. § 364(b). Moreover, pursuant to section 105(a) of the Bankruptcy

Code, a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

19. A debtor has the burden of establishing that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding, Corp.*, 242 B.R. at 154. However, once a debtor articulates a valid business justification, a presumption arises that the debtor's decision is made "on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second guessing, and mandates that a court approve a debtor's business decision unless that decision is the product of bad faith or gross abuse of discretion. *See id.*; *see also Lubrizol Enters., Inc.* v. *Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

20. The Debtors respectfully submit that, in their business judgment, there are substantial business justifications for allowing AbitibiBowater to enter into the ABL Facility Commitment Documents, to pay the related fees and expenses set forth in the ABL Facility Commitment Documents, and to provide the indemnities contemplated under the Commitment Letter. As discussed above, exit financing is necessary to finance the Debtors' obligations under the Plan and to provide the Debtors with essential funding for their emergence from chapter 11. Rather than bear the risk of an adverse change in the financial markets or the occurrence of other circumstances that might create obstacles

to the Debtors' emergence from chapter 11, the Debtors seek to secure meaningful exit financing commitments for a revolving credit facility as promptly as possible. AbitibiBowater's entry into the ABL Facility Commitment Documents is the next critical step forward in the process of securing the necessary exit financing.

21.     Further, the payment of the fees and expenses described in the ABL Facility Commitment Documents in connection with and as consideration for Citibank N.A., Barclays, and JPMCB's commitment (upon completion and execution of the Commitment Letter and the effectiveness thereof) provide their respective commitments under the ABL Facility subject to the terms and conditions of the Commitment Letter, as well as for the Joint Lead Arrangers' efforts to structure and syndicate the ABL Facility, is customary under the circumstances and the Debtors submit that the amounts requested are reasonable. The indemnities provided in the ABL Facility Commitment Documents are also customary for this type of transaction and under the circumstances. The Debtors believe that the authority to pay the fees and expenses and provide the indemnities is appropriate and necessary under the circumstances. As noted above, the Debtors and their professional advisors engaged in substantial, arm's-length bargaining with the Agents and their advisors over the core terms and conditions of the ABL Facility Commitment Documents.

22.     The Debtors note that similar relief requested in this Motion has been granted to other debtors in this jurisdiction in other chapter 11 cases. See *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Mar. 4, 2009); *In re Sea Containers Ltd.*, Case No. 06-11156 (KJC) (Bankr. D. Del. Nov. 20, 2007); *In re Pliant Corp.*, Case No. 06-10001 (MFW) (Bankr. D. Del. May 5, 2006); *In re Meridian*

*Automotive Systems – Composite Operations, Inc.*, Case No. 05-11168 (MFW) (Bankr. D. Del. June 16, 2005); *In re Federal-Mogul Global Inc.*, Case No. 01-10578 (RTL) (Bankr. D. Del. Oct. 1, 2004); *In re Exide Techs.*, Case No. 02-11125 (KJC) (Bankr. D. Del. Sept. 12, 2003); *In re ANC Rental Corp.*, Case No. 01-11200 (MFW) (Bankr. D. Del. April 2, 2003); and *In re Integrated Health Servs., Inc.*, Case No. 00-389 (MFW) (Bankr. D. Del. Oct. 10, 2002).

## WAIVER OF BANKRUPTCY RULE 6004(h)

23.     The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." As set forth in the Motion, the relief proposed herein is essential and necessary for the Debtors to fund the Plan and emerge from chapter 11 successfully. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

24.     Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the Creditors Committee; (vi) counsel to the agents for the Debtors' prepetition loan facilities; (vii) counsel to the agents for the Debtors' post-petition lenders; (viii) the indenture trustees for each series of the Debtors' pre-petition notes; and (ix) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with

Local Rule 2002-1(b). In light of the nature of the relief requested in this Motion, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

25.    No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, pursuant to sections 105(a), 363(b) and 364(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h), the Debtors respectfully request entry of the Proposed Order, in substantially the form attached hereto, (i) authorizing the Debtors to (a) enter into the ABL Facility Commitment Letter, the Arranger Fee Letter and the Agent Fee Letter, (b) pay associated fees and expenses, and (c) furnish the related indemnities, and (ii) granting such other relief as is just and proper.

Dated: Wilmington, Delaware
August 6, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Kelley A. Cornish
Jeffrey D. Saferstein
Alice Belisle Eaton
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Counsel for the Debtors and Debtors in Possession