# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline: September 23, 2010 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: September 30, 2010 at 10:00 a.m. (ET)** |

## DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 9019: (I) APPROVING A SETTLEMENT AGREEMENT BETWEEN THE DEBTORS, BOWATER CATAWBA NOTE HOLDINGS I LLC, BOWATER CATAWBA NOTE HOLDINGS II LLC, BOWATER SALUDA NOTE HOLDINGS LLC AND CERTAIN NOTEHOLDERS; AND (II) GRANTING RELATED RELIEF

Bowater Incorporated ("*Bowater*") and its affiliated debtors and debtors-in-possession in the above captioned cases (collectively, with Bowater, the "*Debtors*"), by and through their undersigned counsel, hereby move (the "*Motion*") this Court, pursuant to section 363(b) of title 11 of the United States Code (the "*Bankruptcy Code*") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), for entry of an order substantially in the form

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

attached hereto as Exhibit A (the "*Order*"): (i) approving settlement agreements, substantially in the form attached hereto as Exhibit B (together the "*Settlement Agreement*"), between as applicable Bowater, Bowater Catawba Note Holdings I LLC ("*Catawba I*"), Bowater Catawba Note Holdings II LLC ("*Catawba II*"), Bowater Saluda Note Holdings LLC ("*Saluda*") and the holders of certain notes issued by Catawba I, Catawba II and Saluda (the "*Noteholders*", and along with Bowater, Catawba I, Catawba II and Saluda, the "*Parties*") and (ii) authorizing Bowater to perform its obligations under the Settlement Agreement. In support of this Motion, the Debtors respectfully represent as follows:

## INTRODUCTION

1. Bowater currently holds 100% of the membership interests in three wholly owned, non-debtor limited liability entities: Catawba I, Catawba II and Saluda. These three entities were created in connection with three separate timber land sale transactions (collectively, the "*Timberland Sales Transactions*") that took place in 2001 and 2002, in which Bowater sold certain timberlands in exchange for one or more promissory notes executed by the purchaser (*"Timber Notes"*), secured by letters of credit (*"Letters of Credit"*) and the principal amounts of which are payable in a single installment in 2016, in the case of the Catawba I and Catawba II Timberland Sales Transactions, and 2017, in the case of the Saluda Timberland Sales Transaction. Following the respective Timberland Sales Transaction, Bowater created Catawba I, Catawba II and Saluda, respectively as qualified special purpose entities (Catawba I, Catawba II and Saluda are hereinafter sometimes referred to individually as a "*QSPE*" and, collectively, as the "*QSPEs*"), with Bowater as the sole member and contributed the Timber Note of the original third party purchaser issued to Bowater in such Timberland Sales Transaction (or, in the case of

Saluda, multiple notes) to Catawba I, Catawba II and Saluda, respectively.[2] Following the contribution of the Timber Note and Letter of Credit to its capital, each QSPE, in separate and unrelated transactions, subsequently issued senior secured notes (collectively, the "Notes") secured by a pledge of the Timber Note and Letter of Credit held by such QSPE and agreed to pay the income received from the issuer of such Timber Note to the Noteholders to the extent necessary to pay scheduled principal and interest and all other obligations due on the Notes issued by such QSPE (each a "*Note Transaction*" and, collectively, the "*Note Transactions*"). In addition, with respect to Saluda and Catawba II, Bowater agreed to guaranty payment of a make-whole amount up to an amount equal to 10% of the aggregate outstanding principal amount of the Notes issued by such QSPE pursuant to a Limited Guaranty (each a "*Make-Whole Guaranty*" and collectively, the "*Make-Whole Guaranties*"). With the exception of the Make-Whole Guaranties, the Notes and the Note Transactions are non-recourse to Bowater. Each Note Transaction is separate and distinct and the Note Transactions are not cross-collateralized. Bowater's interest in each of Catawba I, Catawba II and Saluda consists principally of its membership interest in the QSPE, which constitutes 100% of the outstanding membership interests in each of the QSPEs.

