**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 09-11296 (KJC) |
| | ) | |
| ABITIBIBOWATER INC., et al.,[1] | ) | Jointly Administered |
| | ) | RE: D.I. 2796 |
| | ) | |
| Debtors. | ) | **Hearing Date: September 24, 2010 at 10:00 a.m. (ET)** |
| | ) | **Extended Objection Deadline: September 13, 2010 at 4:00 p.m. (ET)** |

**LIMITED OBJECTION OF WILMINGTON TRUST COMPANY, SOLELY
AS SUCCESSOR INDENTURE TRUSTEE FOR THE 7.95% NOTES DUE
2011 ISSUED BY BOWATER CANADA FINANCE CORPORATION, TO
CONFIRMATION OF SECOND AMENDED JOINT PLANS OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY
CODE FOR BOWATER CANADA FINANCE CORPORATION AND
BOWATER INCORPORATED**

Wilmington Trust Company ("Wilmington Trust"), solely as successor indenture

trustee for the 7.95% Notes due 2011 (collectively, the "7.95% Notes") issued by Bowater

Canada Finance Corporation ("BCFC") pursuant to that certain indenture, dated as of October

31, 2001 (the "7.95% Notes Indenture"), by and through its undersigned attorneys, hereby

submits this objection to confirmation solely with respect to the Joint Plan for BCFC (the

"BCFC Plan") and the Joint Plan (the "Bowater Plan") for Bowater Incorporated ("Bowater").[2]

In support of this Objection, Wilmington Trust respectfully represents as follows:

---

[1]     The Debtors in these chapter 11 cases are listed in footnote 1 of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 2796] (the "Joint Plan").

[2]     The Joint Plan provides that it "constitutes a separate plan of reorganization for each Debtor in the Chapter 11 cases" and that "the CCAA Plan constitutes a separate plan of restructuring and compromise for each entity subject to the CCAA Proceedings", such that the requirements for confirmation must be satisfied with respect to each Debtor's and each CCAA Debtor's plan of reorganization. See Joint Plan p. 2. Wilmington Trust objects solely to the BCFC Plan and the Bowater Plan.

## PRELIMINARY STATEMENT

As proposed, the BCFC Plan and Bowater Plan fail to satisfy multiple requirements of section 1129 of the Bankruptcy Code. Further, without justification, the Joint Plan provisions in question would severely prejudice Wilmington Trust and the 7.95% Noteholders.

First, the BCFC Plan and Bowater Plan include unfair discriminatory treatment of the Unsecured Note Claim arising under the 7.95% Notes Indenture and the 7.95% Notes (the "7.95% Unsecured Notes Claim") and the 7.95% Notes Guaranty Claim. The BCFC Plan would artificially cap the 7.95% Unsecured Notes Claim, but no other claim. The Bowater Plan would: (a) artificially cap the 7.95% Notes Guaranty Claim, but no other claim; (b) fail to allow the 7.95% Notes Guaranty Claim, while allowing other guaranty claims; and (c) fail to provide Wilmington Trust (and any Related Indenture Party) with a release, while granting a release to all other similarly situated parties. That treatment signifies that the plans contravene the Bankruptcy Code's requirement under sections 1129(a)(1) and 1123(a)(4) that claims in the same class receive equal treatment.

Second, that discriminatory treatment, among other things, signifies the BCFC Plan and Bowater Plan were not proposed in good faith as required by section 1129(a)(3).

Third, provisions in the Joint Plan that would impair or release BCFC's claims against its officers, directors, and affiliates are improper and violate the best interests test under section 1129(a)(7).

Fourth, as BCFC is a Cross-Border Debtor, the BCFC Plan is codependent on BCFC's CCAA Plan, which includes provisions mutually inconsistent with the Bankruptcy

Code, including the absolute priority rule. Thus, the BCFC Plan should not be confirmed absent appropriate changes to BCFC's CCAA Plan.

## BACKGROUND

Wilmington Trust

1.      Pursuant to an Agreement of Resignation, Appointment and Acceptance, dated as of April 28, 2009, The Bank of New York Mellon resigned as indenture trustee under the 7.95% Notes Indenture and Wilmington Trust was appointed as successor indenture trustee.

BCFC and Bowater

2.      BCFC is a wholly-owned subsidiary of Bowater and is organized under Nova Scotia law as an unlimited liability company (a "ULC"). Each of BCFC and Bowater is a Debtor in this Court. BCFC is also a Cross-Border Debtor with a CCAA case pending in Canada. Bowater is not a debtor in Canada.

BCFC's 7.95% Notes

3.      The 7.95% Notes were issued by BCFC. The principal amount owed under the 7.95% Notes is $600 million. Additionally, more than $20 million is owed on the 7.95% Notes for accrued prepetition interest, fees, expenses and other charges.

4.      The 7.95% Notes were guaranteed by Bowater (the "7.95% Notes Guaranty"). On behalf of the holders of the 7.95% Notes, Wilmington Trust has a claim against Bowater based on the 7.95% Notes Guaranty for principal, accrued prepetition interest, fees, expenses, and other amounts due respecting the 7.95% Notes and the 7.95% Notes Indenture (the "7.95% Notes Guaranty Claim").[3]

---

[3]      Section 1.25 of the Joint Plan defines "7.95% Notes Guaranty Claims" as "all Claims arising under or relating to the 7.95% Notes Guaranty in the amount of $619,875,000" (emphasis added). As demonstrated below, the Bowater Plan improperly limits the amount of the 7.95% Notes Guaranty Claim.

