THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ABITIBIBOWATER, INC., *et al*[1] | Case No.: 09-11296 (KJC) |
| Debtors. | (Jointly Administered) |

## OBJECTION BY CERTAIN EQUITY SHAREHOLDERS TO THE DEBTORS' PLAN OF REORGANIZATION

Certain equity shareholders of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") and hereby submit this Objection to the Debtors' Plan of Reorganization. In support of this objection, we represent as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter constitutes a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A).

### BACKGROUND

2. On April 16, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Pursuant to Debtors' voluntary petitions filed with this Court, the company listed assets valued at $9.94 billion against liabilities of $8.78 billion.

3. On April 17, 2009, certain of the Debtors (the "Canadian Debtors"), along with

---

[1] The Debtors in these chapter 11 cases are AbitiBowater, Inc.; AbitiBowater US Holding 1 Corp.; AbitiBowater US Holding LLC; AbitiBowater Canada, Inc.; Abitibi-Consolidated Alabama Corp.; AbitibiConsolidated Corp.; Abitibi-Consolidated Finance LP; Abitibi-Consolidated Sales Corp.; Alabama River Newsprint Co.; August Woodlands, LLC; Bowater Alabama LLC; Bowater America, Inc.; Bowater Canada Finance Corp.; Bowater Canadian Forest Products, Inc.; Bowater Canadian Holdings Inc.; Bowater Canadian Ltd.; Bowater Finance Company, Inc.; Bowater Finance II LLC; Bowater, Inc.; Bowater LaHave Corp.; Bowater Maritimes, Inc.; Bowater Newsprint South LLC; Bowater Newsprint South Operations LLC; Bowater Nuway, Inc.; Bowater Nuway MidSates, Inc.; Bowater South American Holdings, Inc.; Bowater Ventures, Inc.; Catawba Property Holdings LLC; Coosa Pines Golf Club Holdings LLC; Donohue Corp.; Lake Superior Forest Products, Inc.; and Tenex Data, Inc.

non-debtor subsidiaries, sought protection from creditors under Canada's <u>Companies' Creditors Arrangement Act</u>, R.S.C. 1985, c. C-36 (the "<u>CCAA</u>"), in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "<u>Canadian Proceeding</u>" and the "<u>Canadian Court</u>," respectively).

4. On April 28, 2009, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") appointed a statutory committee of unsecured creditors (the "<u>Committee</u>"), pursuant to 11 U.S.C. sec. 1102 of the Bankruptcy Code.

5. On April 14, 2010, the Debtors filed their Third Motion for Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances (the "<u>Third Exclusivity Motion</u>"). Pursuant to this Court's order dated May 12, 2010 granting the Third Exclusivity Motion (the "<u>Order</u>"), Debtors' exclusivity for filing a plan of reorganization was extended through and including July 21, 2010. Further, the Order extended exclusivity for solicitation of acceptance of a plan through and including September 9, 2010.

6. On May 24, 2010, Debtors filed their First Amended Joint Plan of Reorganization (the "<u>Plan</u>") and Disclosure Statement for First Amended Plan (the "<u>Disclosure Statement</u>") [D.I. 2199 and 2200]. On June 29, 2010, Aurelius Capital Management, LP ("<u>Aurelius</u>") filed an Objection to Disclosure Statement (the "<u>Aurelius Objection</u>") [D.I. 2526].

7. The Shareholders filed a Joinder (the "<u>Joinder</u>") [D.I. 2558] to the Aurelius Objection as the Shareholders share many of the concerns raised by Aurelius. For example, Aurelius objects to the Debtors' Disclosure Statement as it lacks a liquidation analysis for each Debtor, nor does it include a valuation of the reorganized Debtors. <u>See</u> Objection, at *3. Aurelius also objects to the Disclosure Statement's lack of explanation of how certain intercompany claims are being treated under Debtors' proposed plan. <u>Id.</u>

8. Contained in Docket # 2796, AbitibiBowater Inc. (the "Company"), together with

its subsidiaries, affiliated debtors and debtors-in-possession (collectively the "Debtors" and individually as an "Individual Debtor" or "Individual Debtors") proposed a second amended joint plan of reorganization (the "Plan") for acceptance by the court and all creditors entitled to vote on the Plan. The Plan is to be considered with reference to the Disclosure Statement with exhibits thereto.

