# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

**VIA ELECTRONIC FILING AND HAND DELIVERY**
Honorable Kevin J. Carey, Chief Judge
United States Bankruptcy Court for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, DE 19801

October 29, 2010

Re:   In re AbitibiBowater Inc., et al., Case No. 09-11296 (KJC) — Post-Trial Submission

Dear Judge Carey:

Wilmington Trust Company ("Wilmington Trust"), solely in its capacity as successor indenture trustee for the 7.95% Notes[1] issued by BCFC, respectfully submits this post-trial letter brief in support of requiring modifications to the Joint Plan solely as it applies to Bowater (the "Bowater Plan")[2] and appropriate relief regarding BCFC so as to protect the interests of the 7.95% Noteholders.

The process for developing, negotiating, and seeking confirmation of the Bowater Plan is a remarkable study in contrasts. On one hand, after a cursory analysis, the Debtors quickly determined to allow the full $387.3 million 8.00% Convertible Notes Guaranty Claim against Bowater (the "Fairfax Claim") notwithstanding: (a) significant potential challenges to that claim; and (b) that allowance of the Fairfax Claim would shift nearly $200 million of plan distributions from Bowater's other unsecured creditors to Fairfax, which has two seats on AbitibiBowater Inc.'s ("ABH") board. Further, rather than be neutral facilitators for resolving intercreditor issues raised by the Fairfax Claim, the Debtors were the lead advocates for releasing any right to avoid the Fairfax Claim as a fraudulent transfer. On the other hand, BCFC, which should have advocated for the BCFC Contribution Claim against Bowater (the "§ 135 Claim"), instead (along with other Debtors) took every opportunity to ignore, delay, and obstruct pursuit of that claim (and BCFC's other claims against affiliates). Equally problematic, the Debtors had BCFC's interests represented by Jacques Vachon (who, as the Debtors' Chief Legal Officer ("CLO") and a Bowater officer and director, was hopelessly conflicted) and belatedly, by the Donahue/Togut team (which was severely hindered by multiple restrictions on the scope of its work and authority). Consequently, BCFC had no forceful advocate for its claims.

That inconsistent approach happened because when advantageous, the Debtors seek all the benefits of preserving their corporate distinctions, but ignore those same distinctions when addressing BCFC's interests. For example, BCFC was set up as a separate unlimited company ("ULC") to finance Bowater and generate tax benefits for affiliates. Further, the Joint Plan provides for the Debtors not to be substantively consolidated so as to obtain tax and other benefits. Yet, senior management has run the Debtors to benefit the AbitibiBowater enterprise as a whole (the "Company") while disregarding the individual interests of BCFC (and its creditors). Thus, prepetition, BCFC's assets repeatedly were transferred to benefit the entire Company without regard to BCFC's interests.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (As Amended)*, dated October 6, 2010 (the "Joint Plan") [D.I. 3539].

[2] The Joint Plan provides that it "constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases". See Joint Plan p. 3.

NEW YORK   WASHINGTON   PARIS   LONDON   MILAN   ROME   FRANKFURT   BRUSSELS
in alliance with Dickson Minto W.S., London and Edinburgh

Similarly, the Joint Plan was developed by management, advisors, and creditors seeking to benefit the Company as a whole while sacrificing BCFC's interests.

As a result, the Bowater Plan unfairly discriminates against BCFC related claims. To address those deficiencies, Wilmington Trust respectfully requests that the Court require curative amendments to the Bowater Plan and protect BCFC's interests on the other matters pending before the Court.

## I. DISREGARD FOR BCFC'S INTERESTS AND CORPORATE DISTINCTIONS

BCFC is a ULC organized under Nova Scotia law. BCFC's ULC status created certain tax advantages for its affiliates. 9/24 Tr. 112:9-25.[3] The trade-off for these advantages is BCFC's § 135 Claim against Bowater which, as the ULC's member, is obligated, under section 135 of the *Companies Act* (Nova Scotia), to make payments to BCFC "sufficient for payment of [BCFC's] debts and liabilities and the costs, charges, and expenses of winding up . . . ."

After the $600 million of 7.95% Notes were issued, BCFC was forced into several transactions with its affiliates for "tax planning" that had no apparent benefit to BCFC, but eviscerated the value of BCFC's assets. 9/30 Tr. 47:3-9; Debtors' Exh. 36 at 13. Notably: (a) BCFC received no independent legal or financial advice regarding such transactions; (b) BCFC's Board never met regarding the transactions; and (c) BCFC's Board members (i) also were officers and directors of the BCFC affiliates that benefited from the transactions; (ii) were compensated by and held stock in the ultimate parent of those affiliates; and (iii) analyzed the transactions from the perspective of the entire Company rather than from BCFC's perspective alone. 9/24 Tr. 37:14-38:12, 41:7-13, 115:14-20. Accordingly, BCFC likely had claims related to the misuse of BCFC's assets against its officers, directors, and certain affiliates. Unfortunately, BCFC's Board (and the Debtors generally) ignored and then consistently sought to delay and obstruct prosecution of all of BCFC's claims.

