# PaulHastings

Paul, Hastings, Janofsky & Walker LLP
Park Avenue Tower
75 East 55th Street
First Floor
New York, NY 10022
telephone 212-318-6000 • facsimile 212-319-4090 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Frankfurt
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Tokyo
Washington, DC

(212) 318-6001
lucdespins@paulhastings.com

October 29, 2010

**BY HAND DELIVERY AND FILED ELECTRONICALLY**

Honorable Kevin J. Carey
Chief United States Bankruptcy Judge
United States Bankruptcy Court for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

Re: **In re AbitibiBowater Inc., et al. (Case No. 09-16335) (KJC) --
Creditors' Committee Post-Confirmation Hearing Letter**

Dear Judge Carey:

We represent the Official Committee of Unsecured Creditors (the "Committee") of AbitibiBowater Inc. and its related debtors and debtors in possession in the above-referenced jointly administered Chapter 11 Cases (collectively, the "U.S. Debtors").

The Committee urges this Court to confirm the Debtors' Second Amended Joint Plan of Reorganization [Docket No. 2796] (as amended, the "Plan").[1] The standards for confirmation of the Plan have been met as to the Debtors other than BCFC, which is no longer a proponent of the Plan.[2] The Plan should be confirmed because it provides the best recovery under the circumstances to the creditors of those Debtors. Moreover, the Plan is fair and equitable, is in the best interest of creditors, and was proposed in good faith. The Committee also writes to state its position with respect to (i) the allowance of certain claims of Fairfax Financial Holdings Ltd. ("Fairfax"); (ii) outstanding issues related to BCFC; and (iii) objections to the Plan raised by certain equity holders.

**I.     The Plan Should Be Confirmed**

As Your Honor knows, the Committee represents the creditors of the U.S. Debtors, as distinguished from the Debtors who filed for relief in Canada under the CCAA procedures (the "CCAA Debtors"). The U.S. Debtors primarily consist of those

---

[1]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

[2]  *See Statement Of The Official Committee Of Unsecured Creditors In Support Of Confirmation Of The Debtors' Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code* [Docket No. 3398].

entities referred to in testimony as "Bowater silo" or "B-side debtors".[3] The Plan was heavily negotiated among key constituencies and provides for the greatest possible recovery under the circumstances to unsecured creditors of the U.S. Debtors in the Bowater silo. These creditors hold the vast majority of the general unsecured claims at the U.S. Debtors. Uncontroverted testimony elicited at the hearing on confirmation of the Plan (the "Confirmation Hearing") demonstrates that the Debtors initially proposed distributing as little as 53% of the equity in the Reorganized Debtors to the unsecured creditors of the Bowater silo, with the rest going to the creditors of the Abitibi silo.[4] After extensive negotiations among the Committee, the Debtors and their respective professionals, the Plan now provides that those Bowater silo creditors will receive **60%** of the equity in Reorganized ABH upon emergence.[5] Assuming a $2.4 billion valuation of that equity,[6] the Plan now results in an approximately $170 million improvement in recoveries for unsecured creditors of the chapter 11 Debtors.

In addition to significantly increasing recoveries of unsecured creditors of the Bowater silo, the Committee also pursued a number of issues affecting the distribution of those recoveries and post-confirmation value, including: (i) analyzing the Debtors' intercompany obligations to determine whether such obligations were subject to recharacterization as equity; (ii) testing and challenging the Debtors' valuation assumptions; (iii) examining pre-petition transactions to evaluate potential avoidance actions; (iv) negotiating a protocol with the Debtors and the Monitor in the CCAA proceedings regarding the treatment of claims against cross-border Debtors; and (v) participating in the search for the directors of the board of Reorganized ABH.[7] In all its actions, the Committee considered the best interests of the unsecured creditors of the Bowater silo collectively in order to ensure the greatest possible recovery on their claims. Taking into consideration all the investigations and activities the Committee has conducted, the Plan provides the best possible recovery to unsecured creditors of the U.S. Debtors.

---

[3] For those U.S. Debtors that are actually subsidiaries in the "Abitibi silo", their principal obligation is the guarantee of the 15.5% Notes which are slated to receive nearly a full recovery. *See* Plan, at 8; Plan Exhibit B6; Disclosure Statement, at 30-32.

[4] *See* Hr'g Tr. 172:24-25 (Unofficial Transcript October 7, 2010 – Afternoon Session)(Testimony of S. Zelin).

[5] *See* Hr'g Tr. 107:3-5 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin).

[6] *See* Hr'g Tr. 132:13-18 (Unofficial Transcript October 8, 2010 – Afternoon Session) (Testimony of S. Zelin).

