# Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*,[1] | ) | Case No. 09-11296 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No. 208 & 406** |

## AGREED FINAL ORDER MODIFYING REPORTING REQUIREMENTS OF BANKRUPTCY RULE 2015.3(a) PURSUANT TO BANKRUPTCY RULE 2015.3(d) FOR CERTAIN ENTITIES

Upon the Motion[2] of AbitibiBowater Inc. and its affiliated debtors and

debtors-in-possession in the above-captioned cases (each a "<u>Debtor</u>," and collectively, the

"<u>Debtors</u>"), requesting entry of an order modifying the reporting requirements of

Bankruptcy Rule 2015.3(a) for certain entities in which the Debtors hold a controlling

interest that are not Debtors in these Chapter 11 Cases or publicly traded corporations, for

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "<u>SPV Debtors</u>") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

cause pursuant to Bankruptcy Rule 2015.3(d), 9006(b) and Local Bankruptcy Rule 9006-2; the Court having granted the Motion on an interim basis and having stayed the Debtors' reporting requirements under Rule 2015.3 for all of the Non-Filing Entities pursuant to Rule 2015.3(f) [Docket. No. 406]; and the Debtors having consulted with the United States Trustee and having reached an agreed form of final order granting the Motion; and upon consideration of the *Declaration of William G. Harvey in Support of Chapter 11 Petitions and Various First Day Applications and Motions* and the *Statement of Joseph Johnson in Support of Rule 2015.3 Modification*; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found and determined that the legal bases set forth in the Motion establish just cause for the relief granted herein; it is hereby ORDERED that:

1.　　The Motion is GRANTED as set forth herein.

2.　　The reporting requirements of Bankruptcy Rule 2015.3(a) are modified for cause as set forth herein. A table summarizing the Rule 2015.3 modifications for each entity and its ownership is attached as Appendix 1 to this Order.

3.　　The following entities have no material operations and/or value and are exempt from all Rule 2015.3(a) reporting requirements:

> St. Maurice River Drive Company
> Casapedia Booming Company Inc.
> The Restigouche Log Driving and Boom Company
> Produits Forestiers Canbo Inc.
> 9032-4286 Quebec Inc.
> Rich Timber Holdings LLC

Timber Note Holdings LLC
Bowater Timber A LLC
Bowater Timber B LLC
Bowater Timber C LLC
Bowater Timber D LLC
Bowater Timber E LLC
Bowater Timber F LLC
Bowater Timber G LLC

4.      The following entities are qualified special purpose entities set up

in accordance with FASB ASC 860 and are disclosed in the Debtors' public filings with

the Securities Exchange Commission ("SEC"), which disclosures satisfy Rule 2015.3:

Bowater Saluda Note Holdings LLC
Bowater Catawba Note Holdings I LLC
Bowater Catawba Note Holdings II LLC
Calhoun Note Holdings TI LLC
Calhoun Note Holdings AT LLC

5.      The following entities are partnerships ("Partnerships") in which

the Debtors have an interest:

Bowater Mersey Paper Company Limited
Ponderay Newsprint Company
Calhoun Newsprint Company
Augusta Newsprint Company

6.      The Debtors account for their investments in the Partnerships at

book value and using the equity method of accounting in the consolidating balance sheets

filed with the Debtors' monthly operating reports. The Debtors account for the non-

consolidated Partnerships (*i.e.*, Ponderay) in their consolidated financial statements using

the equity method. AbitibiBowater Inc.'s annual reports on Form 10k filed with the SEC

disclose additional information about the partnerships, including the Partnerships' mill

capacity and production. Schedule F of the Disclosure Statement for Debtors' Second

Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the

"Disclosure Statement" and as may be amended from time to time, the "Plan") discloses the Plan value of each Debtor's proportionate interest in the Partnerships calculated as the Debtor's percentage ownership multiplied by the value of the mill, net of a deduction for pension costs allocated to each mill. These public disclosures and existing reporting requirements satisfy Rule 2015.3 under the facts and circumstances of this case. To satisfy their reporting obligations under Rule 2015.3, the Debtors shall file copies of relevant SEC filings within 30 days of filing such documents with the SEC.

7.    The Debtors shall not be required to submit reports on account of the operations of Abitibi-Consolidated U.S. Funding Corp., a special purpose entity formed in connection with the Debtors' securitization facility.

8.    For purposes of Rule 2015.3, the monthly operating reports of Bowater Canadian Forest Products Inc. and Bowater Incorporated adequately account for the operations of Bowater Europe Limited, Bowater Asia Pte. Ltd., Bowater S. America Ltda., Bowater-Korea Ltd., and accordingly, the Debtors do not need to submit any additional or further reporting under Rule 2015.3 with respect to these entities.

9.    For purposes of Rule 2015.3, the periodic reports of the Monitor appointed in the Canadian Proceeding, which are publicly available, adequately account for the operations of the CCAA Debtors to the extent they are subject to Rule 2015.3, and accordingly, the Debtors do not need to submit any additional or further reporting under Rule 2015.3 with respect to these entities.

10.    The disclosures identified herein fully satisfy Rule 2015.3. A copy of the Debtors' initial Rule 2015.3 Report is attached as Exhibit B to this Order. The Debtors shall file subsequent Rule 2015.3 Reports every 3 months or within the time

frame set forth in paragraph 6 above up to and through the effective date of the Plan; provided, however, that no such reports shall be required if the Debtors have not filed any relevant SEC filings during such time.

11. Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors are authorized and empowered to, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

12. This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Order.

Dated: _____, 2010
     Wilmington, Delaware

                              _____
                              Kevin J. Carey
                              Chief United States Bankruptcy Judge

**Exhibit A**

Summary of Modified Rule 2015.3 Reporting Obligations

*In re AbitibiBowater Inc., et al.,* 09-11296 (KJC) (Bankr. D. Del. 2009)

| Name of Entity subject to Rule 2015.3 | Owner | % Ownership | Modified Reporting Requirement |
|---|---|---|---|
| Bowater Mersey Paper Company Limited | Bowater Canadian Limited | 51% | Reporting is satisfied through SEC filings, Monthly Operating Reports, and Disclosure Statement |
| Ponderay Newsprint Company | Lake Superior Forest Products Inc. | 40% | Reporting is satisfied through SEC filings, Monthly Operating Reports, and Disclosure Statement |
| Calhoun Newsprint Company | Bowater Nuway Inc. | 51% | Reporting is satisfied through SEC filings, Monthly Operating Reports, and Disclosure Statement |
| Augusta Newsprint Company | Abitibi Consolidated Sales Corporation | 52.5% | Reporting is satisfied through SEC filings, Monthly Operating Reports, and Disclosure Statement |
| Bowater Mitis Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Guérette Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Couturier Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Alliance Forest Products (2001) Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Belledune Sawmill Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Treated Wood Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Canexel Hardboard Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| 9068-9050 Quebec Inc. | Bowater Canadian Forest Products Inc. | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Canada Treasury Corporation | Bowater Canadian Holdings Incorporated | 100% | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Pulp and Paper Canada Holdings Limited Partnership | Bowater Incorporated (99%); Bowater Ventures Inc. (1%) | Wholly-owned | Reporting is satisfied by the Monitor's monthly report. |
| Abitibi-Consolidated Inc. | AbitibiBowater Inc. (82%); AbitibiBowater Canada Inc. (18%) | Wholly-owned | Reporting is satisfied by the Monitor's monthly report. |
| Bowater Saluda Note Holdings LLC | Bowater Incorporated | 100% | Reporting is satisfied through the Debtor's SEC filings. |
| Bowater Catawba Note Holdings I LLC | Bowater Incorporated | 100% | Reporting is satisfied through the Debtor's SEC filings. |
| Bowater Catawba Note Holdings II LLC | Bowater Incorporated | 100% | Reporting is satisfied through the Debtor's SEC filings. |
| Calhoun Note Holdings TI LLC | Calhoun Newsprint Company | 100% | Reporting is satisfied through the Debtor's SEC filings. |

| Name of Entity subject to Rule 2015.3 | Owner | % Ownership | Modified Reporting Requirement |
|---|---|---|---|
| Calhoun Note Holdings AT LLC | Calhoun Newsprint Company | 100% | Reporting is satisfied through the Debtor's SEC filings. |
| Abitibi-Consolidated U.S. Funding Corp. | Abitibi Consolidated Sales Corporation | 100% | None. Special purpose entity formed in connection with securitization program. |
| Bowater S. America Ltd. | Bowater Incorporated (99.9%); Bowater South American Holdings Incorporated (0.1%) | Wholly-owned | None. Financial performance rolls up into BCFPI and Bowater reporting. |
| Bowater-Korea Ltd. | Bowater LaHave Corporation | 100% | None. Financial performance rolls up into BCFPI and Bowater reporting. |
| Bowater Europe Limited | Bowater Canadian Forest Products Inc. | 100% | None. Financial performance rolls up into BCFPI and Bowater reporting. |
| Bowater Asia Pte. Ltd. | Bowater Incorporated | 100% | None. Financial performance rolls up into BCFPI and Bowater reporting. |
| Bowater Timber A LLC, (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber B LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber C LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber D LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber E LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber F LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Bowater Timber G LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive.. |
| St. Maurice River Drive Company | Bowater Canadian Forest Products Inc. | 22% | None. Operations not material. |
| Casapedia Booming Company Inc. | Bowater Canadian Forest Products Inc. (25%); Bowater Maritimes Inc. (25%) | Partly-owned | None. Operations not material. |
| The Restigouche Log Driving and Boom Company | Bowater Maritimes Inc. | 40% | None. Operations not material. |
| Produits Forestiers Canbo Inc. | Bowater Canadian Forest Products Inc. | 20% | None. Operations not material. |
| 9032-4286 Quebec Inc. | Bowater Canadian Forest Products Inc. | 50% | None. Operations not material. |
| Rich Timber Holdings LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |
| Timber Note Holdings LLC (Inactive) | Bowater Incorporated | 100% | None. Inactive. |

**Exhibit B**

Initial Rule 2015.3 Report

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABITIBIBOWATER INC., *et al.*, [1] | ) | Case No. 09-11296 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No. [   ]** |

## INITIAL REPORT PURSUANT TO RULE 2015.3 OF THE
## FEDERAL RULES OF BANKRUPTCY PROCEDURE

      The following constitutes the initial report pursuant to Rule 2015.3 of the Federal Rules of Bankruptcy Procedures (the "Initial Rule 2015.3 Report" or the "Report") of AbitibiBowater Inc. *et al.*, chapter 11 debtors in the above captioned cases (collectively, the "Debtors"), on the Plan value, operations and profitability of certain entities in which the Debtors hold a substantial or controlling interest, as modified by that certain *Agreed Final Order Modifying Reporting Requirements of Bankruptcy Rule 2015.3(a) Pursuant to Bankruptcy Rule 2015.3(d) for Certain Entities* (the "Order") [Docket No.   ] which identifies the entities subject to this Report and the applicable reporting requirements.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AbitibiBowater Inc. (6415), AbitibiBowater US Holding 1 Corp. (N/A), AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc. (N/A), Abitibi-Consolidated Alabama Corporation (4396), Abitibi-Consolidated Corporation (9050), Abitibi-Consolidated Finance LP (4528), Abitibi Consolidated Sales Corporation (7144), Alabama River Newsprint Company (7247), Augusta Woodlands, LLC (9050), Bowater Alabama LLC (7106), Bowater America Inc. (8645), Bowater Canada Finance Corporation (N/A), Bowater Canadian Forest Products Inc. (N/A), Bowater Canadian Holdings Incorporated (N/A), Bowater Canadian Limited (N/A), Bowater Finance Company Inc. (1715), Bowater Finance II LLC (7886), Bowater Incorporated (1803), Bowater LaHave Corporation (N/A), Bowater Maritimes Inc. (N/A), Bowater Newsprint South LLC (1947), Bowater Newsprint South Operations LLC (0168), Bowater Nuway Inc. (8073), Bowater Nuway Mid-States Inc. (8290), Bowater South American Holdings Incorporated (N/A), Bowater Ventures Inc. (8343), Catawba Property Holdings, LLC (N/A), Coosa Pines Golf Club Holdings LLC (8702), Donohue Corp. (9051), Lake Superior Forest Products Inc. (9305) and Tenex Data Inc. (5913). On December 21, 2009, ABH LLC 1 (2280) and ABH Holding Company LLC (2398) (the "SPV Debtors") commenced chapter 11 cases, which cases are jointly administered with the above-captioned Debtors. The Debtors' and SPV Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1155 Metcalfe Street, Suite 800, Montreal, Quebec H3B 5H2, Canada.

In accordance with the Order, this Report contains information about the Plan value, operations, and profitability of the following entities, as modified by the Order:

| Non-Filing Entity | Debtor Owner | % Ownership |
|---|---|---|
| Bowater Mersey Paper Company Limited | Bowater Canadian Limited | 51% |
| Ponderay Newsprint Company | Lake Superior Forest Products Inc. | 40% |
| Calhoun Newsprint Company | Bowater Nuway Inc. | 51% |
| Augusta Newsprint Company | Abitibi Consolidated Sales Corporation | 52.5% |

Specifically, this Report includes a Plan valuation estimate for the entities (attached as Exhibit A), the entities' mill capacity and production as disclosed in the Company's annual reports filed with the SEC on April 30, 2010 for the period ending December 31, 2009, and on April 30, 2009 for the period ending December 31, 2008 (attached as Exhibit B), and a description of each entity's business operations (attached as Exhibit C).

THIS REPORT MUST BE SIGNED BY A REPRESENTATIVE OF THE
TRUSTEE OR DEBTOR IN POSSESSION.

The undersigned, having reviewed the above listing of entities in which the Debtors hold a substantial or controlling interest, and being familiar with the Debtors' financial affairs, verifies under the penalty of perjury that the listing (as modified by the Order) is complete, accurate and truthful to the best of his/her knowledge.

Date: _Nov. 5, 2010_

_W G Harvey_
Signature of Authorized Individual

_WILLIAM G. HARVEY_
Name of Authorized Individual

_CFO_
Title of Authorized Individual

**Exhibit A**
**Plan Valuation Estimate**

Schedule F of the Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated August 2, 2010 ("Disclosure Statement"), discloses the Plan value of each Debtor's proportionate interest in the Partnerships calculated as the Debtor's percentage ownership multiplied by the value of the mill, net of a deduction for pension costs allocated to each mill. Relevant portions of Schedule F are attached hereto. The attached Plan valuation is subject to all the Disclosure Statement notes, disclosures and other disclaimers, all of which are hereby incorporated by reference as if fully set forth herein. The information contained in the attached Schedule F is not (a) intended to be prepared in conformity with U.S. GAAP; (b) has not been audited or reviewed by independent registered public accountants; (c) is based on an agreement that the Distribution Model (as defined in the Disclosure Statement) accurately reflects the Company's assets and liabilities; and (d) is limited to the purpose for which it was prepared, and the time at which it was prepared, as set forth in the Disclosure Statement. No independent valuation by a third party appraiser has been made.

The information contained in this Periodic Report is provided to fulfill the reporting requirements under Rule 2015.3 of the Federal Rules of Bankruptcy Procedure as modified by the Order. All information contained herein is unaudited and subject to future adjustment.

# Bowater Canadian Limited

| Unsecured Recovery % | |
|---|---|
| Plan | 100.0% |
| *Memo: Liquidation Analysis* | 100.0% |

($ in millions)

| Assets | Book Value[1] | Plan Value |
|---|---|---|
| Directly Held Assets | | |
| Cash | $ 0.6 | $ 0.6 |
| Working Capital | - | - |
| PP&E | - | - |
| Other Assets | 0.6 | - |
| **Total Directly Held Assets** | 1.2 | 0.6 |
| Intercompany Pre-Petition Receivables | - | - |
| All Others | - | - |
| **Total** | - | - |
| Equity / Preferred Equity Interests in Affiliates | | |
| Bowater Mersey Paper Company Limited | - | 40.0 |
| All Others | - | - |
| **Total** | - | 40.0 |
| **Total** | $ 1.2 | $ 40.6 |

| Liabilities | Face Amount of Claims | Recovery of Claim at Entity | Total Recovery on Claim* |
|---|---|---|---|
| Secured Claims: | | | |
| All Others | - | - | - |
| **Total Secured Claims** | - | - | - |
| Total Administrative Claims | - | - | - |
| Unsecured Claims: | | | |
| Unsecured Claims | 0.2 | 0.2 | 0.2 |
| Unsecured Guarantees of Indebtedness | - | - | - |
| **Total General Unsecured Claims** | 0.2 | 0.2 | 0.2 |
| Intercompany Pre-Petition Claims: | | | |
| Bowater Canadian Forest Products Inc. | 0.0 | 0.0 | 0.0 |
| All Others | - | - | - |
| **Total** | 0.0 | 0.0 | 0.0 |
| Equity | NA | 40.3 | - |
| **Total** | $ 0.2 | $ 40.6 | - |

* Note: Represents aggregate distributions from all legal entities obligated with respect to such claim.
(1) Values as of the Petition Date, with the exception of working capital and cash which are estimated at the Effective Date.

# Lake Superior Forest Products Inc.

| Unsecured Recovery % | |
|---|---|
| Plan | 53.1% |
| Memo: Liquidation Analysis | 40.0% |

($ in million)

| Assets | Book Value [1] | | Plan Value |
|---|---|---|---|
| Directly Held Assets | | | |
| Cash | $ 0.0 | $ | 0.0 |
| Working Capital | - | | - |
| PP&E | 0.0 | | - |
| Other Assets | 0.0 | | - |
| Total Directly Held Assets | 0.0 | | 0.0 |
| Intercompany Pre-Petition Receivables | | | |
| Bowater Incorporated | 12.1 | | 5.9 |
| Ponderay Newsprint Company | 0.0 | | 0.0 |
| All Others | | | |
| Total | 12.2 | | 5.9 |
| Equity / Preferred Equity Interests in Affiliates | | | |
| Ponderay Newsprint Company | - | | 41.7 |
| All Others | | | |
| Total | - | | - |
| Total | $ 12.2 | $ | 47.6 |

| Liabilities | Face Amount of Claim | Recovery of Claim at Entity | Total Recovery on Claim* |
|---|---|---|---|
| Secured Claims: | | | |
| All Others | - | - | - |
| Total Secured Claims | - | - | - |
| Total Administrative Claims | - | - | - |
| Unsecured Claims: | | | |
| Unsecured Claims | 0.0 | 0.0 | 0.0 |
| Unsecured Guarantees of Indebtedness | | | |
| Total General Unsecured Claims | 0.0 | 0.0 | 0.0 |
| Intercompany Pre-Petition Claims | | | |
| Bowater America Inc. | 89.8 | | 47.6 |
| All Others | | | |
| Total | 89.8 | 89.8 | 47.6 |
| Equity | NA | | |
| Total | $ 89.8 | $ | 47.6 |

* Note: Represents aggregate distributions from all legal entities obligated with respect to such claim.
(1) Values as of the Petition Date, with the exception of working capital and cash which are estimated at the Effective Date.

# Abitibi Consolidated Sales Corporation

| Unsecured Recovery % | |
|---|---|
| Plan | 23.4% |
| *Memo: Liquidation Analysis* | 11.2% |

($ in millions)

| Assets | Book Value(1) | Plan Value |
|---|---|---|
| **Directly Held Assets** | | |
| Cash | $ 3.8 | $ 3.8 |
| Working Capital | - | - |
| PP&E | 7.9 | - |
| Other Assets | 49.3 | - |
| Total Directly Held Assets | 60.7 | 3.8 |
| | | |
| **Intercompany Pre-Petition Receivables** | | |
| Abitibi-Consolidated Company of Canada | 143.4 | 24.5 |
| Abitibi-Consolidated Corporation | 200.0 | 24.2 |
| Ponderay Newsprint Company | 0.4 | 0.4 |
| Donohue Malbaie | 0.4 | 0.4 |
| All Others | 238.8 | 0.1 |
| Total | 583.0 | 49.6 |
| | | |
| **Equity / Preferred Equity Interests in Affiliates** | | |
| Abitibi-Consolidated U.S. Funding Corp. | - | 178.2 |
| Augusta Newsprint Company | - | 51.5 |
| All Others | - | - |
| Total | - | 229.7 |
| | | |
| Total | $ 644.6 | $ 283.0 |

| Liabilities | Face Amount of Claim | Recovery of Claim at Entity | Total Recovery on Claim* |
|---|---|---|---|
| **Secured Claims:** | | | |
| Other Secured Claims | $ 0.2 | $ 0.2 | 0.2 |
| Total Secured Claims | | | |
| | | | |
| All Others | - | - | |
| Total Administrative Claims | 0.2 | 0.2 | 0.2 |
| | | | |
| **Unsecured Claims:** | | | |
| Unsecured Claims | 10.3 | 10.3 | |
| | | | |
| Unsecured Guarantees of Indebtedness | 447.2 | 104.4 | 104.4 |
| | | | |
| Total General Unsecured Claims | 791.2 | 104.4 | 104.4 |
| | | | |
| **Intercompany Pre-Petition Claims** | | | |
| Donohue Corp. | 360.0 | 84.3 | |
| Abitibi-Consolidated Inc. | 331.3 | 77.9 | |
| Bowater Incorporated | 23.5 | 5.5 | |
| Bowater America Inc. | 2.5 | 0.6 | |
| All Others | 0.8 | 0.2 | |
| Total | 718.1 | 168.2 | |
| | | | |
| Equity | NA | | |
| | | | |
| Total | $ 1,519.5 | $ 283.0 | |

\* Note: Represents aggregate distributions from all legal entities obligated with respect to each claim.

(1) Values as of the Petition Date, with the exception of working capital and cash which are estimated at the Effective Date.

# Bowater Nuway Inc.

| Unsecured Recovery % | |
| --- | --- |
| Plan | 100.0% |
| Memo: Liquidation Analysis | 100.0% |

($ in millions)

| Assets | Book Value[1] | Plan Value |
| --- | --- | --- |
| Directly Held Assets | | |
| Cash | $ 0.0 | $ 0.0 |
| Working Capital | 0.2 | - |
| PP&E | - | - |
| Other Assets | 0.1 | - |
| Total Directly Held Assets | 0.3 | 0.0 |
| Intercompany Pre-Petition Receivables | | |
| Bowater Incorporated | 537.7 | 260.4 |
| Bowater Newsprint Mid-States Inc. | 11.4 | 2.1 |
| Bowater Alabama LLC | 0.0 | 0.0 |
| Bowater Newsprint South Operations LLC | 0.0 | 0.0 |
| All Others | | |
| Total | 549.1 | 262.5 |
| Equity / Preferred Equity Interests in Affiliates | | |
| Calhoun Newsprint Company | | 22.0 |
| All Others | | |
| Total | - | 22.0 |
| | | |
| Total | $ 549.3 | $ 244.5 |

| Liabilities | Face Amount of Claim | Recovery of Claim at Entity | Total Recovery on Claims[1] |
| --- | --- | --- | --- |
| Secured Claims: | | | |
| Other Secured Claims | $ 0.0 | $ 0.0 | 0.0 |
| All Others | - | - | - |
| Total Secured Claims | 0.0 | 0.0 | 0.0 |
| Total Administrative Claims | 0.0 | 0.0 | 0.0 |
| Unsecured Claims: | | | |
| Unsecured Claims | 0.1 | 0.1 | |
| Unsecured Guarantees of Indebtedness | | | |
| Total General Unsecured Claims | 0.1 | 0.1 | 0.1 |
| Intercompany Pre-Petition Claims | | | |
| Bowater América Inc. | 32.7 | 32.7 | |
| Bowater Canadian Forest Products Inc. | 30.6 | 30.6 | |
| All Others | | | |
| Total | 63.3 | 63.3 | 63.3 |
| Equity | | | |
| Total | NA | 221.1 | |
| | | | |
| Total | $ 63.4 | $ 284.5 | |

* Note: Represents aggregate distributions from all legal entities obligated with respect to such claim.
(1) Values as of the Petition Date, with the exception of working capital and cash which are estimated at the Effective Date.

**Exhibit B**
**Financial Information**

Pursuant to the Order, the Debtors attach AbitibiBowater Inc.'s Annual Report on Form 10-K for the Year ended December 31, 2009 filed with the SEC on April 30, 2010 and Annual Report on Form 10-K for the Year ended December 31, 2008 filed with the SEC on April 30, 2009. These reports speak only as of the time they were filed and have not been updated in any way in connection with the Order. The SEC filings consolidate majority owned partnerships and use the equity method of accounting for non-majority owned partnerships.



Morningstar® Document Research℠

# FORM 10-K/A

## AbitibiBowater Inc. - ABWTQ

**Filed: April 30, 2010 (period: December 31, 2009)**

Amendment to a previously filed 10-K

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 10-K/A

---

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE FISCAL YEAR ENDED DECEMBER 31, 2009

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE TRANSITION PERIOD FROM          TO

### COMMISSION FILE NUMBER: 001-33776

---

# ABITIBIBOWATER INC.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **98-0526415** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification number) |

**1155 Metcalfe Street, Suite 800; Montreal, Quebec; Canada H3B 5H2**
(Address of principal executive offices) (Zip Code)

**(514) 875-2160**
(Registrant's telephone number, including area code)

---

#### Securities registered pursuant to Section 12(b) of the Act: None

#### Securities registered pursuant to Section 12(g) of the Act: Common stock, $1.00 par value per share

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☐  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

---

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010                    Powered by Morningstar® Document Research℠

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2009), was approximately $6 million. For purposes of the foregoing calculation only, all directors, executive officers and 5% beneficial owners have been deemed affiliates.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed pursuant to Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.  Yes ☐  No ☐

As of February 28, 2010, there were 54,703,212 shares of AbitibiBowater Inc. common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

None.

# EXPLANATORY NOTE

This amendment (this "*Amendment No. 1*") amends AbitibiBowater Inc.'s Annual Report on Form 10-K for the year ended December 31, 2009 (the "*Original 10-K*"), which was originally filed with the Securities and Exchange Commission (the "*SEC*") on March 31, 2010. We refer to AbitibiBowater Inc. with its subsidiaries and affiliates, either individually or collectively, unless otherwise indicated, as "AbitibiBowater," "we," "our," "us" or the "Company." We refer to our Abitibi-Consolidated Inc. and Bowater Incorporated subsidiaries as "Abitibi" and "Bowater," respectively, and to the transaction that brought them together to form AbitibiBowater as the "combination."

This Amendment No. 1 is being filed solely to provide the information required by Part III of Form 10-K (Items 10, 11, 12, 13 and 14) that was previously omitted from the Original 10-K. As of the date of this Amendment No. 1, we do not intend to file a definitive proxy statement containing the information required in Part III, nor do we expect to hold an annual meeting of stockholders while the Creditor Protection Proceedings, as defined in the Original 10-K, continue.

No other changes have been made to the Original 10-K. The Original 10-K continues to speak as of the date it was filed, and the disclosures contained therein have not been updated to reflect any events that occurred thereafter other than as expressly indicated herein. This Amendment No. 1 should therefore be read in conjunction with the Original 10-K and our other filings with the SEC on and after March 31, 2010. This Amendment No. 1 consists solely of the preceding cover page, this explanatory note, Part III (Items 10, 11, 12, 13 and 14), Part IV (Item 15), the signature page and the certifications required to be filed hereto.

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

### Corporate Governance

*Corporate Governance Principles*

The board has adopted a formal set of corporate governance principles and practices, which we refer to as the "corporate governance principles." The purpose of the corporate governance principles, which are available on our website (www.abitibibowater.com), is to provide a structure within which directors and management can pursue the Company's objectives for the benefit of stockholders and within which directors can supervise management. The corporate governance principles are guidelines intended to serve as a flexible framework within which the board may conduct its business, and not as a set of legally binding obligations.

The corporate governance principles outline the board's responsibilities and the interplay among the board and its committees in furthering the Company's overall objectives. The corporate governance principles note the board's role in advising management on significant issues facing the Company and in reviewing and approving significant actions. In addition, the corporate governance principles highlight the principal roles of certain committees of the board, including:

- The board's selection and evaluation of senior executive officers, including the president and chief executive officer, with assistance from the Human Resources and Compensation Committee and the Nominating and Governance Committee, and succession planning.

- 1 -

Powered by Morningstar® Document Research℠

- The administration of executive and director compensation by the Human Resources and Compensation Committee, with assistance from the Nominating and Governance Committee and final approval by the board.

- The selection and oversight of our independent registered public accounting firm and oversight of public financial reporting by the Audit Committee.

- The evaluation of candidates for board membership and the oversight of the structure and practices of the board, the committees and corporate governance matters in general by the Nominating and Governance Committee, including annual assessment of board and committee effectiveness.

Our corporate governance principles also include, among other things:

- General qualifications for board membership, including independence requirements (with, among other things, the categorical standards for board determinations of independence).

- Director responsibilities, including board and stockholder meeting attendance and advance review of meeting materials.

- Provisions for director access to management and independent advisors, and for director orientation and continuing education.

- An outline of management's responsibilities, including production of financial reports and disclosures, implementation and monitoring of internal controls and disclosure controls and procedures, development, presentation and implementation of strategic plans and setting a strong ethical "tone at the top."

*Employee Code of Conduct*

We have adopted a code of ethics, which we refer to as the "code of business conduct," that applies to all of our employees, including our principal executive officer, principal financial officer and principal accounting officer. The code of business conduct is posted on our website (www.abitibibowater.com). We will disclose amendments to our code of business conduct and any waivers of its provisions with respect to the chief executive officer, chief financial officer and chief accounting officer on our website within four business days following the date of the amendment or waiver.

*Board Leadership Structure; Communication with Independent Directors*

The Company's business is managed under the direction of the board, with the board delegating the management of the Company to the president and chief executive officer, working with other executive officers, in a manner consistent with the Company's objectives and in accordance with its by-laws. This delegation of authority is not intended to minimize the board's supervisory duties, as more fully set forth in our corporate governance principles. Mr. Evans, the Company's chairman and an independent director, presides over each board meeting and the separate meetings

- 2 -

Powered by Morningstar® Document Research℠

of independent directors in executive session. Our by-laws provide that in the event the chairman is not an independent director, an independent director selected by a majority of the board will serve as lead director, whose responsibilities include, among other things, chairing any meeting of the independent directors in executive session.

Stockholders and other interested persons that would like to communicate with the independent directors may send an email to codirectors@abitibibowater.com or send a written communication to: AbitibiBowater Inc. Independent Directors, c/o AbitibiBowater Inc. Secretary, 1155 Metcalfe Street, Suite 800, Montreal, Quebec, Canada, H3B 5H2. The Company's secretary will forward those communications to the intended recipients and will retain copies for the Company's records.

Regardless of the method of communication, no message will be screened or edited before it is delivered to the intended recipient(s), who will determine whether to relay the message to other members of the board.

### Board of Directors and Committees

The Company's board of directors is divided into three classes, each of which consists as nearly as possible of one-third of the total number of directors. According to our by-laws, each director serves for a term ending on the date of the third annual meeting of stockholders following the annual meeting at which such director was elected, except that the term of office of each director elected in connection with the formation of AbitibiBowater in October 2007, whom we refer to as an "initial director", that is a Class II director will end on the date of the second annual meeting following the date of formation and the term of office of each initial director that is a Class III director will end on the third annual meeting following the date of formation. Each Class I director was re-elected at the 2008 annual meeting of stockholders. Except as otherwise noted below, each director is an initial director.

The Company believes that each director should possess high personal and professional ethics, integrity and values, an inquiring and independent mind as well as practical wisdom, vision and mature judgment. He or she should also have substantial training and experience at the policy-making level in business, government, or education and/or expertise that is useful to the Company and complementary to the background and experience of other board members, so that an optimum balance of expertise among members on the board can be achieved and maintained. In light of other business and personal commitments, he or she should also be willing and able to devote the required amount of time to diligently fulfill the duties and responsibilities of board membership, and be committed to serve on the board over a period of years to develop knowledge about the Company's operations.

Some of the specific areas of expertise and experience that we believe to be important in light of our business are listed below; ideally, these areas should be represented by at least one board member:

· professional services, such as lawyers, investment bankers and university professors

· politics/government relations

- 3 -

Powered by Morningstar® Document Research℠

- management/operating experience, such as a chief executive office, chief operating officer or senior manager

- financial/accounting experience, such as a chief financial officer, certified financial analyst or chartered public accounting or analyst

The applicable aspects of each director's experience, qualifications and skills that the board considered in their nomination in light of the foregoing are included in their individual biographies. It is also desirable that each member of the board has recent experience as a member of the board of at least one other company, preferably a publicly-held reporting company.

*Class I Directors*

| | |
|---|---|
| William E. Davis | Mr. Davis served on Abitibi's board of directors from 2003 through the combination. |
| Age: 68 | He was chairman and chief executive officer of Niagara Mohawk Power Corporation from 1993 to 2002 and chairman of National Grid USA and executive director of National Grid (UK) from 2002 to 2003. |
| Director since 2007 | He serves on the board of CONSOL Energy Inc. |
| Director Qualifications: | • Management/operating experience – former chairman and chief executive officer of a power company |
| | |
| Ruth R. Harkin | Ms. Harkin served on Bowater's board from 2005 through the combination. |
| Age: 65 | She was senior vice president for international affairs and government relations of United Technologies Corporation from 1997 to 2005. From 1993 to 1997, she was president and chief executive officer of the Overseas Private Investment Corporation. |
| Director since 2007 | She serves on the board of ConocoPhillips and is a member of the Iowa Board of Regents. |
| Director Qualifications: | • Politics/government relations – former senior vice president for international affairs and government relations for a publicly-held industrial company; former president and chief executive officer of an agency of the U.S. government focused on assisting U.S. companies invest overseas |
| | • Professional services – former county attorney for Story County, Iowa and former deputy counsel for the U.S. Department of Agriculture |

- 4 -

Powered by Morningstar® Document Research℠

| | |
|---|---|
| Lise Lachapelle | Mrs. Lachapelle served on Abitibi's board from 2002 through the combination. |
| Age: 60 | After a 20-year career in the Canadian public service, she served as president of Strategico Inc. from 1993 to 1994 and as president and chief executive officer of the Canadian Pulp and Paper Association from 1994 to 2002. |
| Director since 2007 | |
| | She serves on the boards of Industrial Alliance, Insurance and Financial Services Inc., Russel Metals Inc. and Innergex Power Trust. |
| Director Qualifications: | •     Management/operating experience – former president and chief executive officer of an industry trade organization |
| | •     Politics/government relations – held numerous positions in the Canadian public service |

| | |
|---|---|
| John A. Rolls | Mr. Rolls served on Bowater's from 1990 through the combination. |
| Age: 68 | Mr. Rolls was president and chief executive officer of Thermion Systems International from 1996 to 2007. He was president and chief executive officer of Deutsche Bank North America from 1992 to 1996. |
| Director since 2007 | |
| | Mr. Rolls serves on the board of FuelCell Energy, Inc. He served on the board of MBIA Inc. in the last five years. |
| Director Qualifications: | •     Management/operating experience – former president and chief executive officer of a private industrial company; former president and chief executive officer of a large European bank's North American operations |
| | •     Financial/accounting experience – former executive vice president and chief financial officer of a large industrial company; former senior vice president, chief financial officer and treasurer of a large electronics company |

*Class II Directors*

| | |
|---|---|
| Jacques Bougie, O.C. | Mr. Bougie served on Abitibi's board from 2004 through the combination. |
| Age: 62 | He was president and chief executive officer of Alcan Inc. from 1993 to 2001. |
| Director since 2007 | Mr. Bougie serves on the board of Rona Inc. He served on the boards of Nova Chemicals Inc. and Novelis Inc. in the last five years. |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010         Powered by Morningstar® Document Research℠

| | |
|---|---|
| Director Qualifications: | • Management/operating experience – former president and chief executive officer of a publicly-held multinational resources company |
| Anthony F. Griffiths | Mr. Griffiths was appointed to the board as of April 15, 2008. |
| Age: 79 Director since 2008 | He is an independent business consultant and corporate director, and the lead director on the board of Fairfax Financial Holdings Limited. Mr. Griffiths was chairman of Mitel Corporation from 1987 to 1993 and president and chief executive officer from 1991 to 1993. |
| | Mr. Griffiths also serves on the boards of Bronco Energy Ltd., Northbridge Financial Corporation (no longer a public corporation), Crum & Forster Holding Corp., Jaguar Mining Inc., OdysseyRe Holding Corp. (no longer a public corporation), Vitran Corporation Inc. and The Brick Group Income Fund. He is the chairman of Russel Metals Inc. and Novadaq Technologies Inc. |
| | He served on the boards of PreMD Inc., Cunningham Lindsey Group Inc., Alliance Atlantis Communications Inc., Hub International Limited, Leitch Technology Corp., Binscarth PVC Ventures Inc. and Counsel Corporation in the last five years. |
| Director Qualifications: | • Management/operating experience – former chairman, president and chief executive officer of an international telecommunications company |
| Gary J. Lukassen | Mr. Lukassen served on Abitibi's board from 2003 through the combination. |
| Age: 66 Director since 2007 | He was executive vice president, chief financial officer and a director of Hudson's Bay Company from 1989 to 2001. |
| | Mr. Lukassen serves on the board of The North West Company Fund and has served on the boards of Stelco Inc. and Spinrite Income Fund in the last five years. |
| Director Qualifications: | • Financial/accounting experience – chartered accountant; former vice president, chief financial officer and a director of a large retail company |

- 6 -

Powered by Morningstar® Document Research℠

| | |
|---|---|
| David J. Paterson | Mr. Paterson served on Bowater's board from 2006, and as chairman from January 2007, through the combination. |
| Age: 55<br>Director since 2007 | He has been the Company's president and chief executive officer since the combination and had been president and chief executive officer of Bowater since 2006. He was executive vice president of Georgia-Pacific Corporation in charge of its building products division from 2003 to 2006. At various times from 2000 to 2006, he had been responsible for Georgia-Pacific's pulp and paperboard division, paper and bleached board division and communication papers division. |
| | Mr. Paterson is not on the board of any public company other than AbitibiBowater. |
| Director Qualifications: | • Management/operating experience – the Company's current president and chief executive officer, and formerly Bowater's president and chief executive officer; senior management positions with another large forest products company |

| | |
|---|---|
| Hon. Togo D. West, Jr. | Secretary West served on Bowater's board from 2002 through the combination. |
| Age: 67<br>Director since 2007 | He was president and chief executive officer of the Joint Center for Political and Economic Studies from 2004 to 2006 and Of Counsel to Covington & Burling LLP, a law firm, from 2000 to 2004. Secretary West served as U.S. secretary of veterans affairs from 1998 to 2000 and as secretary of the army from 1993 to 1998, during which time he also served as chairman of the Panama Canal Commission.<br>Secretary West is chairman of TLI Leadership Group and serves on the boards of Bristol-Myers Squibb Company, Krispy Kreme Doughnuts, Inc. and FuelCell Energy, Inc. |
| Director Qualifications: | • Politics/government relations – held senior positions in the U.S. government, including secretary of the army and secretary of veterans affairs |
| | • Professional services – lawyer, formerly counsel with an international law firm |
| | • Management/operating experience – former president and chief executive officer of a national, nonprofit research and public policy institution |

- 7 -

Powered by Morningstar® Document Research℠

*Class III Directors*

| | |
|---|---|
| John Q. Anderson<br><br>Age: 58<br>Director since 2007 | Mr. Anderson served on Abitibi's board from 2006 through the combination.<br><br>He has been a managing director with Fenway Partners Resources, Inc. and its predecessors since 1999 and is chairman and chief executive officer of BigWheel Partners, Inc.<br><br>Mr. Anderson is chairman of the North American Electric Reliability Corporation. He is not on the board of any public company other than AbitibiBowater. |
| Director Qualifications: | •    Management/operating experience – held senior positions with U.S. private equity firms; former senior executive with two U.S. railroad companies |
| | |
| Richard B. Evans<br><br>Age: 62<br>Director since 2007 | Mr. Evans served on Bowater's board from 2003 through the combination. He has been the Company's chairman since February 2009.<br><br>He was president and chief executive officer of Alcan Inc. from 2006 until its merger with Rio Tinto Aluminum in October 2007. He then served as executive director of Rio Tinto PLC and Rio Tinto Ltd. from 2007 through 2009. From October 2005 to March 2006, he was chief operating officer of Alcan Inc. and from 1997 to October 2005, he held several executive positions with that company, including executive vice president for aluminum fabrication, Europe; executive vice president for fabricated products, North America; and president of Alcan Aluminum Corporation.<br><br>Mr. Evans is chairman of the International Aluminum Institute. He also serves on the board of CGI Inc. |
| Director Qualifications: | •    Management/operating experience – former president and chief executive officer and former executive director of a large multinational resources company |

- 8 -

| Paul C. Rivett | Mr. Rivett was appointed to the board as of April 15, 2008. |
| Age: 42 | He has been vice president and chief legal officer of Fairfax Financial Holdings Limited since 2004 and also serves as vice president and chief operating officer of Hamblin Watsa Investment Counsel Ltd. Mr. Rivett was an attorney at Shearman & Sterling LLP in Toronto, Canada, before joining Fairfax in 2004. |
| Director since 2008 | |
| | Mr. Rivett serves on the boards of Mega Brands Inc. and The Brick Group Income Fund. |
| Director Qualifications: | • Professional services – currently vice president and chief legal officer of a Canadian financial services company; former lawyer with a New York-based law firm |
| | • Management/operating experience – currently vice president and chief operating officer of an asset management subsidiary of Fairfax |

We expect each director to attend all regular board meetings, all meetings of the committee(s) on which he or she sits and all annual and special meetings of ours stockholders. The board met 26 times in 2009, including 20 special meetings. All current directors attended at least 75% of the regular and special meetings of the board and the committees of which they were a member. Attendance at board and committee meetings in 2009 averaged 96% at regular meetings and 84% at special meetings for the directors as a group. There was no annual meeting of stockholders in 2009.

The board has adopted written charters for each of its four standing committees: the Audit Committee, the Nominating and Governance Committee, the Human Resources and Compensation Committee, and the Environmental, Health and Safety Committee. Each committee's charter is available on our website at www.abitibibowater.com/investors/corporate-governance.

As the chair of the board, Richard B. Evans is an *ad hoc* member of all board committees on which he does not otherwise sit.

*Audit Committee*

The Audit Committee of the board of directors oversees our financial reporting, internal controls and audit function process on behalf of the board.

Four directors sit on the Audit Committee, each of whom the board has determined to be "independent" in accordance with the New York Stock Exchange's ("*NYSE*") corporate governance standards and our by-laws. The members of the Audit Committee are: William E. Davis, Lise Lachapelle, Gary J. Lukassen and John A. Rolls (chair). The board has determined that each of Messrs. Rolls and Lukassen is an "audit committee financial expert" in accordance with SEC rules.

- 9 -

Powered by Morningstar® Document Research℠

The purposes and responsibilities of the Audit Committee include:

- Monitoring the integrity of our financial reporting process and systems of internal control, including reviewing our accounting policies, internal auditing procedures, earnings press releases, quarterly financial statements and the scope and results of the annual audit.

- Monitoring the independence and qualifications of our independent registered public accounting firm, including approving the non-audit services rendered by the independent registered public accounting firm and considering the effect of those services on the firm's independence.

- Monitoring the performance of our internal audit function and independent registered public accounting firm, including appointing, retaining or replacing the independent registered public accounting firm.

- Monitoring our compliance with legal and regulatory requirements, including establishing and maintaining procedures for the receipt, retention and treatment of complaints or concerns regarding accounting or auditing matters.

- Providing an open avenue of communication among the board, management, the independent registered public accounting firm and internal auditors.

The Audit Committee met 11 times in 2009, including six special meetings.

*Nominating and Governance Committee*

Six directors sit on the Nominating and Governance Committee, each of whom the board has determined to be "independent" in accordance with the NYSE's corporate governance standards and our by-laws. The members of the committee are: Jacques Bougie (chair), William E. Davis, Richard B. Evans, Anthony F. Griffiths, Ruth R. Harkin and John A. Rolls.

The purposes and responsibilities of the Nominating and Governance Committee include:

- Advising the board with respect to the organization, membership and function of the board and the structure, membership and operation of committees, including the identification, selection or recommendation of board members and of board nominees for the annual meetings of stockholders.

- Developing and recommending to the board corporate governance principles and policies.

- Jointly with the Human Resources and Compensation Committee, assessing, at least annually, the performance, goals and objectives of the president and chief executive officer and making related recommendations to the board.

- Evaluating and making recommendations for approval by the board, in consultation with the Human Resources and Compensation Committee, of the Company's director compensation structure.

The Nominating and Governance Committee will consider director candidates nominated or proposed by stockholders where those candidates have been properly and timely proposed for nomination or recommended as prospective nominees by stockholders. The committee will

- 10 -

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

consider the candidates in the same manner as other candidates, but it has the sole discretion to recommend any candidate as a nominee for board approval. We describe the general qualifications and specific qualities and skills that we believe each director should possess above. The information required in any notice of nomination and the advance notice requirement are described in our by-laws.

The Nominating and Governance Committee met six times in 2009, including two special meetings.

*Human Resources and Compensation Committee*

Six directors sit on the Human Resources and Compensation Committee, each of whom the board has determined to be "independent" in accordance with the NYSE's corporate governance standards and our by-laws. The members of the committee are: John Q. Anderson, Jacques Bougie, Richard B. Evans, Anthony F. Griffiths, Ruth R. Harkin and Hon. Togo D. West, Jr. (chair).

The purposes and responsibilities of the Human Resources and Compensation Committee include:

- With the assistance of the Nominating and Governance Committee, annually evaluating and recommending to the board for approval the compensation of the president and chief executive officer, and reviewing and approving appropriate corporate goals and objectives relating to the president and chief executive officer, and assessing his performance in light of those goals.

- Reviewing and evaluating the Company's executive compensation structure as it applies to the officers reporting directly to the president and chief executive officer.

- Evaluating and making recommendations for approval by the board, in consultation with the Nominating and Governance Committee, regarding the compensation of directors.

- Evaluating and approving the adoption, amendment and termination of equity-based plans for the Company's executive officers, and administering executive bonus plans and awards and stock option plans and grants under the plans.

The Human Resources and Compensation Committee met six times in 2009, including one special meeting.

*Environmental, Health and Safety Committee*

The five members of the Environmental, Health and Safety Committee are: John Q. Anderson, Lise Lachapelle (chair), Gary J. Lukassen, Paul C. Rivett and Togo D. West, Jr. The purposes and responsibilities of the Environmental, Health and Safety Committee include overseeing the policies, management systems and performance of the Company's environmental and occupational health and safety matters.

The committee met four times in 2009.

- 11 -

**Executive Officers**

Information on our executive officers is provided under *Executive Officers* in Item 1 of the Original 10-K.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act of 1934, as amended (the "*Exchange Act*"), requires the Company's directors, executive officers and 10% stockholders to file reports of holdings and transactions in common stock and exchangeable shares with the SEC. Those persons are also required to furnish the Company with copies of all section 16(a) reports they file, which we publish on our website at www.abitibiwater.com/investors/sec-filings.

Based on a review of the copies of such reports and on written representations from the Company's directors and executive officers, the Company believes that all section 16(a) filing requirements applicable to the Company's directors, executive officers and stockholders were complied with during the most recent fiscal year, except that, since the combination, Mr. Johnson filed one late Form 3 and seven late Form 4s (two in respect of individual reportable events and the remaining five in connection with the vesting of RSUs initially reported as derivative securities).

## ITEM 11. EXECUTIVE COMPENSATION.

**Compensation Committee Interlocks and Insider Participation**

None of our executive officers served as a member of the board of directors or the compensation committee of any entity having one or more executive officers serving on the board or the Company's Human Resources and Compensation Committee.

**Director Compensation**

### DIRECTOR COMPENSATION FOR 2009

| Name | Fees Earned or Paid in Cash[1][2] | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings[6] | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| John Q. Anderson | $ 50,000 | $ — | $ — | $ — | $ 313 | $ — | $ 50,313 |
| Jacques Bougie, O.C. | 55,000 | — | — | — | — | — | 55,000 |
| William E. Davis | 60,000 | — | — | — | — | — | 60,000 |
| Richard B. Evans [3] | 50,000 | — | — | — | 625 | — | 50,625 |
| Gordon D. Giffin | 4,167 | — | — | — | — | — | 4,167 |
| Anthony F. Griffiths | 50,000 | — | — | — | — | — | 50,000 |
| Ruth R. Harkin | 50,000 | — | — | — | — | — | 50,000 |
| Lise Lachapelle | 55,000 | — | — | — | — | — | 55,000 |
| Gary J. Lukassen [4] | 50,000 | — | — | — | — | — | 50,000 |
| David J. Paterson | — | — | — | — | — | — | — |
| John A. Rolls | 60,000 | — | — | — | 750 | — | 60,750 |
| Paul C. Rivett | 50,000 | — | — | — | — | — | 50,000 |
| John W. Weaver | 59,166[5] | — | — | — | — | 4,620,000[7] | 4,679,166 |
| Hon. Togo D. West, Jr. | 55,000 | — | — | — | — | — | 55,000 |

(1)    The retainer fees of directors Bougie, Davis, Giffin, Griffiths, Harkin, Lachapelle, Lukassen, Rivett, Weaver and West were payable in cash. Mr. Anderson elected to receive 50% of his fees in cash and defer the remaining 50% of his fees as deferred stock units, or "*DSUs*", under the AbitibiBowater Outside Director Deferred Compensation Plan (described below). Messrs. Evans and Rolls elected to defer all of their fees as DSUs to the AbitibiBowater Outside Director Deferred Compensation Plan. During 2009, Messrs. Anderson, Evans and Rolls changed their allocation to cash, as more fully described below.

(2)    The director fees are paid quarterly. A portion of the fees earned for the second quarter of 2009, however, was not paid as a result of the Creditor Protection Proceedings, as described in *Item 1 – Business – Creditor Protection Proceedings* of the Original 10-K. Depending on the director, this amount ranged from $2,222 to $2,667. Also, Mr. Giffin's fees earned for the first quarter of 2009 in the amount of $4,167 were not paid as a result of the Creditor Protection Proceedings. The directors have an unsecured claim for the unpaid amount as part of the Creditor Protection Proceedings.

(3)    Mr. Giffin resigned from the board on January 22, 2009.

(4)    As required under SEC rules, all of Mr. Paterson's compensation from the Company for 2009 is set forth in the Summary Compensation Table because he is a named executive officer.

(5)    Mr. Weaver continued to serve as non-executive chairman of the board through his resignation from such position effective January 31, 2009 and received $10,000 for his services in this capacity. He continued to receive $10,000 per month through March 2009, when his fees were adjusted effective April 1, 2009 to reflect his services as a director. Beginning April 1, 2009 through his resignation from the board on October 31, 2009, Mr. Weaver received a retainer fee of $29,166.44 ($4,166.66 per month) for his services as a director, $2,222 of which was not paid as described in footnote 2 above.

(6)    Under the AbitibiBowater Outside Director Deferred Compensation Plan, if a director elects to defer fees and allocate the fees to the DSU account, the director is credited with a number of DSUs determined by dividing the allocated fees by 95% of the fair market value of Company stock. The amounts reflected in the table for Messrs. Anderson, Evans and Rolls represent the value of the 5% discount as above-market earnings for the amount of fees credited to the DSU account on their behalf in the first quarter of 2009.

(7)    The "All Other Compensation" column reflects a payment of $4,500,000 on January 23, 2009 under his severance agreement and a Memorandum of Agreement, dated as of July 29, 2008, as amended on January 21, 2009, covering his June 30, 2008 termination as an employee. In addition,

Mr. Weaver was party to a consulting agreement that expired March 31, 2009. In 2009, he received $120,000 ($40,000 per month) for his services as a consultant, which payment is also reflected in the "All Other Compensation" column.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

*Standard Compensation Arrangement*

Cash Component with Deferral Opportunity

Compensation payable to AbitibiBowater's directors is based on an annual retainer fee of $50,000 for all non-employee directors, payable in cash. In recognition of added responsibilities for committee chairs, the Audit Committee chair receives an additional annual fee of $10,000 and other committee chairs receive an additional annual fee of $5,000. At this time, no additional fees are payable to the chair of the board. The Company reimburses all directors for reasonable expenses incurred in connection with attending board and committee meetings.

The directors have an annual opportunity to defer receipt of their cash compensation by participating in the AbitibiBowater Outside Director Deferred Compensation Plan, or "*AbitibiBowater Deferred Compensation Plan*", effective as of January 1, 2009. The Company established this plan in 2008 creating a deferral opportunity for cash fees earned beginning with the 2009 calendar year. The AbitibiBowater Deferred Compensation Plan combines features from prior plans offered by Abitibi and Bowater for non-employee directors.

*Deferral Election*

Under the AbitibiBowater Deferred Compensation Plan, a director can elect to defer all or a portion of his annual cash compensation for board service. Under this plan, a director who is a U.S. resident for tax purposes and elects to defer all or a portion of his annual cash compensation for board service, can allocate his deferrals in an interest-bearing cash account and/or a DSU account. Fees subject to a deferral election are credited to the elected account approximately at the same time the fees would have been paid in cash (generally, quarterly). On the last business day of each quarter, the cash account is credited with interest based on the average balance of the account during such quarter at a rate equal to the Lipper Money Market Fund Index. Fees deferred to the DSU account are credited as a number of deferred stock units equal to the amount of such fees divided by 95% of the fair market price, as defined in the AbitibiBowater Deferred Compensation Plan, of Company common stock on the last business day of the quarter. On the last business day of each subsequent quarter, the value of the DSU account is adjusted based on corresponding increases or decreases in the price of Company common stock. In addition, if dividends are paid on Company common stock during a quarter, the DSU account is increased on the last day of the quarter by the number of shares that could be purchased with the amount of dividends otherwise payable as of the dividend record date, based on the stock price on such date. Originally, the directors' elections to allocate deferrals between the cash account and DSU account were also irrevocable such that they could not change their allocation elections during the year. However, in June 2009, the board amended the AbitibiBowater Deferred Compensation Plan to allow the directors to change their elections to allocate deferrals between their cash and DSU account as applied to their fees that had not yet been credited to the AbitibiBowater Deferred Compensation Plan. For example, if, in 2008, a director elected to have all or a portion of his 2009 fees deferred and credited to the DSU account, that election was irrevocable when made in 2008. As a result of the amendment to the AbitibiBowater Deferred Compensation Plan, a director was authorized to change his DSU account allocation to the cash account for his fees for the second, third and fourth quarters in 2009. However, his fees credited to the Plan in the first quarter of 2009 remained allocated to the DSU account and were not impacted by the allocation election change.

- 13 -

If a director who is a Canadian resident for tax purposes elects to defer all or a portion of his annual cash compensation, it may only be allocated to the DSU account. The June 2009 amendment did not apply to directors who are Canadian residents.

In addition, to ensure that AbitibiBowater's directors make steady progress toward satisfying applicable stock ownership guidelines (currently suspended as noted below), AbitibiBowater may require that a portion of the director's cash compensation be deferred as DSUs until the guidelines are satisfied. In practice, AbitibiBowater has not imposed such requirements given the current value of the Company's stock, delisted status on the NYSE and Toronto Stock Exchange, or the "*TSX*", and the Creditor Protection Proceedings.

### Distribution

Distributions of deferred compensation generally will be made in a lump sum cash payment upon the director's termination or resignation from service or death, whichever is earlier.

As a result of the Creditor Protection Proceedings, any payments owing in respect of awards made under the AbitibiBowater Deferred Compensation Plan cannot be made except pursuant to a court order or a confirmed plan or plans of reorganization. In addition, claims against the Company arising under the AbitibiBowater Deferred Compensation Plan may be subordinated in right of payment to claims of general unsecured creditors pursuant to provisions of the U.S. Bankruptcy Code.

### Historical Abitibi and Bowater Director Plans

Before the establishment of the AbitibiBowater Deferred Compensation Plan, directors were permitted to defer their cash compensation pursuant to the terms of the former plans of Abitibi and Bowater. In conjunction with the establishment of the AbitibiBowater Deferred Compensation Plan, any eligible director's outstanding balance determined as of December 31, 2008 under these plans along with any deferred stock unit award granted to a Bowater director under the Bowater Incorporated 2006 Stock Option and Restricted Stock Plan were transferred and credited to the AbitibiBowater Deferred Compensation Plan as an opening account balance. The respective Abitibi and Bowater plans were then terminated on December 31, 2008. As a result, the AbitibiBowater Deferred Compensation Plan is the only ongoing deferred compensation plan for non-employee directors.

Equity Component

In addition to the cash component of the directors' compensation, to ensure that the directors' interests are aligned with those of the stockholders, AbitibiBowater granted an annual equity-based award valued at $70,000 to each director. In 2008, AbitibiBowater used deferred stock units granted under AbitibiBowater's 2008 Equity Incentive Plan to deliver this component of director compensation. However, as a result of the significant decrease in the Company's stock price in 2008 and 2009, the value of all outstanding equity awards to directors has become negligible. In light of this decrease, the Creditor Protection Proceedings and subsequent

- 14 -

Powered by Morningstar® Document Research℠

delisting of the Company's stock from the NYSE and TSX, no equity-based awards were granted in 2009. Given the Creditor Protection Proceedings, the Company continues to review all of its options with respect to directors' compensation. New or modified directors' compensation arrangements, if any, may only be adopted and implemented pursuant to court order, a confirmed plan or plans of reorganization, or after emergence from the Creditor Protection Proceedings.

*Stock Ownership Guidelines*

AbitibiBowater has established stock ownership guidelines for directors to ensure that the directors would also be stockholders, thereby aligning their interests with those of the stockholders. However, measurements of compliance with existing guidelines have been suspended in light of equity market conditions and the Creditor Protection Proceedings. The Company expects to revisit and review the stock ownership guidelines after emergence from the Creditor Protection Proceedings.

## Compensation Discussion and Analysis

*Overview*

As discussed in *Item 1 – Business – Creditor Protection Proceedings* of the Original 10-K, AbitibiBowater and certain of its subsidiaries are restructuring in connection with the Creditor Protection Proceedings. As a result, AbitibiBowater's priority has been to evaluate, restructure and reposition its businesses for emergence. Cash preservation has been chief among AbitibiBowater's goals during the Creditor Protection Proceedings, which led to a suspension of the annual bonus component of the executive compensation program for 2009, as more fully described below. In addition, in 2009, AbitibiBowater did not grant any equity awards, which were previously a significant component of the program. Further, even though management incentive plans rewarding performance during the reorganization are often adopted by companies restructuring pursuant to Chapter 11, the Human Resources and Compensation Committee, upon management's recommendation, decided not to adopt such a plan. The impact of the Creditor Protection Proceedings and the Human Resources and Compensation Committee's decision to not implement the bonus and equity award components of its compensation program or offer a management incentive plan during the reorganization proceedings has led to a significant decrease in total compensation in 2009. Given the Creditor Protection Proceedings, the Company continues to review all of its options with respect to executive compensation. Any new or modified executive compensation arrangements may only be adopted and implemented pursuant to court order, a confirmed plan or plans of reorganization, or after emergence from the Creditor Protection Proceedings.

As a result of the foregoing, this year's Compensation Discussion and Analysis focuses on the 2009 compensation paid in 2009 as well as a discussion on the compensation structure as adopted by AbitibiBowater at the time of the combination and described in *Item 1 – Business – Creditor Protection Proceedings* of the Original 10-K. This discussion is intended to provide a better understanding of the Company's executive compensation program as impacted by the Creditor Protection Proceedings.

- 15 -

Powered by Morningstar® Document Research℠

## Objectives

At the time of the combination, AbitibiBowater adopted a compensation program designed to meet the following objectives:

- to attract team members with superior management ability, insight and judgment;

- to retain valued members of the executive team throughout the business cycles typical in the forest products industry;

- to motivate and reward members of the executive group for achieving short-, mid- and long-term Company results;

- to have a significant portion of the compensation package linked to the achievement of specific financial measures; and

- to ensure that executives recognize the close link between their personal interest and the creation of stockholder value.

The Human Resources and Compensation Committee originally developed the following four principles to establish a pay for performance model supporting the objectives described above and guiding specific decisions regarding executive compensation:

- **Market competitiveness:** The compensation for executives should be competitive with compensation of executives of comparable peer companies and take into consideration Company and business unit results relative to the results of peers.

- **Performance-based:** Executive compensation levels should reflect Company, business unit and individual results based on specific quantitative and qualitative objectives established at the start of each financial year in keeping with short-, mid- and long-term strategic objectives.

- **Aligned with stockholder interests:** The annual incentive plans have and should incorporate short-term financial and operational performance goals, the attainment of which is expected to enhance stockholder value. Further, stock options and restricted stock units, coupled with stock ownership guidelines requiring senior executives to own stock with a value equal to a specified multiple of their base salaries, should ensure that the executives have a substantial ownership interest consistent with those of the Company's stockholders.

- **Individual considerations:** The compensation levels are also designed to reflect individual factors such as scope of responsibility, experience and performance against individual measures.

The Company decided not to apply the pay for performance model. Instead, the Company focused on preserving cash and restructuring its businesses through the Creditor Protection Proceedings, as discussed in detail below.

- 16 -

*Role of Human Resources and Compensation Committee and Compensation Consultants*

At the beginning of each year, the Human Resources and Compensation Committee, with the assistance of the Nominating and Governance Committee, assesses the performance goals and objectives of the president and chief executive officer and makes recommendations to the board as to the amounts and individual elements of his total compensation. The independent directors of the board ultimately approve the final compensation package for the president and chief executive officer. For the Company's other executive officers, namely the chief financial officer and the executive officers who report directly to the president and chief executive officer, the Human Resources and Compensation Committee evaluates and approves all compensation packages and awards.

The Human Resources and Compensation Committee has, as part of its charter, the authority to select and retain its own independent advisors to provide guidance on the competitiveness and appropriateness of the compensation programs for the president and chief executive officer and the other top executive officers. This advice typically pertains to base salaries, short- and long-term incentives, pension design, benefits, perquisites, employment and change in control provisions, analysis of performance factors used to determine incentive awards and payouts and related pay-for-performance analysis.

Mercer Human Resource Consulting, or "*Mercer*", provided assistance in developing a 2009 annual incentive program. However, the Human Resources and Compensation Committee decided not to implement the program. In 2009, Mercer was engaged to gather information and provide advice and counsel on various executive compensation matters related to post-emergence issues.

While external information and advice have been used in the ongoing assessment of the executive compensation programs, the Human Resources and Compensation Committee and the board retained the full responsibility for all decisions related to the Company's compensation programs and plans as well as their implementation.

*Compensation Structure*

2009

In prior years, the Company and its predecessors used a pay-for-performance framework. Since 2008, as a result of market conditions and various decisions made by the Human Resources and Compensation Committee, the Company delivered total earned pay to named executive officers at levels well below what was intended or expected. In prior years, the compensation framework of the Company included a weighted mix of the following elements: base salary, an annual bonus, equity awards, retirement benefits, certain perquisites and severance/change in control arrangements. With the market deterioration and the Creditor Protection Proceedings, the Human Resources and Compensation Committee decided to preserve cash and minimize business risk by eliminating the annual bonus and equity award elements of the compensation package until emergence from the Creditor Protection Proceedings. In addition, it decided not to offer a management incentive plan in 2009. The following discusses each element of compensation paid in 2009, the reason the Company paid each element, and how it was determined.

- 17 -

Powered by Morningstar® Document Research℠

*Base salary*

AbitibiBowater provides senior management with a level of assured cash compensation in the form of base salary. The Human Resources and Compensation Committee set current base salary levels in 2008 based on competitive market data at comparable companies considering the scope of the individual's responsibilities relative to the responsibilities of executives at those companies as well as the executives' professional status and accomplishments. Following the combination, the Company believed that salary increases for executive officers should be made only under one or more of the following circumstances: (i) assumption of significantly greater responsibility, (ii) outstanding achievement that leads to improved profitability and/or (iii) adjustment of base salary that is considerably below the 50th percentile of pay for similar positions at comparable companies. Although competitive pay is important, the Company's focus on improving its performance and preserving cash caused the Human Resources and Compensation Committee to freeze salaries for senior executives in 2008 and salaries have remained frozen since.

Under the terms of their employment agreements, the salaries of all named executive officers are set in U.S. dollars. In the case of Pierre Rougeau, Alain Grandmont, Jacques P. Vachon and Jon Melkerson, their salary is converted monthly, for payroll and fiscal purposes, to Canadian dollars, using the previous month's average exchange rate.

*Retirement plans*

The executive officers participate in both a tax-qualified retirement plan and a supplemental retirement plan, subject to either U.S. or Canadian law. The tax-qualified retirement plans are offered to all eligible employees (not just executives), but limit the pay that may be considered pursuant to the applicable tax law. The executive officers may receive their retirement benefits through either a pension plan program, a defined contribution plan program or both. Benefits provided through pension plans are described more fully under *Pension Benefits*. The defined contribution plan benefits are described under *Nonqualified Deferred Compensation for 2009*.

The supplemental retirement plans provide retirement benefits (either under a pension plan formula or a savings plan formula) to account for benefits lost due to limits on the amount of compensation that may be taken into account under the tax-qualified retirement plans. The supplemental plans are paid using the Company's general assets. As a result of the Creditor Protection Proceedings, all payments to retirees pursuant to the supplemental plans have been suspended and will not resume except pursuant to a court order or pursuant to a confirmed plan or plans of reorganization. The Company expects that most benefits under the supplemental retirement plans will constitute prepetition claims against the Company that will be subject to compromise under a confirmed plan or plans of reorganization.

*Severance and Change in Control Arrangements*

AbitibiBowater believes that it should provide reasonable severance benefits to its employees. With respect to senior executives, these severance benefits should reflect the fact that it may be difficult for employees to find comparable employment within a short period of time. Severance benefits should help provide an opportunity for the Company and former employees to part ways in an efficient and effective manner.

- 18 -

Powered by Morningstar® Document Research℠

In the event of a change in control, AbitibiBowater believes that the interests of stockholders will be best served if the interests of the Company's senior executives are aligned with them, and providing change in control benefits should eliminate, or at least reduce, the reluctance of senior executives to pursue potential change in control transactions that may be in the best interests of stockholders.

The named executive officers generally retained the severance and change in control benefits that Abitibi or Bowater, as the case may be, provided them. These benefits are further described below in *Severance and Change in Control Arrangements*. However, like all other elements of the executive compensation program, the nature and scope of these benefits are under review as part of the plan or plans of reorganization. Further, severance and change in control benefits would not be paid to the Company's named executive officers as a result of the Creditor Protection Proceedings, except pursuant to a court order or a confirmed plan or plans of reorganization.

### Perquisites

The named executive officers are entitled to receive a $12,000 allowance per year to cover perquisites, which allowance is intended to cover expenses for fiscal and financial advice, tax preparation, and such other perquisites as chosen by the executive. If an executive requires tax preparation assistance for tax filings in both the U.S. and Canada, the executive is entitled to an additional benefit of up to $5,000 to cover the costs of this tax assistance. The Company also provides named executive officers with a comprehensive annual medical examination. The Human Resources and Compensation Committee has the discretion to approve additional perquisites from time to time. The named executive officers are responsible for any tax consequences related to their use and receipt of the perquisites. The Company does not provide any additional tax gross-ups for any perquisites.

Intended Compensation Structure

To provide a better understanding of the Company's intended compensation program, it is useful to look back at the elements of executive compensation set by the Human Resources and Compensation Committee in 2008. In 2008, in addition to the above elements, the Human Resources and Compensation Committee provided an annual bonus opportunity and equity awards. As a result, in 2008, the weighted mix of the elements discussed above, the annual bonus opportunity and equity awards was as follows. The mix for named executive officers favored a predominately performance-based and long-term compensation package while lower levels of management received a greater portion of their compensation in base salary and annual incentives.

| Level | Base Salary | Annual Incentive | Mid/Long-Term Incentive |
|---|---|---|---|
| **President and Chief Executive Officer** | 23% | 18% | 59% |
| **CFO / Senior Vice Presidents** (Newsprint & Commercial Printing and Coated Papers)[1] | 34% | 24% | 42% |
| **Senior Vice Presidents** (Wood Products ) | 39% | 23% | 38% |
| **Senior Vice Presidents** (Support Functions) **& Vice Presidents** (Newsprint & Commercial Printing and Coated Papers) | 43% | 19% | 38% |
| **Vice Presidents** (Direct Reports to Senior Vice Presidents) | 57% | 21% | 22% |

(1)    During the restructuring process, the executive team was downsized. The senior vice president, newsprint was appointed executive vice president, operations and sales and, as such, is responsible for all paper products, and the senior vice president, commercial printing and coated papers was appointed executive vice president, human resources and supply chain. Their compensation mix has remained unchanged despite their respective expanded responsibilities.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010          Powered by Morningstar® Document Research℠

*Annual Bonus*

When the Company established the 2008 Annual Incentive Plan, the Plan was designed to provide an incentive to executives to meet pre-established short-term financial and operational performance goals administered by the Human Resources and Compensation Committee. The 2008 Annual Incentive Plan set performance goals for six metrics: operational excellence, cash return on capital employed, operating profit, individual performance, synergy attainment and a financial reduction factor. Further, there was a holdback feature of 20% based on individual or group performance goals. The annual bonus was designed to focus executives on the objectives approved by the Human Resources and Compensation Committee for a particular year, including divisional goals or individual goals set by the Human Resources and Compensation Committee or management.

The bonus opportunity for 2008 took into account performance in November and December 2007, upon the decision of the Human Resources and Compensation Committee to carry over performance post-closing of the combination to 2008 for bonus payment purposes. Consequently, any bonus payment amount in respect of the 2008 annual award would have been multiplied by 14/12 in order to reflect performance of the Company at the end of 2007 after the combination was consummated. The Company ultimately did not pay the 2008 bonus because the Human Resources and Compensation Committee, on management's recommendation in 2009, conditioned payment on achievement of two consecutive quarters of net positive operating cash flow in 2009 (defined as cash from operations minus capital expenditures). This new metric was introduced as a consequence of the Company's financial situation, to preserve cash usage while the Company attempted to refinance its significant indebtedness and as a means of tying bonus payments to the repeated achievement of positive cash flows. No payment was made because the payment condition was not achieved.

As noted above, the 2008 Annual Incentive Plan set performance goals for six metrics, which were defined as follows:

- **Operational Excellence**—The performance result of each individual operation's objectives (at the division or site level), which includes at least three performance criteria from the following: volume, cost, overall equipment efficiency, quality and safety.

- **Cash Return on Capital Employed ("*Cash ROCE*")**—This was defined as earnings before interest, taxes, depreciation and amortization, or "*EBITDA*", divided by the average over a 12-month period of total assets minus accounts payable and accrued liabilities minus income tax payable. For the 12-month period ending September 30, 2008, cash ROCE performance of the Company was measured against the following peer group in the United States: Domtar Corporation, International Paper Company, MeadWestvaco Corp., Smurfit-Stone Container Corporation and Weyerhaeuser Company.

- **Operating Profit**—This was defined as the EBITDA result for the Company in 2008 compared with an annual EBITDA forecast.

- **Individual Performance Component**—Each participant was given individual performance objectives, which we refer to as the "*key objectives*", by the participant's

- 20 -

Powered by Morningstar® Document Research℠

reporting manager. At the end of the calendar year, a potential bonus for each participant was calculated based on the results for the other four metrics: Operational Excellence, Cash ROCE, Operating Profit and the Financial Reduction Factor. Participants in the 2008 Annual Incentive Plan were eligible to receive up to 80% of the computed payout based on the results of the performance goals. The remaining bonus portion of 20% was discretionary and could be earned in part, in full or in excess of 20% based on individual performance.

- **Synergy Attainment**—In addition to the regular bonus, a separate award was based on synergy attainment, which we refer to as the "*Synergy Bonus.*" Final savings were based on the annualized quarterly run rate for the last quarter of 2008, which is the average ongoing costs for that quarter multiplied by four, and is compared to the 2006 year-end baseline for synergy calculation.

- **Financial Reduction Factor**—Bonus results under both the 2008 regular bonus and the Synergy Bonus could be reduced by 50% for the top executives if the Company's cash position (cash from operations minus capital expenditures) was negative.

The Human Resources and Compensation Committee had discretion to adjust any or all awards based on any individual non-financial goals established for the executive officers. These goals were qualitative in nature and did not contain any specific quantitative targets or thresholds. No specific weighting was assigned to any particular non-financial goal. The Human Resources and Compensation Committee also had discretion to cancel any or all awards despite achievement of performance measures. On management's recommendation, the Human Resources and Compensation Committee utilized its discretion to apply additional conditions for payment of the 2008 bonus, which conditions were not met. As a result, the Company did not pay a bonus for 2008 performance.

*Equity awards*

AbitibiBowater adopted the 2008 Equity Incentive Plan to enable the grants of common stock-based awards to employees. When the plan was adopted, the Company intended to make equity awards to executive officers at the Human Resources and Compensation Committee's first or second meeting each year following the availability of the financial results for the prior year. This would have permitted the Human Resources and Compensation Committee to consider the prior year's performance and expectations for the current year. Equity awards are generally based on a percentage of salary, but can be adjusted on a discretionary basis, based on past year's performance and other pertinent factors. The 2008 awards were made as early as practicable in the year in order to maximize the positive incentive component associated with the awards. The board had intended that the 2008 grants of restricted stock units, or "*RSUs*", and stock option awards would not only retain their initial value, but also serve to deliver long lasting appreciation to recipients so that 2008 grants made would represent a large part of the overall total long-term compensation package. However, those awards lost almost all of their value. As a result of the Creditor Protection Proceedings, settlement of the awards will be made only pursuant to a court order or a confirmed plan or plans of reorganization. In addition, claims against the Company arising under these plans may be subordinated in right of payment to claims of general unsecured creditors pursuant to provisions of the U.S. Bankruptcy Code.

- 21 -

*Stock ownership guidelines*

AbitibiBowater developed stock ownership guidelines applicable to senior management to ensure that senior executives would also be stockholders and thus their interests would be aligned with stockholders' interests. However, measurement of compliance with existing guidelines has been suspended as a result of equity market conditions and the Creditor Protection Proceedings. The Company expects to revisit and review the stock ownership guidelines after emergence from the Creditor Protection Proceedings.

*Deductibility of compensation—Section 162(m) of the Code*

In order to maintain flexibility to attract and retain qualified executives, the Company allows for compensation that is not deductible under Section 162(m) of the Code and it will continue to do so in the future if it determines such approach to be in the best interests of the Company.

*Compensation Committee Report*

The following report does not constitute soliciting material and is not considered filed or incorporated by reference into any other filing by AbitibiBowater under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

The Human Resources and Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis above with management and, based on such review and discussion, the Human Resources and Compensation Committee recommended to the board that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K/A.

Hon. Togo D. West, Jr. (Chair)
John Q. Anderson
Jacques Bougie, O.C.
Richard B. Evans
Anthony F. Griffiths
Ruth R. Harkin

- 22 -

Powered by Morningstar® Document Research℠

Tabular Disclosure of Executive Compensation

The following table sets forth information concerning all compensation earned by the Company's named executive officers for 2009, 2008 and 2007:

## SUMMARY COMPENSATION TABLE FOR 2009

| Name and Principal Position | Year | Salary | Bonus(1) | Stock Awards(2) | Option Awards(3) | Non-Equity Incentive Plan Compensation(4) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(5) | All Other Compensation(6) | Total |
|---|---|---|---|---|---|---|---|---|---|
| David J. Paterson, President & Chief Executive Officer | 2009 | $ 900,000 | $ — | $ — | $ — | $ — | $ — | $ 195,455 | $ 1,095,455 |
| | 2008 | 900,000 | — | 1,493,770 | 1,174,960 | — | — | 519,114 | 4,087,844 |
| | 2007 | 900,000 | 380,970 | 1,299,065 | 427,336 | 174,834 | — | 420,372 | 3,602,577 |
| William G. Harvey, Executive Vice President and Chief Financial Officer | 2009 | 425,000 | — | — | — | — | 67,172(8) | 101,393 | 593,565 |
| | 2008 | 425,000 | — | 442,337 | 347,850 | — | — | 194,069 | 1,409,256 |
| | 2007 | 375,652 | 377,725 | 474,492 | 47,808 | 46,922 | 80,881 | 189,295 | 1,592,775 |
| Pierre Rougeau, Executive Vice President, Operations and Sales | 2009 | 450,000 | — | — | — | — | 356,548(8) | 118,858 | 925,406 |
| | 2008 | 450,000 | — | 442,337 | 347,850 | — | — | 15,287 | 1,255,474 |
| | 2007 | 431,104 | 287,981 | 217,654 | 144,802 | 95,853 | 196,691 | 19,681 | 1,393,766 |
| Alain Grandmont, Executive Vice President, Human Resources and Supply Chain | 2009 | 425,000 | — | — | — | — | 727,343(8) | 18,610 | 1,170,953 |
| | 2008 | 425,000 | — | 442,337 | 347,850 | — | — | 16,260 | 1,231,447 |
| | 2007 | 403,119 | 199,341 | 180,970 | 120,672 | 118,275 | 253,536 | 12,556 | 1,288,469 |
| Jacques P. Vachon, Senior Vice President Corporate Affairs & Chief Legal Officer(9) | 2009 | 340,000 | — | — | — | — | 477,799 | 13,779 | 831,578 |
| James T. Wright, Senior Vice President – Human Resources(10) | 2009 | 340,000 | — | — | — | — | 12,836(8) | 85,103 | 437,939 |
| | 2008 | 340,000 | — | 295,372 | 231,900 | — | 318,686(8) | 295,088 | 1,481,046 |
| | 2007 | 312,859 | 342,802 | 238,717 | 41,576 | 39,466 | 113,020 | 42,982 | 1,131,422 |
| Jon Melkerson, Vice President, International and Pulp Sales(9) | 2009 | 325,000 | 78,376(7) | — | — | — | 186,584 | 97,279 | 687,239 |

(1)  Amounts in this column reflect non-performance based bonuses such as retention or other *ad hoc* bonuses.

(2)  Amounts in this column reflect the aggregate grant date fair value of RSUs granted in 2007 and 2008. No RSUs were granted in 2009.

(3)  Amounts in this column reflect the aggregate grant date fair value of nonqualified stock option awards. No stock options were awarded in 2009.

(4)  No annual bonus was paid in 2009 for 2008 performance and an annual bonus program was not established for 2009 performance due to Company restructuring, as further described above in *Compensation Discussion and Analysis*.

(5)  Amounts in this column reflect the actuarial increase in the present value of the named executive officers' benefits under applicable U.S. tax-qualified, U.S. supplemental, Canadian registered (*i.e.*, tax-qualified) and Canadian supplemental pension plans established by Abitibi, Bowater or AbitibiBowater using interest rate and mortality rate assumptions consistent with those used in the Company's financial statements. In 2009, the interest rate and mortality assumptions changed, and the actuarial increases reflected in the table for 2009 are attributable to such changes in the case of Messrs. Rougeau and Melkerson, and partially attributable to such changes in the case of Messrs. Harvey, Grandmont and Vachon. For Messrs. Harvey, Grandmont and Vachon, the actuarial increase is also attributable to their additional accruals. There were no above-market or preferential earnings on nonqualified deferred compensation for the named executive officers in 2007, 2008 or 2009. A discussion of pension benefits is provided after the Pension Benefits Table below.

(6)  Amounts in this column include the following contributions to defined contribution retirement plans:

- for each former Bowater named executive officer, matching contributions were allocated to such individuals pursuant to the AbitibiBowater Inc. Retirement Savings Plan (the 401(k) plan) and the AbitibiBowater Inc. Supplemental Retirement Savings Plan in the following amounts: Mr. Paterson, $164,860; Mr. Harvey, $74,915; and Mr. Wright, $61,960; and

- for Messrs. Rougeau and Melkerson, Company basic and additional contributions were allocated to such individuals pursuant to the Defined Contribution Pension Plan for Non-Unionized Employees of Abitibi-Consolidated Inc. (the registered defined contribution plan) and the AbitibiBowater Defined Contribution Supplemental Executive Retirement Plan in the following amounts: Mr. Rougeau, $101,238; and Mr. Melkerson, $73,116.

Additional perquisites for all named executive officers include (i) a $12,000 perquisite account covering personal transportation, fiscal/financial advice, etc., (ii) an additional benefit value of up to $5,000 for U.S. tax preparation for U.S. taxpayers who also have Canadian tax liabilities, (iii) a comprehensive annual medical examination, (iv) parking, and (v) vested RSU payments.

- 23 -

Powered by Morningstar® Document Research℠

(7) This amount represents a Cdn$100,000 discretionary performance and retention award granted to Mr. Melkerson on January 30, 2009. This amount was converted to U.S. dollars at the rate of $0.78376 on the date of payment. If Mr. Melkerson had left the Company at any time during 2009, the bonus was to be repaid to the Company.

(8) Due to a change in measurement date as required by FASB ASC 715, "Compensation – Retirement Benefits", the value of benefits accrued in 2008 is the annualized value of the total benefits accrued between September 30, 2007 and December 31, 2008.

(9) Messrs. Vachon and Melkerson were not named executive officers of the Company in 2007 or 2008. In accordance with existing SEC guidance, their 2007 and 2008 compensation is not reported in the Summary Compensation Table.

(10) Mr. Wright resigned from the Company due to retirement, effective January 1, 2010.

## Narrative Disclosure to Summary Compensation Table

The following is a discussion of the policies and agreements governing the compensation awarded to AbitibiBowater's named executive officers, as set forth in the Summary Compensation Table above. Compensation to which a named executive officer may be entitled upon a severance from employment, whether or not in connection with a change in control, is addressed below in *Severance and Change in Control Arrangements*.

### *Bonuses, cash incentive compensation and equity awards*

In 2007, bonuses were paid to Messrs. Paterson, Harvey and Wright pursuant to the 2007 Bowater Incorporated Annual Incentive Plan and to Messrs. Rougeau and Grandmont pursuant to the 2007 Abitibi-Consolidated Inc. Annual Bonus Plan. In 2008, the framework for a bonus program was set forth in the 2008 AbitibiBowater Annual Incentive Plan, but bonuses and cash incentive compensation were not paid to the named executive officers for 2008 performance. As noted above under above *Compensation Discussion and Analysis*, the Human Resources and Compensation Committee, on management's recommendation, conditioned payment of the 2008 bonus on two consecutive quarters of net positive operating cash flow in 2009, which condition was not achieved. To preserve cash and align named executive officer compensation with the interests of AbitibiBowater stockholders, the Human Resources and Compensation Committee elected not to establish a bonus program for 2009 performance. Moreover, although equity awards granted in prior years (up to and including 2008) lost their initial value before 2009, the Human Resources and Compensation Committee elected not to award any new equity grants in 2009 in light of the above considerations.

### *Employment agreements and offer letters*

AbitibiBowater has entered into written employment agreements or offer letters with all named executive officers. The material terms of each employment agreement or arrangement are identified below, but any severance arrangement to which a named executive officer may be subject upon certain termination events, whether or not in connection with a change in control, is described below under *Severance and Change in Control Arrangements*.

## Messrs. Paterson, Harvey and Wright

From May 1, 2006 until the closing of the combination, Mr. Paterson served as president and chief executive officer of Bowater pursuant to the terms of an employment agreement, which continues in effect with AbitibiBowater. Mr. Harvey and Mr. Wright each entered into an employment agreement with Bowater, also continuing in effect with AbitibiBowater after the closing of the combination. However, Messrs. Harvey and Wright were each provided offer letters by AbitibiBowater, establishing post-combination base salary, bonus target levels and addressing specific perquisites. In addition, AbitibiBowater provided Mr. Harvey with a new employment agreement.

- 24 -

The employment agreements with Messrs. Paterson and Harvey each continue in effect until death, disability, retirement or written notice of termination by the Company or the executive. Mr. Wright's employment agreement contained the same durational terms and continued in effect until his retirement on January 1, 2010, except for the ongoing restrictive covenants as described below.

Mr. Paterson is entitled to an annual base salary of $900,000. Under the terms of his employment agreement, Mr. Paterson was eligible to receive an annual bonus with a target payout of 68% of his base salary and a maximum payout of 200% of his target bonus, subject to reduction if there was an across the board reduction that affected all management personnel. For the 2008 performance period, the Human Resources and Compensation Committee set Mr. Paterson's target bonus at 75%, with the maximum payout remaining at 200% of the target bonus. Mr. Harvey is entitled to a base salary of $425,000 and is eligible to receive an annual bonus with a target payout of 70% of base salary. Before his retirement from the Company, Mr. Wright was entitled to a base salary of $340,000 and was eligible to receive an annual bonus with a target payout of 50% of base salary.

Messrs. Paterson, Harvey and Wright are all subject to an ongoing covenant not to disclose confidential information and covenants not to compete with the Company and not to solicit customers of the Company during the term of the agreement. Mr. Paterson's covenants not to compete or solicit customers extend for two years following termination while Messrs. Harvey's and Wright's post-employment restrictive covenant period is one year following termination. The scope of these covenants is more fully described in each executive's employment agreement.

Messrs. Rougeau, Grandmont, Vachon and Melkerson

Messrs. Rougeau, Grandmont, Vachon and Melkerson did not have separate employment agreements, but were provided offer letters by AbitibiBowater establishing the parameters for base salary, bonus targets and perquisites. Pursuant to the terms of their offer letters, Messrs. Rougeau, Grandmont, Vachon and Melkerson are each entitled to an annual base salary of $450,000, $425,000, $340,000 and $325,000, respectively, and to participate in a short-term incentive plan with a bonus target level of 70% of base salary in the case of Messrs. Rougeau and Grandmont and 50% of base salary in the case of Messrs. Vachon and Melkerson. In addition, in 2007, Mr. Rougeau received a signing bonus of $50,000, and Mr. Grandmont received a signing bonus of $30,000.

Future employment agreements

Due to the Creditor Protection Proceedings, the Company continues to review all of its options with respect to its employment agreements with executive officers. The Company expects that the composition of its board of directors, and the identity of its executive officers, may change upon emergence from the Creditor Protection Proceedings and will be dictated, in part, by any confirmed plan or plans of reorganization. In the meanwhile, executives continue to participate in various benefit plans such as pension, group insurance and vacation until informed otherwise.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

Equity Awards

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END 2009

| Name | Grant Date | Option Awards | | | | | Stock Awards | | | Equity Incentive Plan Awards: Market Value of Unearned Units That Have Not Vested |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options | | Equity Incentive Plan Awards: Unearned Options | Option Exercise Price | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (2) | Market Value of Shares or Units That Have Not Vested (2) | Equity Incentive Plan Awards: Number of Unearned Units That Have Not Vested (2) | |
| | | Exercisable | Unexercisable | | | | | | | |
| **David J. Paterson** | 05-01-06 | 130,000 | — | — | $ 52.74 | 05-01-2016 | — | $ — | — | $ — |
| | 01-30-07 | 16,323 | 8,160[1] | — | 53.60 | 01-30-2017 | 8,079[1] | 889 | — | — |
| | 06-04-08 | 38,000 | 114,000[4] | — | 13.08[6] | 03-25-2018 | 59,089[5] | 6,500 | 59,089[5] | 6,500 |
| **William G. Harvey** | 01-25-00 | 5,200 | — | — | 92.31 | 01-25-2010 | — | — | — | — |
| | 05-10-00 | 4,212 | — | — | 105.46 | 05-10-2010 | — | — | — | — |
| | 01-30-01 | 5,200 | — | — | 99.87 | 01-30-2011 | — | — | — | — |
| | 01-29-02 | 5,200 | — | — | 90.43 | 01-29-2012 | — | — | — | — |
| | 01-28-03 | 5,200 | — | — | 78.35 | 01-28-2013 | — | — | — | — |
| | 01-27-04 | 5,200 | — | — | 86.58 | 01-27-2014 | — | — | — | — |
| | 01-25-05 | 5,200 | — | — | 71.72 | 01-25-2015 | — | — | — | — |
| | 05-10-05 | 5,200 | — | — | 61.67 | 05-10-2015 | — | — | — | — |
| | 05-10-06 | 3,003 | — | — | 50.67 | 05-10-2016 | — | — | — | — |
| | 01-30-07 | 1,826 | 913[1] | — | 53.60 | 01-30-2017 | 1,707[1] | 188 | — | — |
| | 06-04-08 | 11,250 | 33,750[4] | — | 13.08[6] | 03-25-2018 | 17,498[5] | 1,925 | 17,497[5] | 1,925 |
| **Pierre Rougeau** | 09-04-01 | 11,270 | — | — | 204.71[3] | 09-04-2011 | — | — | — | — |
| | 02-26-02 | 4,696 | — | — | 222.96[3] | 02-26-2012 | — | — | — | — |
| | 03-04-03 | 6,261 | — | — | 183.62[3] | 03-04-2013 | — | — | — | — |
| | 02-24-04 | 4,070 | — | — | 174.92[3] | 02-24-2014 | — | — | — | — |
| | 03-01-05 | 5,635 | — | — | 102.44[3] | 03-01-2015 | — | — | — | — |
| | 02-28-06 | 4,695 | 1,566[4] | — | 67.96[3] | 02-28-2016 | — | — | — | — |
| | 03-06-07 | 3,756 | 3,757[4] | — | 54.90[3] | 03-06-2017 | — | — | — | — |
| | 06-04-08 | 11,250 | 33,750[4] | — | 13.08[6] | 03-25-2018 | 17,498[5] | 1,925 | 17,497[5] | 1,925 |
| **Alain Grandmont** | 02-28-00 | 1,928 | — | — | 224.63[3] | 02-28-2010 | — | — | — | — |
| | 02-26-01 | 3,023 | — | — | 197.01[3] | 02-27-2011 | — | — | — | — |
| | 02-26-02 | 3,757 | — | — | 222.96[3] | 02-26-2012 | — | — | — | — |
| | 03-04-03 | 4,696 | — | — | 183.62[3] | 03-04-2013 | — | — | — | — |
| | 02-24-04 | 4,070 | — | — | 174.92[3] | 02-24-2014 | — | — | — | — |
| | 03-01-05 | 5,635 | — | — | 102.44[3] | 03-01-2015 | — | — | — | — |
| | 02-28-06 | 4,695 | 1,566[4] | — | 67.96[3] | 02-28-2016 | — | — | — | — |
| | 03-06-07 | 3,130 | 3,131[4] | — | 54.90[3] | 03-06-2017 | — | — | — | — |
| | 06-04-08 | 11,250 | 33,750[4] | — | 13.08[6] | 03-25-2018 | 17,498[5] | 1,925 | 17,497[5] | 1,925 |
| **Jacques P. Vachon** | 02-28-00 | 2,273 | — | — | 224.63[3] | 02-28-2010 | — | — | — | — |
| | 02-26-01 | 2,868 | — | — | 197.01[3] | 02-27-2011 | — | — | — | — |
| | 02-26-02 | 3,757 | — | — | 222.96[3] | 02-26-2012 | — | — | — | — |
| | 03-04-03 | 3,444 | — | — | 183.62[3] | 03-04-2013 | — | — | — | — |
| | 02-24-04 | 3,131 | — | — | 174.92[3] | 02-24-2014 | — | — | — | — |
| | 03-01-05 | 3,757 | — | — | 102.44[3] | 03-01-2015 | — | — | — | — |
| | 02-28-06 | 3,287 | 1,096[4] | — | 67.96[3] | 02-28-2016 | — | — | — | — |
| | 03-06-07 | 2,348 | 2,348[4] | — | 54.90[3] | 03-06-2017 | — | — | — | — |
| | 06-04-08 | 5,750 | 17,250[4] | — | 13.08[6] | 03-25-2018 | 8,945[5] | 984 | 8,944[5] | 984 |
| **James T. Wright** | 01-25-00 | 7,800 | — | — | 92.31 | 01-25-2010 | — | — | — | — |
| | 05-10-00 | 4,888 | — | — | 105.46 | 05-10-2010 | — | — | — | — |
| | 01-30-01 | 7,800 | — | — | 99.87 | 01-30-2011 | — | — | — | — |
| | 01-29-02 | 7,800 | — | — | 90.43 | 01-29-2012 | — | — | — | — |
| | 01-28-03 | 7,800 | — | — | 78.35 | 01-28-2013 | — | — | — | — |
| | 01-27-04 | 7,800 | — | — | 86.58 | 01-27-2014 | — | — | — | — |
| | 01-25-05 | 7,800 | — | — | 71.72 | 01-25-2015 | — | — | — | — |
| | 05-10-06 | 2,610 | — | — | 50.67 | 05-10-2016 | — | — | — | — |
| | 01-30-07 | 1,588 | 794[1] | — | 53.60 | 01-30-2017 | 1,484[1] | 163 | — | — |
| | 06-04-08 | 7,500 | 22,500[4] | — | 13.08[6] | 03-25-2018 | 11,684[5] | 1,285 | 11,684[5] | 1,285 |
| **Jon Melkerson** | 02-28-00 | 270 | — | — | 224.63[3] | 02-28-2010 | — | — | — | — |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 02-26-01 | 358 | — | — | 197.01[3] | 02-27-2011 | — | — | — | — |
| 02-26-02 | 455 | — | — | 222.96[3] | 02-26-2012 | — | — | — | — |
| 03-04-03 | 939 | — | — | 183.62[3] | 03-04-2013 | — | — | — | — |
| 02-24-04 | 751 | — | — | 174.92[3] | 02-24-2014 | — | — | — | — |
| 03-01-05 | 626 | — | — | 102.44[3] | 03-01-2015 | — | — | — | — |
| 02-28-06 | 704 | 235[4] | — | 67.96[3] | 02-28-2016 | — | — | — | — |
| 03-06-07 | 939 | 939[4] | — | 54.90[3] | 03-06-2017 | — | — | — | — |
| 06-04-08 | 5,750 | 17,250[4] | — | 13.08[6] | 03-25-2018 | 8,945[5] | 984 | 8,944[5] | 984 |

(1)    One third vested January 30, 2008, one third vested on January 30, 2009 and one third vested on January 30, 2010.

(2)    In 2010, the remaining outstanding RSU awards will vest as follows:

- January 30, 2010: Mr. Paterson, 8,079; Mr. Harvey, 1,707; Mr. Wright, accelerated to January 1, 2010 upon his retirement, 1,484.

- December 31, 2010: Mr. Paterson, 118,178; Mr. Harvey, Mr. Rougeau and Mr. Grandmont, 34,995; Mr. Wright, 23,368; Mr. Vachon and Mr. Melkerson, 17,889.

- If terminated during 2010, Mr. Rougeau, Mr. Grandmont, Mr. Vachon and Mr. Melkerson would receive 3,773; 2,636; 1,397 and 871 RSUs, respectively.

(3)    Option exercise prices were converted as of October 29, 2007 into U.S. dollars using the exchange rate on that date of $1.048.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010                    Powered by Morningstar® Document Research℠

(4) Each option vests ratably over a four-year period.

(5) The 2008 RSU awards are scheduled to vest on December 31, 2010 as follows. If the executive remains employed, 50% of the RSU award will vest. If the Company's financial results meet or exceed specified thresholds over a 3-year performance period from 2008 to 2010, the remaining 50% of the RSU award will vest. At this time, the Company does not expect the performance thresholds to be met, in which case only 50% of the RSUs are anticipated to vest on December 31, 2010.

(6) The exercise price for the options was computed using the average of the high and low stock price as quoted on the NYSE on March 25, 2008, which was the date the options were issued to employees; however, in accordance with FASB ASC 718, Compensation - Stock Compensation, the grant date fair value was determined on June 4, 2008, which was the date of shareholder approval of the 2008 Equity Incentive Plan.

## OPTION EXERCISES AND STOCK VESTED FOR 2009

None of the named executive officers exercised any stock options during the fiscal year ended December 31, 2009. Other than RSUs subject to vesting and settlement upon achievement of synergy thresholds established following the combination (referred to as Synergy RSUs), RSUs that vested in 2009 before the Creditor Protection Proceedings began were settled in AbitibiBowater common stock. However, as a result of the Creditor Protection Proceedings, no other stock awards that vested in 2009 were settled. The remaining vested stock awards will be settled, if at all, pursuant to the terms of a confirmed plan or plans of reorganization.

| | Stock Awards | |
| | Number of shares acquired on vesting (#) | Value realized on vesting ($) |
| Name | | |
| --- | --- | --- |
| David J. Paterson | 36,263[1] | $ 26,755[3] |
| William G. Harvey | 3,261[1] | 2,285[3] |
| Pierre Rougeau | 4,889[2] | 538[4] |
| Alain Grandmont | 4,066[2] | 447[4] |
| Jacques P. Vachon | 3,042[2] | 335[4] |
| James T. Wright | 2,837[1] | 1,988[3] |
| Jon Melkerson | 1,280[2] | 141[4] |

(1) David J. Paterson: 8,079 RSUs (valued at $6,181) vested on January 30, 2009. In addition, 28,184 Synergy RSUs (valued at $20,574) vested on March 17, 2009 upon achievement of documented post-combination synergies of more than $300 million, but were not immediately settled and, due to the Creditor Protection Proceedings, are not permitted to be settled except pursuant to a court order or a confirmed plan or plans of reorganization.

William G Harvey: 1,554 RSUs vested on January 24, 2009 and 1,707 vested on January 30, 2009.

James T. Wright: 1,352 RSUs vested on January 24, 2009 and 1,485 vested on January 30, 2009.

(2) These RSUs were granted on March 6, 2007 under the Abitibi-Consolidated Inc. Restricted Share Unit Plan and all RSUs vested on December 31, 2009.

(3) The stock prices used in calculating the value realized were the average of the high and low share prices, as quoted on the Pink OTC Markets Inc. quotation service, or "*Pink Sheets*", on the following vesting dates:

- January 24, 2009: $0.630 (price as of Friday, January 23, 2009)
- January 30, 2009: $0.765
- March 17, 2009 $0.730

(4) The stock price used in calculating the value realized was the closing price of Company shares, as quoted on Pink Sheets on the vesting date ($0.110 per share).

### Pension Benefits

The table below shows the present value of accumulated benefits payable to each of the named executive officers, including the number of years of service credited to them under each applicable plan. The benefits were determined using the interest rates and mortality rate assumptions consistent with those used in the Company's financial statements.

- 27 -

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Name | Plan Name | Number of Years Credited Service | Present Value of Accumulated Benefit[1] | Payments During Last Fiscal Year |
|------|-----------|----------------------------------|------------------------------------------|-----------------------------------|
| David J. Paterson | n/a | — | $ — | $ — |
| William G. Harvey | Registered Plan (Canada) | 7.42 | 130,289 | — |
| | Supplemental Plan (Canada) | 7.42 | 28,002 | — |
| | Qualified Plan (U.S.) | 8.42 | 146,435 | — |
| Pierre Rougeau | Registered Plan (Canada) | 7.25 | 221,287 | — |
| | Supplemental Plan (Canada) | 12.25 | 1,003,707 | — |
| Alain Grandmont | Registered Plan (Canada) | 11.00 | 394,169 | — |
| | Supplemental Plan (Canada) | 25.58 | 2,330,036 | — |
| Jacques P. Vachon | Registered Plan (Canada) | 10.58 | 334,072 | — |
| | Supplemental Plan (Canada) | 24.50 | 1,332,284 | — |
| James T. Wright | Qualified Plan (U.S.) | 8.80 | 275,196 | — |
| Jon Melkerson | Registered Plan (Canada) | 4.50 | 127,187 | — |
| | Supplemental Plan (Canada) | 4.50 | 88,991 | — |
| | Qualified Plan (U.S.) | 18.00 | 160,365 | — |
| | Supplemental Plan (U.S.) | 18.00 | 285,927 | — |

(1)    The present value of accumulated benefits under U.S. qualified and supplemental pension plans and Canadian registered and supplemental pension plans sponsored by Abitibi, Bowater or AbitibiBowater is determined based on the assumptions used in the Company's financial statements, as described in Footnote 20 of the Consolidated Financial Statements, except that each named executive officer's retirement age was assumed to be the normal retirement age under the plan(s) in which he was a participant as of December 31, 2009. These assumptions are further described in the narratives below.

The following discussion describes the terms of the pension plans applicable to each named executive officer.

As a result of the Creditor Protection Proceedings, all payments to retirees pursuant to the supplemental plans have been suspended and will not resume except pursuant to a court order or a confirmed plan or plans of reorganization. The Company expects that most benefits under the supplemental retirement plans will constitute prepetition claims against the Company that will be subject to compromise under a confirmed plan or plans of reorganization.

*U.S. Pension Benefits of Former Bowater Executives*

Of the named executive officers, Messrs. Harvey and Wright currently have pension benefits payable from Bowater's qualified plan — the AbitibiBowater Inc. Retirement Plan (formerly named the Bowater Incorporated Retirement Plan). A "qualified plan" means the plan is qualified for favorable tax treatment under Section 401(a) of the Code and is available to all eligible employees (not just executives). In general, the Bowater pension plan formula provides a traditional pension plan formula based on years of service and a percentage of final average monthly compensation. Mr. Paterson has never been covered by any pension plan. His retirement benefits are provided through defined contribution plans, described further below. Further, no pension benefits are payable through supplemental pension plans, but benefits are payable under supplemental defined contribution plans as described below.

- 28 -

Bowater changed its retirement program by shifting to a predominantly defined contribution environment from a traditional defined benefit pension environment. In this regard, effective January 1, 2007, the Bowater pension plan was frozen to new entrants and to certain current employees who did not meet a threshold eligibility requirement for continued participation (determined as of December 31, 2006). For these affected individuals, including Messrs. Paterson and Harvey, retirement benefits were provided through a new enhanced defined contribution program described below. Mr. Wright was not among those determined as of December 31, 2006 to have been affected by this freeze and he continued to accrue benefits until December 31, 2007 (at which time his benefits were frozen under the Bowater pension plan).

Pension Formula

The Bowater pension plan provides an age 65 pension benefit equal to 52.5% of a participant's final average monthly compensation, proportionately reduced for each year of benefit service less than 35 years, minus 50% of his primary Social Security benefit, proportionately reduced for each year of benefit service less than 35 years. Participants with at least 10 years of service can begin this benefit, unreduced, at age 62. The plan also provides for a reduced early retirement benefit if the participant has attained age 50 and completed at least 10 years of service. The early retirement reduction is 4.5% per year before age 62.

The definition of compensation under the Bowater pension plan includes base salary and any annual incentive bonus. Final average monthly compensation is determined using the highest paying 60 consecutive calendar months out of the most recent 120 calendar months. As of December 31, 2009, final average compensation used under the Bowater pension plan was $207,000 for Mr. Harvey and $212,000 for Mr. Wright.

Time and form for payment

The Bowater pension plan provides for payment in an annuity with a participant option to select payment among different types of annuities, any of which will provide monthly payments for the life of the participant and, if elected, the life of the participant's beneficiary. Payment is made following termination from employment with AbitibiBowater and its related entities, and only upon an affirmative election by the participant. Mr. Wright retired on January 1, 2010 and elected payment of his benefits under the Bowater pension plan. Mr. Harvey is currently eligible to retire early and elect payment of his benefits under the plan.

Payments from the Bowater pension plan are permitted during the Creditor Protection Proceedings because payments are made from a trust qualified under the Code, which is exempt from the Creditor Protection Proceedings. However, the Pension Protection Act imposes certain restrictions on the types of payments that can be made during certain restricted periods. Payments that provide for "accelerated" payments (such as lump sums or certain annuity types) cannot be paid in order to preserve the maximum amount of assets for all participants. The Creditor Protection Proceedings are considered a restricted period. Because Mr. Wright retired and elected payment of his retirement benefit under the Bowater pension plan during the Creditor Protection Proceedings, he was limited to electing among the permissible payment annuity options. Similarly, if Mr. Harvey retires and elects payment during the Creditor Protection Proceedings, the permissible payment options available to him will also be limited.

- 29 -

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

Assumptions for Pension Benefits Table Values

The accrued benefit amounts identified in the Pension Benefits table above show the present value of the future monthly payments if calculated as a lump sum. An interest rate and mortality table providing for current life expectancies are used to calculate the present value amount as of December 31, 2009. The interest rate and mortality table used are the same as those used for AbitibiBowater's financial statements, which are a 6.20% interest rate and the RP2000 mortality table projected to 2010 with white collar adjustments and no presumption for pre-retirement mortality.

The amounts shown were also calculated assuming retirement at age 62 or current age, if greater, but no earlier than the earliest retirement age at which the participant can receive an unreduced benefit. In this regard, Mr. Wright became eligible to retire with an unreduced benefit on April 1, 2009.

*Canadian Pension Benefits of Former Bowater Executive*

Mr. Harvey

In addition to the pension benefits described above, Mr. Harvey accumulated 7.42 years of credited service in a Bowater Canadian registered plan and an unfunded Canadian supplemental plan before transferring to the United States on November 30, 1998. Pursuant to these plans, for each year of credited service in Canada, Mr. Harvey is entitled to a total pension at age 65 equal to 1.6% of final average earnings determined on November 30, 1998, indexed to the date of termination of employment based on the increase in Canadian average weekly earnings for the period. The pension would not be reduced if he is aged 60 or more upon retirement, and it would be reduced by 6% for each year retirement precedes age 60. Upon early retirement at age 60, for each year of credited service in Canada, Mr. Harvey is entitled to a bridge benefit equal to 1/35 of the maximum annual retirement pension payable under the Bowater Registered Plan.

The portion of the pension payable from the registered plan will be determined upon termination of employment or retirement based on the maximum pension payable under the Canadian Income Tax Act, or the "*Income Tax Act*", on that date.

The pension is payable for life subject to a five-year guarantee. Final average earnings are based on the 36 consecutive months before November 30, 1998, including 50% of target bonus. The resulting final average earnings are $130,883 as of November 30, 1998.

The accrued benefit amounts identified in the Pension Benefits table above show the present value of the future monthly payments if calculated as a lump sum. An interest rate and mortality table providing for current life expectancies are used to calculate the present value amount as of December 31, 2009. The interest rate and mortality table used are the same as those used for AbitibiBowater's financial statements, which are a 6.40% interest rate and the RP2000 mortality table projected to 2010 with white collar adjustments and no presumption for pre-retirement mortality. Benefits were calculated assuming Mr. Harvey's retirement at age 60 because he would be eligible to receive an unreduced pension and bridge benefit at that age.

- 30 -

*U.S. Pension Benefits of Former Abitibi Executive*

Mr. Melkerson

Retirement benefits for Mr. Melkerson are payable under the following defined benefit pension plans: the Abitibi Consolidated U.S. Retirement Plan, or *"Qualified Salaried Plan"*, a qualified defined benefit plan covering all U.S. salaried employees of Abitibi, and the AbitibiBowater U.S. Supplemental Executive Retirement Plan, or *"Abitibi U.S. SERP"*, a nonqualified supplemental plan. The Qualified Salaried Plan provides pension benefits based on earnings, service and age, and the Abitibi U.S. SERP provides a target benefit offset by the value of benefits provided under certain qualified plans including the Qualified Salaried Plan.

The Qualified Salaried Plan is a cash balance retirement plan that provides an account balance based upon accumulated interest and pay credits. The interest crediting rate used for a plan year is based upon the 30-year Treasury Rate for the month of November preceding the plan year. A participant's pay credits are based upon his age, and range from 4% to 8% of compensation. A participant's compensation includes his base salary and bonus. The Qualified Salaried Plan allows for the payment of a lump sum at the time of termination. Mr. Melkerson's benefit under the Qualified Salaried Plan includes service and pay through June 30, 2004, the date he transferred from the U.S. to Canada.

The Abitibi U.S. SERP provides an age 65 retirement benefit (if a participant has at least two years of service), equal to 2% of average annual compensation multiplied by years of credited service up to 35 years (reduced by amounts credited under certain qualified plans, including any amounts that have been commuted). Average annual compensation is the average of the Participant's annual base salary and paid bonuses the Participant received during the five consecutive calendar years during his last ten consecutive calendar years of continuous employment that results in the highest average annual amount, disregarding any paid bonuses in excess of 125% of the target bonus prescribed by the board for any such year. The total pension payable is unreduced if the participant retires at age 58 and the sum of his age and years of service is at least 80. If a participant is not eligible for an unreduced benefit and has completed 20 years of service, the total pension payable is reduced by 6% for each year (or 0.5% for each month) between his retirement date and the date he would have attained age 58 and the sum of his age and years of service would equal at least 80. If the participant has less than 20 years of service, the 6% per year (or 0.5% per month) reduction is calculated for each year before age 65 that the retirement occurs. Mr. Melkerson's benefit under the Abitibi U.S. SERP reflects his service through June 30, 2004 and all earnings through the date his benefit is calculated in conjunction with a distribution election (including his earnings earned as a Canadian employee).

The accrued benefit amounts identified in the Pension Benefits table above show the present value of the future monthly payments if calculated as a lump sum. An interest rate and mortality table providing for current life expectancies are used to calculate the present value amount as of December 31, 2009. The interest rate and mortality table used are the same as those used for AbitibiBowater's financial statements, which are a 6.20% interest rate and the RP2000 mortality table projected to 2010 with white collar adjustments and a presumption of pre-retirement mortality. Benefits were calculated assuming retirement at age 65.

- 31 -

Powered by Morningstar® Document Research℠

*Canadian Pension Benefits of Former Abitibi Executives*

Of the named executive officers, Messrs. Rougeau, Grandmont, Vachon and Melkerson have pension benefits payable under legacy Abitibi Canadian pension plans. Messrs. Grandmont and Vachon continue to actively participate in those plans, while pension benefits for Messrs. Rougeau and Melkerson were frozen effective January 1, 2009. The following describes the pension benefits payable under these plans.

Pension benefits under these Canadian pension plans are offered through a registered plan and a non-registered plan. In general, the plans' formulas provide a traditional pension plan formula based on years of credited service and a percentage of final average compensation. A "*registered plan*" means the plan is intended to be qualified for favorable tax treatment under the Income Tax Act and to apply to a broad base of employees. In contrast, a "*non-registered plan*" is not qualified for this favorable tax treatment and provides for retirement benefits to a select group of management and highly compensated employees in order to provide for additional pension benefits that cannot be provided under the registered plans because of statutory limitations or provide an overall benefit that is partially offset by the benefit provided under the registered plan.

The Abitibi registered plan is the Pension Plan for Executive Employees of Abitibi-Consolidated Inc., or the "*Abitibi Registered Plan*", and the non-registered plan is the AbitibiBowater Canadian Defined Benefit SERP, or the "*Canadian DB SERP*", which is now sponsored by AbitibiBowater. The Canadian DB SERP provides an overall pension benefit that is offset by the benefit payable under the Registered Plan, including any registered plan benefits that have been commuted. The Registered Plan limits the amount of the pension benefit payable due to statutory constraints.

AbitibiBowater changed its retirement program for Canadian employees by shifting to predominantly defined contribution plans from traditional pension plans. Effective January 1, 2009, the Abitibi Registered Plan and Canadian DB SERP were frozen to new entrants, as well as to current employees who did not meet a threshold eligibility requirement for continued participation, including Messrs. Rougeau and Melkerson. New entrants and non-eligible participants enrolled in new defined contribution plans. Messrs. Grandmont and Vachon were not among those affected by the freeze and continue to accrue benefits under the Abitibi Canadian pension plans.

Pension Formula

These Canadian pension plans generally provide total pension benefits equal to 2% of final average compensation multiplied by years of credited service with AbitibiBowater and its related entities, up to 35 years of service. However, as a result of the benefit service freeze described above, the total pension benefits for Messrs. Rougeau and Melkerson only take into account their years of credited service before January 1, 2009. Messrs. Rougeau, Grandmont, Vachon and Melkerson are each fully vested in their benefits under the Abitibi Canadian pension plans.

- 32 -

For years of credited service through December 31, 2008, final average compensation is the sum of (i) average monthly base salary based on the best 60 consecutive months of base salary within the last 120 months and (ii) the best five annual bonuses in the last ten years.

For years of credited service after December 31, 2008, final average compensation is the average of the five highest consecutive calendar years of eligible earnings in the last 10 years. Eligible earnings in a given calendar year is the sum of the base salary and the bonus paid under the annual incentive plan (excluding any special bonuses unless authorized by the Company). The paid bonus component is capped at 125% of the target bonus of each year.

Starting January 1, 2009, Messrs. Grandmont and Vachon are required to contribute to the Abitibi Registered Plan. Each executive's contributions are each equal to 5% of his pensionable earnings up to the U.S. compensation limit ($245,000 in 2009). Contributions are credited with interest at the average net rate of return of the pension fund of the Abitibi Registered Plan over the preceding two calendar years.

Participants are entitled to early retirement if they have attained age 55. The total pension payable is unreduced if the participant retires at age 58 and the sum of his age and years of service is at least 80. If a participant is not eligible for an unreduced benefit and has completed 20 years of service, the total pension payable is reduced by 6% for each year (or 0.5% for each month) between his retirement date and the date he would have attained age 58 and the sum of his age and years of service would equal at least 80. If the participant has less than 20 years of service, the 6% per year (or 0.5% per month) reduction is calculated for each year before age 65 that the retirement occurs. A participant who terminates employment with AbitibiBowater and its related entities for any reason before attaining age 55 is eligible for an unreduced pension payable at age 65, but may elect to receive a reduced pension at any time before age 65. If his employment was terminated involuntarily, his pension payable is reduced by 6% for each year (or 0.5% for each month) between the date payments commence and the date on or after attainment of age 58 that the sum of his age and years of service would equal at least 80. If his employment was terminated voluntarily, the 6% per year (or 0.5% per month) reduction is calculated for each year before age 65 that payments commence.

The Abitibi Human Resources and Compensation Committee granted five extra years of credited service under the Canadian DB SERP to Mr. Rougeau. As mentioned above, years of benefit service credited to Messrs. Rougeau and Melkerson were frozen on December 31, 2008, and effective January 1, 2009 they commenced participation in the Company's new defined contribution plans.

Time and form of payment

The Abitibi Canadian pension plans provides for payment in an annuity with a participant option to select payment among different types of annuities, any of which will provide monthly payments for the life of the participant and his spouse, if any. Payments from the Abitibi Registered Plan are permitted during the Creditor Protection Proceedings.

- 33 -

Assumptions for Pension Benefits Table Value

The accrued benefit amounts identified in the Pension Benefits table above show the present value of the future monthly payments if calculated as a lump sum. An interest rate and mortality table providing for current life expectancies are used to calculate the present value amount as of December 31, 2009. The interest rate and mortality table used are the same as those used for AbitibiBowater's financial statements, which are a 6.40% interest rate and the RP2000 mortality table projected to 2010 with white collar adjustments and no presumption for pre-retirement mortality. Benefits were calculated assuming retirement on the date an executive attains age 58 with the sum of his age and years of service equaling at least 80. In addition, the final average earnings used for the calculation of the accumulated benefit as of December 31, 2009, as shown in the Pension Benefits table, are: for years of service credited through December 31, 2008, Mr. Rougeau, $618,487, Mr. Grandmont, $586,636, Mr. Vachon $476,466 and Mr. Melkerson $360,893; and for years of service credited after December 31, 2008, Mr. Grandmont, $552,351 and Mr. Vachon $442,474.

**Nonqualified Deferred Compensation for 2009**

The Company sponsors supplemental retirement savings plans. Messrs. Paterson, Harvey and Wright participate in the AbitibiBowater Inc. Supplemental Retirement Savings Plan, or the "*AbitibiBowater U.S. DC SERP*", and Messrs. Rougeau and Melkerson participate in the AbitibiBowater Defined Contribution Supplemental Executive Retirement Plan, or "*Canadian DC SERP*". Messrs. Grandmont and Vachon do not participate in any Company sponsored supplemental retirement savings plans.

The Company also sponsors certain other nonqualified deferred compensation plans for its U.S. and Canadian executives. The Company's nonqualified deferred compensation plans allow the named executive officers to defer a portion of their base salary and annual bonus and to receive additional Company contributions. These nonqualified deferred compensation plans include the Abitibi-Consolidated Inc. Executive Deferred Share Unit Plan, or "*Abitibi DSU Plan*", and AbitibiBowater Executive Deferred Share Unit Plan, under which amounts may be credited in cash or DSUs that track the value of Company stock. Messrs. Rougeau, Grandmont, Vachon and Melkerson have deferrals credited to accounts under the Abitibi DSU Plan. Messrs. Paterson, Harvey and Wright do not have amounts credited under any of the Company's nonqualified deferred compensation plans other than the AbitibiBowater U.S. DC SERP. No amounts are credited to the AbitibiBowater Executive Deferred Share Unit Plan.

The table below shows the amounts that have been credited to each executive's account(s) under these plans.

| Name | Executive Contributions in Last FY | Registrant Contributions in Last FY | Aggregate Earnings in Last FY | Aggregate Withdrawals/ Distributions | Aggregate Balance at Last FY |
|---|---|---|---|---|---|
| David J. Paterson | | 144,355 [2] | | | |
| | $ — | $ | $ 169,288 | $ — | $ 809,779 |
| William G. Harvey | | 56,710 | | | |
| | — | [2] | 55,728 | — | 270,853 |
| Pierre Rougeau [1] | — | 91,981 [3] | 4,319 [4] | — | 96,300 |
| Alain Grandmont [1] | — | | (949) [5] | — | 290 |
| Jacques P. Vachon [1] | — | | (503) [5] | — | 154 |
| James T. Wright | | 42,155 | | | |
| | — | [2] | 19,961 | — | 119,998 |
| Jon Melkerson [1] | — | 63,859 [3] | 3,327 [4] | — | 67,186 |

- 34 -

Powered by Morningstar℠ Document Research℠

(1)   Amounts shown for these named executive officers were converted to U.S. dollars at the rate of 0.9494.
(2)   Amounts shown reflect 2009 contributions to the AbitibiBowater U.S. DC SERP.
(3)   Amounts shown reflect 2009 contributions to the Canadian DC SERP.
(4)   In a prior year, Messrs. Rougeau and Melkerson deferred a portion of their annual bonus into the Abitibi DSU Plan. Before the combination, the value of that deferred bonus was credited to an account in a number of units having a value equivalent to the Abitibi-Consolidated Inc. stock price and are referred to as deferred share units (DSUs). Upon the combination, the value of each unit was converted into having a value based on AbitibiBowater stock. In addition, these executives have contributions under the Canadian DC SERP. The amounts shown under "Aggregate Earnings in Last Fiscal Year" for these executives reflect the earnings on contributions to the Canadian DC SERP less the decline in value of their accounts under the Abitibi DSU Plan. In 2009, the value of their DSUs declined by $1,773 for Mr. Rougeau and $409 for Mr. Melkerson.
(5)   In a prior year, Messrs. Grandmont and Vachon deferred a portion of their annual bonus to the Abitibi DSU Plan. The amounts shown under "Aggregate Earnings in Last Fiscal Year" for these executives reflect the decline in value of the DSUs during 2009.

As a result of the Creditor Protection Proceedings, payments from the nonqualified deferred compensation plans and supplemental retirement savings plans cannot be made except pursuant to a court order or a confirmed plan or plans of reorganization. The Company expects that a significant portion of amounts owed by the Company under these plans will constitute prepetition claims against the Company that will be subject to compromise under a confirmed plan or plans of reorganization.

*AbitibiBowater U.S. DC SERP*

The key features of the AbitibiBowater U.S. DC SERP are:

- If the employee participates in the AbitibiBowater Retirement Savings Plan, the tax-qualified savings plan, and cannot receive the full employer match under the plan because of Code limitations, the employee will receive the remainder of the match in the AbitibiBowater U.S. DC SERP. However, effective April 1, 2009, the employer match was suspended under the AbitibiBowater Retirement Savings Plan. Because the match under the AbitibiBowater U.S. DC SERP is provided on a payroll basis, a match was provided for the period from January 1, 2009 through March 31, 2009, as reflected in the table. Beginning April 1, 2009, no employer match was provided under the AbitibiBowater U.S. DC SERP.

- An employer automatic contribution may also be made to the AbitibiBowater U.S. DC SERP. The eligible employees for this contribution include the chief executive officer, all executive and senior vice presidents, most vice presidents and the plant general managers. The employer automatic contribution is equal to 6.5% of earnings less the amount he received in employer contributions under the tax-qualified savings plan. This formula was first applied in 2009. Before 2009, if an employee could not receive the full employer automatic contribution (ranging from 2.5% to 6.5% (depending on the age and service of participants) of earnings (limited to $245,000 in 2009)) because of Code limitations, the employee received the remainder of the automatic contribution in the AbitibiBowater U.S. DC SERP.

- 35 -

Powered by Morningstar® Document Research℠

- An additional employer contribution of 10% of base salary plus bonus (12% for the chief executive officer) was provided for the chief executive officer and his direct reports. No base salary deferrals were permitted to be made.

- Contributions to the AbitibiBowater U.S. DC SERP are credited to a bookkeeping account. Earnings and losses to these accounts are credited based on hypothetical investment returns corresponding to the employees' elections among the hypothetical investment options. The options mirror the same options offered under the tax-qualified savings plan. Investment elections can be changed at any time before separation from service.

- Amounts credited under the AbitibiBowater U.S. DC SERP are generally subject to a three year vesting schedule. Exceptions apply for excess matching contributions credited before January 1, 2009, which were fully vested. Certain events that occur before an employee is vested can operate to accelerate the vesting — in full or in part. These events include an involuntary termination without cause, death or disability and, for amounts credited before January 1, 2009, a change in control. In any event, if an employee voluntarily quits before age 55, then he will forfeit one-half of the amounts credited on or after January 1, 2009.

- The AbitibiBowater U.S. DC SERP pays any amounts due in two installments. The first is payable as of the seventh month following separation from service for any reason and the second installment is due on the first anniversary of separation from service. Interest will be credited from the employee's separation until the entire account balance is distributed. Interest is credited at the one-year LIBOR rate published in the Wall Street Journal. Distribution is also triggered by a death or disability on terms described in the AbitibiBowater U.S. DC SERP.

In January 2007, Mr. Paterson enrolled in the AbitibiBowater Retirement Savings Plan (then named the Bowater Retirement Savings Plan) and the AbitibiBowater U.S. DC SERP. Mr. Paterson is entitled to contribute 5% of his annual base salary and bonus to these plans, in which case the Company contributes a maximum of 20.5% of the amount of his base salary and bonus. In lieu of any deferred compensation plan participation or payment to which he may otherwise be entitled for his employment during 2006, Mr. Paterson was entitled to a contribution in respect of 2006 on the foregoing basis, including his 5% elective deferral, but based on his 2006 base salary and bonus, which was credited as non-qualified deferred compensation under the AbitibiBowater U.S. DC SERP. He vested in this benefit on May 1, 2009, other than with respect to 21.95% of the total Bowater contribution, which shall remain subject to three year vesting.

Messrs. Harvey and Wright also enrolled in these plans and each is (was, in the case of Mr. Wright) entitled to an employer contribution under these plans. However, neither of them was provided a specific contribution similar to that of Mr. Paterson.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

*Canadian DC SERP*

The key features of the Canadian DC SERP are:

- The Canadian DC SERP provides supplemental benefits to eligible employees on the Company's Canadian payroll who are not active participants in the Canadian DB SERP. The eligible employees include the chief executive officer, all executive and senior vice presidents, most vice presidents and the plant general managers. If these eligible employees participate in the Defined Contribution Pension Plan for Non-Unionized Employees of Abitibi-Consolidated Inc., or the "*Registered DC Plan*", the registered savings plan, and cannot receive the full Company basic contribution of 10.5% of eligible earnings under the plan because of the annual limit under the Income Tax Act ($22,000 in 2009), the remainder of the Company basic contribution is credited to a bookkeeping account established for the employee under the Canadian DC SERP. The annual contribution limit under the Income Tax Act takes into account the employee's contributions to the Registered DC Plan of 5% of eligible earnings, plus the amount of the Company basic contribution. Eligible earnings include an employee's base salary, plus his paid bonus under the annual incentive plan (excluding any special bonuses unless authorized by the Company), subject to the U.S. compensation limit ($245,000 in 2009).

- An additional Company contribution may also be made to the Canadian DC SERP. For executive vice presidents, senior vice presidents and most of their direct reports, an additional Company contribution of 10% of eligible earnings will be credited to the employee's account under the Canadian DC SERP. For the chief executive officer, if otherwise eligible to participate in the Canadian DC SERP, an additional Company contribution of 12% of eligible earnings will be made. Because Mr. Paterson is not on the Company's Canadian payroll, he is not eligible to participate in the Canadian DC SERP.

- Company contributions allocated to the Canadian DC SERP are credited to a bookkeeping account, which is credited with interest each year at a rate equal to the average rate of return on the balanced funds offered under the Registered DC Plan during the year.

- Amounts are generally subject to a vesting schedule. Before age 55, an employee's account balance is 50% vested. Upon the employee's attainment of age 55 while employed, his account balance becomes 70% vested and vests an additional 10% on each subsequent birthday while employed. Full vesting occurs upon attainment of age 58 while employed. Certain events that occur before the employee is partially or fully vested can operate to accelerate the vesting. These events include death and an involuntary termination without cause (as defined in the employee's employment agreement or other individual agreement with the Company or, if the employee does not have such an agreement, by the Company in its sole discretion).

- The Canadian DC SERP pays any amounts due in two installments. The first is payable as of the seventh month following termination for any reason and the second installment is due on the first anniversary of termination. If the employee dies before payment is completed, any remaining payment will be made to his spouse or beneficiary in a lump sum.

- 37 -

Powered by Morningstar® Document Research℠

In January 2009, Messrs. Rougeau and Melkerson enrolled in the Registered DC Plan and the Canadian DC SERP. Messrs. Rougeau and Melkerson are required to contribute 5% of their eligible earnings to the Registered DC Plan and, in return, are eligible for the Company basic contribution of 10.5% of eligible earnings. In addition, they are each eligible for an additional Company contribution of 10% of eligible earnings. The accounts of Messrs. Rougeau and Melkerson were 50% vested as of December 31, 2009 because neither executive had attained age 55. However, if either executive had been terminated without cause on December 31, 2009, his account would have become fully vested.

Abitibi DSU Plan

The key features of the Abitibi DSU Plan are:

- The Abitibi DSU Plan is a legacy plan that provided eligible executives with an opportunity to defer all or a portion of their annual bonus to a DSU account. Effective March 28, 2008, AbitibiBowater adopted a new plan, the AbitibiBowater Executive Deferred Share Unit Plan, which permits this deferral opportunity under terms substantially similar to the Abitibi DSU Plan, described below. Because no amounts were credited to the new plan, the description below is limited to the Abitibi DSU Plan. Messrs. Rougeau, Grandmont, Vachon and Melkerson currently have account balances under the Abitibi DSU Plan.

- When an executive elected to defer all or a portion of his annual bonus to the Abitibi DSU Plan, his DSU account was credited with an equivalent number of DSUs determined by dividing the deferral amount by the fair market value of Abitibi-Consolidated Inc. common stock on the date his annual bonus would have been paid. Upon the combination, the number of DSUs credited for each executive was adjusted as of the date of the combination to reflect the conversion to AbitibiBowater common stock. DSU accounts under the Abitibi DSU Plan are bookkeeping accounts. On each date that dividends are paid on shares of applicable Company common stock, a DSU account is credited with dividend equivalents in proportion to the number of DSUs in the account on such date. Dividend equivalents are converted to DSUs based on the fair market value of Company common stock on the date credited. Amounts credited to the DSU account are always fully vested.

- An executive who has never been subject to U.S. tax laws or did not elect to defer a portion of his annual bonus to such plan after December 31, 2004 will receive payment in the year after his termination of employment. The executive can select when in the year he receives payment by filing a notice to request payment of his DSU account on or before December 15 of the first calendar year commencing after his termination of employment. If the executive does not file a notice, then he is deemed to have filed a notice on December 15 of that year. The executive can specify whether amounts in the DSU account are to be paid in a lump sum cash payment or in shares of Company common stock based on its fair market value on the filing date or a combination of cash

- 38 -

and shares. If no form of payment is selected, then payment is made in cash. In the event of the executive's death before distribution of amounts in his DSU account, then such amounts are automatically paid to his legal representative or beneficiary in a lump sum cash payment within 90 days after his date of death if he dies before retirement or termination of service, and no later than December 31 of the year following the year of his retirement or other termination if he dies after retiring or otherwise terminating service.

## Severance and Change in Control Arrangements

### Severance

The following is a discussion of the policies and agreements to which a named executive officer becomes subject upon certain termination events absent a change in control. Mr. Paterson's employment agreement that was originally provided by Bowater and assumed by AbitibiBowater provides for severance under certain circumstances. Mr. Wright's employment agreement contained similar provisions, but is no longer in effect. Mr. Harvey is covered by an employment agreement with AbitibiBowater that provides for severance. The remaining named executive officers do not have employment agreements but are covered by an executive severance policy.

To be eligible for severance benefits, the named executive officers must agree to certain restrictive covenants intended to mitigate the competitive disadvantage that would result from losing executive talent to competitors of the Company. Under their employment agreements, Messrs. Paterson and Harvey would be eligible for severance benefits only if they agree not to (i) disclose confidential information, (ii) compete with the Company, or (iii) solicit customers of the Company. Although Mr. Wright is no longer eligible for severance benefits under his employment agreement, he is subject to restrictive covenants similar to those applicable to Messrs. Paterson and Harvey as a condition to his receipt in 2008 of other supplemental pension benefits. The executive severance policy covering Messrs. Rougeau, Grandmont, Vachon and Melkerson also requires eligible executives to protect confidential information. In addition, to receive benefits under the executive severance policy, an eligible executive must sign a release in which he agrees not to compete with the Company.

In light of the Creditor Protection Proceedings, the Company continues to review all of its options with respect to its severance arrangements with executive officers. Moreover, payments from the severance arrangements are not permitted except pursuant to a court order or a confirmed plan or plans of reorganization.

### Messrs. Paterson and Harvey

In the event either Messrs. Paterson's or Harvey's employment is involuntarily terminated by the Company without "cause" (i.e., for reasons other than death, disability, retirement or "cause"), or is terminated by the executive for "good reason," the executive would receive a lump sum payment upon termination equal to:

- twenty-four months of his then current annual base salary, plus

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

- two times his most recently paid bonus, plus

- a prorated portion of his most recently paid bonus for the calendar year of termination.

If payments under an executive's change in control agreement are also triggered by the termination of the executive's employment, then the executive may elect to receive those payments in lieu of any payments under his employment agreement.

For purposes of these agreements, "cause" is defined as (i) gross negligence or willful misconduct by the executive either in the course of his employment or which has a material adverse effect on the Company or on the executive's ability to perform his duties adequately and effectively, and (ii) under Mr. Paterson's employment agreement only, conviction of (or pleading guilty or nolo contendere to) a felony.

For Messrs. Paterson and Harvey, "good reason" means one or more of the following actions that are not cured within 20 days of receiving notice of such action from the executive: (i) a reduction in his base salary or target bonus (or maximum bonus percentages for Mr. Paterson) unless the same reduction is made with respect to all management personnel; (ii) a material diminution in his title, duties or responsibilities; (iii) a change as to whom he must report (unless, for Mr. Harvey, the change means Mr. Harvey reports to the chairman of the board); (iv) an unconsented relocation of the executive's principal place of work more than 30 miles from Greenville, South Carolina or Montreal, Quebec, Canada; or (v) failure of a successor to expressly assume the agreement.

Mr. Wright

As a result of his retirement on January 1, 2010, Mr. Wright became ineligible for severance payments under his employment agreement. However, if Mr. Wright had been terminated by the Company without "cause" (as defined above) before his retirement, his employment agreement entitled him to the same lump sum payment available to Messrs. Paterson and Harvey, as described above.

As with Messrs. Paterson and Harvey, if Mr. Wright became entitled to payments under his change in control agreement due to a termination of employment before his retirement, then those payments could have been made in lieu of any payments under his employment agreement.

Messrs. Rougeau, Grandmont, Vachon and Melkerson.

Messrs. Rougeau, Grandmont, Vachon and Melkerson are covered by an executive severance policy, which provides severance pay and benefits upon a termination by the Company, except in connection with a change in control where different severance pay or related benefits might be available. Except as required by law, severance pay and benefits (other than outplacement counseling) are contingent upon the execution of a valid release.

Under the executive severance policy, if Messrs. Rougeau, Grandmont, Vachon and Melkerson are terminated involuntarily (except for cause) by the Company, they would be eligible for severance pay equal to six weeks of eligible pay per year of service, with a minimum of

- 40 -

Powered by Morningstar® Document Research℠

52 weeks and a maximum of 104 weeks. Eligible pay would be base pay, plus the lesser of (i) the average of the last two annual bonuses paid or (ii) 125% of the current target bonus. The Human Resources and Compensation Committee has discretion to approve higher severance pay amounts. Severance pay is generally paid as a lump sum upon termination. However, Messrs. Rougeau, Grandmont, Vachon and Melkerson would have the option to elect to receive their full severance pay in the form of salary continuance. If an executive elects the salary continuance option, subject to the usual cost sharing arrangements, he would remain covered under Company group life insurance, medical, dental and pension plans (but not Company disability plans). Otherwise, all such benefits end on the last day worked. Finally, Messrs. Rougeau, Grandmont, Vachon and Melkerson would be eligible for outplacement counseling following a covered termination, regardless of whether they sign a release entitling them to additional pay or benefits under the executive severance policy.

*Equity Awards*

The Company maintains a variety of equity-based compensation plans. In light of the Creditor Protection Proceedings, the Company continues to review all of its options with respect to these plans or the implementation of future plans, if any. The Company believes that, due to market conditions and the Creditor Protection Proceedings, most awards under these plans have lost almost all of their value or are worthless. Moreover, payments and distributions on account of these plans are currently suspended due to the Creditor Protection Proceedings and cannot be made except pursuant to a court order or a confirmed plan or plans of reorganization. In addition, claims against the Company arising under these plans may be subordinated in right of payment to claims of general unsecured creditors pursuant to provisions of the U.S. Bankruptcy Code.

Messrs. Paterson, Harvey and Wright currently hold equity awards outstanding pursuant to the terms of one or more of the following four Company equity incentive plans of Bowater: the Bowater Incorporated 1997 Stock Option Plan, as Amended and Restated Effective January 1, 1997; the Bowater Incorporated 2000 Stock Option Plan; the Bowater Incorporated 2002 Stock Option Plan; and the Bowater Incorporated 2006 Stock Option and Restricted Stock Plan. Messrs. Rougeau, Grandmont Vachon and Melkerson currently hold equity awards pursuant to the terms of the Abitibi-Consolidated Inc. Stock Option Plan and the Abitibi-Consolidated Inc. Restricted Share Unit Plan.

Under each equity incentive plan, if an executive's employment is terminated for cause, as determined by the Company, all options, SARs and restricted stock awards, whether or not vested and exercisable, would be forfeited.

Under each Bowater equity incentive plan except the Bowater Incorporated 2006 Stock Option and Restricted Stock Plan, if an executive's employment is terminated without cause or by the executive for any reason other than death, disability or retirement, all unvested equity awards would be forfeited but the executive would have three months after termination to exercise all exercisable options and SARs. Under these plans, if the executive's employment terminates due to disability or retirement, he would be treated under all awards as if employment had continued for five years after the date of termination for purposes of determining vesting and the portion of the award that is exercisable. If the executive dies, all awards would become exercisable and all restrictions and conditions would lapse.

- 41 -

Pursuant to the award agreements entered into in 2006 under the Bowater Incorporated 2006 Stock Option and Restricted Stock Plan, if an executive's employment terminates due to death, disability, retirement or involuntary termination without cause, a pro rata portion of all unvested options would become exercisable on the date of termination. If the executive's employment terminates due to retirement or disability, he would have five years from the date of termination to exercise vested option awards and two years if due to death. For any termination due to any reason other than death, retirement or disability, the executive would have 90 days to exercise the vested option awards following termination.

Pursuant to the award agreements entered into in 2007 under the Bowater Incorporated 2006 Stock Option and Restricted Stock Plan, if an executive's employment terminates due to death, disability, retirement or involuntary termination without cause, all unvested options would become exercisable and all RSUs would become vested on the date of termination. If the executive's employment terminates due to retirement or disability, he would have five years from the date of termination to exercise vested option awards and two years if due to death. For any termination due to any reason other than death, retirement or disability, the executive would have 90 days to exercise the vested option awards following termination.

Pursuant to the terms of the Abitibi-Consolidated Inc. Stock Option Plan, if the executive's employment terminates due to death, involuntary termination without cause or retirement or any other reason approved by the Company, all unvested option awards would be forfeited. However, the executive would have five years after termination to exercise all vested options. If his employment terminates for any reason other than the foregoing, all unvested option awards would be forfeited and the executive would have three months after termination to exercise all vested options.

Pursuant to the terms of the Abitibi-Consolidated Inc. Restricted Share Unit Plan, if an executive's employment terminates due to retirement or an involuntary termination leading to retirement eligibility at termination or immediately following the severance period, vesting of previously granted RSUs would proceed as if the employee had remained employed. If the executive's employment is involuntarily terminated without cause, RSUs would continue to vest during the severance period. If the executive's employment terminates due to death, vesting would be prorated to time worked, or time including severance period vesting if death occurred following retirement or involuntary termination without cause.

AbitibiBowater's executives currently hold outstanding equity awards pursuant to the terms of the 2008 Equity Incentive Plan. Under this plan, if an executive's employment is terminated without cause and without eligibility to retire, vested options would be exercisable during the 90 days following termination and a pro rata portion of RSUs would become vested on the date of termination. If the executive's employment terminates due to death or long-term disability, vested options would remain exercisable for a period of two years from termination and a pro rata portion of RSUs would become vested on the date of termination. If his employment is terminated due to retirement or without cause while eligible for retirement, all awards would continue to vest with exercise rights maintained for five years (or to expiration) following vesting, in the case of options, and to term in the case of RSUs.

- 42 -

Powered by Morningstar℠ Document Research℠

If the named executive officers had been terminated without cause (or if Messrs. Paterson or Harvey had terminated employment for good reason) on December 31, 2009, absent a change in control, the named executive officers would have received the following benefits under the severance arrangements described above:

| | David J. Paterson | William G. Harvey | Pierre Rougeau | Alain Grandmont | Jacques P. Vachon | James T. Wright[1] | Jon Melkerson |
|---|---|---|---|---|---|---|---|
| Base Salary (1 - 2X)[2] | $ 1,800,000 | $ 850,000 | $ 450,000 | $ 850,000 | $ 680,000 | $ 680,000 | $ 650,000 |
| Bonus (1- 3X) | 524,502[3] | 140,766[3] | 126,045[4] | 250,870[4] | 168,733[4] | 118,398[3] | 148,300[4] |
| Accelerated Vesting and Payment of RSUs | 9,555 | 2,754 | 2,566 | 2,566 | 1,312 | 1,877 | 1,312 |
| Total | 2,334,057 | 993,520 | 578,611 | 1,103,437 | 850,045 | 800,275 | 799,612 |

(1)    Upon his resignation from the Company effective January 1, 2010, Mr. Wright became ineligible for the severance benefits described in this table.

(2)    Assumes annual base salaries of $900,000, $425,000, $450,000, $425,000, $340,000, $340,000 and $325,000, respectively.

(3)    For disclosure purposes, bonus calculations for Messrs. Paterson, Harvey and Wright are based on their 2007 bonuses, paid in 2008, which is the more conservative interpretation of the terms of the agreement and does not represent the interpretation the Company may ultimately make if severance payments are, in fact, triggered.

(4)    For disclosure purposes, bonus calculations for Messrs. Rougeau, Grandmont, Vachon and Melkerson are based on the average of their 2006 and 2007 bonuses, paid in 2007 and 2008, respectively, which is the more conservative interpretation of the terms of the severance policy and does not represent the interpretation the Company may ultimately make if severance payments are, in fact, triggered.

The accelerated equity awards include 8,160 options and 86,863 RSUs for Mr. Paterson; 9,130 options and 25,036 RSUs for Mr. Harvey; and 794 options and 17,063 RSUs for Mr. Wright. Stock option awards would not be accelerated for Messrs. Rougeau, Grandmont, Vachon and Melkerson, but RSUs would vest pro-ratably with 23,329 RSUs vesting for each of Messrs. Rougeau and Grandmont, and 11,927 RSUs vesting for each of Messrs. Vachon and Melkerson. No quantification in respect of stock options appears because the stock options all had exercise prices in excess of the fair market value of the underlying shares on December 31, 2009.

Due to the Creditor Protection Proceedings, severance payments to named executive officers are not permitted except pursuant to a court order or a confirmed plan or plans of reorganization.

*Change in Control Benefits*

This section provides a description of change in control benefits pursuant to legacy arrangements that were assumed by AbitibiBowater as a result of the combination. As mentioned above, due to the Creditor Protection Proceedings, payments of change in control benefits to the named executive officers are not permitted except pursuant to a court order or a confirmed plan or plans of reorganization.

Change in Control Arrangements of Former Bowater Executives

At present, certain named executive officers are entitled to change in control benefits pursuant to legacy arrangements entered into with Bowater before the combination. Bowater change in control agreements apply to Messrs. Paterson and Harvey and continue in effect until the date of the executive's termination and, if applicable, until all severance payments and benefits have been provided under the executive's change in control agreement. Before his retirement, Mr. Wright was also covered by a change in control agreement provided by Bowater.

- 43 -

Under the Bowater change in control agreements, if the executive's employment is terminated within 36 months after a change in control (which did not occur with respect to Bowater upon the consummation of the combination), the executive would receive:

- his accrued salary;

- bonus awards for fiscal years completed before termination;

- vacation pay; and

- unless the executive's termination is for "cause," a prorated annual incentive award and all benefits under the benefit plans and policies to which he is entitled through his date of termination.

In addition, if his termination is for any reason other than death, disability or "cause," or if the executive elects to terminate his employment for "good reason," he would receive, in lieu of any severance payments provided in any applicable employment agreement, a lump sum payment payable as of the first day of the seventh month after termination in an amount equal to the sum of:

- three times his annual base salary, using either the rate in effect as of his termination date or immediately before the change in control, whichever is greater;

- three times his target annual incentive award, using either the rate in effect on termination of employment or immediately before the change in control, whichever is greater;

- three times the largest annual contribution that could have been made to the defined contribution savings plans (both tax-qualified and supplemental) on the executive's behalf for the fiscal year in which the change in control occurred, or, if greater, the maximum contribution that could have been made on the executive's behalf for the fiscal year in which the executive's employment terminated;

- 30% of the executive's annual base salary, using either the rate in effect on termination of employment or immediately before the change in control, whichever is greater; and

- an amount equal to the present value of the additional retirement benefits the executive would have earned for the three years following the date of termination under the tax-qualified and supplemental defined benefit retirement plans under which Messrs. Harvey and Wright are covered, or the defined contribution or savings plans under which Mr. Paterson is covered (excluding any employer matching contributions), as the case may be.

- 44 -

Certain retiree health care and life insurance coverage is also provided if the termination is without cause or by the executive for good reason. In this case, the executive and his dependents are entitled to retiree health care and life insurance coverage for the remainder of their lives. If the retiree health coverage and life insurance cannot be provided on a tax-free basis, AbitibiBowater will either provide individual insurance policies with substantially similar coverage or a monthly cash payment equal to the amount of tax imposed on the value of such coverage (plus the amount of tax imposed on such monthly cash payment). Also, AbitibiBowater will provide each executive with, or pay for, reasonable individual outplacement assistance (at a total cost not to exceed $20,000 in the case of Mr. Harvey).

The Bowater agreements contain the following general definitions of a "change in control," "cause" and "good reason," which will now be determined with reference to AbitibiBowater. All definitions are qualified in their entirety by the terms of the agreements.

- In general, a "change in control" occurs if: (i) any person becomes beneficial owner of an amount of Bowater stock representing 20% or more of the combined voting power of Bowater's then outstanding voting securities, unless the board has approved the acquisition of up to 50% of these securities or the person has filed a Schedule 13G indicating the person's intent to hold the securities for investment; (ii) less than 50% of the total membership of the board are continuing directors (as defined in the change in control agreements); or (iii) Bowater's stockholders approve a merger, consolidation or reorganization of Bowater, or Bowater sells or otherwise transfers all or substantially all of Bowater's assets, unless at least 50% of the voting power of the outstanding securities of the resulting entity is still owned by previous Bowater stockholders or at least 50% of the board of directors of the resulting entity are previous Bowater directors.

- In general, "cause" means gross negligence or willful misconduct that has not been cured within 30 days after receipt of notice or conviction of a felony, which action has a demonstrable and material adverse effect upon Bowater.

- In general, "good reason" means: (i) a substantial adverse change in the executive's status, title, position or responsibilities (including a change in reporting relationships) as in effect within 180 days preceding, or at any time after, the change in control; (ii) failure to pay or provide the executive compensation and benefits, in the aggregate, at least equal to those to which he was previously entitled within 180 days preceding, or at any time after, the change in control; (iii) the reduction of the executive's salary as in effect on the date of the change in control or any time thereafter; (iv) Bowater's failure to obtain from any successor its assumption of the change in control agreement; or (v) the relocation of the executive's principal office to a location more than 35 miles from its location immediately before the change in control or a substantial increase in the executive's travel obligations following the change in control.

The change in control agreements also generally provide a terminated executive with (i) a waiver of any non-compete obligations to AbitibiBowater to which the executive is subject pursuant to any other agreement and (ii) reimbursement for any cost incurred (or to be incurred) in connection with realizing the benefits of the change in control agreement, payable to the executive by the end of the year following the year in which the cost is incurred.

- 45 -

Powered by Morningstar® Document Research℠

The change in control agreements with Messrs. Paterson, Harvey and Wright provide that in the event any payment to the executive following a change in control results in the imposition of an excise tax under Section 4999 of the Code, the executive would receive an additional payment such that after the payment of all such excise taxes and any taxes on the additional payments, he will be in the same after-tax position as if no excise tax had been imposed.

Under each of the Bowater equity incentive plans, upon a change in control (as defined in the Bowater change in control agreements), all options and SARs become immediately exercisable in full and all restricted and performance stock awards will be immediately exchanged for common stock free of any restrictions or performance conditions. All stock options and SARs were underwater as of December 31, 2009.

Under each of the Bowater equity incentive plans except the 2006 Stock Option and Restricted Stock Plan, upon a change in control, all outstanding options, SARs and restricted stock awards held by Messrs. Paterson, Harvey and Wright would automatically be purchased by AbitibiBowater at the "Acceleration Price" within 30 days of the change in control. Acceleration Price means (i) in the case of a restricted stock award, the highest of (A) through (D) described below; and (ii) in the case of an option or SAR, the excess over the exercise or base price thereof of the highest of (A) though (D), on the date of a change in control: (A) the highest reported sales price of Bowater common stock within the 60 days preceding the date of the change in control; (B) the highest price of Bowater common stock reported in a Schedule 13D or an amendment thereto that is paid within the 60 days preceding the date of the change in control; (C) the highest tender offer price paid for Bowater common stock; and (D) any cash merger or similar price.

Change in Control Arrangements of Former Abitibi Executives

*Messrs. Rougeau, Grandmont and Vachon*

Messrs. Rougeau, Grandmont and Vachon are entitled to change in control benefits pursuant to legacy change in control agreements entered into with Abitibi before the combination. AbitibiBowater assumed the agreements in connection with the combination. For purposes of the Abitibi change in control agreements, a change in control occurred for Abitibi upon consummation of the combination. Consequently, if AbitibiBowater had terminated Messrs. Rougeau, Grandmont or Vachon from employment before October 29, 2009 other than for "just cause," death, disability or retirement, or if the executive had terminated for "good reason," the executive would have been entitled to severance. Because each executive remained employed with the Company until such date, he is not eligible to receive severance payments or benefits under his agreement unless terminated for one of the above reasons within two years after the occurrence of another change in control.

Generally, the Abitibi change in control agreements are effective until the date of the executive's termination for any reason or, if applicable, until all severance payments and benefits have been provided under the executive's change in control agreement. However, if an executive becomes disabled (as defined in the change in control agreements), AbitibiBowater could terminate his agreement at any time with 30 days' notice.

- 46 -

Under the Abitibi change in control agreements, if the employment of Messrs. Rougeau, Grandmont or Vachon is terminated by AbitibiBowater other than for "just cause," death, disability or retirement or by the executive for "good reason," the executive would be entitled to receive a lump sum payment upon termination equal to three times the following sum, less required statutory deductions:

- the executive's base salary in effect at the end of the month immediately before the month of termination, plus

- the greater of the executive's last annual bonus earned in the year immediately before termination or the average of the annual bonuses earned in the two years preceding his termination.

In addition, for up to three years after his termination date or, if earlier, upon receipt of equivalent benefits from another employer, the executive could continue to receive group welfare benefits, other than disability insurance benefits. In the alternative, the executive would be entitled to receive cash payments equal to the value of such continued benefits (as determined by a mutually agreed upon accountant). Also, Messrs. Grandmont and Vachon would each be entitled to receive an additional three years of age and service credited under the Abitibi Canadian pension plans (above actual age and credited service), and imputed earnings during the extra three years of service would be included in the earnings components of the pension calculations. Mr. Rougeau, who currently has a frozen pension benefit under the Abitibi Canadian pension plans, would be entitled to an additional three years of age credited under such plans (above actual age), and imputed earnings during the extra three years of age credited would be included in the earnings components of his pension calculations. Because Mr. Rougeau is currently an active participant in the Canadian defined contribution plans, the Company would also credit his account under the Canadian DC SERP with an amount equal to three times the annual Company contributions to which he is regularly entitled (as described above). For purposes of this special contribution to the Canadian DC SERP, Mr. Rougeau's eligible earnings would equal the sum of his base salary as of his termination date and the average of his three highest annual bonuses paid with respect to the five years immediately preceding his termination date. All additional pension benefits would be payable upon termination in accordance with the terms of the applicable pension plans or retirement agreements.

In addition, upon termination, all outstanding stock options would become fully vested but would remain exercisable in accordance with their terms as though the executive remained employed or, in the case of Mr. Vachon only, the executive could elect within 90 days following his termination that the Company purchase his unexercised options at a price equal to the difference between the fair market value thereof (as defined in his change in control agreement) and the aggregate option price for such shares. All outstanding RSUs awarded to Messrs. Rougeau, Grandmont or Vachon would continue to vest during the severance period as though the executive remained employed.

The Abitibi agreements contain the following general definitions of a "change in control," "cause" and "good reason." All definitions are qualified by their entirety by the terms of the agreements.

- 47 -

- In general, a "change in control" means (i) the acquisition of a number of voting shares equal to or greater than 35% of the total number of voting shares immediately after such acquisition, unless another person or group has already acquired a greater percentage of voting shares; (ii) the election or appointment of a number of members of the board of directors equal to or greater than one-third of the board of directors; (iii) any transaction or series of transactions whereby assets of the Company become the property of any other person (other than a subsidiary of the Company) if such assets have a fair market value (net of any existing liabilities assumed by such other person as part of the same transaction) equal to 50% or more of the Company's market capitalization (as defined in the agreement) immediately before such transaction; or (iv) the completion of any transaction or the first of a series of transactions that would have the same or similar effect as any transaction or series of transactions referred to in clauses (i), (ii) and (iii).

- In general, "just cause" means (i) after notice and an opportunity to cure, the willful failure of the executive to properly carry out his duties; or (ii) theft, fraud, dishonesty or material misconduct.

- In general, "good reason" means (i) with the executive's consent, assignment of duties materially inconsistent with the executive's existing duties, position or responsibilities, or failure to reappoint the executive to his existing position, duties or responsibilities; (ii) reduction of the executive's salary; (iii) failure to continue any incentive, compensation, pension, or welfare benefits, or the taking of any action that would adversely affect the executive's participation in the plans or material reduce the benefits under such plans; (iv) relocation to a location other than the Company's principal offices, or substantial increase in travel obligations; (v) any reason that would be considered constructive dismissal by a court of competent jurisdiction; (vi) failure of a successor company to assume the severance agreement; or (vii) if the executive consents to relocate and the Company does not pay for the moving expenses plus the extra cost of obtaining a new residence.

Each Abitibi change in control agreement generally provides that the executive will be reimbursed for all legal fees and expenses as a result of the termination of employment in circumstances covered by the agreement. Each agreement also imposes confidentiality restrictions and a two-year non-compete obligation.

### Mr. Melkerson

Mr. Melkerson is covered by a change in control agreement with AbitibiBowater provided pursuant to his 2007 offer letter. The change in control agreement is generally effective until the date of Mr. Melkerson's termination for any reason or, if applicable, until all severance payments and benefits have been provided under the agreement. However, if Mr. Melkerson becomes disabled (as defined in the agreement), the Company can terminate his agreement at any time with 30 days' notice. Also, the Company may amend or terminate Mr. Melkerson's agreement at any time, other than within 90 days before or after a change in control, in order to comply with applicable laws or conform with prevailing corporate practices of comparable companies, provided that all other change in control agreements between the Company and similarly situated executives are also amended or terminated, as the case may be, and Mr. Melkerson is notified of the amendment or termination and the reason for its adoption within 30 days after it is adopted.

- 48 -

Under his change in control agreement, if Mr. Melkerson is terminated by the Company other than for "cause" or disability, or if he terminates employment for "good reason," within 24 months after a change in control, he would be entitled to receive a lump sum payment upon termination equal to two times the following sum, less required statutory deductions:

- his annual base salary at the rate in effect on his termination date, plus

- the lesser of the average of the last two annual bonuses paid, or 125% of his target bonus in effect on his termination date, plus

- the largest annual contribution that could have been made by the Company to its defined contribution savings plans on Mr. Melkerson's behalf for the fiscal year of the termination date.

In addition, for up to 24 months after his termination date or, if earlier, upon commencement of coverage under another employer's health care and life insurance programs, Mr. Melkerson (and his spouse, surviving spouse and dependents) could continue to receive the health care and life insurance coverage provided by the Company to executives as of the change in control date, subject to applicable premiums no greater than those in effect for actively employed executives. To the extent the Company cannot provide Mr. Melkerson with such health care or life insurance coverage, he would be entitled to receive a lump sum cash payment generally equal to the difference between the full premium cost of such coverage and the premium amount he would have been required to pay. In addition, upon termination, all outstanding stock options and RSUs would become fully vested but remain exercisable in accordance with their terms as though Mr. Melkerson remained employed. Finally, Mr. Melkerson would be entitled a lump sum payment of $20,000 in lieu of individual outplacement services.

Mr. Melkerson's agreement contains the following general definitions of a "change in control," "cause" and "good reason." All definitions are qualified by their entirety by the terms of the agreements.

- In general, a "change in control" means (i) the acquisition of a number of voting shares equal to or greater than 50% of the total number of voting shares immediately after such acquisition; (ii) the election or appointment of a number of members of the board of directors equal to or greater than 50% of the board of directors; (iii) any transaction or series of transactions whereby assets of the Company become the property of any other person (other than a subsidiary of the Company) if such assets have a fair market value (net of any existing liabilities assumed by such other person as part of the same transaction) equal to 50% or more of the Company's market capitalization (as defined in the agreement) immediately before such transaction; or (iv) the completion of any transaction or the first of a series of transactions that would have the same or similar effect as any transaction or series of transactions referred to in clauses (i), (ii) and (iii).

- In general, "cause" means Mr. Melkerson's gross negligence, willful misconduct or conviction of a felony, which has a demonstrable and material adverse effect on the

- 49 -

Powered by Morningstar® Document Research℠

Company, provided that if cause exists by virtue of his gross negligence or willful misconduct that is capable of being cured, the Company will give him written notice of the alleged negligence or misconduct. If Mr. Melkerson cures the negligence or misconduct within 30 days after receiving the notice, then he would not be terminated for cause as a result of such negligence or misconduct.

- In general, "good reason" means (i) a material change in Mr. Melkerson's status, title, position or responsibilities (including in reporting line relationships) that represents a substantial adverse change from his status, title, position or responsibilities as in effect immediately preceding or at any time within 24 months after the change in control; the assignment to Mr. Melkerson of any duties or responsibilities that are materially inconsistent with his status, title, position or responsibilities as in effect immediately preceding or at any time within 24 months after the change in control; or any removal of Mr. Melkerson from or failure to reappoint or reelect him to any material office or position held immediately preceding or at any time within 24 months after the change in control; (ii) a material reduction in Mr. Melkerson's compensation and benefits, in the aggregate, to those provided for under the employee compensation and benefit plans, programs and practices in which he was participating immediately preceding or at any time within 24 months after the change in control; (iii) a material reduction of Mr. Melkerson's salary as in effect immediately preceding or at any time within 24 months after the change in control; (iv) the failure of a successor company to assume the change in control agreement; or (v) a material change in the geographic location at which Mr. Melkerson is to perform services on behalf of the Company from the location immediately before the change in control.

Mr. Melkerson's change in control agreement provides that he would be reimbursed for all legal, accounting or actuarial fees and expenses incurred by him (i) to confirm his rights to, and amounts of, payments under the agreement, (ii) to contest or dispute any termination following a change in control, or his rights to payments or benefits under the agreement, or (iii) in connection with any tax audit, contest or litigation related to payments or benefits under the agreement. The agreement also imposes confidentiality restrictions and a two-year non-compete obligation.

Based upon a hypothetical termination and change in control date of December 31, 2009, the change in control termination benefits for the named executive officers would be as set forth in the following table.

| | David J. Paterson | William G. Harvey | Pierre Rougeau | Alain Grandmont | Jacques P. Vachon | James T. Wright | Jon Melkerson |
|---|---|---|---|---|---|---|---|
| Severance | $ 4,725,000 | $ 2,167,500 | $ 1,493,780 | $ 1,452,413 | $ 1,146,726 | $ 1,530,000 | $ 719,918[4] |
| Pro-rata bonus | 675,000 | 297,500 | — | — | — | 170,000 | — |
| Payment based on historic savings plan contributions | 189,000 | 86,700 | — | — | — | 61,200 | — |
| Welfare payment | 270,000 | 127,500 | — | — | — | 102,000 | — |
| Outplacement | 20,000 | 20,000 | — | — | — | 20,000 | — |
| Value of equity awards [1] | 18,632 | 5,456 | 5,302 | 5,302 | 2,710 | 3,674 | 2,710 |
| Additional retirement benefit [2] | 732,267 | 323,191 | 831,000 | 1,560,000 | 711,000 | 228,135 | 146,000 |
| Total pre-tax value | 6,629,899 | 3,027,847 | 2,330,082 | 3,017,715 | 1,860,436 | 2,115,009 | 868,628 |
| Excise tax and gross-up payment [3] | 2,634,433 | 1,310,290 | — | — | — | 866,078 | — |
| Total funding | $ 9,264,332 | $ 4,338,137 | $ 2,330,082 | $ 3,017,715 | $ 1,860,436 | $ 2,981,087 | $ 868,628 |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

(1)     Assumes stock prices of $0.11 (price of AbitibiBowater common stock on December 31, 2009) and $0.20 (highest closing price of AbitibiBowater common stock within 60 days preceding December 31, 2009), as applicable, and the following semi-annual federal interest rates: short-term, 0.83%; mid-term, 3.14%; long-term, 4.96%.

(2)     Assumes conversion to a lump sum amount using (i) for U.S. pension plans, segment rates of 5.24% for the first five years, 5.69% for the next 15 years, and 5.37% for each year thereafter; and (ii) for Canadian pension plans, a rate of 6.4%.

(3)     Assumes federal individual income tax rate of 35% and South Carolina state individual tax rate of 7%.

(4)     For disclosure purposes, the pro-rata bonus calculation for Mr. Melkerson is based on the average of his 2006 and 2007 bonuses, paid in 2007 and 2008, respectively, which is the more conservative interpretation of the terms of his change in control agreement and does not represent the interpretation the Company may ultimately make if severance payments under the agreement are, in fact, triggered.

No qualification is provided for outstanding stock options since all awards had exercise prices in excess of the fair market value of common stock on December 31, 2009.

The Company may not take a tax deduction for amounts subject to the change in control excise tax under Section 4999 of the Code or the related gross-up payments. Calculations to estimate the excise tax due and the gross-up payments are complex and require a number of assumptions. The gross-up payments detailed above are calculated based on the assumption that the excise tax rate under Section 4999 of the Code is 20%, the cumulative rate for other taxes, including federal, state, and local income taxes, applicable for each affected named executive officer is 42%, that all shares subject to outstanding equity awards are treated as accelerated upon a change in control and included in the gross-up calculation in full, and the equity awards were valued taking into account the closing price of a share of AbitibiBowater common stock on December 31, 2009, which was $0.11 per share, and an exchange rate of $0.9494 per Canadian dollar. These calculations are estimates for disclosure purposes only.

- 51 -

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

The following table contains information as of April 30, 2010 on the beneficial ownership of common stock and exchangeable shares by each of our directors and named executive officers, the directors and named executive officers as a group, and all those known to us to beneficially own more than 5% of the outstanding common stock (based solely on a review of Schedules 13D or 13G filed with the SEC).

| | Common Stock | | |
|---|---|---|---|
| Name and Address of Beneficial Owner | Number of Shares (1)(8)(9) | Percent of Class | Total Voting Power (2) |
| Fairfax Financial Holdings Limited | 36,886,111 (3) | 40.3% | 39.0% |
|     95 Wellington Street West, Suite 800 | | | |
|     Toronto, Ontario M5J 2N7 Canada | | | |
| Far East Investment & Services Ltd. | 2,974,676 (4) | 5.2% | 4.9% |
|     15C, 35 Braemar Hill Road | | | |
|     Hong Kong Island HKG China | | | |
| David J. Paterson | 495,811 (5) | * | * |
| William G. Harvey | 152,472 (6) | * | * |
| Alain Grandmont | 74,476 | * | * |
| Pierre Rougeau | 85,750 | * | * |
| Jacques P. Vachon | 48,182 | * | * |
| Jon Melkerson | 26,320 (7) | * | * |
| James Wright | 95,404 | * | * |
| John Q. Anderson | — | — | — |
| Jacques Bougie, O.C. | 37,504 | * | * |
| William E. Davis | 2,194 | * | * |
| Richard B. Evans | 102,080 | * | * |
| Anthony F. Griffiths | — | — | — |
| Ruth R. Harkin | 7,500 | * | * |
| Lise Lachapelle | 882 | * | * |
| Gary J. Lukassen | 1,380 | * | * |
| Paul C. Rivett | — | — | — |
| John A. Rolls | 11,440 | * | * |
| Togo D. West, Jr. | 7,511 | * | * |
| Directors and named executive officers as a group (18 persons) | 1,148,906 (9) | 2.1% | 2.0% |

\*     Less than 1%

(1)     For purposes of this table, "beneficial ownership" is determined in accordance with Rule 13d-3 under the Exchange Act, pursuant to which a person or group of persons is deemed to have beneficial ownership of the shares of common stock that the person has the right to acquire within 60 days of the date of determination. For purposes of computing the percentage of outstanding shares of common stock held by each person or group of persons named above, all the shares the person or persons has (have) the right to acquire within 60 days (as well as the shares of common stock underlying vested stock-settled RSUs and vested options) are deemed to be outstanding but are deemed not to be outstanding for the purpose of computing the percentage ownership of any other person. All numbers listed represent sole investment and voting power unless otherwise indicated.

- 52 -

Powered by Morningstar® Document Research℠

(2) On all matters submitted for a stockholder vote, holders of common stock and the holder of the "special voting stock" representing the exchangeable shares vote together as a single class. Pursuant to a voting and exchange trust agreement, the trustee is entitled to cast a number of votes equal to the number of outstanding exchangeable shares not owned by us or our affiliates and as to which the trustee has timely received voting instructions from the holders of exchangeable shares. Accordingly, percentages in the total voting power column have been calculated based on the total number of shares of common stock and exchangeable shares outstanding as of April 30, 2010, excluding all exchangeable shares held by us and our affiliates.

(3) This information has been obtained from an amended Schedule 13D filed on March 23, 2009 by V. Prem Watsa, 1109519 Ontario Limited, The Sixty Two Investment Company Limited, 810679 Ontario Limited, Fairfax Financial Holdings Limited, TIG Insurance Company, The North River Insurance Company, OdysseyRe Holdings Corp., Odyssey America Reinsurance Corporation, Northbridge Financial Corporation, Markel Insurance Company of Canada, Commonwealth Insurance Company, Federated Insurance Company of Canada, Lombard General Insurance Company of Canada and Lombard Insurance Company. The shares are issuable upon the exercise of conversion rights in respect of the 8.0% convertible notes due 2013 issued to Fairfax Financial Holdings Limited and certain of its subsidiaries pursuant to a note purchase agreement entered into as of March 24, 2008 between the Company and Fairfax Financial Holdings Limited. The reporting persons reported that they exercise shared voting and dispositive power on all the shares.

(4) This information has been obtained from a Form 3 filed on April 22, 2010 by Far East Investment & Services Ltd. The reporting person reported that it owns the shares directly. The reporting person has not filed, to our knowledge, any schedule pursuant to Regulation 13D-G under the Exchange Act.

(5) 159,287 shares are pledged to a financial institution as collateral for a loan.

(6) Includes 40 exchangeable shares.

(7) 99 shares are pledged to the Company as collateral for a loan made in 1999.

(8) The shares of common stock held in Company benefit plans are as follows:

| | |
|---|---:|
| David J. Paterson | 355 |
| William G. Harvey | 3,766 |
| James Wright | 3,401 |

(9) The shares of common stock underlying exercisable stock options are as follows:

| | |
|---|---:|
| David J. Paterson | 230,483 |
| William G. Harvey | 68,854 |
| Alain Grandmont | 56,566 |
| Pierre Rougeau | 66,328 |
| Jacques P. Vachon | 38,635 |
| Jon Melkerson | 17,247 |
| James Wright | 71,680 |
| William E. Davis | 343 |
| Richard B. Evans | 1,040 |
| Lise Lachapelle | 632 |
| Gary J. Lukassen | 343 |
| John A. Rolls | 11,440 |
| Togo D. West, Jr. | 7,511 |

- 53 -

Powered by Morningstar® Document Research℠

(10)   Includes 7,167 shares held in benefit plans and 571,102 shares underlying exercisable stock options.

The remaining information called for by this item relating to securities authorized for issuance under equity compensation plans is provided in *Item 12 – Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters* of the Original 10-K.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

### Director Independence

Some of the more significant aspects of the Company's corporate governance principles, which are designed to comply with the standards established by the SEC and the NYSE, include the following:

- Our by-laws and corporate governance principles require that all directors, except for the president and chief executive officer and, at the discretion of the board, up to two additional directors, be "independent directors." The definition of independent directors set forth in our corporate governance principles is based on the definition from NYSE's corporate governance standards, which require a majority of directors to be "independent."

- Each member of the Audit Committee, Human Resources and Compensation Committee and Nominating and Governance Committee must be "independent."

- Our independent directors (namely, all directors except for Messrs. Paterson and Rivett and former director Mr. Weaver), where required, hold formal executive sessions after board meetings without the presence of non-independent directors or executive officers. The chair presides at these meetings.

The board has determined that directors Anderson, Bougie, Davis, Evans, Griffiths, Harkin, Lachapelle, Lukassen, Rolls and West (ten out of the Company's twelve directors) are "independent," as defined in the NYSE's corporate governance standards and our by-laws. The board has also determined that each of the Audit Committee, Human Resources and Compensation Committee and Nominating and Governance Committee is made up entirely of independent directors. As part of these determinations, which included considering the relationships described below under *Related Party Transactions* and the categories of relationships below, the board determined that none of the independent directors has a material relationship with the Company.

- 54 -

Our corporate governance principles reflect the board's determination that the following categories of relationships are not material and will not impair a director's independence:

- Ownership of less than 5% of the equity of, or being a director of, another company that does business with the Company where the annual sales to, or purchases from, the Company are less than 5% of the annual revenues of either company.

- Ownership of less than 5% of the equity of, or being an executive officer or director of, an unaffiliated company that is indebted to the Company (or to which the Company is indebted), where the total amount of either company's indebtedness to the other is less than 5% of the total consolidated assets of either company.

- Serving as an officer, director or trustee of a charitable organization, where the Company's charitable contributions to the organization are less than 2% of that organization's total annual charitable receipts, or $20,000 per year, whichever is less.

We have adopted a written code of business conduct that applies to all employees of the Company, including subsidiaries and divisions, including our president and chief executive officer, chief financial officer and chief accounting officer. Under the code of business conduct, employees are required to obtain the prior approval of the senior vice president, corporate affairs and chief legal officer or, in the case of executive officers, from the Audit Committee, before entering into any transaction that might present a conflict of interest, including related party transactions with the Company.

The board has a separate board of directors' code of conduct that contains provisions specifically applicable to directors. The board's code of conduct, among other things, sets forth our policies with regard to the review and approval of conflicts of interest or related party transactions with respect to board members. The guidelines apply to transactions in which a director's personal interest is adverse to, or may appear to be adverse to, the interests of the Company as a whole. The guidelines provide that, with respect to any such transaction, a director shall recuse him or herself from any board decision involving another firm or company with which the director is affiliated and directors may not receive a personal benefit from a person or firm that is seeking to do business or to retain business with the Company, unless such a relationship is fully disclosed by the interested director and approved by the vote of the directors disinterested in the transaction.

The board, acting through the disinterested directors, considered each of the transactions discussed under *Related Party Transactions* below and determined that each transaction complied with the guidelines. The Audit Committee is responsible for reviewing and overseeing related party transactions and conflicts of interest situations involving the Company, its directors, officers and related parties.

## Related Party Transactions

Paul C. Rivett, a director, is vice president and chief legal officer of Fairfax Financial Holdings Limited ("*Fairfax*"), and he is expected to benefit from the transactions described below only to the extent that Fairfax, as an entity, benefits.

- 55 -

*Convertible Notes*

On April 1, 2008, we consummated a private sale of $350 million of 8% convertible notes due April 15, 2013 (the "*Convertible Notes*") to Fairfax and certain of its designated subsidiaries. The Convertible Notes bear interest at a rate of 8% *per annum* (10% *per annum* if we elect to pay interest "in kind" by issuing additional convertible notes with the same terms). Bowater provided a full and unconditional guarantee of the payment of principal and interest on the Convertible Notes. Bowater's guarantee ranks equally in right of payment with all of our existing and future unsecured senior indebtedness. The Convertible Notes are not guaranteed by Abitibi, Donohue Corp., an indirect subsidiary of the Company, or any of their respective subsidiaries. The Convertible Notes are convertible into shares of our common stock at a conversion price of $10.00 per share. We paid $20 million of fees to entities other than Fairfax (including investment banking fees, legal fees, etc.), in connection with the issuance of the Convertible Notes. On April 15, 2008, Fairfax exercised its right to appoint two directors (Messrs. Griffiths and Rivett) to our board pursuant to the terms of the purchase agreement. On October 15, 2008, we elected to pay in kind the interest payment due on that date and issued $19 million of additional Convertible Notes in respect thereof. As a result, the balance as of December 31, 2008 of the Convertible Notes outstanding was $369 million, convertible into an aggregate of 36,886,111 shares of our common stock. We have made no payments of principal, nor interest, on the Convertible Notes since the beginning of the last fiscal year. The commencement of the Creditor Protection Proceedings caused an event of default under the Convertible Notes and they therefore became automatically and immediately due and payable by their terms. Any action to enforce those payment obligations, however, is stayed as a result of the commencement of the Creditor Protection Proceedings.

Under the terms of the registration rights agreement relating to the Convertible Notes, we may be liable for penalties of up to 0.50% *per annum* of the principal amount of the Convertible Notes to the extent we are unable to maintain an effective registration statement for common shares deliverable upon conversion. We have not filed a registration statement in respect of those shares as a result of the Creditor Protection Proceedings.

*Backstop Agreement*

On February 9, 2009, in order to enhance near-term liquidity, Abitibi entered into agreements with two affiliates of Fairfax, pursuant to which those affiliates agreed to backstop a portion of the proceeds to be received in an anticipated sale of timberlands property by Abitibi to a third party. Under the terms of the backstop agreements, the Fairfax affiliates agreed to (i) purchase the timberlands property from Abitibi for a total price of $55 million in the event that the proposed sale to the third party was not consummated and (ii) advance $25 million of the purchase price on February 9, 2009 and an additional $30 million on February 17, 2009 upon Abitibi's request (provided such amounts be reimbursed upon consummation of the timberlands sale with the third party). The timberlands sale was consummated with the third party on February 20, 2009, and the Fairfax affiliates were reimbursed the entirety of the amounts advanced to Abitibi under the agreements and paid a termination fee of $1 million.

- 56 -

Powered by Morningstar® Document Research℠

Bowater and other parties to its U.S. and Canadian bank credit facilities amended those facilities on February 27, 2009 to reflect the lenders' consent to $12 million of additional liquidity provided to Bowater Canadian Forest Products Inc., an indirect subsidiary of Bowater, by Fairfax on February 6, 2009 and to treat the advance as an "additional loan" thereunder, thus allowing the collateral securing the Canadian bank credit facility (other than certain fixed assets of Bowater Newsprint South LLC, a direct subsidiary of AbitibiBowater Inc., and certain of its subsidiaries) to secure the additional loan on a last-out basis. As of December 31, 2009, the weighted average interest rate on the additional liquidity was 8% (based on a specified market interest plus a margin). We made no interest or principal payments to Fairfax in respect of the additional liquidity. The commencement of the Creditor Protection Proceedings caused an event of default under the U.S. and Canadian bank credit facilities, which therefore became automatically and immediately due and payable by their terms. Any action to enforce those payment obligations, however, is stayed as a result of the commencement of the Creditor Protection Proceedings.

*Bowater DIP Agreement*

The description of the Bowater DIP Agreement, as defined in the Original 10-K, is incorporated by reference to *Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Bowater Liquidity – Bowater DIP Agreement* in the Original 10-K.

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.

Our Audit Committee appointed PricewaterhouseCoopers LLP ("*PwC*") as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2009.

The Audit Committee's policy is to pre-approve all audit and non-audit services performed by the Company's independent registered public accounting firm, including audit-related, tax and other services. The Audit Committee pre-approved all audit and permissible non-audit services provided by PwC in 2009.

The Company's chief financial officer, chief accounting officer (or another officer designated by the board) and the independent registered public accounting firm must submit to the Audit Committee a request to provide any service that requires pre-approval. Each request must include a statement as to whether the independent registered public accounting firm and the submitting officer view the provision of the requested services as consistent with the SEC's rules on auditor independence. The request must be sufficiently detailed to enable the Audit Committee to precisely identify the services requested. The Audit Committee may delegate pre-approval authority to its chair or one or more other committee members, but not to management. Any committee member with delegated authority must report all pre-approval decisions to the Audit Committee at its next scheduled meeting.

The following table contains certain information on the fees paid to PwC for professional services rendered in the years ended December 31, 2009 and 2008.

- 57 -

| Fee Category | 2009 Fees | 2008 Fees |
|---|---|---|
| | (in thousands) | |
| Audit fees | $ 6,290 | $ 8,283 |
| Audit-related fees | 151 | 1,167 |
| Tax fees | 573 | 350 |
| All other fees | 63 | 203 |
| Total fees | $ 7,077 | $ 10,003 |

*Audit fees.* Audit fees consist of fees billed for professional services rendered for the audits of annual consolidated financial statements and internal control over financial reporting, review of interim consolidated financial statements included in quarterly reports on Form 10-Q and other services provided in connection with statutory and regulatory filings or engagements.

*Audit-related fees.* Audit-related fees consist primarily of fees for audits of financial statements of certain employee benefit plans and other attestation engagements.

*Tax fees.* Tax fees in each of 2008 and 2009 consisted primarily of tax planning and consulting for our Canadian and U.S. legal entities.

*All other fees.* All other fees in each of 2008 and 2009 consist mainly of translation services for the Company's periodic reports.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENTS AND SCHEDULES.**

1.  Consolidated Financial Statements

The consolidated financial statements required to be filed in our Annual Report on Form 10-K are included in Part II, Item 8 of the Original 10-K.

2.  Financial Statement Schedule

The financial statement schedule required to be filed in our Annual Report on Form 10-K is included in the Original 10-K.

3.  Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1* | Combination Agreement and Agreement and Plan of Merger, dated as of January 29, 2007, among Alpha-Bravo Holdings Inc., Abitibi-Consolidated Inc., Bowater Incorporated, Alpha-Bravo Merger Sub Inc., and Bowater Canada Inc. (incorporated by reference from Exhibit 2.1 to Bowater Incorporated's Current Report on Form 8-K filed January 29, 2007, SEC File No. 001-08712). |

- 58 -

| Exhibit No. | Description |
|---|---|
| 2.1.1* | First Amendment, dated as of May 7, 2007, to the Combination Agreement and Agreement and Plan of Merger dated as of January 29, 2007 among AbitibiBowater Inc., Abitibi-Consolidated Inc., Bowater Incorporated, Alpha-Bravo Merger Sub Inc. and Bowater Canada Inc. (the "First Amendment") (incorporated by reference from Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed May 10, 2007, SEC File No. 001-08712). |
| 2.2* | Form of Plan Arrangement (incorporated by reference from Annex E to the Joint Proxy Statement/Prospectus/Management Information Circular of AbitibiBowater Inc., filed pursuant to Rule 424(b)(3) on June 25, 2007). |
| 3.1* | Second Amended and Restated Certificate of Incorporation of AbitibiBowater Inc. effective July 8, 2008 (incorporated by reference from Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008 filed August 11, 2008, SEC File No. 001-33776). |
| 3.2* | Second Amended and Restated By-Laws of AbitibiBowater Inc. effective April 29, 2009 (incorporated by reference from Exhibit 3.1 to the Company's Current Report on Form 8-K filed April 29, 2009, SEC File No. 001-33776). |
| 4.1* | Indenture, dated as of August 1, 1989, between Bowater Incorporated and Manufacturers Hanover Trust Company, as Trustee (incorporated by reference from Exhibit 4.0 to Bowater Incorporated's Quarterly Report on Form 10-Q filed November 10, 1989, SEC File No. 001-08712). |
| 4.2* | Trust Indenture, dated as of December 12, 1989, between Canadian Pacific Forest Products Limited and Montreal Trust Company, as Trustee (incorporated by reference from Exhibit 4.31 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| 4.3* | Note Agreement, dated as of November 1, 1990, between Canadian Pacific Forest Products Limited and the Purchasers named therein (incorporated by reference from Exhibit 4.32 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| 4.4* | Indenture, dated as of December 1, 1991, between Bowater Incorporated and Marine Midland Bank, N.A., as Trustee (incorporated by reference from Exhibit 4.8 to Bowater Incorporated's Annual Report on Form 10-K for 1991, SEC File No. 001-08712). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 4.5* | Indenture, dated as of October 15, 1992, between Bowater Incorporated and The Chase Manhattan Bank (N.A.) as Trustee (incorporated by reference from Exhibit 4.10 to Bowater Incorporated's Annual Report on Form 10-K for 1992, SEC File No. 001-08712). |
| 4.6* | Indenture, dated as of April 6, 1998, between Abitibi-Consolidated Inc. and Montreal Trust Company, as trustee (incorporated by reference from Exhibit 4.6 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.7* | First Supplemental Indenture to the April 6, 1998 Indenture, dated as of September 1, 2001, between Abitibi-Consolidated Inc., 3834328 Canada Inc. and Abitibi-Consolidated Inc as partners, Abitibi-Consolidated General Partnership and Computershare Trust Company of Canada (incorporated by reference from Exhibit 4.7 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.8* | Second Supplemental Indenture to the April 6, 1998 Indenture, dated as of October 1, 2001, between Abitibi-Consolidated Inc., 3834328 Canada Inc. and Abitibi-Consolidated Inc as partners, Abitibi-Consolidated General Partnership, Donohue Forest Products Inc. and Computershare Trust Company of Canada (incorporated by reference from Exhibit 4.8 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.9* | Third Supplemental Indenture to the April 6, 1998 Indenture, dated as of December 1, 2001, between Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated General Partnership and Computershare Trust Company of Canada (incorporated by reference from Exhibit 4.9 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.10* | Fourth Supplemental Indenture, dated April 1, 2008, to the indenture governing the 6.95% Senior Notes due 2008 (incorporated by reference from Exhibit 10.5 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 4.11* | Indenture, dated as of July 26, 1999, between Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P. and The Bank of Nova Scotia Trust Company of New York, as trustee (incorporated by reference from Exhibit 4.10 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |

- 60 -

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 4.12* | First Supplemental Indenture to the July 26, 1999 Indenture, dated as of September 1, 2001, between Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P., 3834328 Canada Inc. and Abitibi-Consolidated Inc. as partners, Abitibi-Consolidated General Partnership and The Bank of Nova Scotia Trust Company of New York (incorporated by reference from Exhibit 4.11 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.13* | Second Supplemental Indenture to the July 26, 1999 Indenture, dated as of October 1, 2001, between Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P., 3834328 Canada Inc. and Abitibi-Consolidated Inc. as partners, Abitibi-Consolidated General Partnership, Donohue Forest Products Inc. and The Bank of Nova Scotia Trust Company of New York (incorporated by reference from Exhibit 4.12 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.14* | Third Supplemental Indenture to the July 26, 1999 Indenture, dated as of December 1, 2001, between Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated General Partnership and The Bank of Nova Scotia Trust Company of New York (incorporated by reference from Exhibit 4.13 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.15* | Fourth Supplemental Indenture to the July 26, 1999 Indenture, dated as of November 21, 2005, between Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P., Abitibi-Consolidated Company of Canada and The Bank of Nova Scotia Trust Company of New York (incorporated by reference from Exhibit 4.14 to Abitibi-Consolidated Inc.'s Annual Report on Form 20-F/A for the year ended December 31, 2007 filed April 10, 2008, SEC File No. 001-14636). |
| 4.16* | Fifth Supplemental Indenture, dated April 1, 2008, to the indenture governing the 7.875% Senior Notes due 2009 (incorporated by reference from Exhibit 10.7 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 4.17* | Indenture dated as of October 31, 2001, by and among Bowater Canada Finance Corporation (as Issuer), Bowater Incorporated (as Guarantor) and The Bank of New York (as Trustee) (incorporated by reference from Exhibit 10.3 to Bowater Incorporated's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001 filed November 14, 2001, SEC File No. 001-08712). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 4.18* | Indenture, dated November 2001, among Abitibi-Consolidated Inc., Abitibi-Consolidated Finance L.P. (as Issuer) and The Bank of Nova Scotia Trust Company of New York (as Trustee) (incorporated by reference from Exhibit 7.1 to Abitibi-Consolidated Inc.'s Form F-9/A filed July 12, 2000, SEC File No. 001-14636). |
| 4.19* | Indenture, dated December 11, 2001, among Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada (as Issuer) and The Bank of Nova Scotia Trust Company of New York (as Trustee) (incorporated by reference from Exhibit 7.1 to Abitibi-Consolidated Inc.'s Form F-9/A filed November 20, 2001, SEC File No. 001-14636). |
| 4.20* | First Supplemental Indenture, dated April 1, 2008, to the indenture governing the 5.25% Senior Notes due 2008 (incorporated by reference from Exhibit 10.6 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 4.21* | Indenture dated June 19, 2003, by and between Bowater Incorporated, as Issuer, and The Bank of New York, as Trustee (incorporated by reference from Exhibit 4.2 to Bowater Incorporated's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003 filed August 14, 2003, SEC File No. 001-08712). |
| 4.22* | Senior Indenture, dated March 17, 2004, between Bowater Incorporated and The Bank of New York (incorporated by reference from Exhibit 4.1 to Bowater Incorporated's Current Report on Form 8-K filed March 17, 2004, SEC File No. 001-08712). |
| 4.23* | First Supplemental Indenture, dated March 17, 2004, between Bowater Incorporated and The Bank of New York (incorporated by reference from Exhibit 4.2 to Bowater Incorporated's Current Report on Form 8-K filed March 17, 2004, SEC File No. 001-08712). |
| 4.24* | Indenture, dated June 15, 2004, among Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada (as Issuer) and the Bank of Nova Scotia Trust Company of New York (as Trustee) (incorporated by reference from Exhibit 7.1 to Abitibi-Consolidated Inc.'s Form F-10 filed July 26, 2004, SEC File No. 001-14636). |
| 4.25* | Form of Provisions Attaching to the Exchangeable Shares (incorporated by reference from Schedule 1 of Annex F to the Joint Proxy Statement/Prospectus/Management Information Circular of the Company, filed pursuant to Rule 424(b)(3) on June 25, 2007). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 4.26* | Form of Amended and Restated Support Agreement, among AbitibiBowater Inc., Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc. and Bowater Incorporated (incorporated by reference from Exhibit 4.1 to the Company's Form S-3ASR filed October 29, 2007). |
| 4.27* | Certificate of Designation of Special Voting Stock of AbitibiBowater Inc. effective as of 5:45 a.m. Eastern Time on October 29, 2007 (incorporated by reference from Exhibit 4.1 to the Company's Current Report on Form 8-K12B/A filed October 29, 2007, SEC File No. 001-33776). |
| 4.28* | 13.75% Senior Secured Notes due 2011 Indenture, dated April 1, 2008, by and among Abitibi-Consolidated Company of Canada, the Guarantor Parties named therein and Wells Fargo Bank, National Association (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 4.29* | 15.5% Senior Notes due 2010 Indenture, dated April 1, 2008, by and among Abitibi-Consolidated Company of Canada, the Guarantor Parties named therein and Wells Fargo Bank, National Association (incorporated by reference from Exhibit 10.3 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 4.30* | 8% Convertible Senior Notes due 2013 Indenture, dated April 1, 2008, by and among AbitibiBowater Inc., Bowater Incorporated and The Bank of New York Trust Company, N.A. (incorporated by reference from Exhibit 10.8 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 9.1* | Form of Amended and Restated Voting and Exchange Trust Agreement among AbitibiBowater Canada Inc., Bowater Canadian Holdings Incorporated, AbitibiBowater Inc., Bowater Incorporated and CIBC Mellon Trust Company (incorporated by reference from Exhibit 9.1 to the Company's Form S-3ASR filed October 29, 2007). |
| 10.1* | Purchase Agreement, dated March 24, 2008, by and between AbitibiBowater Inc. and Fairfax Financial Holdings Limited (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 28, 2008, SEC File No. 001-33776). |
| 10.2* | 8% Convertible Senior Notes due 2013 Registration and Qualification Rights Agreement, dated April 1, 2008 (incorporated by reference from Exhibit 10.9 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |

- 63 -

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 10.3* | 13.75% Senior Secured Notes due 2011 Exchange and Registration Rights Agreement, dated April 1, 2008 (incorporated by reference from Exhibit 10.2 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 10.4* | 15.5% Senior Notes due 2010 Exchange and Registration Rights Agreement, dated April 1, 2008 (incorporated by reference from Exhibit 10.4 to the Company's Current Report on Form 8-K filed April 7, 2008, SEC File No. 001-33776). |
| 10.5* | Waiver and Amendment No. 3 to Amended and Restated Receivables Purchase Agreement, dated as of February 26, 2009 to the Amended and Restated Receivables Purchase Agreement, dated as of January 31, 2008 by and among Abitibi-Consolidated U.S. Funding Corp., Eureka Securitisation, plc, as an investor, Citibank, N.A., as a bank, Citibank, N.A., London Branch, as operating agent for the investors and the banks, Abitibi Consolidated Sales Corporation, as an originator and as servicer and Abitibi-Consolidated Inc., as an originator and subservicer (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 4, 2009, SEC File No. 001-33776). |
| 10.6* | Omnibus Amendment No. 5 to Amended and Restated Receivables Purchase Agreement and Amendment No. 3 to Amended and Restated Purchase and Contribution Agreement and Waiver Agreement, dated as of April 16, 2009 to the Amended and Restated Receivables Purchase Agreement, dated as of January 31, 2008 by and among Abitibi-Consolidated U.S. Funding Corp., Eureka Securitisation, plc, as an investor, Citibank, N.A., as a bank, Citibank, N.A., London Branch, as operating agent for the investors and the banks, Abitibi Consolidated Sales Corporation, as an originator and as servicer and Abitibi-Consolidated Inc., as an originator and subservicer and to the Amended and Restated Purchase and Contribution Agreement, dated as of January 31, 2008 by and among Abitibi-Consolidated U.S. Funding Corp., as purchaser, Abitibi Consolidated Sales Corporation, as a seller and Abitibi-Consolidated Inc., as a seller (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed April 22, 2009, SEC File No. 001-33776). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 10.7* | Amendment No. 6 to Amended and Restated Receivables Purchase Agreement, dated as of May 27, 2009, to the Amended and Restated Receivables Purchase Agreement, dated as of January 31, 2008, by and among Abitibi-Consolidated U.S. Funding Corp., Eureka Securitisation, plc, as an investor, Citibank, N.A., as a bank, Citibank, N.A., London Branch, as operating agent for the investors and the banks, Abitibi Consolidated Sales Corporation, as an originator and as servicer and Abitibi-Consolidated Inc., as an originator and subservicer (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 2, 2009, SEC File No. 001-33776). |
| 10.8* | Amendment No. 7 to Amended and Restated Receivables Purchase Agreement, dated as of June 12, 2009, to the Amended and Restated Receivables Purchase Agreement, dated as of January 31, 2008, by and among Abitibi-Consolidated U.S. Funding Corp., Eureka Securitisation, plc, as an investor, Citibank, N.A., as a bank, Citibank, N.A., London Branch, as operating agent for the investors and the banks, Abitibi Consolidated Sales Corporation, as an originator and as servicer and Abitibi-Consolidated Inc., as an originator and subservicer (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 18, 2009, SEC File No. 001-33776). |
| 10.9* | Second Amended and Restated Receivables Purchase Agreement, dated June 16, 2009, by and among Abitibi-Consolidated U.S. Funding Corp., as the seller, Abitibi Consolidated Sales Corporation and Abitibi-Consolidated Inc. as originators, Abitibi Consolidated Sales Corporation, as servicer, Abitibi-Consolidated Inc. as subservicer, Citibank, N.A., as agent, Barclays Capital Inc., as syndication agent, The CIT Group / Business Credit, Inc., as documentation agent, and Citibank, N.A., Barclays Bank PLC and the other financial and other institutions from time to time party thereto, as banks (incorporated by reference from Exhibit 10.2 to the Company's Current Report on Form 8-K filed December 18, 2009, SEC File No. 001-33776). |
| 10.10* | Ninth Amendment and Consent, dated as of February 27, 2009, to the Credit Agreement dated as of May 31, 2006 by and among Bowater Incorporated, Bowater Newsprint South LLC, certain subsidiaries and affiliates of Bowater Incorporated and Bowater Newsprint South LLC party thereto, AbitibiBowater Inc., the Lenders and the Canadian Lenders party thereto and Wachovia Bank, National Association, as administrative agent for the Lenders party thereto (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 4, 2009, SEC File No. 001-33776). |

- 65 -

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 10.11* | Eleventh Amendment and Consent, dated as of February 27, 2009, to the Credit Agreement dated as of May 31, 2006 by and among Bowater Canadian Forest Products Inc., Bowater Incorporated, Bowater Newsprint South LLC, certain subsidiaries and affiliates of Bowater Incorporated, Bowater Canadian Forest Products Inc. and Bowater Newsprint South LLC party thereto, AbitibiBowater Inc., the Lenders and the U.S. Lenders party thereto and The Bank of Nova Scotia, as administrative agent for the Lenders party thereto (incorporated by reference from Exhibit 10.2 to the Company's Current Report on Form 8-K filed March 4, 2009, SEC File No. 001-33776). |
| 10.12* | Form of Firm Commitment Agreement (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 19, 2009, SEC File No. 001-33776). |
| 10.13* | Senior Secured Superpriority Debtor in Possession Credit Agreement, dated as of April 21, 2009, by and among AbitibiBowater Inc., Bowater Incorporated, Bowater Canadian Forest Products Inc., as debtors, debtors in possession and borrowers and Avenue Investments, as an initial lender, and Fairfax Financial Holdings Ltd., as an initial lender, initial administrative agent and initial collateral agent (incorporated by reference from Exhibit 10.79 to the Company's Current Report on Form 8-K filed December 18, 2009, SEC File No. 001-33776). |
| 10.14* | Amendment No. 1, dated as of June 5, 2009, to the Senior Secured SuperPriority Debtor In Possession Credit Agreement, dated as of April 21, 2009, by and among AbitibiBowater Inc., Bowater Incorporated, Bowater Canadian Forest Products Inc. and each of the lenders party thereto (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 11, 2009, SEC File No. 001-33776). |
| 10.15* | Letter Loan Agreement, dated as of May 6, 2009, relating to the Super-Priority, Senior Secured Debtor-in-Possession Credit Facility, among Abitibi-Consolidated Inc. and Donohue Corp., as Borrowers, Bank of Montreal, as Lender, and the Subsidiary Guarantors named therein (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed May 12, 2009, SEC File No. 001-33776). |
| 10.16* | Amending Agreement dated as of October 30, 2009 among Abitibi-Consolidated Inc., Donohue Corp. and Bank of Montreal, read and received by Investissement Quebec, to the US$100 Million SuperPriority Senior Secured Debtor In Possession Credit Facility dated May 6, 2009 (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed November 5, 2009, SEC File No. 001-33776). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
| --- | --- |
| 10.17* | Form of Offer to Guarantee a Loan (translated from French) (incorporated by reference from Exhibit 10.2 to the Company's Current Report on Form 8-K filed May 12, 2009, SEC File No. 001-33776). |
| 10.18* | Form of Amendment Letter among Abitibi-Consolidated Inc., Donohue Corp. and Investissement Quebec dated October 30, 2009 to Investissement Quebec's Offer to Guarantee a Loan dated as of May 6, 2009 (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 filed November 13, 2009, SEC File No. 001-33776). |
| 10.19* | Guaranty and Undertaking Agreement, dated as of June 16, 2009, among the Guarantors party thereto, each a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, Abitibi-Consolidated Inc., an obligator, and Citibank, N.A., as agent (incorporated by reference from Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 filed August 11, 2009, SEC File No. 001-33776). |
| 10.20* | Implementation Agreement among Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Alcoa Canada Ltee, Alcoa Ltd. and Manicouagan Power Company and to which intervened HQ Energie Inc., dated September 3, 2009 (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed December 18, 2009, SEC File No. 001-33776). |
| 10.21* | Acquisition Agreement among Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada and HQ Energie Inc., dated as of November 12, 2009 (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed November 18, 2009, SEC File No. 001-33776). |
| 10.22* | CDN$230 million Super Priority Debtor-In-Possession Credit Facility dated December 9, 2009 between Abitibi-Consolidated Inc. and 3239432 Nova Scotia Company (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed December 15, 2009, SEC File No. 001-33776). |
| †10.23* | Employment Agreement, dated as of April 4, 2006, by and between Bowater Incorporated and David J. Paterson (incorporated by reference from Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended March 31, 2006 filed May 10, 2006, SEC File No. 001-08712). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| †10.24* | Repayment Agreement between David J. Paterson and Bowater Incorporated, dated January 28, 2008 (incorporated by reference from Exhibit 10.23 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.25* | Change in Control Agreement between David J. Paterson and Bowater Incorporated, dated May 10, 2006 (incorporated by reference from Exhibit 10.4 to Bowater Incorporated's Current Report on Form 8-K filed May 15, 2006, SEC File No. 001-08712). |
| †10.26* | Amendment to Amended and Restated Change in Control Agreement between David J. Paterson and Bowater Incorporated, dated December 22, 2008 (incorporated by reference from Exhibit 10.57 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.27* | Offer Letter between William G. Harvey and AbitibiBowater Inc., dated October 12, 2007 (incorporated by reference from Exhibit 10.5 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.28* | Employment Agreement between AbitibiBowater Inc. and William G. Harvey, executed on October 29, 2007, effective as of October 29, 2007 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.29* | Bonus Letter between William G. Harvey and Bowater Incorporated, dated October 26, 2007 (incorporated by reference from Exhibit 10.4 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.30* | Repayment Agreement between William G. Harvey and Bowater Incorporated, dated October 29, 2007 (incorporated by reference from Exhibit 10.3 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.31* | Amended and Restated Change in Control Agreement between Bowater Incorporated and William G. Harvey, executed on August 4, 2006, effective as of February 5, 2005 (incorporated by reference from Exhibit 10.5 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended June 30, 2006 filed August 4, 2006, SEC File No. 001-08712). |

- 68 -

| Exhibit No. | Description |
|---|---|
| †10.32* | Amendment to Amended and Restated Change in Control Agreement between William G. Harvey and Bowater Incorporated, dated December 19, 2008 (incorporated by reference from Exhibit 10.58 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.33* | Offer letter between Pierre Rougeau and AbitibiBowater Inc., dated September 28, 2007 (incorporated by reference from Exhibit 10.1 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.34* | Severance Compensation Agreement between Abitibi-Consolidated Inc. and Pierre Rougeau, dated April 1, 2002 (incorporated by reference from Exhibit 10.2 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.35* | Offer Letter between Alain Grandmont and AbitibiBowater Inc., dated September 27, 2007 (incorporated by reference from Exhibit 10.12 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.36* | Severance Compensation Agreement between Abitibi-Consolidated Inc. and Alain Grandmont, dated April 1, 2002 (incorporated by reference from Exhibit 10.11 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.37* | Offer Letter between Jacques P. Vachon and AbitibiBowater Inc., dated September 28, 2007 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.38* | Severance Compensation Agreement between Abitibi-Consolidated Inc. and Jacques P. Vachon, dated November 10, 1998 (incorporated by reference from Exhibit 10.19 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.39* | Offer Letter between Jim T. Wright and AbitibiBowater Inc., dated October 17, 2007 (incorporated by reference from Exhibit 10.7 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.40* | Employment Agreement, dated as of March 15, 1999, by and between Bowater Incorporated and James T. Wright (incorporated by reference from Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended March 30, 1999 filed May 13, 1999, SEC File No. 001-08712). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| †10.41* | Bonus Letter between Jim T. Wright and Bowater Incorporated, dated October 17, 2007 (incorporated by reference from Exhibit 10.8 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.42* | Repayment Agreement between Jim T. Wright and Bowater Incorporated, dated November 1, 2007 (incorporated by reference from Exhibit 10.6 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.43* | Revised Change in Control Agreement between Bowater Incorporated and James T. Wright, executed on October 10, 2006, effective as of September 1, 2005 (incorporated by reference from Exhibit 10.4 to Bowater Incorporated's Annual Report on Form 10-K for the year ended December 31, 2006 filed March 1, 2007, SEC File No. 001-08712). |
| †10.44* | Amendment to Amended and Restated Change in Control Agreement between James T. Wright and Bowater Incorporated, dated December 23, 2008 (incorporated by reference from Exhibit 10.60 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.45* | Offer Letter between Jon Melkerson and AbitibiBowater Inc., dated September 28, 2007 (incorporated by reference from Exhibit 10.48 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.46* | Bonus Letter between Jon Melkerson and AbitibiBowater Inc., dated January 30, 2009 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.47* | Severance Compensation Agreement Letter between Abitibi-Consolidated Inc. and Yves Laflamme, dated December 11, 2006 (incorporated by reference from Exhibit 10.17 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.48* | Severance Compensation Agreement between Abitibi-Consolidated Inc. and AbitibiBowater Inc., dated September 1, 2006 (incorporated by reference from Exhibit 10.18 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| †10.49* | Form of Assumption and Consent to Assignment Agreement between Abitibi-Consolidated Inc., AbitibiBowater Inc. and each of Pierre Rougeau, Alain Grandmont, Yves Laflamme and Jacques P. Vachon (incorporated by reference from Exhibit 10.48 to the Company's Current Report on Form 8-K filed December 18, 2009, SEC File No. 001-33776). |
| †10.50* | Offer Letter between W. Eric Streed and AbitibiBowater Inc., dated October 19, 2007 (incorporated by reference from Exhibit 10.20 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.51* | Change in Control Agreement, dated August 7, 2006, between Bowater Incorporated and W. Eric Streed (incorporated by reference from Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended September 30, 2006 filed November 14, 2006, SEC File No. 001-08712). |
| †10.52* | Amendment to Amended and Restated Change in Control Agreement between W. Eric Streed and Bowater Incorporated, dated December 22, 2008 (incorporated by reference from Exhibit 10.59 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.53* | Offer Letter between Joseph B. Johnson and AbitibiBowater Inc., dated October 17, 2007 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.54* | Employment Agreement between Bowater Incorporated and Joseph B. Johnson, executed on August 2, 2006, effective as of January 25, 2006 (incorporated by reference to Exhibit 10.11 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended June 30, 2006 filed August 4, 2006, SEC File No. 001-08712). |
| †10.55* | Amended and Restated Change in Control Agreement between Bowater Incorporated and Joseph B. Johnson, executed on August 2, 2006, effective as of January 25, 2006 (incorporated by reference to Exhibit 10.8 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended June 30, 2006 filed August 4, 2006, SEC File No. 001-08712). |
| †10.56* | Amendment to Amended and Restated Change in Control Agreement between Bowater Incorporated and Joseph B. Johnson, dated December 29, 2008 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.57* | Form of AbitibiBowater Inc. Change in Control Agreement (incorporated by reference to the identically numbered exhibit in the Original 10-K). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010                    Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| †10.58* | Consulting Agreement, dated as of August 15, 2008, between AbitibiBowater Inc. and John Weaver (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed August 15, 2008, SEC File No. 001-33776). |
| †10.59* | Memorandum of Agreement, dated as of July 29, 2008, between AbitibiBowater Inc. and John W. Weaver (incorporated by reference from Exhibit 10.61 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.60* | Amendment No. 1, dated as of January 21, 2009, to the Memorandum of Agreement, dated as of July 29, 2008, between AbitibiBowater Inc. and John W. Weaver (incorporated by reference from Exhibit 10.63 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.61* | Bowater Incorporated 1997 Stock Option Plan, effective as of January 1, 1997, as amended and restated (incorporated by reference to Exhibit 10.31 to Bowater Incorporated's Annual Report on Form 10-K for the year ended December 31, 1996, filed March 26, 1997, SEC File No. 001-8712). |
| †10.62* | First Amendment, effective April 15, 1998, to the Bowater Incorporated 1997 Stock Option Plan, effective as of January 1, 1997, as amended and restated (incorporated by reference to Exhibit 10.38.1 to Bowater Incorporated's Annual Report on Form 10-K for the year ended December 31, 1996, filed March 26, 1997, SEC File No. 001-8712). |
| †10.63* | Second Amendment, effective February 26, 1999, to the Bowater Incorporated 1997 Stock Option Plan, as amended and restated January 1, 1997 (incorporated by reference to Exhibit 10.16 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended June 30, 1999, filed April 16, 1999, SEC File No. 001-8712). |
| †10.64* | Abitibi-Consolidated Inc. Stock Option Plan, dated as of April 27, 1998 (incorporated by reference to Exhibit 4.1 to Abitibi-Consolidated Inc.'s Form S-8, filed March 10, 2003, SEC File No. 333-103697). |
| †10.65* | Bowater Incorporated 2000 Stock Option Plan, effective as of January 1, 2000 (incorporated by reference to Exhibit 10.40 to Bowater Incorporated's Annual Report on Form 10-K for the year ended December 31, 1999, filed March 27, 2000, SEC File No. 001-8712). |

- 72 -

| Exhibit No. | Description |
|---|---|
| †10.66* | Bowater Incorporated 2002 Stock Option Plan, dated as of January 30, 2002 (incorporated by reference to Exhibit 10.14 to Bowater Incorporated's Annual Report on Form 10-K for the period ended December 31, 2001, filed March 19, 2002, SEC File No. 001-8712). |
| †10.67* | First Amendment to the Bowater Incorporated 2002 Stock Option Plan dated September 16, 2002. (incorporated by reference to Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended September 30, 2002, filed November 14, 2002, SEC File No. 001-8712). |
| †10.68* | Form of Non-Qualified Stock Option Agreement for 2002 Stock Option Plan (incorporated by reference to Exhibit 10.1 to Bowater Incorporated's Quarterly Report on Form 10-Q for the period ended September 30, 2004, filed November 9, 2004, SEC File No. 001-8712). |
| †10.69* | Bowater Incorporated 2006 Stock Option and Restricted Stock Plan, dated as of May 10, 2006 (incorporated by reference to Exhibit A to Bowater Incorporated's Proxy Statement on Form DEF 14A for the period ended December 31, 2005, filed April 12, 2006, SEC File No. 001-8712). |
| †10.70* | Abitibi-Consolidated Inc. Restricted Share Unit Plan, undated (incorporated by reference from Exhibit 10.25 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.71* | 2008 Equity Incentive Plan (incorporated by reference from Appendix A to the Company's Definitive Proxy Statement on Schedule 14A filed April 28, 2008, SEC File No. 001-33776). |
| †10.72* | Form of AbitibiBowater Inc. 2008 Equity Incentive Plan Nonqualified Stock Option Agreement (incorporated by reference from Exhibit 10.12 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008 filed August 11, 2008, SEC File No. 001-33776). |
| †10.73* | Form of AbitibiBowater Inc. Performance-Based Vesting Restricted Stock Unit Agreement (incorporated by reference from Exhibit 10.46 to the Company's Current Report on Form 8-K filed December 18, 2009, SEC File No. 001-33776). |
| †10.74* | Form of AbitibiBowater Inc. Time-Based Vesting Restricted Stock Unit Agreement (incorporated by reference from Exhibit 10.14 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008 filed August 11, 2008, SEC File No. 001-33776). |

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar™ Document Research℠

| Exhibit No. | Description |
|---|---|
| †10.75* | Abitibi-Consolidated Inc. U.S. Supplemental Executive Retirement Plan, as Amended and Restated, dated January 1, 2007, renamed the AbitibiBowater U.S. Supplemental Executive Retirement Plan for Certain Executives (incorporated by reference from Exhibit 10.27 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.76* | Amendment No. One to the AbitibiBowater U.S. Supplemental Executive Retirement Plan For Certain Executives, effective July 1, 2008 (incorporated by reference from Exhibit 10.11 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.77* | Canadian Supplemental Executive Retirement Plan (SERP) for Executive Employees of Abitibi-Consolidated Inc., effective as at January 1, 1999 (incorporated by reference from Exhibit 10.28 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.78* | AbitibiBowater Inc. Supplemental Retirement Savings Plan, effective January 1, 2009 (incorporated by reference from Exhibit 10.12 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed April 30, 2009, SEC File No. 001-33776). |
| †10.79* | AbitibiBowater Defined Contribution Supplemental Executive Retirement Plan, effective January 1, 2009 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.80* | Abitibi-Consolidated Inc. Executive Deferred Share Unit Plan, effective date as of January 1, 2000 (incorporated by reference from Exhibit 10.24 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2007 filed March 20, 2008, SEC File No. 001-33776). |
| †10.81* | Amendment No. One to the Abitibi-Consolidated Inc. Executive Deferred Share Units Plan, dated as of December 13, 2005 (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| †10.82* | AbitibiBowater Inc. Amended and Restated Outside Director Deferred Compensation Plan, effective as of June 16, 2009 (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 22, 2009, SEC File No. 001-33776). |
| 12.1* | Computation of Ratio of Earnings to Fixed Charges (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| 21.1* | Subsidiaries of the registrant (incorporated by reference to the identically numbered exhibit in the Original 10-K). |

- 74 -

Powered by Morningstar® Document Research℠

| Exhibit No. | Description |
|---|---|
| 23.1* | Consent of Independent Registered Public Accounting Firm (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| 24.1* | Power of attorney from the directors of the registrant (incorporated by reference to the identically numbered exhibit in the Original 10-K). |
| 31.3** | Certification of President and Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.4** | Certification of Executive Vice President and Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.3** | Certification of President and Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.4** | Certification of Executive Vice President and Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

\*      Previously filed and incorporated herein by reference.

\*\*     Filed with this Amendment No. 1.

†      This is a management contract or compensatory plan or arrangement.

Source: AbitibiBowater Inc., 10-K/A, April 30, 2010

Powered by Morningstar® Document Research℠

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ABITIBIBOWATER INC.

Date: April 30, 2010

By: /s/ DAVID J. PATERSON
     David J. Paterson
     President and Chief Executive Officer

- 76 -

Powered by Morningstar® Document Research℠

Exhibit 31.3

**Certification**

I, David J. Paterson, certify that:

1.    I have reviewed this amendment to the annual report on Form 10-K for the year ended December 31, 2009 of ABITIBIBOWATER INC.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 30, 2010


/s/  David J. Paterson
David J. Paterson
President and Chief Executive Officer

Exhibit 31.4

**Certification**

I, William G. Harvey, certify that:

1.  I have reviewed this amendment to the annual report on Form 10-K for the year ended December 31, 2009 of ABITIBIBOWATER INC.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 30, 2010


/s/  William G. Harvey
_____
William G. Harvey
Executive Vice President and Chief Financial Officer

Powered by Morningstar® Document Research℠

EXHIBIT 32.3

### Certification

Pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of ABITIBIBOWATER INC. (the "Company"), hereby certifies, to such officer's knowledge, that the Company's amendment to its annual report on Form 10-K for the year ended December 31, 2009 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: April 30, 2010

/s/   David J. Paterson
_____
Name: David J. Paterson
Title: President and Chief Executive Officer

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to AbitibiBowater Inc. and will be retained by AbitibiBowater Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The foregoing certification is being furnished solely pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is not being filed as part of the Report or as a separate disclosure document.

**EXHIBIT 32.4**

**Certification**

Pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of ABITIBIBOWATER INC. (the "Company"), hereby certifies, to such officer's knowledge, that the Company's amendment to its annual report on Form 10-K for the year ended December 31, 2009 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: April 30, 2010                                    /s/   William G. Harvey
                                                         _____
                                                         Name: William G. Harvey
                                                         Title: Executive Vice President and Chief Financial Officer

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to AbitibiBowater Inc. and will be retained by AbitibiBowater Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The foregoing certification is being furnished solely pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is not being filed as part of the Report or as a separate disclosure document.

**Created by** Morningstar® Document Research℠
http://documentresearch.morningstar.com

# AbitibiBowater Inc.

1155 METCALF STREET, SUITE 800
MONTREAL, A8, H3B 5H2
514-875-2160
HTTP://WWW.ABITIBIBOWATER.COM

# 10-K

Annual report pursuant to section 13 and 15(d)
Filed on 4/30/2009
Filed Period 12/31/2008





# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10−K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2008**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE TRANSITION PERIOD FROM            TO**
**COMMISSION FILE NUMBER: 001−33776**

# ABITIBIBOWATER INC.
(Exact name of registrant as specified in its charter)

Delaware                                                                 98−0526415

(State or other jurisdiction of incorporation or organization)          (I.R.S. employer identification number)
1155 Metcalfe Street, Suite 800; Montreal, Quebec; Canada H3B 5H2

(Address of principal executive offices)  (Zip Code)
(514) 875−2160

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock, par value $1.00 per share | New York Stock Exchange (pending delisting) |
| | Toronto Stock Exchange (pending delisting) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well−known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes  ☐ No  ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes  ☐ No  ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes  ☐ No  ☑

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S−T (§229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes  ☐ No  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in any amendment to this Form 10−K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non−accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b−2 of the Exchange Act.

Large accelerated filer  ☑          Accelerated filer  ☐          Non−accelerated filer  ☐          Smaller reporting company  ☐
                                                        (Do not check if a smaller
                                                        reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Act). Yes  ☐ No  ☑

The aggregate market value of the voting common equity held by non−affiliates of the registrant, computed by reference to the closing price as reported on the New York Stock Exchange as of June 30, 2008, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $534 million. Without acknowledging that any individual director or executive officer of the registrant is an affiliate, the shares over which they are deemed to have voting control are considered to be owned by affiliates solely for purposes of this calculation.

As of March 31, 2009, there were 54,427,589 shares of AbitibiBowater common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None

## TABLE OF CONTENTS

**Part I**

Item 1. Business .......................................................................................... 2
Item 1A. Risk Factors .................................................................................. 15
Item 1B. Unresolved Staff Comments ........................................................ 25
Item 2. Properties ....................................................................................... 25
Item 3. Legal Proceedings ......................................................................... 25
Item 4. Submission of Matters to a Vote of Security Holders .................... 26

**Part II**

Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities .................... 27
Item 6. Selected Financial Data ................................................................. 29
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations .................... 30
Item 7A. Quantitative and Qualitative Disclosures About Market Risk ...... 66
Item 8. Financial Statements and Supplementary Data ............................. 68
Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure .................... 127
Item 9A. Controls and Procedures ............................................................ 127
Item 9B. Other Information ......................................................................... 127

**Part III**

Item 10. Directors, Executive Officers and Corporate Governance ........... 128
Item 11. Executive Compensation .............................................................. 133
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters .................... 164
Item 13. Certain Relationships and Related Transactions, and Director Independence .................... 165
Item 14. Principal Accounting Fees and Services ...................................... 167

**Part IV**

Item 15. Exhibits, Financial Statement Schedules .................................... 168

**Signatures** ............................................................................................. 176
EX–4.31
EX–4.32
EX–10.11
EX–10.12
EX–10.57
EX–10.58
EX–10.59
EX–10.60
EX–10.61
EX–10.63
EX–10.72
EX–10.73
EX–10.74
EX–10.75
EX–10.76
EX–10.77
EX–12.1
EX–21.1
EX–23.1
EX–23.2
EX–24.1
EX–24.2
EX–24.3
EX–24.4
EX–24.5
EX–24.6
EX–24.7
EX–24.8
EX–24.9
EX–24.10
EX–24.11
EX–24.12
EX–31.1
EX–31.2
EX–32.1
EX–32.2

## CAUTIONARY STATEMENTS REGARDING FORWARD–LOOKING INFORMATION AND USE OF THIRD–PARTY DATA

Statements in this report that are not reported financial results or other historical information of AbitibiBowater Inc. (referred to, with its subsidiaries and affiliates unless otherwise indicated, as "AbitibiBowater," "we," "our" or the "Company") are "forward–looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. They include, for example, statements relating to our creditor protection proceedings, debtor in possession financing arrangements and reorganization process; our ability to successfully restructure our debt and other obligations at our Abitibi–Consolidated Inc. ("Abitibi") and Bowater Incorporated ("Bowater") subsidiaries; our efforts to reduce costs and increase revenues and profitability; our business outlook; our curtailment of production of certain of our products; our assessment of market conditions; and the success of our program to sell non–core assets in light of the current global credit crisis and the requirements under the creditor protection proceedings to obtain court approval for asset sales, as well as strategies for achieving our goals generally. Forward–looking statements may be identified by the use of forward–looking terminology such as the words "should," "would," "could," "will," "may," "expect," "believe," "anticipate" and other terms with similar meaning indicating possible future events or potential impact on the business or shareholders of AbitibiBowater.

The reader is cautioned not to place undue reliance on these forward–looking statements, which are not guarantees of future performance. These statements are based on management's current assumptions, beliefs and expectations, all of which involve a number of business risks and uncertainties that could cause actual results to differ materially. These risks and uncertainties include, but are not limited to the following: (i) risks and uncertainties relating to our creditor protection proceedings including, among other things: (a) risks associated with our ability to: continue as a going concern; stabilize the business to maximize the chances of preserving all or a portion of the enterprise; develop a comprehensive restructuring plan in an effective and timely manner; resolve ongoing issues with creditors and other third parties whose interests may differ from ours; obtain court orders or approvals with respect to motions filed from time to time, including court approvals for asset sales; obtain alternative or replacement financing to replace our debtor in possession financing and restructure our substantial indebtedness and other obligations in a manner that allows us to obtain confirmation of a plan of reorganization by the courts in order to successfully exit our creditor protection proceedings, especially in light of the current decline in the global economy and the credit crisis; successfully implement a comprehensive restructuring plan and a plan of reorganization; generate cash from operations and maintain cash–on–hand; operate within the restrictions and limitations of our current and any future debtor in possession financing arrangements; realize full or fair value for any assets or business we may divest as part of our comprehensive restructuring plan; attract and retain customers; maintain market share as our competitors move to capitalize on customer concerns; maintain current relationships with customers, vendors and trade creditors by actively and adequately communicating on and responding to events, media and rumors associated with the creditor protection proceedings that could adversely affect such relationships; resolve claims made against us in connection with the creditor protection proceedings for amounts not exceeding our recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to our interests; and reject, repudiate or terminate contracts; and (b) risks and uncertainties associated with: limitations on actions against any debtor during the creditor protection proceedings; the values, if any, that will be ascribed in our creditor protection proceedings to our various pre–petition liabilities, common stock and other securities; and our suspension from the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange ("TSX") and expected subsequent delistings; and (ii) risks and uncertainties relating to our business including: industry conditions generally and further growth in alternative media; our ability to achieve growth in the stronger international destinations where market conditions are more favorable; our capital intensive operations and the adequacy of our capital resources; our ability to obtain timely contributions to our cost–reduction initiatives from our unionized and salaried employees; the prices and terms under which we would be able to sell targeted assets; the volatility of the U.S. dollar versus the Canadian dollar; the costs of raw materials such as energy, chemicals and fiber and the success of our post–merger integration activities, including the implementation of additional measures to enhance our operating efficiency and productivity; and our ability to obtain fair compensation for our expropriated assets in the Province of Newfoundland and Labrador, Canada. Additional risks that could cause actual results to differ from forward–looking statements are enumerated in Item 1A, "Risk Factors." All forward–looking statements in this report are expressly qualified by information contained in this report and in our other filings with the United States Securities and Exchange Commission ("SEC") and the Canadian securities regulatory authorities. We disclaim any obligation to publicly update or revise any forward–looking information, whether as a result of new information, future events or otherwise.

**Market and Industry Data**

Information about industry or general economic conditions contained in this report is derived from third–party sources and certain trade publications ("third–party data") that we believe are widely accepted and accurate; however, we have not independently verified this information and cannot provide assurances of its accuracy.

**PART I**

**ITEM 1. BUSINESS**

We produce a wide range of newsprint and coated and specialty papers, market pulp and wood products globally. We are the largest producer of newsprint in the world by capacity and one of the largest publicly traded pulp and paper manufacturers in the world. As of December 31, 2008, we owned or operated 24 pulp and paper facilities and 30 wood products facilities located in Canada, the United States, the United Kingdom and South Korea. We are also among the world's largest recyclers of newspapers and magazines and have more third−party certified sustainable forest land than any other company in the world. We are a Delaware corporation incorporated on January 25, 2007. On October 29, 2007, Abitibi and Bowater combined in a merger of equals with each becoming a wholly−owned subsidiary of AbitibiBowater (the "Combination"). As a result of the Combination, each issued and outstanding share of Bowater common stock and exchangeable share of Bowater Canada Inc. (a wholly−owned subsidiary of Bowater now named AbitibiBowater Canada Inc.) was converted into 0.52 of a share of AbitibiBowater common stock and 0.52 of an exchangeable share of AbitibiBowater Canada Inc., respectively. Each issued and outstanding share of Abitibi common stock was exchanged for either 0.06261 of a share of AbitibiBowater common stock or 0.06261 of an exchangeable share of AbitibiBowater Canada Inc. All Abitibi and Bowater stock options, stock appreciation rights and other stock−based awards outstanding, whether vested or unvested, were converted into AbitibiBowater stock options, stock appreciation rights or stock−based awards. The number of shares subject to such converted awards was adjusted by multiplying the number of shares outstanding by the Abitibi exchange ratio of 0.06261, in the case of an Abitibi award, and by the Bowater exchange ratio of 0.52, in the case of a Bowater award. Similarly, the exercise price of the converted stock options or base price of the stock appreciation rights was adjusted by dividing such price by the Abitibi exchange ratio or the Bowater exchange ratio as appropriate. As a result of the Combination, we issued, or reserved for issuance, approximately 57.4 million shares of AbitibiBowater common stock, including 5.6 million exchangeable shares, to the former shareholders of Abitibi and Bowater. Our common stock began trading under the symbol "ABH" on both the NYSE and the TSX on October 29, 2007. Our exchangeable shares began trading under the symbol "AXB" on the TSX on October 29, 2007. As a result of the Creditor Protection Proceedings, as defined and described below, our common stock has been suspended from trading on the NYSE, our common stock and the exchangeable shares of AbitibiBowater Canada Inc. have been suspended from trading on the TSX and we expect these securities to be delisted from both the NYSE and the TSX in the near future. Our common stock is currently traded in the over−the−counter market. For additional information, see the section entitled "Creditor Protection Proceedings − Listing and trading of our common stock and exchangeable shares" below.

Even though Abitibi and Bowater consider the Combination to have been a "merger−of−equals," Bowater was deemed to be the "acquirer" of Abitibi for accounting purposes, and AbitibiBowater has been deemed to be the successor to Bowater for purposes of U.S. securities laws and financial reporting. Therefore, unless otherwise indicated, the financial information included in this Annual Report on Form 10−K reflects the results of operations and financial position of Bowater for the periods before October 29, 2007 and those of both Abitibi and Bowater for periods beginning on or after October 29, 2007. This means that our consolidated results of operations for 2007 include Abitibi's results of operations for only the 64 days following the Combination. In accordance with United States generally accepted accounting principles ("GAAP"), Abitibi's results of operations prior to the consummation of the Combination are excluded. All non−financial information included in Part I of this Annual Report on Form 10−K reflects the combined businesses of Abitibi and Bowater unless otherwise indicated.

**Creditor Protection Proceedings**
*U.S. and Canadian filings for creditor protection*

In recent years, we have experienced significant recurring losses, which have resulted in significant negative operating cash flows. A number of factors have contributed to these results, including a highly competitive market for our products, the highly cyclical nature of the forest products industry, significant annual declines over the past several years in the demand for newsprint, which is our principal product, a weak U.S. housing market, the capital−intensive nature of our operations, the weakened global economy and cost pressures resulting from the volatility of currency exchange rates and costs for raw materials and energy. In recent quarters, we have taken steps to attempt to address these issues, including actions to curtail our production capacity, such as permanent closures or indefinite idling of certain facilities, as well as market−related downtime at other facilities. In addition, we have divested non−core assets as an additional source of liquidity, taken a disciplined approach to capital spending and implemented cost reduction initiatives to achieve improved operational efficiencies. However, these restructuring measures have not provided adequate relief from the significant liquidity pressure we have been experiencing. As global economic conditions dramatically worsened beginning in 2008, we have experienced significant pressure on our business and a deterioration of our liquidity. The extreme volatility in the global equity and credit markets has further compounded the situation by limiting our ability to refinance our debt obligations.

2

In early 2009, we made several unsuccessful attempts to refinance our significant indebtedness, which included, among other things, an exchange offer and concurrent notes offering to address Bowater's liquidity issues and a debt recapitalization plan to address Abitibi's liquidity issues. After extensive consideration of all other alternatives and after thorough consultation with our advisors, we determined, with the consent of our Board of Directors, that a comprehensive financial and business restructuring could be most effectively and quickly achieved within the framework of creditor protection proceedings in both the United States and Canada. Therefore, on April 16, 2009, AbitibiBowater and certain of its U.S. and Canadian subsidiaries filed voluntary petitions (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") for relief under the provisions of Chapter 11 of the United States Bankruptcy Code, as amended ("Chapter 11"). In addition, on April 17, 2009, AbitibiBowater and certain of its Canadian subsidiaries sought creditor protection (the "CCAA Proceedings") under the Companies' Creditors Arrangement Act (the "CCAA") with the Superior Court of Quebec in Canada (the "Canadian Court"). On April 17, 2009, Abitibi and its wholly-owned subsidiary, Abitibi–Consolidated Company of Canada ("ACCC"), each filed a voluntary petition for provisional and final relief (the "Chapter 15 Cases") in the U.S. Court under the provisions of Chapter 15 of the United States Bankruptcy Code, as amended, to obtain recognition and enforcement in the United States of certain relief granted in the CCAA Proceedings. The Chapter 11 Cases, the Chapter 15 Cases and the CCAA Proceedings are collectively referred to as the "Creditor Protection Proceedings." Our subsidiaries which own our Bridgewater, United Kingdom and Mokpo, South Korea operations were not included in the Creditor Protection Proceedings and will continue to operate outside of such proceedings.

We initiated the Creditor Protection Proceedings in order to enable us to pursue reorganization efforts under the protection of Chapter 11 and the CCAA. The Creditor Protection Proceedings will allow us to reassess our business strategy with a view to developing a comprehensive financial and business restructuring plan. We remain in possession of our assets and properties and will continue to operate our business and manage our properties as "debtors in possession" under the jurisdiction of the U.S. Court and the Canadian Court and in accordance with the applicable provisions of Chapter 11 and the CCAA. In general, we and our subsidiaries are authorized to continue to operate as ongoing businesses, but may not engage in transactions outside the ordinary course of business without the approval of the relevant court(s).

The commencement of the Creditor Protection Proceedings constituted an event of default under substantially all of our debt obligations, and those debt obligations became automatically and immediately due and payable, although any actions to enforce such payment obligations are stayed as a result of the commencement of the Creditor Protection Proceedings.

*Debtor in possession financing arrangements*

*DIP Credit Agreement*

In the Creditor Protection Proceedings, we have sought and obtained interim approval by the U.S. Court and the Canadian Court to enter into a debtor in possession financial facility for the benefit of AbitibiBowater and certain of our Bowater subsidiaries. On April 21, 2009, we entered into a Senior Secured Superpriority Debtor In Possession Credit Agreement (the "DIP Credit Agreement") among AbitibiBowater, Bowater and Bowater Canadian Forest Products Inc. ("BCFPI"), as borrowers, Fairfax Financial Holdings Limited ("Fairfax"), as administrative agent, collateral agent and an initial lender, and Avenue Investments, L.P., as an initial lender.

The DIP Credit Agreement provides for borrowings in an aggregate principal amount of up to $206 million (the "Initial Advance"), consisting of a $166 million term loan facility to AbitibiBowater and Bowater (the "U.S. Borrowers") and a $40 million term loan facility to BCFPI. The DIP Credit Agreement also provides for an incremental facility consisting of additional borrowings, upon our election and the satisfaction of certain conditions, in an aggregate principal amount of up to $360 million (less the Initial Advance). Borrowings under the DIP Credit Agreement will bear interest, at our election, at either a rate tied to the U.S. Federal Funds Rate (the "base rate") or LIBOR, in each case plus a specified margin. The interest margin for base rate loans is 6.5%, with a base rate floor of 2.5%. The interest margin for LIBOR loans is 7.5%, with a LIBOR floor of 3.5%. The outstanding principal amount of loans under the DIP Credit Agreement, plus accrued and unpaid interest, will be due and payable on April 21, 2010 (the "Maturity Date"), but is subject to an earlier maturity date under certain circumstances. The Maturity Date may be extended for additional six–month periods upon the satisfaction of certain conditions. The obligations of the U.S. Borrowers under the DIP Credit Agreement are guaranteed by AbitibiBowater, Bowater, Bowater Newsprint South LLC ("Newsprint South") and each of the U.S. subsidiaries of Bowater and Newsprint South that are debtors in the Chapter 11 Cases (collectively, the "U.S. Guarantors") and secured by all or substantially all assets of each of the U.S. Guarantors. The obligations of BCFPI under the DIP Credit Agreement are guaranteed by the U.S. Guarantors and each of Bowater's subsidiaries that are debtors in the CCAA Proceedings, other than BCFPI, (collectively, the "Canadian Guarantors") and secured by all or substantially all assets of BCFPI and the Canadian Guarantors.

The proceeds of the DIP Credit Agreement will be used by us, among other things, for working capital, general corporate purposes, to pay adequate protection to holders of secured debt under Bowater's and BCFPI's pre–petition bank credit facilities, to pay the costs associated with administration of the Creditor Protection Proceedings and to pay transaction costs, fees and expenses in connection with the DIP Credit Agreement.

The DIP Credit Agreement has been approved by the U.S. Court and the Canadian Court on an interim basis and is subject to the final approval by such courts.

3

*Abitibi DIP Agreement*

In the Creditor Protection Proceedings, we have sought approval by the Canadian Court to enter into a debtor in possession financial facility for the benefit of Abitibi and Donohue Corp. ("Donohue"), a wholly-owned subsidiary of AbitibiBowater, and expect to obtain approval of the Canadian Court shortly. We are presently negotiating a letter loan agreement (the "Abitibi DIP Agreement"), which is subject to the approval of the Canadian Court, among Abitibi and Donohue, as borrowers (the "Borrowers") and the Bank of Montreal, as lender, which is expected to be acknowledged by Investissement Quebec, as sponsor (the "Sponsor"). Although Donohue would be a signatory thereto, the Abitibi DIP Agreement would not be enforceable against Donohue until such time as the U.S. Court would grant authorization and approval of the DIP Facility (as defined below) and the charge in connection therewith with respect to Donohue (the "U.S. DIP Order"). Donohue would have no obligation to seek a U.S. DIP Order and its failure to obtain such U.S. DIP Order would not affect the rights of Abitibi under the Abitibi DIP Agreement.

The Abitibi DIP Agreement is expected to provide for borrowings in an aggregate principal amount of up to $87.5 million for Abitibi and Donohue (the "DIP Facility"), provided that Donohue would not borrow more than $10 million and that a minimum availability of $12.5 million would be maintained at all times. The DIP Facility is expected to be made available by way of loans advanced in three disbursements pursuant to a drawdown schedule. Such loans are expected to bear interest at either LIBOR plus 1.75% (with a LIBOR floor of 3.0%) or the U.S. base rate plus 0.75%. The outstanding principal amount of loans under the DIP Facility, plus accrued and unpaid interest would be payable in full at the earliest of: (i) April 30, 2010; (ii) the effective date of a plan of reorganization under the CCAA or Chapter 11; (iii) the acceleration of the Abitibi DIP Agreement or the occurrence of a specified event of default; and (iv) the unenforceability of the backstop guarantee of the Sponsor. Notwithstanding the foregoing, the Borrowers would be required to repay the DIP Facility no later than November 1, 2009, as not doing so would result in the occurrence of a specified event of default.

The obligations of the Borrowers under the Abitibi DIP Agreement are expected to be guaranteed by certain of Abitibi's subsidiaries (collectively, the "Subsidiary Guarantors") and secured by first priority liens (the "DIP Liens") on all present and after-acquired property of the Borrowers and the Subsidiary Guarantors provided that the DIP Liens would be subordinated to (i) an administrative charge not exceeding $6 million of professional fees and disbursements in connection with the CCAA Proceedings; (ii) a directors' charge not exceeding $2.5 million; and (iii) the interests of Citibank, N.A., Abitibi Consolidated Sales Corporation and the other parties to the accounts receivable securitization program. Furthermore, the repayment obligation of the Borrowers under the DIP Facility is expected to be guaranteed by the Sponsor.

The proceeds of the loans under the Abitibi DIP Agreement would be used by us for working capital and other general corporate purposes, including costs of the Creditor Protection Proceedings.

The Abitibi DIP Agreement would contain usual and customary covenants for debtor in possession financings of this type, including among other things, the obligation for Abitibi to provide a rolling 13-week cash flow forecast of receipts and disbursements and a weekly cash flow results.

For additional information on the DIP Credit Agreement and the Abitibi DIP Agreement, including certain restrictive financial covenants, see Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Liquidity after the commencement of the Creditor Protection Proceedings."

*Accounts receivable securitization program*

In connection with the Creditor Protection Proceedings, on April 16, 2009, Abitibi and certain subsidiaries of Donohue entered into an amendment to their existing accounts receivable securitization program, which, among other things, maintained the maximum commitment of $210 million and provided for the continuation of the program for 45 days, subject to certain termination provisions. For additional information, reference is made to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Liquidity after the commencement of the Creditor Protection Proceedings."

*Reorganization process*

The U.S. Court and the Canadian Court have issued a variety of orders on either a final or interim basis intended to support our business continuity throughout the restructuring process. These orders include, among other things, authorization to: (i) make payments relating to certain employees' pre-petition wages, salaries and benefit programs in the ordinary course; (ii) ensure the continuation of existing cash management systems; (iii) honor certain ongoing customer obligations; (iv) enter into the DIP Credit Agreement discussed above; and (v) enter into the amendment to the accounts receivable securitization program discussed above. We have retained legal and financial professionals to advise us on the Creditor Protection Proceedings. From time to time, we may seek court approval for the retention of additional professionals.

Shortly after the commencement of the Creditor Protection Proceedings, we began notifying all known current or potential creditors regarding these filings. Subject to certain exceptions under Chapter 11 and the CCAA, our filings (and in Canada, the Initial Order, as defined below) automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover, collect or secure a claim arising prior to the filing of the Creditor Protection Proceedings. Thus, for example, most creditor actions to obtain possession of property from us, or to create, perfect or enforce any lien against our property, or to collect on monies owed or otherwise exercise rights or remedies with respect to a pre-petition claim, are enjoined unless and until the courts lift such stay.

As required under Chapter 11, on April 28, 2009, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 cases. The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the U.S. Court with respect to us. Under the terms of a Canadian Court order, Ernst & Young Inc. will serve as the court-appointed monitor under the CCAA Proceedings (the "Monitor") and will assist us in formulating our restructuring plan.

Under Section 365 and other relevant sections of Chapter 11, we may assume, assume and assign, or reject certain executory contracts and unexpired leases, including leases of real property and equipment, subject to the approval of the U.S. Court and certain other conditions. Any description of an executory contract or unexpired lease in this Annual Report on Form 10–K, including, where applicable, our express termination rights or a quantification of our obligations, must be read in conjunction with, and is qualified by, any overriding rejection rights we have under Section 365 of Chapter 11.

Pursuant to the initial order issued by the Canadian Court on April 17, 2009 (the "Initial Order"), we have the right to, among other things, repudiate agreements, contracts or arrangements of any nature whatsoever, whether oral or written, subject to the approval of the Monitor or further order of the Canadian Court. Any description of an agreement, contract or arrangement in this Annual Report on Form 10–K must be read in conjunction with, and is qualified by, overriding rights, including the above–mentioned repudiation rights, we have under the CCAA.

In order to successfully exit Chapter 11 and the CCAA, we will need to propose and obtain approval by affected creditors and confirmation by the U.S. Court and the Canadian Court of a plan of reorganization that satisfies the requirements of Chapter 11 and the CCAA. A plan of reorganization would resolve our pre–petition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to our exit from Chapter 11 and the CCAA.

In the United States, Chapter 11 provides that we have the exclusive right for 120 days after the filing of the Creditor Protection Proceedings to file a plan of reorganization with the U.S. Court. We will likely file one or more motions to request extensions of this exclusivity period, which are routinely granted up to 18 months in cases of this size and complexity. If our exclusivity period were to lapse, any party in interest would be able to file a plan of reorganization. In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of Chapter 11 and must be approved or confirmed by the U.S. Court in order to become effective.

In Canada, the Initial Order provides for a general stay of proceedings for an initial period of 30 days. We will likely file one or more motions to request extensions of this stay of proceedings, which are routinely granted for up to 18 months in cases of this size and complexity. The Initial Order provides that a plan of reorganization under the CCAA shall be filed with the Canadian Court before the termination of the stay of proceedings or such other time or times as may be allowed by the Canadian Court. Third parties could seek permission to file a plan of reorganization; however, management believes that this is a rare occurrence in Canada. In addition to being voted on by the required majority of holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the CCAA and must be approved or confirmed by the Canadian Court in order to become effective.

The timing of filing a plan of reorganization by us will depend on the timing and outcome of numerous other ongoing matters in the Creditor Protection Proceedings. There can be no assurance at this time that a plan of reorganization will be supported and approved by affected creditors and confirmed by the U.S. Court and the Canadian Court or that any such plan will be implemented successfully.

Under the priority scheme established by Chapter 11 and the CCAA, unless creditors agree otherwise, pre–petition liabilities and post–petition liabilities must be satisfied in full before stockholders are entitled to receive any distribution or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation of a plan or plans of reorganization. No assurance can be given at this time as to what values, if any, will be ascribed to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock, receiving no distribution on account of their interests and cancellation of their holdings. A plan of reorganization could also result in holders of our common stock being materially diluted. Because of such possibilities, the value of our liabilities and securities, including our common stock, is highly speculative. Appropriate caution should be exercised with respect to existing and future investments in any of our liabilities and/or securities. At this time, there can be no assurance that we will be able to restructure as a going concern, as described below, or successfully propose or implement a plan of reorganization.

See Item 1A, "Risk Factors — Risks Related to Our Creditor Protection Proceedings," for, among other things, the strategic, financial, operational and procedural risks resulting from the Creditor Protection Proceedings.

Further information pertaining to our Creditor Protection Proceedings may be obtained through our website at **www.abitibibowater.com**. Certain information regarding the CCAA Proceedings, including the reports of the Monitor, is available at the Monitor's website at **www.ey.com/ca/abitibibowater**. Documents filed with the U.S. Court and other general information about the Chapter 11 Cases are available at **http://chapter11.epiqsystems.com/abh**.

*Listing and trading of our common stock and exchangeable shares*

On April 16, 2009, we received notice from the NYSE that it had determined to immediately suspend the trading of our common stock on the NYSE. The NYSE stated that its decision was based on the commencement of the Chapter 11 Cases. Accordingly, the last day that our common stock traded on the NYSE was April 15, 2009. We do not intend to take any further action to appeal the NYSE's decision, and therefore it is expected that our common stock will be delisted after the completion of the NYSE's application to the SEC. Our common stock is currently traded in the over–the–counter market and is quoted on the Pink Sheets Quotation Service ("Pink Sheets") under the symbol "ABWTQ."

In addition, on April 16, 2009, we received notice from the TSX that trading of our common stock and the exchangeable shares of AbitibiBowater Canada Inc. had been suspended and would be delisted effective at the close of market on May 15, 2009.

While we are in the Creditor Protection Proceedings, investments in our securities will be highly speculative. Our common stock and exchangeable shares may have little or no value and there can be no assurance that they will not be cancelled pursuant to the comprehensive restructuring plan.

*Reporting requirements*

For periods subsequent to the Creditor Protection Proceedings, we will apply the American Institute of Certified Public Accountants' Statement of Position 90–7 ("SOP 90–7"), "Financial Reporting by Entities in Reorganization under the Bankruptcy Code," in preparing our consolidated financial statements. SOP 90–7 requires that the financial statements distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Accordingly, certain revenues, expenses (including professional fees), realized gains and losses and provisions for losses that are realized or incurred in the Creditor Protection Proceedings will be recorded in reorganization items on the consolidated statements of operations. In addition, pre–petition obligations that may be impacted by the reorganization process will be classified on the consolidated balance sheets in liabilities subject to compromise. These liabilities will be reported at the amounts expected to be allowed by the U.S. Court and the Canadian Court, even if they may be settled for lesser amounts.

As a result of the Creditor Protection Proceedings, we are required to periodically file various documents with and provide certain information to the Canadian Court, the U.S. Court, the Monitor and the Creditors' Committee. Depending on the jurisdiction, these documents and information may include schedules of assets and liabilities, monthly operating reports and information relating to forecasted cash flows, as well as certain other financial information. Such documents and information, to the extent they are prepared or provided by us, will be prepared and provided according to the requirements of the relevant legislation, subject to variation as approved by an order of the relevant court. Such documents and information may be prepared or provided on an unconsolidated, unaudited or preliminary basis, or in a format different from that used in the consolidated financial statements included in our periodic reports filed with the SEC. Accordingly, the substance and format of these documents and information may not allow meaningful comparison with our regular publicly–disclosed consolidated financial statements. Moreover, these documents and information are not prepared for the purpose of providing a basis for an investment decision relating to our securities or for comparison with other financial information filed with the SEC.

*Going Concern*

Our consolidated financial statements included in Item 8 of this Annual Report on Form 10–K (the "Consolidated Financial Statements") have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. However, the commencement of the Creditor Protection Proceedings and the factors contributing to our liquidity issues, as discussed above, raise substantial doubt about our ability to continue as a going concern.

The Creditor Protection Proceedings and our debtor in possession financing arrangements discussed above provide us with a period of time to stabilize our operations and financial condition and develop a comprehensive restructuring plan. Management believes that these actions make the going concern basis of presentation appropriate. However, it is not possible to predict the outcome of these proceedings and as such, the realization of assets and discharge of liabilities are each subject to significant uncertainty. Further, our ability to continue as a going concern is dependent on market conditions and our ability to successfully develop and implement a comprehensive restructuring plan and improve profitability, obtain alternative financing to replace our debtor in possession financing arrangements and restructure our obligations in a manner that allows us to obtain confirmation of a plan of reorganization by the U.S. Court and the Canadian Court. However, it is not possible to predict whether the actions taken in our restructuring will result in improvements to our financial condition sufficient to allow us to continue as a going concern. If the going concern basis is not appropriate, adjustments will be necessary to the carrying amounts and/or classification of our assets and liabilities. Further, a comprehensive restructuring plan could materially change the carrying amounts and classifications reported in our Consolidated Financial Statements. The assets and liabilities in our Consolidated Financial Statements do not reflect any adjustments related to the Creditor Protection Proceedings, which arose subsequent to December 31, 2008.

In order to improve profitability, management is seeking actions to reduce corporate and operational expenses. These actions could result in the closure of additional facilities and further headcount reductions in 2009.

**Transactions within the AbitibiBowater Consolidated Group of Companies**

Prior to April 1, 2008, Donohue was a wholly–owned subsidiary of ACCC, which is a wholly–owned subsidiary of Abitibi. Donohue owns 52.5% of the Augusta Newsprint Company and operates the U.S. recycling operations and the Alabama River newsprint mill and, prior to its sale on April 10, 2008, the Snowflake paper mill. On April 1, 2008, ACCC transferred all of the outstanding common and preferred stock of Donohue to AbitibiBowater US Holding LLC ("Holding"), a direct subsidiary of AbitibiBowater, for a combination of cash and notes issued or assumed by Holding. As a result, Donohue is no longer a subsidiary of Abitibi, but remains an indirect subsidiary of AbitibiBowater.

On May 12, 2008, AbitibiBowater contributed to Bowater, as additional paid–in–capital, a promissory note executed by AbitibiBowater in favor of Bowater. On May 15, 2008, Bowater transferred the ownership interest it held in its wholly–owned subsidiary, Newsprint South, to AbitibiBowater. Newsprint South, through its subsidiaries, owns and operates the Coosa Pines, Alabama and Grenada, Mississippi mills, as well as the Westover, Alabama sawmill. As a result, Newsprint South is no longer a subsidiary of Bowater, but is now a direct and wholly–owned subsidiary of AbitibiBowater.

These transfers of businesses between subsidiary companies that are under common control of AbitibiBowater, the ultimate parent, were accounted for at the AbitibiBowater level at historical costs, and accordingly, there was no impact on the financial position or results of operations of AbitibiBowater. Reference to "Abitibi" or "Bowater" includes the operations of Donohue and Newsprint South, respectively, for the applicable period.

6

**Expropriation**

On December 16, 2008, following our December 4, 2008 announcement of the permanent closure of our Grand Falls paper mill, the Government of Newfoundland and Labrador, Canada passed legislation under Bill 75 to expropriate all of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, whether partially or wholly owned through our subsidiaries and affiliated entities. The Government of Newfoundland and Labrador also announced that it does not plan to compensate us for the loss of the water and timber rights, but has indicated that it may compensate us for certain of our hydroelectric assets. However, it has made no commitment to ensure that such compensation would represent the fair market value of such assets. As a result of the expropriation, in the fourth quarter of 2008, we recorded, as an extraordinary loss, a non-cash write-off of the carrying value of the expropriated assets of $256 million, or $4.45 per share, with no related income tax benefit.

We have retained legal counsel to review all legal options. On April 23, 2009, we filed a Notice of Intent to Submit a Claim to Arbitration (the "Notice of Intent") under the North American Free Trade Agreement ("NAFTA"), relating to the expropriation of these assets specifying violations by the Government of Newfoundland and Labrador under the terms of NAFTA, for which the Government of Canada is responsible. Although there is no guarantee regarding the outcome and receipt of fair compensation under the terms of NAFTA, we believe that the Government of Newfoundland and Labrador has violated the terms of NAFTA, and that we (a U.S. domiciled company) should be fairly compensated for the expropriation. Under the terms of NAFTA, compensation for expropriated assets is based on fair market value. The Notice of Intent asserts that the expropriation was arbitrary, discriminatory and illegal, and we are seeking in excess of CDN$300 million in direct compensation for the fair market value of the expropriated rights and assets, plus additional costs and further relief as the Arbitral Tribunal may deem just and appropriate. We have asserted in the Notice of Intent that the expropriation unquestionably breaches Canada's NAFTA obligations on a number of grounds, including among others: (i) the criteria for expropriation are not met in Bill 75; (ii) Bill 75 does not ensure payment for the fair market value of the expropriated rights and assets; (iii) Bill 75 purports to strip us of any rights to access the courts, which is independently a violation of NAFTA; and (iv) Bill 75 is retaliatory in nature and discriminates against us. We have filed the Notice of Intent as part of the dispute resolution mechanism available under NAFTA and will submit the claim to arbitration in three months, pursuant to the relevant NAFTA provisions, should this matter not be resolved by that date. Although we believe that the Canadian Government will be required to compensate us for the fair market value of the expropriated assets, we have not recognized any asset for such claim in these financial statements.

**Product Lines**

We manage our business based on the products that we manufacture and sell to external customers. Our reportable segments, which correspond to our primary product lines, are newsprint, coated papers, specialty papers, market pulp and wood products. In general, our products are globally traded commodities. Pricing and the level of shipments of these products will continue to be influenced by the balance between supply and demand as affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates.

Certain segment and geographical financial information, including sales by segment and by geographic area, operating income (loss) by segment, total assets by segment and long-lived assets by geographic area, can be found in Note 25, "Segment Information," to our Consolidated Financial Statements.

*Newsprint*

We produce newsprint at 17 facilities in North America, South Korea and the United Kingdom. We are the largest producer of newsprint in the world by capacity, with annual capacity estimated at 5.0 million metric tons, or approximately 13% of worldwide capacity. Our annual North American production capacity of approximately 4.5 million metric tons represents approximately 43% of North American capacity.

We supply leading publishers in more than 90 countries with top-quality newsprint, including products made of up to 100% recycled fiber. Our North American newsprint is sold directly by our regional sales offices. Sales outside North America are serviced primarily through our international offices located in or near the markets we supply or through international agents. We sell approximately 44% of our total newsprint production to markets outside North America. We distribute newsprint by rail, truck and ship.

We sell newsprint to various joint venture partners (partners with us in the ownership of certain mills we operate). During 2008, these joint venture partners purchased approximately 535,000 metric tons from our consolidated entities. Newsprint sold to these joint venture partners represents approximately 11% of the total newsprint tons we sold in 2008.

*Coated papers*

We produce coated mechanical paper at one facility in North America. We are one of the largest producers of coated mechanical paper in North America, with a capacity of approximately 736,000 short tons in 2008. This tonnage represents

7

approximately 14% of North American capacity. Our coated papers are used in magazines, catalogs, books, retail advertising, direct mail and coupons. We sell coated papers to major commercial printers, publishers, catalogers and retailers. We distribute coated papers by truck and rail. Export markets are served primarily through international agents.

*Specialty papers*

We produce specialty papers at 11 facilities in North America. We are one of the largest producers of specialty papers, including supercalendered, superbright, high bright, bulky book and directory papers in North America, with a capacity of approximately 2.3 million short tons in 2008. This tonnage represents approximately 36% of North American capacity. Our combined specialty and coated papers' broad product family allows us to present a more balanced paper offering to our customers. Our specialty papers are used in books, retail advertising, direct mail, coupons and other commercial printing applications.

We sell specialty papers to major commercial printers, direct mailers, publishers, catalogers and retailers. We distribute primarily by truck and rail. Export markets are served primarily through international agents.

*Market pulp*

We produce approximately 1.0 million metric tons of market pulp at five facilities in North America, which represents approximately 6% of North American capacity. We also sell market pulp in numerous overseas markets. Market pulp is used to make a range of consumer products including tissue, packaging, specialty paper products, diapers and other absorbent products.

North American market pulp sales are made through our regional sales offices, while export sales are made through international sales agents local to their markets. We distribute market pulp by truck, rail and ship.

8

*Pulp and paper manufacturing facilities*
The following table provides a listing of the pulp and paper manufacturing facilities we owned or operated as of December 31, 2008, and production information by product line (which represents all of our reportable segments except wood products). This table excludes facilities which have been permanently closed as of December 31, 2008.

| (In 000s of metric tons) | Number of Paper Machines | 2009 Annual Capacity | 2008 Total Production | 2008 Production by Product Line | | | |
|---|---|---|---|---|---|---|---|
| | | | | Newsprint | Coated Paper | Specialty Paper | Market Pulp |
| **Canada** | | | | | | | |
| Alma, Quebec | 3 | 357 | 343 | – | – | 343 | – |
| Amos, Quebec | 1 | 209 | 199 | 199 | – | – | – |
| Baie-Comeau, Quebec | 4 | 574 | 545 | 545 | – | – | – |
| Beaupre, Quebec | 2 | 241 | 218 | – | – | 218 | – |
| Clermont, Quebec [(1)] | 2 | 353 | 349 | 349 | – | – | – |
| Dolbeau, Quebec [(2)] | 2 | 244 | 215 | – | – | 215 | – |
| Fort Frances, Ontario | 3 | 393 | 364 | – | – | 268 | 96 |
| Gatineau, Quebec | 2 | 357 | 320 | 320 | – | – | – |
| Grand Falls, Newfoundland and Labrador [(3)] | 2 | 51 | 192 | 192 | – | – | – |
| Iroquois Falls, Ontario | 2 | 276 | 260 | 225 | – | 35 | – |
| Kenogami, Quebec | 2 | 211 | 207 | – | – | 207 | – |
| Laurentide, Quebec | 2 | 360 | 327 | – | – | 327 | – |
| Liverpool, Nova Scotia [(4)] | 2 | 253 | 234 | 217 | – | 17 | – |
| Thorold, Ontario | 2 | 414 | 378 | 378 | – | – | – |
| Thunder Bay, Ontario | 3 | 760 | 604 | 274 | – | 23 | 307 |
| **United States** | | | | | | | |
| Alabama River, Alabama [(3)] | 1 | 261 | 226 | 226 | – | – | – |
| Augusta, Georgia [(5)] | 2 | 423 | 400 | 400 | – | – | – |
| Calhoun, Tennessee [(3)] [(6)] | 5 | 890 | 839 | 220 | – | 491 | 128 |
| Catawba, South Carolina | 3 | 908 | 880 | – | 651 | 7 | 222 |
| Coosa Pines, Alabama | 2 | 610 | 583 | 318 | – | – | 265 |
| Grenada, Mississippi | 1 | 246 | 233 | 233 | – | – | – |
| Usk, Washington [(7)] | 1 | 257 | 234 | 234 | – | – | – |
| **United Kingdom** | | | | | | | |
| Bridgewater, England | 2 | 235 | 212 | 212 | – | – | – |
| **South Korea** | | | | | | | |
| Mokpo, South Korea | 1 | 254 | 245 | 245 | – | – | – |
| | 52 | 9,137 | 8,607 | 4,787 | 651 | 2,151 | 1,018 |

(1) Donohue Malbaie Inc. ("DMI"), which owns one of Clermont's paper machines, is owned 51% by us and 49% by the New York Times. We manage the facility and wholly own all of the other assets at the site. Manufacturing costs are transferred between us and DMI at agreed-upon transfer costs. DMI's paper machine produced 217,000 metric tons of newsprint in 2008. The amounts in the above table represent the mill's total capacity and production including DMI's paper machine.

(2) We indefinitely idled paper machine No. 2 at our Dolbeau, Quebec facility in late May 2007. We restarted this machine in February 2008.

(3) On December 4, 2008, we announced the permanent closure of our Grand Falls, Newfoundland and Labrador newsprint mill by the end of the first quarter of 2009; the immediate idling, until further notice, of our Alabama River, Alabama newsprint mill; and the immediate idling, until further notice, of two paper machines (No. 1 and No. 2) in Calhoun, Tennessee (representing 118,000 metric tons of newsprint capacity and 111,000 metric tons of specialty grades capacity). The 2009 annual capacity for the Grand Falls mill represents the expected production until the closure of the mill.

(4) The Bowater Mersey Paper Company Limited ("Mersey") is located in Liverpool, Nova Scotia and is owned 51% by us and 49% by The Washington Post Company. We manage the facility. The amounts in the above table represent the mill's total capacity and production.

(5) Augusta Newsprint Company, which operates our newsprint mill in Augusta, Georgia, is owned 52.5% by us and 47.5% by The Woodbridge Company. We manage the facility. The amounts in the above table represent the mill's total capacity and production.

(6) Calhoun Newsprint Company ("CNC"), which owns one of Calhoun's paper machines (No. 5), Calhoun's recycle fiber plant and a portion of the thermomechanical pulp ("TMP") mill, is owned 51% by us and 49% by Herald Company, Inc. We manage the facility and wholly own all of the other assets at the site, including the remaining portion of the TMP mill, a kraft pulp mill, a market pulp dryer, four other paper machines and other support equipment. Pulp, other raw materials, labor and other manufacturing services are transferred between us and CNC at agreed-upon transfer costs. CNC's paper machine produced 201,000 metric tons of newsprint in 2008. The amounts in the above table represent the mill's total capacity and production including CNC's paper machine.

(7) The Ponderay Newsprint Company ("Ponderay") is located in Usk, Washington. Ponderay is an unconsolidated partnership in which we have a 40% interest and, through a wholly-owned subsidiary, we are the managing partner. The balance of the partnership is held by subsidiaries of five newspaper publishers. The amounts in the above table represent the mill's

*Wood products*

We operate sawmills in Canada and the United States that produce construction–grade lumber that is sold in North America. Our sawmills have an annual capacity of close to three billion board feet of lumber. In addition, our sawmills are a major source of wood chips for our pulp and paper mills.

On October 12, 2006, an agreement regarding Canada's softwood lumber exports to the U.S. became effective (the "2006 Softwood Lumber Agreement"). The 2006 Softwood Lumber Agreement provides for softwood lumber to be subject to one of two ongoing border restrictions, depending upon the province of first manufacture with several provinces, including Nova Scotia, being exempt from these border restrictions. Volume quotas have been established for each company within the provinces of Ontario and Quebec based on historical production, and the volume quotas are not transferable between provinces. The volume that we were allocated was insufficient to operate both our Ignace and Thunder Bay, Ontario sawmills; therefore, we decided to indefinitely shut our Ignace sawmill, which had an annual capacity of 84,000 board feet, in December 2006. U.S. composite prices would have to rise above $355 composite per thousand board feet before the quota volume restrictions would be lifted, which had not occurred as of December 31, 2008. For additional information, reference is made to Note 21, "Commitments and Contingencies – Lumber duties," to our Consolidated Financial Statements.

The following table provides a listing of the sawmills we owned or operated as of December 31, 2008, and their respective capacity and lumber production. This table excludes facilities which have been permanently closed as of December 31, 2008.

| *(In million board feet)* | 2009 Annual Capacity | 2008 Total Production |
|---|---|---|
| **Canada** | | |
| Comtois, Quebec | 140 | 60 |
| Girardville–Normandin, Quebec | 175 | 113 |
| La Dore, Quebec | 155 | 160 |
| La Tuque, Quebec [1] | 130 | 79 |
| Mackenzie, British Columbia (2 facilities) [2] | 500 | 10 |
| Maniwaki, Quebec | 125 | 99 |
| Mistassini, Quebec | 175 | 134 |
| Oakhill, Nova Scotia | 151 | 90 |
| Obedjiwan, Quebec [3] | 30 | 24 |
| Pointe–aux–Outardes, Quebec | 175 | 6 |
| Roberval, Quebec | 100 | 83 |
| Saguenay Produits Forestiers Saguenay, Quebec (3 facilities) | 190 | 20 |
| Saint–Felicien, Quebec | 100 | 88 |
| Saint–Hilarion, Quebec | 50 | 28 |
| Saint–Ludger–de–Milot, Quebec [4] | 80 | 88 |
| Saint–Raymond, Quebec | 54 | 4 |
| Saint–Thomas, Quebec | 90 | 97 |
| Senneterre, Quebec | 85 | 90 |
| Thunder Bay, Ontario | 250 | 198 |
| **United States** | | |
| Albertville, Alabama | 115 | 53 |
| Westover, Alabama | 54 | 44 |
| | 2,924 | 1,568 |

| | |
|---|---|
| [1] | Produits Forestiers Mauricie is located in La Tuque, Quebec and is a consolidated subsidiary in which we have a 93.2% interest. The amounts in the above table represent the mill's total capacity and production. |
| [2] | On November 29, 2007, we announced the results of the initial phase of a comprehensive strategic review of our businesses, which included a decision to indefinitely idle the two Mackenzie sawmills, which directly support the Mackenzie paper operation, which was also indefinitely idled and subsequently closed in the fourth quarter of 2008. |
| [3] | Societe en Commandite Scierie Opiticiwan is located in Obedjiwan, Quebec and is an unconsolidated entity in which we have a 45% interest. The amounts in the above table represent the mill's total capacity and production. |
| [4] | Produits Forestiers Petit–Paris Inc. is located in Saint–Ludger–de–Milot, Quebec and is an unconsolidated entity in which we have a 50% interest. The amounts in the above table represent the mill's total capacity and production. |

We also operate facilities that remanufacture and engineer wood for greater strength for specialized applications such as bedding components, roofing and flooring material, and other products. The following table provides a listing of our remanufacturing and engineered wood facilities we owned or operated as of December 31, 2008, and their respective capacity and wood production. This table excludes facilities which have been permanently closed as of December 31, 2008.

| (In million board feet, except where otherwise stated) | 2009 Annual Capacity | 2008 Total Production |
|---|---|---|
| **Remanufacturing Wood Facilities** | | |
| Chateau−Richer, Quebec | 63 | 41 |
| La Dore, Quebec | 15 | 14 |
| Manseau, Quebec | 20 | 12 |
| Saint−Prime, Quebec | 28 | 23 |
| Total Remanufacturing Wood Facilities | 126 | 90 |
| **Engineered Wood Facilities** | | |
| Larouche and Saint−Prime, Quebec (million linear feet) [(1)] | 145 | 72 |

[(1)] Abitibi−LP Engineering Wood Inc. and Abitibi−LP Engineering Wood II Inc. are located in Larouche, Quebec and Saint−Prime, Quebec, respectively, and are unconsolidated entities in which we have a 50% interest in each entity. We operate the facilities and our joint venture partners sell the products. The amounts in the above table represent the mills' total capacity and production.

*Other products*

In addition to paper, market pulp and wood products, we sell pulpwood, sawtimber, wood chips and electricity to customers located in Canada and the United States. Sale of these other products is considered a recovery of the cost of manufacturing our primary products.

**Raw Materials**

Our operations consume substantial amounts of raw materials, such as wood, recovered paper and chemicals, and energy, including electricity, natural gas, fuel oil, coal and wood waste, in the manufacturing of our pulp, paper and wood products. We purchase our raw materials and energy sources primarily on the open market.

*Wood*

Our sources of wood include property we own or lease, property on which we possess cutting rights and purchases from local producers, including sawmills that supply residual wood chips. At December 31, 2008, we owned or leased approximately 0.1 million acres of timberlands in the southeastern United States, and we owned or leased approximately 1.2 million acres in Canada. We also have contractual cutting rights on approximately 44.7 million acres of Crown−owned land in Canada. The contractual cutting rights contracts are approximately 20−25 years in length and automatically renew every 5 years, contingent upon our continual compliance with environmental performance and reforestation requirements.

In accordance with our values, our environmental vision statement and forestry policies and the interests of our customers and other stakeholders, we are committed to environmental management systems with the goal of sustainable forest management. All of our managed forestlands and wood−purchasing operations in the United States are third−party certified to be in compliance with standards of the Sustainable Forestry Initiative® ("SFI"). The SFI program combines the perpetual growing and harvesting of trees with the protection of wildlife, plants, soil and water quality. We have also achieved SFI® certification for our freehold forest land in Nova Scotia and for our Ontario Crown−owned land operations (former Bowater and Abitibi licenses) with the exception of our Iroquois Falls licenses and private land, which are certified to the Canadian Standards Association Z809 ("CSA Z809") forest management standard. This standard utilizes a continual improvement approach and requires public participation, practical demonstration of sustainable forest management practices and management commitment. In Quebec, approximately 100% of our Crown−owned managed land operations are certified to the CSA Z809 standard, while all of our private land operations are certified to either SFI or the CSA Z809 standard.

*Recovered paper*

We are among the largest recyclers of newspapers and magazines in the world. We have a number of recycling plants that utilize advanced mechanical and chemical processes to manufacture high quality pulp from a mixture of old newspapers and old magazines ("recovered paper"). The resulting products, which include recycled fiber newsprint and uncoated specialty paper, are comparable in quality to paper produced with 100% virgin fiber pulp. The Bridgewater, Coosa Pines, Thorold and Mokpo operations produce newsprint containing 100% recycled fiber. In 2008, we used 2.4 million metric tons of recovered paper worldwide. The average de−inking yield in our recycling facilities is approximately 78%. In 2008, our recycled fiber content in newsprint averaged 38%. We produce more than 40 grades with recycled content.

Our North American recycling division collects or purchases 2.4 million metric tons of recovered paper per year. Our trademarked Paper Retriever® program collects recovered fiber through a combination of community drop−off containers and recycling programs with businesses and commercial offices. The recovered paper we physically purchase is from suppliers generally within the region of our recycling plants, primarily under long−term agreements. Our European recycling division focuses its efforts on Paper Retriever® and Paper Bank® programs, and curbside collection from over 1.7 million homes in the United Kingdom.

11

*Energy*

Steam and electrical power are the primary forms of energy used in pulp and paper production. Process steam is produced in boilers using a variety of fuel sources. All of our mills produce 100% of their own steam requirements, except our Alabama River, Bridgewater, Iroquois Falls and Dolbeau mills, which purchase their steam from third–party suppliers. In 2008, our Alma, Baie–Comeau, Calhoun, Catawba, Coosa Pines, Fort Frances, Gatineau, Grand Falls, Iroquois Falls, Kenogami, Mersey and Thunder Bay operations collectively consumed approximately 41% of their electrical requirements from internal sources, notably on–site cogeneration and hydroelectric stations. The balance of our energy needs was purchased from third parties.

We have seven sites which operate cogeneration facilities and generate "green energy" from carbon–neutral biomass. In addition, we utilize alternative fuels such as methane from landfills, used oil and tire–derived fuel to reduce consumption of virgin fossil fuels.

The following table provides a listing of our hydroelectric facilities as of December 31, 2008, and their respective capacity and generation.

| | Ownership | Installed Capacity (MW) | Share of Capacity (MW) | Generation (GWh) | Share of Generation (GWh) | Share of Generation Received (GWh) |
|---|---|---|---|---|---|---|
| Hydro Saguenay | 100% | 162 | 162 | 1,189 | 1,189 | 1,189 |
| Fort Frances [1] | 75% | 27 | 20 | 127 | 95 | 95 |
| Kenora [1] | 75% | 18 | 14 | 90 | 68 | 68 |
| Iroquois Falls [1] | 75% | 92 | 69 | 585 | 439 | 439 |
| Manicouagan Power Company Inc. [1][2] | 60% | 335 | 201 | 2,897 | 1,738 | 666 |
| | | 634 | 466 | 4,888 | 3,529 | 2,457 |

[1] The amounts in the above table represent the facility's total installed capacity and power generation.

[2] We are required to sell a portion of our share of the power generation back to Alcoa, Inc. through January 1, 2011; therefore, the power we receive is net of the amounts sold under this contract with Alcoa, Inc.

See the "Business Strategy and Outlook" section in Item 7 below for information regarding the status of the sales of our interests in ACH Limited Partnership and Manicouagan Power Company Inc.

Hydroelectric assets and water rights at the Grand Falls facility, Star Lake Hydro Partnership and Exploits River Hydro Partnership were among the assets expropriated by the Government of Newfoundland and Labrador, Canada, as discussed above under "Expropriation" and have been excluded from the above table.

**Competition**

In general, our products are globally traded commodities, and the markets in which we compete are highly competitive. Pricing and the level of shipments of our products are influenced by the balance between supply and demand, global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. Any material decline in prices for our products or other adverse developments in the markets for our products could have a material adverse effect on our financial results, financial condition and cash flow. Prices for our products have been and are likely to continue to be highly volatile.

Newsprint, one of our principal products, is produced by numerous manufacturers worldwide. Aside from quality specifications to meet customer needs, the production of newsprint does not depend upon a proprietary process or formula. The five largest North American producers represent approximately 89% of the North American capacity for newsprint. The five largest global producers represent approximately 40% of global newsprint capacity. Our annual production capacity is approximately 13% of worldwide capacity. We face actual and potential competition from both large, global producers and numerous smaller regional producers. In recent years, a number of global producers of newsprint based in Asia, particularly China, have grown their production capacity substantially. Price, quality, customer relationships and the ability to produce paper with recycled fiber are important competitive determinants.

We compete with nine other coated mechanical paper producers with operations in North America. The five largest North American producers represent approximately 81% of the North American capacity for coated mechanical paper. In addition, several major offshore suppliers of coated mechanical paper compete for North American business. As a major supplier to printers and magazine/catalog publishers in North America, we compete with numerous worldwide suppliers of other grades of paper such as coated freesheet, supercalendered and uncoated mechanical paper. We compete on the basis of price, quality and service.

We produced approximately 2.4 million short tons of uncoated mechanical papers in 2008. This represented about 37% of North American uncoated mechanical paper demand in 2008 and was comprised mainly of supercalendered, superbright, high bright, bulky book and directory papers. We compete with numerous uncoated mechanical paper producers with operations in North America. In addition, imports from overseas represented about 9% of North American demand in 2008. We compete on the basis of price, quality and service.

12

We compete with six other major market pulp suppliers with operations in North America along with other smaller competitors. Market pulp is a globally traded commodity for which competition exists in all major markets. Aside from quality specifications to meet customer needs, the production of market pulp does not depend on a proprietary process or formula. We produce five major grades of market pulp (northern and southern hardwood, northern and southern softwood and fluff) and compete with other producers from South America (eucalyptus hardwood and radiata pine softwood), Europe (northern hardwood and softwood), and Asia (mixed tropical hardwood). Price, quality and service are considered the main competitive determinants.

As with other global commodities, the competitive position of our products is significantly affected by the volatility of currency exchange rates. See "Quantitative and Qualitative Disclosures About Market Risk — Foreign Currency Exchange Risk" in Item 7A of this Annual Report on Form 10−K. We have operations in Canada, the United States, the United Kingdom and South Korea. Several of our primary competitors are located in Canada, Sweden, Finland and certain Asian countries. Accordingly, the relative rates of exchange between those countries' currencies and the United States dollar can have a substantial effect on our ability to compete. In addition, the degree to which we compete with foreign producers depends in part on the level of demand abroad. Shipping costs and relative pricing generally cause producers to prefer to sell in local markets when the demand is sufficient in those markets. Trends in advertising, electronic data transmission and storage, and the Internet could continue to adversely affect traditional print media, including our products and those of our customers, but neither the timing nor the extent of those trends can be predicted with certainty. Our newspaper publishing customers in North America use and compete with businesses that use other forms of media and advertising, such as direct mailings and newspaper inserts (both of which are end uses for several of our products), television and the Internet. U.S. consumption of newsprint declined in 2008 as a result of continued declines in newspaper circulation, declines in newspaper advertising volume and publishers' conservation measures, which include increased usage of lighter basis−weight newsprint and web−width and page count reductions. Our magazine and catalog publishing customers are also subject to the effects of competing media, including the Internet.

**Employees**

As of December 31, 2008, we employed approximately 15,900 people, of whom approximately 11,600 were represented by bargaining units. Our unionized employees are represented predominantly by the Communications, Energy and Paperworkers Union in Canada and predominantly by the United Steelworkers Union in the U.S. As we develop and implement our reorganization plan, we expect to have some decline in employment.

**Trademarks**

We registered the mark "AbitibiBowater" and the AbitibiBowater logo in the countries of our principal markets. We consider our interest in the logo and mark to be valuable and necessary to the conduct of our business.

**Environmental Matters**

Information regarding environmental matters is included in Note 21, "Commitments and Contingencies," to our Consolidated Financial Statements.

We believe that our operations are in material compliance with all applicable federal, state, provincial and local environmental regulations and that the currently required control equipment is in operation. While it is impossible to predict future environmental regulations that may be established, we believe that we will not be at a competitive disadvantage with regard to meeting future Canadian, United States, British or South Korean standards.

**Internet Availability of Information**

We make our Annual Reports on Form 10−K, our Quarterly Reports on Form 10−Q and our Current Reports on Form 8−K, and any amendments to these reports, available free of charge on our Internet website (**www.abitibibowater.com**) as soon as reasonably practicable after we file or furnish such materials to the SEC. The SEC also maintains a website (**www.sec.gov**) that contains our reports and other information filed with the SEC. In addition, any materials we file with the SEC may be read and copied at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C., 20549. Information on the operations of the Public Reference Room may be obtained by calling the SEC at 1−800−SEC−0330. Our reports are also available on the System for Electronic Document Analysis and Retrieval website (**www.sedar.com**). See "Creditor Protection Proceedings − Reorganization process," for additional websites where information pertaining to our Creditor Protection Proceedings can be found.

13

**Corporate Governance**

In accordance with the corporate governance rules of the New York Stock Exchange, we have adopted Corporate Governance Principles related to certain key areas such as director qualifications and responsibilities, responsibilities of key board committees and director compensation. We have also adopted a Board of Directors Code of Conduct and a Code of Business Conduct for directors, officers and employees. Our Corporate Governance Principles, our Board of Directors Code of Conduct, our Code of Business Conduct and the charters of our Audit Committee, Human Resources & Compensation Committee and Nominating & Governance Committee are published on our website. We will disclose any amendments to our Board of Directors Code of Conduct, our Code of Business Conduct or waivers of any provision thereof on our website within four business days following the date of the amendment or waiver, and that information will remain available for at least a twelve–month period. We will provide any shareholder with printed versions of any of the foregoing guidelines, codes or committee charters upon request.

**Executive Officers**

Our executive officers are elected by the Board of Directors to serve one–year terms. There are no family relationships among officers or directors and no arrangements or understandings between any officer and any other person under which the officer was selected other than any provision contained in the Combination Agreement and Agreement and Plan of Merger dated as of January 29, 2007, as amended. Set forth below are the names, positions, ages and a brief description of the business experiences of our executive officers as of March 2, 2009:

| Name | Age | Position | Officer Since |
|------|-----|----------|---------------|
| David J. Paterson | 54 | President and Chief Executive Officer | 2007 |
| Alain Grandmont | 53 | Senior Vice President, Commercial Printing Papers Division | 2007 |
| William G. Harvey | 51 | Senior Vice President and Chief Financial Officer | 2007 |
| Yves Laflamme | 53 | Senior Vice President, Wood Products Division | 2007 |
| Jon Melkerson | 46 | Senior Vice President, International and Business Development | 2007 |
| Pierre Rougeau | 51 | Senior Vice President, Newsprint | 2007 |
| W. Eric Streed | 64 | Senior Vice President, Supply Chain | 2007 |
| Jacques P. Vachon | 49 | Senior Vice President, Corporate Affairs and Chief Legal Officer | 2007 |
| James T. Wright | 62 | Senior Vice President, Human Resources | 2007 |

Mr. Paterson, President and Chief Executive Officer of AbitibiBowater, served as Chairman, President and Chief Executive Officer of Bowater from January 2007 to October 2007. From May 2006 to January 2007, he was President and Chief Executive Officer and a Director of Bowater. Previously, from 1987 through 2006, Mr. Paterson worked for Georgia–Pacific Corporation where he was most recently Executive Vice President in charge of its Building Products Division. He has also been responsible for its Pulp and Paperboard Division, its Paper and Bleached Board Division and its Communications Papers Division.

Mr. Grandmont, Senior Vice President, Commercial Printing Papers Division of AbitibiBowater, served as Senior Vice President, Commercial Printing Papers of Abitibi from 2005 to October 2007. He served as Senior Vice President, Value–Added Operations and Sales of Abitibi in 2004. Previously, he was Senior Vice President, Value–Added Operations of Abitibi.

Mr. Harvey, Senior Vice President and Chief Financial Officer of AbitibiBowater, served as Executive Vice President and Chief Financial Officer of Bowater from August 2006 to October 2007. From 2005 to 2006, he was Senior Vice President and Chief Financial Officer and Treasurer of Bowater. From 1998 to 2005, he served as Vice President and Treasurer of Bowater. Previously, he was Vice President and Treasurer of Avenor Inc., a pulp and paper company, until its acquisition by Bowater.

Mr. Laflamme, Senior Vice President, Wood Products Division of AbitibiBowater, served as Senior Vice President, Woodlands and Sawmills of Abitibi from 2006 to October 2007. He was Vice President, Sales, Marketing and Value–Added Wood Products Operations of Abitibi from 2004 to 2005. Previously, he was Vice President, Sales and Marketing, Wood Products of Abitibi.

Mr. Melkerson, Senior Vice President, International and Business Development of AbitibiBowater, served as Vice President, International Newsprint Sales of Abitibi from 2006 to October 2007. He was Vice President, Operations, Commercial Printing Papers Division of Abitibi from 2004 to 2006. Previously, he was Vice President and General Manager, Newsprint Sales of Abitibi.

Mr. Rougeau, Senior Vice President, Newsprint of AbitibiBowater, served as Senior Vice President, Corporate Development and Chief Financial Officer of Abitibi from 2001 to October 2007.

Mr. Streed, Senior Vice President, Supply Chain of AbitibiBowater, served as Executive Vice President of Operations and Process Improvement of Bowater from August 2006 to October 2007. Previously, he was Vice President of Supply Chain Projects and Information Technology at Domtar Inc. He also served as Vice President of U.S. Operations for Domtar Inc. and previously held positions in engineering and mill management with Georgia–Pacific Corporation.

Mr. Vachon, Senior Vice President, Corporate Affairs and Chief Legal Officer of AbitibiBowater, served as Senior Vice President, Corporate Affairs and Secretary of Abitibi from 1997 to October 2007.

Mr. Wright, Senior Vice President, Human Resources of AbitibiBowater, served as Executive Vice President, Human Resources of Bowater from August 2006 to October 2007. He was Senior Vice President, Human Resources of Bowater from 2002 to 2006 and Vice President, Human Resources of Bowater from 1999 to 2002. Previously, he was Vice President of Human Resources for Georgia–Pacific Corporation.

## ITEM 1A. RISK FACTORS

In addition to the other information set forth in this Annual Report on Form 10−K, you should carefully consider the following factors which could materially affect our business, results of operations or financial condition. The Creditor Protection Proceedings will have a direct impact on our business and exacerbate these risks and uncertainties. In particular, the risks described below could cause actual events to differ materially from those contemplated in our forward−looking statements. The risks described below are not the only risks we are facing. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially affect our business, financial condition or results of operations.

We have organized our risks into the following categories:

- Risks Relating to Our Creditor Protection Proceedings, and

- Risks Relating to Our Business

### Risks Relating to Our Creditor Protection Proceedings

*We, and many of our direct and indirect subsidiaries, are currently subject to Creditor Protection Proceedings and additional subsidiaries could become subject to similar proceedings. Our business, operations and financial position are subject to the risks and uncertainties associated with such proceedings.*

Actions and decisions of our creditors and other third parties with interest in our Creditor Protection Proceedings may be inconsistent with our plans. For the duration of the Creditor Protection Proceedings, our business, operations and financial position will be subject to the risks and uncertainties associated with such proceedings. These risks, without limitation and in addition to the risks otherwise noted in this Annual Report on Form 10−K, are comprised of:

*Strategic risks, including risks associated with our ability to:*

- stabilize the business to maximize the chances of preserving all or a portion of the enterprise;

- develop a comprehensive restructuring plan in an effective and timely manner;
- resolve ongoing issues with creditors and other third parties whose interests may differ from ours;

- obtain court approval with respect to motions in the Creditor Protection Proceedings prosecuted from time to time;

- obtain creditor, court and any other requisite third−party approvals for a comprehensive restructuring plan;

- successfully implement a comprehensive restructuring plan; and

- obtain court approval for asset sales.

*Financial risks, including risks associated with our ability to:*

- generate cash from operations and maintain adequate cash−on−hand;

- operate within the restrictions and limitations of the current DIP Credit Agreement, the amended accounts receivable securitization program and the proposed Abitibi DIP Agreement, or put in place a longer term solution;

- continue to maintain currently approved intercompany lending and transfer pricing arrangements and ongoing deployment of cash resources throughout the Company in connection with ordinary course intercompany trade obligations and requirements;

- continue to maintain our cash management arrangements, and obtain any further approvals from the Monitor, the courts or other third parties, as necessary to continue such arrangements;

- raise capital to satisfy claims, including our ability to sell assets to satisfy claims against us;

- obtain sufficient exit financing to support a comprehensive restructuring plan; and

- realize full or fair value for any assets or business we may divest as part of a comprehensive restructuring plan.

*Operational risks, including risks associated with our ability to:*

- attract and retain customers despite the uncertainty caused by the Creditor Protection Proceedings;

- avoid reduction in, or delay or suspension of, customer orders as a result of the uncertainty caused by the Creditor Protection Proceedings;

- maintain market share as our competitors move to capitalize on customer concerns;

- operate our business effectively in consultation with the Creditors' Committee and the Monitor;

- actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings that could adversely affect our relationships with customers, suppliers, partners and employees;

- retain and incentivize key employees, attract new key employees and avoid labor disputes;

- retain, or if necessary, replace major suppliers on acceptable terms;

- avoid disruptions in our supply chain as a result of uncertainties related to our Creditor Protection Proceedings; and

- maintain current relationships with customers, vendors and trade creditors.

*Procedural risks, including risks associated with our ability to:*

- obtain court orders or approvals with respect to motions we file from time to time, including motions seeking extensions of the applicable stays of actions and proceedings against us, or obtain timely approval of transactions outside the ordinary course of business, or other events that may require a timely reaction by us or present opportunities for us;

- resolve the claims made against us in such proceedings for amounts not exceeding our recorded liabilities subject to compromise;

- prevent third parties from obtaining court orders or approvals that are contrary to our interests, such as the termination or shortening of the exclusivity period in the Chapter 11 Cases during which we can propose and seek confirmation of a comprehensive restructuring plan and the appointment of a Chapter 11 trustee or the conversion of our Chapter 11 Cases to Chapter 7 liquidation cases; and

- reject, repudiate or terminate contracts.

These risks and uncertainties could affect our business and operations in various ways. For example, negative events or publicity associated with our Creditor Protection Proceedings could adversely affect our sales and relationships with our customers, as well as with vendors and employees, which in turn could adversely affect our operations and financial condition, particularly if the Creditor Protection Proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the U.S. Court and the Canadian Court, which may limit our ability to respond timely to certain events or take advantage of certain opportunities.

We cannot provide any assurance as to what values, if any, will be ascribed in our Creditor Protection Proceedings to our various pre–petition liabilities, common stock and other securities. As a result of the Creditor Protection Proceedings, our currently outstanding common stock and exchangeable shares could have no value and may be canceled under any plan of reorganization we might propose and, therefore, we believe that the value of our various pre–petition liabilities and other securities is highly speculative. Accordingly, caution should be exercised with respect to existing and future investments in any of these liabilities or securities.

**Our Creditor Protection Proceedings raise substantial doubt about our ability to continue as a going concern.**

Because of the risks and uncertainties associated with our Creditor Protection Proceedings, we cannot predict the ultimate outcome of the reorganization process, or predict or quantify the potential impact on our business, financial condition or results of operations. Our Creditor Protection Proceedings and our debtor in possession financing arrangements discussed above provide us with a period of time to stabilize our operations and financial condition and develop a comprehensive restructuring plan. However, it is not possible to predict the outcome of these proceedings and as such, the realization of assets and discharge of liabilities are each subject to significant uncertainty. Accordingly, substantial doubt exists as to whether we will be able to continue as a going concern. Our ability to continue as a going concern is dependent on market conditions and our ability to successfully develop and implement a comprehensive restructuring plan and improve profitability, obtain alternative financing to replace the debtor in possession financing arrangements and restructure our obligations in a manner that allows us to obtain confirmation of a plan of reorganization by the U.S. Court and the Canadian Court. However, it is not possible to predict whether the actions taken in this restructuring will result in improvements to our financial condition sufficient to allow us to continue as a going concern. Even assuming a successful emergence from the Creditor Protection Proceedings, there can be no assurance as to the long–term viability of all or any part of the enterprise. In addition, a long period of operating under the Creditor Protection Proceedings may exacerbate the potential harm to our business and further restrict our ability to pursue certain business strategies or require us to take actions that we otherwise would not. These challenges are in addition to business, operational and competitive challenges that we would normally face even absent the Creditor Protection Proceedings.

16

*The terms of our DIP Credit Agreement, the proposed Abitibi DIP Agreement and any future debtor in possession financing arrangements may severely limit our ability to plan for or respond to changes in our business.*

Our ability to incur additional debt is significantly limited or restricted under the DIP Credit Agreement and the proposed Abitibi DIP agreement. These restrictions limit our ability to:

- incur liens or make negative pledges on our assets;

- merge, consolidate or sell our assets;

- issue additional debt;

- pay dividends or repurchase or redeem capital stock;

- make investments and acquisitions;

- enter into certain transactions with stockholders and affiliates;

- make capital expenditures;

- materially change our business;

- amend our debt and other material agreements; or

- make investments in unrestricted subsidiaries.

Our failure to comply with these covenants, or similar covenants in future debtor in possession financing arrangements, could result in our being required to repay these borrowings before their due date. If we are unable to make these repayments or otherwise refinance these borrowings, our lenders could foreclose on our assets. We may be unable to refinance these borrowings or refinance them on favorable terms, which could significantly increase our costs of borrowing.

*Our common stock and the exchangeable shares of AbitibiBowater Canada Inc. are no longer traded on a national securities exchange. It will likely be more difficult for stockholders and investors to sell our common stock or the exchangeable shares of AbitibiBowater Canada Inc. or to obtain accurate quotations of the price of these securities.*

On April 16, 2009, we received notice from the NYSE that it had determined that the trading of our common stock on the NYSE should be suspended immediately and that our common stock will be delisted after the completion of the NYSE's application to the SEC. In addition, our common stock and the exchangeable shares of AbitibiBowater Canada Inc. have been suspended from trading by the TSX and will be delisted effective May 15, 2009. Our common stock is now traded over–the–counter ("OTC") and is quoted on the Pink Sheets under the ticker symbol "ABWTQ." We can provide no assurance that we will be able to re–list our common stock or exchangeable shares on a national securities exchange or that the common stock will continue being quoted on the Pink Sheets. The trading of our common stock OTC negatively impacts the trading price of our common stock. In addition, securities that trade OTC are not eligible for margin loans and make our common stock subject to the provisions of Rule 15g–9 under the Securities Exchange Act of 1934, as amended, commonly referred to as the "penny stock rule." In connection with the delistings of our common stock and exchangeable shares, there may also be other negative implications, including the potential loss of confidence in us by our suppliers, customers and employees and the loss of institutional investor interest in our common stock.

OTC transactions involve risks in addition to those associated with transactions on a stock exchange. Many OTC stocks trade less frequently and in smaller volumes than stocks listed on an exchange. Accordingly, OTC–traded shares are less liquid and are likely to be more volatile than exchange–traded stocks. The price of our common stock is currently electronically displayed in the U.S. on the Pink Sheets, which is a quotation medium that publishes market maker quotes for OTC securities. It is not a stock exchange or listing service and is not owned, operated or regulated by any exchange. Investors are advised that we have not taken any steps to have our securities quoted on the Pink Sheets; there is no relationship, contractual or otherwise, between an issuer whose securities are quoted on the Pink Sheets, and Pink Sheets LLC exercises no regulatory oversight over us. Our status on the Pink Sheets is dependent on market makers' willingness to continue to provide the service of accepting trades of our common stock.

*We must restructure and transform our business and the assumptions underlying these efforts may prove to be inaccurate. We may not be able to successfully develop, obtain all requisite approvals for, or implement a comprehensive restructuring plan. Failure to obtain the requisite approvals for, or failure to successfully develop and implement our comprehensive restructuring plan within the time granted by the courts would, in all likelihood, lead to the liquidation of all of our assets.*

Pursuant to the ongoing Creditor Protection Proceedings, we are working on developing a comprehensive restructuring plan. In order to successfully emerge from the Creditor Protection Proceedings, our senior management will be required to spend significant amounts of time developing a comprehensive restructuring plan, instead of focusing exclusively on business operations.

In connection with the transformation of our business, we have made, and will continue to make, judgments as to whether we should further reduce, relocate or otherwise change our workforce. Costs incurred in connection with workforce reduction efforts may be higher than estimated. Furthermore, our workforce efforts may impair our ability to achieve our current or future business objectives. Any further workforce efforts including reductions may not occur on the expected timetable and may result in the recording of additional charges.

Further, we have made, and will continue to make, judgments as to whether we should limit investment in, exit, or dispose of certain businesses. The Creditor Protection Proceedings and the development of a comprehensive plan of reorganization may result in the sale or divestiture of assets or businesses, but we can provide no assurance that we will be able to complete any sale or divestiture on acceptable terms or at all. Any decision by management to further limit investment in, or exit or dispose of businesses may result in the recording of additional charges.

We also must obtain the approvals of the respective courts, creditors, the Creditors' Committee and the Monitor. We may not receive the requisite approvals and even if we do, a dissenting holder of a claim against us may challenge and ultimately delay the final approval and implementation of a comprehensive restructuring plan. If we are not successful in developing a comprehensive restructuring plan, or if we are successful in developing it but do not receive the requisite approvals, it is unclear whether we would be able to reorganize our businesses and what distributions, if any, holders of claims against us would receive. Should the stay or moratorium period and any subsequent extension thereof not be sufficient to develop and implement a comprehensive restructuring plan or should such plan not be approved by creditors and the courts and, in any such case, should we lose the protection of such stay or moratorium, substantially all of our debt obligations will become due and payable immediately, or subject to acceleration, creating an immediate liquidity crisis that in all likelihood would lead to the liquidation of all of our assets, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive if we were able to emerge as a viable, reorganized entity.

***During the pendency of the Creditor Protection Proceedings, our financial results may be volatile and may not reflect historical trends. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification.***

During the pendency of the Creditor Protection Proceedings, we expect our financial results to continue to be volatile as asset impairments, asset dispositions, restructuring activities, contract terminations and rejections and claims assessments may significantly impact our consolidated financial statements. As a result, our historical financial performance is likely not indicative of our financial performance following the dates we initiated the Creditor Protection Proceedings. Further, we may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in our historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in our historical consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan. As a result of the Creditor Protection Proceedings, we will adopt SOP 90–7 commencing on the dates of our Creditor Protection Proceedings, which will require certain changes and additional reporting in our financial statements. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification, including with respect to the Monitor, and we may implement additional controls to accommodate the adoption of SOP 90–7, as well as any of the additional reporting requirements relating to our Creditor Protection Proceedings. The implementation of the foregoing may adversely affect the ability to timely file our reports.

***Our liquidity position imposes significant risks to our operations.***

Because of the public disclosure of our liquidity issues, and despite the liquidity provided by our DIP Credit Agreement, the accounts receivable securitization program and the proposed Abitibi DIP Agreement, our ability to maintain normal credit terms with our suppliers may become impaired. We may be required to pay cash in advance to certain vendors and may experience restrictions on the availability of trade credit, which would further reduce our liquidity. If liquidity problems persist, our suppliers could refuse to provide key products and services in the future. In addition, due to public perception of our financial condition and results of operations, in particular with regard to our potential failure to meet our debt obligations, some customers could become reluctant to enter into long–term agreements with us.

The DIP Credit Agreement provides for borrowings in an aggregate principal amount of up to $206 million. The DIP Credit Agreement also provides for an incremental facility consisting of additional borrowings, upon our election and the satisfaction of certain conditions, in an aggregate principal amount of up to $360 million, less the Initial Advance. The Abitibi and Donohue securitization program has a maximum commitment of approximately $210 million and has been extended only for 45 days from April 16, 2009, subject to certain termination provisions. The Abitibi DIP Agreement, which has not yet been executed and is subject to the approval of the Canadian Court, is expected to provide for borrowings in an aggregate principal amount of up to $87.5 million. There can be no assurance that the amounts of cash from operations together with amounts available under these agreements will be sufficient to fund operations. In the event that cash flows and amounts available under these agreements are not sufficient to meet our liquidity requirements, we may be required to seek additional financing. There can be no assurance that such additional financing would be available or, if available, offered on acceptable terms. Failure to secure any necessary additional financing would have a material adverse impact on our operations. For additional information on our liquidity, see Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources."

Risks Related to Our Business

***Developments in alternative media could continue to adversely affect the demand for our products, especially in North America, and our responses to these developments may not be successful.***

Trends in advertising, electronic data transmission and storage and the Internet could have further adverse effects on traditional print media, including our products and those of our customers, but neither the timing nor the extent of those trends can be predicted with certainty. Our newspaper, magazine and catalog publishing customers may increasingly use, and compete with businesses that use, other forms of media and advertising and electronic data transmission and storage, including television and the Internet, instead of newsprint, coated paper, uncoated specialty papers or other products made by us. The demand for certain of our products weakened significantly over the last several years. For example, industry statistics indicate that North American newsprint demand has been in decline for several years and has experienced annual declines of 5.6% in 2005, 6.1% in 2006, 10.3% in 2007 and 11.2% in 2008. Third−party forecasters indicate that these declines in newsprint demand could continue or accelerate for 2009 due to conservation measures taken by publishers, reduced North American newspaper circulation, less space devoted to advertising and substitution to other uncoated mechanical grades.

One of our responses to the declining demand for our products has been to curtail our production capacity. See the "Business Strategy and Outlook" section in Item 7 for further information regarding the actions we took in 2007, 2008 and 2009 to reduce our production capacity, such as permanent closures or indefinite shutdown of certain facilities, as well as market−related downtime at other facilities. It may become necessary to curtail even more production or permanently shut down even more machines or facilities. Such further curtailments and shutdowns would become increasingly likely as North American newsprint demand continues to decline or if market conditions otherwise worsen. Curtailments or shutdowns could result in goodwill or asset write−downs and additional costs at the affected facilities, and could negatively impact our cash flows and materially affect our results of operations and financial condition.

***Bankruptcy of a significant customer could have a material adverse effect on our liquidity, financial position and results of operations.***

Trends discussed in the immediately preceding risk factor continue to impact the operations of our newsprint customers. If a customer is forced into bankruptcy as a result of these trends, any pre−petition receivables related to that customer may not be realized. In addition, such a customer may choose to reject its contracts with us, which could result in a larger pre−petition claim.

***Currency fluctuations may adversely affect our results of operations and financial condition, and changes in foreign currency exchange rates can affect our competitive position, selling prices and manufacturing costs.***

We compete with North American, European and Asian producers in most of our product lines. Our products are sold and denominated in U.S. dollars, Canadian dollars and selected foreign currencies. A substantial portion of our manufacturing costs are denominated in Canadian dollars. In addition to the impact of product supply and demand, changes in the relative strength or weakness of such currencies, and particularly the U.S. dollar, may also affect international trade flows of these products. A stronger U.S. dollar may attract imports into North America from foreign producers, increase supply and have a downward effect on prices, while a weaker U.S. dollar may encourage U.S. exports and increase manufacturing costs that are in Canadian dollars or other foreign currencies. Variations in the exchange rates between the U.S. dollar and other currencies, particularly the Euro and the currencies of Canada, United Kingdom, Sweden and certain Asian countries, will significantly affect our competitive position compared to many of our competitors.

We are particularly sensitive to changes in the value of the Canadian dollar versus the U.S. dollar. The impact of these changes depends primarily on our production and sales volume, the proportion of our production and sales that occur in Canada, the proportion of our financial assets and liabilities denominated in Canadian dollars, our hedging levels and the magnitude, direction and duration of changes in the exchange rate. We expect exchange rate fluctuations to continue to impact costs and revenues; however, we cannot predict the magnitude or direction of this effect for any quarter, and there can be no assurance of any future effects. During the last two years, the relative value of the Canadian dollar ranged from US$0.85 in January 2007 to US$1.09 in November 2007 and back to US$0.77 in October 2008. Based on exchange rates, hedging levels and operating conditions originally projected for 2009 prior to the impact of the Creditor Protection Proceedings, we project that a one−cent increase in the Canadian−U.S. dollar exchange rate would increase our operating loss for 2009 by approximately $27 million.

If the Canadian dollar strengthens again against the U.S. dollar, it could influence the foreign exchange rate assumptions that are used in our evaluation of long−lived assets for impairment and, consequently, result in asset impairment charges. See the discussion under "Critical Accounting Estimates — Long−lived assets, other than goodwill" in Item 7 of this Annual Report on Form 10−K.

***We may not be successful in our strategy of increasing our share of coated and specialty papers and competing in growth markets with higher returns.***

One of the components of our long−term strategy is to improve our portfolio of businesses by focusing on coated and specialty papers and competing more aggressively in growth markets with higher returns. There are risks associated with the implementation of this strategy, which is complicated and which involves a substantial number of mills, machines and personnel. To the extent we are unsuccessful in achieving this strategy, our results of operations may be adversely affected.

19

*We face intense competition in the forest products industry and the failure to compete effectively would have a material adverse effect on our business, financial condition and results of operations.*

We compete with numerous forest products companies, some of which have greater financial resources than we do. There has been a continued trend toward consolidation in the forest products industry, leading to new global producers. These global producers are typically large, well–capitalized companies that may have greater flexibility in pricing and financial resources for marketing, investment and expansion than we do. The markets for our products are all highly competitive. Actions by competitors can affect our ability to sell our products and can affect the volatility of the prices at which our products are sold. While the principal basis for competition is price, we also compete on the basis of customer service, quality and product type. There has also been an increasing trend toward consolidation among our customers. With fewer customers in the market for our products, our negotiation position with these customers could be weakened. In addition, the Creditor Protection Proceedings and their associated risks and uncertainties may be used by our competitors in an attempt to divert our existing customers or may discourage future customers from purchasing our products under long–term agreements.

In addition, our industry is capital intensive, which leads to high fixed costs. Some of our competitors may be lower–cost producers in some of the businesses in which we operate. Global newsprint capacity, particularly Chinese and European newsprint capacity, has been increasing, which is expected to result in lower prices, volumes or both for our exported products. We believe that new hardwood pulp capacity at South American pulp mills has unit costs that are significantly below those of our hardwood kraft pulp mills. Other actions by competitors, such as reducing costs or adding low–cost capacity, may adversely affect our competitive position in the products we manufacture and, consequently, our sales, operating income and cash flows. We may not be able to compete effectively and achieve adequate levels of sales and product margins. Failure to compete effectively would have a material adverse effect on our business, financial condition and results of operations.

*The forest products industry is highly cyclical. Fluctuations in the prices of, and the demand for, our products could result in small or negative profit margins, lower sales volumes and curtailment or closure of operations.*

The forest products industry is highly cyclical. Historically, economic and market shifts, fluctuations in capacity and changes in foreign currency exchange rates have created cyclical changes in prices, sales volume and margins for our products. Most of our paper and wood products are commodities that are widely available from other producers and even our coated and specialty paper is susceptible to these fluctuations. Because our commodity products have few distinguishing qualities from producer to producer, competition for these products is based primarily on price, which is determined by supply relative to demand. The overall levels of demand for the products we manufacture and distribute and, consequently, our sales and profitability, reflect fluctuations in levels of end–user demand, which depend in part on general economic conditions in North America and worldwide. In 2008, we experienced lower demand and decreased pricing for our wood products due to a weaker U.S. housing market. We are not expecting any significant improvements in the wood products market before the end of 2009. As such, during 2008 we announced the curtailment of annualized capacity of approximately 1.3 billion board feet of lumber in the provinces of Quebec and British Columbia. We are also conducting an in–depth review of our wood products business with the objective of selling non–core assets, consolidating facilities, and curtailing or closing non–contributing operations. Curtailments or shutdowns could result in asset write–downs at the affected facilities and could negatively impact our cash flows and materially affect our results of operations and financial condition.

*Our manufacturing businesses may have difficulty obtaining fiber at favorable prices, or at all.*

Fiber is the principal raw material we use in our business. We use both virgin fiber (wood chips and logs) and recycled fiber (old newspapers and magazines) as fiber sources for our paper mills. Wood fiber is a commodity and prices historically have been cyclical. The primary source for wood fiber is timber. Environmental litigation and regulatory developments have caused, and may cause in the future, significant reductions in the amount of timber available for commercial harvest in Canada and the United States. In addition, future domestic or foreign legislation, litigation advanced by Aboriginal groups and litigation concerning the use of timberlands, the protection of endangered species, the promotion of forest biodiversity and the response to and prevention of catastrophic wildfires could also affect timber supplies. Availability of harvested timber may further be limited by factors such as fire and fire prevention, insect infestation, disease, ice storms, wind storms, drought, flooding and other natural and man–made causes, thereby reducing supply and increasing prices. As is typical in the industry, we do not maintain insurance for any loss to our outstanding timber from natural disasters or other causes. Wood fiber pricing is subject to market influences and our cost of wood fiber may increase in particular regions due to market shifts. In 2008, we experienced lower demand and decreased pricing for our wood products due to a weaker U.S. housing market. We are not expecting any significant improvements in the wood products market before the end of 2009. We and other wood products producers have announced closures or curtailments of sawmills. Continued closures and curtailments are likely to reduce the supply and increase the price of wood fiber.

Pricing of recycled fiber increased significantly during the first three quarters of 2008, but began to decrease during the fourth quarter of 2008. For example, prices of old newspapers increased from an average of $118 per ton in December 2007, to averages of $158 per ton, $165 per ton and $195 per ton during the first, second and third quarters of 2008, respectively, and then decreased to $111 per ton during the fourth quarter of 2008. We believe that the price increases in the first three quarters of 2008 were related to expanding paper and packaging capacity in Asia, as well as strong North American demand, and that the price decreases in the fourth quarter of 2008 were due to declining North American demand. There can be no assurance that prices of recycled fiber will remain at their current lower levels. Any sustained increase in fiber prices would increase our operating costs and we may be unable to increase prices for our products in response.

Although we believe that the balance of fiber supply between our internal sources and the open market is adequate to support our current wood products and paper and pulp production requirements, there can be no assurance that access to fiber will continue at the same levels achieved in the past. The cost of softwood fiber and the availability of wood chips may be affected. If our cutting rights pursuant to the forest licenses or forest management agreements of Abitibi and Bowater are reduced or if any third–party supplier of wood fiber stops selling or is unable to sell wood fiber to us, our financial condition and operating results could suffer.

*An increase in the cost of our purchased energy, chemicals and other raw materials would lead to higher manufacturing costs, thereby reducing our margins.*

Our operations consume substantial amounts of energy, such as electricity, natural gas, fuel oil, coal and wood waste. We buy energy and raw materials, including chemicals, wood, recovered paper and other raw materials, primarily on the open market.

The prices for raw materials and energy are volatile and may change rapidly, directly affecting our results of operations. The availability of raw materials and energy may also be disrupted by many factors outside our control, adversely affecting our operations. Energy prices, particularly for electricity, natural gas and fuel oil, have been volatile in recent years and prices for 2005, 2006, 2007 and 2008 exceeded historical averages. As a result, fluctuations in energy prices will impact our manufacturing costs and contribute to earnings volatility.

We are a major user of renewable natural resources such as water and wood. Accordingly, significant changes in climate and forest diseases or infestation could affect our financial condition and results of operations. The volume and value of timber that we can harvest or purchase may be limited by factors such as fire and fire prevention, insect infestation, disease, ice storms, wind storms, drought, flooding and other natural and man–made causes, thereby reducing supply and increasing prices. As is typical in the industry, we do not maintain insurance for any loss to our standing timber from natural disasters or other causes. Also, we can provide no assurance that we will be able to maintain our rights to utilize water or to renew them at conditions comparable to those currently in effect.

For our commodity products, the relationship between industry supply and demand for these products, rather than changes in the cost of raw materials, will determine our ability to increase prices. Consequently, we may be unable to pass along increases in our operating costs to our customers. Any sustained increase in energy, chemical or raw material prices without any corresponding increase in product pricing would reduce our operating margins and potentially require us to limit or cease operations of one or more of our machines.

*The sale of certain of our hydroelectric facilities may result in an increase in energy and other costs.*

The sale of certain of our hydroelectric facilities, as discussed below, if approved by the applicable courts in connection with the Creditor Protection Proceedings, may result in an increase in energy and other costs, which could have an adverse effect on our results of operations. See the risk factor, "The current decline in the global economy and the Creditor Protection Proceedings may significantly inhibit our ability to sell assets," for additional information.

*We could experience disruptions in operations or increased labor costs due to labor disputes.*

We believe we are the largest employer in the Canadian pulp and paper sector and have the sector's largest representation by unions. A significant number of our collective bargaining agreements with respect to our paper operations in Eastern Canada will expire in the second quarter of 2009. The collective bargaining agreement for the Calhoun, Tennessee facility, which expired in July 2008, has not been renewed. The collective bargaining agreement which covers the Catawba, South Carolina facility expires in April 2009. The employees at the facility in Mokpo, South Korea have complied with all conditions necessary to strike, but the possibility of a strike or lockout of those employees is not clear. While negotiations with the unions in the past have resulted in collective agreements being signed, as is the case with any negotiation, we may not be able to negotiate acceptable new agreements, which could result in strikes or work stoppages by affected employees. Renewal of collective bargaining agreements could also result in higher wage or benefit costs. Therefore, we could experience a disruption of our operations or higher ongoing labor costs which could have a material adverse effect on our business, financial condition or results of operations.

The Communications, Energy and Paperworkers Union of Canada has selected contract talks with us to set the industry–wide pattern for contracts that will replace current agreements that expire at the end of April 2009.

At this time, we cannot predict the impact of the Creditor Protection Proceedings on our labor costs and relations.

*Our operations require substantial capital and we may not have adequate capital resources to provide for all of our capital requirements.*

Our businesses are capital intensive and require that we regularly incur capital expenditures in order to maintain our equipment, increase our operating efficiency and comply with environmental laws. In addition, significant amounts of capital may be required to modify our equipment to produce alternative grades with better demand characteristics or to make significant improvements in the characteristics of our current products. If our available cash resources and cash generated from operations are not sufficient to fund our operating needs and capital expenditures, we would have to obtain additional funds from borrowings or other available sources or reduce or delay our capital expenditures. The recent credit crisis and downturn in the global economy have resulted in a significant decline in the credit markets and the overall availability of credit. We may not be able to obtain additional funds on favorable terms or at all. If we cannot maintain or upgrade our equipment as we require, we may become unable to manufacture products that compete effectively. At this time, we cannot predict the impact of the Creditor Protection Proceedings on our capital expenditure program.

***Changes in laws and regulations could adversely affect our results of operations.***

We are subject to a variety of foreign, federal, state, provincial and local laws and regulations dealing with trade, employees, transportation, taxes, timber and water rights and the environment. Changes in these laws or regulations or their interpretations or enforcement have required in the past, and could require in the future, substantial expenditures by us and adversely affect our results of operations. For example, changes in environmental laws and regulations have in the past, and could in the future, require us to spend substantial amounts to comply with restrictions on air emissions, wastewater discharge, waste management and landfill sites, including remediation costs. Environmental laws are becoming increasingly stringent. Consequently, our compliance and remediation costs could increase materially.

***Changes in the political or economic conditions in Canada, the United States or other countries in which our products are manufactured or sold could adversely affect our results of operations.***

We manufacture products in Canada, the United States, the United Kingdom and South Korea and sell products throughout the world. Paper prices are tied to the health of the economies of North and South America, Asia and Europe, as well as to paper inventory levels in these regions. The economic and political climate of each region has a significant impact on our costs and the prices of, and demand for, our products. Changes in regional economies or political instability, including acts of war or terrorist activities, can affect the cost of manufacturing and distributing our products, pricing and sales volume, directly affecting our results of operations. Such changes could also affect the availability or cost of insurance.

***We may be subject to environmental liabilities.***

We are subject to a wide range of general and industry–specific laws and regulations relating to the protection of the environment, including those governing air emissions, wastewater discharges, timber harvesting, the storage, management and disposal of hazardous substances and waste, the clean–up of contaminated sites, landfill operation and closure, forestry operations, endangered species habitat, and health and safety. As an owner and operator of real estate and manufacturing and processing facilities, we may be liable under environmental laws for cleanup and other costs and damages, including tort liability and damages to natural resources, resulting from past or present spills or releases of hazardous or toxic substances on or from our current or former properties. We may incur liability under these laws without regard to whether we knew of, were responsible for, or owned the property at the time of, any spill or release of hazardous or toxic substances on or from our property, or at properties where we arranged for the disposal of regulated materials. Claims may arise out of currently unknown environmental conditions or aggressive enforcement efforts by governmental or private parties.

***We are subject to physical and financial risks associated with climate change.***

Our operations are subject to climate variations, which impact the productivity of forests, the distribution and abundance of species and the spread of disease or insect epidemics, which may adversely or positively affect timber production. Over the past several years, changing weather patterns and climatic conditions have added to the unpredictability and frequency of natural disasters such as hurricanes, earthquakes, hailstorms, wildfires, snow and ice storms, which could also affect our woodlands or cause variations in the cost for raw materials such as fiber. Changes in precipitation resulting in droughts could adversely affect our hydroelectric facilities' production, increasing our energy costs, while increased precipitation may generally have positive effects. To the extent climate change impacts raw material availability or our electricity production, it may also impact our costs or revenues. Furthermore, should financial markets view climate change as a financial risk, our ability to access capital markets or to receive acceptable terms and conditions could be affected.

***We may be required to record additional long–lived asset impairment charges.***

Losses related to impairment of long–lived assets are recognized when circumstances indicate the carrying values of the assets may not be recoverable, such as continuing losses in certain locations. When certain indicators that the carrying value of a long–lived asset may not be recoverable are triggered, we evaluate the carrying value of the asset group in relation to its expected undiscounted future cash flows. If the carrying value of the asset group is greater than the expected undiscounted future cash flows, an impairment charge is recorded based on the excess of the long–lived asset group's carrying value over its fair value.

In November 2008, we announced the permanent closure of our previously idled Donnacona and Mackenzie paper mills, based on current market conditions. Upon review of the recoverability of the long–lived assets at these facilities, we recorded long–lived asset impairment charges of $127 million at our Donnacona paper mill and $12 million at our Mackenzie paper mill in the third quarter of 2008.

In December 2008, we announced the permanent closure of our Grand Falls, Newfoundland and Labrador newsprint mill by the end of the first quarter of 2009 and our Covington, Tennessee paper converting facility by the end of 2008, based on current market conditions. Upon review of the recoverability of the long–lived assets at these facilities, we recorded long–lived asset impairment charges of $74 million at our Grand Falls newsprint mill and $28 million at our Covington paper converting facility in the fourth quarter of 2008.

On March 13, 2009, we announced that we signed a non–binding agreement in principle for the sale of our interests in Manicouagan Power Company Inc. for a total purchase price of approximately Cdn$615 million ($504 million), payable 90% upon the closing of the transaction and 10% on the second anniversary of the closing, subject to adjustment for contingencies. The non–binding agreement is subject to certain terms and conditions including, but not limited to, satisfactory due diligence, obtaining required consents and approvals and execution of definitive agreements (including a long–term power supply agreement for our Baie–Comeau, Quebec paper mill). In the fourth quarter of 2008, we recorded a long–lived asset impairment charge of $181 million related to these assets held for sale. The fair value of these assets was determined based on the net realizable value of the long–lived assets consistent with the terms of the non–binding agreement in principle for the sale.

For additional information, see Note 6, "Closure Costs, Impairment of Assets Other than Goodwill and Other Related Charges," to our Consolidated Financial Statements. It is possible that we could record additional non–cash long–lived asset impairment charges in future periods when there is a triggering event.

*We have net liabilities with respect to our pension plans and the actual cost of our pension plan obligations could exceed current provisions.*

As of December 31, 2008, our defined benefit pension plans were under–funded by an aggregate of approximately $389 million on a financial accounting basis. Our future funding obligations for the defined benefit pension plans depend upon changes to the level of benefits provided by the plans, the future performance of assets set aside in trusts for these plans, the level of interest rates used to determine minimum funding levels, actuarial data and demographic experience (e.g., mortality and retirement rates) and any changes in government laws and regulations. Any adverse change to any of these factors may require us to increase our cash contributions to our pension plans and those additional contributions could have a material adverse effect on our cash flows and results of operations. We are evaluating our pension and OPEB benefit obligations in the context of the Creditor Protection Proceedings and as a result, our current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change.

The determination of projected benefit obligations and the recognition of expenses related to our pension plan obligations are dependent on assumptions used in calculating these amounts. These assumptions include, among other things, expected rates of return on plan assets, which are developed using our historical experience applied to our target allocation of investments in conjunction with market related data for each individual country in which such plans exist. All assumptions are reviewed periodically with third–party actuarial consultants and adjusted as necessary. Recent deterioration in the global securities markets has impacted the value of the assets included in our defined benefit pension plans. In June 2008, in response to market disruptions, management approved a tactical de–risking policy to increase debt securities and reduce equity securities. Over the last half of 2008, debt securities were increased to approximately 75%. Accordingly, during the second half of 2008, we mitigated much of the effect of the volatility that impacted the global equity markets during such period. In December 2008, assets were rebalanced towards a normalized allocation of 50% equity securities and 50% debt securities for the majority of our pension plans. Future minimum cash contributions will not be materially impacted in 2009 as a result of the market volatility in 2008, since the 2009 contributions are largely based on valuations performed as of or prior to January 1, 2008. The decline in the fair value of our plans may, however, increase the minimum cash contributions that will be required in 2010.

*We may not be compensated for the expropriation of certain assets by the Government of Newfoundland and Labrador.*

On December 16, 2008, following our December 4, 2008 announcement of the permanent closure of our Grand Falls paper mill, the Government of Newfoundland and Labrador, Canada passed legislation under Bill 75 to expropriate all of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, whether partially or wholly owned through our subsidiaries and affiliated entities. The Government of Newfoundland and Labrador also announced that it does not plan to compensate us for the loss of the water and timber rights, but has indicated that it may compensate us for certain of our hydroelectric assets. However, it has made no commitment to ensure that such compensation would represent the fair market value of such assets. As a result of the expropriation, in the fourth quarter of 2008, we recorded, as an extraordinary loss, a non–cash write–off of the carrying value of the expropriated assets of $256 million, or $4.45 per share, with no related income tax benefit.

We have retained legal counsel to review all legal options. On April 23, 2009, we filed a Notice of Intent under NAFTA, relating to the expropriation of these assets specifying violations by the Government of Newfoundland and Labrador under the terms of NAFTA, for which the Government of Canada is responsible. Although there is no guarantee regarding the outcome and receipt of fair compensation under the terms of NAFTA, we believe that the Government of Newfoundland and Labrador has violated the terms of NAFTA, and that we (a U.S. domiciled company) should be fairly compensated for the expropriation. Under the terms of NAFTA, compensation for expropriated assets is based on fair market value. The Notice of Intent asserts that the expropriation was arbitrary, discriminatory and illegal, and we are seeking in excess of CDN$300 million in direct compensation for the fair market value of the expropriated rights and assets, plus additional costs and further relief as the Arbitral Tribunal may deem just and appropriate. We have asserted in the Notice of Intent that the expropriation unquestionably breaches Canada's NAFTA obligations on a number of grounds, including among others: (i) the criteria for expropriation are not met in Bill 75; (ii) Bill 75 does not ensure payment for the fair market value of the expropriated rights and assets; (iii) Bill 75 purports to strip us of any rights to access the courts, which is independently a violation of NAFTA; and (iv) Bill 75 is retaliatory in nature and discriminates against us. We have filed the Notice of Intent as part of the dispute resolution mechanism available under NAFTA and will submit the claim to arbitration in three months, pursuant to the relevant NAFTA provisions, should this matter not be resolved by that date. Although we believe that the Canadian Government will be required to compensate us for the fair market value of the expropriated assets, we have not recognized any asset for such claim in these financial statements.

*The current decline in the global economy are the Creditor Protection Proceedings may significantly inhibit our ability to sell assets.*

We have targeted approximately $750 million in asset sales by the end of 2009, including our 75% equity interest in ACH Limited Partnership, our interests in Manicouagan Power Company Inc., additional timberlands, sawmills, other hydroelectric sites and other assets in order to provide us with additional working capital. However, as a result of the current global economy and credit crisis, it may be difficult for potential purchasers to obtain the financing necessary to buy such assets. As a result, we may be forced to sell the assets for significantly lower amounts than planned or may not be able to sell them at all. In addition, any sale during the Creditor Protection Proceedings will be subject to approval by the applicable court. No assurances can be provided that the applicable court will approve any such sales under their current terms, or at all, or the timing of any such approvals.

*The late filing of our Annual Report on Form 10–K with the SEC could adversely affect our ability to access public capital markets in the future and limit our ability to issue shares of common stock to holders of our convertible notes and to holders of the exchangeable shares of AbitibiBowater Canada Inc. under our existing shelf registration statements.*

We did not file this Annual Report on Form 10–K for the year ended December 31, 2008 within the timeframe required by SEC rules. As a result, we will be ineligible to register our securities using short–form registration on Form S–3 for a period of at least 12 months, which could adversely affect our ability to raise capital during this period, or any future period, of non–compliance. In addition, we will be unable to use our previously filed registration statements on Form S–3 for a period of at least 12 months. As a result, we will be unable to deliver freely tradable shares of our common stock to (i) holders of our 8% senior convertible notes due 2013 upon exercise of their conversion rights or (ii) holders of the exchangeable shares of AbitibiBowater Canada Inc. upon exercise of their exchange rights, in each case until we have filed a new registration statement on Form S–1 with respect to such shares and the SEC has declared the registration statement effective (absent reliance on an exemption from the registration requirements of the U.S. securities laws).

Under the terms of the registration rights agreement related to the convertible notes, we may be required to pay penalties of up to 0.50% per annum of the principal amount of the convertible notes to the extent we are unable to maintain an effective registration statement for common shares deliverable upon conversion. Under the terms of the amended and restated support agreement related to the exchangeable shares, we are required to take good faith actions to maintain an effective registration statement for shares of common stock of AbitibiBowater deliverable upon exchange of exchangeable shares of AbitibiBowater Canada Inc. In light of the Creditor Protection Proceedings, holders of the exchangeable shares may be unable to exchange such shares for shares of our common stock for a significant period of time.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**
None.

**ITEM 2. PROPERTIES**
Information regarding our owned properties is included in Item 1 of this Form 10–K.

In addition to the properties that we own, we also lease under long–term leases certain timberlands, office premises and office and transportation equipment and have cutting rights with respect to certain timberlands. Information regarding timberland, capital and operating leases and cutting rights is included in Note 24, "Timberland, Capital and Operating Leases and Purchase Obligations," to our Consolidated Financial Statements. As a result of the Creditor Protection Proceedings, we are in default with respect to certain contracts, including without limitation certain leases of real property. However, as a result of the Creditor Protection Proceedings, all actions against us have been stayed and no action may be undertaken against us for these defaults during the stay period. We may seek to reject, repudiate or terminate certain burdensome contracts and leases so as to vacate additional leased properties and close and sell additional facilities.

**ITEM 3. LEGAL PROCEEDINGS**
On April 16, 2009, AbitibiBowater and certain of its U.S. and Canadian subsidiaries filed voluntary petitions for relief under Chapter 11. In addition, on April 17, 2009, AbitibiBowater and certain of its Canadian subsidiaries sought creditor protection under the CCAA. On April 17, 2009, Abitibi and ACCC each filed Chapter 15 Cases in the U.S. Court under the provisions of Chapter 15 of the United States Bankruptcy Code, as amended, to obtain recognition and enforcement in the United States of certain relief granted in the CCAA Proceedings. See Item 1, "Business – Creditor Protection Proceedings," for additional information.

We are involved in various legal proceedings relating to contracts, commercial disputes, taxes, environmental issues, employment and workers' compensation claims and other matters. We periodically review the status of these proceedings with both inside and outside counsel. Although the final outcome of any of these matters is subject to many variables and cannot be predicted with any degree of certainty, we establish reserves for a matter when we believe an adverse outcome is probable and the amount can be reasonably estimated. We believe that the ultimate disposition of these matters will not have a material adverse effect on our financial condition, but it could have a material adverse effect on our results of operations in any given quarter or year. Subject to certain exceptions, all litigation against us in respect of AbitibiBowater that arose or may arise out of pre–petition conduct or acts is subject to the automatic stay provisions of Chapter 11 and the CCAA and the orders of the U.S. Court and the Canadian Court rendered thereunder. As a result, we believe that these matters will not have a material adverse effect on our results of operations during the Creditor Protection Proceedings.

On December 16, 2008, following our December 4, 2008 announcement of the permanent closure of our Grand Falls paper mill, the Government of Newfoundland and Labrador, Canada passed legislation under Bill 75 to expropriate all of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, whether partially or wholly owned through our subsidiaries and affiliated entities. The Government of Newfoundland and Labrador also announced that it does not plan to compensate us for the loss of the water and timber rights, but has indicated that it may compensate us for certain of our hydroelectric assets. However, it has made no commitment to ensure that such compensation would represent the fair market value of such assets. As a result of the expropriation, in the fourth quarter of 2008, we recorded, as an extraordinary loss, a non–cash write–off of the carrying value of the expropriated assets of $256 million, or $4.45 per share, with no related income tax benefit.

We have retained legal counsel to review all legal options. On April 23, 2009, we filed a Notice of Intent under NAFTA, relating to the expropriation of these assets specifying violations by the Government of Newfoundland and Labrador under the terms of NAFTA, for which the Government of Canada is responsible. Although there is no guarantee regarding the outcome and receipt of fair compensation under the terms of NAFTA, we believe that the Government of Newfoundland and Labrador has violated the terms of NAFTA, and that we (a U.S. domiciled company) should be fairly compensated for the expropriation. Under the terms of NAFTA, compensation for expropriated assets is based on fair market value. The Notice of Intent asserts that the expropriation was arbitrary, discriminatory and illegal, and we are seeking in excess of CDN$300 million in direct compensation for the fair market value of the expropriated rights and assets, plus additional costs and further relief as the Arbitral Tribunal may deem just and appropriate. We have asserted in the Notice of Intent that the expropriation unquestionably breaches Canada's NAFTA obligations on a number of grounds, including among others: (i) the criteria for expropriation are not met in Bill 75; (ii) Bill 75 does not ensure payment for the fair market value of the expropriated rights and assets; (iii) Bill 75 purports to strip us of any rights to access the courts, which is independently a violation of NAFTA; and (iv) Bill 75 is retaliatory in nature and discriminates against us. We have filed the Notice of Intent as part of the dispute resolution mechanism available under NAFTA and will submit the claim to arbitration in three months, pursuant to the relevant NAFTA provisions, should this matter not be resolved by that date. Although we believe that the Canadian Government will be required to compensate us for the fair market value of the expropriated assets, we have not recognized any asset for such claim in these financial statements.

Following the announcement of the permanent closure of our Donnacona paper mill (the "Donnacona mill"), on December 3, 2008, the Centrale Syndicale Nationale ("CSN") and the employees of the Donnacona mill filed, against us, Investissement Quebec and the Government of the Province of Quebec, a civil lawsuit before the Superior Court of the district of Quebec. The CSN and the employees also filed a grievance claim for labor arbitration on the same basis. The CSN and the employees are claiming an amount of approximately $48 million in salary through April 30, 2011, as well as moral and exemplary damages, arguing that we failed to respect the obligations subscribed in the context of a loan made by Investissement Quebec. The CSN and the employees are also claiming that Investissement Quebec and the Government are solidarily responsible for the loss allegedly sustained by the employees. We believe our defense is meritorious and intend to contest this matter vigorously.

On June 18, 2007, The Levin Group, L.P. filed a complaint against Bowater in the Supreme Court of New York, New York County, asserting claims for breach of contract and related claims relating to certain advisory services purported to have been provided by the plaintiff in connection with the Combination. This complaint was dismissed and the matter is now before the Court of Common Pleas in Greenville County, South Carolina, where the parties are currently involved in the initial stages of the litigation, including discovery and the maintaining of various procedural motions. The Levin Group, L.P. seeks damages of no less than $70 million, related costs and such other relief as the court deems just and proper. We believe this claim is entirely without merit and intend to continue to contest this matter vigorously.

On April 26, 2006, we received a notice of violation from the U.S. Environmental Protection Agency ("EPA") alleging four violations of the Clean Air Act ("CAA") at our Calhoun mill for which penalties in excess of $100,000 could be imposed. We have strong arguments that the Calhoun mill did not violate the CAA and continue to discuss these issues with the EPA.

Since late 2001, Bowater, several other paper companies, and numerous other companies have been named as defendants in asbestos personal injury actions. These actions generally allege occupational exposure to numerous products. We have denied the allegations and no specific product of ours has been identified by the plaintiffs in any of the actions as having caused or contributed to any individual plaintiff's alleged asbestos–related injury. These suits have been filed by approximately 1,800 claimants who sought monetary damages in civil actions pending in state courts in Delaware, Georgia, Illinois, Mississippi, Missouri, New York, Tennessee and Texas. Approximately 1,000 of these claims have been dismissed, either voluntarily or by summary judgment, and approximately 800 claims remain. Insurers are defending these claims, and we believe that all of these asbestos–related claims are covered by insurance, subject to any applicable deductibles and our insurers' rights to dispute coverage. While it is not possible to predict with certainty the outcome of these matters, we do not expect these claims to have a material adverse impact on our business, financial position or results of operations.

We may be a "potentially responsible party" with respect to three hazardous waste sites that are being addressed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("Superfund") or the Resource Conservation and Recovery Act ("RCRA") corrective action authority. The first two sites are on CNC timberland tracts in South Carolina. One was already contaminated when acquired, and subsequently, the prior owner remediated the site and continues to monitor the groundwater. On the second site, several hundred steel drums containing textile chemical residue were discarded by unknown persons. The third site, at our mill in Coosa Pines, Alabama, contained buried drums and has been remediated pursuant to RCRA. We continue to monitor the groundwater. We believe we will not be liable for any significant amounts at any of these sites.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of security holders during the fourth quarter of 2008.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock began trading under the symbol "ABH" on both the NYSE and the TSX on October 29, 2007, following the consummation of the Combination. Prior to the Combination, Abitibi common shares traded on the NYSE under the symbol "ABY" and on the TSX under the symbol "A," and Bowater common stock traded on the NYSE under the symbol "BOW." Shares of Abitibi and Bowater common stock ceased separate trading on October 29, 2007. As a result of the Creditor Protection Proceedings, our common stock has been suspended from trading on the NYSE and is expected to be delisted in the near future. Our common stock and the exchangeable shares of AbitibiBowater Canada Inc. have been suspended from trading on the TSX and will be delisted effective May 15, 2009. Our common stock is currently traded on the OTC and is quoted on the Pink Sheets under the symbol "ABWTQ."

In the Combination, shareholders of Abitibi generally received 0.06261 shares of AbitibiBowater common stock for each common share of Abitibi they owned and shareholders of Bowater received 0.52 shares of common stock of AbitibiBowater for each share of Bowater common stock they owned. Since Bowater was the deemed "acquirer" of Abitibi in the Combination, the following table sets forth the high and low sales prices per share and cash dividends paid on the common stock of Bowater prior to the Combination (adjusted for the 0.52 exchange ratio), and AbitibiBowater subsequent to the Combination, for each fiscal quarter of 2008 and 2007, as applicable.

| | Bowater | | AbitibiBowater | | Dividends |
|---|---|---|---|---|---|
| | High | Low | High | Low | Per share |
| **2007** | | | | | |
| First quarter | $ 57.62 | $ 41.29 | – | – | $ 0.38 |
| Second quarter | $ 51.52 | $ 39.10 | – | – | $ 0.38 |
| Third quarter | $ 50.23 | $ 26.87 | – | – | $ 0.38 |
| Fourth quarter | $ 37.60 | $ 28.58 | $ 37.45 | $ 14.13 | – |
| **2008** | | | | | |
| First quarter | – | – | $ 26.13 | $ 4.70 | – |
| Second quarter | – | – | $ 14.89 | $ 8.65 | – |
| Third quarter | – | – | $ 9.76 | $ 3.75 | – |
| Fourth quarter | – | – | $ 4.24 | $ 0.24 | – |

As of March 31, 2009, there were 3,025 holders of record of AbitibiBowater common stock.

During the fourth quarter of 2007, the payment of a quarterly dividend to shareholders was suspended indefinitely. Under the terms of our debtor in possession financing arrangements and our Creditor Protection Proceedings, we cannot pay dividends on our common stock for the duration of our Creditor Protection Proceedings.

See Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters," for information regarding our equity compensation plans.

The following graph compares the cumulative 5-year total return attained by shareholders on our common stock versus the cumulative total returns of the S&P 500 index and a peer group of fifteen companies. The individual companies comprising the peer group are: Bemis Company, Inc., Caraustar Industries, Inc., Domtar Corporation, Graphic Packaging Holding Company, International Paper Company, Louisiana-Pacific Corporation, MeadWestvaco Corporation, Packaging Corporation of America, Potlatch Corporation, Rock-Tenn Company, Sealed Air Corporation, Smurfit-Stone Container Corporation, Sonoco Products Company, Temple-Inland Inc. and Wausau Paper Corp. The graph tracks the performance of a $100 investment in our common stock, in the S&P 500 index and in the peer group (with the reinvestment of all dividends) from December 31, 2003 to December 31, 2008. The stock price performance included in the graph is not necessarily indicative of future stock price performance.

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN**
Among AbitibiBowater Inc., the S&P 500 index and a peer group



|  | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 | 12/08 |
|---|---|---|---|---|---|---|
| AbitibiBowater Inc. | $ 100.00 | $ 96.81 | $ 69.29 | $ 52.53 | $ 25.75 | $ 0.59 |
| S&P 500 | $ 100.00 | $ 110.88 | $ 116.33 | $ 134.70 | $ 142.10 | $ 89.53 |
| Peer group | $ 100.00 | $ 109.40 | $ 96.68 | $ 104.40 | $ 97.96 | $ 45.01 |

28

ITEM 6. SELECTED FINANCIAL DATA
The following table presents summary historical consolidated financial information for each of the last five years. The selected financial information for the years ended December 31, 2008, 2007 and 2006 and as of December 31, 2008 and 2007 under the captions "Statement of Operations Data," "Segment Sales Information" and "Financial Position" shown below has been derived from our audited Consolidated Financial Statements. All other data under the above-referenced sections has been derived from Bowater's audited consolidated financial statements not included in this Annual Report on Form 10-K. This table should be read in conjunction with Items 7 and 8 of this Annual Report on Form 10-K. On October 29, 2007, Abitibi and Bowater became wholly-owned subsidiaries of AbitibiBowater. See information regarding the Combination in Note 1, "Organization and Basis of Presentation," and Note 3, "Business Combination," to our Consolidated Financial Statements. The data set forth below reflects the results of operations and financial position of Bowater for the periods before October 29, 2007 and those of both Abitibi and Bowater for periods beginning on or after October 29, 2007, and may not be indicative of our future financial condition or results of operations (see "Risk Factors" in Item 1A).

| (In millions, except per share amounts or otherwise indicated) | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **Statement of Operations Data** | | | | | |
| Sales | $ 6,771 | $ 3,876 | $ 3,530 | $ 3,484 | $ 3,190 |
| Operating (loss) income[1] | (1,430) | (400) | 41 | 99 | 30 |
| Loss before extraordinary item and cumulative effect of accounting changes | (1,978) | (490) | (135) | (120) | (87) |
| Net loss [2] | (2,234) | (490) | (138) | (121) | (87) |
| Basic and diluted loss per common share | (38.79) | (14.11) | (4.64) | (4.05) | (2.93) |
| Dividends declared per common share[3] | – | 1.15 | 1.54 | 1.54 | 1.54 |
| **Segment Sales Information** | | | | | |
| Newsprint | $ 3,238 | $ 1,574 | $ 1,438 | $ 1,429 | $ 1,341 |
| Coated papers | 659 | 570 | 612 | 625 | 495 |
| Specialty papers | 1,829 | 800 | 570 | 477 | 409 |
| Market pulp | 626 | 600 | 559 | 534 | 543 |
| Wood products | 418 | 318 | 332 | 385 | 370 |
| Other | 1 | 14 | 19 | 34 | 32 |
| | $ 6,771 | $ 3,876 | $ 3,530 | $ 3,484 | $ 3,190 |
| **Financial Position** | | | | | |
| Timber and timberlands[4] | $ 47 | $ 58 | $ 61 | $ 85 | $ 186 |
| Fixed assets, net | $ 4,460 | $ 5,675 | $ 2,878 | $ 3,049 | $ 3,301 |
| Total assets | $ 8,072 | $ 10,287 | $ 4,646 | $ 5,152 | $ 5,450 |
| Long-term debt, including current installments [5] | $ 5,293 | $ 5,059 | $ 2,267 | $ 2,422 | $ 2,442 |
| Total debt [5] | $ 5,970 | $ 5,648 | $ 2,267 | $ 2,477 | $ 2,515 |
| **Additional Information** | | | | | |
| Cash flow (used in) provided by operations | $ (420) | $ (247) | $ 182 | $ 169 | $ 123 |
| Cash invested in fixed assets, timber and timberlands | $ 186 | $ 128 | $ 199 | $ 168 | $ 84 |
| Employees (number) | 15,900 | 18,000 | 7,400 | 8,000 | 8,100 |

(1) Operating (loss) income includes a net gain on disposition of assets of $49 million, $145 million, $186 million, $66 million and $7 million for the years 2008, 2007, 2006, 2005 and 2004, respectively. Operating (loss) income for 2008, 2007, 2006, and 2005 includes closure costs, impairment of assets other than goodwill and other related charges of $481 million, $123 million, $53 million and $83 million, respectively. Operating (loss) income for 2008 and 2006 includes impairment of goodwill charges of $810 million and $200 million, respectively. Operating loss includes an arbitration award of $28 million in 2007. Operating income includes a lumber duties refund of $92 million in 2006.

(2) Net loss in 2008 includes a $256 million extraordinary loss (no related income tax benefit), or $4.45 per share, for the non-cash write-off of the carrying value of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, which were expropriated by the Government of Newfoundland and Labrador in the fourth quarter of 2008. See Item 3, "Legal Proceedings."

(3) Dividends were declared quarterly. During the fourth quarter of 2007, the payment of a quarterly dividend to shareholders was suspended indefinitely.

(4) We sold approximately 46,400 acres, 133,600 acres, 535,200 acres, 29,900 acres and 3,200 acres of timberlands in 2008, 2007, 2006, 2005 and 2004, respectively.

(5) The Creditor Protection Proceedings constituted an event of default under substantially all of our debt obligations, and those debt obligations became automatically and immediately due and payable, although any actions to enforce such payment obligations are stayed as a result of the Creditor Protection Proceedings.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**
The following management's discussion and analysis of financial condition and results of operations ("MD&A") provides information that we believe is useful in understanding our operating results, cash flows and financial condition for the years ended December 31, 2008, 2007 and 2006.
**Our Financial Information and the Going Concern Assumption**
This discussion should be read in conjunction with, and is qualified in its entirety by reference to, the Consolidated Financial Statements and related notes, which have been prepared assuming that AbitibiBowater and its subsidiaries, Abitibi and Bowater, will continue as a going concern. The going concern basis of presentation contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. However, the commencement of the Creditor Protection Proceedings and the factors contributing to our liquidity issues, which are discussed below under "Creditor Protection Proceedings" and "Liquidity and Capital Resources," raise substantial doubt about our ability to continue as a going concern. The Creditor Protection Proceedings and our debtor in possession financing arrangements, which are discussed below under "Creditor Protection Proceedings" and "Liquidity and Capital Resources," provide us with a period of time to stabilize our operations and financial condition and develop a comprehensive restructuring plan. Management believes that these actions make the going concern basis of presentation appropriate. However, it is not possible to predict the outcome of these proceedings and as such, the realization of assets and discharge of liabilities are each subject to significant uncertainty. Further, our ability to continue as a going concern is dependent on market conditions and our ability to successfully develop and implement a comprehensive restructuring plan and improve profitability, obtain alternative financing to replace our debtor in possession financing arrangements and restructure our obligations in a manner that allows us to obtain confirmation of a plan of reorganization by the U.S. Court and the Canadian Court. However, it is not possible to predict whether the actions taken in our restructuring will result in improvements to our financial condition sufficient to allow us to continue as a going concern. If the going concern basis is not appropriate, adjustments will be necessary to the carrying amounts and/or classification of our assets and liabilities. Further, a comprehensive restructuring plan could materially change the carrying amounts and classifications reported in our Consolidated Financial Statements. The assets and liabilities in our Consolidated Financial Statements do not reflect any adjustments related to the Creditor Protection Proceedings, which arose subsequent to December 31, 2008.
**Creditor Protection Proceedings**
In recent years, we have experienced significant recurring losses, which have resulted in significant negative operating cash flows. A number of factors have contributed to these results, including a highly competitive market for our products, the highly cyclical nature of the forest products industry, significant annual declines over the past several years in the demand for newsprint, which is our principal product, a weak U.S. housing market, the capital-intensive nature of our operations, the weakened global economy and cost pressures resulting from the volatility of currency exchange rates and costs for raw materials and energy. In recent quarters, we have taken steps to attempt to address these issues, including actions to curtail our production capacity, such as permanent closures or indefinite idling of certain facilities, as well as market-related downtime at other facilities. In addition, we have divested non-core assets as an additional source of liquidity, taken a disciplined approach to capital spending and implemented cost reduction initiatives to achieve improved operational efficiencies. See the "Business Strategy and Outlook" section below for additional information. However, these restructuring measures have not provided adequate relief from the significant liquidity pressure we have been experiencing. As global economic conditions dramatically worsened beginning in 2008, we have experienced significant pressure on our business and a deterioration of our liquidity. The extreme volatility in the global equity and credit markets has further compounded the situation by limiting our ability to refinance our debt obligations.
In early 2009, we made several unsuccessful attempts to refinance our significant indebtedness, which included, among other things, an exchange offer and concurrent notes offering to address Bowater's liquidity issues and a debt recapitalization plan to address Abitibi's liquidity issues. After extensive consideration of all other alternatives and after thorough consultation with our advisors, we determined, with the consent of our Board of Directors, that a comprehensive financial and business restructuring could be most effectively and quickly achieved within the framework of creditor protection proceedings in both the United States and Canada. Therefore, on April 16, 2009, AbitibiBowater and certain of its U.S. and Canadian subsidiaries filed voluntary petitions in the U.S. Court for relief under Chapter 11. In addition, on April 17, 2009, AbitibiBowater and certain of its Canadian subsidiaries sought creditor protection under the CCAA in the Canadian Court. On April 17, 2009, Abitibi and ACCC each filed a voluntary petition for provisional and final relief in the U.S. Court under the provisions of Chapter 15 of the United States Bankruptcy Code, as amended, to obtain recognition and enforcement in the United States of certain relief granted in the CCAA Proceedings. Our subsidiaries which own our Bridgewater, United Kingdom and Mokpo, South Korea operations were not included in the Creditor Protection Proceedings and will continue to operate outside of such proceedings.
We initiated the Creditor Protection Proceedings in order to enable us to pursue reorganization efforts under the protection of Chapter 11 and the CCAA. The Creditor Protection Proceedings will allow us to reassess our business strategy with a view to developing a comprehensive financial and business restructuring plan. We remain in possession of our assets and properties and will continue to operate our business and manage our properties as "debtors in possession" under the jurisdiction of the U.S. Court and the Canadian Court and in accordance with the applicable provisions of Chapter 11 and the CCAA. In general, we and our subsidiaries are authorized to continue to operate as ongoing businesses, but may not engage in transactions outside the ordinary course of business without the approval of the relevant court(s).

30

The commencement of the Creditor Protection Proceedings constituted an event of default under substantially all of our debt obligations, and those debt obligations became automatically and immediately due and payable, although any actions to enforce such payment obligations are stayed as a result of the commencement of the Creditor Protection Proceedings.

In the Creditor Protection Proceedings, we have sought and obtained interim approval by the U.S. Court and the Canadian Court to enter into the DIP Credit Agreement for the benefit of AbitibiBowater and certain of our Bowater subsidiaries. In the Creditor Protection Proceedings, we have sought approval by the Canadian Court to enter into the Abitibi DIP Agreement for the benefit of Abitibi and Donohue and expect to obtain approval of the Canadian Court shortly. In connection with the Creditor Protection Proceedings, Abitibi and certain subsidiaries of Donohue entered into an amendment to their existing accounts receivable securitization program to extend the program for 45 days, subject to certain termination provisions. For additional information on our debtor in possession financing arrangements and the accounts receivable securitization program, see "Liquidity and Capital Resources" below.

See Item 1, "Business — Creditor Protection Proceedings — Reorganization process," for information regarding the reorganization process under our Creditor Protection Proceedings.

In early 2009, we have incurred significant costs associated with our unsuccessful refinancing efforts and our Creditor Protection Proceedings and will continue to incur significant costs associated with our Creditor Protection Proceedings, which could adversely affect our results of operations and financial condition.

**Our Financial Information and the Combination of Bowater and Abitibi**

As discussed in more detail in Item 1 of this report, on October 29, 2007, Bowater and Abitibi combined in a merger of equals with each becoming a wholly−owned subsidiary of AbitibiBowater. Bowater was deemed to be the "acquirer" of Abitibi for accounting purposes; therefore, the financial information and discussion below reflect the results of operations and financial position of Bowater for the periods before the closing of the Combination and those of both Abitibi and Bowater for periods beginning on or after the closing of the Combination. This means that our consolidated results of operations for 2007 include Abitibi's results of operations for only the 64 days following the Combination. Our year−end results of operations for 2006 include only Bowater results of operations.

**Business Fundamentals**

Through our subsidiaries, we manufacture newsprint, coated and specialty papers, market pulp and wood products. We operate pulp, paper and wood products facilities in Canada, the United States, the United Kingdom and South Korea. Our reportable segments, which correspond to our primary product lines, are newsprint, coated papers, specialty papers, market pulp and wood products.

We manufacture approximately 8 million metric tons annually of a broad range of mechanical−based printing papers — newsprint, coated mechanical and mechanical specialty papers. These products are sold to leading publishers, commercial printers and advertisers. We also sell pulp that is not used in the production of our newsprint, coated and specialty printing papers to paper, tissue and toweling manufacturers who do not have a sufficient supply of pulp for their own needs. We are involved in the recovery of old paper, which fulfills part of our recycled fiber needs. We operate sawmills that can produce close to 3 billion board feet of lumber annually and provide a source of residual wood chips that we use to manufacture pulp and paper. We also operate remanufacturing and engineered wood facilities. Our wood products are sold to a diversified group of customers, including large retailers, buying groups, distributors, wholesalers and industrial accounts.

To produce our pulp and paper products, as of December 31, 2008, we owned or operated 24 pulp and paper mills, 21 of which are located in eastern North America. Mills outside of eastern North America include a newsprint mill in the state of Washington for which we are the managing partner, a newsprint mill in the United Kingdom that provides access to the European markets and a newsprint mill in South Korea that provides access to the growing Asian markets.

Our North American manufacturing facilities are located near key domestic markets and many have access to export markets. They are supported by approximately 46 million acres of timberland — about 1 million acres are owned or leased and the balance of 45 million acres is under long−term cutting rights on Crown−owned land in Canada.

Our products are, in large part, commodities sold in global markets. Our business is influenced by general economic conditions that impact our customers as well as changes within our industry that affect demand, supply, pricing, shipments or the cost of production. North American demand for newsprint continued to decline in 2008, and there is no indication as to whether or when the demand will stabilize.

The manufacturing facilities we operate are capital−intensive and require significant amounts of cash to maintain. Our ability to generate positive cash flow is dependent on achieving revenues that exceed manufacturing and interest costs and on the amount of cash that must be reinvested in the business.

A significant portion of our manufacturing facilities are located outside the U.S.; however, the majority of our sales are denominated in U.S. dollars. Therefore, fluctuations in currency rates can have a significant impact on our revenues, costs, relative cost competitiveness and cash flows. In particular, our results can be materially influenced by the movement of the Canadian dollar. A stronger Canadian dollar, such as existed throughout the first three quarters of 2008, will typically weaken our results, whereas a weaker Canadian dollar, such as existed in the fourth quarter of 2008, will tend to strengthen our earnings. We can also be subject to government imposed trade restrictions that can limit shipments or increase costs.

Significant cost components of manufacturing our products can be highly volatile, particularly the cost of wood, recycled fiber (old newspapers and magazines), energy, and commodity and specialty chemicals.

The current weakness in the global economy has reduced the level and extent of publishing and advertising, which in turn has adversely affected the demand for our pulp and paper products. The current weakness in the construction and real estate markets has reduced the level of building and remodeling, which has adversely impacted the demand for our wood products. Declines in demand for our products could in turn have a negative effect on prices. Changes in the level of supply caused by capacity additions or contractions could also influence the supply and demand balance for our products and have a direct impact on shipment levels and pricing.

**Business Strategy and Outlook**

We are attempting to stabilize our business to maximize the chances of preserving all or a portion of the enterprise and evaluating our various operations to develop a comprehensive restructuring plan in an effective and timely manner, in consultation with our business and financial advisors. As we develop a comprehensive restructuring plan, we will also consult with the Monitor and the Creditors' Committee and any such plan would be subject to the approval of the affected creditors and the courts. There can be no assurance that any such plan will be confirmed or approved by any of the affected creditors or the courts, or that any such plan will be implemented successfully.

As discussed above under "Creditor Protection Proceedings," a number of factors have contributed to our significant recurring losses and negative operating cash flows. In an attempt to mitigate the impact of these factors, we have taken numerous actions since the fourth quarter of 2007 including:

- During the first quarter of 2008, we completed the implementation of the first phase of a strategic review of our business, pursuant to which, among other things, we reduced our newsprint and specialty papers production capacity by almost 1 million metric tons per year. The reductions included the permanent closure of the Belgo (Shawinigan, Quebec) and Dalhousie (New Brunswick) mills, as well as the indefinite idling of the Donnacona (Quebec) and Mackenzie (British Columbia) mills. We also indefinitely idled two sawmills that directly supported the Mackenzie paper operation. These facilities in the aggregate represented capacity of approximately 600,000 metric tons of newsprint, 400,000 metric tons of specialty papers and 500 million board feet of lumber, and were all cash flow negative. Additionally, we permanently closed previously idled paper mills at Fort William (Thunder Bay, Ontario) and Lufkin (Texas), as well as the No. 3 paper machine at the Gatineau (Quebec) facility. The previously idled operations had a total capacity of approximately 650,000 metric tons.

- During the last half of 2008, we idled in excess of 50% of our lumber production and consolidated certain of our wood products operations in Eastern Canada, materially improving our cost competitiveness and reducing our loss on the business as the business segment continues to be challenged by severe economic conditions. We expect our 2009 operating rate in our wood products business segment to continue at these extremely low levels and we will continue to take curtailment and other actions to minimize the financial impact as a result of the economic conditions.

- During the third quarter of 2008, we permanently closed the previously idled Donnacona (Quebec) and Mackenzie (British Columbia) paper mills.

- On December 4, 2008, we announced additional measures aimed at creating a more flexible and responsive operating platform, addressing ongoing volatility in exchange rates, energy and fiber pricing, as well as structural challenges in the North American newsprint industry. Pursuant to these measures, we announced the removal of an additional 830,000 metric tons of newsprint, 110,000 metric tons of specialty paper and 70,000 metric tons of coated paper capacity through the permanent closure by the end of the first quarter of 2009 of our Grand Falls, Newfoundland and Labrador newsprint mill, representing 205,000 metric tons, the permanent closure by the end of 2008 of our Covington, Tennessee paper converting facility, representing 70,000 metric tons of coated grades and the indefinite idling, until further notice, of our Alabama River, Alabama newsprint mill, representing 265,000 metric tons, and two paper machines in Calhoun, Tennessee, representing 120,000 metric tons of newsprint and 110,000 metric tons of specialty grades and by taking 20,000 metric tons of monthly newsprint downtime in 2009 at other facilities across the organization until market conditions improve.

- We successfully implemented each of our previously announced North American newsprint price increases through November 2008 and implemented price increases in export newsprint, coated papers, specialty papers and market pulp.

32

We have achieved our targeted run rate of annualized synergies as a result of actions taken following the Combination, one full year ahead of plan. As of December 31, 2008, we had achieved an annual run rate of approximately $375 million in captured synergies. These synergies were achieved from improved efficiencies in such areas as production, selling and administrative expenses, procurement and logistics costs. We will seek to implement additional measures as we enhance our operating efficiency and productivity through continual systems analyses and operational improvements. We believe that the synergies resulting from the Combination and these additional measures will enhance our ability to further decrease production costs per ton and to increase operating cash flow and margins.

The actions discussed above have helped mitigate the newsprint demand declines in North America and significant cost pressures from recycled fiber and energy prices we experienced in 2008. However, the current North American and global economy has required us to take additional actions in 2009 across all product lines and therefore, we curtailed a further 125,000 to 150,000 metric tons of newsprint, 70,000 short tons of commercial printing paper and 80,000 metric tons of market pulp during the first quarter of 2009, in addition to the capacity curtailments discussed above. Further capacity curtailments in 2009 would become increasingly likely as North American newsprint demand continues to decline or if market conditions otherwise worsen for all of our product lines.

We have increased our target asset sales to $750 million by the end of 2009, including our 75% equity interest in ACH Limited Partnership, our interests in Manicouagan Power Company Inc., other hydroelectric sites, timberlands, sawmills and other assets. In December 2008, we announced that we accepted a non-binding proposal for the sale of our 75% interest in ACH Limited Partnership, which was established to hold hydroelectric generating assets in Ontario, to a major industrial energy producer. Pursuant to such a proposal, the resulting gross cash proceeds to us would have been approximately Cdn$198 million ($162 million); the buyer would also have assumed our share of ACH Limited Partnership's total long-term debt of Cdn$250 million ($205 million). Since we have control over ACH Limited Partnership, our consolidated financial statements include this entity on a fully consolidated basis. Accordingly, the total long-term debt of $205 million would have no longer been reflected in our Consolidated Balance Sheets. The non-binding proposal for the sale of the Ontario hydroelectric assets provided the offeror with a 60-day exclusivity period, which has since expired with no definitive agreement having been entered into by the parties. It was also made subject to due diligence, among other terms and conditions. In view of the foregoing, no assurance can be made that such sale will be concluded on the terms of the non-binding proposal, or that it will be concluded at all. On March 13, 2009, we announced that we signed a non-binding agreement in principle for the sale of our interests in Manicouagan Power Company Inc. for a total purchase price of approximately Cdn$615 million ($504 million), payable 90% upon the closing of the transaction and 10% on the second anniversary of the closing, subject to adjustment for contingencies. The non-binding agreement is subject to certain terms and conditions including, but not limited to, satisfactory due diligence, obtaining required consents and approvals and execution of definitive agreements (including a long-term power supply agreement for our Baie-Comeau, Quebec paper mill). As a result of the Creditor Protection Proceedings, these proposed sales, as well as any additional sales while the Creditor Protection Proceedings are ongoing, must be approved by the applicable courts. No assurance can be provided that the sales will be approved under their current terms or, if approved, the timing of any such approvals. It is unclear how the current global credit crisis may impact our ability to sell any of these assets.

We continue to take a disciplined approach to capital spending until market conditions improve and translate to strong positive cash flow. In light of the Creditor Protection Proceedings, any significant capital spending would be subject to the approval of the applicable court, and there can be no assurance that such approval would be granted.

## Expropriation

On December 16, 2008, following our December 4, 2008 announcement of the permanent closure of our Grand Falls paper mill, the Government of Newfoundland and Labrador, Canada passed legislation under Bill 75 to expropriate all of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, whether partially or wholly owned through our subsidiaries and affiliated entities. The Government of Newfoundland and Labrador also announced that it does not plan to compensate us for the loss of the water and timber rights, but has indicated that it may compensate us for certain of our hydroelectric assets. As a result of the expropriation, in the fourth quarter of 2008, we recorded, as an extraordinary loss, a non-cash write-off of the carrying value of the expropriated assets of $256 million, or $4.45 per share, with no related income tax benefit.

We have retained legal counsel to review all legal options. On April 23, 2009, we filed a Notice of Intent under NAFTA, relating to the expropriation of these assets specifying violations by the Government of Newfoundland and Labrador under the terms of NAFTA, for which the Government of Canada is responsible. Although there is no guarantee regarding the outcome and receipt of fair compensation under the terms of NAFTA, we believe that the Government of Newfoundland and Labrador has violated the terms of NAFTA, and that we (a U.S. domiciled company) should be fairly compensated for the expropriation. Under the terms of NAFTA, compensation for expropriated assets is based on fair market value. The Notice of Intent asserts that the expropriation was arbitrary, discriminatory and illegal, and we are seeking in excess of CDN$300 million in direct compensation for the fair market value of the expropriated rights and assets, plus additional costs and further relief as the Arbitral Tribunal may deem just and appropriate. We have asserted in the Notice of Intent that the expropriation unquestionably breaches Canada's NAFTA obligations on a number of grounds, including among others: (i) the criteria for expropriation are not met in Bill 75; (ii) Bill 75 does not ensure payment for the fair market value of the expropriated rights and assets; (iii) Bill 75 purports to strip us of any rights to access the courts, which is independently a violation of NAFTA; and (iv) Bill 75 is retaliatory in nature and discriminates against us. We have filed the Notice of Intent as part of the dispute resolution mechanism available under NAFTA and will submit the claim to arbitration in three months, pursuant to the relevant NAFTA provisions, should this matter not be resolved by that date. Although we believe that the Canadian Government will be required to compensate us for the fair market value of the expropriated assets, we have not recognized any asset for such claim in these financial statements.

**Overview of 2008 Financial Performance**

In our newsprint segment, North American newsprint consumption continued to decline and we continued to seek growth in the stronger international destinations by exporting newsprint from North America into areas where market conditions are more favorable. Demand for coated mechanical papers declined primarily due to sharp declines in advertising. In specialty papers, the industry experienced increased North American demand for standard uncoated mechanical papers, while North American demand for lightweight or directory grades and supercalendered high gloss papers declined. The decrease in global demand for market pulp was primarily due to offshore markets, particularly Western Europe. Our wood products segment continues to be negatively impacted by a weaker U.S. housing market and lower demand.

Our sales in 2008 were $6.8 billion, an increase of $2,895 million from 2007, primarily due to the inclusion of a full year of Abitibi's operating results in 2008. Excluding sales of $665 million and $3,480 million attributable to Abitibi in 2007 and 2008, respectively, sales on a comparable basis increased $80 million, or 2.5%, from $3.2 billion in 2007 to $3.3 billion in 2008. Average transaction prices in 2008 increased for all of our major products except for wood products, and shipments, excluding Abitibi's results, decreased for all of our major products.

Our operating loss in 2008 was $1,430 million, an increase of $1,030 million from an operating loss of $400 million in 2007. Abitibi was included in our operating results beginning October 29, 2007 and contributed operating losses of $99 million and $772 million to our consolidated results in 2007 and 2008, respectively. Other factors that increased our operating loss in 2008 include higher closure costs, impairment of assets other than goodwill and other related charges of $358 million, a goodwill impairment charge of $810 million, and lower net gains on disposition of assets of $96 million, as well as the impact of higher costs for wood and fiber, energy and chemicals, as discussed further below. These factors were partially offset by the impact of the achievement of our synergies discussed above, merger—related expenses incurred in 2007 in connection with the Combination, an arbitration award in 2007 related to a 1998 asset sale and the strengthening of the U.S. dollar against the Canadian dollar in the fourth quarter of 2008.

During 2008, we recorded an extraordinary loss of $256 million (no related income tax benefit), or $4.45 per share, for the non—cash write—off of the carrying value of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, which were expropriated by the Government of Newfoundland and Labrador in the fourth quarter of 2008. For additional information, see the "Business Strategy and Outlook — Expropriation" section above under this Item 7.

Our net loss for 2008 was $2,234 million, or $38.79 per share, as compared to a net loss of $490 million, or $14.11 per share, for 2007. The increase in our net loss in 2008 was primarily due to the extraordinary loss on expropriation of assets and the increase in the operating loss discussed above. The increase in net loss was also the result of an increase in interest expense, primarily due to the inclusion of Abitibi for a full year in 2008, as well as increased interest rates, higher Abitibi debt levels and amortization of deferred financing fees that resulted from the refinancing transactions consummated on April 1, 2008, and a decreased income tax benefit. These increases in net loss were partially offset by a gain on extinguishment of debt and a foreign exchange loss that improved to a foreign exchange gain, due to a stronger U.S. dollar versus the Canadian dollar in 2008.

Total assets were $8.1 billion as of December 31, 2008, a decrease of $2.2 billion compared to December 31, 2007. The decrease relates primarily to planned reductions in inventory levels, the sale of assets, the impairments of long—lived assets, assets held for sale and goodwill, as well as the write—off of the carrying value of the expropriated assets. Total debt (short—term and long—term) was $6.0 billion at December 31, 2008, an increase of $0.3 billion compared to December 31, 2007. Cash and cash equivalents decreased $3 million to $192 million at December 31, 2008, as cash generated from investing and financing activities in 2008 was used to fund the cash shortfall from operating activities in 2008. Our current liquidity assessment and outlook, including our significant near—term liquidity challenges, is discussed further below under "Liquidity and Capital Resources."

For purposes of the "Business and Financial Review" section which follows, Abitibi's results include Donohue and Bowater's results include Newsprint South for all periods presented.

Due to the Creditor Protection Proceedings and the significant uncertainties associated therewith, our past operating results and financial condition are not likely to be indicative of our future operating results and financial condition.

34

**Business and Financial Review**
**Consolidated Results of Operations**

| (In millions, except per share amounts) | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 vs. 2007 | 2007 vs. 2006 |
| Sales | $ 6,771 | $ 3,876 | $ 3,530 | $ 2,895 | $ 346 |
| Operating loss (income) | (1,430) | (400) | 41 | (1,030) | (441) |
| Net loss | (2,234) | (490) | (138) | (1,744) | (352) |
| Net loss per share – basic and diluted | (38.79) | (14.11) | (4.64) | (24.68) | (9.47) |
| | | | | | |
| Significant items that improved (lowered) operating loss (income): | | | | | |
| Product pricing – Bowater | | | | $ 340 | $ (89) |
| Shipments – Bowater | | | | (260) | (230) |
| Sales – Abitibi | | | | 2,815 | 665 |
| **Change in sales** | | | | **2,895** | **346** |
| Manufacturing costs – Bowater | | | | 132 | 80 |
| Manufacturing costs – Abitibi | | | | (2,427) | (654) |
| Manufacturing costs – employee termination costs | | | | 27 | (22) |
| **Change in cost of sales and depreciation, amortization and cost of timber harvested** | | | | **(2,268)** | **(596)** |
| Distribution costs – Bowater | | | | (7) | 6 |
| Distribution costs – Abitibi | | | | (340) | (82) |
| **Change in distribution costs** | | | | **(347)** | **(76)** |
| Selling and administrative expenses – Bowater | | | | (1) | (9) |
| Selling and administrative expenses – Abitibi | | | | (126) | (28) |
| Selling and administrative – merger and severance related costs | | | | 53 | (47) |
| **Change in selling and administrative expenses** | | | | **(74)** | **(84)** |
| **Change in impairment of goodwill** | | | | **(810)** | **–** |
| **Change in closure costs, impairment of assets other than goodwill and other related charges** | | | | **(358)** | **130** |
| **Change in lumber duties refund** | | | | **–** | **(92)** |
| **Change in arbitration award** | | | | **28** | **(28)** |
| **Change in net gain on disposition of assets** | | | | **(96)** | **(41)** |
| | | | | $ (1,030) | $ (441) |

**Year ended December 31, 2008 versus December 31, 2007**

*Sales*

Sales increased in 2008 as compared to 2007, primarily due to the inclusion of a full year of Abitibi's results. Excluding sales of $665 million and $3,480 million attributable to Abitibi in 2007 and 2008, respectively, sales on a comparable basis increased $80 million, or 2.5%, from $3,211 million in 2007 to $3,291 million in 2008. The increase was due primarily to higher transaction prices for newsprint, coated papers, specialty papers and market pulp, partially offset by lower shipments of newsprint, coated papers, specialty papers, market pulp and wood products, as well as lower product pricing for wood products. The impact of each of these items is discussed further in the "Segment Results of Operations" section of this MD&A.

*Operating loss*

Operating loss increased in 2008 as compared to 2007. The inclusion of Abitibi's results since October 29, 2007 contributed operating losses of $99 million and $772 million in 2007 and 2008, respectively. Excluding the impact of Abitibi's results, the operating loss of $658 million in 2008 represents an increase of $357 million from the operating loss of $301 million in 2007. The above table analyzes the major items that increased operating loss. A brief explanation of these major items follows.

Manufacturing costs, excluding Abitibi's results, decreased in 2008 as compared to 2007 by $132 million, primarily due to lower volumes ($115 million) and lower costs for labor and benefits ($107 million), maintenance ($26 million), depreciation ($23 million), favorable currency exchange ($16 million) and other favorable costs. These lower costs were partially offset by higher costs for wood and fiber ($125 million), energy ($41 million) and chemicals ($39 million).

Distribution costs, excluding Abitibi's results, were slightly higher in 2008 as compared to 2007, despite a significant decrease in shipments year over year. Distribution costs per ton in 2008 were significantly higher as a result of our market mix of domestic versus export shipments, higher fuel charges by our carriers and the destination of customers.

Excluding the impact of Abitibi's selling and administrative costs, the decrease in our selling and administrative expenses reflects the impact of merger–related costs and severance incurred in 2007 in connection with the Combination. These costs are discussed further in the "Segment Results of Operations — Corporate and Other" section of this MD&A.

We recorded an $810 million non–cash impairment charge for goodwill in the fourth quarter of 2008, which represented the full amount of goodwill associated with our newsprint and specialty papers reporting units. In addition, in 2008, we incurred approximately $481 million in closure costs, impairment of assets other than goodwill and other related charges, primarily due to long–lived asset impairment charges related to the permanent closures in the third quarter of 2008 of our Donnacona, Quebec, and Mackenzie, British Columbia, paper mills, which were indefinitely idled during the first quarter of 2008; the permanent closures announced in the fourth quarter of 2008 of our Grand Falls, Newfoundland and Labrador paper mill and our Covington, Tennessee paper converting facility; and an impairment charge related to assets held for sale for our interest in Manicouagan Power Company Inc. In addition, we incurred charges for severance costs for workforce reductions across several facilities, the permanent closure of our recycling facility at Baie–Comeau and additional charges for noncancelable contracts and severance at our Dalhousie and Donnacona operations. In 2007, we incurred $123 million for closure costs, impairment of assets other than goodwill and other related charges related mainly to the permanent closure of our Dalhousie, New Brunswick facility, the indefinite idling of our Donnacona, Quebec facility and permanent closure of paper machine No. 3 at our Gatineau, Quebec facility. In 2007, we also recorded a charge of $28 million relating to an arbitration award for a claim regarding the cost of certain environmental matters related to the 1998 sale of our pulp and paper facility in Dryden, Ontario to Weyerhaeuser. We realized $49 million in net gains on disposition of timberlands and other fixed assets in 2008, compared to net gains of $145 million in 2007. These costs and charges are discussed further in the "Segment Results of Operations — Corporate and Other" section of this MD&A.

*Net loss*

Net loss in 2008 was $2,234 million, or $38.79 per common share, an increase in net loss of $1,744 million, or $24.68 per common share, compared to 2007. The net loss in 2008 includes an extraordinary loss of $256 million (no related income tax benefit), or $4.45 per share, for the non–cash write–off of the carrying value of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, which were expropriated by the Government of Newfoundland and Labrador, Canada in the fourth quarter of 2008, as discussed above. The increase in net loss was also the result of the increase in operating loss ($1,030 million) as noted above, an increase in interest expense ($457 million), primarily due to the inclusion of Abitibi for a full year in 2008, as well as increased interest rates, higher Abitibi debt levels and amortization of deferred financing fees that resulted from the refinancing transactions consummated on April 1, 2008, and a decreased income tax benefit ($66 million). These increases in net loss were partially offset by a gain on extinguishment of debt of $31 million included in other income, net (see "Liquidity and Capital Resources") and a foreign exchange loss that improved to a foreign exchange gain ($74 million), due to a stronger U.S. dollar versus the Canadian dollar in 2008 and included in other income, net.

Year ended December 31, 2007 versus December 31, 2006

*Sales*

Sales increased in 2007 as compared to 2006, primarily due to the inclusion of Abitibi's results since October 29, 2007. Excluding sales of $665 million attributable to Abitibi, sales for 2007 amounted to $3,211 million, a decrease of $319 million from 2006. The decrease was due primarily to lower shipments of newsprint, coated papers, market pulp and wood products, as well as lower product pricing for newsprint, coated papers, specialty papers and wood products. These decreases were partially offset by higher transaction prices for market pulp and higher shipments of specialty papers. The impact of each of these items is discussed further in the "Segment Results of Operations" section of this MD&A.

*Operating (loss) income*

Operating income in 2006 decreased to an operating loss in 2007 due to a number of factors, including changes in sales discussed previously, and costs as listed in the table above and further described below. The inclusion of Abitibi's results since October 29, 2007 contributed an operating loss of $99 million. Manufacturing costs, excluding Abitibi's results, decreased in 2007 as compared to 2006. The decrease is mainly attributable to lower volumes ($112 million), as well as lower labor ($22 million), energy ($19 million), maintenance ($17 million) and chemical costs ($4 million). These decreases were partially offset by a stronger Canadian dollar ($73 million), higher wood costs ($92 million) and reduced benefits from our Canadian dollar hedging program ($34 million).

Distribution costs, excluding Abitibi's results, were flat despite a decrease in shipments. Distribution costs per ton in 2007 were higher as a result of our mix of domestic versus export shipments, higher fuel charges by our carriers and the destination of customers.

Selling and administrative costs, excluding Abitibi's results, increased primarily due to merger–related costs incurred in 2007 in connection with the Combination, employee termination costs and higher share–based compensation costs. These costs are discussed further in the "Segment Results of Operations — Corporate and Other" section of this MD&A.

In 2007, we incurred $123 million for closure costs, impairment of assets other than goodwill and other related charges related mainly to the permanent closure of our Dalhousie, New Brunswick facility, the indefinite idling of our Donnacona, Quebec facility and permanent closure of paper machine No. 3 at our Gatineau, Quebec facility. We also recorded a charge of $28 million relating to an arbitration award for a claim regarding the cost of certain environmental matters related to the 1998 sale of our pulp and paper facility in Dryden, Ontario to Weyerhaeuser. In 2007, we realized $145 million in net gains on disposition of timberlands and other fixed assets, compared to net gains of $186 million in 2006. These costs and charges are discussed further in the "Segment Results of Operations — Corporate and Other" section of this MD&A.

In 2006, we received a refund of $92 million for lumber duties that were previously paid to the U.S. government as a result of the finalization of the 2006 Softwood Lumber Agreement. This is discussed further in the "Segment Results of Operations — Wood Products" section of this MD&A.

*Net loss*

Net loss in 2007 was $490 million, or $14.11 per common share, an increase in net loss of $352 million or $9.47 per common share, compared to 2006. The increase in net loss was the result of the decrease in operating income as noted above and an increase in interest expense, partially offset by an income tax benefit recorded in 2007. Interest expense increased $53 million in 2007, from $196 million in 2006 to $249 million in 2007, due to the inclusion of Abitibi's results since October 29, 2007, which contributed $64 million of interest expense to our consolidated results.

**Fourth Quarter of 2008**

Sales for the fourth quarter of 2008 increased $126 million compared to the fourth quarter of 2007, primarily due to increased transaction prices and the inclusion of Abitibi's results since October 29, 2007, which contributed sales of $665 million and $843 million in the fourth quarter of 2007 and 2008, respectively. Transactions prices were significantly higher for our newsprint, specialty papers and coated papers products compared to the fourth quarter of 2007 due to price increases implemented throughout 2008. Despite the inclusion of Abitibi's results for the full quarter of 2008, our shipments for our paper and pulp products declined slightly as compared to the fourth quarter of 2007.

Operating loss for the fourth quarter of 2008 was $1,059 million compared to an operating loss of $358 million for the fourth

quarter of 2007. The operating loss for the fourth quarter of 2008 includes $316 million in closure costs, impairment of assets other than goodwill and other related charges, $20 million for inventory write−downs (included in Cost of sales, excluding depreciation, amortization and cost of timber harvested), primarily related to the closure of our Grand Falls and Covington facilities, goodwill impairment charges of $810 million and a net gain on disposition of assets of $4 million. The operating loss for the fourth quarter of 2007 included $123 million in closure costs, impairment of assets other than goodwill and other related charges, $39 million for severance and inventory write−downs (included in Cost of sales, excluding depreciation, amortization and cost of timber harvested) and a net gain on disposition of assets of $5 million. Depreciation, amortization and cost of timber harvested were $164 million and $156 million in the fourth quarter of 2008 and 2007, respectively. The fourth quarter of 2008 operating loss as compared to the fourth quarter of 2007 was impacted by the inclusion of Abitibi's results since October 29, 2007 (which contributed operating losses of $99 million and $501 million in the fourth quarter of 2007 and 2008, respectively), as well as the impact of higher costs for wood and fiber and energy, partially offset by the impact of increased sales, the achievement of our synergies discussed above and a favorable currency exchange with the Canadian dollar, as the U.S. dollar strengthened considerably against the Canadian dollar in the fourth quarter of 2008, as compared to the fourth quarter of 2007.

Interest expense for the fourth quarter of 2008 was $187 million, an increase of $80 million compared to the fourth quarter of 2007. The increase is primarily due to the inclusion of Abitibi for a full quarter in 2008, as well as increased interest rates, higher Abitibi debt levels and amortization of deferred financing fees that resulted from the refinancing transactions consummated on April 1, 2008.

During the fourth quarter of 2008, we recorded an extraordinary loss of $256 million (no related income tax benefit), or $4.45 per share for the year, for the non−cash write−off of the carrying value of our timber rights, water rights, leases and hydroelectric assets in the Province of Newfoundland and Labrador, which were expropriated by the Government of Newfoundland and Labrador in the fourth quarter of 2008.

Net loss for the fourth quarter of 2008 was $1,433 million, or $24.85 per diluted share, on sales of $1,617 million compared to a net loss for the fourth quarter of 2007 of $250 million, or $5.09 per diluted share, on sales of $1,491 million.

**Segment Results of Operations**

We manage our business based on the products that we manufacture and sell to external customers. Our reportable segments, which correspond to our primary product lines, are newsprint, coated papers, specialty papers, market pulp and wood products. In general, our products are globally traded commodities. Pricing and the level of shipments of these products will continue to be influenced by the balance between supply and demand as affected by global economic conditions, changes in consumption and capacity, the level of customer and producer inventories and fluctuations in currency exchange rates. None of the income or loss items following "Operating (loss) income" in our Consolidated Statements of Operations included in our Consolidated Financial Statements ("Consolidated Statements of Operations") are allocated to our segments, since those items are reviewed separately by management. For the same reason, closure costs, impairment of assets other than goodwill and other related charges, impairment of goodwill, employee termination costs, net gain on disposition of assets and other discretionary charges or credits are not allocated to our segments. Share−based compensation expense and depreciation expense are, however, allocated to our segments. For further information regarding our segments, see Note 25, "Segment Information," to our Consolidated Financial Statements.

38

Newsprint

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Average price (per metric ton) | $ 682 | $ 601 | $ 636 |
| Average cost (per metric ton) | $ 676 | $ 652 | $ 601 |
| Shipments (thousands of metric tons) | 4,746 | 2,620 | 2,260 |
| Downtime (thousands of metric tons) | 238 | 237 | 245 |
| Inventory at end of year (thousands of metric tons) | 129 | 221 | 68 |

| | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| (In millions) | 2008 | 2007 | 2006 | 2008 vs. 2007 | 2007 vs. 2006 |
| Sales | $ 3,238 | $ 1,574 | $ 1,438 | $ 1,664 | $ 136 |
| Segment operating income (loss) | 30 | (134) | 79 | 164 | (213) |
| | | | | | |
| Significant items that improved (lowered) segment operating (loss) income: | | | | | |
| Product pricing – Bowater | | | | $ 165 | $ (74) |
| Shipments – Bowater | | | | (123) | (148) |
| Sales – Abitibi | | | | 1,622 | 358 |
| **Change in sales** | | | | **1,664** | **136** |
| Manufacturing costs – Bowater | | | | 61 | 28 |
| Manufacturing costs – Abitibi | | | | (1,344) | (329) |
| **Change in cost of sales and depreciation, amortization and cost of timber harvested** | | | | **(1,283)** | **(301)** |
| Distribution costs – Bowater | | | | (1) | (3) |
| Distribution costs – Abitibi | | | | (210) | (44) |
| **Change in distribution costs** | | | | **(211)** | **(47)** |
| Selling and administrative expenses – Bowater | | | | 8 | 2 |
| Selling and administrative expenses – Abitibi | | | | (14) | (3) |
| **Change in selling and administrative expenses** | | | | **(6)** | **(1)** |
| | | | | $ 164 | $ (213) |

**Year ended December 31, 2008 versus December 31, 2007**

Segment sales increased in 2008 as compared to 2007, primarily due to the inclusion of a full year of Abitibi's results. Sales for 2008 were $3,238 million and shipments were 4,746,000 metric tons, whereas sales for 2007 on an unaudited combined basis for Abitibi and Bowater were $3,240 million and shipments were 5,323,000 metric tons.

Excluding sales of $358 million and $1,980 million attributable to Abitibi in 2007 and 2008, respectively, sales on a comparable basis increased $42 million, or 3.5%, from $1,216 million in 2007 to $1,258 million in 2008. Excluding shipments of 589,000 metric tons and 2,897,000 metric tons attributable to Abitibi in 2007 and 2008, respectively, Bowater's newsprint shipments in 2008 decreased 182,000 metric tons, or 9.0%, compared to 2007. While North American consumption continued its decline in 2008, we continue to seek growth in the stronger international destinations by exporting newsprint from North America into areas where market conditions are more favorable. Our average transaction price in 2008 was higher than 2007 as a result of the implementation of previously announced newsprint price increases in North America, the sales impact of which offset the significant decrease in shipments.

In 2008, the total downtime was primarily related to our indefinite idling of our Mackenzie facility and maintenance and market–related downtime at several other facilities. Inventory levels at December 31, 2008 were 129,000 metric tons compared to inventory levels at December 31, 2007 of 221,000 metric tons.

Segment operating results improved to $30 million of operating income in 2008 compared to a $134 million operating loss in 2007, primarily as a result of higher transaction prices. Segment operating results for Abitibi improved to $35 million of operating income in 2008 from an operating loss of $18 million in 2007. Segment operating loss for Bowater, excluding Abitibi's results in both years, decreased from $116 million in 2007 to $5 million in 2008. The above table analyzes the major items that improved operating results. A brief explanation of these major items follows.

Segment manufacturing costs, excluding Abitibi's results for 2007 and 2008 decreased $61 million in 2008 compared to 2007, despite a significant increase in input costs for wood and fiber ($75 million). These increased input costs were offset by lower volumes ($17 million) and lower costs for labor and benefits ($46 million), repairs ($12 million), a favorable currency exchange ($21 million), depreciation ($4 million) and other favorable costs.

Segment distribution costs and selling and administrative costs increased in 2008 compared to 2007, primarily due to the inclusion of a full year of Abitibi's results. Bowater's increased distribution costs per ton were offset by lower shipments.

*Newsprint Third–Party Data:* For the year ended December 31, 2008, total North American newsprint demand declined 11.2%, compared to the same period last year. North American net exports of newsprint were 7.3% higher than 2007 levels. Inventories (North American mills and U.S. users) at December 31, 2008 were 1.1 million metric tons, 1.0% lower than December 31, 2007. The days of supply at the U.S. daily newspapers was 50 days at December 31, 2008 compared to 39 days at December 31, 2007. The North American operating rate was 94% for the year ended December 31, 2008.

Year ended December 31, 2007 versus December 31, 2006

Segment sales increased in 2007 as compared to 2006, primarily due to the inclusion of Abitibi's results since October 29, 2007. Excluding sales of $358 million attributable to Abitibi, sales for 2007 amounted to $1,216 million, a decrease of $222 million from 2006. The decrease was due primarily to lower shipments of newsprint by Bowater mills and lower product pricing. Excluding shipments of 589,000 metric tons attributable to Abitibi, newsprint shipments for 2007 were 10.1% lower when compared to 2006, as we curtailed production in response to the decline in our customer orders and continued the shift of machine capacity from the production of newsprint to the production of specialty paper grades. Excluding Abitibi's results, our average price for newsprint was 5.8% lower in 2007 compared to 2006. While North American consumption remains in decline, global newsprint demand excluding North America increased in 2007 compared to 2006.

In 2007, we had total downtime of 237,000 metric tons, including 39,000 metric tons of maintenance downtime. Inventory levels of 221,000 metric tons increased by 153,000 metric tons at December 31, 2007 as compared to December 31, 2006, due to the inclusion of Abitibi's newsprint inventory of 133,000 metric tons and an increase in export warehouse inventory levels.

Segment operating income in 2006 decreased to a segment operating loss in 2007, primarily as a result of lower sales by Bowater, as noted above, and an operating loss of $18 million contributed by Abitibi's operations since October 29, 2007, partially offset by lower manufacturing costs for Bowater. Manufacturing costs for Bowater were lower as a result of lower volumes ($68 million), lower labor costs ($24 million), lower maintenance costs ($11 million), lower depreciation ($6 million) and lower energy costs ($4 million), partially offset by higher wood costs ($49 million), a stronger Canadian dollar ($34 million) and reduced benefits from our Canadian dollar hedging program ($14 million). Although Bowater's manufacturing costs were lower year over year, shipments were substantially lower, which resulted in higher fixed costs per ton and higher operating costs per ton. Bowater's distribution costs per ton were also higher, primarily due to an increase in export shipments.

40

Coated Papers

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Average price (per short ton) | $ 882 | $ 720 | $ 769 |
| Average cost (per short ton) | $ 713 | $ 667 | $ 673 |
| Shipments (thousands of short tons) | 748 | 792 | 797 |
| Downtime (thousands of short tons) | 10 | 29 | 68 |
| Inventory at end of year (thousands of short tons) | 39 | 26 | 37 |

| | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| (In millions) | 2008 | 2007 | 2006 | 2008 vs. 2007 | 2007 vs. 2006 |
| Sales | $ 659 | $ 570 | $ 612 | $ 89 | $ (42) |
| Segment operating income | 126 | 42 | 76 | 84 | (34) |
| | | | | | |
| Significant items that improved (lowered) segment operating income: | | | | | |
| Product pricing | | | | $ 128 | $ (37) |
| Shipments | | | | (39) | (5) |
| **Change in sales** | | | | **89** | **(42)** |
| **Change in cost of sales and depreciation, amortization and cost of timber harvested** | | | | **(6)** | **7** |
| **Change in distribution costs** | | | | **(3)** | **(1)** |
| **Change in selling and administrative expenses** | | | | **4** | **2** |
| | | | | $ 84 | $ (34) |

**Year ended December 31, 2008 versus December 31, 2007**

The Combination did not impact our coated papers segment results as Abitibi does not have any facilities that produce or sell coated papers. Segment sales increased to $659 million in 2008 as compared to $570 million in 2007, as a result of significantly higher transaction prices. Our average transaction price increased by 22.5% as compared to 2007, due to implemented transaction price increases over the past year. Segment operating income increased by $84 million in 2008 as compared to 2007, primarily due to increased sales as discussed above, partially offset by higher manufacturing costs. The above table analyzes the major items that impacted operating income. The higher manufacturing costs are due to increased costs for purchased fiber and wood ($8 million), chemicals ($19 million), energy ($5 million) and fuel ($6 million), partially offset by lower volumes ($32 million).

*Coated Papers Third–Party Data:* U.S. consumer magazine advertising pages decreased 12% in 2008 compared to 2007. North American demand for coated mechanical papers decreased 16.3% in 2008 compared to 2007. The industry operating rate was 85% in 2008, compared to 98% in 2007. North American coated mechanical mill inventories were at 27 days supply at December 31, 2008, compared to 11 days supply at December 31, 2007.

Year ended December 31, 2007 versus December 31, 2006

Segment sales of coated papers decreased in 2007 as compared to 2006 as a result of lower product pricing and lower shipments. Our average transaction price declined 6.4% and our coated mechanical papers shipments decreased 0.6% in 2007 as compared to 2006. Demand for our coated mechanical papers improved in the second half of 2007, despite the negative impact of the May 2007 postal increase on demand, primarily due to capacity closures by some of our North American competitors and reduced offshore imports.

41

Segment operating income decreased in 2007 as compared to 2006, primarily as a result of lower sales, as noted above. The lower sales were partially offset by lower manufacturing costs, including the impact of lower energy costs ($9 million), lower volumes ($7 million) and lower depreciation ($4 million), partially offset by higher costs for wood ($5 million) and chemicals ($3 million).

**Specialty Papers**

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Average price (per short ton) | $ 754 | $ 699 | $ 669 |
| Average cost (per short ton) | $ 760 | $ 741 | $ 711 |
| Shipments (thousands of short tons) | 2,425 | 1,195 | 852 |
| Downtime (thousands of short tons) | 124 | 102 | 5 |
| Inventory at end of year (thousands of short tons) | 143 | 151 | 48 |

|  | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| (In millions) | 2008 | 2007 | 2006 | 2008 vs. 2007 | 2007 vs. 2006 |
| Sales | $ 1,829 | $ 800 | $ 570 | $ 1,029 | $ 230 |
| Segment operating loss | (14) | (85) | (35) | 71 | (50) |
| Significant items that improved (lowered) segment operating loss: | | | | | |
|   Product pricing – Bowater | | | | $ 70 | $ (13) |
|   Shipments – Bowater | | | | (12) | 24 |
|   Sales – Abitibi | | | | 971 | 219 |
|   **Change in sales** | | | | **1,029** | **230** |
|   Manufacturing costs – Bowater | | | | 12 | (36) |
|   Manufacturing costs – Abitibi | | | | (856) | (213) |
|   **Change in cost of sales and depreciation, amortization and cost of timber harvested** | | | | **(844)** | **(249)** |
|   Distribution costs – Bowater | | | | (8) | (5) |
|   Distribution costs – Abitibi | | | | (107) | (26) |
|   **Change in distribution costs** | | | | **(115)** | **(31)** |
|   Selling and administrative expenses – Bowater | | | | 5 | 2 |
|   Selling and administrative expenses – Abitibi | | | | (4) | (2) |
|   **Change in selling and administrative expenses** | | | | **1** | **–** |
|  | | | | $ 71 | $ (50) |

**Year ended December 31, 2008 versus December 31, 2007**

Segment sales increased in 2008 as compared to 2007, primarily due to the inclusion of a full year of Abitibi's results. Sales for 2008 were $1,829 million and shipments were 2,425,000 short tons, whereas sales for 2007 on an unaudited combined basis for Abitibi and Bowater were $1,772 million and shipments were 2,627,000 short tons.

Excluding sales of $219 million and $1,190 million attributable to Abitibi in 2007 and 2008, respectively, sales on a comparable basis increased $58 million, or 10.0%, from $581 million in 2007 to $639 million in 2008. Excluding shipments of 315,000 short tons and 1,562,000 short tons attributable to Abitibi in 2007 and 2008, respectively, Bowater's specialty papers shipments in 2008 decreased 17,000 short tons, or 1.9%, compared to 2007. The increase in Bowater's sales was due to higher product pricing, partially offset by lower volumes.

Our downtime in 2008 was primarily due to the indefinite idling of our Donnacona facility, which was permanently closed in November 2008, and market–related downtime at several facilities. Inventory levels at December 31, 2008 of 143,000 short tons decreased slightly from 151,000 short tons at December 31, 2007.

Segment operating loss decreased to $14 million in 2008 compared to $85 million in 2007, primarily as a result of higher transaction prices. Segment operating loss for Abitibi decreased to $19 million compared to $22 million in 2007. Segment operating income for Bowater, excluding Abitibi's losses in both years, improved from a $63 million loss in 2007 to $5 million of income in 2008, primarily due to increased sales revenue, as discussed above, and lower manufacturing costs as discussed below. The above table analyzes the major items that decreased operating loss. A brief explanation of these major items follows.

Segment manufacturing costs, excluding Abitibi's results for 2007 and 2008, were slightly lower in 2008 as compared to 2007. Favorable labor and benefit costs ($18 million), lower repairs ($9 million), lower depreciation ($13 million) and other favorable costs were partially offset by unfavorable input costs for wood and fiber ($14 million) and energy ($13 million).

Segment distribution costs increased in 2008 compared to 2007, primarily due to the inclusion of a full year of Abitibi's results and higher distribution costs per ton from higher transportation and fuel costs.

*Specialty Papers Third–Party Data:* In 2008 compared to 2007, North American demand for supercalendered high gloss papers was down 8.2%, for lightweight or directory grades was down 9.5% and for standard uncoated mechanical papers was up 4.0%. The industry operating rate was 92% in 2008 compared to 90% in 2007. North American uncoated mechanical mill inventories were at 20 days supply at December 31, 2008 compared to 19 days supply at December 31, 2007.

Year ended December 31, 2007 versus December 31, 2006

Segment sales increased in 2007 as compared to 2006, primarily due to the inclusion of Abitibi's results since October 29, 2007. Excluding sales of $219 million attributable to Abitibi, sales for 2007 amounted to $581 million, an increase of $11 million from 2006. The increase was due to higher shipments of specialty papers by Bowater, partially offset by lower product pricing. Excluding shipments of 315,000 short tons attributable to Abitibi, shipments of specialty papers for 2007 were 3.3% higher when compared to 2006, primarily due to the shift of machine capacity from newsprint to specialty papers.

In 2007, we had total downtime of 102,000 short tons, including 73,000 short tons of downtime related to the idling of a specialty–producing machine at our Dolbeau facility in May 2007. Inventory levels were higher at December 31, 2007 as compared to December 31, 2006 due to the inclusion of Abitibi's specialty papers inventory of 83,000 short tons, increased capacity and a weaker market in 2007 as compared to 2006.

Segment operating loss increased in 2007 as compared to 2006 primarily as a result of increased manufacturing costs, the inclusion of Abitibi's results since October 29, 2007 which contributed an operating loss of $22 million, and higher distribution costs, which were partially offset by higher sales, as discussed above. The higher manufacturing costs were a result of higher volumes ($17 million), higher wood costs ($22 million), a stronger Canadian dollar ($18 million), higher depreciation ($10 million) and reduced benefits from our Canadian dollar hedging program ($8 million), partially offset by lower energy costs ($12 million) and lower chemical costs ($11 million). As a result of the higher costs, including the costs of Abitibi since the Combination, our average cost per ton has increased. Additionally, due to the increased downtime taken on certain machines producing specialty products, our depreciation cost per ton increased substantially year over year.

43