## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **ABITIBIBOWATER INC.,** *et. al*[1] | : | |
| | : | Case No.09-11296(KJC) |
| Debtors | : | |

## OPINION ON CONFIRMATION[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Debtors' request for confirmation of the Second Amended Joint

Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as amended) (the "Plan").[3]

The hearing to consider confirmation of the Plan was held September 24 and 30, 2010, and

October 7, 8, and 19, 2010, and November 5, 2010 (the "Confirmation Hearing").

---

[1]The following chapter 11 debtors are being jointly administered in this case: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp, AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc., AbitibiConsolidated Alabama Corporation, Abitibi-Consolidated Corporation, Abitibi-Consolidated Finance LP, Abitibi Consolidated Sales Corporation, Alabama River Newsprint Company, Augusta Woodlands, LLC, Bowater Alabama LLC, Bowater America Inc., Bowater Canada Finance Corporation, Bowater Canadian Forest Products Inc., Bowater Canadian Holdings Incorporated, Bowater Canadian Limited, Bowater Finance Company Inc., Bowater Finance II LLC, Bowater Incorporated, Bowater LaHave Corporation, Bowater Maritimes Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Nuway Inc. Bowater Nuway Mid-States Inc., Bowater South American Holdings Incorporated, Bowater Ventures Inc., Catawba Property Holdings, LLC (N/A), Coosa Pines Gold Club Holdings LLC, Donohue Corp., Lake Superior Forest Products Inc., and Tenex Data Inc. (collectively referred to herein as the "Debtors"). *See* Order dated April 17, 2009 (D.I. 61) and Order dated January 15, 2010 (D.I. 1567).

[2]This Opinion constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L). Any capitalized terms not defined in this Opinion shall have the definitions set forth in the Plan.

[3]The Plan was dated August 2, 2010 (D.I. 2796) and amended with the following supplements: D.I. 3093 dated 9/1/2010; D.I. 3109 dated 9/2/2010; D.I. 3122 dated 9/3/2010; D.I. 3187 dated 9/10/2010; D.I. 3245 dated 9/13/2010; D.I. 3334 dated 9/17/2010; D.I. 3335 dated 9/17/10; D.I. 3425 dated 9/23/2010; D.I. 3732 dated 11/3/2010; and D.I. 3869 dated 11/15/2010.

Over 30 objections to the Plan were filed. Prior to and during the Confirmation Hearing, the Debtors negotiated with the objecting parties and resolved a number of objections. In addition, the Court scheduled and held telephonic hearings on November 9 and 12, 2010, as the parties continued their discussions and to answer questions of the Court occasioned by its review of the confirmation record. On November 16, 2010, the Debtors filed a notice of filing of agreed proposed findings of facts and conclusions of law and order confirming the Plan (D.I. 3872) (the "Agreed Order") which reflected resolution of many of the objections of Aurelius Capital Management, L.P. and Contrarian Capital Management, LLC (the "BCFC Minority Noteholders")[4] (D.I. 3203), and the objection of Wilmington Trust Company, as indenture trustee for the 7.95% Notes (D.I. 3223). A final telephonic hearing was held on November 18, 2010. Currently, the following objections to Plan confirmation remain:

(1)     the "Remaining BCFC Minority Noteholder Objections," as described in the "Statement of Aurelius Capital Management, LP regarding confirmation of the Debtors' Second Amended Plan of Reorganization" (D.I. 3875) regarding the Plan's allowance of the Fairfax Guaranty Claim[5];

(2)     the "Ponderay Newsprint Company Objections" filed by the Association of Western Pulp and Paper Workers (D.I. 3194) and by Robert Wallis ((D.I.3138),

(3)     the "Retiree Objections" filed by Robert Van Houten (D.I. 2991), and Kelly

---

[4]"BCFC" refers to the Debtor, Bowater Canadian Finance Corporation.

[5]The "Fairfax Guaranty Claim" refers to the claim held by Fairfax Financial Holdings Limited and certain of its affiliates ("Fairfax") against Bowater Incorporated ("Bowater") arising from Bowater's guaranty of the 8.00% Convertible Notes due April 14, 2013 issued by AbitibiBowater, Inc. pursuant to the 8.00% Convertible Notes Indenture (known as the "8.00% Convertible Notes Guaranty" in the Plan).

Nickolson (D.I. 3431),

(4)     the "Shareholder Objections," including those filed by Henry and Elizabeth

        Romero (D.I. 3224), William Kovach (D.I. 3430), Joel Lambeth (D.I. 3435),

        Robert Gilbertson (D.I. 3436) Daniel Thornton (D.I. 3437), Tamer Ziady (D.I.

        3452) and "Certain Holders of AbitibiBowater's Common Stock" (including Peter

        Shah) (D.I. 3293) and others (the "Shareholders"), and

(5)     the "Haack Objection" filed by John Haack (D.I. 3209) (collectively, the

        "Objections.").

    Based on the record made at the Confirmation Hearing and for the reasons set forth

herein, the Objections will be overruled and the Debtors' Plan will be confirmed.

## BACKGROUND

    On October 29, 2007, AbitibiBowater, Inc. ("ABH") was created by merging the largest

and second-largest North American newsprint manufacturers in the forest and wood products

industry - - Abitibi-Consolidated, Inc. ("ACI"), a company headquartered in Montreal, Canada,

and Bowater Incorporated ("Bowater"), a company headquartered in Greenville, South Carolina

(the "Company"). (Disclosure Statement (D.I. 2797) the "Discl. St."), p. 33, Tr. 9/24/10 at 37:20-

23, 43:4-22 (Harvey)).[5]  Since the merger, as a general matter, Bowater and its former

subsidiaries, and ACI and its former subsidiaries have retained distinct identities within the

corporate enterprise for cash flow and finance purposes. Both groups maintain separate

---

[5]William Harvey is the chief financial officer of ABH, and has been in that position since
October 2007.  (Tr. 9/24/10 at 37:14-20).

accounting systems capable of tracking cash flows within the Abitibi/D-corp Companies[6] (the "Abitibi Side") and Bowater Companies (the "Bowater Side"). (Discl. St., p. 33).

