**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| **ABITIBIBOWATER INC.,** ***et al,*** | : | |
| | : | Case No. 09-11296 (KJC) |
| Debtors | : | (Jointly Administered) |
| | : | |
| ______________________________________ | : | Re: (D.I. 3374, 4586, 4627) |

**MEMORANDUM**[1]

The Levin Group, L.P. ("TLG") filed a proof of claim in the chapter 11 cases of Abitibibowater Inc. and its affiliated debtors (the "Debtors").[2] The claim arises from a contract dispute, which is the subject of litigation between TLG and Bowater, Inc. ("Bowater") that was pending in the South Carolina Court of Common Pleas at the time the Debtors filed their chapter 11 petitions. On September 21, 2010, the Debtors filed an objection to TLG's proof of claim (D.I. 3374).

Before the Court are two motions filed in connection with the claim objection: (i) The Levin Group, L.P.'s Motion for an Order Confirming the Unambiguous Meaning of the

---

[1]This Court has jurisdiction to decide the motions before it pursuant to 28 U.S.C. § 1334 and § 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2) (B).

[2] The following chapter 11 debtors are jointly administered in this case: AbitibiBowater Inc., AbitibiBowater Holding 1 Corp, AbitibiBowater US Holding LLC (N/A), AbitibiBowater Canada Inc., AbitibiConsolidated Alabama Corporation, Abitibi-Consolidated Corporation, Abitibi-Consolidated Finance LP, Abitibi Consolidated Sales Corporation, Alabama River Newsprint Company, Augusta Woodlands, LLC, Bowater Alabama LLC, Bowater America Inc., Bowater Canada Finance Corporation, Bowater Canadian Forest Products Inc., Canadian Holdings Incorporated, Bowater Canadian Limited, Bowater Finance Company Inc., Bowater Finance II LLC, Bowater Incorporated, Bowater LaHave Corporation, Bowater Maritimes Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Nuway Inc. Bowater Nuway Mid-States Inc., Bowater South American Holdings Incorporated, Bowater Ventures Inc., Catawba Property Holdings, LLC (N/A), Coosa Pines Gold Club Holdings LLC, Donohue Corp., Lake Superior Forest Products Inc., and Tenex Data Inc. (collectively referred to herein as the "Debtors"). *See* Order dated April 17, 2009 (D.I. 61) and Order dated January 15, 2010 (D.I. 1567).

Engagement Agreement (the "Motion) (D.I. 4586) and (ii) the Claims Agent's Objection and Cross-Motion for Summary Judgment Pursuant to Bankruptcy Rule 7056 as to Claim No. 3455 ("the Cross-Motion") (D.I. 4627).[3] For the reasons set forth below, the Court will deny TLG's Motion and grant the Claims Agent's Cross-Motion.

## I. Background

TLG and Bowater entered into a six-month engagement agreement (the "Engagement Agreement") dated July 31, 2006. The Engagement Agreement includes the following relevant provisions:

> This letter agreement confirms that Bowater Incorporated, for itself and its affiliates ("Bowater" or the "Company") has retained The Levin Group, L.P. ("TLG") on the following terms, (i) to be a strategic and financial advisor to Bowater, and (2) [*sic*] to review certain potential acquisitions and divestitures as specifically identified by Bowater to TLG in writing as a transaction subject to Paragraph 2(b) below (such potential acquisitions and divestitures referred to herein individually as a "Transaction"),
>
> 1. Services. TLG, in its capacity as a strategic and financial advisor to Bowater, will at the latter's request undertake certain activities on behalf of Bowater including, if appropriate, the following:
>
> (a) Familiarize itself with and conduct such financial review and evaluation of the Transaction, and its business, operations, properties, financial condition and prospects as Bowater and TLG shall mutually agree is desirable and feasible;
>
> (b) Review and advise on the strategic and financial alternatives available to Bowater in connection with the Transaction, including valuation, transaction structure, and due diligence review;
>
> (c) Assist in the negotiation of definitive agreements for the Transaction to the extent requested by Bowater;

[3] Pursuant to Section 4.3 of the Debtors' Second Amended Joint Plan of Reorganization (As Amended) dated November 23, 2010 (D.I. 3938) (the "Plan"), and paragraph 159 of the Finding of Facts, Conclusion of Law, and Order Confirming the Debtor's Second Amended Joint Plan of Reorganization dated November 23, 2010 (D.I. 3940), Avidity Partners, LLC, became the post-effective date Claims Agent for the Debtors' chapter 11 estates, with the authority to evaluate and prosecute certain claims.