2. Pursuant to the terms of the Notes and related Note Agreements (as defined below), the filing of the voluntary petition under the Bankruptcy Code by Bowater constituted an Event of Default under each of the Note Agreements. The Note Agreements provide that, if such an Event of Default occurs, the Notes are automatically accelerated, becoming immediately due and payable. The Noteholders and Collateral Agent assert they are entitled to: (i) payment of all

---

[2] The QSPEs were created in accordance with the Financial Accounting Standards Board's SFAS No. 140. The QSPEs were not consolidated within the Debtors' financial statements.

outstanding principal plus accrued interest thereon as of the date of the bankruptcy filing, plus default interest at the then current rate of interest applicable to the Notes plus 2% (*"Default Interest"*) from the date of the bankruptcy filing, and (ii) with respect to certain of the Notes (Saluda and Catawba II), payment of the Make-Whole Amount. [3]

3. Notwithstanding the acceleration of the Notes, neither Bowater, the QSPEs, the Collateral Agent nor the holders of the Notes are entitled to accelerate the repayment of the Timber Notes nor to draw upon the Letters of Credit for the repayment of any principal on the Notes prior to the maturity of the Timber Note secured by such Letter of Credit; provided that upon non-payment of scheduled principal or interest on any of the Timber Notes (*"Missed Payment"*), respectively, the beneficiary (now the Collateral Agent as provided in the relevant documents) may draw upon the Letter of Credit for the Missed Payment and as otherwise provided in the Letter of Credit and relevant documents. Since the QSPEs have no other assets other than their respective Timber Note and Letter of Credit pledged as security therefor, the Collateral Agent and the Noteholders will be unable to collect any payments on the Notes issued by such QSPE except as payments are made on the Timber Note held by such QSPE. The payments made under each Timber Note are expected be sufficient to pay the interest on the Notes secured by such Timber Note at the non-default Rate plus all or a portion of Default Interest payable on such Notes and, upon the maturity of such Timber Note, the principal amount of the Notes secured thereby.

---

[3] The Collateral Agent, at the direction of holders of a majority in aggregate principal amount of each of the Saluda and Catawba II Notes, has filed timely proof of claim against Bowater for any amounts owed by Bowater under the Make-Whole Guarantees and fees and expenses incurred by Collateral Agent and holders of the Saluda and Catawba II Notes.

4. Although the Note Agreements for the Catawba II and Saluda Note Transactions provide that, if an Event of Default occurs under Section 11(f), the holders of the Notes are entitled to receive the Make-Whole Amount, Bowater believes that payment of the Make-Whole Amount, which is intended to compensate the holders of the Notes for income lost due to the prepayment of the Notes, would represent a double recovery for the holders of the Notes since the principal amount of the Notes will not be prepaid due to the inability to accelerate the principal amount of the Timber Note securing such Notes. The Noteholders and the Collateral Agent dispute this and assert that, under the provisions of the applicable Note Agreement, the Notes are automatically accelerated as of the date of such Event of Default, are immediately due and payable and the Noteholders are also automatically entitled to payment of the Make-Whole Amount and Default Interest until all Obligations under the Note Agreement are paid in full.

5. Given the size of the claims for the Default Interest asserted by the Noteholders, Bowater has determined that the membership interests in the QSPEs have no remaining value to Bowater's estate. As a result, Bowater and the Noteholders have engaged in a series of discussions regarding the future of the QSPEs. At that time, the Noteholders informed Bowater that they wished to retain the current transaction structure so that the Notes could remain outstanding and the Noteholders could continue to receive the income paid by the issuer of the Timber Notes. The Noteholders also assert that claims for significant damages would exist if Bowater simply abandoned the QSPEs and its obligations under the Note Agreements.