3

5.      BCFC used the proceeds from the 7.95% Notes for "providing financing

to Bowater" through BCFC's acquisition of Bowater's direct and indirect equity interests in a

finance subsidiary:

> We [BCFC] are an unlimited liability company organized under
> the laws of the Province of Nova Scotia, Canada and a wholly-
> owned subsidiary of Bowater. Bowater formed us for the purpose
> of providing financing to Bowater in Canada. We have no
> independent operations and prior to this offering, we had no
> material assets or liabilities. We will use the proceeds from this
> offering to acquire 99% of Bowater Canada Finance Limited
> Partnership from Bowater and to capitalize our wholly owned
> subsidiary, Bowater Canada Treasury Corporation, which will then
> acquire the remaining 1% of Bowater Canada Finance Limited
> Partnership from Bowater Ventures Inc., a wholly-owned
> subsidiary of Bowater.
>
> * * *
>
> Bowater and Bowater Ventures Inc. then will use the proceeds
> from that sale to repay all amounts outstanding under the bridge
> credit agreement and to repay other short-term borrowings of
> Bowater.

BCFC Notes Offering Circular, dated October 31, 2001, pp. 3, 11 (emphasis added).

6.      BCFC's ULC status creates certain tax advantages under Canadian and

U.S. law. The trade-off for these advantages (and the basis upon which the 7.95% Notes were

issued) is that the ULC's parent is obligated, under section 135 of the *Companies Act (Nova

Scotia)*, to make payments to the ULC "sufficient for payment of [ULC's] debts and liabilities

and the costs, charges, and expenses of winding up . . . ." Here, BCFC has such a claim (the

"BCFC Contribution Claim") under section 135 of the *Companies Act (Nova Scotia)* against

Bowater, which includes the amounts due in connection with the 7.95% Notes.

7.      After issuance of the 7.95% Notes, BCFC entered into multiple

transactions with its affiliates that apparently had no benefit to BCFC, but significantly reduced

the value of BCFC's assets. Accordingly, BCFC may have related claims against BCFC's officers and directors as well as against certain affiliates of BCFC.

8. The 7.95% Notes represent most of the liabilities of BCFC. However, according to the Debtors, BCFC has no material assets other than the BCFC Contribution Claim (and, potentially, BCFC's claims against BCFC's officers and directors as well as against certain affiliates of BCFC). See Disclosure Statement p. 31 (estimating Class 6M BCFC unsecured creditor claims at approximately $620 million and recoveries on such claims under the Joint Plan, assuming no value for the BCFC Contribution Claim or any claims of BCFC against its affiliates, officers and directors, at less than 1%). Consequently, the BCFC Contribution Claim is triggered here. Further, the need for BCFC to pursue its claims against its officers, directors, and employees as well as against BCFC's affiliates is apparent.

9. Nevertheless, the Debtors and their Canadian affiliates at first ignored and then consistently sought to obstruct and delay prosecution of BCFC's claims. Among other things, those steps included the following:

- During the first year of these cases, the Debtors took no steps to address or resolve BCFC's claims.

- Meanwhile, the Debtors resisted efforts of certain 7.95% Noteholders and Wilmington Trust to have an independent fiduciary and conflicts counsel appointed for BCFC to pursue BCFC's claims. Throughout that period (and until today), the Debtors (including BCFC's Board) maintained they had no conflict in resolving such claims even though the claims were litigation claims for over $620 million, were between Debtors, and could be asserted against BCFC's officers and directors, as well as the fact BCFC's officers and directors also are officers and directors of other U.S. and CCAA debtors and are compensated exclusively by AbitibiBowater Inc. See, e.g., *Motion for Order Pursuant to the Court-to-Court Protocol Authorizing Bowater Incorporated to Seek Advice and Direction from the Canadian Court* (the "Advice Motion") ¶ 15 ("the Debtors believe that BCFC's officers, directors and retained professionals were fully capable and legally authorized to discharge their fiduciary duties to BCFC in connection with resolving these potential intercompany disputes").

5

- Contemporaneously, the CCAA Debtors, <u>including BCFC</u> (by virtue of its current Board), took the position <u>on the record</u> in the Canadian Court that BCFC's Contribution Claim was meritless. <u>See</u> Advice Motion, <u>Exhibit B</u> ¶ 6(e) ("[T]here is no evidence to suggest that this [Contribution Claim] . . . has any validity at all."); Advice Motion, <u>Exhibit B</u> ¶ 97 ("[T]here is no credible basis to assume the [Contribution Claim's] validity in this case . . . .").[4] Further, the Debtors (including BCFC) agreed to the Joint Plan and CCAA Plan even though they substantially impair BCFC's Contribution Claim and would provide <u>no value</u> to BCFC for its Intercompany Claims and Claims against its officers and directors related to the misuse of BCFC's assets.[5]

- Eventually, the Debtors acquiesced in seeking to retain conflicts counsel for BCFC, but only if such counsel could be hand-picked by the Debtors, would report solely to BCFC's existing (conflicted) Board of Directors, and solely could address the Contribution Claim.