9. In March, 2010, a group of shareholders formed an Ad Hoc Equity Committee. This group of shareholders included pre-petition and post-petition shareholders eventually controlling 31% of the outstanding shares in the Debtor. Many members of the Ad Hoc Equity Committee were current and former employees of the Debtor and their shares are tied up in retirement and pension funds of the CEP Union.

10. Many members of the Ad Hoc Equity Committee formed a Litigation Trust in the State of Delaware for the purposes of securing legal counsel and a financial advisor. The results of this effort were included in the Motion of Certain Equity Shareholders for the Appointment of An Equity Security Holders Committee (Docket #2663).

11. Since then, several shareholders have completely sold their positions or greatly reduced them, but the Ad Hoc Equity Committee still currently holds approximately 27% of the outstanding shares.

## OBJECTION

12. Certain equity shareholders as part of the Litigation Trust hereby object to the Debtors' Plan of Reorganization (D.I. 2796).

## BASIS FOR OBJECTION

13. This objection is based upon the following arguments: (1) Debtors have undervalued or failed to value multiple assets, (2) Debtors are withholding recoveries until after Plan confirmation to avoid distribution; (3) Debtors' subsidiaries have not been properly valued; and (4)

3

Debtors' management have put forward this Plan without concern for the fundamental fairness of the bankruptcy process nor a concern for their fiduciary duties to the shareholders.

A.     **ARGUMENT 1: Debtors have undervalued or failed to value multiple assets**

14.     The Debtors have consistently used either book value or distressed sale value for the purposes of the providing the Court with information on their assets. However, fair market value is a more accurate measure of the worth of their assets. In addition, the Debtors have failed to value some of their assets entirely including timber cutting rights, water rights, and timberland. Although timber cutting rights, water rights, and timberland are mentioned in the Disclosure Statement, no value has been clearly assigned to them. In fact, during a recent hearing in this case regarding appointment of an Equity Committee, Mr. Zelin was quoted as saying that timberland relative to other assets was not significant.

15.     The Debtor currently owns approximately 800,000 acres of Canadian timberland and 100,000 acres in the United States. This number is not included in the Disclosure statement. However, according to Timberwest at the Forest Estate Models for the Future Conference at Victoria, B.C. (June 11, 2007), timberland sales averaged $783 dollars per acre of Canadian timberland and $1,828 per acre of United States timberland. This would provide a total asset value of approximately $809,200,000.

16.     In 2008, the Debtors took a one-time extraordinary loss of $256,000,000 for the expropriated assets in Newfoundland-Labrador (Debtors' 2008 Annual Report, p. 28). Yet the Debtors recently settled with the Newfoundland-Labrador government for $130,000,000 or a 51% discount claiming this saved them money in ongoing legal costs.

17.     In 2010, the Debtors sold a 9-hole Golf Club located on the St. Lawrence River plus six residential lots in a resort town, Donnaconna, just outside Montreal for USD$337,989. The Golf Club de Donnaconna is slightly larger than 34.5 acres (according to Google Maps) which means the

Debtors sold it (and the 6 residential lots) for an average price not greater than USD$9,815 per acre. Using the average value for vacant and residential lands published on a Canadian real estate website, Donnaconna vacant and residential lands are worth on average approximately $197,115 per acre. This would mean the golf course plus six residential lots would have for a fair market value of approximately $7,884,627 or 2,333% more than the value claimed by the Debtors.

18. The water rights value has not been included in the Debtors' Disclosure Statement. The Debtors' Annual Reports historically included intangible assets including water rights. In 2007, the water rights were equal to $1.172 billion dollars, in 2008, the water rights were $214 million, and in 2009, the water rights were $409 million. However, this line item is not included in the Disclosure Statement. While a line item for "Intangible Assets, net" is listed for a value of $311 million, it is unclear whether this includes water rights at all.