### A. Pre-Bankruptcy Mistreatment Of BCFC

Since 2007, BCFC's Board has been comprised of the following, who are five of the six members of the Company's senior management: (a) David Paterson – CEO; (b) William Harvey – CFO; (c) Jacques Vachon – CLO; (d) Pierre Rougeau – Executive V.P.; and (e) Alain Grandmont - Executive V.P. 10/19 Tr. 105:11-22, 156:21-158:1. Each director is and will be compensated by, and has held and will hold stock in, ABH, the Debtors' parent, and views his role as being to act for the entire Company, not for BCFC individually. See, e.g., Patterson Dep. 17:16-17:17 ("From my perspective, I manage the Company in its entirety, not one part against another"); 9/30 Tr. 24:21-25:1 (Harvey); 10/19 Tr. 158:18-159:14 (Vachon). Even today, Mr. Vachon, the Company's CLO, does not understand each Debtor has a separate plan. See 10/19 Tr. 178:22-25 ("Q: Isn't [the Joint Plan] a separate plan for every debtor? A: No, it's a general plan.").

The Debtors' all-one-company approach was evident well before these cases commenced. For example, prior to receiving Aurelius's September 4, 2009 letter, BCFC's directors were oblivious to both BCFC's ULC status and the related existence of BCFC's § 135 Claim. See, e.g., 10/19 Tr. 89:20-90:15 (Mr. Vachon testifies that before receiving Aurelius's letter, he did not understand BCFC was a ULC with a § 135 Claim because "I have never had to focus on that company before."). Similarly, BCFC's directors were unaware of BCFC's resolution in which Bowater acknowledged its § 135 obligation. See Noteholders' Exh. 30 ¶ 1 (Bowater "hereby sanction[s] the exercise by [BCFC] of all and every power . . . to secure repayment conferred on it by the Companies Act . . . ."); 10/19 Tr. 92:9-93:10. Hence, despite BCFC's financial plight, BCFC never made a call against Bowater to have

---

[3] References to confirmation hearing testimony are cited based on the date of such testimony and the transcript page upon which such testimony appears.

the § 135 Claim accrue interest at a 10% annual rate. See Noteholders' Exh. 30; 10/19 Tr. 96:16-19. Indeed, notwithstanding the inherent conflicts between BCFC and Bowater, on April 15, 2009, BCFC directors Harvey and Vachon signed a BCFC Shareholders Resolution that enabled Bowater to supplant the BCFC Board by "exercise[ing] all such powers and do all such acts and things as may be exercised or done by the [BCFC] directors". Noteholders' Exh. 32.

Correspondingly, BCFC's Board had no meeting to consider BCFC's bankruptcy filing or its impact on BCFC's claims. 9/24 Tr. 115:17-20 (Mr. Harvey explains there were no prepetition BCFC Board meetings because "[t]here were no decisions to be made at BCFC"), 225:23-226:2; 10/19 Tr. 100:13-25. Instead, "combined meetings" were held for subsidiaries and "formal authorization" was given "at the main board of the corporation." 10/19 Tr. 25:13-26:7, 27:7-15. Meanwhile, legal advice on BCFC's bankruptcy filing was obtained from the same lawyers then advising Bowater on BCFC's § 135 Claim. 9/24 Tr. 118:20-23, 226:11-19, 227:3-8; 10/19 Tr. 26:8-11. Accordingly, the BCFC Board's decision to file a chapter 11 petition (despite BCFC's lack of operations or employees) was made without regard to whether a chapter 7 filing and corresponding BIA filing in Canada would have facilitated pursuit of BCFC's § 135 Claim and avoided one defense to that claim now asserted by Bowater. See WT Exh. 6 at 24. Rather, the BCFC Board's decision was dictated by the needs of the entire Company, whose DIP and other lenders allegedly asked for a BCFC chapter 11 filing. 10/19 Tr. 26:20-27:2. Yet that excuse, which is belied by those lenders' later acquiescence in BCFC not being an obligor under the Debtors' DIP facility [D.I. 503], and a similar excuse that BCFC's Board relied on "advice of counsel", are unacceptable as the Debtors' lenders' and counsel's advice focused on the concerns of the entire Company, not of BCFC. 9/24 Tr. 227:3-8; 10/19 Tr. 26:8-11.