[7] *See Statement Of The Official Committee Of Unsecured Creditors In Support Of Confirmation Of The Debtors' Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code* [Docket No. 3398].

## II. The Allowance of Certain Claims Asserted By Fairfax Was A Reasonable Exercise of the Debtors' Business Judgment and Was Approved by Creditors Entitled to Vote on the Plan

Aurelius Capital Management, LP and Contrarian Capital Management, LLP (collectively, the "BCFC Noteholders") allege that Bowater Inc.'s ("Bowater") guaranty (the "Guaranty") of the 8.00% Convertible Notes (the "Guaranty Claim") is potentially avoidable as a fraudulent transfer. The BCFC Noteholders argue that the Plan should not be confirmed because it includes the allowance of the Guaranty Claim by Fairfax and allegedly does not compensate Bowater for the value of that purported fraudulent transfer claim.

This issue first arose in connection with the Debtors' motion seeking approval of the Backstop Commitment Agreement.[8] The Backstop Investors (led by Fairfax) agreed to backstop the Debtors' proposed Rights Offering. Without the Rights Offering, it was feared that the Debtors would have insufficient cash to pay secured creditors in full, resulting in such secured creditors sharing in the equity of the Reorganized Debtors and significantly diluting the stock distributed to unsecured creditors.[9] In exchange for Fairfax's support of the Plan and backstop commitment, and as part of a global settlement, the Committee agreed not to challenge allowance of the Guaranty Claim against Bowater and the waiver of any ability to pursue a fraudulent transfer challenge with respect to the Guaranty Claim. At a hearing before the Court on June 17, 2010, the Committee expressly stated it would prefer not to provide a release to Fairfax.[10] Nevertheless, the facts at that time clearly showed that:

- The Debtors believed in good faith that the Backstop Commitment Agreement was necessary to the implementation of the Plan;[11]

- Neither Aurelius, Contrarian or any party other than Fairfax and the Backstop Investors was willing to commit to backstop the Rights Offering;[12]

- Fairfax would not commit to backstop the Rights Offering unless it had certainty about the treatment of the Guaranty Claim and the Fairfax Release;[13] and

---

[8] *See* Docket No. 2201.

[9] Hr'g Tr. 61:6-25; 62:1-4 (June 17, 2010) (Testimony of S. Zelin).

[10] Hr'g Tr. 214:9-14 (June 17, 2010) (Comments of L. Despins).

[11] Hr'g Tr. 22:16-24 (June 17, 2010) (Testimony of S. Zelin).

[12] Hr'g Tr. 25:11-24; 183:6-23; 184:24-185:10 (June 17, 2010) (Testimony of S. Zelin).

[13] Hr'g Tr. 171:7-8 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin); *see also* Dep. Tr. of P. Rivett 133:19-25; 134:2 (October 4, 2010) (Testimony of P. Rivett), referenced as Exhibit Debtors' 79 in the *Index of Exhibits Entered Into Evidence in Connection with*

- The other Backstop Investors were unwilling to proceed if Fairfax pulled out of the deal.[14]

Given all the facts as they were known at the time, the Committee voted to support the Plan, including the allowance of the Guaranty Claim, because it was in the best interests of the estate and its unsecured creditors.[15] On June 18, 2010, the Court ruled that it would not approve the Fairfax Release in the context of the approval of the Backstop Commitment Agreement, but would consider the Fairfax Release in the context of Plan confirmation.[16]

Under the Plan, the full Guaranty Claim is treated as an Allowed Claim. The consequences of the allowance of the Guaranty Claim (and arguments pro and con regarding such allowance) were fully disclosed in the Plan, the Disclosure Statement and in a letter sent by the Committee to all creditors entitled to vote on the Plan.[17] The Disclosure Statement contained detailed arguments from both the Debtors and the BCFC Noteholders on their respective positions with respect to the validity of the purported fraudulent transfer claim.[18] Creditors were made fully aware that the Court would not approve the Fairfax Release in the context of the approval of the Backstop Commitment Agreement. Creditors were also explicitly made aware that voting in favor of the Plan would result in Fairfax (a) being released from a potential fraudulent transfer action with respect to the Guaranty Claim, and (b) receiving its *pro rata* share of equity in Reorganized ABH.[19]

With access to all this information, creditors nonetheless voted by substantial majorities in favor of the Plan and, most importantly, unsecured creditors of Bowater have voted in support of the Plan by a significant majority in both amount and value.[20]

---

*Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3631].

[14] Hr'g Tr. 174:22-25; 175:1-14 (June 17, 2010) (Testimony of S. Zelin).

[15] Hr'g Tr. 215-218 (June 17, 2010) (Comments of L. Despins).