The merger was expected to generate approximately $250 million of annualized cost savings within two years from improved efficiencies in such areas as production, sales, general and administrative costs, and distribution and procurement. (*Id.* 56:18-57:12, Ex. D-2, at 114-15). Following the merger, Abitibi and Bowater integrated quickly. (Tr. 9/24/10 at 89 (Harvey)). By March 2008, the Company was realizing significant benefits from the merger of the two companies. (Tr. 10/7/10 at 95 (Zelin)). [7]

In early 2008, however, the Abitibi Side of the Company had looming debt maturities and was considering the need for bankruptcy relief if refinancing efforts failed. (Tr. 9/24/10 at 69-73 (Harvey)). Management believed, however, that it was critical that the Abitibi Side of the Company avoid a bankruptcy filing so that the integrity of the consolidated enterprise could be maintained without disruption and so that the Bowater Side of the Company did not risk losing valuable synergies, vendor relationships, bank relationships, customer relationships, and management's ability to operate the Company effectively (Tr. 9/24/10 at 83:14-92:17 (Harvey)). With the assistance of Goldman Sachs & Co., management implemented a $1.4 billion refinancing of the Abitibi Side debt. (Ex. D-16). As part of that refinancing, on March 24, 2008, ABH entered into a purchase agreement with Fairfax for the sale and issuance of 8.00% Convertible Notes in the principal amount of $350 million, which were fully and unconditionally

---

[6]*See* Discl. St., p. 34 for a more detailed description of the Abitibi/D-Corp. Companies.

[7]Steven Mark Zelin is a senior managing director at Blackstone Advisory Partners ("Blackstone"), the Debtors' financial advisor.

guaranteed by Bowater.  (Ex. D-17 (item 1.01), D-18, D-19, Tr. 9/24/10 at 77:19 - 80:18 (Harvey)).[8]

The Bankruptcy

While the Company realized significant value from the synergies sooner than expected, and despite the March 2008 refinancing, other significant indebtedness with impending maturities restricted the Company's liquidity and made it vulnerable to adverse economic and industry conditions.  This impaired the Company's ability to obtain additional financing and was a critical factor that required the Company to file chapter 11 petitions and CCAA proceedings (defined below).  (Discl. St., p. 56).  On April 16, 2009, ABH and its subsidiaries filed voluntary petitions under chapter 11 of the Bankruptcy Code in this Court.[9]  The cases are being jointly administered.

On April 17, 2009, certain of the Debtors (the "Cross Border Debtors")[10] and certain non-debtor subsidiaries of ABH (the "CCAA Debtors," and together with the Cross Border Debtors, the "Canadian Debtors") applied for protection from their creditors under Canada's *Companies' Creditors Arrangement Act*, (the "CCAA") in the Superior Court, Commercial Division, for the Judicial District of Montreal, Canada (the "Canadian Court," and the proceedings before the Canadian Court are the "CCAA Proceedings").  (*See* Ex. D-1).

_____

[8]As of the Petition Date, the total outstanding amount, including capitalized and accrued and unpaid interest, under the 8.00% Convertible Notes was approximately $387.3 million.  (Discl. St., p. 40).

[9]Two subsidiaries - - ABH LLC I and ABH Holding Company, LLC - - did not file their chapter 11 petitions in this Court until December 21, 2009.

[10]The Cross-Border Debtors are: Bowater Canada Finance Corporation ("BCFC"), Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation, and Bowater Canadian Limited.

<u>Plan Negotiations</u>

In late 2009, the Debtors (with their advisor, Blackstone) began discussions with the Creditors Committee, the Ad Hoc Unsecured Noteholders Committee, secured lenders, the monitor in the CCAA Proceedings (the "Monitor"), and other stakeholders, along with their financial and legal advisors, to obtain feedback on the recovery and valuation models that had been developed. (Tr. 10/7/10 at 58:11 - 61:5 (Zelin)). These efforts resulted in a tentative agreement among key stakeholders on the valuation approach and the "Distribution Model." (*Id.* 50:10- 51:1, 58:11 - 61:5, Ex. D-36). The Distribution Model maps all of the Company's assets, liabilities (including intercompany obligations), and interests, and based upon that mapping, allocates asset values to the creditors at each of the various legal entities. (*Id.*).

Then, due to the Company's complex capital structure and conflicting economic interests among creditors, plan negotiations stalled. (Tr. 10/7/10 at 33:14-34:22, 38:6-15, 39:1-13, 77:4 - 78:14 (Zelin)). The Company then reached out to Fairfax and Avenue Capital Management LLC to lend support to a 40/60 Abitibi Side/Bowater Side equity split and a backstop of a $500 million Rights Offering to move the process forward. (*Id.* 78:15-24; 79:17 - 81:17). Fairfax agreed to take the lead despite the fact that the revised split would lower recoveries to Fairfax due to its larger Abitibi Side holdings. (*Id.* 78:25-80:12, 125:19-126:10; Ex. D-79 at 178:24-179:21). With Fairfax's support, the key stakeholders ultimately reached final agreement on the terms of a plan incorporating what the Plan supporters refer to as the "Global Settlement." (Tr. 10/7/10 80:13-81:17, 85:12-21 (Zelin)).[11] The "Global Settlement" is the key stakeholders'

---

[11]Fairfax was described at the Confirmation hearing as a "Canadian based insurance company [that is] publicly traded. It's a very well respected institution in Canada. But amongst the investment profile that they like to make with their assets, they are perceived to be long term value investors . . . .

agreement to a number of issues, including the post-emergence financial projections, the value of reorganized ABH, treatment of claims and potential intercompany claims, and the Distribution Model. (*See* Ex. D-35).