(d) Provide such other strategic and financial advisory services related to the Transaction as may from time to time be agreed upon by the [*sic*] Bowater and TLG.

2. Fees. In consideration of its rendering the strategic and financial advisory [services and][4] services related to a Transaction described above, Bowater agrees to pay to TLG the following fees:

(a) an advisory fee of $100,000, payable monthly beginning August 1, 2006 and terminating January 31, 2007. In the event of termination of this agreement as defined herein in Paragraph 6, the advisory fee shall be pro rata for the month of termination; and

(b) in the event of execution of definitive agreements and closing of a Transaction, a transaction fee equal 2% of the enterprise value of the transaction, defined as the equity value plus assumed indebtedness (the "Transaction Fee").[5]

While the Engagement Agreement was in force, Bowater was involved in merger talks with Abitibi-Consolidated, Inc. (the "Merger"), and there is no dispute that TLG performed services related to the Merger.[6] During this time, TLG was paid a total of $600,000 in monthly service fees pursuant to Paragraph 2(a) of the Engagement Agreement.[7] Bowater also engaged

[4] The bracketed words were handwritten in the Engagement Agreement and initialed by the executing parties, William Levin, Managing Director, for TLG, and William Harvey, Senior Vice President and Chief Financial Officer, for Bowater.

[5] Motion, Ex. 1. Cross-Motion, Ex. A.

[6] There is a dispute, however, about how to characterize the extent of the services performed. The Claims Agent argues that TLG had a "supportive role" in the Merger and that Bowater hired other firms "to perform the investment banking services necessary to execute a merger of two large multi-national companies with a combined enterprise value of $7 billion." (Cross-Motion at 5). According to the Claims Agent, "[A]ll of the work described by TLG [in its motion] is consistent with the provision of strategic and financial advisory services under clause (1) of the Preamble, for which TLG was paid $100,000 per month." (Cross-Motion at 6). TLG, however, characterizes its services as "participat[ing] in the principal meetings and perform[ing] detailed analyses at Bowater's directive pertaining to the Abitibi transaction" including "enterprise and equity valuation, the potential impact on shareholder value of anti-trust divestitures, analysis of potential transaction synergies, respective share ownership in the new entity and preparation for due diligence and post-transaction integration." (Motion ¶ 16).

[7] Cross-Motion, Ex. B at 48:3-8.

Goldman Sachs & Company and UBS Investment Bank as financial advisors for the Merger while the Engagement Agreement with TLG was in effect.[8]

In January 2007, William Levin, managing director and owner of TLG, sent an email to David Paterson, Chief Executive Officer of Bowater, discussing a new agreement to replace the Engagement Agreement, which was set to expire at the end of that month, and adding: "[W]e would like to review the understaning [*sic*] regarding our fee agreement in the event [the Merger] closes."[9] By letter dated March 27, 2007, Ronald J. Lindsay, Executive Vice President, General Counsel and Secretary of Bowater, responded to Levin, advising of Bowater's position that TLG was not entitled to a 2% transaction fee for work on the Merger because, in part, the Merger was never identified in writing as a Transaction subject to paragraph 2(b) of the Engagement Agreement.[10]

On April 16, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. On November 11, 2009, TLG filed a proof of claim against Bowater requesting payment of 2% of the enterprise value of the Merger transaction, a fee of $88 million, and for breach of the Engagement Agreement.[11] The Debtors filed an objection to the proof of claim on September 21, 2010. (D.I. 3374).

On February 18, 2011, TLG served a subpoena to depose Mr. Lindsay. Mr. Lindsay and the Claims Agent filed an Objection and Motion to Quash Subpoena in the United States

---

[8] The Securities and Exchange Commission Form S-4 Registration Statement for Abitibibowater, Inc., filed March 19, 2007, stated, in part, that: "In conjunction with its consideration of its strategic alternatives, Bowater began consulting with outside financial and legal advisors. Bowater's financial advisors in connection with overall consideration of various strategic alternatives during the latter half of 2006 were Goldman Sachs and The Levin Group, LLP. In addition, Bowater engaged UBS to act as an additional financial advisor in connection with the potential Abitibi transaction due in large measure to the firm's familiarity with both companies and the advice it rendered during Bowater's initial consideration of a transaction with Abitibi in July 2006." Motion, Ex. 3 at 66.

[9] Cross-Motion, Ex. G.

[10] Motion, Ex. 7.

[11] Proof of Claim No. 3455. Cross-Motion, Ex. H.