6. After a series of negotiations, the Parties agreed to the terms of the Settlement Agreement in order to resolve all outstanding issues related to the Notes. Pursuant to the Settlement Agreement, the Parties have agreed to: (a) the transfer of all of Bowater's

membership interests in Catawba I, Catawba II and Saluda to Lord Securities Corporation or any entity designated by it to hold the ownership interests (*"Lord"*), and (b) without prejudice to and with all rights reserved (i) the right of the Collateral Agent and/or the holders of the Notes to pursue a claim against Bowater in the Bankruptcy Case with respect to the Make-Whole Guaranties and (ii) the right of Bowater to contest any claim under any Make-Whole Guaranty by the Collateral Agent or the holder of any Note, all such rights, claims, obligations, defenses, counterclaims and causes of action with respect to the Make-Whole Guaranty and the Make-Whole Amount being hereby reserved by the Parties (the *"Make-Whole Claim Reservation of Rights"*).

## JURISDICTION

7. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § IS7(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The relief requested herein is predicated on section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

8. Bowater is a wholly-owned subsidiary of AbitibiBowater, Inc. (*"Abitibi"*) Abitibi is incorporated in Delaware and headquartered in Montreal, Quebec. Abitibi is the world's largest producer of newsprint by capacity and one of the largest publicly traded pulp and paper manufacturers worldwide. It produces an extensive range of commercial printing papers, market pulp and wood products, serving customers in over 90 countries. Abitibi is also among the world's largest recyclers of newspapers and magazines, and has third-party certified 100% of its

- 6 -

YCST01:10136408.1            068104.1001

managed woodlands to sustainable forest management standards. As of December 31, 2008, Abitibi owned or operated 24 pulp and paper facilities and 30 wood products facilities located in the United States, Canada, the United Kingdom and South Korea, as well as recycling and power generation facilities. Employing around 15,900 people, Abitibi realized sales of approximately $6.8 billion[4] in 2008. Its total assets were $8.1 billion as of December 31, 2008.

**THE CHAPTER 11 CASES**

9. Abitibi's financial performance depends primarily on the market demand for its products and the prices at which they can be sold. These products are globally traded commodities, and as such, the balance between supply and demand drives their pricing and shipment levels. Supply and demand, in turn, are affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. The recent downturn in the global economy has resulted in an unprecedented decline in demand for newsprint, Abitibi's and Bowater's primary product. In addition, substantial price competition and volatility in the pulp and paper industry, along with negative trends in advertising, electronic data transmission and storage and continued expansion of the Internet, have exacerbated downward pressure on revenue. At the same time, the global credit markets suffered a significant contraction, including the failure of some large financial institutions, which has resulted in a severe decline in the credit markets and overall availability of credit. These market disruptions, as well as Bowater's high debt levels and the overall weakness in consumer demand, have adversely impacted Bowater's financial performance and have necessitated the commencement of these Chapter 11 Cases and coordinated Canadian filings.

---

[4] All monetary figures are presented in U.S. Dollars unless specifically noted otherwise.

- 7 -
YCST01:10136408.1                                                                068104.1001

10. Specifically, on April 16, 2009 (the *"Petition Date"*), certain of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the *"Chapter 11 Cases"*). On April 17, 2009, certain of the Debtors (the *"Canadian Debtors"*)[5] and non-debtor subsidiaries of Abitibi (the *"CCAA Debtors"*)[6] applied for protection from their creditors under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the *"CCAA"*), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the *"Canadian Court"* and the filing, the *"Canadian Proceeding"*). Two of the CCAA Debtors -- Abitibi-Consolidated Inc. (*"ACI"*) and Abitibi-Consolidated Company of Canada (*"ACCC"*) (together, the *"Chapter 15 Debtors"*) -- thereafter filed petitions for recognition under chapter 15 of the Bankruptcy Code (the *"Chapter 15 Cases"*) in this Court seeking emergency provisional relief in support of the Canadian Proceeding. Abitibi and certain of the Debtors also filed for ancillary relief in Canada seeking provisional relief in support of the Chapter 11 Cases in Canada under the Canadian equivalent of chapter 15, section 18.6 of the CCAA.[7]

---

[5] The Canadian Debtors are: Bowater Canada Finance Corporation, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

[6] The CCAA Debtors are: Bowater Mitis Inc., Bowater Guerette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St. Maurice River Drive Company, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Quebec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231078 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings Limited Partnership, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated Nova Scotia Incorporated, 32117925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquiere Pulp Company, The International Bridge and Terminal Company, Scramble Mining Limited, 9150-3383 Quebec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling and 1508756 Ontario Inc.