- After filing an application to retain such a conflicts counsel, but no independent fiduciary, and receiving informal objections from 7.95% Noteholders and Wilmington Trust, the Debtors delayed further and ultimately agreed to seek to appoint Lisa Donahue as a BCFC Vice President (and AP Services LLC) (collectively, "<u>Donahue</u>") to investigate the BCFC Contribution Claim, but subject to the oversight of BCFC's Board.

- At the hearing on Donahue's retention, the Court refined the retention to make clear Donahue could investigate all of BCFC's claims, and BCFC's Board would not be the final arbiter as to the pursuit and/or resolution of BCFC's claims.[6] Nonetheless, Donahue (and her counsel) still report to BCFC's conflicted Board, cannot resolve any claim without the Board's approval, and cannot object to the Joint Plan or the CCAA Plan even to the extent they reduce or impair BCFC's claims.

---

[4] The "Petitioners" who filed the Response that is <u>Exhibit B</u> to the Advice Motion included "BCFC". <u>Id.</u>, Exhibit B ¶ 11.

[5] Earlier versions of the Joint Plan were even more damaging to BCFC as they entirely eliminated the Contribution Claim. Notably, BCFC's directors will receive valuable releases and substantial bonuses under the Joint Plan.

[6] On July 7, 2010, the Court entered an order (the "<u>Donahue Order</u>") [Docket No. 2614] appointing Lisa Donahue as the Vice President — Restructuring of BCFC and authorizing Donahue to (i) "investigate claims, if any, against the directors and officers of BCFC arising in connection with the [7.95% Notes]"; and (ii) "investigate causes of action, if any, based on or related to the use of (or failure to use) the proceeds of the [7.95% Notes], any assets subsequently acquired by BCFC, or otherwise, as appropriate to maximize BCFC's assets." Donahue Order ¶¶ 5, 6.

- Meanwhile, the Debtors' delay in addressing BCFC's claims signified that BCFC's creditors would not be able to participate in the Debtors' valuable Rights Offering respecting BCFC's claims because these claims had not been resolved. Ultimately, however, objections to that approach by certain 7.95% Noteholders and Wilmington Trust led to a procedure under which BCFC's unsecured creditors could participate in the Rights Offering (subject to certain limitations) as indirect holders of the Contribution Claim.

The Joint Plan

10. On August 2, 2010, the Debtors filed the Joint Plan and related Disclosure Statement. Wilmington Trust requested the Debtors to revise or clarify various provisions of the Joint Plan to reduce or eliminate the need for the objections presented below. The Debtors rejected such requested changes (except in a few instances, where proposed changes just mentioned have not yet been made or fail to fully address the issue raised). Accordingly, Wilmington Trust submits the following objections:

**OBJECTIONS**

11. Plan confirmation is governed by section 1129 of the Bankruptcy Code. See In re Armstrong World Indus., 432 F.3d 507, 511 (3d Cir. 2005). BCFC and Bowater, as plan proponents, bear the burden of proving that the BCFC Plan and the Bowater Plan satisfy each of section 1129's requirements. See In re Lernout & Hauspie Speech Products, N.V., 301 B.R. 651, 656 (Bankr. D. Del. 2003), aff'd In re Lernout & Hauspie Speech Products, N.V., 308 B.R. 672 (D. Del. 2004).

**I. THE BCFC PLAN AND BOWATER PLAN FAIL TO SATISFY SECTION 1129(a)(1) BECAUSE EACH IMPROPERLY DISCRIMINATES AGAINST THE CLAIMS OF WILMINGTON TRUST AND THE 7.95% NOTEHOLDERS**

12. Section 1129(a)(1) of the Bankruptcy Code provides that a plan may be confirmed only if it "complies with the applicable provisions of the Bankruptcy Code." 11 U.S.C. § 1129(a)(1). Among those applicable provisions is section 1123(a)(4), which requires

that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable." In re New Century TRS Holdings, Inc., 407 B.R. 576, 592 (D. Del. 2009).[7]

A.     The BCFC Plan Provides For Unjustified Less Favorable
       Treatment Of The 7.95% Unsecured Notes Claim

13.     Section 2.13(b) of the Joint Plan provides that "notwithstanding anything in the Debtors' Schedules to the contrary, and unless agreed to by the Debtors or ordered by the Bankruptcy Court, the Unsecured Note Claims set forth on Exhibit B6 shall be allowed Class 6 Claims solely in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B6." Joint Plan § 2.13(b) (emphasis added).[8] Thus, Exhibit B6 fixes (and caps) the Allowed Unsecured Note Claim relating to the 7.95% Notes at an amount equal to $619,875,000 (i.e., solely the amount of principal and unpaid prepetition interest due on the 7.95% Notes).[9]

14.     By limiting the amount of the 7.95% Unsecured Notes Claim to principal and unpaid interest, the BCFC Plan treats such Claim less favorably than other unsecured claims against BCFC because the BCFC Plan places an artificial (and unjustified) cap on the 7.95%

---

[7]     See In re Adelphia Comm's Corp., 361 B.R. 337, 363 (S.D.N.Y. 2007) ("Section 1123(a)(4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan."), aff'd In re Adelphia Comm's Corp., 544 F.3d 420 (2d Cir. 2008).

[8]     Section 1.271 of the Joint Plan provides that "'Unsecured Note Claims' means all Claims arising under or relating to the Unsecured Notes, . . . , 7.95% Note Guaranty Claims, . . . ." "Unsecured Notes" includes the 7.95% Notes. Joint Plan § 1.272.