19. The timber assets have either been not included or included at a reduced value for the purposes of the Plan. The timber assets are not valueless eventhough the Debtors do not own the timber on 43 million acres but rather lease it from the Crown. They do own timber on the 1.4 million acres they own in Canada and the US and this has anot apparently been valued either. The 43 million acres worth of timber are held in long-term secured lease and is a huge income generating potential for the Debtors.

20. Timber assets have not been included in the Disclosure Statement. The Debtors indicate that based upon the profit margin associated with it and the fact that they lease cutting rights from the Crown in Canada, there is little value for the timber asset. However, this overlooks the income generation potential of the 43 million acres that the Debtors lease. IFRS in 2011 will demand that Canadian companies account for the income generation potential of timber lands and assets. The IRS in the United States already requires timber assets, including timber held under "contract right to cut", to be reported using Form T (Timber), Forest Activities Schedule.

Currently, timberland investors know that the value of their investment is determined by its cash generation potential not by any measure of net income. It is easy to see that although the Debtors do not own the timber, a lease for a parcel of land thickly wooded with hardwood is worth more to the Debtors than a lease for a parcel of land sparsely wooded with softwoods.

21. To value an asset's income generation potential requires an understanding of the value of the asset upon sale and the cost to deliver the asset as a raw material. In the cost to deliver the asset as a raw material, the Debtors must consider stumpage fees and the cost of labor and equipment to harvest and ship the product. In the value upon sale, the asset's percentage in the final product must be considered multiplied by the gross sales price of the finished product. In addition, the Crown limits the amount of timber that can be harvested from a particular block of land using an Annual Allowable Cut (AAC). Since these figures are difficult to average and obtain, some published figures are used for comparison. An area- and volume-based harvest schedule for the Yale Forest has been generated from data collected in the continuous forest inventory (CFI). These figures for the Yale Toumey Forest show that for about 100 acres and between 100 and 150 MBF cut annually yields an estimated annual timber income of $20,000- $30,000. These figures for the Yale Meyers Forest are for about 300 acres and between 450 and 500 MBF cut annually which yields an estimated annual income generated from timber sales at around $70,000-$80,000. Harvests at Yale's northern forests are generally awarded by competitive bid to any of several skilled, high-quality logging contractors in the region. These numbers are obviously for United States forests and these differ somewhat from Canadian forests. In addition, US deals with stumpage costs and allowable cut limits differently. Yet, the data provides an income generating potential per acre of $250. Multiplying this by the 43,000,000 acres leased by the Debtors gives an income generating potential of $10,750,000,000. The Debtors have already stated they have no desire to harvest trees from boreal forests which further reduces the income generating potential for

6

the Debtors' forests. However, it is clearly not accurate to state, as was stated by the Debtors' financial advisor, that the timber asset is insignificant in value compared to other assets of the Debtors.

22.     The impact of Carbon Credits has not been realized within the Debtor's Disclosure Statement. While cap and trade legislation has not been enacted, the trading of carbon credits has already commenced. In fact the Debtors have been registered on the Chicago Carbon Credit Exchange since 2002 clearly demonstrating a value to the Debtors for carbon sequestration. International Financial Reporting Standards (IFRS) already requires companies to account for the carbon sequestration capabilities of their holdings and IFRS is to be mandatory for Canada in 2011 and in the US by 2016. Currently, carbon credits are worth a small amount, only about $1 per acre or $43,000,000 for the Debtors, yet there is a likelihood for substantially greater value should the Cap & Trade legislation be passed. The Debtors' themselves recognized the value of the carbon offsets when utilizing them to garner goodwill associated with a forestry conference in which the Debtors chose to provide carbon offsets free of charge to the conferees.

23.     The impact of the Net Operating Losses (NOLs) to the positive equity of the Debtors has not been included within the Debtors' Disclosure Statement. Currently the Debtors have not disclosed the NOLs, but they must be worth at least hundreds of millions to the Debtors. In the CIBC World Market Report, the Net Operating Loss Carryforwards for the Debtors was $350,000,000 based upon $1 billion of net operating loss carryforwards at a 35% tax rate [The Merger Between Abitibi & Bowater: Necessary, But Not Sufficient - November 19, 2007]. The distribution of this value needs to be assessed inside the Plan Disclosure Statement or it cannot be considered to have adequate information.