B.     BCFC's Post-Petition Failures To React To Aurelius's September 4, 2009 Letter

The BCFC Board's disregard for BCFC's best interests continued post-petition, particularly after receiving Aurelius's September 4, 2009 letter concerning BCFC's inattention to its § 135 and other claims. Debtors' Exh. 28. BCFC's Board merely referred the letter to counsel for all of the Debtors, including Bowater. 9/30 Tr. 27:25-28:7; 10/19 Tr. 104:5-16. Further, the BCFC Board did not consider whether BCFC's liquidation might be in its best interests in deference to the potential for "bringing some confusion to the overall process" for other Debtors. 10/19 Tr. 53:1-4. Remarkably, however, the Debtors' view then (and now) was that BCFC's hopelessly conflicted Board and the Debtors' equally conflicted professionals somehow could address BCFC's claims against BCFC's affiliates and Board members. See, e.g., Debtors' Application for BCFC to Retain Ms. Donahue [D.I. 2301] ¶ 12 ("the Debtors believe that BCFC's directors and officers are fully capable and legally authorized to discharge their fiduciary duties to BCFC in connection with resolving those intercompany disputes"). Unworthy of a response is the BCFC Board's additional explanation for inaction, that BCFC Board members — as the Company's senior managers — were too busy on reorganization matters for other Debtors to spend time on BCFC's claims. See 9/30 Tr. 26:18-29:5.

C.     Disregard For BCFC's Interests During Development, Negotiation, And Filing Of The Plans

By early 2010, the Debtors' plan development process was in full swing, but without any advocate to protect BCFC's interests. Indeed, Blackstone, the Debtors' financial advisor, prepared its "Rosetta Stone" value allocation model based on the assumption that BCFC's § 135 Claim against Bowater would be $0. 10/7 Tr. 208:2-13; 10/8 Tr. 44:15-45:7. Yet that assumption is directly contradicted by BCFC's "independent advisors" filing of the § 135 proof of claim for over $620 million. WT Exh. 4. Even Mr. Vachon admitted BCFC's § 135 claim has substantial merit. See 10/19 Tr. 183:24-184:12.

Consequently, the plan's allocation of value between unsecured claims against Bowater by affiliates and those by third parties (including BCFC's § 135 Claim) does not reflect the impact of allowance of BCFC's § 135 Claim. 10/7 Tr. 70:11-71:5, 203:21-204:1 Thus, under the Bowater Plan, BCFC's § 135 Claim would recover substantially less cents on the dollar than would Intercompany Claims against Bowater. 10/7 Tr. 203:21-205:3, 205:16-206:10. No spokesperson for BCFC's interests was involved in these so-called "global settlement" negotiations. See 10/7 Tr. 199:23-200:23; 10/8 Tr. 43:14-44:3. Similarly, BCFC's interests were unrepresented in late 2009 and early 2010 when the CCAA Monitor reviewed BCFC's Intercompany Claims. See Debtors' Omnibus Reply to Objections to Confirmation p. 56 [D.I. 3378]. While the Debtors relied on the Monitor's work for the assumptions on the treatment of BCFC's Intercompany Claims in the plan, the Monitor never heard from an advocate for BCFC 's claims. 10/7 Tr. 195:20-196:25.

Meanwhile, BCFC's Board repeatedly authorized impairment of BCFC's claims in filed plans. The May 4 and 24, 2010 plans effectively disallowed BCFC's § 135 Claim because it then was an "Intercompany Claim" that received no distribution. See WT Exhs. 13, 14 at § 2.15(c); 9/30 Tr. 49:21-50:13 (Q: "You agree that the [May 4] plan disallowed the BCFC contribution claim and BCFC's intercompany claims, correct? A: [Mr. Harvey] Yes."). The Debtors now argue that section 2.15(c)'s prefatory phrase "[u]nless otherwise ordered by the Bankruptcy Court with respect to a particular Intercompany Claim" enabled the Court to reverse that result. See 10/7 Tr. 135:19-137:12. Yet, that section 2.15(c) was "subject to" section 6.15 or section 6.17 of such plans, which effectively precluded any distribution on the § 135 Claim by providing that: "[e]ach Debtor that holds an Allowed Intercompany Claim . . . shall be deemed to have received distributions on account of such Allowed Intercompany Claim." WT Exhs. 13 at § 6.15, 14 at § 6.17. Further, in the May plans all Intercompany Claims (then including the § 135 Claim) were classified in Class 8 while all of the Reorganized ABH's distributable stock was allocated to Class 6. WT Exhs. 13, 14 §§ 2.13(c), 2.15(a). Consequently, as section 2.15(c) did not enable the Court to rewrite those plans, the "unless otherwise ordered" language cited by the Debtors did not protect BCFC's § 135 Claim.

Similarly, BCFC and the other Debtors filed the August 2 plan even though it substantially impaired BCFC's § 135 Claim by using a definition of "BCFC Contribution Claim" that defined it as "contingent" and required that the following amounts be subtracted when calculating BCFC's Contribution Claim: "the aggregate amount of distributions to holders of (a) Allowed Class 6M Claims against BCFC and (b) any Allowed 7.95% Notes Guaranty Claim against Bowater that certain holders of the 7.95% Notes have asserted that BCFC may hold against Bowater . . . ." Joint Plan § 1.96. BCFC's Board (and the Debtors) cannot reconcile their fiduciary duties with authorizing such plan provisions that could preclude the § 135 Claim entirely (as "contingent") or, at best, would reduce distributions on the § 135 Claim by as much as $150 million.