[16] Hr'g Tr. 9:13-20 (June 18, 2010) (Comments of Judge K. Carey).

[17] *See The Official Committee Of Unsecured Creditors of AbitibiBowater Inc. Letter In Support Of Debtors' Second Amended Plan Of Reorganization*, referenced as Exhibit Debtors' 76 in the *Index of Exhibits Entered Into Evidence in Connection with Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3631].

[18] *See* Disclosure Statement, at 71-78.

[19] *See Disclosure Statement For Debtors' Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code* [Docket No. 2797] (the "Disclosure Statement"), at 24-26.

[20] Unsecured creditors of Bowater voted in favor of the Plan by 86.72% in amount and 82.31% in value. *See Amended Declaration Of Stephanie Kjontvedt Of Epiq Bankruptcy Solutions, LLC Regarding Voting On, And Tabulation Of, Ballots Accepting And Rejecting The Debtors' Second Amended Joint Plan Of Under Chapter 11 Of The Bankruptcy Code* [Docket No. 3396].

These are the very creditors who would benefit from a successful challenge to the Guaranty Claim.

Whether the Guaranty Claim against Bowater is characterized as a claims allowance or as a release, the economic reality is that creditors of these estates (including Bowater) have voted in favor of a Plan that provides Fairfax with a fully allowed Guaranty Claim. It is true that subsequent events have caused the Backstop Commitment Agreement to no longer be necessary, but the Debtors could not have known at the time of the June 17, 2010 hearing that (a) the Debtors would outperform their projections; (b) favorable credit markets would support an asset-based loan and a high-yield notes offering that were $100 million and $250 million larger, respectively, than was reasonably expected in June and at terms more favorable to creditors than the convertible notes that would have been issued under the Rights Offering; and (c) a settlement with the Canadian government would conclude in a timely fashion and yield $130 million in liquidity to the estate.[21] Had the Committee objected to the Fairfax Release, the loss of the backstop commitment could have delayed pursuit of confirmation to the ultimate detriment of all creditors, and the Committee would have essentially been gambling with heavily negotiated creditors' recoveries and the U.S. Debtors' ability to emerge from bankruptcy in a timely fashion.

Thus, the Court should not view the allowance of the Guaranty Claim as a settlement of a fraudulent transfer claim but as an exercise of the Debtors' business judgment.[22] That allowance is fair, reasonable, and in the best interests of the creditors, confirmed by the fact that a significant majority of creditors whose recoveries are most directly affected by the allowance of the Guaranty Claim approved the Plan. The objections based on the allowance of the Guaranty Claim should be overruled.

### III. The Interests of BCFC and Its Creditors Are Adequately Protected

Under current estimates, creditors of BCFC are projected to recover value approaching approximately 50% of their claims.[23] Despite these projected recoveries, the BCFC Noteholders are seeking to maximize their individual recoveries through objections to the Plan. The aggressive strategy adopted by the BCFC Noteholders to extract more value for themselves should not be allowed to threaten the Debtors' entire reorganization, at the expense of the overwhelming majority of creditors who have approved the Plan.

---

[21] *See Order, dated September 14, 2010, Approving a Settlement Agreement with the Government of Canada Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 3267].

[22] *See In re Aleris Int'l, Inc.*, 2010 Bankr. LEXIS 2997, at *64 (Bankr. D. Del. May 3, 2010) ("[A] debtor may release claims belonging to the estate if the release is a valid exercise of the debtor's business judgment, is fair and reasonable, and is in the best interest of the debtor and its estate.").

[23] As explained herein, the primary source of recovery for creditors of BCFC is the assets of Bowater. Under the Plan, unsecured creditors of Bowater are projected to recover 48.4% on their claims. *See* Disclosure Statement, at 31.

The principal concern of the Committee is that objections by Wilmington Trust Company or the BCFC Noteholders should not derail confirmation as to the remaining estates other than BCFC.[24] If confirmation were delayed until all BCFC issues were fully resolved, such delay could result in the loss of the Debtors' exit financing, as well as the global settlement, both of which are integral to the Debtors' emergence from chapter 11. Testimony given at the Confirmation Hearing demonstrated that if confirmation were delayed, all creditors of the Debtors, including creditors of BCFC, would suffer because (i) the favorable equity split achieved by the Committee regarding distributions to unsecured creditors of the Bowater silo may be reopened to the detriment of those creditors;[25] (ii) the benefit of highly favorable capital markets may be lost and result in less favorable exit financing terms for the Debtors;[26] (iii) secured claims will continue to grow through interest accrual, potentially reducing recoveries to all unsecured creditors;[27] and (iv) the expense and delay of remaining in chapter 11 erodes value for all parties. Thus, delay of confirmation could be damaging to all creditors.