The Plan

The result of the negotiations and the Global Settlement is the proposed Plan which, in short, provides for:

    (i)      payment in full of all administrative and priority claims, post-petition financing claims, and pre-petition secured claims,

    (ii)     a 50% payment to a "convenience class" of unsecured claims in the amount of $5,000 or less;

    (iii)    conversion of unsecured debt into equity, by providing that all holders of allowed unsecured claims will receive their pro rata share of the newly issued common stock of Reorganized ABH allocated to the Debtor; and

    (iv)    no distribution to shareholders of ABH.

The Monitor in the CCAA Proceedings participated in the Plan negotiations and supports confirmation. The Monitor noted that implementation of the CCAA Plan, which was sanctioned (confirmed) by the Canadian Court on September 23, 2010, is conditioned upon confirmation of this Plan.

Voting creditors included a broad cross-section of noteholders, employees, trade creditors, customers, and other claimants. All voting classes, both in the U.S. and Canada, voted

---

They take positions in investments with the hope of realizing value over the long term." (Tr. 10/7/10 at 32:4-10 (Zelin)).

overwhelmingly in support of the Plan, *except* BCFC's unsecured creditors (Class 6M), which rejected the Plan by a majority in dollar amount. (Ex. D-45, p. 11). The Debtors, however, no longer seek confirmation of the Plan with respect with BCFC.

BCFC is an unlimited liability company organized under the laws of Nova Scotia. The BCFC Minority Noteholders objected to the Plan, arguing (among other things) that their claims against Bowater (Class 6S) were not adequately addressed. Those claims include (i) a claim based upon Bowater's guaranty of the 7.95% Notes (the "BCFC Guaranty Claim") and (ii) a claim based upon Section 135 of the *Companies Act (Nova Scotia)*, which obligates Bowater to contribute funds to BCFC to fully satisfy BCFC's obligations (including those under the 7.95% Notes) if the company is "wound up" (the "Contribution Claim" or, sometimes, the "Wind-up Claim"). (Discl. St., p.79). The Agreed Order filed on November 16, 2010 includes resolution of the BCFC Minority Noteholders' objections regarding treatment of those claims in Section XX of the revised proposed confirmation order, which provides, briefly, for (i) establishment of a reserve of New ABH Common Stock for the 7.95% Disputed Claims, (ii) distribution of New ABH Common Stock to the 7.95% Indenture Trustee in accordance with the Plan provisions, as if the Indenture Trustee held an Allowed Class 6S Claim of $619,875,000, (iii) establishment of a BCFC Escrow Account, which funds will be released (as agreed) to a BCFC Representative in connection with prosecuting the BCFC Contribution Claim and the actual expenses of winding-up the BCFC estate, (iv) payment of BCFC's Independent Advisors pursuant to agreed terms, and (v) taking steps to cause BCFC to make an assignment for the benefit of its creditors in Nova Scotia under the Bankruptcy Insolvency Act of Canada (the "BIA") and appointment of Peter

Wedlake as trustee in the BIA, and dismissing BCFC's chapter 11 case and CCAA proceeding.[12]

The remaining objections are addressed below.

## DISCUSSION

1.   The Remaining BCFC Minority Noteholders' Objection to the Plan.

The remaining BCFC Minority Noteholders Objection asserts that the Plan was not proposed in good faith because it allows, in full, Fairfax's guaranty claim against Bowater. The BCFC Minority Noteholders assert that Bowater's March 2008 guaranty of ABH's 8.00% Convertible Notes sold to Fairfax should be avoided as a fraudulent transfer because, they allege, Bowater did not receive any value for the guaranty and was insolvent at the time. They contend that pursuing the fraudulent transfer claim would result in the recovery of significant value for Bowater's creditors. The BCFC Minority Noteholders also argue that allowing the full amount of the Fairfax Guaranty Claim in the Plan amounts to a release of the fraudulent transfer claim, which was given without any consideration to the estate.

In response, the Debtors argue that they have investigated the alleged fraudulent transfer claim against Fairfax and determined it to be without merit. The Debtors also argue that allowing the Fairfax Guaranty Claim is a valuable part of the Plan's Global Settlement.

Section 1129(a)(3) provides that the Court shall confirm a plan only if, among other requirements, the plan has been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1129(a)(3). The Third Circuit has recognized that, for purposes of determining good faith, "the important point of inquiry is the plan itself and whether such plan will fairly achieve a

---

[12]This brief description of the provisions of the BCFC Resolution in section XX of the proposed confirmation order is not intended to modify or extinguish any of the detailed agreements between the parties as set forth therein.

result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000), quoting *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir. 1986).

The Debtors view the allowance of the Fairfax Guaranty Claim as an integral part of the Global Settlement in the Plan, and have argued that the Court should consider and approve it as a compromise under a Bankruptcy Rule 9019 standard. However, upon review of the Debtors' evidence regarding the process followed in negotiating the Plan (*see, e.g.,* Ex. D-51), I conclude that what the parties refer to as a "Global Settlement" is really, in substance, the result of the chapter 11 plan negotiation process, albeit here, an extremely complex and intricate exercise.

Of course, plan negotiations among the various constituencies involved the making of concessions and agreements to achieve the level of consensus likely to result in the overwhelming creditor support attained here. Admittedly, the line between what constitutes, on the one hand, a settlement subject to Rule 9019 review and, on the other, the "give and take" commonly involved in plan negotiations can sometimes be indistinct. On the record and Plan before me, I conclude that the elements of this Plan fall on the latter side. I will, therefore, consider whether the plan negotiation process, which included - - as one element - - allowance of the Fairfax Guaranty Claim, proceeded in good faith, i.e., consistent with the objectives and purposes of the Bankruptcy Code. *See In re Smurfit-Stone Container Corp.*, 2010 WL 2403793, *11 (Bankr.D.Del. June 11, 2010) (the Court considered whether "[c]onsistent with the overriding purpose of chapter 11, the Plan is designed to allow each of the Debtors to reorganize on a going concern basis while maximizing recoveries to their creditors and providing the Reorganized Debtors with a capital structure that will allow the Reorganized Debtors to satisfy

their obligations with sufficient liquidity and capital reserves and to fund necessary capital expenditures and otherwise conduct their business in the ordinary course."); *In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, *11 (Bankr.D.Del. April 29, 2010) ("In determining that the Plan has been proposed in good faith, the court has examined the totality of the circumstances surrounding the filing of these chapter 11 cases, the Plan itself, and the process leading to its formulation. These chapter 11 cases were filed and the Plan was proposed with the legitimate and honest purpose of reorganizing the Debtors' business and maximizing the value of each of the Debtors and value available to creditors.").