Bankruptcy Court, District of South Carolina.[12] On March 15, 2011, Judge Waites of the United States Bankruptcy Court, District of South Carolina, entered an Order deferring any decision on the subpoena and motion to quash subpoena, writing:

> It appearing to the Court that since the Delaware Court is the proper court to make determinations regarding the engagement agreement at issue and the allowance or disallowance of extrinsic evidence beyond the agreement may control the need for the deposition at issue, this Court has requested that counsel for The Levin Group seek a determination by the Delaware Court regarding whether evidence beyond the express language of such agreement may be permissible to indicate the meaning or intent of its terms.[13]

Following Judge Waites' Order, TLG filed the Motion and the Claims Agent responded by filing the Cross-Motion. TLG filed its reply on June 15, 2011. (D.I. 4642). Oral argument was held before this Court on June 23, 2011.

## II. Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materiality "is determined by the substantive law," and a dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Id*. at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

---

[12] Motion, Ex. 8.

[13] Motion, Ex. 9.

The moving party always bears the burden of establishing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") (citing Rule 56). Where the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden ... by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n. 5 (3d Cir.1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment, cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn–Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D.Pa.1997) (citation omitted), *aff'd,* 189 F.3d 464 (3d Cir.1999), or by relying on "conclusory allegations, improbable inferences, and unsupported speculation." *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir.1996). Rather, the nonmoving party must point to specific evidence of record that demonstrates a genuine issue for trial. *Celotex,* 477 U.S. at 324.

## III. <u>Discussion: 2(b) or not 2(b)? That is the question.</u>

It is undisputed that the Engagement Agreement is governed by South Carolina law.[14] Under South Carolina law,

---

[14] Motion, Ex. 1, Engagement Agreement ¶ 7(a).

> The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language. Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect. A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause. It is a question of law for the court whether the language of a contract is ambiguous.

*McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009) (internal citations omitted). "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Farr v. Duke Power Co.*, 265 S.C. 356, 362, 218 S.E.2d 431, 433-34 (1975) (citing *Carolina Ceramics, Inc. v. Carolina Pipeline Co.*, 251 S.C. 151, 161 S.E.2d 179 (1968)). "Common sense and good faith are the leading touchstones of the inquiry." *Farr*, 218 S.E.2d at 434.

TLG maintains that the plain meaning of the Engagement Agreement provides is that if TLG performed transaction-related services in *any* transaction, pursuant to the written direction of Bowater, then TLG was entitled to receive the 2% fee if that transaction closed. If any such transaction did not close, then TLG would be paid only the $100,000 per month advisory fee. TLG argues that an absurd result follows if the contract is read to allow Bowater to decide on a case-by-case basis when a transaction qualifies for the 2% fee, as doing so would grant Bowater an unfair advantage over TLG because Bowater could demand that TLG perform transaction-related services on a full-time basis with no right to receive a transaction fee if the transaction closed.

The Claims Agent contends that the Engagement Agreement states clearly that TLG was entitled to a 2% fee only for transactions specifically identified in writing by Bowater as "transactions subject to paragraph 2(b)." Because the Merger was never identified in writing as such a transaction, the Claims Agent argues that TLG is not entitled to the 2% transaction fee. The Claims Agent notes that TLG received its monthly fee of $100,000 for work performed on

transactions (such as the Merger) that were not designated as "Transactions" subject to paragraph 2(b).

(a) <u>The contract language</u>

The phrase in dispute, located in the preamble to the Engagement Agreement, provides that Bowater retained TLG:

> (i)to be a strategic and financial advisor to Bowater, and (2) [*sic*] ***to review certain potential acquisitions and divestitures as specifically identified by Bowater to TLG in writing as a transaction subject to Paragraph 2(b) below*** (such potential acquisitions and divestitures referred to herein individually as a "Transaction.").[15]

TLG argues that the clauses in the preamble are "interchangeable" and are meant to clarify that a potential transaction fee of 2% was due if TLG performed services on a transaction that closed.[16] TLG asserts that the description of Transaction-related services in paragraph 1(a) through (d) loses its meaning if the preamble allows Bowater to ask TLG to perform these services solely in return for the $100,000 monthly advisory fee. TLG also asserts that the Claims Agent "invents" new contract language to conclude that the Engagement Agreement requires TLG to perform "general" services for the monthly advisory fee and reserves a 2% transaction fee only when TLG was asked specifically by Bowater "to run" a transaction.

I disagree with TLG's reading of the plain language of the Engagement Agreement. The preamble, when read in its entirety, provides that certain potential acquisitions and divestitures become defined "Transactions" when "specifically identified by Bowater to TLG in writing as a transaction subject to Paragraph 2(b)." To interpret the Engagement Agreement as does TLG, the phrase "as a transaction subject to Paragraph 2(b) below" must be ignored.