[7] The Debtors who obtained section 18.6 relief are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., Bowater Ventures Inc., Bowater Incorporated, Bowater Nuway Inc., Bowater Nuway-Midstates, Inc.,

11. On April 28, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the *"Creditors Committee"*) in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

12. Abitibi's and Bowater's ability to reorganize depends on the comprehensive reorganization of its businesses in Canada and the United States. The Debtors' and the CCAA Debtors' interests are united in their integrated, co-dependent business relationship. The Debtors and the CCAA Debtors have therefore committed to engage in a joint and harmonious restructuring in both jurisdictions in an effort to maximize value for the benefit of the Company's collective stakeholders.

**STATUS OF CHAPTER 11 CASES**

13. Abitibi and Bowater have made significant progress towards confirmation and consummation of viable plans of reorganization and arrangement in the Chapter 11 Cases and Canadian Proceedings, respectively, that will enable Abitibi and Bowater to emerge from bankruptcy as successful going-concerns. Prior to the filing of this Motion, Abitibi filed its Plan in the Bankruptcy Court and the Monitor filed, on behalf of Abitibi, the First Amended Plan of Reorganization and Compromise under the CCAA (the *"CCAA Plan"* and, together with the Plan, the *"Plans"*) in the Canadian Court. Together, the Plans contemplate repayment in full in cash of all of Abitibi's and Bowater's prepetition and postpetition secured debt, and recoveries for unsecured creditors in the form of equity in the reorganized Company (*"New ABH Stock"*).

---

Catawba Property Holdings LLC, Bowater Finance Company Inc., Bowater South American Holdings Incorporated, Bowater America Inc., Lake Superior Forest Products Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Finance II, LLC, Bowater Alabama LLC and Coosa Pines Golf Club Holdings LLC.

Bowater will continue as a wholly-owned subsidiary of the reorganized Company. Concurrent with the filing of the Plans, Abitibi also filed the Disclosure Statement with respect to the Plan and an information circular with respect to the CCAA Plan. The Debtors filed a motion seeking approval of their proposed solicitation materials and procedures with respect to the Plan (the *"Solicitation Motion"*) on June 22, 2010. A hearing on the Solicitation Motion was held on July 30, 2010, and the Court authorized the Debtors to commence the Plan solicitation process and the Rights Offering.

**THE CATAWBA NOTES**

14. On December 27, 2001, Catawba I issued $17,360,000 principal amount of its Floating Rate Senior Secured Notes due December 27, 2016 (the *"Catawba I Notes"*). The Catawba I Notes are secured by a lien as against a promissory note (the *"Teredo Timber Note"*) issued to Bowater by Teredo Timber II, LLC (*"Teredo"*) backed by a letter of credit (the *"Teredo L/C"*). The Teredo Timber Note and Teredo L/C were each received as payment for the sale of certain timber lands sold by Bowater to Teredo. Both the Teredo Timber Note and Teredo L/C were contributed by Bowater to the capital of Catawba I. Subsequent to the issuance of the Teredo Timber Note, Catawba I entered into the Note Purchase Agreement, dated as of December 27, 2001 (the *"Catawba I Note Agreement"*), with certain of the Noteholders. Pursuant to the Catawba I Note Agreement, the Catawba I Notes accrue interest at a rate of LIBOR plus .85% payable quarterly plus Default Interest at 2.0% per annum given the default caused by Bowater's filing of a bankruptcy. The Catawba I Notes are not supported by a Make-Whole Guaranty and Bowater has no liability with respect to the Catawba I Notes. In addition, Catawba I, The Bank of New York Mellon Trust Company, N.A. as Collateral Agent and Paying