[9]     The exact amount of prepetition interest due is still under discussion. To the extent the 7.95% Unsecured Notes Claim is being allowed in an amount that does not include interest through the same date as other unsecured claims, that treatment would represent further unjustified discrimination.

Unsecured Notes Claim. In effect, for Wilmington Trust's 7.95% Unsecured Notes Claim, the 7.95% Notes Indenture and the 7.95% Notes provide for the applicable issuer and guarantors to be liable for amounts in addition to principal and interest, including, without limitation, for Indenture Trustee fees, expenses, and indemnification.[10] See, e.g., 7.95% Notes Indenture § 607. There is no basis for the BCFC Plan imposing such an artificial cap on only one claim in Class 6M, the 7.95% Notes Unsecured Claim.[11]

   15. To the extent Wilmington Trust, as an Indenture Trustee, has a right to payment under the 7.95% Notes Indenture that is not paid by the Debtors, Wilmington Trust would exercise its right under the 7.95% Notes Indenture to impose a charging lien on any Joint Plan distributions on the 7.95% Notes to ensure receipt by the Indenture Trustee of all amounts due under the 7.95% Notes Indenture. Specifically, the 7.95% Notes Indenture provides that Wilmington Trust "shall have a lien prior to the Securities and the Guarantees as to all property and funds held by it hereunder for any amount owing it or any predecessor Trustee". 7.95% Notes Indenture § 607. Any such application of a charging lien would deprive 7.95% Noteholders of Joint Plan distributions, thereby reducing their distributions as compared to other

---

[10] In addition to providing for Wilmington Trust's right to payment of its fees and expenses from BCFC and Bowater, the 7.95% Notes Indenture also provides that BCFC (as issuer) and Bowater (as guarantor) jointly and severally agree "to fully indemnify . . . [Wilmington Trust] and its agents for, and to hold it harmless against, any and all loss, liability, claim, damage or expense asserted by any Person (including reasonable legal fees and expenses), incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder." 7.95% Notes Indenture § 607.

[11] Section 2.13(b) of the Joint Plan might signify that the Bankruptcy Court may enter an order fixing a different amount for Unsecured Note Claims, but that the provision is ambiguous as to both its meaning and the timing for any such determination. Also, section 10.13 of the Joint Plan provides for the preservation of the rights of an Indenture Trustee under any applicable Indenture to assert Claims for fees and expenses, but does not address other potential claims under an Indenture, such as for indemnification. See Joint Plan § 10.13 ("the Disbursing Agent shall pay in Cash all reasonable and documented fees and expenses of the Indenture Trustees and their advisors"). To date, the Debtors have failed to amend the Plan to address these concerns.

holders of Class 6M Claims. To the extent such a charging lien is imposed due to the cap on Wilmington Trust's Claim, intra-class unequal treatment would result that violates section 1123(a)(4) and, therefore, section 1129(a)(1).

B.    The Bowater Plan Provides For Prejudicial Treatment
      Of The 7.95% Notes Guaranty Claim

16.    Pursuant to the 7.95% Notes Indenture and related guaranty, Bowater unconditionally guaranteed the payment of principal and interest on the 7.95% Notes and obligated itself to reimburse Wilmington Trust for "any and all costs, fees and expenses (including, without limitation, legal fees on a solicitor and client basis) incurred by [Wilmington Trust], its agents, advisors and counsel" arising out of or in connection with the 7.95% Notes. See 7.95% Notes Indenture §§ 607, 1301, 1309. The 7.95% Notes Indenture also provides that Bowater agreed "to fully indemnify [Wilmington Trust] . . . and its agents for, and to hold it harmless against, any and all loss, liability, claim, damage or expense asserted by any Person (including reasonable legal fees and expenses), incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder." See 7.95% Notes Indenture § 607.

17.    Despite these provisions requiring Bowater, as guarantor, to pay Wilmington Trust's fees and expenses and to indemnify Wilmington Trust, section 1.25 of the Bowater Plan provides that the "7.95% Notes Guaranty Claims" against Bowater refer to "all Claims arising under or relating to the 7.95% Notes Guaranty in the amount of $619,875,000." Plan § 1.25 (emphasis added). This figure represents only principal and accrued but unpaid interest on the 7.95% Notes as of the Petition Date and does not account for Wilmington Trust's

additional claims for fees, expenses and indemnification.[12] Thus, the Bowater Plan imposes an artificial cap on the amount of the 7.95% Notes Guaranty Claims that ignores the plain terms of the 7.95% Notes Indenture entitling Wilmington Trust to reimbursement of its fees and expenses and its right to seek indemnity from Bowater.[13]

18.     Notably, the definition of none of the other Class 6S Claims against Bowater (guaranty claims or otherwise) are defined in a set dollar amount so as to preclude an Indenture Trustee's (or any other creditor's) recovery of additional amounts due under the governing Indenture or document. See, e.g., Joint Plan § 1.30 (defining "8.00% Convertible Notes Guaranty Claims" as "all Claims arising under or relating to the 8.00% Convertible Notes Guaranty").

19.     Also, Exhibit B6 of the Joint Plan provides for all Unsecured Notes Claims and related guaranty Claims to be allowed except the 7.95% Notes Guaranty Claim. Yet, there is no basis to challenge the validity of the 7.95% Notes Guaranty.[14] Hence, the Bowater Plan improperly treats the 7.95% Notes Guaranty Claim less favorably than another guaranty Claim against Bowater because only the 7.95% Note Guaranty Claim is not allowed under the Bowater Plan. For example, Exhibit B6 provides for the guaranty Claim asserted against Bowater based on the 8.00% Convertible Notes to be an allowed Claim against Bowater.