**B.      ARGUMENT 2: Debtors are withholding recoveries until after Plan confirmation**

24.     As mentioned previously, the Debtors recently settled with the government of

7

Newfoundland-Labrador for the expropriated timber cutting rights, water rights, hydro assets, and the Grand Windsor mill property, plant and equipment for $130,000,000. Although the Debtors claim they also have removed liabilities for environmental cleanup, the value in 2008 was reflective only of the timber cutting rights, water rights, hydro assets, and property, plant and equipment associated with the Grand Windsor Mill, not for environmental cleanup. Furthermore, it is not clear the Debtors are no longer liable for the environmental cleanup, but a recent article in the Canadian press indicated it should cost close to $200 million to restore the area. Neither the settled value of $130,000,000 nor the potential savings in environmental cleanup costs have been included in the Disclosure Statement. The reason for not including the values in the statement is stated as being due to the fact that the deal is not consummated until after the Debtors Plan is confirmed. The Debtors claim the low settlement value was due to the fact they needed to settle this case quickly to make the cash available to their distressed companies. Yet, they are willing to wait several weeks or months to acquire it. This seems contradictory.

25. The Debtors also recently entered into the docket an agreement with the United States unions. In the agreement, the Debtors claim that the successful negotiations would remove $108,000,000 in claims from the unions. Again, this agreement is only viable after the Plan is confirmed meaning the $108,000,000 is retained as a liability until after Plan confirmation.

26. The Debtors also came to an agreement for reduced wages and benefits with the Canadian unions. However, a particular claim compromise was not listed for the completion of the negotiations. Yet, this agreement is only viable after the Plan is confirmed meaning that the reduced labor costs will not be reflected in the Debtors financial reports until after Plan confirmation.

27. The Debtors have reportedly come to an agreement with the Quebec governments in principle regarding pension funding liabilities [Canadian Press, September 7, 2010]. The details

8

have not been released, but it is understood that it will reduce the needed funding of the pension liabilities upon exiting from bankruptcy. In effect, it makes the pension fund a creditor in the process and a payment plan is put into place. However, this remains a significant liability on the Disclosure Statement.

C. **ARGUMENT 3: Debtors' subsidiaries have not been properly valued**

28. The Plan affirmatively states that it does not substantively consolidate the various Debtors and, as a result, the confirmation standards must be met for each Debtor standing alone. Plan, §2.2.

29. The Debtors' with no published, independent valuation report are claiming that their liabilities on a consolidated basis exceed their assets by $2.5 billion dollars ("Alleged Equity Deficit") as of March 31, 2010. However, the interest for the shareholders is also in the subsidiaries since the Debtors are not substantively consolidated.

30. Currently, without a valuation analysis, the Court is being asked to distribute monies to creditors and completely devalue shareholders. Yet, there is evidence that the Debtors have undervalued or failed to value certain assets as shown in Argument 1 of this Objection. There is also evidence there have been asset sales and claims compromised that have not been reflected in the Disclosure Statement as shown in Argument 2 of this Objection. It is unclear whether these valuation changes or recoveries will be sufficient to overcome the Alleged Equity Deficit on a consolidated basis. It may do so and in fact is highly likely to overcome the equity deficit in one or more subsidiaries. If the subsidiary that overcomes this Alleged Equity Deficit is a direct subsidiary of the parent Debtor in these cases, then this equity may flow to the shareholders. An objective valuation analysis is required to clearly demonstrate this and shows that the Disclosure Statement does not contain adequate information.

31. "Adequate information" in the context of Chapter 11 means information "of a kind,

and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan..."