Equally troubling, BCFC's May 24 and August 2 plans preemptively disallowed BCFC's claims against its affiliates, officers, and directors long before any "independent advisor" investigation of these claims had even started. In particular, section 2.15(b) of those BCFC plans authorized the Debtors or Reorganized Debtors, as applicable, to disallow BCFC's Intercompany Claims. WT Exhs. 14, 15 at § 2.15(b). Correspondingly, section 8.5(a) of the BCFC plans provided that on the Effective Date, BCFC shall forever release its "officers, directors, [and] employees" from any and all claims, including the claims related to the misuse of BCFC's assets.[4] WT Exhs. 13, 14, 15 at § 8.5(a).

---

[4] Also, until BCFC creditors objected, all the plans failed to provide BCFC (and, therefore its creditors) with any ability to participate in the valuable Rights Offering respecting BCFC's § 135 Claim. See 9/30 Tr. 72:14-73:9.

The Debtors also effectively abdicated their responsibility to protect BCFC's rights under the plans (and resolution of the § 135 Claim) pursuant to the Plan Support Agreement ("PSA"). [D.I. 2201, Exh. C at Exh. D]. Specifically, ABH (presumably on behalf of all Debtors) became obligated to support the May 24, 2010 version of the plans, subject to amendments acceptable to the "Majority Support Parties". Id. at § 3(b). A key "Termination Event" under the PSA is if there is a "material change" to the plan distributions to any plan support party measured in the aggregate, not by individual Debtor. Id. at § 9(c). The only exception would be if "such material change has been mandated by an order of the Bankruptcy Courts over the objection or motion for disallowance by the Company . . . ." Id. Hence, the Debtors' attacks on BCFC's § 135 Claim have been partly due to the Debtors' ceding their responsibilities pursuant to the PSA. Indeed, the conclusion that the PSA (the final version of which is not even a public document) controlled the Debtors' actions here is reflected by the Joint Plan's reference to the PSA for "detail on recoveries for Claims arising from the Unsecured Notes". WT Exh. 15, Exh. B6 (2d note 1).

In light of such unfavorable plan provisions, the BCFC plans proposed by BCFC's Board were soundly rejected by BCFC's creditors. See Epiq Declaration, Exh. C [D.I. 3354].

D. The "Independent Advisor" Facade

As demonstrated above, during the first year of these cases, BCFC's Board had taken no meaningful steps to address BCFC's claims or BCFC's need for an independent fiduciary to pursue BCFC's claims. See, e.g., Debtors' Omnibus Reply to Objections to Confirmation ¶ 116 (After "global plan economics were agreed to in principle among the Key Constituents . . . the Debtors' management [first] took action to address the intercompany issues between BCFC and Bowater."). Meanwhile, by September 2009, the Debtors' reorganization plan process had begun in earnest. 10/19 Tr. 171:5-11. Out of frustration and to ensure BCFC's claims could be properly pursued, in March 2010, certain 7.95% Noteholders filed a motion in the CCAA proceedings to obtain a trustee for BCFC and related relief. Debtors' Exh. 54. In response and only as a defensive measure to thwart BCFC having a true independent fiduciary, did the Debtors first seek some "independent" advice for BCFC.

Even then, however, the BCFC Board ignored the obvious conflicts of BCFC's Board, the Debtors, and their professionals regarding BCFC's claims against its affiliates, officers, and directors. Thus, the "Debtors", not BCFC, interviewed, effectively hand-picked, and sought BCFC's retention of Togut, Segal & Segal LLP (the "Togut Firm") and Ms. Donahue. 10/7 Tr. 182:3-183:20; 10/19 Tr. 31:14-22, 32:24-33:8. Further, the Debtors retained the Togut Firm to investigate the § 135 Claim, but no other BCFC claims, and to do so at the direction of the hopelessly conflicted Mr. Vachon. Debtors' Exh. 30. Indeed, the concept of retaining Ms. Donahue as an "independent" officer supervising the Togut Firm and of expanding the claims she would investigate came about solely because BCFC's creditors said they otherwise would object to the Togut retention. Yet, even after the Debtors reluctantly acquiesced in Ms. Donahue's retention, the Debtors still insisted (in Board resolutions drafted by the Debtors' counsel, not by the Togut Firm) that Ms. Donahue be hamstrung by being: (i) forced to report to BCFC's conflicted Board; (ii) without authority to object to plan provisions obstructing BCFC's claims; and (iii) unable to settle claims without the conflicted BCFC Board's approval. See Debtors' Exh. 31; 9/30 Tr. 36:25-39:2. When asked to explain the limitations on Donahue's authority, Mr. Harvey testified: "I don't have a good response for that." 9/30 Tr. 60:6-13. The bottom line, therefore, is that: (a) until May 2010, eight months after receiving Aurelius's letter, the BCFC Board did not meet to discuss the § 135 Claim or retain any "independent advisor", Debtors' Exhs. 28, 30; 9/30 Tr. 34:21 to 35:9; and (b) even then, Ms. Donahue's "independent" authority was severely limited so she could not function as an arm's-length third party creditor, such as a trustee. See Debtors' Exh. 31; 10/19 Tr. 112:1-3 ("THE COURT: It's pretty clear, isn't it [why the BCFC Board

barred Ms. Donahue from objecting to the plans]. Because they don't want the independent person mucking up the confirmation process.").