The interests of BCFC are adequately protected under the current Plan because a full reserve will be established for the Contribution Claim.[28] Further, no plan is being confirmed as to BCFC, so no release of BCFC directors and officers is effectuated.[29] In addition, the Canadian court in the CCAA proceedings has already held a public hearing (in which the BCFC Noteholders participated) on the Intercompany Claims and determined, based on the Monitor's investigation and other findings in the record, that there simply are no Intercompany Claims held by BCFC other than the Contribution Claim.[30] The period to appeal this ruling has lapsed and no action was taken by the BCFC Noteholders; therefore the ruling of the Canadian court is final.

---

[24] *See e.g., Limited Response Of Official Committee Of Unsecured Creditors To Order To Show Cause Concerning Appointment Of Chapter 11 Trustee For Bowater Canada Finance Corporation Pursuant To Section 1104 Of The Bankruptcy Code* [Docket No. 3371].

[25] *See* Hr'g Tr. 183:6-22 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin). Unsecured creditors of the chapter 11 Debtors could be greatly harmed in a renegotiation of value because if the agreed-upon equity splits were revisited, secured creditors would likely demand equity if insufficient funds are available to pay secured claims in full. *See* Hr'g Tr. 61:22-25; 62:1-4 (June 17, 2010).

[26] *See* Hr'g Tr. 113:8-16; 114:18-25 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin).

[27] *See* Hr'g Tr. 113:25; 114:1-3, 18-25 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin).

[28] *See Amended Chapter 11 Plan - Blackline Version of Debtors Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3539], at 47.

[29] *See* Hr'g Tr. 33:17-19 (September 24, 2010) (Comments of K. Cornish).

[30] *See Reasons for Judgment Rendered September 20, 2010 on Motion for Advice and Directions*, attached as Exhibit B to Docket No. 3410.

Moreover, contrary to the allegations of the BCFC Noteholders and Wilmington Trust Company, the Committee has protected the interests of BCFC and its creditors during the course of these Chapter 11 Cases. The primary source of recovery for creditors of BCFC is from the assets of Bowater.[31] The Committee has effectively protected the interests of BCFC and its creditors by seeking to maximize recoveries to Bowater and the other Bowater silo Debtors, vis-à-vis the Abitibi silo Debtors. The Committee acts in the best interests of *all* unsecured creditors, and does not owe a fiduciary duty to any particular creditor to seek the allowance of any specific claim.[32] The BCFC Noteholders and Wilmington Trust Company are capable of pursuing and protecting their individual interests in BCFC and will have a chance to do so at the upcoming hearing on the Contribution Claim.

### IV. Equity Holders Will Not Receive Any Distribution Because the Debtors Are Hopelessly Insolvent

Several equity holders continue to insist that they are entitled to recoveries under the Plan based on their calculations of the value of certain of the Debtors' assets. At the Confirmation Hearing, Mr. Steven Zelin, Senior Managing Director of Blackstone, testified that Blackstone calculated the Debtors' total enterprise valuation at approximately $3.5 billion dollars and total claims against the Debtors in excess of $8 billion.[33] From these values, it is apparent that the Debtors are hopelessly insolvent and shareholders will not receive any distributions. In fact, under current projections, creditors of AbitibiBowater, Inc. (the Debtor in which the equity holders own stock) are expected to recover just 0.8% on their claims, obviously leaving nothing for equity holders.[34]

The equity holders have presented no evidence in support of their contention that they are entitled to some form of distribution, and have not presented any credible methodology to change the valuation of the Debtors that results in a distribution to shareholders.

---

[31] *See* Hr'g Tr. 112:19-21 (Unofficial Transcript October 7, 2010 – Afternoon Session) (Testimony of S. Zelin).

[32] *See e.g., Pension Ben. Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.,* 42 B.R. 960, 963 (E.D. Pa. 1984) (finding that the committee's fiduciary duties require no obligation to maximize any individual creditors' interest).

[33] Hr'g Tr. 161:20-23 (Unofficial Transcript October 8, 2010 – Afternoon Session) (Testimony of S. Zelin).

[34] *See* Disclosure Statement, at 31.

In conclusion, the Committee requests that the Court confirm the Plan and overrule all remaining objections thereto.[35]

Respectfully submitted,

*/s/ Luc A. Despins*

Luc A. Despins

---

[35] The Committee continues to address issues regarding certain claims of the secured lenders and hopes to achieve a consensual resolution by the time of the hearing scheduled for November 5, 2010. *See* Hr. Tr. 154:3-25; 155:1-3 (Unofficial Transcript October 19, 2010 – Afternoon Session) (Comments of L. Despins).