The Debtors provided extensive evidence that they evaluated the proposed fraudulent transfer claim against Fairfax and determined that it had no merit. To succeed on a fraudulent transfer claim under Bankruptcy Code §548(a)(1)(B), a plaintiff is required to show (1) that Bowater received less than reasonably equivalent value in exchange for the guaranty; and (2) that Bowater was (i) insolvent on the date the guaranty was issued or became insolvent as a result, (ii) about to engage, or was engaged, in a business or transaction for which any property remaining with Bowater was unreasonably small capital, or (iii) intended to incur or believed that it would incur debts beyond its ability to pay as those debts matured. 11 U.S.C. §548(a)(1)(B).

The Debtors insist that the evidence demonstrates that Bowater received substantial, concrete benefits by entering into the Fairfax Guaranty, and that those benefits outweighed the cost that Bowater was expected to incur. At the time of the 8.00% Convertible Notes transaction, the Abitibi Side of the business was considering the need for bankruptcy if its efforts at refinancing upcoming debt maturities failed. (Tr. 9/24/10 at 69-73 (Harvey)). Management believed, however, that it was critical that the Abitibi Side avoid a bankruptcy filing, so that the

integrity of the consolidated enterprise could be maintained without disruption and the Bowater Side did not risk losing valuable synergies, vendor relationships, bank relationships, customer relationships and management's ability to operate the Company effectively (the "Guaranty Benefits"). (*See* Tr. 9/24/10 at 82-91, 180 (Harvey)). As part of the $1.4 billion refinancing of Abitibi's debt, the Company approached Fairfax about purchasing the 8.00% Convertible Notes, which Fairfax agreed to do only if it received the guaranty from Bowater. (Tr. 9/24/10 at 78 (Harvey)). Although the proceeds from the Convertible Notes transaction were used to address Abitibi's financial needs, the Company's management caused Bowater to issue the Fairfax Guaranty because it was in *Bowater's* best interest to do so. Without Bowater's guaranty, the Abitibi Side likely would have had no choice but to seek bankruptcy relief and Bowater would have risked losing all or a substantial portion of the Guaranty Benefits. (Tr. 9/24/10 at 82-91, 180 (Harvey)).

Blackstone examined the potential impact of an Abitibi bankruptcy on Bowater's share of the Company's synergies. Mr. Zelin opined that, under a worst case scenario, an Abitibi/Bowater split would unwind all of the benefits of the merger. (Tr. 10/7/10 at 96 (Zelin)). The Company's Form 10K for 2008 showed that the merged Company had achieved the goal of $375 million in annualized synergies one year ahead of management's projections. (Ex. D-13, Tr. 9/24/10 at 68 (Harvey)).

In addition to preventing the loss of the synergy benefits and an Abitibi bankruptcy, the Fairfax Guaranty also allowed Bowater to realize other benefits, such as preserving vendor, banking, and customer relationships, and avoiding a contraction of trade credit. (Tr. 10/7/10 at 93 (Zelin), 9/24/10 at 87 (Harvey)). By March 2008, many suppliers started to view the two

companies as a single enterprise and suppliers suffering from an Abitibi bankruptcy likely would have required Bowater to pay in advance or on a shortened time frame. (Tr. 9/24/10 at 84 (Harvey), Tr. 10/7/10 at 89-91 (Zelin)). Blackstone considered the risk to Bowater's trade credit in its analysis of the potential impact of an Abitibi bankruptcy and determined that a loss of trade credit could have cost Bowater hundreds of millions of dollars. (Tr. 10/7/10 at 89 (Zelin)). Moreover, Bowater would have needed an immediate liquidity infusion of approximately $100 million to withstand an Abitibi bankruptcy. (Tr. 9/24/10 at 86 (Harvey); Tr. 10/7/10 at 88-93 (Zelin)). All of the Guaranty Benefits, which, according to the Debtors, aggregated at least $465 million of measurable benefits, plus an unquantified amount of other benefits, outweighed the cost associated with Bowater's grant of the Fairfax Guaranty. (Ex. D-38, Tr. 10/7/10 at 92-101 (Zelin)).

In *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, the Third Circuit Court of Appeals employed a two-step process to determine whether a debtor received "reasonably equivalent value" in the form of indirect economic benefits; first, whether *any* value is received, and second, whether that value was "reasonably equivalent" to the transfer made. *R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996). The evidence demonstrates that Bowater received value in return for the Fairfax Guaranty by helping to avert Abitibi's bankruptcy filing and realizing the other Guaranty Benefits. To determine whether that value is "reasonably equivalent" to the transfer made, a court can rely on the "totality of the circumstances," by looking at factors such as fair market value compared to the actual price paid, the arm's length nature of the transaction, and the good faith of the transferee. *R.M.L.*, 92 F.3d at 145, 153.