---

[15] Motion, Ex. 1 (emphasis added).
[16] Oral Arg. Tr. at 8:2.

Moreover, there is no need to "invent" new language to conclude that the Engagement Agreement anticipates that TLG will provide both (i) strategic and financial advisor services, and (ii) services related to specified "Transactions." The agreement states this plainly in the preamble. Paragraph 1, entitled "Services," provides that TLG's strategic and financial advisor services will include, *if appropriate*, services related to specified Transactions, as detailed in subsections (a) through (d). Those subsections do not lose their meaning if Bowater does not designate a transaction as a "Transaction." Further, the handwritten addition (initialed by both parties) in Paragraph 2, entitled "Fees," indicates - - unambiguously - - the parties' agreement that TLG would provide both "strategic and financial advisory [services and] services related to a Transaction . . . ."[17]

(b) <u>"Absurd Result"</u>

Both parties also argue that the other's interpretation of the Engagement Agreement language leads to an "absurd result." When parties assert different interpretations of the same language, and "one construction makes the provisions unusual or extraordinary while another construction, which is equally consistent with the language employed, would make it reasonable, fair and just, the latter construction must prevail." *Popocar Enterprises By & Through Fin. Mgmt. Corp. v. McGowan*, 300 S.C. 178, 181, 386 S.E.2d 795, 797 (Ct. App. 1989) (citing *C.A.N. Enterprises, Inc. v. S.C. Health and Human Services Finance Comm.*, 296 S.C. 373, 373 S.E.2d 584, 586 (1988)). *See also Farr*, 265 S.C. at 362, 218 S.E.2d at 434.

TLG argues that the Claims Agent's interpretation is absurd because it would give Bowater the power to require TLG to perform lengthy and valuable Transaction-related services "for an illusory benefit." I do not agree that it is unreasonable to permit Bowater to identify the

---

[17] The bracketed words were handwritten in the Engagement Agreement and initialed by the executing parties. *See* n.4, *supra.*

transactions that will be subject to the 2% fee. Furthermore, I do not agree that the Engagement Agreement provided no alternative to TLG if it believed Bowater unfairly requested excessive services for the monthly fee, because either party had the right to terminate the Engagement Agreement at any time upon thirty days written notice.[18]

Bowater retained two large investment banks, Goldman Sachs & Co. and UBS Investment Bank, to provide investment banking services for the Merger, including, among other things, meeting with the Bowater Board of Directors to advise them on critical matters related to the Merger and the issuance of "fairness opinions" regarding the amount of consideration that would be paid to Bowater shareholders in the Merger.[19] For their work on the Merger, Goldman Sachs and UBS were paid a combined fee of approximately $20 million.[20] TLG's interpretation of the Engagement Agreement would result in payment of an $88 million fee to TLG for work on the same project. This would be an absurd result.

**IV. <u>Conclusion</u>**

Applying South Carolina law, I conclude that the Engagement Agreement is not ambiguous. TLG was to provide strategic and financial advisory services in return for monthly payments and Transaction-related services for transactions that were specifically designated, in writing, by Bowater as being subject to the 2% transaction fee. Because the Merger was not designated by Bowater in writing as "a transaction subject to paragraph 2(b)," TLG's work on the Merger was not subject to the 2% transaction fee. The Claims Agent's interpretation of the Engagement Agreement squares with South Carolina law and produces the only reasonable reading of the Engagement Agreement.

---

[18] Motion, Ex. 1 Engagement Agreement ¶6.
[19] Motion, Ex. 3 at 457-462. Cross-Motion, Ex. C, ¶13.
[20] Cross-Motion, Ex. C, ¶13

With respect to the Claims Agent's Cross-Motion for summary judgment, the Claims Agent has met its burden, as the moving party, of establishing the absence of a genuine dispute as to any material fact. TLG argues that there is a wealth of correspondence and other documents exchanged between TLG and Bowater relating to TLG's services performed in connection with the Merger. TLG points to emails, a signed confidentiality agreement, and reports prepared by TLG as evidence of Bowater's written requests that TLG perform services related to the Merger.[21] However, TLG has not provided any evidence that Bowater designated, in writing, that the Merger was "a transaction subject to Paragraph 2(b)." Therefore, the Claims Agent's Cross-Motion will be granted.

For the foregoing reasons, the Court will deny TLG's motion for an order confirming the unambiguous meaning of the Engagement Agreement and grant the Claims Agent's Cross-Motion for summary judgment. An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: December 12, 2012

[21] *See* TLG Response to the Debtors' Objection to Claim No. 3455 (D.I. 3587), Exs. B, C, D, E, and F.