- 10 -
YCST01:10136408.1                                                                                                                                                       068104.1001

Agent (the *"Catawba I Collateral Agent"*) and the Noteholders entered into the Collateral Agency and Paying Agency Agreement to govern the Pledged Collateral and payment on the Catawba I Notes (the *"Catawba I Collateral Agency Agreement"*). Catawba I and the Catawba I Collateral Agent also entered into a Pledge Agreement whereby the Pledged Collateral, as defined therein, including the underlying Teredo Timber Note, all letter of credit rights and all cash were pledged and assigned to the Catawba I Collateral Agent (*"Catawba I Pledge Agreement"*).

15. Also on December 27, 2001, Catawba II issued $86,805,000 principal amount of its 6.85% Senior Secured Notes due December 27, 2016 (the *"Catawba II Notes"*). The Catawba II Notes are secured by a lien as against a promissory note (the "*First Union Timber Note*") issued to Bowater by First Union Development Corporation ("*First Union*") backed by a letter of credit (the "*First Union L/C*"). The First Union Timber Note and First Union L/C were each received by Bowater as payment for certain timber lands sold by Bowater to First Union. Both the First Union Timber Note and First Union L/C were contributed by Bowater to the capital of Catawba II Subsequent to the issuance of the First Union Timber Note, Catawba II entered into the Note Purchase Agreement, dated as of December 27, 2001 (the *"Catawba II Note Agreement"*), with certain of the Noteholders. Pursuant to the Catawba II Note Agreement, the Catawba II Notes accrue interest at the rate of 6.85% per annum from the date of issuance, payable semi-annually, plus Default Interest at the rate of 2% per annum given the default caused by Bowater's filing of a bankruptcy. In addition, in connection with the issuance of the Catawba II Notes, Bowater also entered into the Make-Whole Guaranty, whereby Bowater agreed to guaranty payment of the Make-Whole Amount applicable to this transaction up to an amount

- 11 -

YCST01:10136408.1                                                                                                    068104.1001

equal to 10% of the aggregate outstanding principal amount of the Catawba II Notes. With the exception of the Make-Whole Guaranty, the Catawba II Notes are non-recourse to Bowater. In addition, Catawba II, The Bank of New York Mellon Trust Company, N.A. as Collateral Agent and Paying Agent (the *"Catawba II Collateral Agent"*) and the Noteholders entered into the Collateral Agency and Paying Agency Agreement to govern the Pledged Collateral and payment on the Notes (the *"Catawba II Collateral Agency Agreement"*). Catawba II and the Catawba II Collateral Agent also entered into a Pledge Agreement whereby the Pledged Collateral, as defined therein, including the underlying First Union Timber Note, all letter of credit rights and all cash were pledged and assigned to the Catawba II Collateral Agent (*"Catawba II Pledge Agreement"*).

**THE SALUDA NOTES**

16. On March 28, 2002, Saluda issued $89,200,000 principal amount of its 6.81% Senior Secured Notes due February 15, 2017 (the *"Saluda Notes"*). The Saluda Notes are secured by a first priority security interest as against the promissory notes of Knightwood Holdings LLC numbered 1 through 6 (the *"Knightwood Timber Notes"*) issued to Bowater by such Knightwood Holdings LLCs (*"Knightwood"*) and each of the Knightwood Timber Notes is backed by a letter of credit (the *"Knightwood L/Cs"*). The Knightwood Timber Notes and Knightwood L/Cs were each received by Bowater in exchange for the sale by Bowater to Knightwood of certain timber lands. Both the Knightwood Timber Notes and the Knightwood L/Cs were contributed by Bowater to the capital of Saluda. Subsequent to the issuance of the Knightwood Timber Notes, Saluda entered into the Note Purchase Agreement, dated as of March 28, 2002 (the *"Saluda Note Agreement"* and together with the Catawba I Note Agreement