---

[12]     The exact amount of interest due is still being discussed. See footnote 9.

[13]     Section 10.13 of the Plan provides for the Debtors to pay the Indenture Trustee Fee Claims in Cash on the Effective Date (or as soon as reasonably practicable thereafter). Nonetheless, the definition of Indenture Trustee Fee Claims does not include claims such as for indemnification under the Indentures or fee Claims that might be disputed by the Debtors.

[14]     Any argument that the 7.95% Notes Guaranty Claim duplicates the Contribution Claim is meritless as the Claims are by different entities (BCFC vs. the Indenture Trustee), are in different amounts, and have different bases (statute vs. contract). Regardless, any duplication argument should be addressed to the Contribution Claim, not the 7.95% Notes Guaranty Claim, which is uncontested.

20.     By capping <u>only</u> the 7.95% Notes Guaranty Claim and by not allowing that Claim, the Bowater Plan impermissibly discriminates against Wilmington Trust and the holders of the 7.95% Notes vis-à-vis the holders of other Class 6S Claims (guaranty or direct) against Bowater. No creditor has consented to such less favorable treatment of the 7.95% Notes Guaranty Claim. Accordingly, the unequal treatment of the 7.95% Notes Guaranty Claim as compared to other Class 6S Claims directly contravenes section 1123(a)(4) and, therefore, section 1129(a)(1).

C.      The Joint Plan's Release Provision Would Improperly Deprive Wilmington Trust, As The Indenture Trustee For The 7.95% Notes, Of A Release And, Therefore, Prejudice 7.95% Noteholders

21.     Section 8.5(a) of the Joint Plan provides that the Debtor Releasing Parties (which include Bowater) shall release the Indenture Trustees from any and all claims arising on or prior to the Effective Date of the Plan. However, one carve-out from this release under section 8.5(a) is that: "the Debtor Releasing Parties shall not release any Indenture Trustee (and any related Indenture Trustee Party) that serves as Indenture Trustee for any Unsecured Notes issued by a Debtor for which this Plan is not confirmed in these Chapter 11 Cases . . . ." Joint Plan § 8.5(a)(vi). Due to the expressed opposition to the BCFC Plan by holders of more than one-third in principal amount of the 7.95% Notes, it is anticipated that the BCFC Plan will not be confirmed based on the lack of acceptance of the BCFC Plan by Class 6M.[15] Hence, a direct consequence of the section 8.5(a)(vi) release carve-out is that Wilmington Trust, as the 7.95% Notes Indenture Trustee, would not receive a release from any of the Debtors, including

---

[15]     If the BCFC Plan is not accepted by Class 6M, then there would be no impaired accepting class of creditors for the BCFC Plan necessary to cram down Class 6M under the BCFC Plan. <u>See</u> 11 U.S.C. § 1129(a)(l0). The Joint Plan does not explain what happens if the BCFC Plan is not confirmed. Despite multiple requests, the Debtors have refused to advise Wilmington Trust of the consequences under the Joint Plan if the BCFC Plan is not confirmed.

Bowater, if the BCFC Plan is not confirmed. Yet, if the Bowater Plan is confirmed, there would be no basis for Wilmington Trust (and any related Indenture Trustee Party) not to receive a release because Wilmington Trust is a creditor in the Bowater case by virtue of the 7.95% Notes Guaranty Claim.[16]

22.     Indeed, such discrimination would conflict with section 1123(a)(4)'s requirement that all claims in the same class receive the same treatment. "It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some other cognizable chose in action — in exchange for the same percentage of recovery." In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986). In fact, "it is unfair to require a creditor to pay a higher price for the same benefit." Id. at 1154. As requiring confirmation of the BCFC Plan would be requiring a higher price from Wilmington Trust (and the 7.95% Noteholders) than would be required of other Bowater creditors (whose release would be contingent on confirmation of only the Bowater Plan), section 8.5(a)(vi) of the Joint Plan may not deprive Wilmington Trust and the 7.95% Noteholders of the benefit of the release.

23.     Notably, while a plan may grant certain class members enhanced value "where the added benefit is given for truly collateral reasons (i.e., independent from their status as claimants)", courts are wary of provisions that condition such additional benefits on a vote to accept a plan. See Adelphia, 361 B.R. at 363. In Adelphia, the debtor's plan provided that only class members who accepted the plan were granted broad releases and exculpations from the debtors. In reviewing certain creditors' motion for a stay pending appeal of the Adelphia

---

[16]     Wilmington Trust does not contend it should get the benefit of the section 8.5(a)(vi) release from BCFC if the BCFC Plan is not confirmed.

confirmation order, the District Court recognized that the Adelphia plan provided enhanced recoveries (in the form of a release) to certain class members based exclusively on such class members' acceptance of the plan. As the releases were not given for "collateral reasons," but instead were directly linked to a vote on plan confirmation, the additional benefits given to accepting class members "may well have led some claimants to approve the Plan when they otherwise may have rejected it. As a result, creditors opposing the Plan may have been prejudiced by a quid pro quo exchange of Plan approval for valuable releases and exculpations." Adelphia, 361 B.R. at 363. Accordingly, the District Court held "there is a substantial possibility that Appellants will succeed in their argument that the distribution of certain benefits to some claimants but not others within a class violates section 1123(a)(4)." Id.