32. Aurelius Capital Management, LP, and Contrarian Capital Management, LLC, have stated that the Plan does not provide information on the Intercompany Claims (D.I. 2796). An explanation of how the Intercompany Claims are being treated under the Plan and, specifically, the amount of each of the Intercompany Claims, how the Debtors will determine which of such Intercompany Claims to subordinate, cancel or reinstate and what value will be realized based on the treatment of Intercompany Claims on a Debtor by Debtor basis is not provided in the Plan. Without the Intercompany Claims for each Debtor, it is impossible to ascertain the solvency of each Debtor.

33. Reviewing the Debtors' own Liquidation analysis, there are several individual Debtors that do show a book value greater than the face value of the claims for that Debtor. These Debtors include: (1) Abitibi-Consolidated Finance LP (Book Value = $50.6M, Face Value of Claim = $8M); (2) Bowater Incorporated (Book Value = $6,338.1M, Face Value of Claim = $5,173.2M); and (3) Bowater Nuway Inc (Book Value = $549.1M, Face Value of Claim = $63.4M). This leaves a book value of $1,693.2M greater than the face values of the claims for those three Debtors. This indicates a recovery for equity but only a valuation of the independent Debtors will ascertain this satisfactorily.

34. It is clear that as time goes on, the Debtors become more solvent. In fact, it has been stated by the Debtors that in 2011, they will become profitable. In fact, recent reports indicate they may become profitable before the end of 2010, based upon the Debtors' own management's projections [Canadian Press, September 7, 2010]. It should be noted that this is only a few weeks to

months from the Effective Date of the POR. Surely, the Court can wait to see the Debtors become solvent. If the subsidiary that becomes solvent is a direct subsidiary of the parent Debtor in these cases, then this equity may flow to the shareholders.

35.  It should be noted that the Debtors' profitability in 2010 included over $750,000,000 USD which was used to pay restructuring costs. For example, the June 2010 Monthly Operating Report showed a Net Loss of $197 million USD, but Bowater Canadian Forest Products, Inc., spent $184 million USD on restructuring. These are one time costs that will not impact the Debtor as on ongoing concern.

## D. ARGUMENT 4: Debtors' management put forward Plan without concern for fundamental fairness

36.  Management continues to assert lack of solvency but continues to demand 8.5% stock ownership in the reorganized company. This means that while eliminating the life savings of people invested in their company for years, the Debtors' management is seeking a personal enrichment by driving their ownership up from approximately 2.1% currently to 8.5% of the Reorganized ABH despite driving the company into bankruptcy. At current market values, the management owns approximately $35,000 worth of stock. The Debtors' Plan clearly states (p. 115):

> "Blackstone's mid-point estimate of Enterprise Value implies a mid-point value for the New ABH Common Stock (the "Equity Value") of approximately $2,425 million."

Therefore, the Debtors' management will see the value of their new holdings become worth $206,125,000. That is a nearly 6,000 times increase in value as a result of shepherding a company into bankruptcy, refusing to pay claims and debts owed, forcing the unions to renegotiate contracts for lower wages and benefits, and eliminating value for people that have been invested in this company for years.

37.  It should be pointed out that the unsecured creditors are receiving cash distribution

11

of a percentage of their claim while secured creditors are receiving cash and shares. If projections for the reorganized Debtors over the next few years are realized, the shares will increase significantly in value from the issuance price. This means secured creditors will be over compensated, management will be additionally enriched and unsecured creditors and equity holders receive either nothing or nearly nothing.

38. In addition to the increase in stock value, the top 51 managers in the company will receive a bonus payment of $6 million. This number has been criticized by the Quebec government and others as being a fundamentally unfair reward given that the management was responsible for the poor economic situation in the first place [Canadian Press, March 09, 2010].

39. In July, 2010, the Debtor repaid $155 million of the DIP Facility Financing while still under Chapter 11 protection. According to their recent 10Q, they have over $700 million in cash on hand. This represents $855 million cash that has been collected or $15.63 per share of common stock. Half of this amount would provide a meaningful recovery to the shareholders that have been invested in this company for years.