Equally revealing is Mr. Vachon's attempt to rewrite history by now asserting there was an "ethical wall" between BCFC and Bowater. 10/19 Tr. 29:7-20. First, this alleged wall was not even set up until seven months after receipt of Aurelius' letter regarding the BCFC Board's fiduciary duties. Id. 29:7-18. Second, Mr. Vachon could not have been an effective advocate for BCFC due to his conflicting concerns as both the Chief Legal Officer for all the Debtors and an officer and director of Bowater as well as the fact he alone remained "responsible for" the Debtors' CCAA cases. Id. 23:12-20, 112:25-113:7, 179:19-181:3 (Mr. Vachon directed the Stikeman firm to file the CCAA papers (WT Exh. 7) that stated BCFC's § 135 Claim and Intercompany Claims were meritless). Third, Mr. Vachon's "ethical wall" applied only "within the [in-house] law department", not to the conflicted BCFC Board. Id. 29:7-18. Fourth, Mr. Vachon apparently told no one about the alleged ethical wall as it never was memorialized in writing or mentioned in any Court filing. 10/19 Tr. 162:4-7.

Also flawed is the Debtors' argument that "BCFC's officers and directors were entitled to rely on the advice of their counsel and other advisors throughout the restructuring proceeding." Debtors' Omnibus Reply to Objections to Confirmation ¶ 124. Such reliance was not appropriate when those advisors worked for all the Debtors and focused on the Company's best interests, not BCFC's.

E.   Mistreatment Of BCFC In The CCAA Proceedings

The BCFC Board's misdeeds continued in the CCAA proceedings. On July 6, 2010, the Canadian Debtors, including BCFC — notwithstanding the Togut/Donahue team's recent retention — took the position on the record in the Quebec Superior Court that BCFC's § 135 Claim and Intercompany Claims were meritless. See WT Exh. 7 ¶ 6(e) ("there is no evidence to suggest that this [§ 135 Claim] . . . has any validity at all."); id. ¶ 97 ("there is no credible basis to assume [the § 135 Claim's] validity in this case . . . ."); id. ¶ 96 ("there is simply no credible suggestion that BCFC has any credible claims arising from intercompany transactions since 2001 as alleged.").[5]

BCFC's Board also did nothing to preserve BCFC's Intercompany Claims pending either the resolution of this Court's Order to Show Cause regarding appointment of a chapter 11 trustee for BCFC or development of a consensus between the BCFC Board and BCFC's main creditors regarding pursuit of such claims, which was the purpose of Ms. Donahue's report). See Order Approving Donahue Retention ¶ 7 [D.I. 2614]. First, BCFC never filed any proofs of claim regarding BCFC's Intercompany Claims to preserve BCFC's rights. 9/30 Tr. 84:18-21. Second, BCFC did not appear at the September 16 and 17 hearing in the Quebec Superior Court on the CCAA Debtors' motion to disallow BCFC's Intercompany Claims. 10/19 Tr. 69:21-23. Third, one of BCFC's Directors, Jacques Vachon, actually filed an affidavit in the Quebec Superior Court supporting disallowance of BCFC's Intercompany Claims, purportedly based on a nonfinal, confidential version of a Donahue Report that had not been vetted with BCFC's creditors. Debtors' Exh. 64. Mr. Vachon's explanation that he filed his affidavit solely to correct certain alleged misrepresentations in another pleading is not credible as Mr. Vachon's affidavit: (a) never refers to those alleged misrepresentations; (b) includes allegations harmful to BCFC's claims on issues not addressed in the other pleading; and (c) was obviously prepared by and admittedly filed by the Stikeman firm, as counsel to the Canadian Debtors objecting to BCFC's claims. 10/19 Tr. 122:20-123:4, 186:15-188:17; Debtors' Exh. 64. Notably, BCFC's failure

---

[5]   The "Petitioners" who filed the Response to the Motion to Convert included "BCFC." WT Exh. 7 at ¶ 8. The Debtors now argue the fact this pleading mentioned the Donahue/Togut retentions somehow explains this inappropriate filing. In fact, that reference does nothing to explain why or how BCFC could have gone on the record in opposition to its § 135 Claim, BCFC's most valuable asset, and other claims.

to file claims or appear and Mr. Vachon's affidavit were primary bases for the Quebec Superior Court's decision disallowing BCFC's Intercompany Claims. Debtors' Exh. 48 ¶¶ 34, 35.