A court may also measure the "amount" of value conferred by considering the amount of risk associated with the deal. *See R.M.L.*, 92 F.3d at 153 (The *R.M.L.* Court decided that the chance of receiving an economic benefit can confer "value" upon a debtor, but "the size of the chance is directly correlated with the amount of 'value' conferred."). The Debtors argue that the at the time the Fairfax Guaranty was given, Bowater contemplated that it would never have to make a payment on the Fairfax Guaranty because management believed Fairfax would convert the 8.00% Convertible Notes into stock at some point. (Tr. 9/24/10 at 81-82 (Harvey)). Indeed, Bowater's 10-Q financial reports filed with the SEC in March, June, and September 2008 included disclosure of the guaranty, but no acknowledgment or statement of concern by the auditor that there was a possibility that Bowater would have to perform under the guaranty. (Tr. 10/7/10 at 99:12 - 101:6 (Zelin)). The Company also assumed that Bowater would not be required to make any payments on the Fairfax Guaranty because interest on the Convertible Notes obligation could be paid in kind through the issuance of additional convertible notes until such time as the Fairfax Guaranty obligation was extinguished upon a refinancing of ABH's debt or an election by Fairfax to convert to equity (*Id* at 198, Tr. 10/8/10 at 184 (Zelin)). After performing its review, Blackstone concluded, based on management's projections and the auditors' lack of concern about the Fairfax Guaranty, that there was a low probability that the Fairfax Guaranty would ever be called. (Tr. 10/710 at 99-101 (Zelin)).

The Debtors' investigation of the alleged fraudulent transfer claim indicated that there was no basis for determining that Bowater was insolvent or was rendered insolvent at the time it issued the Fairfax Guaranty. The Debtors' public filings substantiate that Bowater was solvent at the time. For example, in rendering its opinion on Bowater's Form 10-K for 2007, the

Company's outside auditors, Pricewaterhouse Coopers, did not express any going concern qualification. (Tr. 10/8/10 at 157 (Zelin)). Bowater's first quarter Form 10-Q for 2008 shows that it had $718 million of equity at book value as of March 31, 2008. (Ex. D-20 at 2; Tr. 9/24/10 at 92-93 (Harvey)). As of March 31, 2008, Bowater's assets included $591 million of goodwill and an investment in Abitibi of $198 million. (Tr. 10/8/10 at 97-98 (Zelin)). Goodwill was not written off until the end of 2008 and resulted from unpredictable events that occurred in the fourth quarter of 2008 (Noteholders' Ex. 28 at 87), namely, the collapse - - or near collapse - - of the financial markets, with the attendant effect on the national and global economy. (Tr. 10/8/10 at 126:3 - 127:2 (Zelin)).

Moreover, just 45 days after the closing of the Convertible Notes transaction, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") issued a solvency opinion to Bowater dated May 15, 2008. (Tr. 9/24/10 at 106-07, 190-91, Ex. D-25). The solvency opinion was issued in connection with a spin-off transaction and concluded that Bowater, even after the spin-off of certain mills, was solvent, was adequately capitalized, and would be able to pay its debts when due. (Ex. D-25 at 5, Tr. 9/24/10 at 111 (Harvey)). The objecting parties failed to offer any persuasive evidence that the Houlihan Lokey solvency opinion was flawed.

I conclude that the Debtors' decision not to pursue questionable and costly fraudulent transfer litigation against Fairfax was justified.

Furthermore, the evidence demonstrates that Fairfax was an instrumental part of the Plan negotiation process and helped the Debtors to proceed with confirmation of the Plan predicated upon the Global Settlement. Fairfax provided numerous benefits to the Debtors throughout the chapter 11 cases, including (i) providing a $200 million debtor in possession ("DIP") facility on

15

an emergency basis (Tr. 10/7/10 at 31, 239 (Zelin)); (ii) permitting the Debtors to amend the DIP

Credit Agreements 11 times without receiving additional consideration (Ex. D-79, p. 180); (iii)

playing a pivotal role, at the Debtors' request, in achieving consensus among divergent creditor

groups on the Distribution Model that formed the basis for the Global Settlement (Tr. 10/7/10 at

77-78 (Zelin)); (iv) making significant economic concessions by agreeing to support a 60/40

Bowater/Abitibi split in the Distribution Model, even though Fairfax's claims were far more

weighted toward the Abitibi Side (*Id.* at 79, 224-27); and (v) leading the negotiations with

respect to, making commitments under, and participating in (a) the Plan Support Agreement

approved on June 25, 2010, (b) the Backstop Commitment Agreement approved on June 25,

2010, and (c) the $500 million Rights Offering, each of which greatly facilitated the Debtors'

ability to proceed with Plan confirmation.[13]  In light of the foregoing, I conclude that Fairfax

provided significant consideration to the Debtors and their estates in return for what is,

effectively, a release of any potential fraudulent transfer claim.

The BCFC Minority Noteholders make much of the fact that Fairfax has two directors on

the Company's board.  However, nothing in the record forms any basis for a conclusion that

Fairfax asserted any improper or undue influence.  Rather, this record demonstrates a lengthy,

sometimes contentious, plan negotiation process, which involved many sophisticated, well-

represented constituents.

The BCFC Minority Noteholders argue that the cumulative evidence in this case supports

a finding that the Plan is based on the Debtors' improper motive to prefer the claims of Fairfax

---

[13]The Debtors were able to forego implementing the Rights Offering due to their ability to obtain other exit financing.  The Debtors assert, credibly, that, in part, it was the existence of the Backstop Agreement which enabled them to obtain their exit financing on favorable terms.

over the claims of the BCFC parties. I disagree. The record at the Confirmation Hearing demonstrates that the lengthy, arms length Plan negotiation process included Fairfax, the Creditors Committee, and other key stakeholders. The terms of the Plan were reached only after a number of compromises. After the BCFC Minority Noteholders raised issues about the treatment of the claims of BCFC against Bowater, management moved (albeit without much alacrity) to appoint an independent advisor and independent counsel to represent the interests of BCFC and to investigate the Contribution Claim.