and Catawba II Note Agreement, the "*Note Agreements*"), with certain of the Noteholders. Pursuant to the Saluda Note Agreement, the Saluda Notes accrue interest at the rate of 6.81% per annum from the date of issuance, payable semi-annually, plus Default Interest at the rate of 2% per annum given the default caused by Bowater's filing of a bankruptcy. In addition, in connection with the issuance of the Saluda Notes, Bowater also entered into a Make-Whole Guaranty, whereby Bowater agreed to guaranty payment of the Make-Whole Amount applicable to this transaction up to an amount equal to 10% of the aggregate outstanding principal amount of the Saluda Notes. With the exception of the Make-Whole Guaranty, the Saluda Notes are non-recourse to Bowater. In addition, Saluda, The Bank of New York Mellon Trust Company, N.A. as Collateral Agent and Paying Agent (the "*Saluda Collateral Agent*" and, together with Catawba I Collateral Agent and Catawba II Collateral Agent, the "*Collateral Agent*") and the Noteholders entered into the Collateral Agency and Paying Agency Agreement to govern the Pledged Collateral and payment on the Saluda Notes (the "*Saluda Collateral Agency Agreement*"). Saluda and the Saluda Collateral Agent also entered into a Pledge Agreement whereby the Pledged Collateral, as defined therein, including the underlying Knightwood Timber Notes, all letter of credit rights and all cash were pledged and assigned to the Saluda Collateral Agent ("*Saluda Pledge Agreement*").

### THE SETTLEMENT AGREEMENT

17. As noted above, Bowater's interests in the three QSPEs consist principally of its membership interests in the QSPEs which constitute 100% of the outstanding membership interests of the QSPEs. Given the large amount of the claims for the Default Interest with respect to the Notes, Bowater has determined that it has no remaining equity in the QSPEs. As a result,

- 13 -

YCST01:10136408.1                                                                                                                               068104.1001

Bowater has determined that it is in its best interests to abandon the membership interests in all three of the QSPEs.

As a result, after several rounds of negotiations, the Parties reached the agreement embodied in the Settlement Agreement. Pursuant to the Settlement Agreement, the membership interests in Catawba I, Catawba II and Saluda currently held by Bowater will be assigned to Lord (the "*Third Party Holder*"). Nevertheless, Lord will not be liable for any claims, causes of action or liabilities arising from the Make-Whole Guaranty, Notes, the Note Agreements, the Timber Notes, the Collateral Documents or any other obligations of the QSPEs or any other party including, without limitation, the obligations under the Timber Notes, the Notes, the Make-Whole Guaranties and other related documents. As a result of this transfer, the QSPEs will remain as obligors under the Notes, the income received from the Timber Notes will continue to be paid to the Collateral Agent for the benefit of the Noteholders, the Timber Notes and Letters of Credit can continue to serve as security for payments on the Notes and the Notes will retain their marketability. In addition, the Make-Whole Reservation of Rights will preserve the rights, claims, defenses and factual and legal arguments of Bowater, Noteholders and Collateral Agent with respect to the claim in the bankruptcy for the payment of the Make-Whole Amount and Bowater's obligations under the Make-Whole Guaranties.

### BASIS FOR THE RELIEF REQUESTED

18. By this Motion, the Debtors request the entry of an order under section 363(b) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules approving the execution and delivery of the Settlement Agreement by Bowater and the performance of its obligations

thereunder and authorizing and approving the transfer, conveyance and assignment of all of the membership interests in each of the QSPEs held by Bowater to Lord pursuant to which Lord shall thereafter be the sole member of each QSPE with all powers, rights and privileges of ownership of the QSPEs attendant thereto (but with respect thereto no liability whatsoever for any QSPE obligations). Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). To approve the use, sale, or lease or property outside the ordinary course of business, this Court must find "some articulated business justification" for the proposed action *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (adopting good faith test and implicitly adopting the "articulated business justification" test of *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Diaries*).