24.     As in Adelphia, the release of Wilmington Trust (and related Indenture Trustee Parties) by the Debtor Releasing Parties is directly tied to approval of the BCFC Plan by the 7.95% Noteholders (who control such approval). Under the language of the Joint Plan, if the Class 6M creditors do not approve the BCFC Plan (even though the Bowater Plan is confirmed), Wilmington Trust (and related Indenture Trustee Parties) would not be released from any claims that the Debtor Releasing Parties (including Bowater) may have against Wilmington Trust as the 7.95% Notes Indenture Trustee. Under the 7.95% Notes Indenture, were Wilmington Trust sued due to the absence of a release, Wilmington Trust would be entitled to indemnification through the imposition of a charging lien on the distributions to holders of the 7.95% Notes, thereby forcing the holders of the 7.95% Notes to indirectly pay for Wilmington Trust's (and Related Indenture Trustee Parties') indemnification. See 7.95% Notes Indenture § 607.

25.     Section 8.5(a)(vi) of the Plan, therefore, improperly encourages holders of the 7.95% Notes to accept the BCFC Plan (and the Bowater Plan) to avoid the prejudice they

would suffer under the Bowater Plan if Wilmington Trust were not granted a release. See

Adelphia, 361 B.R. at 363 ("Where the receipt of valuable benefits in a plan is conditioned on a

vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to

the plan.") (emphasis in original). Accordingly, the Bowater Plan violates section 1123(a)(4)'s

requirement that all creditors in the same class receive equal treatment regardless of how certain

class members vote on the BCFC Plan.

## II. THE BCFC PLAN AND BOWATER PLAN FAIL TO SATISFY THE GOOD FAITH REQUIREMENT OF SECTION 1129(a)(3) BECAUSE EACH PLAN IMPROPERLY DISCRIMINATES AGAINST THE CLAIMS OF WILMINGTON TRUST AND THE 7.95% NOTEHOLDERS

26.     Section 1129(a)(3) provides that a plan may be confirmed only if it "has

been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

The Bankruptcy Code does not define the concept of "good faith". See Lernout & Hauspie, 301

B.R. at 657. Nevertheless, "[f]or purposes of determining good faith under section

1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re

Combustion Engineering, Ing., 391 F.3d 190, 247 (3d Cir. 2005) (quoting In re PWS Holding

Corp., 228 F.3d 224, 242 (3d Cir. 2000)).

27.     The BCFC Plan and Bowater Plan's unfair discriminatory treatment of the

7.95% Unsecured Notes Claim and the 7.95% Notes Guaranty Claim as well as the exclusion of

Wilmington Trust from the release provision of section 8.5(a) under the Joint Plan violate

section 1129a)(3)'s requirement that a plan be proposed in good faith. In particular, this

prejudicial treatment reflects a lack of good faith because one of the primary objectives of the

Bankruptcy Code is to ensure equality of treatment of a debtor's similarly-situated creditors.

See, e.g., In re Combustion Engineering, Inc., 391 F.3d at 239 (identifying section 1123(a)(4) as

one of the Bankruptcy Code provisions that furthers the Code's policy of equality of distribution among similarly-situated creditors).

28.     In evaluating the good faith issue, particularly as it relates to the treatment of BCFC's claims and the 7.95% Notes, the Court should consider, <u>inter alia</u>, the following:

- Fairfax Financial Holdings Ltd. ("<u>Fairfax</u>") now has two seats on the Board of AbitibiBowater Inc. and, as one of the largest creditors in these cases, would control a substantial portion of the reorganized Debtors' equity.

- Under the Joint Plan, Fairfax's heavily disputed 8.00% Notes Guaranty Claim in the amount of $383 million would be <u>allowed in full</u>, providing Fairfax with <u>nearly $200 million</u> of plan distributions without Fairfax providing any consideration.

- Fairfax's recoveries on that Claim would be diluted by allowance of the BCFC Contribution Claim against Bowater.

- Under the Joint Plan, BCFC's Board members would receive valuable releases and substantial bonuses and be entitled to substantial future compensation. <u>See, e.g.</u>, Joint Plan §§ 6.8, 6.9, 8.5(a); Plan Supplement 5A, 5B.

## III.     PROVISIONS IN THE JOINT PLAN IMPAIRING BCFC'S CLAIMS AGAINST ITS OFFICERS, DIRECTORS, AND AFFILIATES ARE IMPROPER AND VIOLATE THE BEST INTERESTS TEST UNDER SECTION 1129(a)(7)

29.     A plan of reorganization cannot be confirmed unless it satisfies the "best interests test" of section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) provides that each impaired claim or interest holder must either accept the plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). Section 1129(a)(7) guaranties each creditor that it will receive at least as much in a chapter 11

reorganization as it would in a liquidation.  See In re Stone & Webster, Inc., 286 B.R. 532, 545 (Bankr. D. Del. 2002).