40. Throughout the long months of restructuring, the equity holders have on multiple occasions attempted to contact the Debtors' management to understand the process and become active participants in a successful, timely outcome. However, each time the Ad Hoc Equity Committee was told by the Debtors' representative that no more information or communication would be forthcoming. Furthermore, shareholders were specifically prevented from calling a shareholder meeting during the restructuring process by the by-laws agreed to by the Debtors immediately pre-petition. Therefore, the shareholders are not only prevented from voting on this Plan, but have been locked out of the process from the beginning. It would be difficult to refer to this as a fundamentally fair process.

41. To further demonstrate the Debtors' animosity towards equity, in the Ch 7

Liquidation analysis (D.I., 2796, Exhibit C, p. 1) the Debtors quote the legal requirement for plan confirmation as:

> Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired ***Allowed Claim*** or interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors and the Monitor, have prepared the Liquidation Analysis under a hypothetical liquidation under Chapter 7, the CCAA, or the BIA ("Liquidation") that (a) estimates the realizable value of the Liquidating Debtors, ***and (b) estimates the distribution to creditors resulting from the Liquidation***. [emphasis added]

The distinction is important and illustrative of the Debtors' view toward equity from the beginning of this process. The Debtors' management always assumed and worked toward the goal that equity would receive no distribution.

42. Former employees who filed a claim other than one related to a retirement plan (Example : severance pay, value of pension credits or lost group insurance due to the termination of salary continuance or other) are considered convenience claims, i.e., Class 7. Class 7 are considered impaired and entitled to vote on the plan. According to the POR, Class 7 claims are entitled to "be paid in Cash in an amount equal to the lesser of 50% of (i) $5,000 or (ii) the amount of its Allowed Class 7 Claim". Interestingly, there is no mention of share distribution. However, in a recent communication to the former employees,

> 1. The following options are possible according to the amount of your claim:
>
> If your claim is more than Cdn$6 073 you can 1) choose to limit your claim at Cdn$6 073 and therefore receive a cash amount of 50% of your claim thus reduced i.e., Cdn$3 036 (which is choice A under Item 2. Convenience Claim Elections Form " Proxy, Affected Unsecured Creditors' Instructions Notice " ***or 2) Not make any choice and have the option, by default, of receiving your share of the new common ABH shares. Note: Your share is defined as the accepted amount of your claim, multiplied by the recovery percentage according to your applicant*** (see Section 12 of the Notice of Meeting and Information Circular) divided by the value of the new ABH shares upon emission. To confirm identification of your applicant, you can communicate with the controller.
>
> If your claim is equal to or less than Cdn$6 073, you can 1) Not make any choice and therefore have the option, by default, to receive a cash payment of 50% of your claim up

to Cdn$3,036 *or 2) elect to receive your share of new ABH common shares.* (This is choice B under Item 2. Convenience Claim Elections Form " Proxy, Affected Unsecured Creditors' Instructions Notice ". Note: This choice should be made no later than August 17, 2010.

The former employees who elect to receive their share of the new ABH stock to be issued as settlement of a claim are eligible for the Rights Offering. Former employees who avail themselves of this offering have until September 10th to do so. This offer is not set out in the Plan. [http://www.exabibowpersonnel.ca/en/blog/].

43. It should be noted that some or all of the former employees are equity holders. This in essence establishes two classes of equity holders and one class is permitted access to the rights offering and allowed to vote on the plan while the other is completely wiped out and not allowed to vote.

44. To adequately ensure fundamental fairness in the AbitibiBowater, Inc., bankruptcy process, it would seem obvious the Plan as written is unconfirmable and the Debtor must be required to produce an independent valuation of each subsidiary to allow for an adequate level of information to be included in the Disclosure Statement.

## RESERVATION OF RIGHTS

45. The Shareholders reserve all rights to assert additional statements prior to or at the time of the hearing on the Motion.

Date:   August 16, 2010
        Wilmington, Delaware

EQUITY SHAREHOLDERS

Dr. Henry A Romero, CPE, CSP
Elizabeth L. Romero, MS
115 Bristol Bend Lane
Dickinson, TX 77539
Telephone: 281-770-5382
Facsimile: 713-583-8973