Correspondingly, it was inappropriate for BCFC's Board to authorize a motion seeking to file with the Quebec Superior Court, purportedly on BCFC's behalf, Ms. Donahue's report on BCFC's Intercompany Claims [D.I 3285]. First, that report should not have been finalized without full input from BCFC's creditors. See Debtors' Exh. 74 at 100. Second, the purpose of that report was so BCFC's Board and creditors could seek a common approach on the claims, with this Court as the final arbiter if no agreement could be reached. See Order Approving Donahue Retention ¶ 7. In no event, however, would it have made sense for BCFC, which would be the claimant, to provide a report including a candid assessment of alleged strengths and weaknesses in BCFC's claims to either: (a) the very authorities likely to adjudicate those claims; or (b) BCFC's adversaries on those claims. Instead, the report only should be used for BCFC's internal decision making. Further, the proposed filing of the report (and her wide circulation of the sealed report to BCFC's adversaries) shows Ms. Donahue views herself as being an "examiner" rather than being BCFC's advocate. 10/19 Tr. 43:10-22. Consequently, BCFC had no true advocate and its interests repeatedly have been sacrificed.

## II. THE BOWATER PLAN STILL IMPROPERLY TREATS BCFC RELATED CLAIMS LESS FAVORABLY THAN OTHER CLASS 6 CLAIMS

Section 1129(a)(1) provides that a plan may be confirmed only if it "complies with the applicable provisions of" the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Among those applicable provisions is section 1123(a)(4), which requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . ." 11 U.S.C. § 1123(a)(4). While the Debtors finally have addressed some of the extensive prejudicial treatment of the § 135 Claim and 7.95% Notes Guaranty Claim under the Bowater Plan, at least five such issues remain.

### A. The 7.95% Notes Guaranty Claim Should Be Allowed

Unlike Fairfax's 8.00% Notes Guaranty Claim, the 7.95% Notes Guaranty Claim is not allowed under the Bowater Plan. Exh. 15, Exh. B6. Yet, the 7.95% Notes Indenture unquestionably establishes Bowater's guaranty liability. WT Exh. 5 § 1301. Indeed, with great fanfare, Mr. Harvey, the Debtors' CFO, testified that the 7.95% Notes Guaranty Claim was valid and such guaranty's validity was the basis for his determination as a BCFC director that the plan was "in the best interests of the creditors of BCFC". 9/24 Tr. 61:15-24, 134:22-135:16, 231:11-13 ("we think [the global settlement/plan is] in the best interest of all the creditors, including the creditors of BCFC who have a direct guarantee from Bowater Inc."). Mr. Vachon, the Debtors' CLO, also testified that the 7.95% guaranty was valid and there was no basis to object to the guaranty claim. 10/19 Tr. 173:8-18. Messrs. Vachon and Harvey each testified he understood the 7.95% Notes Guaranty Claim was allowed under the Bowater Plan. Id.; 9/30 Tr. 64:25-65:6, 25:1-2 (Mr. Harvey testifies that "my belief is the plan allows the guaranty claim for the 7.95 percent" noteholders).

Nevertheless, Bowater objected to the 7.95% Notes Guaranty Claim on the theory it might duplicate BCFC's § 135 Claim. While plan confirmation is not the context to fully resolve how claims by different entities (BCFC vs. Wilmington Trust), in different amounts, and having different legal bases (statute vs. contract) could be duplicative, this Court can and should determine now that Bowater's claim objection relates solely to BCFC's § 135 Claim. Indeed, both May versions of the Bowater Plan allowed the 7.95% Notes Guaranty Claim. WT Exh. 13, 14 at § 2.13(b) & Exh. B6.

Otherwise, leaving the 7.95% Notes Guaranty Claim unresolved would prejudice the 7.95% Noteholders by impeding their plan distributions. The Debtors seek to circumvent this impairment by providing for an initial plan distribution to Wilmington Trust on account of either the § 135 Claim or the 7.95% Notes Guaranty Claim. Joint Plan § 3.5. Yet, that approach would put Wilmington Trust (which receives no release under the plan) in the untenable position of receiving a distribution that might belong to BCFC, not Wilmington Trust (as indenture trustee). Further, the Debtors' approach prejudges that the entire distribution on BCFC's § 135 Claim should go to Wilmington Trust rather than to BCFC. Thus, the Debtors again are playing fast and loose with the law to prejudice BCFC.