Moreover, the consequences of allowing the Fairfax Guaranty Claim were fully disclosed in the Disclosure Statement and in a letter sent by the Creditors Committee to all creditors entitled to vote on the Plan. Creditors were explicitly made aware that voting for the Plan would result in Fairfax (i) being released from a potential fraudulent transfer action with respect to the Guaranty Claim, and (ii) receiving its pro rata share of equity in the Reorganized ABH. With access to all of the information, creditors nonetheless voted by substantial majorities in favor of the Plan, and unsecured creditors of Bowater - - who would benefit from a successful challenge to the Fairfax Guaranty Claim - - have voted in support of the Plan by a significant number and amount.

Finally, the Monitor in the CCAA Proceedings also supports confirmation of the Plan. Although similar objections were raised in the CCAA Proceedings, the CCAA Plan was sanctioned (confirmed) by the Canadian Court on September 23, 2010. The sanction of the CCAA Plan, while not binding on this Court, is worthy of consideration and, under these circumstances, further weighs in support of overruling the Remaining BCFC Objections and confirming the Plan.

The record before me shows that the Debtors undertook the Plan negotiation process to enable each of the Debtors to reorganize on a going concern basis, while maximizing recoveries to their creditors. Allowance of the Fairfax Guaranty Claim under the Plan is fair and reasonable, in the best interests of creditors, and consistent with the objectives of chapter 11. Any Plan objections based upon a lack of good faith arising from the Fairfax Guaranty Claim will be overruled.[14]

2.     The Ponderay Newsprint Company Objections

The Ponderay Newsprint Company Objections argue that the Plan should not be confirmed because (i) it discriminates unfairly against the employees of Ponderay Newsprint Company ("PNC") because the PNC employees are bearing a disproportionate share of the Debtors' labor cost-cutting initiatives, and (ii) a potential labor strike by PNC employees impacts the feasibility of the Plan. The Debtors argue that the Association of Western Pulp and Paper Workers ("AAWPW") and Robert Wallis lack standing to object to the Plan because PNC is not a chapter 11 debtor. The objectors argue that they have standing because the chapter 11 debtor - - Bowater - - runs the day to day operations of PNC pursuant to a management agreement between PNC and Bowater; however they do not allege that they are creditors of any chapter 11 debtor.

The AAWPW and Wallis do not have standing to object to the Plan because there is no plan provision that directly or adversely affects the pecuniary interests of PNC's employees. *In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr.S.D.N.Y. 2008) (recognizing that "§1109 has

---

[14]Alternatively, even if subject to a Bankruptcy Rule 9019 standard, the so-called "Global Settlement" would pass muster for the reasons discussed above.

been interpreted to mean that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains . . . ." and "although a party in may object to confirmation of a plan, 11 U.S.C. §1128(b), it cannot challenge portions of the plan that do not affect its direct interests.") (internal quotations omitted). *See also In re Morris Publishing Group, LLP*, 2010 WL 599393 (Bankr. S.D. Ga. Feb. 10, 2010) (noting that a party in interest under §1109(b) has "a pecuniary interest that is directly or adversely affected by the outcome of the proceeding, such that the entity requires representation.").

However, even assuming that the Ponderay Newsprint Company objectors had standing, their objections must be overruled. First, the objectors are not part of any class of claims or interests under the Plan. Section 1129(b)(1) provides that a plan may be confirmed only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each *class of claims or interests* that is impaired under, and has not accepted, the plan." 11 U.S.C. §1129(b)(1). The Code does not prohibit discrimination against an entity that is neither a creditor not an interest holder of the debtor. The declaration of Mr. Harvey demonstrates PNC, not Bowater, makes material management decisions, such as negotiations and approval of labor agreements. Any disparity between the treatment of the PNC employees and any of the Debtors' employees does not result from the Plan, but from PNC's status as a non-debtor company that is currently negotiating with its employees.

Further, the Debtors assert that PNC's production capacity represents 7.7% of the Company's 3.3 million metric tons of newsprint. Given that PNC is not a debtor, and the Company holds a 40% minority ownership interest in PNC, a labor strike by PNC's employees is

unlikely to affect the Plan's feasibility by causing a need for liquidation or further financial reorganization.

The Ponderay Newsprint Company objections will be overruled.

3.   The Retiree Objections

Robert Van Houten and Kelly Nickolson filed objections to the Plan's treatment of retiree claims, particularly (i) payment of only 50% of the claim amount for any retiree who opts for treatment as a Class 7 Convenience Claim, and (ii) the reduction in benefits if, pursuant to Section 6.9 of the Plan, the claimant elects to participate in the new employee compensation and benefit programs as described in Plan Supplement 7A.

The Plan provisions regarding Convenience Claims provides similar treatment for all similarly situated creditors. The objecting parties have not provided any basis for requiring better treatment for a retiree claimant who opts to be part of the Convenience Class.  The objection regarding Class 7 Convenience Claims is overruled.

The objectors also complain about the proposed reductions in retiree benefits. In Plan Supplement 7A, the Debtors confirm that, as of the Effective Date, the various plans either will be continued or will be terminated in accordance with applicable law.  To the extent the objectors' claims are based on the terminated plans, the objectors may retain their claims or elect to participate in the new plans with the reduced benefits.  While I understand that the retirees are dismayed by any proposed reductions in benefits, the Debtors have acknowledged that termination of any existing plans or implementation of new plans are subject to compliance with

applicable non-bankruptcy law.[15]  On the record before me, I conclude that the Debtors'

proposals are reasonable and meet the confirmation requirements. The Retiree Objections will be

overruled.

4.    The Shareholder Objections

The Shareholder Objections raise the following arguments: (i) the Debtors have

significantly undervalued their assets, (ii) the Debtors have not provided sufficient information

about how they allocated value to each Debtor entity, and (iii) the Debtors' management

compensation plans are not fair and equitable.

A.    Value

The Shareholders object to confirmation of the Plan, which does not provide for any

distribution on account of their Class 9 Claims.  The Shareholders argue that the Debtors

wrongfully undervalued numerous assets in their valuation of the Company.