19. In addition, Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Under Bankruptcy Rule 9019(a), the Court has the authority to approve a settlement if it is fair and equitable and in the best interests of the estate. *See In re Louise's Inc.*, 211 B.R. 798 (D. Del. 1997); *Fischer v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. *See In re Penn Central Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979) ("administering reorganization proceedings in an economical and practical manner it will

- 15 -

YCST01:10136408.1 068104.1001

often be wise to arrange the settlement of claims") (*quoting In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Sassalos*, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disprove a compromise ... rests in the sound discretion of the judge."). In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated ... and estimate the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *Penn Central*, 596 F.2d at 1153.

20. More recently, the Third Circuit Court of Appeals enumerated the following four-factor test to be used in deciding whether a settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors." *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

21. Approval of a proposed settlement is within the *"sound discretion"* of the bankruptcy court. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986). The bankruptcy court should not substitute its judgment for that of the debtor. *Id.* The court is not to decide numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); *see also In re Sea Containers Ltd.*, 2008 WL 4296562 (Bankr. D. Del. Sept. 19, 2008) at *5.

- 16 -

YCST01:10136408.1            068104.1001

22. The Debtors believe that the Settlement Agreement, Exhibit B hereto, which is incorporated herein is fair and reasonable and is in the best interests of the Debtors, their creditors and their estates. Furthermore, the Debtors believe a sound business purpose exists to enter into the Settlement Agreement and perform the obligations required thereunder. By entering into the Settlement Agreement and transferring the ownership interest of Catawba I, Catawba II and Saluda, the Debtors will avoid maintaining subsidiaries in which they have no equity and which have defaulted in the payment of material indebtedness. In addition, by entering into the Settlement Agreement, the Debtors will avoid unnecessary and potentially costly litigation over the Defaults that have occurred under the Notes and the Noteholders' rights related thereto. Other than potential claims under the Make Whole Guarantees, which claims and defenses are being reserved by the parties, all issues between the Noteholders and the Debtors are being resolved pursuant to the Settlement Agreement. And, while the Debtors believe that they would ultimately be successful in any litigation brought by the Noteholders relating to the Defaults under the Notes and that the Noteholders would have no claims against the Debtors (the Noteholders obviously disagree with both assertions), there is uncertainty and a cost in any litigation which is being avoided by entry into the Settlement Agreement.

23. Moreover, the Noteholders, creditors of Bowater, will also benefit from the Settlement Agreement. By transferring the membership interests in the QSPEs to the Third Party Holder, the current structure will remain in place, insuring that the Noteholders will continue to receive the income from the Timber Notes. The Noteholders will continue to hold the Notes, on which Default Interest is payable from the date of the Event of Default (the Petition Date) to the payment in full of the Notes respectively, which are secured by (a) the underlying Timber Notes;

- 17 -

YCST01:10136408.1    068104.1001

(b) the related cash flows which should be sufficient to pay the scheduled principal and non-default interest and a portion of the fees, expenses and Default Interest; (c) the Collateral Agent's respective perfected security interest in, assignment of and right to receive payment on the respective Letters of Credit which, if drawn, should provide additional payment towards Default Interest; and (d) any recovery or payment related to the Make-Whole Claim Reservation of Rights. The Settlement Agreement therefore serves to settle all of the disputes between the Parties with regard to the Notes while simultaneously providing substantial benefits to each of the Parties subject to the Make-Whole Claim Reservation of Rights.

24. It should also be noted that the Settlement Agreement was negotiated at arms' length, and both the Debtors and the Noteholders carefully reviewed the amount and legitimacy of each other's alleged claims. The Debtors submit that the terms of the Settlement Agreement are fair and reasonable and in the best interests of the Debtors, their creditors and their estates. Accordingly, the Debtors respectfully request that this Court approve the Settlement Agreement.

WHEREFORE the Debtors respectfully request that the Court enter an order, substantially in the form attached as Exhibit A, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
September 8, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Kelley A. Cornish
Alice Belisle Eaton
Claudia R. Tobler
Jacob A. Adlerstein
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Debtors and Debtors-in-Possession*