A.     The Bowater Plan Improperly Limits The
       Amount Of The BCFC Contribution Claim

30.     The Bowater Plan's definition of "BCFC Contribution Claim" improperly limits the amount of such Claim so that the full BCFC Contribution Claim could not be asserted if the Bowater Plan were confirmed.[17]  Specifically, in its definition of BCFC Contribution Claim, the Bowater Plan requires that the following amounts be subtracted when calculating the BCFC Contribution Claim: "the aggregate amount of distributions to holders of (a) Allowed Class 6M Claims against BCFC and (b) any Allowed 7.95% Notes Guaranty Claim against Bowater that certain holders of the 7.95% Notes have asserted that BCFC may hold against Bowater . . . ."  Joint Plan § 1.96.[18]  While Bowater is free to argue (incorrectly) that such reductions are appropriate (as Bowater does in paragraph 24(e) of its Advice Motion), those arguments are litigation issues to be addressed in connection with resolution of the BCFC Contribution Claim, not results to be dictated by a plan.  Indeed, as the Debtors have argued that they and the Joint Plan are "neutral" regarding the BCFC Contribution Claim against Bowater (because the claim is a dispute between two Debtors) and that Claim still is being investigated by Donahue, BCFC's rights to pursue that claim should not be impaired by the Joint Plan.  Yet,

_____

[17]   Under the Bowater Plan, "the BCFC Contribution Claim shall be classified and treated as a Class 6 Claim against Bowater" rather than being lumped in with Intercompany Claims that purportedly were compromised in connection with the Joint Plan.  Joint Plan § 1.96; see id. § 1.206 ("Intercompany Claims" means a claim by a Debtor or a CCAA Debtor against a Debtor or CCAA Debtor other than the BCFC Contribution Claim.") (emphasis added).

[18]   In full, section 1.96 of the Joint Plan provides that the "BCFC Contribution Claim means the contingent claim in an amount that is not less than $619,875,000 minus the aggregate amount of distributions to holders of (a) Allowed Class 6M Claims against BCFC and (b) any Allowed 7.95% Notes Guaranty Claim against Bowater that certain holders of the 7.95% Notes have asserted that BCFC may hold against Bowater pursuant to section 135 of the Nova Scotia Companies Act, R.S.N.S., 1989, c. 81, as amended, based on BCFC's incorporation as an unlimited liability company under Nova Scotia law."

based on the plan distribution values projected by the Debtors, the artificial cap on the Contribution Claim included in the Joint Plan could reduce the BCFC Contribution Claim by almost 50% and, therefore, distributions for the BCFC Contribution Claim by almost $150 million (based on the Debtors' projections that an unsecured claim against Bowater would receive distributions valued at 48.4% of the Claim).

B.    The Joint Plan's Preemptive Disallowance Of BCFC's Intercompany Claims
        And Causes Of Action Against BCFC's Directors And Officers Is Improper

31.    Throughout these Chapter 11 Cases, it has been apparent that BCFC may have claims related to the misuse of BCFC's assets, against certain other Debtors and/or CCAA Debtors as well as against BCFC's officers and directors.[19]  Specifically, BCFC's assets repeatedly have been used and transferred solely to provide tax and other benefits to BCFC's affiliates while the value of BCFC's assets evaporated as a consequence.  The Joint Plan would adversely impact BCFC by preemptively disallowing any Intercompany Claims that BCFC might have against its affiliates and releasing BCFC's breach of fiduciary duty and related claims against its directors and officers related to the misuse of BCFC's assets.  In particular, section 2.15(b) of the Joint Plan authorizes the Debtors or Reorganized Debtors, as applicable, to disallow in full any Intercompany Claims that BCFC may possess.  Meanwhile, section 8.5(a) of the BCFC Plan provides that on the Effective Date, BCFC shall - without any consideration - forever release its "officers, directors, and employees from any and all claims, etc., based upon acts or omissions occurring on or prior to the Effective Date".[20]  BCFC Plan § 8.5(a).

---

[19]    Whatever determinations Donahue might make regarding these claims, BCFC's creditors will have had no meaningful opportunity to comment on them.  Regardless, this Court has stated that BCFC's Board, which is comprised of some of the potential defendants, will not be the final arbiter of such claims.

[20]    The Joint Plan is ambiguous on this point as it is unclear whether the releases in section 8.5(a) are solely between the subsets of "Released Parties" listed in subsections (i) through (ix) of section 8.5(a) (e.g., group

18

Accordingly, even if BCFC has viable claims against its affiliates (other than the Contribution Claim) or BCFC's officers, directors, or employees, BCFC would lose those claims under the BCFC Plan. Moreover, even if BCFC were to retain such claims, the Joint Plan provides no mechanism for BCFC's creditors to share in BCFC's recoveries on the claims.

      C.    The Joint Plan Violates the Best Interests Test

      32.    Eliminating or reducing these sources of recovery for the 7.95% Noteholders would violate the best interests tests under section 1129(a)(7). In particular, in a chapter 7 liquidation, a trustee for BCFC would pursue all Intercompany Claims, and all claims against BCFC's officers and directors as well as seek to maximize recoveries on the BCFC Contribution Claim. Yet, the Joint Plan would deprive the 7.95% Noteholders of this valuable consideration and instead provide them with a de minimus recovery that is smaller than the 7.95% Noteholders would receive in a chapter 7 liquidation. Hence, the BCFC Plan violates the "best interests test" of section 1129(a)(7) by releasing BCFC's claims against its officers, directors, employees and affiliates as well as by capping the BCFC Contribution Claim.