B. Wilmington Trust Should Receive The Same Release Granted To Other Bowater Indenture Trustees

Within Class 6S there is unequal treatment of the 7.95% Notes Guaranty Claim regarding releases. Specifically, the Joint Plan release includes the following carve-out regarding releases of Indenture Trustees: "the Debtor Releasing Parties [including Bowater] shall not release any Indenture Trustee (and any related Indenture Trustee Party) that serves as Indenture Trustee for any unsecured notes issued by BCFC . . . ." Joint Plan § 8.5(a)(vi). As no plan for BCFC will be confirmed, the carve-out apparently signifies that only Wilmington Trust, as the 7.95% Notes Indenture Trustee, would receive no release. Yet, if the Bowater Plan is confirmed, there would be no basis for Wilmington Trust (and any related Indenture Trustee Party) not to receive a release because Wilmington Trust is a Bowater creditor by virtue of the 7.95% Notes Guaranty Claim.

Such discrimination would conflict with section 1123(a)(4)'s requirement that all claims in the same class receive the same treatment. "It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some other cognizable chose in action — in exchange for the same percentage of recovery." In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986). In effect, "it is unfair to require a creditor to pay a higher price for the same benefit." Id. at 1154. As requiring confirmation of the BCFC plan would be requiring a higher price from the 7.95% Noteholders than would be required of other Bowater creditors (whose release would be contingent on confirmation of only the Bowater Plan), section 8.5(a)(vi) may not deprive Wilmington Trust and the 7.95% Noteholders of the release. See In re Adelphia Comm's Corp., 361 B.R. 337, 363 (S.D.N.Y. 2007) ("Section 1123(a)(4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan."), aff'd In re Adelphia Comm's Corp., 544 F.3d 420 (2d Cir. 2008).

Under the 7.95% Notes Indenture, were Wilmington Trust sued due to the absence of a release, Wilmington Trust would be entitled to indemnification by imposing a charging lien on distributions to 7.95% Noteholders, thereby forcing 7.95% Noteholders to indirectly pay for Wilmington Trust's (and Related Indenture Trustee Parties') indemnification. See 7.95% Notes Indenture § 607. Section 8.5(a)(vi), therefore, improperly encouraged 7.95% Noteholders to accept the BCFC and Bowater Plans to avoid being prejudiced by Wilmington Trust not receiving a release. See Adelphia, 361 B.R. at 363 ("Where the receipt of valuable benefits in a plan is conditioned on a vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to the plan."). Hence, the Bowater Plan violates section 1123(a)(4)'s requirement that all claims in one class receive equal treatment regardless of how certain class members vote. Moreover, linking a Bowater release to the BCFC plan vote once again demonstrates the other Debtors' improper meddling in BCFC's affairs.

C. The Disputed Claims Reserve Should Be Increased

The Joint Plan's reserve for the disputed § 135 Claim and 7.95% Notes Guaranty Claim is inadequate and effectively caps the distributions on those claims below their legal entitlements, unlike

the plan's treatment of other Class 6S claims. Section 4.4(a) of the Joint Plan provides for a Disputed Claim Reserve based on an "Allowed Class 6S claim in the amount of $619,875,000, plus such other amounts as may be due and payable as of the Petition Date under the 7.95% Notes Guaranty." As to the 7.95% Notes Guaranty Claim, that reserve is inadequate because additional amounts will be due under the 7.95% Notes Indenture for the period after the Petition Date for Wilmington Trust's fees, expenses, and indemnity claims. See WT Exh. 5, §§ 607, 1301. As to the § 135 Claim, that reserve is inadequate as it does not provide for, inter alia: (a) BCFC's wind-up costs; (b) claims against BCFC other than respecting the 7.95% Notes (which according to BCFC's claim register, exceed $29,491,000); (c) post-petition claims of Wilmington Trust for fees, expenses, and indemnity; and (d) post-petition interest on the 7.95% Notes that continues to accrue against BCFC under the CCAA.

### D. Intercompany Claims Should Not Receive Superior Treatment

Both the § 135 Claim and the 7.95% Notes Guaranty Claim receive less favorable treatment under the Bowater Plan than do Intercompany Claims that are also de facto members of Class 6S. In effect, Blackstone's "Rosetta Stone" value allocation model was calculated based on the § 135 Claim being $0. 10/8 Tr. 44:15-45:7. Hence, plan distributions on Intercompany Claims against Bowater, which are fixed under the Bowater Plan using their pro rata share of distributions based on the projected amount of Class 6S Unsecured Claims (and valuing the § 135 Claim at $0), would be higher than on the § 135 Claim because it will dilute only the third party unsecured claims against Bowater.[6] Debtors' Exh. 36 at 13; 10/7 Tr. 70:11-71:5, 202:3-206:10 ("Q. So you have unequal treatment between the [unsecured] intercompany claims and the third party general unsecured claims if . . . the contribution claim, is allowed? A. [By Mr. Zelin] Yes."), 209:17-22. Thus, under the Bowater Plan, distributions on the § 135 Claim and the 7.95% Notes Guaranty Claim will be meaningfully less than if the § 135 Claim had been resolved sooner or appropriately factored into Blackstone's value allocation model. 10/7 Tr. 202:6-206:10. In fact, if the § 135 Claim is allowed in the minimum $620 million amount of the claim filed by Ms. Donahue, then the total distributions to 7.95% Noteholders related to those two claims would be almost $50 million less than if Intercompany Claim distributions also were diluted by the § 135 Claim (i.e., 37.46% versus 41.37% of $1,240,000). Moreover, unlike other Intercompany Claim holders, only BCFC's distributions will be withheld. Joint Plan Exh. B6 n.1.