On August 4, 2010, a hearing was held on the motion of certain shareholders (including

one or more of the Shareholder Objectors) for appointment of an equity security holders

committee, at which the shareholders argued that the Debtors' enterprise value was significant

enough to place shareholders "in the money."  Based on the record developed at that hearing, I

denied the request to direct appointment of an official equity security committee upon finding

that a shortfall of literally billions of dollars lay between the Debtors' enterprise value and the

possibility of any distribution to shareholders.

The Company, in conjunction with formulating the Plan and the CCAA Plan, hired its

---

[15]The Objectors do not assert the applicability of any Bankruptcy Code section which precludes the Debtors' proposed benefit plan changes. *See, e.g.,* Bankruptcy Code §1114.

financial advisor, Blackstone, to assist in preparing an estimation of the Company's consolidated value on a going concern basis (the "Enterprise Value"). (Discl. St., p. 149). As described in the Disclosure Statement, Blackstone reviewed and analyzed numerous aspects of the Company in arriving at the Enterprise Value, such as the Company's historical financial information, its internal and projected financial operating data, economic and industry information relevant to the Company's businesses, and other studies and investigations as appropriate. (*Id.* at 149-50). In estimating Enterprise Value, Blackstone applied standard valuation methodologies, including a discounted cash flow analysis, comparable company analysis, and precedent transaction analysis. (*Id.* at 150-152). Blackstone also valued other non-operating assets separately, including tax attributes of each Debtor, certain litigation claims, and miscellaneous timber assets. (*Id.*). Blackstone relied on management's financial projections for years 2010-2014. Based on these financial analyses, Blackstone estimated that the Enterprise Value of the Company falls within a range of approximately $3.5 billion to $3.8 billion, with a mid-point of $3.675 billion. (*Id.*, Tr. 10/8/10 at 221 (Zelin)). The estimate of allowed claims against the Company, including the Debtors and the CCAA Debtors, is approximately $8.9 billion. (*Id.*). As a result, taken as a whole, the Company is "hopelessly insolvent." (Zelin Decl. in support of Debtors' objections to motion to appoint an equity security holder committee, moved into evidence at the 8/4/10 hearing, at ¶¶9, 16) The estimated recovery for unsecured creditors of ABH, the ultimate parent that issued public shares, is less than 1%.

Understandably, the Shareholders are frustrated that the Plan does not provide for any recovery for their interests. They argue that the Debtors undervalued a number of assets, but provide only argument in support of their position. Several appeared in person or by telephone

22

during the course of the Confirmation Hearing. Their dismay arising from the loss of their investments is real, but without probative evidence to rebut the Debtors' valuation evidence, this record provides no rational basis to conclude that the Debtors' valuation is so flawed that it fails to account for more than $5 billion dollars of value.

The Debtors also provided evidence that the Plan satisfies the best interests of creditor and interest holders test of §1129(a)(7). That test provides that the Plan can be confirmed only if, with respect to each class, each holder of a claim or equity interest who has not accepted the plan "will receive or retain under the plan . . . value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors liquidated under chapter 7 of [the Bankruptcy Code] on such date. 11 U.S.C. §1127(a)(7)(A). *See In re Lason, Inc.* 300 B.R. 227, 232 (Bankr.D.Del. 2003) ("Section 1127(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

Blackstone prepared a Liquidation Analysis using the Debtors' and the CCAA Debtors' books and records, unaudited financial information, certain independent appraisals prepared in conjunction with financings, and valuation information prepared as part of the plan negotiation process. (Zelin Decl. (D.I. 3376) at 12, ¶31). Blackstone estimated that the net liquidation proceeds of the Debtors and the CCAA Debtors is $3.1 billion (approximately $500 million less than the Enterprise Valuation). Further, Blackstone estimated that allowed claims against the Debtors and the CCAA Debtors on a liquidation basis would be approximately $10.9 billion - - or $2 billion higher than under a going concern scenario due to, among other things, the termination of retiree benefits and other liabilities that would likely arise from the forced

liquidation of the Debtors' and CCAA Debtors' assets. (*Id.* at ¶32). Based upon the Liquidation Analysis, Blackstone opined that (after payment of pre-petition secured and post-petition administrative and priority claims), the net value available to unsecured creditors would be approximately $1.3 billion, or approximately $1.1 billion less than the Equity Value set forth in the Plan. (*Id.*).

Because the Plan does not contemplate substantive consolidation of the Debtors, Blackstone also prepared (i) a projected range of recovery for unsecured creditors of each Debtor, and (ii) the Legal Entity Creditor Recovery Summaries, attached as Ex. F to the Disclosure Statement, to detail projected recoveries under the Plan for unsecured creditors of each Debtor. The Debtors have demonstrated that the Plan provides substantially greater recoveries to holders of Claims than a hypothetical liquidation under chapter 7, the CCAA or the BIA. (*Id.*).

The Debtors also assert that the Plan is fair and equitable with respect to the impaired classes who rejected or are deemed to reject the Plan. Courts have decided that a plan is fair and equitable to an impaired class if the "absolute priority rule" is met, which requires that, if a class rejecting a plan will receive less than full value for their claims or interests, then no holder of claims or interests in a junior class may receive or retain any property under the plan. 11 U.S.C. §1129(b)(2). Moreover, senior classes cannot receive more than a 100% recovery on their claims. *See In re Exide Tech.*, 303 B.R. 48, 61 (Bankr.D.Del. 2003). I conclude that the Plan satisfies the absolute priority rule.

Finally, the Shareholders also argue that the valuation was not prepared in good faith, thereby violating §1129(a)(3). This record amply supports a finding that the Plan was negotiated and proposed in good faith. The Plan allows each of the Debtors to reorganize on a going

concern basis while maximizing recoveries to their creditors and providing the Reorganized

Debtors with a capital structure that will allow them to satisfy their obligations with sufficient

liquidity and capital reserves, to fund necessary capital expenditures, and to otherwise conduct

their business in the ordinary course. *Smurfit-Stone,* 2010 WL 2403793 at *11.