## IV.    THE LINKAGE OF BCFC'S CHAPTER 11 PLAN TO BCFC'S CCAA PLAN PRECLUDES CONFIRMATION

      33.    The Debtors and CCAA Debtors have proposed the Joint Plan and the CCAA Plan as linked efforts to resolve the Chapter 11 Cases and the CCAA Proceedings. Inherent in these parallel proceedings is that such plans must be approved in both the U.S. and Canada for the Cross-Border Debtors, including BCFC. See, e.g., Joint Plan § 7.2(c), (d) ("The following are conditions precedent to the occurrence of the Effective Date, each of which may

---

(i) vs. group (ii)) or also include releases among the Released Parties within each of subsections (i) through (ix).

be satisfied or waived in accordance with Section 7.3 of this Plan: . . . (c) The Sanction Order in form and substance reasonably acceptable to the Debtors and the Creditors Committee shall have been entered by the Canadian Court; [and] (d) The operation and effect of the Sanction Order shall not have been stayed, reversed or amended"). Conditioning the BCFC Plan's effectiveness upon the Canadian Court's sanctioning of BCFC's CCAA Plan establishes that the two plans are inextricably intertwined such that the Court's confirmation of the BCFC Plan would constitute indirect approval of the CCAA Plan.[21] Accordingly, to the extent terms of the CCAA Plan are inconsistent with the Bankruptcy Code, the BCFC Plan should not be confirmed.

34.     A chapter 11 plan only may be confirmed despite its rejection by an impaired class of claims or interests if all of the requirements of section 1129(a) have been satisfied except sub-section 1129(a)(8) and the plan "does not discriminate unfairly, and is fair and equitable" with respect to each dissenting impaired class. 11 U.S.C. § 1129(b). The "fair and equitable" requirement of section 1129(b) implicates the "absolute priority rule". Lernout & Hauspie, 301 B.R. at 512. As codified in section 1129(b), the absolute priority rule guarantees that "the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(b)(ii). "The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired." In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005).

35.     Certain of BCFC's 7.95% Noteholders who assert they hold a sufficient amount of the 7.95% Notes to block confirmation of the BCFC Plan, have stated they will vote

---

[21]     For example, section 2.1 of the CCAA Plan provides that "the treatment of a Proven Claim against a Cross-border Debtor is intended to be consistent with the treatment of an Allowed Claim (as defined in the U.S. Plan) against same Cross-Border Debtor in the U.S. Plan." See CCAA Plan § 2.1.

to reject the BCFC Plan and BCFC CCAA Plan. Assuming that rejection occurs, then under sections 2.5(a) and 3.6 of the CCAA Plan, because the class of BCFC's unsecured creditors entitled to vote on the CCAA Plan votes to reject the CCAA Plan (and assuming the CCAA Plan is nevertheless sanctioned e.g., because the non consolidation of the CCAA Debtors in Canada is not as clear cut as in the U.S.), such BCFC unsecured creditors would not receive any distribution on account of their Claims.[22] Providing BCFC's unsecured creditors in the CCAA Proceedings (and the BCFC chapter 11 case) with no recovery despite the Canadian Court's sanctioning of the CCAA Plan would violate the absolute priority rule because it would result in a recovery for BCFC's equity holders. Specifically, if BCFC's creditors do not receive a distribution of New ABH Common Stock as provided in the CCAA Plan, then such New ABH Common Stock would be retained as treasury stock by ABH, the ultimate equity holder of BCFC.[23] This redistribution of CCAA Plan value to de facto equity holders of BCFC would violate basic bankruptcy principles embodied in section 1129(b) and the absolute priority rule. Accordingly, as approval of the BCFC Plan is conditioned upon the CCAA Plan satisfying the Bankruptcy Code's confirmation requirements, the BCFC Plan cannot be confirmed. Simply put, the Debtors cannot be permitted to do indirectly that which they are prohibited from doing directly.

---

[22] See CCAA Plan § 2.5 ("Unless otherwise set forth herein, Affected Unsecured Creditors in any Affected Unsecured Creditor Class that fails to approve this CCAA Plan by the affirmative vote of the Required Majority . . . shall be deemed to be Unaffected Creditors in respect of their Claims against that No Vote Applicant for the purpose of this CCAA Plan."); CCAA Plan § 3.6 ("Affected Unsecured Creditors deemed to be Unaffected Creditors pursuant to Subsection 2.5(a) shall not be entitled to receive any distribution under this CCAA Plan.").

[23] Here, all senior creditors of BCFC would be paid in full under the BCFC Plan and, therefore, could not be providing a "gift" to Class 6 unsecured creditors. Instead, that value must come from BCFC's estate.

## RESERVATION OF RIGHTS

36.     Wilmington Trust reserves its rights to supplement this Objection, including without limitation, to the extent BCFC or Bowater seeks to confirm the BCFC Plan or the Bowater Plan under the "cramdown" provisions of section 1129(b).[24]

---

[24]     The absence of inclusion of any other plan confirmation objection in this document does not signify any position of Wilmington Trust regarding such objections.

## CONCLUSION

WHEREFORE, Wilmington Trust respectfully requests that the Court not confirm the BCFC Plan or Bowater Plan unless, _inter alia_, the points raised in this Objection have been appropriately addressed.

Dated: Wilmington, Delaware
September 13, 2010

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: _____
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

Alan J. Lipkin, Esquire
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

Attorneys for Wilmington Trust Company,
solely as successor indenture trustee for the
7.95% Notes due 2011 issued by Bowater
Canada Finance Corporation pursuant to an
Indenture Agreement, dated as of October 31,
2001