### E. BCFC's Officers And Directors Should Not Be Released

The Bowater Plan's section 8.5(a) release provision appears to be overly broad as it includes "all of [the Debtors and Reorganized Debtors'] respective officers, directors and employees". Joint Plan § 8.5(a). As BCFC's officers and directors overlap with those of other Debtors, section 8.5(a) should provide that such releases apply only to such individuals "in their capacities as officers, directors and employees of the Debtors".

## III. THE BOWATER PLAN SHOULD BE MODIFIED TO SATISFY GOOD FAITH REQUIREMENTS

The Bowater Plan's unfair discriminatory treatment of the § 135 Claim and 7.95% Notes Guaranty Claim as well as the exclusion of Wilmington Trust from the section 8.5(a) release should be modified so that the plan satisfies section 1129(a)(3)'s good faith requirement. See, e.g., In re Combustion Eng'g, Inc., 391 F.3d 190, 239 (3d Cir. 2005) (equality of treatment is critical).

---

[6] Under the Joint Plan, Intercompany Claims perform double duty. First, based on the Blackstone value allocation model, they are used as the vehicle to reallocate value among Debtors based on the Intercompany Claims' pro rata share of value, with the rest allocated to projected third party Class 6 Unsecured Claims. Next, Intercompany Claims are reused in Class 8 to provide the Reorganized Debtors tax and other benefits.

Such amendments also are warranted because while certain inappropriate plan provisions are no longer in the Bowater Plan and there is no BCFC plan, the plan process has been tainted by the Debtors' unjustified efforts to deter objections to the Fairfax Claim while holding BCFC's § 135 Claim hostage. For the Bowater Plan, such omitted provisions included those effectively disallowing the § 135 Claim by defining it as an "Intercompany Claim" or as "contingent" as well as those substantially reducing the § 135 Claim by treating it as a deficiency claim. WT Exhs. 13, 14 at § 2.15(c); WT Exh. 15 at § 1.96. The Debtors provide no good faith justification for having included such provisions. Similarly, there was no good faith justification for BCFC plan provisions that prematurely disallowed BCFC's Intercompany Claims and claims against its management long before "independent advisors" even had been retained to investigate such claims. This Court should evaluate the Debtors' good faith based on the entire plan process, not just based on the terms of the Bowater Plan now before the Court. See In re Pierce Housing Auth., 414 B.R. 702, 720 (Bankr. W.D. Wash. 2009) (good faith finding under § 1129(a)(3) requires consideration of "whether a plan's terms or the process used to seek its confirmation was fundamentally fair") (emphasis added).

Correspondingly, there is no justification for the other Debtors' efforts to prematurely disallow and BCFC's efforts to sabotage BCFC's Intercompany Claims. It is unacceptable that after letting BCFC's Intercompany Claims languish for well over one year, there then needed to be a rush to judgment on those claims in the CCAA Proceedings such that the related advice and direction motion, the circulation of Ms. Donahue's draft report, and the claims hearing in the Quebec Superior Court all were done in a less than two week period and in the midst of the confirmation hearing in this Court. Those efforts led to what is tantamount to a default judgment on BCFC's Intercompany Claims even though the method of pursuing such claims was pending before this Court and there was absolutely no need for those claims to be resolved immediately.

Still another test of good faith is that "debtors in possession have fiduciary duties, which include, among others, the duty of loyalty . . . [which] includes an obligation to . . . treat all parties to the case fairly, and to maximize the value of the estate". In re Adelphia Communications Corp., 336 B.R. 610, 669-70 (Bank. S.D.N.Y. 2006), aff'd 342 B.R. 122 (S.D.N.Y. 2006). Here, there is no way to reconcile BCFC's duty of loyalty with the BCFC Board's (and the Company's senior management's) conduct, which ranged from inattention for, to outright obstruction of, BCFC's claims.

Consequently, due to the Bowater Plan's continued unfair treatment of BCFC-related claims and overall lack of good faith in the plan process, this Court should require appropriate modifications to the Bowater Plan and address related pending matters so as to protect BCFC and its creditors.

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Curtis S. Miller (No. 4583)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200

WILLKIE FARR & GALLAGHER LLP

_____
Alan J. Lipkin, Esq.
Andrew E. Schwartz, Esq.
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000

*Co-Counsel to Wilmington Trust, Solely as the 7.95% Notes Indenture Trustee*