      B.    Disclosure of value allocation among the Debtors

The Shareholders also argue against Plan confirmation because, although the Debtors are

not substantively consolidating, the Debtors have failed to explain adequately how the Plan

allocates value to each individual Debtor entity. However, the Debtors have explained that the

Plan is premised, in part, upon the Distribution Model to calculate asset value for each Debtor.

The Distribution Model is explained in detail the Disclosure Statement as follows:

> The Distribution Model maps all of the Debtors', Cross-Border Debtors, and CCAA Debtors' assets, liabilities (including intercompany obligation) and interests (including interests in affiliates. . . ) and calculates, based upon that mapping, the allocation of asset value to the creditors at each of the Debtors, Cross-Border Debtors and CCAA Debtors.
>
> During the fourth quarter of 2009, the Company shared a preliminary draft of the Distribution Model with advisors to the Creditors Committee, the Ad Hoc Committee, and the Monitor. These parties thereafter performed detailed due diligence of the Distribution Model, including testing the Distribution Model's inputs and outputs. Based upon the results of the diligence, all of these parties agreed that the Distribution Model accurately reflected the Company's assets and liabilities and could be relied upon to calculate distributions to be made pursuant to the Plan, as summarized in the Legal Entity Creditor Recovery Summaries set forth in Exhibit F [to the Disclosure Statement].

(Discl. St., pp. 153-54). The record made at the Confirmation Hearing is sufficient. This

objection is overruled.

      C.    Management compensation plans.

The Shareholders also object to Plan confirmation on the grounds that the proposed

management compensation plans are too generous and enrich management at the expense of the shareholders. The Debtors contend that the proposed management compensation is reasonable and appropriate: (1) because the Debtors' management and key executives have worked tirelessly through this case to stabilize operations, manage the restructuring process, and lead the Company to confirmation and successful emergence from chapter 11; (2) to save cash during the chapter 11, the Debtors took numerous measures impacting executive compensation, including salary freezes since 2008, salary reductions (including a 15% reduction to the Company's top executives), and (3) because the Debtors suspended any bonus programs in 2008 and 2009. (Zelin Decl. p. 18, ¶49). The Plan terminates all existing employment, consulting, and compensation agreements. (*See* Plan Supp. 6B).

The Debtors engaged in arms length negotiations with the Creditors Committee to establish the post-emergence management compensation package, which includes a Restructuring Recognition Award, long and short-term equity incentive plans, and the continuance of executive severance policies. (Zelin Decl. ¶50). The Restructuring Recognition Award is payable only upon approval by the Reorganized Debtors' new board, in its discretion. (*Id.*). The long-term equity incentive plan reserves 8.5% of New ABH Common Stock for management, which, the Debtors posit, is consistent with (and in many cases less generous than) similar reorganization plans approved by Courts in this district and elsewhere. *See Smurfit-Stone*, Case No. 09-10235 (Bankr.D.Del. June 21, 2010) (reserving 8% of the reorganized debtors common stock for distribution to management); *Spansion*, Case No. 09-10960 (Bankr.D.Del. Apr. 7, 2010) (reserving 10% of the reorganized debtor's common stock for distribution to management), *Premier Int'l Holdings*, Case No. 09-12019 (Bankr.D.Del Apr. 30,

2010 (reserving 15% of the reorganized debtors' common stock for distribution to management), and *Foamex Int'l*, Case No. 05-12685 (Bankr.D.Del. Nov. 27, 2006) (reserving 10% of the reorganized debtors' common stock for distribution to management).

The Debtors also point out that the Debtors' management compensation plans were subject to the disclosure, notice, and hearing requirements of the Plan confirmation process. Creditors overwhelmingly voted in favor of the Plan, which includes the management compensation provisions. The Shareholders argue that the management compensation plans are unfair, but presented no probative evidence in support of this proposition. Based on the record before me, I conclude that the management compensation plans are reasonable and appropriate for this market at this time, and are consistent with the objectives of chapter 11.

For these reasons, the Shareholders' Objections will be overruled.

5.    John Haack's Objection

Also before the Court is the objection to Plan confirmation filed by John Haack. Mr. Haack filed a proof of claim based upon a claim for investor fraud. He represents that he owns 55 notes of Abitibi Consolidated Incorporation of Canada, which is not one of the Debtors in this chapter 11, but is a CCAA Debtor. For the same reasons articulated above in connection with the Ponderay Newsprint Company Objections, Mr. Haack has not demonstrated that he has standing to be heard on Plan confirmation. He is not a creditor of the Debtors and has not identified any Plan provisions that directly impact his interests. Moreover, most of his objections related to the Backstop Agreement and Rights Offering, which the Debtors are no longer pursuing, since it has obtained sufficient exit financing to fund the Plan. Finally, his objections based upon value and value allocation among the Company's entities have been

addressed in connection with the Shareholder Objections, above. Accordingly, Mr. Haack's objections to Plan confirmation are overruled.

## CONCLUSION

For the reasons set forth herein, the Remaining BCFC Noteholder Objections, the Ponderay Newsprint Company Objections, the Retiree Objections, the Shareholders' Objections, and the Haack Objection are overruled. Due to resolution of the future status of BCFC, agreed by the relevant parties, this Court's Order to show cause why a chapter 11 trustee should not be appointed in the case of BCFC (D.I. 3265) will be vacated. The Debtors' Plan will be confirmed. The Debtors previously submitted a 90-page proposed Findings of Facts, Conclusions of Law, and Order Confirming Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Amended) (D.I. 3872). The parties are directed to review the submission in light of the Court's Opinion and recast it accordingly. The parties should be prepared to discuss the form of a proposed confirmation order at the hearing scheduled for November 23, 2010.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: November 22, 2010